Stacey Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
Connie K. Chan (SBN 284230)
Colin Clemente Jones (SBN 354301)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
(415) 421-7151
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com
cchan@altber.com
cjones@altber.com

*Attorneys for Plaintiffs*

Norman L. Eisen*
Tianna Mays*
Pooja Chaudhuri (SBN 314847)
Jacob Kovacs-Goodman*
Elizabeth Westphal*
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Ave. SE #15180
Washington, DC 20003 (202) 601-8678
(202) 601-8678
norman@democracydefenders.org
tianna@democracydefenders.org
pooja@democracydefenders.org
jacob@democracydefenders.org
elizabeth-contract@democracydefenders

*Attorneys for Plaintiffs*

* *Pro Hac Vice application forthcoming*

[Additional counsel and affiliations listed on signature page]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO; AMERICAN FEDERATION OF STATE COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO; LEAGUE OF UNITED LATIN AMERICAN CITIZENS; NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE; TODD BLANCHE, in his official capacity as Attorney General; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1. This case involves unprecedented and unlawful threats by federal government officials to state and local election workers, which significantly risk interfering with the lawful administration of the ongoing 2026 midterm elections and the counting of ballots in accordance with federal and state law. The threats, intimidation, and coercion are rapidly escalating as Election Day approaches, and are likely to continue well after Election Day as the state and local officials perform the work required by law to tabulate and certify the results of this election.

2. Federal government officials, including high-ranking officials at the Department of Justice ("USDOJ") and Department of Homeland Security ("DHS"), have engaged in a coordinated campaign to intimidate, threaten, and coerce state and local officials and employees who are engaged in the hard and important work of administering the ongoing midterm 2026 election. Specifically, Defendants have threatened the criminal prosecution of state and local election workers if they process and count ballots using procedures required by federal and state law. They have directed these threats to any and all election workers who process any ballot cast by lawfully registered voters who Defendants have claimed at the eleventh hour, through extremely flawed methods, might be non-citizens. And they have initiated a criminal investigation into county officials including issuing grand jury subpoenas.

3. Defendants have already begun following through on their threats. Most recently, earlier today, October 29, 2026, USDOJ directed federal prosecutors to pursue criminal subpoenas of state and local election officials in California, supposedly for their role in facilitating allegedly unlawful votes. This USDOJ directive followed a federal district court's rejection of USDOJ's request for injunctive relief forcing state and county officials to segregate the ballots of voters Defendants have identified using unreliable methods as supposedly and potentially unlawful.

4. While Defendants have claimed that their actions will only prevent voting by individuals who may potentially not be citizens, the purpose and effect of the USDOJ and DHS threats and intimidation is to coerce election workers to stop processing and counting ballots cast

by lawfully registered voters. These actions reflect a coordinated USDOJ and DHS plan months in the making, as those agencies obtained data from obscure and insecure sources, augmented and enhanced that data through analytics and commercially available AI of questionable reliability, and used that data to target election workers with real and tangible threats. This plan by USDOJ and DHS officials has manifested in targeting state and county election officials and employees with threats of criminal investigation and prosecution in order to coerce them into halting the processing and counting of ballots, which will interfere with election administration and disenfranchise lawful voters.

5. The roots of the current plan and implementing actions are grounded in Executive Orders issued by the President in 2025 and 2026 directing officials in his administration to interfere with election administration. In particular, in March 2026, President Trump issued Executive Order 14,399, "Ensuring Citizenship Verification and Integrity in Federal Elections." Executive Order No. 14,399, 91 Fed. Reg. 17125 (Mar. 31, 2026) (the "2026 Elections EO"). In that Order the President instructed the Attorney General to "prioritize the investigation and, as appropriate, the *prosecution of State and local officials or any others involved in the administration of Federal elections* who issue Federal ballots to individuals not eligible to vote in a Federal election." No prior Executive Order has ever threatened criminal prosecution for election workers who comply with federal and state law in administering elections.

6. High-level officials at USDOJ and DHS heeded this call. Defendants filed dozens of lawsuits across the country seeking to force states to turn over their voter rolls, but their efforts were universally rejected by the federal courts. Throughout this time, USDOJ and DHS officials made escalating threats of criminal prosecution. For example, in July 2026, the head of the USDOJ Civil Rights Division, Assistant Attorney General Harmeet Dhillon, sent letters to the Secretaries of State of all 50 states and the District of Columbia threatening to criminally prosecute local election employees for doing their jobs.

7. In the same timeframe, DHS Secretary Markwayne Mullin sent letters to four states,

including California, identifying thousands of alleged noncitizens on the rolls, based on unexplained methods, and threatened “prison time” to election workers who processed ballots. The states correctly responded with questions, that neither USDOJ nor DHS answered.

8. As the 2026 midterm election approached, and in recent weeks and days, as states and counties began administering the election, Defendants’ efforts escalated dramatically. Defendants sent states and counties new lists of names of voters whom Defendants assert are registered to vote but “likely” ineligible non-citizens. These lists have proven to be unreliable, but USDOJ has repeatedly claimed the letters regarding these DHS lists put election officials and workers “on notice” for aiding and abetting liability, and threaten that any state or local election officials and employees who issue or tabulate the ballots of those individuals will face criminal prosecution.

9. Defendants first aimed their threats at the thousands of dedicated election workers in California. Weeks after California sent mail ballots to registered voters, Defendants sent October 13, 2026 letters demanding that the California Secretary of State and Los Angeles County Registrar of Voters sequester the ballots of approximately 20,000 registered California voters whom Defendants “believe” are “likely” non-citizens. The letters were accompanied by threats that any election worker who processed these ballots could be prosecuted for aiding and abetting, for helping the (allegedly) unlawful voter. The President jumped in online to express his support for these tactics, referring to elections officials: “They will all go to jail for a long period of time!!!”[1]

10. After the State and Los Angeles County refused to accede to Defendants’ demands, Defendants promptly sued them, resulting in ongoing litigation in another district. *United States v. California*, C.D. Cal. Case No. 26-cv-12025-DOC-ADS. While Defendants’ lawsuit against

[1] https://truthsocial.com/@realDonaldTrump/117453415283228242 (Truth Social post); Ward, *Trump threatens California officials with imprisonment over stance on mail ballots* (Oct. 16, 2026) https://www.reuters.com/world/us/trump-threatens-california-officials-with-imprisonment-over-stance-mail-ballots-2026-10-17/.

California and Los Angeles County was pending, Defendants further escalated and increased their pressure on state and local officials and employees.

11. On October 23, 2026, USDOJ delivered threatening letters to county officials and employees across California, including delivery by armed DHS officers. Those letters again threatened criminal prosecution of any election worker who participated in processing a ballot cast by a voter whom Defendants allege is ineligible to vote. Defendants went so far as to assert that the letter and accompanying list of names put all county election workers on notice that lawfully-registered voters on Defendants' lists were ineligible such that election workers could be prosecuted under an aiding and abetting theory of liability—again, simply for doing their jobs in compliance with federal and state laws and regulations, and indeed, the U.S. Constitution.

12. During the same time period, USDOJ opened a criminal investigation into county elections officials and issued federal grand jury subpoenas pursuant to that investigation. Federal marshals served at least one local official at home even though that employee had been previously served at their place of work.[2]

13. On October 26, 2026, Defendants sent a similar letter to the State of Washington identifying potential non-citizens and demanding that the Washington Secretary of State halt the processing of ballots. Other USDOJ officials, including in California and Texas, have amplified and repeated the threats of criminal prosecution of election workers, for performing their jobs of administering this election in compliance with applicable state and federal laws.

14. The same day this Complaint is filed, October 29, 2026, it was publicly reported that DOJ directed federal prosecutors to pursue criminal subpoenas of state and local election

[2] Devlin Barrett and Shawn Hubler, *Justice Dept. Pressures California With Expanded Election Investigation*, N.Y.T. (Oct. 29, 2026), https://www.nytimes.com/2026/10/29/us/trump-doj-california-voter-rolls-midterms.html?unlocked_article_code=1.MVE.QVlR.OCk8vA2Dtun5&smid=url-share.

officials in California, supposedly for facilitating unlawful voting.[3] This directive issued the day after a federal district court's rejection, in *United States v. California*, of USDOJ's request for injunctive relief forcing state and county officials to segregate the ballots of voters Defendants have identified as, in USDOJ's view, supposedly and potentially unlawful, and its admonition that any threats should stop. __ F.Supp.3d __, 2026 WL 3252428 (Oct. 28, 2026). Pursuant to that directive, USDOJ initiated a criminal investigation and issued grand jury subpoenas

15. Defendants' threats to criminally prosecute election workers and initiate criminal investigations show no signs of abating. And since Defendants have never revealed the source of their voter data or the systems they used to identify suspected non-citizens, nothing prevents them from continuing to issue new and expanding lists of ballots to be sequestered and ultimately disqualified, to election workers in any State, accompanied by more threats to prosecute or additional actual prosecutions. These actions threaten to disenfranchise tens if not hundreds of thousands of lawful voters..

