Stacey Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
Connie K. Chan (SBN 284230)
Colin Clemente Jones (SBN 354301)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
(415) 421-7151
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com
cchan@altber.com
cjones@altber.com

*Attorneys for Plaintiffs*

Norman L. Eisen*
Tianna Mays*
Pooja Chaudhuri (SBN 314847)
Jacob Kovacs-Goodman*
Elizabeth Westfall*
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Ave. SE #15180
Washington, DC 20003 (202) 601-8678
(202) 601-8678
norman@democracydefenders.org
tianna@democracydefenders.org
pooja@democracydefenders.org
jacob@democracydefenders.org
elizabeth-contract@democracydefenders

*Attorneys for Plaintiffs*

* *Pro Hac Vice application forthcoming*

[Additional counsel and affiliations listed on signature page]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO, et al.,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF JUSTICE, et al.,

Defendants.

Case No. 5:26-cv-12800-TLT

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHALL NOT ISSUE**

## TABLE OF CONTENTS


INTRODUCTION ..... 1

FACTUAL BACKGROUND ..... 3

I. The Ongoing 2026 Midterm Elections ..... 3

II. Defendants' Campaign of Threating Election Workers and Officials ..... 4

A. Origins of the Administration's Attempt to Use Lists of Purported Noncitizens to Interfere with State and Local Administration of Elections ..... 5

B. Escalating Threats from USDOJ and DHS to Election Officials ..... 7

C. Threats to and Investigations of Election Workers Intensify During the Ongoing Election. ..... 9

D. Defendants' Demands to Set Aside Ballots Are Based on Error-Laden Lists ..... 14

E. Defendants' Actions Are a Stark Departure from USDOJ's Own Longstanding Policy of Non-Interference in Elections ..... 17

III. Defendants' Targeting of State and Local Election Officials and Workers with Threats, Intimidation, and Coercion Is Causing Irreparable Harm to Plaintiffs. ..... 18

A. Irreparable Harm to Election Workers Represented by Union Plaintiffs ..... 18

B. Irreparable Harm to Voters Represented by Non-Profit Plaintiffs ..... 20

ARGUMENT ..... 21

I. Plaintiffs Are Likely to Succeed on the Merits of Their Claims, or at Minimum Have Raised Serious Merits Questions ..... 21

A. Defendants' Conduct Violates Section 11(b) of the Voting Rights Act ..... 21

B. Defendants' Conduct Violates the Tenth Amendment and Exceeds Their Authority Under the Elections Clause ..... 25

C. Defendants' Actions Violate the Fifth Amendment Protections for Fair Elections and the Right to Vote. ..... 28

D. Defendants' Conduct Violates the APA ..... 30

1. Defendants' Actions Are in Excess of Statutory Authority ..... 30

2. Defendants' Actions Are Contrary to Law and Constitutional Authority ..... 33

3. Defendants' Actions Are Arbitrary and Capricious ..... 34

4. Defendants' Actions Are Final Agency Action.................................36

E. Defendants' Actions Are *Ultra Vires*..........................................................38

II. Defendants Are Causing Plaintiffs Ongoing Irreparable Harm ...............................38

III. The Balance of Equities and Public Interest Weigh in Plaintiffs' Favor .................39

CONCLUSION ...........................................................................................................................40

## INTRODUCTION

This case involves unprecedented and unlawful threats by federal government officials to criminally prosecute state and local election workers for doing their jobs, which significantly risk interfering with the lawful administration of the ongoing 2026 midterm elections and the counting of ballots in accordance with federal and state law. The threats, intimidation, and coercion by Defendants U.S. Department of Justice ("USDOJ") and Homeland Security ("DHS") and their high-ranking officials are rapidly escalating as Election Day approaches and are likely to continue to escalate well after Election Day as the state and local officials perform the work required by law to tabulate and certify the results of this election. In the past week, Defendants have issued letters to state and local officials threatening them with criminal prosecution under an "aiding and abetting" theory of criminal liability if they process and ount ballots cast by lawfully registered voters using procedures required by federal and state law. Just yesterday, it was reported that officials at USDOJ directed federal prosecutors to pursue criminal subpoenas of state and local election officials in California and issued an initial batch of subpoenas to local election officials.[1] And this morning it was reported that Defendants again threatened election officials in all fifty states with prosecution. Evers Decl. Ex 42.

Defendants have engaged in a coordinated campaign to intimidate, threaten, and coerce state and local officials and employees who are engaged in the hard and important work of administering the ongoing midterm 2026 election. Specifically, Defendants have directed threats of criminal prosecution to any and all election workers who process ballots cast by lawfully registered voters whom Defendants have claimed, at the eleventh hour in the days before the election, based on extremely unreliable methods, might be non-citizens. The purpose and effect of the USDOJ and DHS threats and intimidation are to coerce election workers to stop processing and counting ballots cast by lawfully registered voters. These actions reflect a coordinated USDOJ and DHS plan months in the making, as those agencies obtained data from obscure and insecure sources, augmented and enhanced

[1] Bloomberg Law, "DOJ Orders Criminal Probes of California Officials on Voting (2)," https://news.bloomberglaw.com/us-law-week/doj-orders-criminal-probes-of-california-officials-over-ballots.

that data through analytics and commercially available AI of questionable reliability, and used that data to target election workers with real and tangible threats. This plan by USDOJ and DHS officials has manifested in targeting state and county election officials and employees with threats of criminal investigation and prosecution in order to coerce them into halting the processing and counting of ballots, which will interfere with election administration and disenfranchise lawful voters.

Defendants' threats to criminally prosecute election workers and initiation of criminal investigations are escalating and show no signs of abating. Unless immediately enjoined, Defendants will continue to threaten election workers with prosecution for doing their jobs, including by issuing new and expanding lists of names that Defendants claim (without any real support) are unqualified to vote, demanding that election officials sequester and ultimately disqualify mailed ballots, and prohibit individuals from voting at the polls, and otherwise continuing to escalate their attempts to coerce these workers into not processing or counting lawfully cast ballots using criminal subpoenas and other intimidation tactics. These actions threaten to disenfranchise tens if not hundreds of thousands of lawful voters across the nation.

Defendants' actions are profoundly unlawful. Section 11(b) of the Voting Rights Act of 1965, 52 U.S.C. § 10307(b), expressly prohibits all persons from actually or attempting to intimidate, threaten, or coerce those who aid others in exercising their right to vote, which includes election workers—a prohibition that Defendants are blatantly violating. Defendants' actions also exceed their authority under the Elections Clause, which grants the authority to establish election rules and to administer elections processes to the States except where Congress has exercised its authority under the Elections Clause to displace state law (which Congress has not done), and violate the Tenth Amendment to the U.S. Constitution. These actions also violate voters' rights protected by the Fifth Amendment. The Executive Branch has no constitutional or statutory authority to unilaterally impose elections demands on state officials—and certainly no authority to engage in intimidation, threats, and coercion of state and local election officials for conducting an election in the manner required by federal and state law. Thus, Defendants' actions violate a host of constitutional and statutory provisions, including Section 11(b) of the Voting Rights Act, the Constitution's Elections Clause, Tenth Amendment, and Due Process Clause, as well as the Administrative Procedure Act

("APA"). The use of faulty methods and unreliable data to threaten workers is quintessential arbitrary and capricious agency action in violation of the APA.

State and local election workers represented by the Plaintiff Unions are hard-working nonpartisan civil servants who seek to faithfully execute their duties in accordance with federal and state law. Their ability to perform those duties free from intimidation, threats, and coercion is paramount to ensuring a free and fair election. Unless immediately enjoined, Defendants' unlawful threats will continue to cause irreparable and lasting harm to these hard-working election workers and the voters whose electoral rights they safeguard. For these reasons, Plaintiffs—unions that represent election workers who are the subjects of these unlawful threats, and nonprofit voting rights organizations representing millions of voters across the country, including those likely to be on Defendants' lists of alleged non-citizens or who fear their name will appear on those lists—seek an emergency TRO that immediately enjoins Defendants from continuing these unlawful threats and enjoins them from criminally investigating or prosecuting state and local officials simply for processing and counting ballots in accordance with the procedures prescribed under federal and state law.

All relevant factors weigh in favor of granting emergency relief. Plaintiffs therefore respectfully request, in light of the exigent circumstances presented by Defendants' actions, the Court enter the accompanying proposed order today, or as soon as possible.

## FACTUAL BACKGROUND

### I. The Ongoing 2026 Midterm Elections

Election Day for the 2026 midterm election is November 3, 2026. Election administration, however, begins well before that day and ends many weeks later, as officials distribute, collect, process, and count ballots, canvass returns, and certify results. Medina Decl. ¶¶14, 20-39; *see generally* Cal. Elec. Code §§ 15000-15702. In at least 48 states, voting has begun in the 2026 midterm elections and is well underway, and more than 40 million votes have been cast nationwide as of October 29. Evers Decl., Ex. 40.

Starting well before Election Day, state and local election workers are responsible for maintaining voter rolls and ensuring compliance with federal laws prohibiting systematic removal of

registered voters within 90 days of an election. *See* National Voter Registration Act, Section 8(c). For the last several months, election workers have also been printing and sending mail-in ballots to voters (including in eight states that send mail-in ballots to all registered voters), *see, e.g.*, Cal. Elec. Code §§ 3000-3026; receiving, collecting, and processing ballots as they are voted, which is a process many states, including California, begin before Election Day, *see, e.g.*, Cal. Code Regs. §§ 201137-38; and, in jurisdictions that permit early in-person voting, administering that as well. Throughout ballot processing, states apply detailed statutory procedures to address challenges to voter eligibility, which ensure the integrity of elections and guarantee the challenged voter due process and the benefit of the doubt. *See, e.g.*, Cal. Elec. Code §§ 3019(d), 14240, *et seq*., 15105.

The responsibilities of election workers expand substantially on Election Day and continue for more than a month following. In California, for example, "immediately upon close of the polls" local elections officials are required to begin the semifinal official canvass and "transmit . . . official results to the Secretary of State" "at intervals no greater than two hours." Cal. Elec. Code §§ 15150-15151. And the official canvass must begin no later than the Thursday after Election Day and be completed within 30 days of Election Day. Cal. Elec. Code § 15301-72. Every state imposes strict requirements on the methods and security for tabulating votes and certifying results, typically requiring extensive work by state and local elections officials for weeks after an election.

Throughout the voting and canvass period, election workers must adhere to detailed requirements for the distribution, collection, processing, and counting of ballots, which are set forth in state laws. *See generally, e.g.*, Cal. Elec. Code; Wash. Rev. Code § 29A; 25 Pa. Stat. §§ 2601-3591. Although state laws vary, election workers across the country are required to process hundreds of thousands or millions of ballots within a short period of time, with unfailing accuracy and fairness, and under public scrutiny. This important work is ongoing now, and does not end on November 3, 2026.

## II. Defendants' Campaign of Threating Election Workers and Officials

Federal government officials, including high-ranking DOJ and DHS officials, have engaged in a coordinated campaign to intimidate, threaten, and coerce state and local officials and employees who are engaged in the hard and important work of administering the ongoing midterm 2026

election. While Defendants have been laying the groundwork for this policy for months—in parallel with other efforts to interfere with states' administration of the 2026 election that have so far largely been enjoined by the federal district courts—Defendants' ongoing threats and coercion of state and local election officials and workers have dramatically escalated in the past weeks and days and will further intensify until and unless enjoined. Just yesterday, October 29, DOJ sent threatening letters to all 50 states. Evers Decl. Ex. 42.

### A. Origins of the Administration's Attempt to Use Lists of Purported Noncitizens to Interfere with State and Local Administration of Elections

Defendants' policy and practice of issuing threats and intimidation to workers to prevent voting by individuals on the administration's eleventh-hour lists of purported noncitizens has its roots in two recent Executive Orders pertaining to election "integrity."