16. These actions are profoundly unlawful. Section 11(b) of the Voting Rights Act of 1965, 52 U.S.C. § 10307(b), expressly prohibits all persons from actually or attempting to intimidate, threaten, or coerce those who aid others in exercising their right to vote, which includes election workers—a prohibition that Defendants are blatantly violating. Defendants have no statutory authority at all to use threats to interfere with the conduct and administration of elections in the manner required by established federal and state laws. The U.S Constitution grants the authority to establish election rules and to administer elections processes to the States, except where Congress has exercised its authority under the Elections Clause to displace state law. The Executive Branch has no constitutional authority to unilaterally impose elections demands on state officials—and certainly no authority to engage in intimidation, threats, and coercion of local

[3] Ben Penn, *DOJ Orders Criminal Probes of California Officials on Voting*, Bloomberg Law (Oct. 29, 2026), https://news.bloomberglaw.com/us-law-week/doj-orders-criminal-probes-of-california-officials-over-ballots.

election officials for conducting an election in the manner required by federal and state law.

17. Thus, the actions of Defendants in threatening and criminally investigating election workers who do not yield to their demands violate a host of constitutional and statutory provisions, including Section 11(b) of the Voting Rights Act, the Constitution's Elections Clause, Tenth Amendment, and Due Process Clause, as well as the Administrative Procedure Act ("APA"). The use of faulty methods and unreliable data to threaten workers is quintessential arbitrary and capricious agency action in violation of the APA.

18. State and local election officials are hard-working civil servants who seek to faithfully execute their duties to administer free and fair elections in accordance with federal and state law. Threatening these election workers with criminal prosecution for faithfully executing their responsibilities in accordance with federal and state law is plainly illegal and, unless enjoined, risks disenfranchising tens of thousands of lawfully registered voters.

19. Plaintiffs are unions that represent election workers who are the subjects of these threats and nonprofit voting rights organizations representing millions of voters across the country, including those likely to be on Defendants' lists of alleged non-citizens or who fear their name will appear on those lists. These organizations bring this lawsuit to stop this unlawful USDOJ and DHS action and thereby protect the rights of their members. Plaintiffs respectfully request that the Court issue declaratory and injunctive relief that will stop Defendants from continuing to attempt to intimidate, threaten, and coerce election workers who are performing their lawful duties.

## JURISDICTION AND VENUE

20. This Court has jurisdiction pursuant to 28 U.S.C. §1331. This Court also has jurisdiction under 28 U.S.C. §1346(a)(2) because the defendants are U.S. officials, and under 28 U.S.C. §1343(a)(4) because this action seeks "relief under an[] Act of Congress providing for the protection of … the right to vote."

21. Venue is appropriate in this district under 28 U.S.C. §1391(e). Plaintiffs Service Employees International Union ("SEIU") and American Federation of State County and Municipal

Employees ("AFSCME") represent county employees (including those who work in election administration) whose place of employment is within the Northern District of California, and who have been subject to the acts of intimidation, threats, and coercion at issue in this case. Plaintiffs League of United Latin American Citizens ("LULAC") and National Association for the Advancement of Colored People ("NAACP") have members who are registered voters and reside in the Northern District of California. Based on the locations of these Plaintiffs and their members, intradistrict assignment is appropriate in the San Francisco/Oakland division of this Court.

**PARTIES**

22. Plaintiff SEIU is a labor organization of approximately two million working people united by the belief in the dignity and worth of workers and the services they provide. SEIU's members work in healthcare, the public sector, and property services. SEIU has more than 150 affiliates across the United States, Canada, and Puerto Rico, and is headquartered at 1800 Massachusetts Ave., N.W., Washington, D.C. 20036. SEIU, together with its local affiliates, represents approximately 3,500 election workers in at least nine states: California, Colorado, Illinois, Maine, Massachusetts, Nevada, New York, Pennsylvania, and Virginia. These members work for state and local election authorities and their responsibilities include receiving, opening, and processing voted ballots; providing verification support; reviewing and tallying write-in votes in accordance with election laws and regulations; inspecting and preparing ballots for computer processing; operating ballot-scanning equipment; and organizing, securely storing, and tracking processed ballots. SEIU also represents registered voters whose right to vote is threatened by Defendants' actions. SEIU, together with local affiliates, represents more than 200,000 members in the Northern District of California, including election workers who live and work in this District as well as registered voters in this District. SEIU is proceeding on a representative basis, based on injury to the workers they represent and their members who are registered voters.

23. Plaintiff AFSCME is a labor organization and unincorporated association headquartered at 1625 L Street, N.W., Washington, D.C. 20036. AFSCME is the largest trade

union of public employees in the United States, with 1.4 million members organized into approximately 3,400 local unions, 58 councils and other affiliates in 46 states, the District of Columbia, and Puerto Rico. AFSCME members include state and local government election workers responsible for providing election administration services in furtherance of free and fair elections in states across the country, including but not limited to Arizona, California, Texas, and Washington. AFSCME also represents registered voters whose right to vote is threatened by Defendants' actions. AFSCME, together with its local affiliates, represents election workers who live and work in this District as well as registered voters in this District. AFSCME is proceeding on a representative basis, based on injury to the workers they represent.

24. Together, Plaintiffs SEIU and AFSCME are the "Union Plaintiffs."

25. Plaintiff LULAC is the largest and oldest Latino civil rights organization in the United States. Established in 1929 and headquartered in Washington, D.C., LULAC is a nationwide, non-profit, nonpartisan, membership-based organization with more than 400 councils (local chapters) and over 800,000 members, with members in every state in the country. LULAC uses local community-based programming to advance the voting rights, economic conditions, educational attainment, and health outcomes of the Hispanic community. LULAC's voting rights work includes educational initiatives, voter registration drives, get-out-the-vote campaigns, and community events around critical issues. In California, LULAC has more than 34 councils and over 55,000 members, including members who live in this District. More than 80 percent of these members are registered to vote.

26. Plaintiff NAACP is the oldest civil rights organization in the country. The NAACP has been at the forefront of fighting against racial discrimination in voting and fighting for the rights of its members and those of all lawfully registered U.S. citizens to cast ballots and have those ballots counted. Nationwide, the NAACP has approximately 200,000 formal members, including approximately 12,000 in California, many of whom are registered voters in the District. Consistent with its mission, the NAACP operates longstanding voter-registration, voter-assistance,

mail-voting, and election protection programs. Its network of state conferences, local branches, college chapters, prison chapters, and youth councils conducts voter-registration drives, canvassing, voter contact, and election protection work. The NAACP recruited more than 100,000 volunteers for that work before the 2024 election and launched a $20 million GOTV campaign to mobilize 6.5 million Black voters across fourteen states in 2026. Its staff and volunteers assist voters in registering, verifying their registration status, completing mail-ballot and emergency-ballot applications, and addressing barriers to voting.

27. Together, LULAC and NAACP are the “Non-Profit Plaintiffs.” The Non-Profit Plaintiffs are proceeding on their own behalf as an organization, including based on injury to their core mission activities, as well as on a representative or associational basis, based on injury to their members.

28. Defendant United States Department of Justice (“USDOJ”) is a federal agency headquartered in Washington, D.C. USDOJ is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

29. Defendant Todd Blanche is the Attorney General of the United States and is sued in his official capacity as the official in charge of USDOJ and its components relevant to this lawsuit, including the Civil Rights Division and U.S. Attorneys Offices.

30. Defendant United States Department of Homeland Security (“DHS”) is a federal agency headquartered in Washington, D.C. DHS is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

31. Markwayne Mullin is the Secretary of Homeland Security and is sued in his official capacity.

## FACTUAL ALLEGATIONS

### I. The Ongoing 2026 Midterm Election

32. Election Day for the 2026 midterm election is November 3, 2026. Election administration, however, begins well before that day and ends many weeks later, as officials

distribute, collect, process, and count ballots, canvass returns, and certify results.

33. Authority over the time, place, and manner for voting in the United States is assigned by the Constitution to the states, unless and until Congress steps in to regulate an aspect of election administration. In general, that means elections are administered according to the requirements of the state running the election. The tens of thousands of people who administer these elections across the country work for state and local governments. The Plaintiff Unions (SEIU and AFSCME) represent many of these public workers across the country.

34. Well before Election Day, state and local election workers are busy preparing. All states (save North Dakota) and the District of Columbia require voters to register to vote in order to vote in elections. The lists of lawfully registered voters serve an important function, easing the many logistics local officials must handle on and before Election Day to ensure polling places are appropriately staffed and equipped, the correct ballots in sufficient numbers are available, and voters are notified of where and how to vote, among many other tasks. Federal law prohibits bulk removal of individuals from those lists of who is qualified to vote within 90 days of any election (sometimes called "the quiet period"). This is an area where Congress felt strongly enough to step in, to prohibit systematic purges of voter rolls too close to an election out of concern that mistakes during that period could prevent eligible voters from participating.

35. Prior to Election Day, states also send out mail-in ballots. In California, for example, ballots are mailed to all registered voters. Those ballots are returned, and returned ballots are processed and prepared for tabulation. Many states, including California, permit that process to begin prior to Election Day. In addition, many jurisdictions permit early in-person voting, and election workers administer that as well.

36. In at least 48 states, voting has begun in the 2026 midterm elections and is well underway. More than 40 million votes have been cast nationwide as of October 29.[4]

---

[4] See University of Florida Election Lab, *Early Voting National Statistics*, https://election.lab.ufl.edu/early-vote/2026-early-voting/#us.

37. Throughout the voting period, election workers must adhere to detailed requirements for the collection and processing of ballots, which are set forth in state laws. *See, e.g.*, Cal. Code Regs. §§ 20118, 201137-38 (regulating the handling, collecting, and processing of ballots).