The first, issued March 25, 2025, is Executive Order No. 14,248, *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14005 (Mar. 25, 2025) (the "2025 Elections EO"), which directs the Attorney General to "prioritize enforcement of Federal election integrity laws" in states that "are unwilling to enter into such an information sharing agreement or refuse to cooperate in investigations and prosecutions of election crimes." *Id.* §5(a). Soon after President Trump issued the Executive Order, USDOJ's Civil Rights Division contacted nearly every state and the District of Columbia to demand their complete Confidential Voter Lists, including sensitive personally identifiable information ("PII"). *See, e.g.*, Decl. of Stuart Holmes ("Holmes Decl.") ¶¶7-8.[2] Signaling that these data demands were not good faith list maintenance efforts, but linked to potential criminal prosecution, USDOJ's Criminal Division also sent its own emails and letters to election officials in at least 12 states, requesting meetings to discuss an "information-sharing agreement" for the purpose of implementing the 2025 Elections EO. Evers Decl. Ex. 3. When 30 states and Washington D.C. did not comply by handing over unredacted voter files, USDOJ sued them, and lost every single case in which a decision has been rendered. *See, e.g.*, *United States v. Weber*, 816 F. Supp. 3d 1168, 1195–96 (C.D. Cal. 2026); Evers. Decl. Ex. 40.

[2] Most states provided a publicly available version (which does not include Social Security numbers or driver's license numbers) or have not provided the voter registration lists at all. Evers Decl. Ex. 40.

Pursuant to the 2025 Executive Order, DHS also expanded the Systematic Alien Verification for Entitlements ("SAVE") program. Previously a limited tool primarily for confirming eligibility for certain public benefits, DHS's overhaul haphazardly linked SAVE to the Social Security database and state voter files in a deeply flawed effort to identify noncitizens registered to vote. The agency actions underlying DHS's modifications to and use of the expanded SAVE system were vacated in June 2026, *League of Women Voters v. U.S. Dep't of Homeland Sec.*, 835 F.Supp.3d 79, 138 (D.D.C. 2026), and the order of the district court was stayed pending appeal on September 25, *Dep't of Homeland Sec. v. League of Women Voters*, No. 26A308, 2026 WL 2879700 (U.S. Sept. 25, 2026) (per curiam).

While the SAVE program was enjoined, DHS pivoted to using other methods to compile its own voter and citizenship lists, including misrepresentations to states to obtain voter information and using information "brought in through supplemental magic," which, on information and belief, refers to generative artificial intelligence. Evers Decl. Ex. 18 at 3. Those methods likewise have been enjoined. *Common Cause v. U.S. Dep't of Justice*, No. CV 26-1352 (SLS), 2026 WL 3033772, at *6 (D.D.C. Oct. 9, 2026).

The second relevant Executive Order, issued March 31, 2026, is Executive Order 14,399, *Ensuring Citizenship Verification and Integrity in Federal Elections*. 91 Fed. Reg. 17125 (Mar. 31, 2026) (the "2026 Elections EO"). There are two major focuses of the 2026 Elections EO: (1) mail voting and (2) citizenship verification. The 2026 Elections EO, among other things, directs the Secretary of Homeland Security to compile a "list of individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State," defined as the "State Citizenship List." *Id.*, §2(a). The 2026 Elections EO directed DHS to compile these lists from various federal databases, including the Social Security Administration, and send those lists to states before every federal election. These databases are widely regarded as out-of-date and unreliable, and the use of such a list to identify alleged noncitizens would almost certainly lead to the disenfranchisement of eligible voters. *See infra* at 14-17.

To serve the same purposes, the 2026 Elections EO specifically orders the Attorney General

to "prioritize the investigation and, as appropriate, *the prosecution of State and local officials or any others involved in the administration of Federal elections* who issue Federal ballots to individuals not eligible to vote in a Federal election." *Id.*, §2(b) (emphasis added). The 2026 Elections EO continues: "Similarly, the Attorney General shall prioritize the investigation and, as appropriate, the prosecution of individuals and public or private entities engaged in, or aiding and abetting, the printing, production, shipment, or distribution of ballots to individuals Who are not eligible to vote in a Federal election." *Id.*

Subsequent to the 2026 Executive Order, DHS surged field operations involving armed and at times militarized agents arriving at people's residential doorsteps or vehicles to interrogate them about their voter registration status and eligibility. On September 1, 2026, DHS reportedly issued internal, non-public guidance titled the "Surge Initiative Guidance," instructing Homeland Security Investigations ("HSI") to conduct significant field operations targeting individuals, including face-to-face interrogations. The guidance indicates that HSI agents have been surged through at least mid-October in at least nine states: California, Connecticut, Georgia, Missouri, Nevada, New York, Pennsylvania, Washington, and Wisconsin. This Court, in another case, has enjoined these actions. *California Nurses Assn. v. Mullin*, No. 26-cv-10680-AMO, 2026 WL 3166149, at *10-11 (N.D. Cal. Oct. 21, 2026), *stay denied*, No. 26-7139 (9th Cir. Oct. 30, 2026).

All of these unlawful actions by the President, USDOJ, and DHS laid the foundation for the later threats to state and local elections officials and workers by the federal officials selected by the President for leadership roles at USDOJ and DHS.

### B. Escalating Threats from USDOJ and DHS to Election Officials

At the same time that federal officials sought (largely unsuccessfully) to obtain voter information from states, USDOJ and DHS ramped up their threats aimed at state and local elections officials.

On July 7, 2026, USDOJ sent letters to all 50 states and Washington D.C. threatening criminal prosecution of election officials if ballots cast by noncitizens were counted in upcoming elections. Evers Decl. Ex. 4; Holmes Decl. ¶¶10-11 & Ex. C. The letters were signed by Assistant Attorney General Harmeet K. Dhillon of the USDOJ Civil Rights Division (the official charged with enforcing

the civil rights laws *protecting* the right to vote), and invoked the Civil Rights Division's authority to "prosecute criminal violations," threatening that "any election officer, including the chief election officer of the state, who knowingly retains noncitizens on the state's SVRL [State Voter Registration List] or *facilitates noncitizens in receiving and casting ballots*" "could be criminally prosecuted for aiding and abetting" a noncitizen's vote in a federal election. *Id.* Ex. 5 (emphasis added).

On July 8, AAG Dhillon posted about these letters on X—warning "*every* state and local election official" that they are "on notice" that "knowingly encouraging noncitizens to vote … is a federal crime." Evers Decl. Ex. 6 (emphasis added). On July 10, AAG Dhillon continued to amplify the letters "sent to all 50 states and DC warning them" that USDOJ "will prosecute violators to the fullest extent of the law." Evers Decl. Ex. 7. On July 17, 2026, DHS Secretary Mullin echoed these sentiments at a press conference, threatening state and local election officials with "*prison time*" and committing DHS to "pursue maximum pressure on this." Evers Decl. Ex. 9; Ex. 10; Ex. 13.

The July 17 DHS press conference addressed letters that DHS had sent to the California, New Jersey, Nevada, and Pennsylvania Secretaries of State the day before, in which Secretary Mullin claimed—without evidence or an explanation of DHS's methodology or sources—that a preliminary review of DHS records indicated thousands to tens of thousands of noncitizens were registered to vote in those states. Evers Decl., Ex. 8; Ex. 13f.

Secretary Mullin demanded that these four Secretaries of State respond within two weeks and "confirm their intentions to collaborate with DHS," but offered no explanation about how DHS determined this list of "potential" non-citizens. Evers Decl. Ex. 43. California Secretary of State Weber responded to Mullin's letter on July 23, explaining that "California's election officials work every day to maintain accurate voter rolls and ensure that only eligible voters are registered," and expressing "serious doubts about the reliability of [DHS's] data and accuracy of [DHS's] claims, since my office has not shared our statewide voter registration list with DHS or any other federal agency or official." Evers Decl. Ex. 11. Secretary Weber noted that Secretary Mullin's July 16 letter had provided "no detail whatsoever that my office can use to evaluate the veracity of your allegations." *Id.* Notably, California requested that DHS respond by August 3 with a "detailed description of the methodology utilized by DHS to identify these allegedly ineligible voters," as well

as a "detailed description of how DHS came into possession of the list of registered voters in California." *Id.* DHS did not provide the requested information. Evers Decl. Ex. 22.The other three states likewise responded with skepticism and questions regarding DHS's methodologies. For example, on July 29, Nevada Secretary Aguilar requested DHS's data sources, methodology, and legal authority, and asked how and whether DHS distinguished current noncitizens from naturalized citizens. Evers Decl. Ex. 13. He stated Nevada would comply with the NVRA and await further information before any removals. *Id.* DHS subsequently reduced the number of alleged non-citizens on Nevada's voter rolls to 185. According to reporting by the New York Times, upon investigation, all 185 individuals proved to be citizens. Evers Decl. Ex. 19.

As federal officials' attempts to unlawfully access state records continued, so did the threats. On September 1, 2026, AAG Dhillon again posted on Truth Social, "Calling all state officials! If you knowingly allow non-citizens to vote in elections, you are committing a federal crime, & the Civil Rights Division @theJusticeDept will prosecute." Evers Decl. Ex. 14. On September 10, 2026, the *New York Times* reported that USDOJ had sent threatening letters to at least 30 top election officials warning them not to destroy any records related to the 2024 election. Evers Decl. Ex. 16.

Meanwhile, DHS continued its surge law enforcement activities aimed at voters. For example, on September 11, 2026, the HSI San Francisco Field Office posted four photos on social media of HSI agents knocking on residential doors, with a statement that HSI in Northern California will "investigate any allegations of noncitizen voting." Evers Decl. Ex. 17. The public posting of door-knocking images weeks before the election communicates a message to voters, especially naturalized citizens, that registering or voting may bring federal agents to their homes.

### C. Threats to and Investigations of Election Workers Intensify During the Ongoing Election.

For months leading up to the 2026 midterm elections, USDOJ and DHS have been working together on a plan to use lists of individuals alleged to be non-citizens, created using data of secret and questionable origins, augmented by data analytics and commercial AI programs, to threaten state and local officials with criminal prosecution. *See infra* at 14-17.

USDOJ and DHS waited until mid-October 2026 to implement the plan, well into the NVRA's 90-day quiet period. Evers Decl. Ex. 21. They began implementation by sending to state and local election officials in California and Washington letters making threats intended to intimidate and coerce the action USDOJ demanded: removing these ballots from the processing and counting of ballots. Evers Decl. Ex. 20; Ex. 21; Ex. 31.

By that time, the election had already begun. On October 1, 2026, California mailed ballots to all registered voters in California in accordance with state law. *See* Cal. Elec. Code §3000.5. California counties, consistent with California law, processed the ballots they began to receive.[3]

In the midst of this election, on October 13, 2026, USDOJ suddenly sent Secretary Weber another letter "Re: Noncitizen Voting in the 2026 Federal Election." Evers Decl. Ex. 21. The October 13 letter referenced Secretary Mullin's July 16 letter and then demanded that state election administrators review—*within 48 hours*—a list of approximately 20,000 registered California voters who Mullin and DHS alleged were "likely noncitizens." *Id.* Despite the fact that USDOJ did not actually provide California the list, it demanded that Secretary Weber "review the list within 48 hours to determine whether any citizens are listed." *Id.* "For individuals whom you cannot independently confirm citizenship status," USDOJ demanded that Secretary Weber "instruct the appropriate elections official to segregate … those individuals' vote-by-mail ballots until their citizenship status can be determined." *Id.* The letter further demanded that "If a ballot for any individual on the list has been returned," Secretary Weber "instruct the appropriate election official to not verify the signature and/or tabulate the ballot until citizenship can be determined." *Id.* Finally, the letter threatened that if Secretary Weber failed to "implement this process" within 48 hours, the United States would "seek emergency relief." *Id.*

The list of 20,000 California voters *was* provided on October 13, 2026 to Los Angeles County, on a thumb drive, with a password written on an attached Post-it note—hardly a secure device for the transmission of confidential identifying data. Evers Decl. Ex. 20.