38. The responsibilities of election workers expand substantially on Election Day and continue for more than a month following. For example, California law requires ballots to be counted if they are mailed by Election Day and received within 7 days thereafter. *Id.* § 3020.

39. The results of all forms of voting (whether early or on Election Day, by mail or in-person), are tabulated and conveyed to state officials. In California, for example, "immediately upon close of the polls" local elections officials are required to begin the semifinal official canvas and "transmit … official results to the Secretary of State" "at intervals no greater than two hours." Cal. Elec. Code §§ 15150-15151.

40. Every state imposes strict requirements on the methods and security for handling voted ballots, tabulating votes and certifying results, after Election Day, typically requiring extensive work by state and local elections officials for weeks after an election.

41. California's procedures exemplify the amount of work. For ballots to be counted "by means of a voting machine at a polling place or vote center," *id.* §15250, the precinct board "shall immediately lock the voting machine against voting" and "[c]ount the votes cast on voting machines and report the results" publicly, *id.* §15250.5. For ballots to be counted at central counting places, at least two precinct board members must "deliver the ballots, in a sealed container." *Id.* §15202. During counting at central counting places, "[e]ach container of ballots shall be opened and its contents removed," *id.* §15208, and "any ballot that is torn, bent, or otherwise defective shall be corrected" to facilitate automatic counting, *id*. §15210.

42. Should issues arise over the course of ballot processing, California has statutory procedures in place to address challenges to voter eligibility. *See, e.g.*, *id.* §§ 3019(d), 14240, *et*

*seq.*, 15105. These procedures provide opportunities for voters to cure to ensure that eligible voters are not inadvertently disenfranchised.

43. An official canvass must begin no later than the Thursday following the election, and must continue for at least six hours every business day until completed. *Id.* §15301. During the official canvas, to confirm the results of automatic ballot counting machines, local officials are required to conduct a "public manual tally" of 1 percent of the votes tabulated by machine. *Id.* § 15360.

44. This official canvass includes (a) an inspection of all "materials and supplies," ballot statements, and voter rosters; (b) a reconciliation of the number of signatures on the roster and "the number of ballots counted, spoiled, canceled, or invalidated" with the number of votes recorded; and (3) a count of any vote-by-mail or provisional ballots not counted in the semifinal official canvas. *Id.* §15302. If automated ballot counting is used, election workers must also conduct a public, manual count of 1 percent of the votes cast to identify and resolve any irregularities with the machine count. *Id.* § 15360.

45. After ballots are counted, they are placed in boxes, which are then sealed. *Id.* §15370. The sealed boxes holding the ballots cannot be opened except under limited circumstances, such as recounts. *Id.* The "package containing the voted ballots" cannot "be taken from the custody of the elections official," even in the event of "a contest or . . . criminal prosecution." *Id.* §15551.

46. The automatic tabulation, resolution of challenges to ballots, reconciliation, and manual tally of ballots must happen within 30 days of Election Day so that elections officials may "prepare a certified statement of the results of the election" by the statutory deadline. *Id.* §15372. In turn, the Secretary of State must certify statewide results within 38 days of the election. *Id.* §15501(b).

47. Each State has similarly detailed procedures laid out in statutes and regulations that govern how election workers must administer elections. And each law requires election workers to

process hundreds of thousands or millions of ballots within a short period of time, with unfailing accuracy and fairness, and under public scrutiny, all while adhering to strict chain of custody requirements.

48. This important work is performed in the service of the public and our democracy, by tens of thousands of dedicated civil servants who work on election administration in every state. As a result of USDOJ and DHS's actions, in particular USDOJ's issuance of threating letters to state and local officials and now issuance of criminal subpoenas to election officials in California, elections workers across the country are now living in fear that they may be criminally prosecuted simply for doing their jobs. Election workers, so crucial to the functioning of our democracy, are caught in the crosshairs.

## II. Defendants' Campaign of Threating Election Workers and Officials

### A. Origins of the Administration's Attempt to Use Lists of Purported Noncitizens to Interfere with State and Local Administration of Elections

49. The current federal administration's policy and practice of issuing threats and intimidation to workers to prevent voting by individuals on the administration's eleventh-hour lists of purported non-citizens has its roots in two recent Executive Orders pertaining to election "integrity."

50. Notwithstanding the Executive Branch's lack of a constitutional and statutory role in the administration of elections by the states, on March 25, 2025, the President signed an Executive Order directing federal agencies to take various actions related to the administration of federal elections, including prioritizing the "investigation and prosecution of election crimes." Executive Order No. 14,248, § 5(a), *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14005 (Mar. 25, 2025) (the "2025 Elections EO"). In that Order, the President directed the Attorney General to "prioritize enforcement of Federal election integrity laws" in states that "are unwilling to enter into such an information sharing agreement or refuse to cooperate in investigations and prosecutions of election crimes." *Id.*

51. Soon thereafter, USDOJ began exploring the mechanisms for prosecuting state and local election officials and workers.[5]

52. USDOJ's Civil Rights Division also contacted nearly every state and the District of Columbia to demand their complete Confidential Voter Lists, including sensitive personally identifiable information ("PII"). At least 48 states and Washington D.C. have received requests for their complete voter registration lists. Most states have provided a publicly available version (which does not include Social Security numbers or driver's license numbers) or have not provided the voter registration lists at all.[6]

53. USDOJ's Criminal Division also sent its own emails and letters to election officials in at least 12 states, requesting meetings to discuss an "information-sharing agreement" for the purpose of implementing the 2025 Elections EO.[7] The involvement of the Criminal Division signaled from the outset that the data demands were linked to plans for criminal prosecution, not a good-faith effort to assist with voter list maintenance.

54. When the states did not comply by handing over unredacted voter files, USDOJ began suing states for their confidential voter files. USDOJ has sued 30 states and Washington D.C. for refusing to provide their statewide voter registration lists with driver's license and Social Security numbers, and lost every single case in which a decision has been rendered.[8] *E.g. United States v. Weber*, 816 F. Supp. 3d 1168, 1195–96 (C.D. Cal. 2026). As Judge Carter of the Central District of California explained:

"The Department of Justice seeks to use civil rights legislation which was enacted for

---

[5] https://www.nytimes.com/2025/07/02/us/politics/justice-department-election-data.html

[6] Brennan Center for Justice, Tracker: Justice Department Requests for Voter Information, https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information

[7] *See*, *e.g.*, Email from Scott Laragy, Principal Deputy Director of the Executive Office for U.S. Att'ys, and Paul Hayden, Senior Counsel at the Dept. of Justice Criminal Division, to Stephanie Thomas, Sec'y of State of Conn. (July 10, 2025), https://perma.cc/5ZC9-AD6P.

[8] Tracker, https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information.

> an entirely different purpose to amass and retain an unprecedented amount of confidential voter data. This effort goes far beyond what Congress intended when it passed the underlying legislation. The centralization of this information by the federal government would have a chilling effect on voter registration which would inevitably lead to decreasing voter turnout as voters fear that their information is being used for some inappropriate or unlawful purpose. This risk threatens the right to vote which is the cornerstone of American democracy."

*Id.* at 1195-96.

55. Pursuant to the 2025 Executive Order, DHS also expanded the Systematic Alien Verification for Entitlements ("SAVE") program. Previously a limited tool primarily for confirming eligibility for certain public benefits, DHS's overhaul haphazardly linked SAVE to the Social Security database and state voter files in a deeply flawed effort to identify noncitizens registered to vote. The agency actions underlying DHS's modifications to and use of the expanded SAVE system were vacated in June 2026, *League of Women Voters v. U.S. Dep't of Homeland Sec.*, 835 F.Supp.3d 79, 138 (D.D.C. 2026), and the order of the district court was stayed pending appeal on September 25, *Dep't of Homeland Sec. v. League of Women Voters*, No. 26A308, 2026 WL 2879700 (U.S. Sept. 25, 2026) (per curiam).

56. While the SAVE program was enjoined, DHS pivoted to using other methods to compile its own voter and citizenship lists, including misrepresentations to states to obtain voter information and using information "brought in through supplemental magic," which, on information and belief, refers to generative artificial intelligence.[9] Those methods likewise have been enjoined. *Common Cause v. U.S. Dep't of Justice*, No. CV 26-1352 (SLS), 2026 WL 3033772, at *6 (D.D.C. Oct. 9, 2026).

57. On March 31, 2026, President Trump signed another Executive Order aimed at "Ensuring Citizenship Verification and Integrity in Federal Elections." Executive Order No.

[9] Senator Padilla, *Whistleblower Letter to Secretary Mullin* (Sept. 3, 2026), https://www.padilla.senate.gov/wp-content/uploads/09.13.26-Senate-Whistleblower-Letter-DHS-USCIS_combined_signed.pdf.

14,399, 91 Fed. Reg. 17125 (Mar. 31, 2026) (the "2026 Elections EO"). There are two major focuses of the 2026 Elections EO: (1) mail voting and (2) citizenship verification.