[3] Decl. of Monica Flores ¶¶23-25, ECF 32-4, *United States v. California*, C.D. Cal. Case No. 26-cv-12025-DOC-ADS

The USDOJ letter that accompanied the hard drive made similar demands of Los Angeles County to segregate the ballots of those on the list that the County could not confirm were citizens within 48 hours. *Id*. The letter also demanded that the County withhold in-person ballots from anyone on the list until USDOJ confirmed their citizenship. The letter falsely claimed that allowing non-citizens to vote "cancels" other voters' ballots. *Id.* According to reports, the thumb drive contained records of registered voters from all over California but provided no location information or source information, and amounted to an "unsubstantiated jumble." Evers Decl. Ex. 27.[4]

On October 16, 2026, USDOJ sent another threatening letter to Los Angeles County, expressly threatening the county's workers with criminal prosecution for continuing to process the ballots the federal government wanted to remove. That letter stated:

> Under 18 U.S.C. § 611(a), noncitizens are prohibited from voting in any election involving federal offices. Under 18 USC. § 2, anyone who aids, abets, counsels, induces, or procures the commission of a federal offense is equally liable. *If persons knowingly tabulate ballots cast by individuals identified by federal agencies as noncitizens, they risk becoming aiders and abettors to a federal crime.* Your assertion that ballots must be counted simply because California's registration system relies on self-attestation does not relieve election officials of their obligations under federal law when they are on actual notice of noncitizen voting. Nor can state procedures supersede federal criminal statutes.

Evers Decl. Ex. 23 (emphasis added). The letter continued: "Administrative difficulty is not a defense to violating federal law or aiding or abetting a federal offense. The Department strongly urges the County and the SOS to reconsider their positions before taking actions that risk significant federal scrutiny and legal exposure." *Id.*

Also on October 16, the person ostensibly in charge of the U.S. Attorney's Office in Los Angeles, First Assistant U.S. Attorney for the Central District of California Bill Essayli, wrote on X: "officials who knowingly tabulate unlawful ballots risk aiding and abetting a federal offense." Evers Decl. Ex. 24. He continued: "@TheJusticeDept urges the County and the Secretary of State to temporarily segregate the flagged ballots pending citizenship verification *or face legal*

[4] The President weighed in, making a threat of his own. He amplified a social media post stating that Los Angeles county workers could be prosecuted for counting ballots of "alleged non-citizens," and posted in response: "They will all go to jail for a very period of time!!!" Evers Decl. Ex. 26.

*consequences*." *Id.* The second-highest ranking USDOJ official, Acting Deputy Attorney General Trent McCotter, amplified Essayli's threats to elections workers on X. Evers Decl. Ex. 25. On October 21, Mr. Essayli stated during a Fox News interview, "When California has actual knowledge of non-citizens in their voter rolls, if they help them vote, they are now aiding and abetting a criminal offense."[5]

When California and Los Angeles County did not cede to USDOJ's unsubstantiated demands, the administration sued in the Central District of California. *United States of America v. California*, ("*California I*"), C.D. Cal. Case No. 2:26-cv-12025-DOC-ADS, 2026 WL 3252428 (C.D. Cal. Oct. 28, 2026). The United States moved for an injunction, attempting to use the courts to force Los Angeles County to remove ballots from processing based solely on federal officials' say-so. On October 28, 2026, the Court rejected that motion in favor of protecting the right to vote and California's ability to run an ongoing election. *Id*. at *15. Asked whether USDOJ would take action like its California lawsuit against other states, Attorney General Todd Blanche responded that the Department is "looking at" "a number of states."[6]

While the Central District of California case was pending, USDOJ escalated its threats to election workers to a new level. On October 23, 2026, USDOJ delivered letters—using uniformed DHS officers—to county officials and employees across California. ECF 1 at ¶93 . Each received a subset of the 20,000-name list, along with a demand for compliance with the federal government's demands within 48 hours. *Id*. As one such county official (from Butte County, CA) explained:

> On Friday October 23rd at approximately 3:30 pm, an individual identifying himself as a Homeland Security Agent hand delivered paperwork to the Clerk-Recorders Office. This agent handed me a Department of Justice demand letter addressed to "Mr. Danlay," two declarations, and a two-page list of names.
>
> …
>
> The letter demands that I segregate ballots submitted by the 47 individuals on the list. According to the letter, if I failed to do so DOJ could charge me with federal crimes. I was given 48 hours to comply.

---

[5] Fox News, *DOJ says more than 20k NONCITIZENS are likely on California's voter roles*, at 1:40 (YouTube, Oct. 17, 2026), https://www.youtube.com/watch?v=R3k1doZrzyk.

[6] Forbes Breaking News, *Todd Blanche Asked Point Blank: Will the DOJ Be Suing Other States Over Alleged Election Issues?*, at 0:12 (YouTube, Oct. 22, 2026), https://www.youtube.com/watch?v=Hw8TXmELL2A.

Evers Decl. Ex. 32. The same day the letters were delivered by armed agents across the State, Mr. Essayli made a statement that "any election official who knowingly processes the ballot of a noncitizen is opening themselves to legal jeopardy." Evers Decl. Ex. 29. He also posted on X that "We will hold election officials accountable. *No one is above the law*." Evers Decl. Ex. 30 (emphasis added).

The October 23 letters to county election officials made more explicit threats in an asserted effort to "make unmistakably clear the legal implications" of tabulating ballots cast by certain registered voters. ECF 1 ¶95; *see also* Moreles Decl. ¶¶7-8 & Ex. A (letter to Santa Clara County warning that county elections officials would be aiding and abetting federal crime unless votes by 902 individuals on list were segregated). The letters took the position that all election workers were now on "notice" that taking any action to process or count ballots that Defendants had questioned would be facilitating a federal crime: "If persons knowingly tabulate ballots cast by individuals identified by federal agencies as noncitizens, they risk becoming aiders and abettors to a federal crime." *Id*. The letter concluded: "The Department strongly urges you and your agency to work with the Department of Justice . . . before taking actions that risk significant federal scrutiny and legal exposure." *Id.* In other words, the letters threatened that doing the work of administering the election in compliance with federal and state laws pertaining to elections would now be prosecuted as a federal crime. The letters also referred to additional forthcoming names of alleged noncitizens from their collaboration with DHS, making clear that Defendants are not done with their demands and threats to California election officials. ECF 1 ¶96.

Defendants' threats and acts of intimidation have intensified even further in recent days. USDOJ opened a criminal investigation into Los Angeles County elections officials and issued federal grand jury subpoenas pursuant to that investigation. Evers Dec. Ex. 41. Federal marshals served at least one local official at home even though that employee had been previously served at their place of work. Evers Decl. Ex. 38; *see also* Moreles Decl. ¶15.

On October 26, Defendants expanded the threats of unlawful prosecution to the State of Washington. Holmes Decl. ¶¶16-17 & Ex. E; Evers Decl. Ex. 31; Ex. 34. Much like the letter to the California Secretary of State, the USDOJ's letter to the Washington Secretary of State included a list

of voters that Defendants deemed likely to be noncitizens. *Id*. The letter threatened to refer criminal charges to state prosecutors and warned that Defendants would "seek emergency relief" if Washington election officials failed to promptly comply with Defendants' unlawful demands. *Id*. Further, the letter made clear that Defendants are not finished providing Washington with names of voters they contend are not citizens. *Id.*; *see* Holmes Decl. ¶¶18-27.

The threats continued. Judge Carter of the Central District of California held a hearing on October 27 in USDOJ's case against California and Los Angeles County and in his order the following day noted: "*The government reiterated its threat in open court yesterday*, stating that State and County election officials who do not comply with their letter risk federal charges under 18 U.S.C. § 2, which criminalizes aiding and abetting the commission of a criminal offense. The court reiterates what it said yesterday: *these threats must stop*." *California I*, Dkt. 149 at 7 (emphasis added).

The threats have not stopped. On October 28, 2026, around the same time the decision issued, Defendants' officials were at it again, posting on X that they "will hold accountable anyone who unlawfully participates in our elections and *those who aid them*." Evers Decl. Ex. 36. The very next day, October 29, 2026, it was reported that DOJ has directed federal prosecutors to pursue criminal subpoenas of state and local election officials in California, supposedly for facilitating unlawful votes. Evers Decl. Ex. 37. Just this morning, it was reported that Defendants further expanded the scope of their threats, sending election officials in all fifty states threatening letters warning them of potential prosecution. Evers Decl., Ex. 42.

### D. Defendants' Demands to Set Aside Ballots Are Based on Error-Laden Lists

The lists of purported non-citizen voters upon which DOJ's intimidation efforts center are unreliable, as Defendants themselves have acknowledged elsewhere. *United States v. Amore,* No. 25-639 (D.R.I. March 26, 2026), Dkt. 47 ( Hr'g Tr. at 51-53); *Common Cause v. U.S. Dep't of Just*., No. CV 26-1352 (SLS), 2026 WL 3033772, at *8 (D.D.C. Oct. 9, 2026). The recent litigation in the Central District of California brought by USDOJ against California and the County of Los Angeles (*California I*) includes declarations filed by the Department of Justice that contain partial information regarding the sources and process by which the lists that accompanied the letters to the state and counties were created. These processes involve unidentified third parties and vague references to

third-party analytics, which appear to refer to the generation of Social Security Numbers using AI, among other problems.

The District Court and the Ninth Circuit in have confirmed these lists lack reliability and undermine any claim that they are what they purport to be: lists of "likely" noncitizens. *California III*, No. 26-7231, Slip Op. at 17 (9th Cir. Oct. 30, 2026) ("The district court also found that the United States's process in creating the October List was not credible, and thus the United States's assertion that individuals on the October List are 'highly likely to be noncitizens' is also not credible. That finding, along with California's established procedures for ensuring voter eligibility, substantially weaken the United States's claim that it is likely to suffer irreparable harm from ballots being cast by noncitizens.").

To summarize what is known about these lists to date: it appears that the process of compiling the original DOJ's original list of California voters began on or about March 19, 2026, when USDOJ and DHS received "what appeared to be the California voter list" from an unidentified "DHS senior counselor." *California I*, Dkt. 107-3. It is unclear – because DOJ redacted the information in public filings – who provided the data, when the data was provided, or whether it was altered in any way before USDOJ obtained it. *Id*., Ex. A.

Because courts across the country held that providing unredacted voter data would violate federal law, DHS and DOJ obtained data that did not include Social Security Numbers or other ID numbers, or dates of birth. *California I*, Dkt. 62-2; 107-2. This makes accurate comparison across datasets "very difficult," Ooskii Decl. ¶17.[7] Remarkably, Defendants then "enhanced" the data using the commercial third-party service Accurint, *California I*, Dkt. 107-2, Ex. A. The "enhancement" of the California list was no enhancement at all, but an AI-reliant compiling of layers of flawed data. *See also California Nurses Association v. Mullin*, No. 26-CV-10680-AMO, 2026 WL 3166149, at *2, 6, 8, 9, 10 (N.D. Cal. Oct. 21, 2026).

After the enhancements to the data using third party information, DHS and DOJ "scored and assigned a confidence level for each match," and compared the list to Department of State and Social

[7] Plaintiffs have refiled two expert declarations from the C.D. Cal case here for the court's convenience.