58. The 2026 Elections EO, among other things, directs the Secretary of Homeland Security to compile a "list of individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State," defined as the "State Citizenship List." *Id.*, §2(a). The 2026 Elections EO directed DHS to compile these lists from various federal databases, including the Social Security Administration, and send those lists to states before every federal election. These databases are widely regarded as out-of-date and unreliable, and the use of such a list to identify alleged non-citizens would almost certainly lead to the disenfranchisement of eligible voters. *Id.*

59. To serve the same purposes, the 2026 Elections EO also orders the Attorney General to prosecute state and local election officials and workers. It specifically orders the Attorney General to "prioritize the investigation and, as appropriate, *the prosecution of State and local officials or any others involved in the administration of Federal elections* who issue Federal ballots to individuals not eligible to vote in a Federal election." *Id.*, §2(b). The 2026 Elections EO continues: "Similarly, the Attorney General shall prioritize the investigation and, as appropriate, the prosecution of individuals and public or private entities engaged in, or aiding and abetting, the printing, production, shipment, or distribution of ballots to individuals Who are not eligible to vote in a Federal election." *Id.*

60. Subsequent to the 2026 Executive Order, DHS surged field operations involving armed and at times militarized agents arriving at people's residential doorsteps or vehicles to interrogate them about their voter registration status and eligibility. On September 1, 2026, DHS reportedly issued internal, non-public guidance titled the "Surge Initiative Guidance," instructing HSI to conduct significant field operations targeting individuals, including face-to-face interrogations. The guidance indicates that HSI agents have been surged through at least mid-October in at least nine states: California, Connecticut, Georgia, Missouri, Nevada, New York,

Pennsylvania, Washington, and Wisconsin. This Court, in another case, has enjoined these actions. *California Nurses Assn. v. Mullin*, No. 26-cv-10680-AMO, 2026 WL 3166149, at *10-11 (N.D. Cal. Oct. 21, 2026).

61. All of these unlawful actions by the President, USDOJ and DHS set the stage for the 2026 midterm elections. These presidential directives laid the foundation for later threats to state and local elections officials and workers by the federal officials selected by the President for leadership roles at USDOJ and DHS.

**B. Escalating Threats from USDOJ and DHS to Election Officials**

62. As previously discussed, throughout 2025 and 2026 federal officials sought and were largely unable to obtain voter information from states, in light of the requirements of federal law. At the same time, USDOJ and DHS ramped up their threats aimed at state and local elections officials.

63. For example, on July 7, 2026, USDOJ sent letters to all 50 states and Washington D.C. threatening criminal prosecution of election officials if ballots cast by noncitizens were counted in upcoming elections. The letters were signed by Assistant Attorney General Harmeet K. Dhillon of the USDOJ Civil Rights Division (the official charged with enforcing the civil rights laws *protecting* the right to vote). The letters invoked the Civil Rights Division's authority to "prosecute criminal violations" and threatened that "any election officer, including the chief election officer of the state, who knowingly retains noncitizens on the state's SVRL [State Voter Registration List] or *facilitates noncitizens in receiving and casting ballots*" "could be criminally prosecuted for aiding and abetting" a noncitizen's vote in a federal election.[10]

[10] Rivas, *Trump DOJ threatens election officials with criminal prosecution over noncitizen voting* (July 7, 2026), https://www.democracydocket.com/news-alerts/trump-doj-threatens-election-officials-with-criminal-prosecution/

64. On July 8, AAG Dhillon posted about these letters on the Truth Social platform—warning "*every* state and local election official":


AAGHarmeetDhillon @AAGDhillon · Jul 8

Every state and local election official is on notice – knowingly encouraging noncitizens to vote or conspiring to fraudulently register noncitizens is a federal crime. The @CivilRights Division is ready to help with compliance as American citizens deserve free and fair elections!

65. On July 10, AAG Dhillon continued to amplify the letters and to make threat of criminal prosecution "*to the fullest extent of the law*":


Harmeet K. Dhillon
@harmeet · Jul 10

This week the Civil Rights Division sent letters to all 50 states and DC warning them that knowingly allowing non-citizens to vote is illegal. This @theJusticeDept will prosecute violators to the fullest extent of the law to ensure ONLY Americans vote in our elections.

66. DHS Secretary Mullin echoed these sentiments at a press conference July 17, 2026, threatening state and local election officials with "*prison time*" and committing DHS to "pursue maximum pressure on this." The press conference addressed letters that DHS had sent to four states the day before.[11]

67. Specifically, DHS sent letters to four states claiming that a preliminary review of DHS records indicated thousands to tens of thousands of noncitizens registered to vote:

- California: Secretary of State Shirley Weber, "there may be as many as 190,832 non-citizens registered to vote in California";
- New Jersey: Secretary of State Dale Caldwell, "there may be as many 35,152 as non-citizens registered to vote in New Jersey";
- Nevada: Secretary of State Cisco Aguilar, "there may be as many as 15,903 non-citizens registered to vote in Nevada"; and
- Pennsylvania: Secretary of the Commonwealth Al Schmidt, "there may be as many as 14,576 non-citizens registered to vote in Pennsylvania."

[11] Joffe-Block & Parks, *Trump's claims of 250,000 non-U.S. citizens on voter rolls leave some states baffled*, NPR (July 31, 2026).

68. In the California letter, DHS Secretary Mullin cited "results of a recent analysis of California's publicly available voter registration database information" and added: "As an example, we found 81,336 California registrants for whom the name, date of birth, address[,] and Social Security number match a non-citizen in our files."[12] Secretary Mullin did not explain DHS's methodology or the sources of the data supporting these claims. *Id.*

69. Secretary Mullin demanded that these four Secretaries of State respond within two weeks and "confirm their intentions to collaborate with DHS," but offered no explanation about how DHS determined this list of "potential" non-citizens.[13]

70. California Secretary of State Weber responded to Mullin's letter on July 23, explaining that "California's election officials work every day to maintain accurate voter rolls and ensure that only eligible voters are registered," and expressing "serious doubts about the reliability of [DHS's] data and accuracy of [DHS's] claims, since my office has not shared our statewide voter registration list with DHS or any other federal agency or official." Secretary Weber noted that Secretary Mullin's July 16 letter had provided "no detail whatsoever that my office can use to evaluate the veracity of your allegations."

71. Notably, California requested that DHS respond by August 3 with a "detailed description of the methodology utilized by DHS to identify these allegedly ineligible voters," as well as a "detailed description of how DHS came into possession of the list of registered voters in California." DHS did not provide the requested information.

72. The other three states likewise responded with skepticism and questions regarding DHS's methodologies. For example, on July 29, Nevada Secretary Aguilar requested DHS's data sources, methodology, and legal authority, and asked how and whether DHS distinguished current

---

[12] Mullin, *Letter to Shirley N. Weber* (July 17, 2026), https://californiaglobe.com/wp-content/uploads/2026/07/public-file-letter-california.pdf.

[13] Joffe-Block & Parks, Trump's claims of 250,000 non-U.S. citizens on voter rolls leave some states baffled, NPR (July 31, 2026).

noncitizens from naturalized citizens. He stated Nevada would comply with the NVRA and await further information before any removals. DHS subsequently reduced the number of alleged non-citizens on Nevada's voter rolls to 165. According to reporting by the New York Times, upon investigation, all 165 individuals proved to be citizens.[14]

73. As federal officials' attempts to unlawfully access state records continued, so did the threats. On September 1, 2026, AAG Dhillon again threatened criminal prosecution of state election officials on Truth Social:




74. On September 10, 2026, the New York Times reported that USDOJ had sent threatening letters to at least 30 top election officials warning them not to destroy any records related to the 2024 election.[15]

75. Meanwhile, DHS continued its surge of law enforcement activities aimed at voters. For example, on September 11, 2026, the HSI San Francisco Field Office posted four photos on social media of HSI agents knocking on residential doors, with a statement that HSI in Northern California will "investigate any allegations of noncitizen voting."[16] The public posting of door-knocking images weeks before the election communicates a message to voters, especially naturalized citizens, that registering or voting may bring federal agents to their homes.

---

[14] Nick Corasaniti, *From 16,000 to 185 to Zero: Trump's Claims of Illegal Voting in Nevada Fizzle*, N.Y. Times (Sep. 24, 2026).

[15] *See, e.g.*, Neff, Letter to Utah Lt. Gov. Henderson re: Maintenance of All Election Records (Sept. 4, 2026), https://www.abc4.com/wp-content/uploads/sites/4/2026/09/2026.09.04-DOJ-Letter_8055-1.pdf; https://www.nytimes.com/2026/09/10/us/politics/department-of-justice-election-fraud-states.html

[16] HSINorCal (@HSISanFrancisco), X (Sep. 11, 2026, 18:23 EST), https://perma.cc/AXZ6-J7EG.

**C. Threats to and Investigations of Election Workers During the Ongoing Election**

76. For months leading up to the 2026 midterm elections, USDOJ and DHS were working together on a plan to use lists of individuals alleged to be non-citizens, created using data of secret and questionable origins, augmented by data analytics and commercial AI programs, to threaten state and local officials with criminal prosecution.

77. USDOJ and DHS waited until mid-October 2026 to implement the plan well into the 90-day quiet period under the NVRA. They began implementation by sending to state and local election officials in California and Washington letters making threats intended to intimidate and coerce the action USDOJ demanded: removing these ballots from the processing and counting of ballots.

78. By that time, the election had already begun. On October 1, 2026, California mailed ballots to all registered voters in California in accordance with state law. See Cal. Elec. Code §3000.5. California counties, consistent with California law, processed the ballots they began to receive.[17]

79. In the midst of this election, on October 13, 2026, USDOJ suddenly sent Secretary Weber another letter "Re: Noncitizen Voting in the 2026 Federal Election." The October 13 letter referenced Secretary Mullin's July 16 letter and then demanded that state election administrators review—within 48 hours—a list of approximately 20,000 registered California voters who Mullin and DHS alleged were "likely noncitizens."[18] But USDOJ had not actually provided California with the list.