Security Administration ("SSA") data, which contains their own flaws and inaccuracies and are generally not intended to be up-to-date records of citizenship. Dkt. 62-2; 107-2; Ooskii Decl; Supp. Ooskii Decl. (filed herewith). The SSA itself warns that its data "do not provide definitive information on U.S. citizenship," and that it "does not have citizenship information for all individuals who have been issued a SSN."[8] *See also Common Cause v. U.S. Dep't of Justice*, No. 1:26-cv-01352, at *12 (D.D.C. Oct. 9, 2026) ("SSA has long recognized that its citizenship data contains certain inaccuracies."). A 2006 SSA audit found that approximately 3.3 million U.S. citizens were mis-identified as noncitizens in its database, *Common Cause*, at *12, and the SSA recently announced it is correcting citizenship information "an additional 8.5 million records."[9]

In addition, USDOJ has not provided basic information such as the specific fields from the voter record compared, specific criteria used to classify matches as "high confidence," and how social security numbers were associated with voter records. Ooskii Decl ¶26. Without this information, the "high confidence" designation is purely "arbitrary." *Id.* at ¶29. The subsequent "manual review," *California I*, Dkt. 107-2, Ex. A, provided little check as DHS instructed agents to treat the source list as presumptively valid evidence of unlawful voting, and "exclude" only those individuals they could establish are U.S. citizens. *California Nurses Association v. Mullin*, No. 26-cv-10680-AMO, at *3 (N.D. Cal. Oct. 21, 2026). Additionally, agents had a daily review quota to review a minimum of 40 records, allowing twelve minutes on average to exclude a person from the target list. *Id.* at *3. The resulting records contain significant data discrepancies (as Defendants have acknowledged). Ooskii Decl. ¶41. Los Angeles County officials conducted a preliminary analysis of 200 of the approximately 7,000 records flagged by DOJ finding that 7.5% of the flagged records were cancelled or inactive and 38.9% of the individuals who had provided birthplace information indicated that they were born in the United States. *California I*, Dkt. 32-4 ¶24-25.

---

[8] Letter from Nancy Morales Gonzalez, SSA, to Jon Sherman, Fair Elections Ctr. 2 (July 13, 2023) (available at: https://perma.cc/GMX5-WKV5) ["SSA Letter"];

[9] News Release, SSA, Social Security Corrects Tens of Millions of Files in the Social Security Number Database Improving the Integrity of Vital Records (Oct. 20, 2026) available at: https://perma.cc/92MB-E7AV.

In addition, USDOJ has not provided basic information such as the specific fields from the voter record compared, specific criteria used to classify matches as "high confidence," and how social security numbers were associated with voter records. Ooskii Decl ¶26. Without this information, the "high confidence" designation is purely "arbitrary." *Id.* at ¶29. The subsequent "manual review," *California I*, Dkt. 107-2, Ex. A, provided little check as DHS instructed agents to treat the source list as presumptively valid evidence of unlawful voting, and "exclude" only those individuals they could establish are U.S. citizens. *California Nurses Association v. Mullin*, No. 26-cv-10680-AMO, at *3 (N.D. Cal. Oct. 21, 2026). Additionally, agents had a daily review quota to review a minimum of 40 records, allowing twelve minutes on average to exclude a person from the target list. *Id.* at *3. The resulting records contain significant data discrepancies (as Defendants have acknowledged). Ooskii Decl. ¶41. Los Angeles County officials conducted a preliminary analysis of 200 of the approximately 7,000 records flagged by DOJ finding that 7.5% of the flagged records were cancelled or inactive and 38.9% of the individuals who had provided birthplace information indicated that they were born in the United States. *California I*, Dkt. 32-3 ¶24-25.

### E. Defendants' Actions Are a Stark Departure from USDOJ's Own Longstanding Policy of Non-Interference in Elections

For many years, USDOJ has maintained a policy against using its criminal enforcement power in ways that could affect an ongoing election. That policy arises out of the fundamental principle that, as articulated by USDOJ, "the States – not the federal government – are responsible for administering elections, determining the validity of votes, and tabulating the results." Hulser Decl. ¶22 (quoting Justice Manual § 9-85.300). More specifically, this non-interference policy acknowledges that "[i]t is the states that have primary authority to ensure that only qualified individuals register and vote." Hulser Decl. Ex. A (*Federal Prosecution of Election Offenses*, Eighth Ed.) at 8. USDOJ's role "is limited to investigating and prosecuting violations of federal election laws and deterring criminal conduct." Hulser Decl. ¶22 (quoting Justice Manual § 9-85.300).

To protect that division of authority, USDOJ policy directs that "overt criminal investigative measures should not ordinarily be taken in matters involving alleged fraud in the manner in which votes were cast or counted *until the election in question has been concluded*, its results certified, and

all recounts and election contests concluded." *Id.* ¶17 (emphasis added).[10] The policy is meant to prevent the "risk of chilling legitimate voting" and of "interjecting the investigation itself" into the election. *Id.* ¶¶17, 23. Since 2008, the Attorney General has reaffirmed this principle in every presidential election year. *Id.* ¶18.

DOJ's conduct here inverts every element of this policy. Rather than deferring overt action until after certification, DOJ is threatening election officials with criminal prosecution while the election is already underway. And rather than investigating actual alleged wrongdoing, it is threatening the state and local officials charged by state law with administering the election, for nothing more than the act of carrying out their state law duties.

**III. Defendants' Targeting of State and Local Election Officials and Workers with Threats, Intimidation, and Coercion Is Causing Irreparable Harm to Plaintiffs.**

Defendants' unrelenting threats of criminal prosecution, issuance of criminal subpoenas, and other attempts to intimidate and coerce election workers are causing and, unless enjoined, will continue to cause, irreparable harm to election workers and voters nationwide. "The federal government's conduct has had and continues to have a severe chilling effect" on county elections officials and workers. Moreles Decl. ¶16; Holmes Decl. ¶¶6, 28-40. Elections workers are concerned about criminal prosecution and harassment "for simply carrying out [their] jobs." Moreles Decl. ¶16. And preparation for additional federal interference is consuming resources that are straining "limited resources to conduct honest, fair, and efficient elections," potentially "beyond their breaking point." Moreles Decl. ¶17; *see also* Holmes Decl. ¶¶32-39 (describing strain on elections resources).

**A. Irreparable Harm to Election Workers Represented by Union Plaintiffs**

Election workers nationwide, including those represented by Union Plaintiffs, are being subjected to the looming threat of criminal investigation and prosecution simply for performing their responsibilities to process and count ballots cast by lawfully registered voters in accordance with federal and state law. Medina Decl. ¶¶18, 40-41; Sforza Decl. ¶¶13-14; Holmes Decl. ¶¶6, 10-12, 21,

[10] Separately, the noninterference policy flatly prohibits prosecutors from timing "any action, including investigative steps, criminal charges, or statements, for the purpose of affecting any election." *Id.* ¶¶19 (quoting Justice Manual § 9-85.500).

28-32 & Exs. C-E; *supra* at 7-14. Election workers nationwide have expressed grave concern that the federal government may target them with criminal prosecution. Medina Decl. ¶¶23-24, 29, 34, 38-39; Sforza Del. ¶13, 14; Evers Decl. Ex. 33.[11] As public employees bound by state law to carry out their nonpartisan responsibilities, Defendants' intimidation, threats, and coercion attempts subject election workers daily to a Hobson's choice between acceding to Defendants' unlawful demands or adhering to their duties and thereby subjecting themselves to a serious risk of criminal investigation and prosecution. Medina Decl. ¶18; Sforza Decl. ¶13.

Further, because the federal government has promised to and is imminently poised to criminally prosecute election officials—indeed, it has already initiated the process for doing so[12]—the Union Plaintiffs' election worker members risk immediate, extreme harm that will result from prosecution. Sforza Decl. ¶14; Medina Decl. ¶¶23, 29, 39-40. And given that Defendants' "initial batch of subpoenas"[13] was issued days before the close of polls on Election Day, the Union Plaintiffs' election worker members will likely face increased scrutiny, investigation, and criminal charges as the election draws on and Defendants' threats persist. Moreover, Defendants' threats are encouraging the public to believe that election workers are facilitating unlawful vote casting, threatening further harm to election workers from public harassment. Holmes Decl. ¶33 (death threats and doxxing); Sforza Decl. ¶15 (describing anthrax threat); Medina Decl. ¶23 (describing public mistrust).

The Union Plaintiffs represent thousands of workers who have been targeted by Defendants. SEIU represents thousands of election workers nationwide, including more than 3,000 in California; AFSCME, in turn, represents election workers in numerous states, including both states where it has been publicly reported that Defendants have most directly threatened election workers with criminal prosecution, including California and Washington. Medina Decl. ¶11-13; Sforza Decl. ¶¶6-7. And beyond California and Washington, both Union Plaintiffs represent election workers in states that

---

[11] Fausset et al., *The New Worst-Case Scenario for Election Officials: Federal Interference*, (Oct. 27, 2026), https://www.nytimes.com/2026/10/27/us/election-interference-trump-midterms.html (reporting about election officials "bracing for even more unwanted and potentially undemocratic federal intervention").

[12] Evers Decl. Ex. 41

[13] Evers Decl. Ex. 37.

have been targeted by the HIS surge or received the letters described by DHS Secretary Mullin at the July 17 press conference. The Union Plaintiffs' election worker members reasonably fear criminal prosecution for doing their jobs in response to Defendants' clear-throated threats, and will face continued and worsening irreparable harm absent judicial intervention. Sforza Decl. ¶¶13-14.

For example, one SEIU member who is a long-time County employee in Northern California and naturalized citizen reasonably fears that Defendants' threats will lead to the loss of their job and livelihood, and possibly even deportation despite their U.S. citizenship status. Medina Decl. ¶¶22-24. An SEIU member who is a Los Angeles County employee and the head of their household reasonably fears they would face irreparable emotional and financial hardship if Defendants proceeded to criminally prosecute election workers. *Id.* ¶29.[14] And another SEIU member and County employee is concerned about the impact of Defendants' threats on their election worker peers, especially as she and their colleagues prepare to operate secure ballot processing on Election Day. *Id.* ¶¶37, 39. AFSCME's election worker members, because they intend to follow state and federal law in accordance with their instructions from management, rather than comply with the federal government's unlawful demands as to ballot processing, face the prospect of retaliatory prosecution for simply adhering to state and federal election laws. Sforza Decl. ¶¶13-14. The possibility of criminal prosecution is real, and the Union Plaintiffs' election worker members stand directly in Defendants' line of fire.

**B. Irreparable Harm to Voters Represented by Non-Profit Plaintiffs**

Defendants' threats against election workers threaten to disenfranchise voters, thereby posing an imminent risk of irreparable harm to Non-Profit Plaintiffs and their members as well as SEIU's voter members.

As a Latino civil rights advocacy organization invested in advancing the voting rights of the Hispanic community, Plaintiff LULAC's members will face irreparable harm as a consequence of Defendants' intimidation strategy. If Defendants' threats to criminally prosecute election workers are

[14] This member's fears are particularly salient in light of the fact that the federal government arrested and initiated prosecution of SEIU local president David Huerta, who was charged for exercising his First Amendment right to protest ICE activity. Medina Decl. ¶29; Evers Decl. Ex. 12.

left unchecked, the disruption to the electoral process will prevent LULAC members from casting their votes and having those votes counted. Proaño Decl. ¶22; *see also* Holmes Decl. ¶¶34-35, 39 (federal government's threats have "created a[n election worker] recruiting crisis," caused "large numbers of election officials [to] resign" or not seek reelection, and diverted resources from elections administration). Moreover, LULAC members fear that they may appear on the October 13 list sent by USDOJ to California Secretary of State Weber. Proaño Decl. ¶¶17-18. If Defendants' election interference efforts are allowed to proceed, LULAC stands to face not only the disenfranchisement of its members, but also the loss of its members' trust in its civic engagement efforts. *Id.* ¶¶24-25.