80. Notwithstanding that oversight, USDOJ demanded that Secretary Weber "review the list within 48 hours to determine whether any citizens are listed." "For individuals whom you cannot independently confirm citizenship status," USDOJ demanded that Secretary Weber "instruct

[17] Decl. of Monica Flores ¶¶ 23-25, ECF 32-4, *United States v. California*, C.D. Cal. Case No. 26-cv-12025-DOC-ADS.

[18] McCotter, *Letter re: Noncitizen Voting in the 2026 Federal Election* (Oct. 13, 2026), https://www.politico.com/f/?id=000001a1-3b6e-dc9a-a9a3-7f7eeb260000.

the appropriate elections official to segregate … those individuals' vote-by-mail ballots until their citizenship status can be determined." The letter further demanded that "If a ballot for any individual on the list has been returned," Secretary Weber "instruct the appropriate election official to not verify the signature and/or tabulate the ballot until citizenship can be determined." Finally, the letter threatened that if Secretary Weber failed to "implement this process" within 48 hours, the United States would "seek immediate relief." *Id.*

81. The list of 20,000 California voters was provided on October 13, 2026 to Los Angeles County, on a thumb drive, with a password written on an attached post-it note—hardly a secure device for the transmission of confidential identifying data.

82. The USDOJ letter that accompanied the thumb drive made similar demands of Los Angeles County to segregate the ballots of those on the list that the County could not confirm were citizens within 48 hours. The letter also demanded that the County withhold in-person ballots from anyone on the list until USDOJ confirmed their citizenship. The letter falsely claimed that allowing non-citizens to vote "cancels" other voters' ballots.

83. According to reports, the thumb drive contained records of registered voters from all over California but provided no location information or source information, and amounted to an "unsubstantiated jumble."[19]

---

[19] Hubler and Nehamas, *California Says D.O.J. System for Identifying Noncitizens Is Sloppy*, N.Y. Times (Oct. 16, 2026).

84. The President weighed in, making a threat of his own. He amplified a social media post stating that Los Angeles County workers could be prosecuted for counting ballots. Referring to elections officials: "*They will all go to jail for a long period of time*!!!"[20]




85. On October 16, 2026, USDOJ responded further to Los Angeles County, expressly threatening the county's workers with criminal prosecution for continuing to process the ballots the federal government wanted to remove. That threatening letter stated:

> Under 18 U.S.C. § 611(a), noncitizens are prohibited from voting in any election involving federal offices. Under 18 USC. § 2, anyone who aids, abets, 'counsels, induces, or procures the commission of a federal offense is equally liable. *If persons knowingly tabulate ballots cast by individuals identified by federal agencies as noncitizens, they risk becoming aiders and abettors to a federal crime.* Your assertion that ballots must be counted simply because California's registration system relies on self-attestation does not relieve election officials of their obligations under federal law when they are on actual notice of noncitizen voting. Nor can state procedures supersede federal criminal statutes.

(Emphasis added).

86. The letter continued: "Administrative difficulty is not a defense to violating federal law or aiding or abetting a federal offense. The Department strongly urges the County and the SOS to reconsider their positions before taking actions that risk significant federal scrutiny and legal exposure."

---

[20] https://truthsocial.com/@realDonaldTrump/117453415283228242 (Truth Social post)

87. Also on October 16, the person ostensibly in charge of the U.S. Attorney's Office in Los Angeles, First Assistant U.S. Attorney for the Central District of California Bill Essayli, wrote on X: "officials who knowingly tabulate unlawful ballots risk aiding and abetting a federal offense." He continued: "@TheJusticeDept urges the County and the Secretary of State to temporarily segregate the flagged ballots pending citizenship verification *or face legal consequences*."[21]


F.A. United States Attorney Bill Essayli
@USAttyEssayli

California on Notice: Federal agencies identified over 20,000 suspected noncitizens registered to vote in California who have already been mailed ballots. Under 18 U.S.C. §§ 611 and 2, officials who knowingly tabulate unlawful ballots risk aiding and abetting a federal offense.
@TheJusticeDept urges the County and the Secretary of State to temporarily segregate the flagged ballots pending citizenship verification or face legal consequences.

88. The second-highest ranking USDOJ official, Acting Deputy Attorney General Trent McCotter, amplified Essayli's threats to elections workers.[22]

89. The next day, McCotter appeared on Fox News and made further threats of criminal prosecution:[23]

McCotter: "If you help someone else commit a federal crime, then you can be guilty. Sure, you didn't do it yourself directly, but you aided and abetted someone. Imagine you walk up to someone, you say I don't think you're a citizen, but here's a ballot, here's a return envelope. Wink, and you let them send it in. You're just as guilty as they are."

Interviewer: "So there is a theoretical world of possibility where you could see an official in California prosecuted, should they aid and abet this?"

McCotter: "We don't want to prejudge any case obviously, especially in the criminal

---

[21] https://x.com/USAttyEssayli/status/2111235463428419898?s=46

[22] https://x.com/PADAGMcCotter/status/2111246336053923891?s=46

[23] Fox News, *DOJ says more than 20k NONCITIZENS are likely on California's voter roles*, at 1:40 (YouTube, Oct. 17, 2026), https://www.youtube.com/watch?v=R3k1doZrzyk.

> area, but it's something they need to keep in mind. Aiding and abetting liability. Well established. Voting illegally. Well established…California cannot keep burying its head in the sand."

90. On October 21, Mr. Essayli was interviewed by Fox News. "When California has actual knowledge of non-citizens in their voter rolls, if they help them vote, they are now aiding and abetting a criminal offense," Essayli said.

91. When California and Los Angeles County did not cede to USDOJ's unsupported demands, the administration sued in the Central District of California. *United States of America v. California*, C.D. Cal. Case No. 2:26-cv-12025-DOC-ADS, 2026 WL 3252428 (C.D. Cal. Oct. 28, 2026). The United States moved for an injunction, attempting to use the courts to force Los Angeles County to remove ballots from processing based solely on federal officials' say-so. On October 28, 2026, the Court rejected that motion in favor of protecting the right to vote and California's ability to run an ongoing election. Id. at *15.

92. Asked whether USDOJ would take action like its California lawsuit against other states, Attorney General Todd Blanche responded that the Department is "looking at" "a number of states."[24]

93. While the Central District of California case was pending, USDOJ escalated its threats to election workers to a new level. On October 23, 2026, USDOJ delivered letters—using uniformed DHS officers—to county officials and employees across California. Each received a subset of the 20,000-name list, along with a demand for compliance with the federal government's demands within 48 hours.

94. As one such county official (from Butte County, CA) explained:

> On Friday October 23rd at approximately 3:30 pm, an individual identifying himself as a Homeland Security Agent hand delivered paperwork to the Clerk-Recorders Office. This agent handed me a Department of Justice demand letter addressed to

[24] Forbes Breaking News, *Todd Blanche Asked Point Blank: Will the DOJ Be Suing Other States Over Alleged Election Issues?*, at 0:12 (YouTube, Oct. 22, 2026), https://www.youtube.com/watch?v=Hw8TXmELL2A

> "Mr. Danlay," two declarations, and a two-page list of names.
> …
> The letter demands that I segregate ballots submitted by the 47 individuals on the list. According to the letter, if I failed to do so DOJ could charge me with federal crimes. I was given 48 hours to comply.[25]

95. The October 23 letters made more explicit threats in an asserted effort to "make unmistakably clear the legal implications" of tabulating ballots cast by certain registered voters. The letters took the position that all election workers were now on "notice" that taking any action to process or count ballots that Defendants had questioned would be facilitating a federal crime: "If persons knowingly tabulate ballots cast by individuals identified by federal agencies as noncitizens, they risk becoming aiders and abettors to a federal crime." The letter concluded: "The Department strongly urges you and your agency to work with the Department of Justice . . . before taking actions that risk significant federal scrutiny and legal exposure." In other words, the letters threatened that doing the work of administering the election in compliance with federal and state laws pertaining to elections would now be prosecuted as a federal crime.

96. Defendants have made clear that they are not done with providing California names of individuals they contend are not citizens. Their letters refer to additional names forthcoming from their collaboration with DHS.

---

[25] *Statement from Keaton Denlay, Butte County Clerk-Recorder/Registrar of Votes* (Oct. 26, 2026), https://www.buttevotes.ca.gov/DocumentCenter/View/4551/Butte-County-Clerk-Recorder-Statement

97. The same day the letters were delivered by armed agents across the State, Mr. Essayli made a statement that "any election official who knowingly processes the ballot of a noncitizen is opening themselves to legal jeopardy."[26] He also posted on X that "We will hold election officials accountable. *No one is above the law*."[27]



F.A. United States Attorney Bill Essayli
@USAttyEssayli

It's simple. California does not verify citizenship status. We did the work for them. We obtained the registered voter list and told them who we believe are noncitizens on their rolls. Knowingly processing noncitizen ballots is a federal crime under 18 U.S.C. §§ 611 and 2. We will hold election officials accountable. No one is above the law.