The NAACP and its members and the Black communities it serves will likewise face irreparable harm. Black voters, including those from communities the NAACP serves, have faced an extensive history of government intimidation, interference, and threats, including threats of malicious prosecution, for their attempts to exercise the right to vote. Sterling Decl. at ¶7. Defendants' actions amount to a continuation—indeed, an escalation—of this history, causing understandable fear in Black communities, and likely deterring many from participating in the 2026 elections. *Id.* ¶17.

## ARGUMENT

A TRO is warranted when the moving party (1) is likely to succeed on the merits; (2) irreparable harm is likely without preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest. Fed. R. Civ. P. 65 (b)(1), (c); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Alternatively, if there are "serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a TRO may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied." *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017) (cleaned up). All factors favor Plaintiffs.

### I. Plaintiffs Are Likely to Succeed on the Merits of Their Claims, or at Minimum Have Raised Serious Merits Questions

#### A. Defendants' Conduct Violates Section 11(b) of the Voting Rights Act

Defendants' policy and practice of threatening state and county election officials and workers with criminal prosecution to intimidate and coerce them into not processing and counting the ballots

of lawfully registered voters is a clear and egregious violation of Section 11(b) of the Voting Rights Act of 1965 ("VRA"), 52 U.S.C. §10307(b).

Section 11(b) states: "No person, whether acting under color of law or otherwise, shall … intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote." 52 U.S.C. §10307(b). "Voting" is defined by the VRA as "all action necessary to make a vote effective in any … election, including, but not limited to registration, casting a ballot, … and having such ballot counted properly and included in the appropriate totals of votes cast …." 52 U.S.C. §10310(c)(1). By its plain text, Section 11(b) prohibits federal agencies and officials from engaging in acts of intimidation directed at individuals who "aid[] others in voting," which includes election workers. *Id.*; *see, e.g.*, *CNA v. Mullin*, No. 26-CV-10680-AMO, 2026 WL 3166149, at *8 (N.D. Cal. Oct. 21, 2026) (finding DHS's intimidation tactics interfered with plaintiff's members' voter assistance and mobilization activities, in violation of Section 11(b)); *Mich. Welfare Rts. Org. v. Trump*, 642 F.Supp.3d 98, 106-07 (D.D.C. 2022) (plaintiffs adequately pled Section 11(b) claim against Trump based on actions to intimidate and coerce state and local election workers).[15]

Section 11(b) "sweeps broadly" and prohibits a broad range of conduct. *See Nat'l Coal. on Black Civic Participation v. Wohl*, 512 F.Supp.3d 500, 509 (S.D.N.Y. 2021) (*"Wohl I"*); *United States v. Beaty*, 288 F.2d 653, 656 (6th Cir. 1961) ("[T]hreats, intimidation[,] or coercion may take on many forms."). This includes threats of legal action. *See, e.g.*, *Nat'l Coal. on Black Civic Participation v. Wohl*, 661 F.Supp.3d 78, 114 (S.D.N.Y. 2023) ("*Wohl II*") (finding Section 11(b)

---

[15] Section 11(b) contains an implied private right of action, as numerous courts have held. *See, e.g.*, *CNA*, 2026 WL 3166149, at *7; *Michigan Welfare Rts. Org. v. Trump*, 600 F. Supp. 3d 85, 104-06 (D.D.C. 2022); *Wohl I*, 512 F.Supp.3d at 509; *Krabach v. King Cnty.*, No. 2:22-CV-1252-BJR, 2023 WL 7018431, at *3 (W.D. Wash. Oct. 25, 2023); *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F.Supp.3d 457, 476 (S.D.N.Y. 2020) ("Consistent with Section 11(b)'s broad reach, both the government and private parties may sue to enforce Section 11(b)."), *reconsideration denied*, 2020 WL 6365336 (S.D.N.Y. Oct. 29, 2020); *League of Women Voters of Massachusetts v. Trump*, 840 F.Supp.3d 101, 119 (D. Mass. 2026) ("[T]he court sees no reason to interpret the language of Section 11(a) as excluding a private right of action."); *cf. Olagues v. Russoniello*, 770 F.2d 791, 805 (9th Cir. 1985) (observing, without expressly concluding, that "a private litigant is entitled to 'the same remedy' as the Attorney General" under the Voting Rights Act) (citation omitted). As discussed below, these actions contrary to law also violate the APA. *Infra* at 30-38.

violation based on "threat[s of] legal action if [voters] voted by mail"); *Jolt Initiative, Inc. v. Paxton*, 821 F.Supp.3d 706, 725-26 (W.D. Tex. 2026) (granting preliminary injunction where attorney general stated "he [sought] to 'crush' [voter registration organization] in his quo warranto action"); *CNA*, 2026 WL 3166149, at *7 ("Unlawful intimidation includes '[a]ctions or communications that inspire fear of … legal repercussions ….'") (citation omitted).

In evaluating whether challenged activity is intimidating, coercive, or threatening, the conduct "must be considered against the background of contemporaneous events … and the general climate prevailing … at the time." *United States v. McLeod*, 385 F.2d 734, 740 (5th Cir. 1967). Conduct is thus prohibited if "a reasonable recipient, familiar with the context of the message, would interpret [it] as a threat of injury – whether physical or nonviolent – intended to deter individuals from exercising their voting rights" or from aiding others in exercising those rights. *Wohl I*, 512 F.Supp.3d at 509. Moreover, Section 11(b) prohibits acts to intimidate, threaten, or coerce, "regardless of whether the conduct 'successfully prevents a person from voting [or urging or aiding any person to vote or attempt to vote],'" *CNA*, 2026 WL 3166149, at *7 (quoting *Wohl I*, 512 F.Supp.3d at 516) (brackets added in *CNA*); *see also United States v. Clark*, 249 F. Supp. 720, 728 (S.D. Ala. 1965) (three-judge court) ("The success or failure of intimidation, threats or coercion, is immaterial, since 'attempts' are equally proscribed.").

Here, there can be no question that Defendants' repeated threats of criminal prosecution to state and county election officials and workers in California, Washington, and across the country, are attempts to use intimidation and coercion to cause the effect of acquiescing to Defendants' demands that they withhold, sequester, and stop processing and counting ballots targeted by Defendants—in other words, to coerce them not to aid the exercise of the right to vote by lawfully registered voters. DHS Secretary Mullin has threatened state and local election officials with "prison time" if they do not cooperate with Defendants' demands to stop counting ballots cast by individuals who Defendants allege *may* be noncitizens (based on a faulty and unreliable process, *supra* at 14-17). Evers Decl. Ex. 13.[16] After months of high-ranking officials threatening election officials with criminal prosecutions

[16] The President has echoed these threats, posting on Truth Social that noncompliant election officials "*will all go to jail for a long period of time*!!!" Evers Decl. Ex. 26.

(*supra* at 7-9), on October 23, 2026, USDOJ delivered letters—using uniformed DHS officers—to county officials and employees across California demanding that they stop processing and counting ballots. Evers Decl. Ex. 32. Defendants told election officials and workers they must comply with these demands with respect to a list of 20,000 voters targeted by Defendants, or risk facing criminal prosecution for "aiding and abetting a federal offense." ECF 1 at ¶ 11; supra at supra pp. 11-12. In those letters, the U.S. Attorney for each county underscored that he was "writ[ing] to make *unmistakably clear the legal implications*" of ignoring Defendants' demands. *Id.* A few days later, Defendants sent a similarly threatening demand letter to the Washington Secretary of State. Evers Decl. Ex. 31. These threats of prosecution have been amplified by other high-ranking USDOJ officials across the country, including those playing the role of U.S. Attorneys in California and Texas. *Supra* at 11-12; *California I*, Case No. 2:26-cv-12025-DOC-ADS, 2026 WL 3252428, Dkt. 149 at 7 ("The government reiterated its threat in open court yesterday."). And on October 29, 2026, it was reported that USDOJ has in fact initiated *criminal investigations against California state and local election officials* and begun seeking criminal subpoenas, immediately after the Central District of California denied the federal government's TRO request. Evers Decl. Ex. 37.

Such threats are objectively and reasonably understood as acts of intimidation and coercion by high-ranking federal officials to achieve the express stated objective of forcing state and election workers to halt the processing of ballots, and thereby interfering with voting in this election. *See supra* at 18-21 (county, state, and union declarations describing effect of threats). The threats are particularly acute and coercive under the particular history and circumstances of the federal government's escalating unlawful actions to insert itself in the administration of elections and voting and exhorted that the federal government's "*threats must stop*." *California I*, 2026 WL 3252428 at 7 (emphasis added); *CNA*, 2026 WL 3166149, at *10-11.

Particularly in light of this unprecedented context, this Court need not be "blind to the effect of baseless arrests, unjustified prosecutions, unwarranted and illegal injunctions, and any other acts or conduct—official or otherwise, but particularly official—upon individuals so subjected who are

legally seeking to" aid voters in exercising their rights. *Clark*, 249 F. Supp. at 728.[17] "The inevitable effect of such acts and conduct is to severely discourage, intimidate, threaten and coerce" those election workers whose job is to aid "citizens who are seeking or might otherwise seek to exercise the rights involved." *Id.* These acts of intimidation, threats, and coercion harm both the election workers themselves and the voters whose electoral rights are endangered, and they are precisely the type of conduct that Section 11(b) forbids.

**B. Defendants' Conduct Violates the Tenth Amendment and Exceeds Their Authority Under the Elections Clause**

Defendants' acts of intimidation, including their ongoing threats to state and local election workers of criminal prosecution for counting ballots in compliance with state and federal elections law, violate the Tenth Amendment and fundamental federalism principles, and exceeds the Executive Branch's constitutional authority under the Elections Clause. *United States v. California*, No. 26-7231, Slip Op. at 8-10, 12-14 (9th Cir. Oct. 30, 2026) (hereinafter "*California IIII*"); *United States v. California*, __ F.4th __, No. 26-12025, 2026 WL 3212945 (9th Cir. Oct. 28, 2026), at *9-11 (Bennett, J., concurring) (hereinafter "*California II*"); *California I*, 2026 WL 3252428, at *8. Under the Tenth Am endment, States retain all "powers not delegated to the United States by the Constitution, nor prohibited by it to the States." U.S. Const. 10th Amend. Those powers that the Tenth Amendment reserves to the States include plenary authority over the structure of their governments and control of

---

[17] While Defendants' threats of criminal prosecution are also unlawful for numerous reasons, even an intimidating act that "is completed pursuant to legal authority … does not make the act necessarily lawful" under voter-intimidation cases. *CNA*, 2026 WL 3166149, at *8. In law-enforcement intimidation cases, "[a]cts otherwise entirely within the law may violate [voter-intimidation statutes] if they have the proscribed" intimidation effect. *McLeod*, 385 F.2d at 740-41 & n.12 (applying analogous prohibition in 131(b)). Even if Defendants' invocation of authority to enforce 18 U.S.C. §611 were not otherwise unlawful, it would be "no excuse or defense" for intimidation. *See United States v. Bruce*, 353 F.2d 474, 476-77 (5th Cir. 1965); *United States v. Beaty*, 288 F.2d 653, 656 (6th Cir. 1961). These conclusions apply equally to 11(b). *E.g.*, *Whatley v. City of Vidalia*, 399 F.2d 521, 526 (5th Cir. 1968); *Jolt Initiative*, 821 F. Supp. 3d at 726. Thus, intimidation by "mesne process," like harassing subpoenas or threat letters from law-enforcement actions, are also voter intimidation, *McLeod*, 385 F.2d at 741 n.12, as is a threat of "baseless arrests and prosecutions" that have a "chilling effect" on protected electoral activity, *id.* at 740-41; *accord Clark*, 249 F. Supp. at 724-29 (pattern and threats of "baseless arrests, unjustified prosecutions, unwarranted and illegal injunctions, and any other acts or conduct—official or otherwise, but particularly official—upon individuals so subjected who are legally seeking to exercise their rights" can "severely discourage, intimidate, threaten and coerce those citizens who are seeking or might otherwise seek to exercise the rights involved."); *United States v. Wood*, 295 F.2d 772, 781-82 (5th Cir. 1961) (baseless arrests of voting rights organizer violated 131(b))

their officers (except as modified by Congress as to federal elections pursuant to the Elections Clause). *See Gregory v. Ashcroft*, 501 U.S. 452, 460, 462 (1991); *Shelby County v. Holder*, 570 U.S. 529, 543 (2013).[18]

The Elections Clause of the U.S. Constitution "expressly dictates which sovereign has the authority to prescribe the manner by which Congressional elections are conducted." *California III*, slip op. at 9; *California II*, 2026 WL 3212945 at *9 (Bennett, J., concurring). It "gives States the primary role in administering federal elections," *California I*, 2026 WL 3252428, at *8, providing that:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations….