Sara Libby @SaraLibby · Oct 23
BREAKING: In an escalation from the DOJ, prosecutors sent demand letters to individual registrars across California, giving them 48 hours to sequester the ballots of suspected noncitizen voters. sfchronicle.com/politics/artic...

5:49 PM · Oct 23, 2026 · **235.7K** Views

98. During the same time period, USDOJ opened a criminal investigation into Los Angeles County elections officials, and election officials in at least three other California counties, and issued federal grand jury subpoenas pursuant to that investigation.[28] Federal marshals served at least one local official at home even though that employee had been previously served at their place of work.

[26] Rosenhall and Hubler, *Justice Dept. Demands that California Counties Help Identify Noncitizen Votes* (Oct. 23, 2026), https://www.nytimes.com/2026/10/23/us/justice-dept-california-noncitizen-voters.html

[27] https://x.com/USAttyEssayli/status/2113794933236871180?s=20 (emphasis added).

[28] Libby, *DOJ subpoenas California election officials as part of ballooning voter fraud probes* (Oct. 29, 2026), https://www.sfchronicle.com/politics/article/california-doj-election-subpoenas-22501615.php

99. On October 26, Defendants expanded the threats of unlawful prosecution to the State of Washington.[29] Much like the letter to the California Secretary of State, the USDOJ's letter to the Washington Secretary of State included a list of voters that Defendants deemed likely to be noncitizens. The letter threatened to refer criminal charges to state prosecutors and that Defendants would "seek emergency relief" if Washington election officials failed to promptly comply with Defendants' unlawful demands." Further, the letter made clear that Defendants are not finished providing Washington with names of voters they contend are not citizens.

100. The threats continued. Judge Carter of the Central District of California held a hearing on USDOJ's case against California and Los Angeles County and observed: "*The government reiterated its threat in open court yesterday*, stating that State and County election officials who do not comply with their letter risk federal charges under 18 U.S.C. § 2, which criminalizes aiding and abetting the commission of a criminal offense. The court reiterates what it said yesterday: *these threats must stop*." *United States of America v. California*, C.D. Cal. Case No. 2:26-cv-12025-DOC-ADS, Dkt. 149 at 7 (emphasis added).

101. The threats have not stopped. On October 28, 2026, around the same time the decision issued, Defendants' officials were at it again, posting on X that they "will hold accountable anyone who unlawfully participates in our elections and *those who aid them*."[30]

102. The next day, October 29, 2026, it was reported that DOJ has directed federal prosecutors to pursue criminal subpoenas of state and local election officials in California,

[29] Johnson and Boone, *Trump administration asks Washington to set aside ballots from 400 voters it says may be noncitizens* (Oct. 27, 2026), https://www.ap.org/news-highlights/elections/2026/trump-administration-asks-washington-to-set-aside-ballots-from-400-voters-it-says-may-be-noncitizens/.

[30] https://x.com/usattyessayli/status/2115597868245619035?a=mQS5GITqcYhNBaL0uRE&s=46 (emphasis added).

supposedly for facilitating unlawful votes.[31] The targeted officials have not, as of the time of this filing, been publicly identified.

## III. Defendants' Unlawful Threats to Election Workers Are Causing Irreparable Harm

103. Defendants' unrelenting threats against election workers are causing and, unless enjoined, will continue to cause irreparable harm to election workers and voters nationwide. Election workers nationwide, including those represented by Union Plaintiffs, are being subjected to the looming threat of criminal prosecution simply for performing their responsibilities to process and count ballots cast by lawfully registered voters in accordance with federal and state law. Election workers nationwide have expressed grave concern about the potential for adverse action, including potential criminal prosecution, by the federal government.[32]

104. As public employees bound by state law to carry out their nonpartisan responsibilities, Defendants' intimidation, threats, and coercion attempts force election workers daily to choose between acceding to Defendants' unlawful demands or adhering to their duties and thereby subjecting themselves to a serious risk of criminal investigation and prosecution.

105. The federal government's efforts to intimidate election workers has succeeded before: election workers have quit or retired in droves when subjected to federal government threats.[33] If Defendants' threats—and potentially pending prosecutions—against election workers

[31] Ben Penn, *DOJ Orders Criminal Probes of California Officials on Voting*, Bloomberg Law (Oct. 29, 2026), https://news.bloomberglaw.com/us-law-week/doj-orders-criminal-probes-of-california-officials-over-ballots.

[32] Fausset et al., *The New Worst-Case Scenario for Election Officials: Federal Interference*, (Oct. 27, 2026), https://www.nytimes.com/2026/10/27/us/election-interference-trump-midterms.html (reporting about election officials "bracing for even more unwanted and potentially undemocratic federal intervention").

[33] Izaguirre, *Exodus of election officials raises concerns of partisanship* (June 13, 2021), https://apnews.com/article/election-officials-retire-trump-2020-threats-misinformation-3b810d8b3b3adee2ca409689788b863f.

is allowed to continue, the Union and Non-Profit Plaintiffs will continue to incur significant, irreparable harm.

106. Plaintiff SEIU represents over 3,000 election workers nationwide, in states from California to Virginia. Defendants' repeated attempts to threaten, intimidate, and coerce election workers are causing and, unless enjoined, will continue to cause irreparable harm to SEIU and its members. SEIU's election-worker members are reasonably fearful of Defendants' promise to prosecute election workers who permit alleged non-citizens to vote. Indeed, SEIU elected leaders and members have already been the target of attempted prosecution by the federal government, as federal agents arrested, detained, and charged SEIU local president David Huerta last year—so SEIU takes the Defendants' threat of prosecution seriously.[34] SEIU's election worker members are reasonably concerned about the direct impacts that criminal prosecution would have on their families and their livelihood. And, as leaders in their workplaces, SEIU's election worker members are deeply concerned about the impact that Defendants' threats will have on their colleagues as workers prepare to process ballots on Election Day. SEIU's membership is also deeply concerned about their status as voters potentially impacted by these unlawful threats.

107. Plaintiff AFSCME represents election workers in states across the country, including both California and Washington. AFSCME is aware of Defendants' threats, both formal and informal, to election officials and election workers nationwide. Because AFSCME's election worker members intend to comply with state and federal law governing elections, AFSCME's election worker members are at immediate risk of criminal prosecution by Defendants. AFSCME members are presently being irreparably injured from Defendants' threats and will face further irreparable harm were Defendants to follow through on their threat of unlawful prosecution, as they have already begun to do by issuing criminal subpoenas against election officials in California.

---

[34] Levin, *US justice department dismisses charges against California union leader* (Jul. 27, 2026), https://www.theguardian.com/us-news/2026/jul/27/doj-charges-california-union-leader-david-huerta (Guarding reporting describing arrest of David Huerta for "protesting an immigration raid in Los Angeles last year").

AFSCME members' families, livelihoods, and future opportunities would be significantly burdened by the imposition of a retaliatory criminal charge.

108. As a Latino civil rights advocacy organization invested in advancing the voting rights of the Hispanic community, Plaintiff LULAC will face irreparable harm as a consequence of Defendants' intimidation strategy. Both LULAC and its members are aware of Defendants' actions to coerce state and local election workers to limit ballot processing and disenfranchise voters. If Defendants' threats to criminally prosecute election workers are left unchecked, the disruption to the electoral process will prevent LULAC members from casting their votes and having those votes counted. Moreover, LULAC members are themselves concerned about whether they appear on the DHS/USDOJ lists. If Defendants' election interference efforts are allowed to proceed, LULAC stands to face not only the disenfranchisement of its members, but also the loss of its members' trust in its civic engagement efforts.

109. The NAACP, its members, and the Black communities it serves will likewise face irreparable harm. Black voters, including those from communities the NAACP serves, have faced an extensive history of government intimidation, interference, and threats, including threats of malicious prosecution, for their attempts to exercise the right to vote. Defendants' actions amount to a continuation—indeed, an escalation—of this history, causing understandable fear in Black communities, and likely deterring many from participating in the 2026 elections.

110. Defendants' actions strike at a time-sensitive stage of the electoral process. California is working hard to process its millions of lawfully cast votes in time to determine the results of the election. Federal law imposes critical deadlines on that process. Each State must complete its post-election canvass, resolve any recounts or election contests provided by state law, and certify the winners of its federal congressional races within a compressed period measured in days, so that its duly elected senators and representatives can take office when the new Congress convenes at noon on January 3, 2027. *See, e.g.*, U.S. Const. amend. XX, §1 ("the terms of their successors shall then begin."); 2 U.S.C. §7 (representatives are elected "to the Congress

commencing on the 3d day of January next thereafter"). Defendants strike now in an effort to disrupt California's ability to process its ballots.

111. Defendants are imposing an undefined, subjective, and open-ended re-certification process for thousands of voters, identified at the federal government's choosing. While Defendants claim that they are only *now* demanding that counties segregate these ballots, they are simultaneously threatening criminal prosecution if any of the ballots are *counted*.

112. Defendants' conduct thus threatens the gravest, irreparable harm to Plaintiffs, others, and the structure of the republic mandated by the Constitution.

113. Defendants' conduct will deprive voters (including Plaintiffs) of their fundamental right to participate in our republican system of government by having their lawfully cast ballots counted. The processes by which states accurately and timely counts ballots will be delayed.

114. Defendants' continued implementation of a policy intended to use threats of criminal prosecution to coerce action by state and local election officials in the form of setting aside ballots and disenfranchising voters will do irreparable damage to the rule of law and American democracy.