U.S. Const. art. I, §4, cl. 1. The Clause thus "invests the States with responsibility for the mechanics of congressional elections," unless Congress has acted to preempt state legislative choices. *Foster v. Love*, 522 U.S. 67, 69 (1997); *see also Storer v. Brown*, 415 U.S. 724, 730 (1974). And as Judge Bennett recently explained, a Congressional enactment "only displaces state election law in 'so far as it is exercised, and no farther.'" *California II*, 2026 WL 3212945, at *9 (quoting *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013)); *accord California III*, slip op. 15 10.

Accordingly, unless Congress has exercised its Elections Clause authority to displace state election law, States have the "authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns." *Roudebush v. Hartke*, 405 U.S. 15, 24 (1972); *see also Inter Tribal Council*, 570 U.S. at 9 (States retain "responsibility for the mechanics of congressional elections") (quotations omitted).

In contrast to the States and to Congress, the President has "no direct role" under the Constitution. *League of United Latin Am. Citizens v. Executive Office of the President*, 818 F.Supp.3d

---

[18] The Constitution grants "the States to keep for themselves … the power to regulate [state] elections." *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973).

34, 59 (D.D.C. 2026) ("*LULAC*"). And as relevant here, Congress has not exercised its authority under the Elections Clause in a manner that displaces state elections law.[19] Nonetheless, the Executive Branch is seeking to displace state elections law through threats of criminal prosecution to state and local officials who are implementing that law. That runs directly contrary to the Elections Clause's allocation of authority: "[T]o prevent the centralization of election management in the Executive, the Elections Clause 'empowers' only Congress and the 'state governments to enact laws governing the mechanics of federal elections.'" *California II*, 2026 WL 3212945, at *9 (quoting *Gonzalez v. Arizona*, 677 F.3d 383, 391 (9th Cir. 2012) (en banc), *aff'd sub nom. Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013)); *see also United States v. Weber*, 816 F.Supp.3d 1168, 1175 (C.D. Cal. 2026) (noting that Elections Clause "has constitutionally prevented the centralization of election management in the Executive").

Threatening criminal prosecution of local election officials and workers for performing their work in compliance with federal and state law directly interferes with the ability of States to conduct their elections within their constitutional authority. When Congress has not displaced state elections law, the President's attempt to do so "represent[s] an overreach and misuse of those limited constitutional exceptions designed to ensure decentralized election regulation" and "disturb[s] the framework of federalism envisioned and enshrined in our Constitution." *United States v. Oregon*, 828 F.Supp.3d 1092, 1108 (D. Or. 2026); *see also*, *e.g.*, *United States v. Bellows*, 834 F.Supp.3d 113, 126 (D. Me. 2026).

"Just as it is appropriate for an individual, in a proper case, to invoke separation-of-powers or checks-and-balances constraints, so too may a litigant, in a proper case, challenge a law as enacted in

[19] Congress *has* exercised its Elections Clause authority to displace state elections law, but in ways that provide no authority for Defendants' actions: in the National Voter Registration Act (which requires States to accept and use a federal form that establishes citizenship by attestation, requires list maintenance to be "uniform" and "nondiscriminatory," and bars systematic removal programs within 90 days of a federal election, 52 U.S.C. §§20505(a)(1), 20508(b), 20507(b)(1), 20507(c)(2)(A)), and the Help America Vote Act (which assigns the statewide registration list to state officials and requires a citizenship question on the voter form, *id.* §§21083(a), 21083(b)(4)(A)(i)). DOJ has authority to enforce these statutory obligations only through specified procedural mechanisms. *See Common Cause v. U.S. Dep't of Just.*, No. 1:26-cv-1352, 2026 WL 3033772, at *25 (D.D.C. Oct. 9, 2026); 52 U.S.C. §§20510(a), 21111.

contravention of constitutional principles of federalism." *Bond v. United States*, 564 U.S. 211, 223-24 (2011). Defendants' actions, including the policy of intimidation, and actual threats to state and county election workers across the country, violate the principles of federalism protected by the Election Clause and the Tenth Amendment and should be enjoined.

**C. Defendants' Actions Violate the Fifth Amendment Protections for Fair Elections and the Right to Vote.**

Defendants' actions threatening election workers violate two different voter rights protected by the Fifth Amendment to the Constitution: the right to fundamentally fair election administration and the right to vote.

First, the Due Process Clause of the Fifth Amendment protects voters' right to participate in fundamentally fair elections. Government action thus violates due process when it "seriously undermine[s] the fundamental fairness of the electoral process." *Duncan v. Poythress*, 657 F.2d 691, 700 (5th Cir. 1981). Consistent with that principle, federal courts distinguish "garden variety election irregularities," which do not violate due process, from conduct reflecting "patent and fundamental unfairness" that pervades the electoral process and works significant disenfranchisement. *Griffin v. Burns*, 570 F.2d 1065, 1076-1078 (1st Cir. 1978); *see also Roe v. Alabama*, 43 F.3d 574, 580 (11th Cir. 1995). Due process concerns arise, for example, where voters rely on established election procedures and official representations regarding those procedures, only to suffer significant disenfranchisement as a result of subsequent changes to or departures from those procedures. *See Bennett v. Yoshina*, 140 F.3d 1218, 1226-1227 (9th Cir. 1998). Defendants' eleventh-hour demands ask state and local elections officials to alter established elections protocols mid-election, and thereby threaten disenfranchisement. If Defendants' threats are allowed to continue, it would render "the electoral process so deficient as to violate the Due Process Clause" because it would undermine "the very integrity of the electoral process." *Griffin v. North Carolina State Board of Elections*, 781 F.Supp.3d 411, 435 (E.D.N.C. 2025) (quotation omitted).

Plaintiffs' members have and will lawfully cast ballots in reliance on the election procedures established by states, including the procedures governing registration of voters, processing of ballots, and the custody, tabulation, canvass, and certification of ballots by state and local election officials.

State election procedures also provide Plaintiffs' members with the opportunity to cure their ballots, ensuring that no members are inadvertently disenfranchised. Defendants' actions directly interfere with those procedures, by issuing threats intended to coerce a marked departure from the established procedures on which Plaintiffs and their members relied. Defendants' actions, including the policy of intimidation and actual threats to state and county election workers across the country, violate the Due Process Clause's protection of the right to fair election procedures.

Second, the Constitution also protects the fundamental right to vote in the 2026 midterm elections. That right to vote encompasses the right of lawfully registered voters, including members of Plaintiffs, to cast and have ballots counted. *See United States v. Classic*, 313 U.S. 299, 314-315 (1941). Action by governmental officials can rise to the level of a constitutional violation if it burdens the right to vote. *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). To assess whether government action unconstitutionally burdens the fundamental right to vote, a court considers "the character and magnitude of the asserted injury to the rights protected by the First and [Fifth] Amendments" and weighs that injury against "the precise interests put forward by the [government] as justifications for the burden imposed by the rule." *Anderson v. Celebrezze*, 460 U.S. at 789 (1983); *see also Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Bolling v. Sharpe*, 347 U.S. 497 (1954).

Defendants' threatening actions challenged here are tied to their demand that election officials set aside tens of thousands of potential ballots, including votes cast by lawfully registered voters, putting a substantial number of voters at risk that their votes will be segregated and not counted. Defendants' coercive actions are entirely unnecessary and disproportionate to the federal government's asserted interests, particularly in the manner in which these lists have been created and in light of Defendants' admissions that these lists are faulty. *Supra* at 14-17.

The character and magnitude of the burden on the right to vote that Defendants' actions impose is severe. The Ninth Circuit has explained an action imposes a severe burden if it 'significantly impair[s] access to the ballot, stifle[s] core political speech, or dictate[s] electoral outcomes.'" *Chamness v. Bowen*, 722 F.3d 1110, 1116 (9th Cir. 2013). Defendants' actions are aimed at intimidating and coercing elections officials into segregating and ultimately discarding ballots cast by lawfully registered and qualified voters. No burden on the right to vote is more severe than the

wholesale failure to count a lawfully cast ballot. *See Saylor*, 322 U.S. at 388. "Having once granted the right to vote on equal terms," the government "may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-105 (2000) (per curiam).

Under the *Anderson-Burdick* test, threatened actions that impose a severe burden on the right to vote must be "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434. Defendants have no interest, let alone a compelling one, in threatening election workers with criminal prosecution for complying with the law based on claims of non-citizen voting. Any asserted interest in investigating alleged criminal offenses could be fully served by materially less restrictive means—including by awaiting the completion of the count and certification before seeking access to election materials that federal law already requires to be preserved. *See* 52 U.S.C. §20701. Defendants' actions are therefore not narrowly tailored to any compelling interest and cannot withstand strict scrutiny. *See Nader v. Brewer*, 531 F.3d 1028, 1040 (9th Cir. 2008).

Defendants' threats of unlawful prosecution, based on these lists compiled from faulty sources and analysis, serve no legitimate governmental purpose. Defendants' actions, including the policy of intimidating and threatening state and county election workers across the country and initiating criminal investigations of election officials, impermissibly burden the right to vote of registered, lawful voters that Defendants have targeted through unreliable, faulty, discriminatory, and unlawful procedures and violates the Due Process Clause's protection of the fundamental right to vote.

### D. Defendants' Conduct Violates the APA

#### 1. Defendants' Actions Are in Excess of Statutory Authority

Under the APA, a court must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §706(2)(C). An "agency … literally has no power to act … unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022). Here, no statute or other legal authority authorizes Defendants' policy or practice of issuing demands to state and local election workers in the midst of an ongoing election that they set aside ballots cast by lawfully registered voters because names appear on Defendants' generated lists of alleged non-citizens, nor Defendants' policy or practice of

intimidating, threatening, or coercing election workers unless they accede to Defendants' unlawful demands.

*First*, Congress has not granted Defendants any authority to demand that state and county election workers violate federal and state law by withholding, sequestering, and not counting ballots cast by lawfully registered voters appearing on Defendants' lists. As the district court ruled in *California I*, the federal government's demand that California sequester and refrain from tabulating vote-by-mail ballots from individuals on the October List until their citizenship statuses could be verified "would likely violate federal election law," including the VRA, the National Voter Registration Act of 1993 ("NVRA"), and the Civil Rights Act. 2026 WL 3252428, at *9-11.

Section 11(a) of the VRA provides that "No person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote under any provision of chapters 103 to 107 of this title or is otherwise qualified to vote, or willfully fail to refuse to tabulate, count, and report such person's vote." 52 U.S.C. §10307(a). By demanding that state and local election workers sequester and not tabulate ballots cast by lawfully registered voters based solely on the fact that the federal government has *alleged* (but not proven) that they are "likely" ineligible, Defendants demand that these workers violate the VRA. As another federal district court just reasoned, Defendants' demands that votes be segregated "solely because of [the federal government's] unproven allegations [of noncitizenship] … would render the act of voter registration meaningless and diminish the significance of the Voting Rights Act itself, which Congress could not have intended." *California I*, 2026 WL 3252428, at *11. Defendants are not authorized by any law to command state and local election officials and workers to engage in conduct that violates the VRA.