## <u>CLAIMS FOR RELIEF</u>

### Claim I:
### Intimidation in Violation of Section 11(b) of Voting Rights Act, 52 U.S.C. §10307(b)

114. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

115. Section 11(b) of the Voting Rights Act of 1965 prohibits federal officials from engaging in acts of intimidation directed at election workers. Specifically, Congress directed that "[n]o person, whether acting under color of law or otherwise, shall … intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote." 52 U.S.C. §§10307(b).

116. Defendants have engaged in a policy and practice of intimidating election workers

in states across the country, including but not limited to California and Washington, by threatening them with criminal prosecution, and targeting them for criminal subpoenas, for processing the ballots of duly registered voters whom Defendants have unilaterally declared ineligible to vote without any substantiation of their claims.

117. Defendants' actions attempt to, and do, "intimidate, threaten, and coerce" state and county election officials and workers for "aiding any person to vote or attempt to vote."

118. These actions of Defendants violate the Voting Rights Act, Section 11(b), 52 U.S.C. §10307(b). *See*, *e.g.*, *CNA v. Mullin*, No. 26-CV-10680-AMO, 2026 WL 3166149, at *8 (N.D. Cal. Oct. 21, 2026); *Mich. Welfare Rts. Org. v. Trump*, 642 F.Supp.3d 98, 106-07 (D.D.C. 2022).

**Claim II:**
**Violation of Constitutional Federalism**
**(U.S. Constitution Elections Clause U.S. Const. art. I, §4, cl. 1; Tenth Amendment)**

119. Plaintiffs reallege and incorporate by reference the foregoing allegations as if set forth fully herein.

120. The federalism principles that are fundamental to the U.S. Constitution give the States authority to hold, oversee, and protect the security of elections.

121. The Elections Clause provides that the "Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof," unless Congress "make[s] or alter[s] such Regulations." U.S. Const. art. I, §4, cl. 1. The Supreme Court has recognized that the clause gives States the "authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns." *Roudebush v. Hartke*, 405 U.S. 15, 24 (1972). In other words, the clause by default "invests the States with responsibility for the mechanics of congressional elections." *Foster v. Love*, 522 U.S. 67, 69 (1997); *see also Storer v. Brown*, 415 U.S. 724, 730 (1974).

122. Under the Tenth Amendment, States retain all "powers not delegated to the United

States by the Constitution, nor prohibited by it to the States." The Supreme Court has explained that this provision reflects the desire of the Constitution's Framers to allow "the States to keep for themselves … the power to regulate [state] elections." *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973).

123. The powers the Tenth Amendment reserves to the States include plenary authority over the structure of their governments and control of their officers (except as modified by Congress as to federal elections). *See Gregory v. Ashcroft*, 501 U.S. 452, 460, 462 (1991); *Shelby County v. Holder*, 570 U.S. 529, 543 (2013).

124. Threatening criminal prosecution and initiating criminal investigation of local election officials for performing their work in compliance with federal and state law directly interferes with the ability of States to conduct their elections within their constitutional authority.

125. "Just as it is appropriate for an individual, in a proper case, to invoke separation-of-powers or checks-and-balances constraints, so too may a litigant, in a proper case, challenge a law as enacted in contravention of constitutional principles of federalism." *Bond v. United States*, 564 U.S. 211, 223-24 (2011).

126. Defendants' actions violate the principles of federalism that the Election Clause and the Tenth Amendment protect.

**Claim III:**
**Violation of Due Process**
**(Denial of the Fundamental Right to Vote)**

127. Plaintiffs reallege and incorporate by reference the foregoing allegations as if set forth fully herein.

128. The U.S. Constitution protects the fundamental right to vote in the 2026 midterm elections. That right to vote encompasses the right of lawfully registered voters, including members of Plaintiffs, to cast and have ballots counted. *See United States v. Classic*, 313 U.S. 299, 314-315 (1941).

129. To assess whether government action unconstitutionally burdens the fundamental

right to vote, a court considers "the character and magnitude of the asserted injury to the rights protected by the First and [Fifth] Amendments" and weighs that injury against "the precise interests put forward by the [government] as justifications for the burden imposed by the rule." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *see also Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Bolling v. Sharpe*, 347 U.S. 497 (1954).

130. Defendants' decision to threaten and initiate criminal investigations of elections officials are tied to their demand that election officials set aside tens of thousands of potential ballots, including votes cast by lawfully registered voters, putting a substantial number of voters at risk that their votes will be segregated and not counted. These actions are intended to deprive those voters of their fundamental right to vote in the midterm elections. Defendants' coercive actions are entirely unnecessary and disproportionate to the federal government's asserted interests.

131. The character and magnitude of the burden on the right to vote that Defendants' actions impose is severe. The Ninth Circuit has explained an action imposes a severe burden if it 'significantly impair[s] access to the ballot, stifle[s] core political speech, or dictate[s] electoral outcomes.'" *Chamness v. Bowen*, 722 F.3d 1110, 1116 (9th Cir. 2013). Defendants' actions are aimed at intimidating and coercing elections officials into segregating and ultimately discarding ballots cast by lawfully registered and qualified voters. No burden on the right to vote is more severe than the wholesale failure to count a lawfully cast ballot. *See Saylor*, 322 U.S. at 388. "Having once granted the right to vote on equal terms," the government "may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-105 (2000) (per curiam).

132. Under the *Anderson-Burdick* test, threatened actions that impose a severe burden on the right to vote must be "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434.

133. Defendants have no interest, let alone a compelling one, in threatening election workers with criminal prosecution for complying with the law based on claims of non-citizen

voting. Any asserted interest in investigating alleged criminal offenses could be fully served by materially less restrictive means—including by awaiting the completion of the count and certification before seeking access to election materials that federal law already requires to be preserved. *See* 52 U.S.C. §20701. Defendants' actions are therefore not narrowly tailored to any compelling interest and cannot withstand strict scrutiny. *See Nader v. Brewer*, 531 F.3d 1028, 1040 (9th Cir. 2008).

134. Defendants' threats of unlawful prosecution serve no legitimate governmental purpose. Defendants' actions, including the policy of intimidating and threatening state and county election workers across the country and initiating criminal investigations of election officials, impermissibly burden the right to vote of registered, lawful voters that Defendants have targeted through unreliable, faulty, discriminatory, and unlawful procedures and violates the Due Process Clause's protection of the fundamental right to vote.

**Claim IV:**
**Violation of Due Process**
**(Interference with Right to Fair Elections)**

135. Plaintiffs reallege and incorporate by reference the foregoing allegations as if set forth fully herein.

136. The Due Process Clause of the Fifth Amendment also protects voters' right to participate in fundamentally fair elections. Government action thus violates due process when it "seriously undermine[s] the fundamental fairness of the electoral process." *Duncan v. Poythress*, 657 F.2d 691, 700 (5th Cir. 1981).

137. Consistent with that principle, federal courts distinguish "garden variety election irregularities," which do not violate due process, from conduct reflecting "patent and fundamental unfairness" that pervades the electoral process and works significant disenfranchisement. *Griffin v. Burns*, 570 F.2d 1065, 1076-1078 (1st Cir. 1978); *see also Roe v. Alabama*, 43 F.3d 574, 580 (11th Cir. 1995). Due process concerns arise, for example, where voters rely on established election procedures and official representations regarding those procedures, only to suffer significant

disenfranchisement as a result of subsequent changes to or departures from those procedures. *See Bennett v. Yoshina*, 140 F.3d 1218, 1226-1227 (9th Cir. 1998). Defendants' eleventh-hour demands ask state and local elections officials to alter established elections protocols mid-election, and thereby threaten disenfranchisement.

138. If Defendants' threats are allowed to continue, it would render "the electoral process so deficient as to violate the Due Process Clause" because it would undermine "the very integrity of the electoral process." *Griffin v. North Carolina State Board of Elections*, 781 F.Supp.3d 411, 435 (E.D.N.C. 2025).

139. Plaintiffs' members have and will lawfully cast ballots in reliance on the election procedures established by states, including the procedures governing registration of voters, processing of ballots, and the custody, tabulation, canvass, and certification of ballots by state and local election officials. State election procedures also provide Plaintiffs' members with the opportunity to cure their ballots, ensuring that no members are inadvertently disenfranchised.

140. Defendants' actions interfere with those procedures, by issuing threats intended to coerce a marked departure from the established procedures on which Plaintiffs relied. Defendants threaten to deprive Plaintiffs and other similarly situated voters of a fundamentally fair electoral process.

141. Defendants' unlawful threats of prosecution serve no legitimate governmental purpose.

142. Defendants' actions, including the policy of intimidation and actual threats to state and county election workers across the country, violate the Due Process Clause's protection of the right to fair election procedures.

**Claim V:**
***Ultra Vires* Unlawful and Unconstitutional Governmental Action**

143. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

144. Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official

action that is *ultra vires*.

144. The President has no constitutional authority over States' elections administration.

145. In the absence of any such authority, and for all the reasons set forth in Claims I through IV, the actions of Defendants are contrary to statute and the Constitution and are *ultra vires*.

**Claim VI:**
**Administrative Procedure Act, 5 U.S.C. §706(2)(A)**
**(Action Contrary to Law)**

146. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

147. Defendants are agencies and agency heads subject to the APA. 5 U.S.C. §701.

148. Defendants' unlawful policy and actions interfering with election officials and employees' processing and counting of ballots via intimidation, threats, and coercion of election workers are final agency actions for the purposes of APA review.

149. Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. §706(2)(A).

150. Defendants' policy and actions intimidating, threatening, investigating, and coercing election workers violate federal statutes prohibiting election interference and threats to election officials and workers, and that apply to federal government officials, including but not limited to Section 11(b) of the Voting Rights Act, 52 U.S.C. §10307(b), as set forth in Claim I, as well as the constitutional provisions set forth in Claims II through V.

151. The actions of Defendants therefore violate the APA because they are contrary to law for all these reasons, in violation of 5 U.S.C. §706(2)(A).

**Claim VII:**
**Administrative Procedure Act, 5 U.S.C. §706(2)(C)**
**(Action Exceeding Statutory Authority)**

152. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

153. Defendants are agencies and agency heads subject to the APA. 5 U.S.C. §701.

154. Defendants' unlawful policy and actions interfering with election officials and employees' processing and counting of ballots via intimidation, threats, and coercion of election workers are final agency actions for the purposes of APA review.

155. Under the APA, a court must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." §706()(C).

156. "An agency . . . literally has no power to act . . . unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022). Congress has not granted Defendants any authority to engage in a policy or acts of intimidation, threats and coercion of state and county election officials and employees.

157. State and local election officials and workers are performing their jobs and administering the election in accordance with federal and state law and procedures. Congress has not granted Defendants any authority to demand that state and local election officials and workers refuse to issue, process, and count ballots cast by lawfully registered voters in violation of federal and state law. Defendants' threats are entirely outside any statutory authority, including the authority to investigate federal crimes. The federal agencies that have issued these threats, including USDOJ and DHS, have no authority for these actions.

158. The actions of Defendants therefore violate the APA because they exceed agency authority in violation of 5 U.S.C. §706(2) (C).

**Claim VIII:**
**Administrative Procedure Act, 5 U.S.C. §706(2)(B)**
**(Action Exceeding Constitutional Authority)**

159. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

160. Defendants are agencies and agency heads subject to the APA. 5 U.S.C. §701.

161. Defendants' unlawful policy and actions interfering with election officials and employees' processing and counting of ballots via intimidation, threats, and coercion of election

workers are final agency actions for the purposes of APA review.

162. Under the APA, a court must "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity," *id.* §706(2)(B).

163. For the same reasons discussed above in Claims II through V, Defendants' actions violate the U.S. Constitution, including the Due Process Clause, the Fifth Amendment, the Elections Clause, the Tenth Amendment, and the Equal Protection Clause.

164. The actions of Defendants therefore violate the APA because they are contrary to constitutional right, power, privilege, or immunity in violation of 5 U.S.C. §706(2)(B).

**Claim IX:**
**Administrative Procedure Act, 5 U.S.C. §706(2)(A)**
**(Arbitrary and Capricious Agency Action)**

165. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

166. Defendants are agencies and agency heads subject to the APA. 5 U.S.C. § 701.

167. Defendants' unlawful policy and actions interfering with election officials and employees' processing and counting of ballots via intimidation, threats, and coercion of election workers are final agency actions for the purposes of APA review.

168. The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

169. The APA requires that an agency provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). An action is also arbitrary and capricious if the agency "failed to consider . . . important aspects of the problem" before it, *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 25 (2020) (quoting *State Farm*, 463 U.S. at 43), "or offers an explanation for its decision that runs counter to the evidence before the agency,'" *Center for*

*Biological Diversity v. U.S. Fish and Wildlife Serv.*, 67 F.4th 1027, 1035 (9th Cir. 2023) (quoting *State Farm*, 463 U.S. at 43).

170. Defendants' unlawful policy and actions interfering with election officials and employees' processing and counting of ballots via intimidation, threats, investigation, and coercion of election workers are neither reasonable nor reasonably explained, and fail to consider important aspects of the problem created by Defendants' actions.

171. In particular, Defendants have failed to give any proper weight to the interests of lawfully registered voters who are citizens and qualified under state law; the interest of voters in the administration of elections fairly and consistently with the requirements of California and federal law; the interests of state and county election officials and employees in doing their jobs in compliance with state and federal law without the threat of criminal prosecution; and the interests of those workers in avoiding the violation of other federal laws by acquiescing to Defendants' unlawful demands.

172. The actions of Defendants therefore violate the APA because they are arbitrary and capricious under 5 U.S.C. §706(2)(A).

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully pray that this Court:

173. Declare that Defendants have violated and acted contrary to statutory law and in excess of constitutional and statutory authority, and acted in an unlawful arbitrary and capricious manner, by adopting and implementing a policy of threatening election workers with criminal prosecution for processing and counting ballots in accordance with federal and state law in the 2026 election solely on the basis that an individual appears on Defendants' questionable lists of 'likely' non-citizens who are registered to vote;

174. Declare that state and local government employees performing work of distributing, processing, or tabulating ballots or otherwise administering the 2026 midterm election in the manner required by their state law do not violate federal criminal law by performing such work

related to a ballot that belongs to an individual targeted by Defendants as ineligible to vote solely on the basis that the ballot belongs to an individual targeted by Defendants as ineligible to vote;

175. Preliminarily and permanently enjoin, vacate, hold unlawful, set aside, and/or stay Defendants, including under 5 U.S.C. §§705 and 706, from the following:

a) Requesting or demanding that any state or local election official (i) remove specific registered voters from their statewide voter registration lists; (ii) refuse to issue ballots to specific registered voters; or (iii) segregate, or otherwise not tabulate, any ballots returned by specific registered voters for the November 3, 2026 General Election;

b) Threatening election officials and workers with criminal prosecution for failure to comply with such demands or for otherwise processing and counting ballots in the 2026 election in compliance with state law on the basis that the ballot belongs to an individual targeted by Defendants as ineligible to vote solely on the basis that the ballot belongs to an individual targeted by Defendants as ineligible to vote;

176. Order USDOJ to inform any State or county to which it sent a letter regarding the processing and counting of ballots in the 2026 election that the threats to election officials and workers reflected in that letter have been enjoined;

177. Order USDOJ to inform this Court of any pending search warrant applications or other demands to access election materials or ballots;

178. Order any and all further temporary, preliminary, or permanent injunctive relief necessary to prevent Defendants' actions from irreparably harming Plaintiffs;

179. Award Plaintiffs their costs, reasonable attorneys' fees, and other disbursements as appropriate;

180. Retain jurisdiction to ensure compliance with this Court's orders;

181. Grant such other relief as this Court may deem proper.

DATED: October 29, 2026

Respectfully submitted,

Stacey Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
Connie K. Chan (SBN 284230)
Colin Clemente Jones (SBN 354301)
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com
cchan@altber.com
cjones@altber.com

By: <u>*/s/ Danielle Leonard*</u>

*Attorneys for Plaintiffs*

Norman L. Eisen*
Tianna Mays*
Pooja Chaudhuri (SBN 314847)
Jacob Kovacs-Goodman*
Elizabeth Westphal*
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Ave. SE #15180
Washington, DC 20003 (202) 601-8678
(202) 601-8678
norman@democracydefenders.org
tianna@democracydefenders.org
pooja@democracydefenders.org
jacob@democracydefenders.org
elizabeth-contract@democracydefenders.org

By: <u>*/s/ Norman L. Eisen*</u>

*Attorneys for Plaintiffs*

Jared Fletcher Davidson*
NY Bar No. 5202429
PROTECT DEMOCRACY PROJECT
82 Nassau Street, #601

New York, NY 10038
(202) 579-4582
jared.davidson@protectdemocracy.org

Naomi Gilens (Cal. Bar. 315813)
Anna Dorman*
Ori Lev *
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, Suite #163
Washington, DC 20006
(202) 579-4582
naomi.gilens@protectdemocracy.org
Anna.dorman@protectdemocracy.org
ori.lev@protectdemocracy.org

Benjamin L. Berwick*
15 Main Street, Suite 312
Watertown, MA 02472
Tel.: (202) 579-4582
ben.berwick@protectdemocracy.org

By: *<u>/s/ Jared Fletcher Davidson</u>*

*Attorneys for Plaintiffs*

Steven K. Ury (SBN 199499)
SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO
1800 Massachusetts Ave., N.W.
Washington, D.C. 20036
Tel: (202) 730-7428
steven.ury@seiu.org

By: *<u>/s/ Steven K. Ury</u>*

*Attorney for Plaintiff Service Employees International Union AFL-CIO (SEIU)*

Teague Paterson (SBN 226659)
Matthew Blumin*
Georgina Yeomans*
AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, AFL-CIO
1625 L Street, N.W.

Washington, D.C. 20036
Tel: (202) 775-5900
TPaterson@afscme.org
MBlumin@afscme.org
GYeomans@afscme.org

By: /s/ Teague Paterson

*Attorneys for Plaintiff American Federation of State County and Municipal Employees, AFL-CIO (AFSCME)*

Stuart Naifeh (SBN 233295)
John S. Cusick*
Brittany Carter*
NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006

I. Sara Rohani (SBN 337842)
Hayley Hahn*
Victor Olofin*
NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
700 14th Street N.W., Ste. 600
Washington, DC 20005
snaifeh@naacpldf.org

By: /s/ Stuart Naifeh

*Attorneys for Plaintiff NAACP*