The NVRA is a federal law that prohibits states from "systematically remov[ing] the names of ineligible voters from the official list of eligible voters" during the 90-day quiet period before a federal election. 52 U.S.C. §20507(c)(2). As the Central District of California found, the federal government's "own description of how it compiled the October List [] indicates a process that involved the 'matching of voters to their immigration status' by relying on information from various databases, including USCIS, Department of State, and Social Security Administration data," and is "'precisely the type of systematic cancellation program that the 90-day Provision was meant to

preclude.'" *California I*, 2026 WL 3252428, at *10. Defendants are not authorized by any law to command state and local election officials and workers to engage in conduct that violates the NVRA.

The Civil Rights Act provides that "no person acting under color of law shall in determining whether any individual is qualified under State law or laws to vote in any election, apply any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision who have been found by State officials to be qualified to vote." 52 U.S.C. §10101(a)(2)(A). This statutory provision (known as the "DSPP provision") thus prohibits "imposing a procedure on a subset of voters to the exclusion of others." *California*, Dkt. 149 at 19 (citing *U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 389 (6th Cir. 2008); *Shivelhood v. Davis*, 336 F. Supp. 1111, 1115 (D. Vt. 1971); *Frazier v. Callicutt*, 383 F. Supp. 15, 18-19 (N.D. Miss. 1974)); *see Mi Familia Vota v. Fontes*, 129 F.4th 691, 717 (9th Cir. 2025) (Arizona law requiring county to use SAVE program to check the citizenship of individuals they had "reason to believe" were not citizens violated the DSPP provision). As the Central District of California found, "[o]n its face, [the federal government's] request clearly imposes a citizenship verification process with respect to only individuals on the October List and not the entire composition of registered voters in California. … Like the citizenship verification process that the Ninth Circuit held violated the CRA in *Mi Familia Vota*, [the federal government's] request does not apply a method 'that could be applied to both naturalized and U.S.-born citizens.'" *California I*, 2026 WL 3252428, at *11 (quoting *Mi Familia Vota*, 129 F.4th at 723). Defendants are not authorized by any law to command state and local election officials and workers to engage in conduct that violates the Civil Rights Act.

In sum, no statute or other authority authorizes Defendants to threaten state and local election workers with criminal prosecution for performing their lawful duties to issue, process, and count ballots cast by lawfully registered voters in accordance with federal and state election procedures because they appear on Defendants' lists, nor to direct state and local election workers to engage in conduct that would violate federal election law and disenfranchise lawfully registered voters.

*Second*, Congress has not granted Defendants any authority to engage in a policy or acts of intimidation, threats, or coercion against state and local election workers, including by threatening

them with criminal prosecution if they do not heed Defendants' demands to withhold, sequester, and not count ballots cast by lawfully registered voters simply because they appear on Defendants' lists. Defendants' threats are entirely outside any statutory authority, including the authority to investigate federal crimes *Cf. California I*, 2026 WL 3252428, at *6 (state and local election officials "do not 'interfere' with the United States' ability to enforce Section 611 by administering an ongoing election in accordance with established State and Federal law, rather than assuming new obligations pursuant to a federal criminal law they are not responsible for enforcing"); *California II*, 2026 WL 3212945, at *9 (Bennett, J., concurring) ("Nothing in §611—a statute that criminalizes voting by a noncitizen—preempts California's comprehensive statutory scheme that has been duly enacted under the Elections Clause."). Nor does the Constitution grant any such authority, in light of the Tenth Amendment and Elections Clause. *Supra* at 25-28. Election workers who comply with their obligations under federal and state election law to issue and then process and count ballots cast by lawfully registered voters are not engaging in illegal conduct and are not "aiding and abetting" the unlawful votes by non-citizens, even where Defendants have provided a list of allegedly unqualified voters.[20] The federal agencies that have issued these threats, including USDOJ and DHS, have no authority for doing so. Defendants' actions therefore exceed agency authority in violation of the APA and must be set aside. *See* 5 U.S.C. §706(2)(C).

**2. Defendants' Actions Are Contrary to Law and Constitutional Authority**

Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law," 5 U.S.C. §706(2)(A), or "contrary to constitutional right, power, privilege, or immunity," *id.* §706(2)(B). For all the reasons that Defendants' conduct violates Section 11(b) of the

[20] Nor could election workers have the requisite mens rea to establish aiding and abetting liability under 18 U.S.C. §2, based solely on Defendants' demand letters and accompanying lists of registered voters, which have been shown to be created through unreliable methods and riddled with errors, *supra* at 14-17, and which Defendants themselves concede do not identify *actual* noncitizens but only "likely" noncitizens, *supra* at 10, 15. *See Rosemond v. United States*, 572 U.S. 65, 76-77 (2014) (aiding and abetting liability requires "inten[t] to facilitate that offense's commission" and "must go to the specific and entire crime charged"); *California I*, 2026 WL 3252428 at *12-13 (finding federal government's list of potential non-citizens on voting list "lack … credibility" given "significant concerns" raised by "protocol" for creating lists and "disproven allegations with respect to noncitizen voting in other states").

VRA (52 U.S.C. §10307(b)), exceeds their authority under the Elections Clause, and violates the Fifth and Tenth Amendments, *see supra* at 25-30, Defendants' conduct is also contrary to law and constitutional authority in violation of the APA, and therefore must be set aside.

**3. Defendants' Actions Are Arbitrary and Capricious**

Defendants' unlawful policy and actions interfering with election officials and employees' processing and counting of ballots via intimidation, threats, and coercion of election workers must also be held unlawful and set aside because these actions are arbitrary and capricious. *See* 5 U.S.C. §706(2)(A).

The APA requires that an agency provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). An action is also arbitrary and capricious if the agency "failed to consider … important aspects of the problem" before it. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 25 (2020) (quoting *State Farm*, 463 U.S. at 43). Action also violates the APA if the agency "offers an explanation for its decision that runs counter to the evidence before the agency,'" *Center for Biological Diversity v. U.S. Fish and Wildlife Serv.*, 67 F.4th 1027, 1035 (9th Cir. 2023) (quoting *State Farm*, 463 U.S. at 43). Further, agencies "must defend its actions based on the reasons [they] gave when [they] acted" and cannot rely on "post hoc rationalizations." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 23-24 (2020); *see also Fed. Power Comm'n v. Texaco, Inc.*, 417 U.S. 380, 397 (1974); *Arrington v. Daniels*, 516 F.3d 1106, 1113 (9th Cir. 2008).[21]

Defendants' policy and implementing acts of interfering with election officials and employees' processing and counting of ballots via intimidation, threats, and coercion are unlawful because they are neither reasonable nor reasonably explained, and Defendants' contemporaneous explanations plainly fail to consider important aspects of the problem they are creating.

[21] As such, any explanations beyond contemporaneous documents must be disregarded. *See, e.g.*, *Cmty. Legal Servs. in E. Palo Alto v. HHS*, 780 F.Supp.3d 897, 924 (N.D. Cal. 2025) ("The Government's attempt to make up for its failure to provide meaningful explanation for the funding termination amounts to post hoc rationalization via attorney argument. This is insufficient to overcome the Government's failure to proffer any competent evidence of reasoned decision making.").

First, Defendants' coercive demands that election workers sequester and not tabulate the ballots of registered voters appearing on Defendants' lists of suspected non-citizens is not reasonable or reasonably explained because those lists have been proven to be unreliable and riddled with errors. *See supra* at 14-17. For example, in Nevada, DHS initially identified up to 15,903 registered voters as likely noncitizens based on "high-confidence" matches, but later reduced that number to 6,218, and then to 185 after conducting a manual review. Evers Decl. Ex. 19. Similarly, in California, Defendants initially claimed that nearly 200,000 registered voters were likely noncitizens, but later reduced that number to 20,000 without any explanation. *Compare* Evers Decl. Ex. 8 (alleging nearly 200,000 noncitizen voters), *with* Evers Decl. Ex. 21 (identifying only 20,000 voters). Defendants themselves have *conceded* that the lists of registered voters they contend are non-citizens are riddled with errors. *See California I*, C.D. Cal. Case No. 2:26-cv-12025-DOC-ADS, Dkt. 107-1 ¶ 13 (DOJ declaration acknowledging that "there is always a risk for human error" in the list); *see also California Nurses Association v. Mullin*, 4:26-cv-10680 (N.D. Cal. Sep. 28, 2026) at ECF 46-2, ¶ 19 (acknowledging initial lists may contain citizens). As the district court in *California I* found, "the federal government's protocol" for compiling its lists of alleged non-citizens "raises significant concerns," and its claims that the voters identified by that process are "highly likely to be noncitizen[s]" "are not credible." 2026 WL 3252428, at *12-13. The Ninth Circuit denied Defendants' motion for a stay based on this finding. *United States v. California*, No. 26-7231, Slip Op. at 17 (9th Cir. Oct. 30, 2026).

Second, Defendants' coercive threats and acts of intimidation are a radical and unexplained departure from USDOJ's longstanding, well-reasoned policy *against* using its criminal enforcement power in ways that could interfere with an ongoing election. *See supra* at 14-18; Hulser Decl. Ex. A. For many years, USDOJ policy has directed that "overt criminal investigative measures should not ordinarily be taken in matters involving alleged fraud in the manner in which votes were cast or counted until the election in question has been concluded, its results certified, and all recounts and election contests concluded." Hulser Decl. ¶17. The USDOJ's noninterference policy also flatly prohibits prosecutors from timing "any action, including investigative steps, criminal charges, or statements, for the purpose of affecting any election." *Id.* ¶¶19 (quoting Justice Manual § 9-85.500).

Defendants' threats of criminal prosecution and USDOJ's issuance of criminal subpoenas to state and local election officials in the middle on ongoing election are an unprecedented and unexplained inversion of USDOJ's own longstanding policy.

Third, Defendants' actions are also arbitrary and capricious because they entirely fail to consider important aspects of the problem created by Defendants' actions. In particular, Defendants have failed to give proper weight to the interests of lawfully registered voters who are citizens and qualified to vote under state law, and who risk disenfranchisement as a result of Defendants' demands; the interests of state and local election officials and employees in doing their jobs in compliance with federal and state law without the threat of criminal prosecution; the interests of those state and local election workers in not violating other federal and state laws by acquiescing to Defendants' unlawful demands; and the interests of all voters in the fair administration of elections consistent with the requirements of federal and state law. *See California I*, 2026 WL 325248, at *14-15. Defendants have also failed to give proper weight to the impracticality of their demands, which seek to force states and counties "to create wholly new procedures while the election is already underway," and the administrative burdens they would place on state and local election officials and workers, which would "lead[] to chaos and upend[] the election." *Id.* at *13-14. Defendants appear to have ignored all of these significant factors in adopting and implementing their policy of demanding in the middle of an ongoing election that state and local election officials set aside ballots cast by lawfully registered voters who the federal government alleges may be non-citizens based on faulty, unreliable criteria, and furthermore threatening those workers with criminal prosecution if they do not accede to the Defendants' demands. This is the height of truly arbitrary and capricious government action.

#### 4. Defendants' Actions Are Final Agency Action

Defendants' decisions to threaten, intimidate, and coerce state and local elections workers were made at the highest level of USDOJ and DHS. This policy of targeting state and local election workers with intimidation, coercion, and threats of criminal prosecution, as well as the issuance of specific threat letters and criminal subpoenas to election workers pursuant to that policy, constitute final agency action subject to APA review. Agency action is final if it (1) "mark[s] the consummation

of the agency's decisionmaking process" and (2) determines "rights or obligations" or if "legal consequences will flow" from it. *Bennett v. Spear,* 520 U.S. 154, 178 (1997) (internal quotations omitted); *see S.F. Herring Ass'n v. DOI*, 946 F.3d 564, 577-78 (9th Cir. 2019). The "absence of a formal statement of" the agencies' policy "is not dispositive" and does not make the policy any less definite. *Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525, 1531 (D.C. Cir. 1990). Finality is evaluated "in a pragmatic and flexible manner." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006); *U.S. Army Corps. of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016).

Both prongs of the test established by *Bennett* are met. Defendants are right now implementing the policy of threatening and initiating criminal prosecutions and investigations of election workers, so it is a "definitive position" and not "merely tentative." *S.F. Herring Ass'n*, 946 F.3d at 578. And Defendants' implementation of their policy is having a "direct and immediate effect on the day-to-day operations of the subject party." *Or. Nat. Desert Ass'n*, 465 F.3d at 987.

In *San Francisco Herring Association*, 946 F.3d at 564, the Ninth Circuit held that a series of threats by National Park Service employees and state park workers acting at their direction to enforce commercial fishing laws and impose penalties constituted final agency action. The court explained that when an agency asserts its authority, refuses to change its position, and threatens enforcement, "potentially subjecting [threatened individuals] to serious penalties," it would "raise[] questions of basic fairness" to require them to risk those penalties by denying that these threats are reviewable final agency action. *Id*. at 575 ("The APA's judicial review provisions prevent precisely this 'heads I win, tails you lose' approach."). Despite the absence of a formal rule, the government was not "still in the middle of trying to figure out its position"— when it "went out … to implement the commercial fishing prohibition," its "position was a fait accompli." *Id*. at 578-79; *see also id*. at 582 ("The APA's final agency action requirement prevents this 'strong-arming of regulated parties into 'voluntary compliance' without the opportunity for judicial review—even judicial review of the question whether the regulated party is within the [agency's] jurisdiction.'") (quoting *Sackett v. EPA*, 566 U.S. 120, 131 (2012)); *AAUP v. Rubio*, 802 F.Supp.3d 120, 191 (D. Mass. 2025) (holding "discrete and novel" enforcement initiative to be final agency action).

The same is true here. "In the face of that lockstep action, a court is 'not required to exhibit a naiveté from which ordinary citizens are free,' and may infer that [Defendants] likely adopted a categorical policy." *Thakur v. Trump*, 787 F.Supp.3d 955, 986 (N.D. Cal. 2025), *rev'd in part on other grounds*, 178 F.4th 1187 (9th Cir. 2026) (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019)). Defendants are implementing an "unprecedented" and "discrete enforcement initiative," and any "insistence" by Defendants that it is "a mere matter of shifting … priorities, not a final agency action, [would be] unavailing." *AAUP*, 802 F.Supp.3d at 191.

**E. Defendants' Actions Are *Ultra Vires***

For all the reasons that Defendants' threats to state and local election workers are not authorized by law and in excess of constitutional and statutory authority, *supra* at Sections I(A)-(C), they are also *ultra vires*. Where the federal government takes ultra vires action, it is the proper constitutional role of this Court to declare that action unlawful. *See, e.g.*, *Murphy Co. v. Biden*, 65 F.4th 1122, 1130 (9th Cir. 2023); *Sierra Club v. Trump*, 963 F.3d 874, 888-93 (9th Cir. 2020), *judgment vacated on other grounds, sub nom. Biden v. Sierra Club*, 142 S. Ct. 46 (2021); *Sierra Club v. Trump*, 929 F.3d 670, 696-97 (9th Cir. 2019)); *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996).

**II. Defendants Are Causing Plaintiffs Ongoing Irreparable Harm**

Defendants' unlawful actions are causing election workers, including the employees that Union Plaintiffs represent, imminent, ongoing, and irreparable harm. Union Plaintiffs represent state and county election workers throughout the country, in states including but not limited to Arizona, California, Colorado, Illinois, Maine, Massachusetts, Michigan, Nevada, New York, Pennsylvania, Virginia, Texas, and Washington. Medina Decl. ¶11; Sforza Decl. ¶7. Their members reasonably fear Defendants' constant threats of criminal prosecution, which Defendants have already escalated into actual criminal investigations against election officials in California. *Supra* at 9-14. Moreover, as against public employees bound by state law to carry out their nonpartisan responsibilities, Defendants' intimidation, threats, and coercion attempts force election workers daily to choose between acceding to Defendants' unlawful demands or adhering to their duties and thereby subjecting themselves to a serious risk of criminal investigation and prosecution. This is precisely "'the type of

'Hobson's choice' that supports irreparable harm.'" *New York v. Admin. for Children & Families*, 833 F.Supp.3d 361, 401 (S.D.N.Y. Mar.10, 2026) (quoting *City of Chicago v. Sessions*, 264 F.Supp.3d 933, 950 (N.D. Ill. 2017)); *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (holding that a "Hobson's choice" in the face of imminent enforcement action can constitute irreparable injury). "Courts have repeatedly recognized the irreparable harm inherent to a situation such as the one in which Defendants have presently placed Plaintiffs, in which plaintiff can either accede to the government's presumptively unlawful threat or else disobey the government's directive and expose itself to potentially devastating injury throughout the pendency of the proceedings." *Metro. Transp. Auth. v. Duffy*, 784 F.Supp.3d 624, 693 (S.D.N.Y. 2025); *see also, e.g.*, *R.I. Coal. Against Domestic Violence v. Bondi*, 794 F.Supp.3d 58, 72 (D. R.I. 2025) ("dilemma" of declining grants or accepting funds subject to the challenged conditions and thus incurring "serious risks of enhanced and aggressive False Claims Act prosecutions" constitutes irreparable harm); *City of Los Angeles v. Sessions*, No. CV 17-7215-R, 2018 WL 6071072, at *3 (C.D. Cal. Sept. 13, 2018) ("impossible choice" between complying with unconstitutional and unlawful directives or loss of federal funding constitutes irreparable harm).

Defendants' unlawful attempts to intimidate and coerce election officials into segregating and ultimately discarding ballots cast by lawfully registered and qualified voters also threaten broader irreparable and catastrophic harm to the tens of thousands of lawfully registered voters on Defendants' lists of alleged non-citizens who risk disenfranchisement. "[T]he deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citation omitted); *Rodriguez v. Robbins*, 715 F.3d 1127, 1144-45 (9th Cir. 2013). Where executive action causes constitutional injuries, injunctive relief is appropriate. *See Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017).

### III. The Balance of Equities and Public Interest Weigh in Plaintiffs' Favor

The equities and public interest, which merge when the government is a party, *Wolford v. Lopez*, 116 F.4th 959, 976 (9th Cir. 2024), also strongly favor Plaintiffs. As explained, Defendants' attempts to threaten, intimidate, and coerce state and local election workers into halting the processing of ballots cast by lawfully registered voters are causing and will continue to cause

catastrophic and irreparable harm to Plaintiffs' members and others in the absence of immediate injunctive relief. The public has a paramount interest in ensuring that election officials and workers are able to carry out their crucial work in accordance with federal and state election procedures—work that is essential to the administration of a free and fair election that is the very core of our democracy—free from threats, intimidation, and coercion. As the district court in *California I* stated plainly, "Constitutional rights and our democracy are at stake. The public interest favors their protection." 2026 WL 3252428, at *15. "The public interest also favors the protection of election staff, who are working diligently to ensure that all citizens can cast their votes." *Id.*; *see also, e.g.*, *Am. Encore v. Fontes*, 152 F.4th 1097, 1120 (9th Cir. 2025) ("Vindication of constitutional rights is always in the public interest."); *NTEU v. U.S. Dep't of Treasury*, 838 F.Supp. 631, 640 (D.D.C. 1993).

By contrast, the federal government will suffer no harm at all from the requested injunction. Plaintiffs are not seeking to constrain the federal government's lawful exercise of its prosecutorial authority. Rather, Plaintiffs seek an order enjoining Defendants from continuing to threaten, intimidate, and coerce state and local election workers, including by threatening them with criminal prosecution unless they acquiesce to Defendants' unlawful demands. Defendants will suffer no harm by refraining from threatening, intimidating, or coercing state and local election officials to violate their duties to administer the midterm elections in accordance with the procedures established by Congress and state law. *See Melendres*, 695 F.3d at 1002; *CNA*, 2026 WL 3166149, at *9-10 (plaintiffs' "and the public's interest in safe elections, free from interference or intimidation, far exceed Defendants' purported interest in combating unlawful voting by non-U.S. citizens"); *Jolt*, 821 F.Supp.3d at 727 (voting rights group "ha[d] a more obvious interest in assisting others with registering to vote than" the Texas Attorney General did in "intimidating, threatening, or coercing Plaintiff, and the public interest favors preventing voter intimidation within the meaning of §11(b) of the VRA").

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this Court grant this motion and enter the accompanying proposed temporary restraining order and an order to show cause why a

preliminary injunction should not issue.

DATED: October 30, 2026

Respectfully submitted,

Stacey Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
Connie K. Chan (SBN 284230)
Colin Clemente Jones (SBN 354301)
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com
cchan@altber.com
cjones@altber.com

By: */s/ Danielle Leonard*

*Attorneys for Plaintiffs*

Norman L. Eisen*
Tianna Mays*
Pooja Chaudhuri (SBN 314847)
Jacob Kovacs-Goodman*
Elizabeth Westfall*
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Ave. SE #15180
Washington, DC 20003 (202) 601-8678
(202) 601-8678
norman@democracydefenders.org
tianna@democracydefenders.org
pooja@democracydefenders.org
jacob@democracydefenders.org
elizabeth-contract@democracydefenders.org

By: */s/ Norman L. Eisen*

*Attorneys for Plaintiffs*

Jared Fletcher Davidson*
NY Bar No. 5202429
PROTECT DEMOCRACY PROJECT
82 Nassau Street, #601
New York, NY 10038
(202) 579-4582

jared.davidson@protectdemocracy.org

Naomi Gilens (Cal. Bar. 315813)
Anna Dorman*
Ori Lev *
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, Suite #163
Washington, DC 20006
(202) 579-4582
naomi.gilens@protectdemocracy.org
Anna.dorman@protectdemocracy.org
ori.lev@protectdemocracy.org

Benjamin L. Berwick*
15 Main Street, Suite 312
Watertown, MA 02472
Tel.: (202) 579-4582
ben.berwick@protectdemocracy.org

By: */s/ Jared Fletcher Davidson*

*Attorneys for Plaintiffs*

Steven K. Ury (SBN 199499)
SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO
1800 Massachusetts Ave., N.W.
Washington, D.C. 20036
Tel: (202) 730-7428
steven.ury@seiu.org

By: */s/ Steven K. Ury*

*Attorney for Plaintiff Service Employees International Union AFL-CIO (SEIU)*

Teague Paterson (SBN 226659)
Matthew Blumin*
Georgina Yeomans*
AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, AFL-CIO
1625 L Street, N.W.
Washington, D.C. 20036
Tel: (202) 775-5900
TPaterson@afscme.org
MBlumin@afscme.org
GYeomans@afscme.org

By: */s/ Teague Paterson*

*Attorneys for Plaintiff American Federation of State County and Municipal Employees, AFL-CIO (AFSCME)*

Stuart Naifeh (SBN 233295)
John S. Cusick*
Brittany Carter*
NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006

I. Sara Rohani (SBN 337842)
Hayley Hahn*
Victor Olofin*
NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
700 14th Street N.W., Ste. 600
Washington, DC 20005
snaifeh@naacpldf.org

By: */s/ Stuart Naifeh*

*Attorneys for Plaintiff NAACP*