Stacey Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
Connie K. Chan (SBN 284230)
Colin Clemente Jones (SBN 354301)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
(415) 421-7151
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com
cchan@altber.com
cjones@altber.com

*Attorneys for Plaintiffs*

Norman L. Eisen*
Tianna Mays*
Pooja Chaudhuri (SBN 314847)
Jacob Kovacs-Goodman*
Elizabeth Westphal*
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Ave. SE #15180
Washington, DC 20003 (202) 601-8678
(202) 601-8678
norman@democracydefenders.org
tianna@democracydefenders.org
pooja@democracydefenders.org
jacob@democracydefenders.org
elizabeth-contract@democracydefenders

*Attorneys for Plaintiffs*

* *Pro Hac Vice application forthcoming*

[Additional counsel and affiliations listed on signature page]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO, et al.,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF JUSTICE, et al.,

Defendants.

Case No. 5:26-cv-12800-TLT

**DECLARATION OF RAYMOND HULSER**

# DECLARATION OF RAYMOND HULSER

I, Raymond Hulser, hereby declare:

1. I have personal knowledge of the facts set forth in this declaration, I am over eighteen years old, and I am competent to testify.

## Background

2. I served as a career prosecutor in the United States Department of Justice ("the Department") from November 1990 through January 27, 2025. During that time, I held many positions in the Public Integrity Section (PIN) of the Department's Criminal Division. I served as Trial Attorney from 1990 to 2003, Deputy Chief from 2003 to 2010, Principal Deputy Chief from 2010 to 2015, and Chief from 2015 to 2017. Each of these offices was traditionally held by a career Department lawyer, and none was politically appointed. In the Criminal Division front office, I held the positions of Deputy Assistant Attorney General from 2017 to 2019, and Senior Counsel to the Assistant Attorney General from 2019 to 2022. I was a member of the Senior Executive Service from 2010 through 2019.

3. In each of my positions in the Department's Criminal Division, I was responsible for handling and/or overseeing campaign finance and election crime investigations and prosecutions. As Principal Deputy Chief and Chief of PIN, and as Deputy Assistant Attorney General, I was responsible for enforcing the Department's election-related policies and overseeing the Election Crimes Branch, which was formed within PIN in 1980 to oversee the Department's handling of election crime and campaign finance investigations and prosecutions nationwide.

4. The Election Crimes Branch was responsible for drafting, revising, and publishing eight editions of the Department's core election crime publication, entitled *Federal Prosecution*

*of Election Offenses*. As Chief of PIN, I supervised the 2017 revision and publication of the eighth and most recent edition of *Federal Prosecution of Election Offenses*, a true and accurate copy of which is attached hereto as Exhibit A.[1]

5. In my position as Deputy Chief of PIN, I was one of the drafters of the first "Election Year Sensitivities" Memorandum, which then-Attorney General Michael Mukasey issued to all Department employees in March 2008. That series of memoranda is described further in paragraph 18, below.

6. From the Criminal Division, I was detailed at times to the United States Attorney's Office for the District of Columbia, where I served in a variety of positions between 2019 and 2022, including Special Assistant United States Attorney, Deputy Chief in the Capitol Siege Section, and Chief of the Public Corruption Unit in the Fraud, Public Corruption, and Civil Rights Section. I held some of my positions in PIN, the Criminal Division, and the United States Attorney's Office in an "acting" capacity at times.

7. Finally, from November 2022 through January 2025, I held the position of Counselor to Special Counsel Jack Smith.

8. I received a B.A. from Colgate University and a J.D. from the University of Pennsylvania Law School. I am admitted to the bars of Massachusetts and the District of Columbia.

**The Role of the Department of Justice's Public Integrity Section and Election Crimes Branch**

9. The Department of Justice is headed by the Attorney General. Its litigating work is carried out by a number of divisions, each led by an Assistant Attorney General, and by the

[1] *Available* at https://www.govinfo.gov/content/pkg/GOVPUB-J-PURL-gpo145659/pdf/GOVPUB-J-PURL-gpo145659.pdf.

ninety-three United States Attorneys' Offices, each led by a United States Attorney. The Criminal Division is one of the Department's litigating divisions. It assists with the enforcement and application of federal criminal law, in coordination with the United States Attorneys' Offices.

10. The Public Integrity Section, commonly referred to within the Department as "PIN," is a section of the Criminal Division. It was created in 1976, after the abuses of executive power identified in connection with the Watergate break-in, to consolidate in a single unit the Department's oversight of the prosecution of criminal abuses of the public trust by government officials. The Section is led by a Chief who reports to the Assistant Attorney General for the Criminal Division. The Section Chief has historically been a career official. During my tenure, PIN was staffed with as many as 30 career attorneys.

11. PIN investigates and prosecutes alleged criminal misconduct of public officials in all three branches of the federal government, as well as state and local public officials. PIN has exclusive jurisdiction over allegations of criminal misconduct against federal judges and also supervises the nationwide investigation and prosecution of election crimes.

12. The Election Crimes Branch is a component within PIN. It supervises the Department's nationwide response to election crimes, such as voter fraud and campaign-finance offenses. The Election Crimes Branch is headed by a Director, who is a career attorney. During my tenure, the Director oversaw all major election-crime investigations throughout the country and all proposed criminal charges relating to election crimes.

13. United States Attorneys' Offices conduct the great majority of federal criminal prosecutions, including election-crime prosecutions. The role of PIN and the Election Crimes Branch was not to displace those offices, but to supervise, consult, coordinate, and provide

consistency and independent judgment, particularly in matters that are politically sensitive or that carry a risk of the appearance of partisan influence.

14. The Civil Rights Division of the Department of Justice also enforces some election-related laws, but has distinct statutory and policy responsibilities. The Civil Rights Division is a separate litigating division, led by its own Assistant Attorney General, and is not part of the Criminal Division. Within it, the Criminal Section prosecutes criminal civil rights violations, and the Voting Section enforces federal voting-rights laws through civil litigation.

15. The division of authority between PIN and the Civil Rights Division turns principally on whether the conduct at issue involves discrimination on a protected basis. The Election Crimes Branch oversees the Department's handling of election-crime allegations, other than those involving voter intimidation or voter suppression based on race, color, religion, or national origin. Those excepted matters are handled by the Civil Rights Division. In practical terms, PIN and its Election Crimes Branch are concerned with crimes affecting the integrity of the electoral process itself, including ballot fraud, campaign-finance offenses, patronage crimes, and corruption of the process. The Civil Rights Division is concerned with protecting individuals' access to the vote against discrimination, through both criminal and civil enforcement. The two components have distinct statutory and policy responsibilities, and neither is a substitute for the other.

**The Department of Justice's Election-Related Policies**

16. The Department has well-established policies regarding how to handle election crime investigations and other types of criminal investigations during an election year. The policies are set forth in writing in several places.

17. First, with respect to the investigation of election crime itself, *Federal Prosecution of Election Offenses* sets forth what is known as the Department's "non-interference policy." That policy provides the following:

> **Non-interference with Elections**
>
> The Justice Department's goals in the area of election crime are to prosecute those who violate federal criminal law and, through such prosecutions, to deter corruption of future elections. The Department does not have a role in determining which candidate won a particular election, or whether another election should be held because of the impact of the alleged fraud on the election. In most instances, these issues are for the candidates to litigate in the courts or to advocate before their legislative bodies or election boards. Although civil rights actions under 42 U.S.C. § 1983 may be brought by private citizens to redress election irregularities, the federal prosecutor has no role in such suits.
>
> In investigating an election fraud matter, federal law enforcement personnel should carefully evaluate whether an investigative step under consideration has the potential to affect the election itself. Starting a public criminal investigation of alleged election fraud before the election to which the allegations pertain has been concluded runs the obvious risk of chilling legitimate voting and campaign activities. It also runs the significant risk of interjecting the investigation itself as an issue, both in the campaign and in the adjudication of any ensuing election contest.
>
> Accordingly, overt criminal investigative measures should not ordinarily be taken in matters involving alleged fraud in the manner in which votes were cast or counted until the election in question has been concluded, its results certified, and all recounts and election contests concluded. Not only does such investigative restraint avoid interjecting the federal government into election campaigns, the voting process, and the adjudication of ensuing recounts and election contest litigation, but it also ensures that evidence developed during any election litigation is available to investigators, thereby minimizing the need to duplicate investigative efforts. Many election fraud issues are developed to the standards of factual predication for a federal criminal investigation during post-election litigation.
>
> The Department views any voter interviews in the pre-election and balloting periods, other than interviews of a complainant and any witnesses he or she may identify, as beyond a preliminary investigation. A United States Attorney's Office considering such interviews must therefore first consult with the Public Integrity Section. USAM 9-85.210. This consultation is also necessary before any investigation is undertaken near the polls while voting is in progress.

> The policy discussed above does not apply to covert investigative techniques, nor does it apply to investigations or prosecutions of federal crimes other than those that focus on the manner in which votes were cast or counted. However, if there is any doubt about whether the policy may apply, we recommend that the Public Integrity Section be consulted.
>
> Exceptions to this general rule of course exist. For example, one exception may be appropriate when undercover techniques are justified and the Department's guidelines for undercover operations have been met. Another exception may apply when it is possible to both complete an investigation and file criminal charges against an offender prior to the period immediately before an election. All such exceptions require consultation with the Public Integrity Section, as they involve action beyond a preliminary investigation.

Ex. A (*Federal Prosecution of Election Offenses* (8th ed. 2017)) at 84-85.

18. In addition to the non-interference policy that was formulated in the specific context of investigating election crimes, the Department also has broader policies that are intended to preserve the Department's reputation for non-partisanship and impartiality in the context of *all* federal investigations and prosecutions. Beginning in 2008, in every presidential election year, the Attorney General has issued a memorandum to all Department personnel setting forth what is known as the Department's "Election Year Sensitivities" policy. The focus and text of the Attorney General memoranda have remained largely the same across administrations since 2008. On June 24, 2024, Attorney General Merrick Garland issued the most recent memorandum, a true and accurate copy of which is attached hereto as Exhibit B.[2] It stated:

> Department of Justice employees are entrusted with the authority to enforce the laws of the United States and with the responsibility to do so in a neutral and impartial manner. This is particularly important in an election year. Now that the 2024 election season is upon us, and as in prior election cycles, I am issuing this memorandum to remind you of the Department's existing policies with respect to political activities.

[2] *Available at* https://www.justice.gov/archives/jmd/media/1359366/dl.

**I. STATEMENTS, INVESTIGATIONS, AND CHARGING NEAR AN ELECTION**

The Department of Justice has a strong interest in the prosecution of election-related crimes, such as those involving federal and state campaign finance laws, federal patronage laws, and corruption of the election process. As Department employees, however, we must be particularly sensitive to safeguarding the Department's reputation for fairness, neutrality, and nonpartisanship.

Simply put, partisan politics must play no role in the decisions of federal investigators or prosecutors regarding any investigations or criminal charges. Law enforcement officers and prosecutors may never select the timing of public statements (attributed or not), investigative steps, criminal charges, or any other action in any matter or case for the purpose of affecting any election, or for the purpose of giving an advantage or disadvantage to any candidate or political party. Such a purpose, or the appearance of such a purpose, is inconsistent with the Department's mission and with the Principles of Federal Prosecution. *See* JM § 9-27.260 – Initiating and Declining Charges -Impermissible Considerations; JM § 9-85.500 – Actions that May Have an Impact on an Election.

If you face an issue, or the appearance of an issue, regarding the timing of statements, investigative steps, charges, or other actions near the time of a primary or general election, contact the Public Integrity Section of the Criminal Division ("PIN") for further guidance. Such consultation is also required at various stages of all criminal matters that focus on violations of federal and state campaign-finance laws, federal patronage crimes, and corruption of the election process. More detailed guidance is available in Sections 1-4 and 9-85 of the Justice Manual at https://www.justice.gov/jm/justice-manual.

19. In addition to those two sources, since 2022, the Department's Justice Manual has codified both the non-interference policy and the election-year sensitivities policy. They are included within Title 9 (Criminal) of the Justice Manual in a section entitled "9-85.000 – Protection of Government Integrity" (a true and accurate copy of which is attached hereto as Exhibit C to this declaration).[3] The Justice Manual provisions are set forth below:

**9-85.300 Non-Interference in Elections When Conducting Federal Criminal Investigations Involving Ballot Fraud**

Ballot fraud is crime involving the process by which voters are registered, votes are cast, or votes are tabulated. The Department has long recognized that the

[3] *Available at* https://www.justice.gov/jm/jm-9-27000-principles-federal-prosecution.

> States – not the federal government – are responsible for administering elections, determining the validity of votes, and tabulating the results, with challenges handled by the appropriate election administrators, officials, legislatures, and courts. The Department has a limited role in these processes and should generally avoid interfering or appearing to interfere with election administration, tabulation, validation, or certification. *See* § 9-85.500. The Department's role is limited to investigating and prosecuting violations of federal election laws and deterring criminal conduct. Accordingly, the Department should not engage in overt criminal investigative measures in matters involving alleged ballot fraud until the election in question has been concluded, its results certified, and all recounts and election contests concluded. Doing otherwise runs the risk of chilling legitimate voting and campaign activities and of interjecting the investigation itself into ongoing campaigns and the adjudication of any ensuing election contest. It may, however, often be appropriate, in consultation with the Public Integrity Section, to share information and allegations involving such matters with state or local authorities where an immediate need for overt measures exists. Exceptions to this policy may be recognized, but only with the approval of the Public Integrity Section.

Ex. C (*Justice Manual*, 9-85.000 – Protection of Government Integrity) at 7.

> **9-85.500 Actions that May Have an Impact on an Election**
>
> Federal prosecutors and agents may never select the timing of any action, including investigative steps, criminal charges, or statements, for the purpose of affecting any election, or for the purpose of giving an advantage or disadvantage to any candidate or political party. Such a purpose is inconsistent with the Department's mission and with the Principles of Federal Prosecution. *See* § 9-27.260. Any action likely to raise an issue or the perception of an issue under this provision requires consultation with the Public Integrity Section, and such action shall not be taken if the Public Integrity Section advises that further consultation is required with the Deputy Attorney General or Attorney General.

*Id.* at 8.

20. Finally, within another section of Title 9 (Criminal) entitled "9-27.000 – Principles of Federal Prosecution" (a true and accurate copy of which is attached hereto as Exhibit D),[4] the Justice Manual states the prohibition against taking politics into account in

[4] *Available at* https://www.justice.gov/jm/jm-9-27000-principles-federal-prosecution.

making prosecutorial decisions and against taking any action (or timing any action) for the purpose of affecting an election:

> **9-27.260 - Initiating and Declining Charges—Impermissible Considerations**
>
> In determining whether to commence or recommend prosecution or take other action against a person, the attorney for the government may not be influenced by:
>
> 1. The person's race, religion, gender, ethnicity, national origin, sexual orientation, or political association, activities, or beliefs;
> 2. The attorney's own personal feelings concerning the person, the person's associates, or the victim; or
> 3. The possible effect of the decision on the attorney's own professional or personal circumstances.
>
> Charges or statutory sentencing enhancements may not be filed, nor the option of filing charges or enhancements raised, simply to exert leverage to induce a plea or because the defendant elected to exercise the right to trial.
>
> In addition, federal prosecutors and agents may never make a decision regarding an investigation or prosecution, or select the timing of investigative steps or criminal charges, for the purpose of affecting any election, or for the purpose of giving an advantage or disadvantage to any candidate or political party. See § 9-85.500.

Ex. D (*Justice Manual*, 9-27.000 – Principles of Federal Prosecution) at 17-18.

21. On November 9, 2020, after voting was completed in the 2020 presidential election, Attorney General William Barr issued a memorandum creating an exception to the non-interference policy that permitted the Department, after voting was completed, "to pursue substantial allegations of voting and vote tabulation irregularities prior to the certification of elections." (A true and accurate copy of the memorandum is attached hereto as Exhibit E). AG Barr instructed that "[s]uch inquiries and reviews may be conducted if there are clear and apparently-credible allegations of irregularities that, if true, could potentially impact the outcome of a federal election in an individual State." The creation of that exception was criticized by

hundreds of current and former DOJ attorneys at the time. The Justice Manual has since 2022 fully reinstated the non-interference policy without Attorney General Barr's exception.

**Purpose and Implementation of the Department's Election-Related Policies**

22. The Department's election-related policies recognize the Department's limited role in our nation's elections. As stated in the Justice Manual: "[t]he Department has long recognized that the States – not the federal government – are responsible for administering elections, determining the validity of votes, and tabulating the results, with challenges handled by the appropriate election administrators, officials, legislatures, and courts." Ex. C (*Justice Manual*, 9-85.000 – Protection of Government Integrity) at 7. In turn, "[t]he Department's role is limited to investigating and prosecuting violations of federal election laws and deterring criminal conduct." *Id.* The Department's election-related policies are designed to preserve the lead role of the states and local jurisdictions who carry out the elections.

23. Consistent with its limited role, the Department's non-interference policy is designed to avoid "the risk of chilling legitimate voting and campaign activities and of interjecting the investigation itself into ongoing campaigns and the adjudication of any ensuing election contest." Ex. A (Federal Prosecution of Election Offenses (8th ed. 2017)) at 84. In plain terms, the non-interference policy is intended to avoid interfering with elections – either directly, by interfering with voting, tabulation, or the certification of results, or indirectly, by chilling participation or "interjecting the investigation itself as an issue . . . in the campaign and in the adjudication of any ensuing election contest." *Id.* Because overt investigative steps (such as witness interviews, search warrants, or seizure of election-related materials) could interfere with the election or inject the Department's investigation itself into ongoing political campaigns

or election contests, those overt steps should generally be avoided until the election is certified. Any exceptions require PIN approval.

24. The Department's Election Year Sensitivities policy reflects the Department's commitment to "safeguarding the Department's reputation for fairness, neutrality, and nonpartisanship." Ex. B (2024 Attorney General Memorandum on Election Year Sensitivities) at 1. The policy is designed to avoid even the appearance that the Department is taking action for the purpose of affecting an election.

25. During my tenure with the Department, these election-related policies were implemented on a nationwide basis in every election year. For decades the Election Crimes Branch and PIN maintained the central role in providing nationwide training, guidance, and enforcement of the policies. And their role was fortified by a nationwide network of specially trained District Election Officers in United States Attorneys' Offices and FBI agents in Field Offices across the country. Those representatives, working with the Election Crimes Branch and attorneys in PIN, would field inquiries in the run-up to elections and on election day itself to ensure that the non-interference and election-year sensitivities policies were followed across the country. When prosecutors or law enforcement agents consulted with PIN regarding potential overt investigative steps in the period immediately before an election, one question we would typically ask was whether there was a reason that they needed to take that action at that time rather than after the election. For example, would postponing that step harm the investigation in some way, such as spoliation of evidence or loss of a witness? If there was no investigative reason that the step needed to be taken at that time, it would weigh in favor of waiting in order to avoid even the appearance of the Department attempting to influence an election.

26. In my experience, DOJ historically has conducted many overt investigations of election crimes after elections have concluded, and been successful at doing so.

27. While I was in the Department, PIN was staffed with dozens of trial attorneys handling public corruption and election crime matters across the country. Since I left the Department in 2025, I understand that the Department has significantly reduced the size and makeup of PIN. Specifically, the Chief of PIN was reassigned, several supervisors resigned and have not been replaced, including the Director of the Election Crimes Branch, and most of PIN's trial attorneys have been transferred or detailed elsewhere, leaving just a small number of attorneys. *See* Lynch et al., *How Trump defanged the Justice Department's political corruption watchdogs*, Reuters (June 9, 2025) (a true and accurate copy of which is attached hereto as Exhibit F).[5]

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 28 2026.

Raymond Hulser

[5] *Available at* https://www.reuters.com/investigations/how-trump-defanged-justice-departments-political-corruption-watchdogs-2025-06-09/.

# EXHIBIT A

# Federal Prosecution of Election Offenses

## Eighth Edition

*December 2017*

Edited by:

Richard C. Pilger, Director
Election Crimes Branch
Public Integrity Section

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

# TABLE OF CONTENTS

**PREFACE ............................................................... xii**

**CHAPTER ONE: OVERVIEW ........................................... 1**

A. INTRODUCTION ................................................ 1
B. TYPES OF ELECTION CRIMES ........................... 2
   1. Election Fraud ................................................ 2
   2. Patronage Crimes ............................................ 3
   3. Campaign Financing Crimes ............................. 4
   4. Civil Rights Crimes .......................................... 5
C. FEDERAL JURISDICTION .................................... 5
D. ADVANTAGES OF FEDERAL PROSECUTION ..................................................... 7
E. FEDERAL ROLE: PROSECUTION, NOT INTERVENTION ................................................... 8
F. EVALUATING AN ELECTION FRAUD ALLEGATION .................................................... 10
G. INVESTIGATIVE CONSIDERATIONS IN ELECTION FRAUD CASES ................................ 11
H. EVALUATING A CAMPAIGN FINANCING ALLEGATION .................................................... 12
I. INVESTIGATIVE CONSIDERATIONS IN CAMPAIGN FINANCING CASES ...................... 14
J. CONSULTATION REQUIREMENTS AND RECOMMENDATIONS ...................................... 15
   1. Consultation Requirements for Election Fraud and Patronage Crimes ..................................... 16
   2. Consultation Requirements for Campaign Financing Crimes ........................................... 17

**CHAPTER TWO: CORRUPTION OF THE ELECTION PROCESS ....................................................................19**

A. HISTORICAL BACKGROUND ............................19
B. WHAT IS ELECTION FRAUD? ............................22
1. In General ............................................................22
2. Conduct that Constitutes Federal Election Fraud ....................................................23
3. Conduct that Does Not Constitute Federal Election Fraud .....................................26
4. Conditions Conducive to Election Fraud .........27
5. Voter Participation Versus Non-voter Participation Cases ..........................................27
(a) Election frauds not involving the participation of voters ...............................28
(b) Election frauds involving the participation of voters ....................................................29
C. JURISDICTIONAL SUMMARY ..........................30
1. Statutes Applicable to Non-Federal Elections .........................................................31
2. Statutes Applicable to Federal Elections Only ..................................................32
D. STATUTES ..........................................................33
1. Conspiracy Against Rights: 18 U.S.C. § 241 ...33
2. Deprivation of Rights under Color of Law: 18 U.S.C. § 242 ................................................37
3. False Information in, and Payments for, Registering and Voting: 52 U.S.C. § 10307(c) .......................................38
(a) The basis for federal jurisdiction ..............39
(b) False information to an election official ...40
(c) Vote-Buying ...........................................43
(d) Conspiracy to cause illegal voting ............45
4. Voting More than Once: 52 U.S.C. § 10307(e) .......................................46

5. Voter Intimidation ........................................49
   (a) Intimidation in voting and registering to vote: 52 U.S.C. § 20511(1) ......................51
   (b) Intimidation of voters: 18 U.S.C. § 594...52
   (c) Coercion of political activity: 18 U.S.C. § 610 ........................................................53
   (d) Conspiracy against rights and deprivation of constitutional rights: 18 U.S.C. §§ 241 and 242 ........................................................53
   (e) Federally protected activities: 18 U.S.C. § 245(b)(1)(A) ........................................55
6. Voter Suppression: 18 U.S.C. §§ 241 and 242 ................................56
7. Fraudulent Registration or Voting: 52 U.S.C. § 20511(2) ........................................................58
   (a) Fraudulent registration: § 20511(2)(A) ...59
   (b) Fraudulent voting: § 20511(2)(B) ...........60
8. Voting by Non-citizens ...................................60
   (a) Fraudulent registration and voting: 52 U.S.C. § 20511(2) ..............................61
   (b) False claims to register or vote: 18 U.S.C. § 1015(f) ..................................................62
   (c) False claims of citizenship: 18 U.S.C. § 911 ........................................................63
9. Voting by Aliens: 18 U.S.C. § 611 .................63
10. Travel Act: 18 U.S.C. § 1952 .........................64
11. Mail and Wire Fraud: 18 U.S.C. §§ 1341, 1343 .................................67
   (a) "Salary Theory" of mail and wire fraud ...67
   (b) "Cost-of-election" theory: 18 U.S.C. § 1341 .....................................72
12. Troops at Polls: 18 U.S.C. § 592 ....................73
13. Campaign Dirty Tricks ...................................73
   (a) Election communications and solicitations: 52 U.S.C. § 30120 ...................................74

(b) Fraudulent misrepresentation: 52 U.S.C. § 30124 .................................. 74
14. Retention of Federal Election Records: 52 U.S.C. § 20701 .......................................... 75
(a) Legislative purpose and background ........ 76
(b) The basic requirements of Section 20701 ......................................... 77
(c) Section 20701 requires document preservation, not document generation .... 78
(d) Originals must be retained ........................ 78
(e) Election officials must supervise storage .. 79
15. Section 20701 versus National Voter Registration Act ............................................ 79
E. POLICY AND PROCEDURAL CONSIDERATIONS ........................................... 80
1. Consultation Requirements .............................. 80
2. Urgent Reports and Press Releases .................. 83
3. Federal Seizure of State Election Materials ..... 83
4. Non-interference with Elections ...................... 84
5. Limitations on Federal Poll Watching ............. 85
6. Selective Prosecution Issues ............................ 86
F. SUGGESTIONS FOR SUCCESSFUL ELECTION FRAUD INVESTIGATIONS ............................... 86
1. Getting Started ............................................... 87
(a) Publicize your intent to prosecute election fraud ....................................................... 87
(b) Be aware of the importance of voting documentation ......................................... 88
(c) Consider the advantages of federal prosecution ............................................ 90
(d) Focus on areas vulnerable to election fraud .......................................... 91
(e) Develop your investigative strategy early ............................................ 91
2. The Investigation ............................................ 92

(a) Preliminary investigation ..........................92
(b) Grand jury and FBI full-field investigations ..........................................93
3. Investigating Two Types of Election Fraud .....93
(a) Absentee ballot frauds ..............................93
(b) Ballot-box stuffing cases ..........................95
4. A Few Cautions ............................................96
5. Conclusion ....................................................98

**CHAPTER THREE: PATRONAGE CRIMES ..................99**

A. HISTORICAL BACKGROUND ...........................99
B. STATUTES ........................................................101
1. Limitations Based on Federal Employment or Workspace ....................................................101
(a) Solicitation of political contributions: 18 U.S.C. § 602 ....................................101
(b) Making political contributions: 18 U.S.C. § 603 .....................................................103
(c) Intimidation to secure political contributions: 18 U.S.C. § 606 .............103
(d) Coercion of political activity: 18 U.S.C. § 610 .....................................................104
2. Place of solicitation: 18 U.S.C. § 607 ...........105
3. Limitations Based on Federal Programs and Benefits ........................................................107
(a) Promise or deprivation of federal employment or other benefit for political activity: 18 U.S.C. §§ 600 and 601........107
(b) Promise of appointment by candidate: 18 U.S.C. § 599 ....................................110
(c) Interference in election by employees of federal, state, or territorial governments: 18 U.S.C. § 595 .....................................111

(d) Coercion by means of relief appropriations: 18 U.S.C. § 598 .....111
(e) Solicitation from persons on relief: 18 U.S.C. § 604 .....111
(f) Disclosure of names of persons on relief: 18 U.S.C. § 605 .....112
4. Permissible Political Activity under the Hatch Act, as Amended: 5 U.S.C. §§ 7323 and 7324 .....112
C. POLICY AND PROCEDURAL CONSIDERATIONS .....115

**CHAPTER FOUR: ELECTION DAY PROCEDURES ..116**

**CHAPTER FIVE: CAMPAIGN FINANCE CRIMES.....122**

A. INTRODUCTION .....122
B. STATUTORY SCOPE .....124
1. Types of Statutes .....124
2. Basic Statutory Definitions .....125
3. Statutory Presumptions .....128
C. STATUTES .....129
1. Introduction .....129
2. Substantive Statutes .....129
(a) 52 U.S.C. § 30116: Limitations on contributions and expenditures .....129
(b) 52 U.S.C. § 30118: Prohibition on contributions and expenditures by national banks, corporations, or labor organizations .....133
(c) 52 U.S.C. § 30119: Prohibition on contributions by government contractors 136
(d) 52 U.S.C. § 30120: Attribution of sponsors of political communications and solicitations .....137

(e) 52 U.S.C. § 30121: Prohibition on contributions, donations, and expenditures by foreign nationals ....138
(f) 52 U.S.C. § 30122: Prohibition on contributions through conduits ....141
(g) 52 U.S.C. § 30123: Limitation on contribution of currency....143
(h) 52 U.S.C. § 30124: Fraudulent misrepresentation of campaign authority....143
(i) 52 U.S.C. § 30125: Soft money of political parties....144
i. Section 30125(a) ....144
ii. Section 30125(b) ....145
iii. Section 30125(d)....147
iv. Section 30125(e) ....147
3. 52 U.S.C. § 30114: Prohibition on Conversion of Campaign Funds ....148
4. 52 U.S.C. §§ 30102, 30103, and 30104: Organization, Recordkeeping, and Reporting Requirements ....149
D. ENFORCEMENT ....150
1. Three Types of Enforcement ....150
2. FECA's Criminal Penalty Provision ....152
(a) Intent....152
(b) Aggregate value....155
3. Penalties ....156
4. Statute of Limitations for Campaign Financing Offenses ....157
5. Venue for FECA Offenses ....157
6. Other Applicable Federal Criminal Statutes ..158
(a) Willfully causing submission of false information to the Federal Election Commission: 18 U.S.C. §§ 1001 and 2....159

(b) Conspiracy to defraud the United States: 18 U.S.C. § 371 .......... 162
(c) Public financing crimes relating to presidential campaigns .......... 163
(d) Mail and wire fraud: 18 U.S.C. §§ 1341 and 1343 .......... 165
(e) False records in the administration of a federal matter: 18 U.S.C. § 1519 .......... 167

7. Policy and Procedural Considerations .......... 167
(a) Consultation requirements and recommendations .......... 167
(b) Investigative jurisdiction .......... 168
(c) Non-waiver of the Federal Election Commission's civil enforcement authority .......... 169
(d) Dealings with the Federal Election Commission .......... 169
(e) Federal Election Commission officials as prosecution witnesses .......... 170

**CHAPTER SIX: SENTENCING OF ELECTION CRIMES .......... 172**

A. OVERVIEW .......... 172
B. CONVICTIONS INVOLVING CORRUPTION OF THE ELECTORAL PROCESS .......... 173
1. § 2H2.1: Obstructing an Election or Registration .......... 174
2. § 2C1.8: Making, Receiving, or Failing to Report a Contribution, Donation, or Expenditure in Violation of the Federal Election Campaign Act; Fraudulently Misrepresenting Campaign Authority; Soliciting or Receiving a Donation in Connection with an Election While on Certain Federal Property .......... 180

3. Examples of Application of FECA Sentencing Guidelines ....................................................185
(a) Example 1: The conduit ........................185
(b) Example 2: A typical FECA crime: laundered corporate contributions ..........187
(c) Example 3: Corporate contributor to multiple candidates through threats and coercion .................................................188
(d) Example 4: Fundraiser possessing special skill .......................................................190
(e) Example 5: Major political party donor seeking a benefit from the government ...191
(f) Example 6: Foreign agent who gives funds from foreign government to non-federal candidates to obtain a specific benefit from the government ......................................192
C. CONVICTIONS OF CAMPAIGN FINANCING VIOLATIONS ADDRESSED UNDER ALTERNATIVE THEORIES OF PROSECUTION ................................................194
1. Conspiracy to Disrupt and Impede the Federal Election Commission ....................................194
2. False Statements to the Federal Election Commission and False Internal Records .........194
3. Embezzlement of Campaign Funds ................195
D. OBLIGATION TO REPORT FELONY CONVICTIONS TO STATE ELECTION OFFICIALS .......................................................196

**CHAPTER SEVEN: CONCLUSION – WHY PROSECUTING ELECTION CRIMES IS SO IMPORTANT ..........................................................................197**

**APPENDIX A: EXCERPT FROM *McCONNELL v. FEDERAL ELECTION COMMISSION* .............................202**

**APPENDIX B: STATUTES ..............................................216**

**APPENDIX C: EDITORIAL RECLASSIFICATION TABLE FOR TITLE 52 ......................................................274**

**APPENDIX D: TABLE OF CASES ...................................275**

# PREFACE

This eighth edition of *Federal Prosecution of Election Offenses* builds on the original work of Craig C. Donsanto, Nancy N. Simmons, and others, in all of the prior editions. This edition updates their work with developments in the law of election offenses since the last edition in 2007. Trial Attorneys Amanda R. Vaughn and Simon J. Cataldo of the Public Integrity Section have contributed substantially to this edition.

Among other things, this edition accounts for important changes in the law regarding independent expenditures and honest services fraud, reflecting the Supreme Court's holdings in *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010), and *Skilling v. United States*, 561 U.S. 358 (2010). On a practical level, the statutory references and appendix have been updated to account for the recodification of many election crimes into Title 52 of the United States Code. This edition also streamlines discussion of the history of amendments to the Federal Election Campaign Act given the passage of time since the most recent actions by Congress.

This monograph provides only internal Department of Justice guidance. It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal. Nor are any limitations placed on otherwise lawful litigative prerogatives of the Department of Justice.

Richard C. Pilger
Director, Election Crimes Branch
Public Integrity Section, Criminal Division

December 2017

# CHAPTER ONE

# OVERVIEW

This book was written to help federal prosecutors and investigators discharge the responsibility of the United States Department of Justice in attacking corruption of the election process with all available statutes and theories of prosecution. It addresses how the Department handles all federal election offenses, other than those involving civil rights, which are enforced by the Department's Civil Rights Division. This Overview summarizes the Department's policies, as well as key legal and investigative considerations, related to the investigation and prosecution of election offenses.

## A. INTRODUCTION

In the United States, as in other democratic societies, it is through the ballot box that the will of the people is translated into government that serves rather than oppresses. It is through elections that the government is held accountable to the people and political conflicts are channeled into peaceful resolutions. And it is through elections that power is attained and transferred.

Our constitutional system of representative government only works when the worth of honest ballots is not diluted by invalid ballots procured by corruption. As the Supreme Court stated in a case upholding federal convictions for ballot box stuffing: "Every voter in a federal . . . election, . . . whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States*, 417 U.S. 211, 227 (1974). When the election process is corrupted, democracy is jeopardized. Accordingly, the effective prosecution of corruption of the election process is a significant federal law enforcement priority.

Although corrupt government may exist without election crime, when election crime exists, public corruption of some form is also usually present. This is so because virtually all election crime is driven by a motive to control governmental power for some corrupt purpose. Election crime cases therefore often provide effective tools for attacking other forms of public corruption. The task of the federal prosecutor and investigator is not only to vindicate the fundamental principle of fair elections by convicting those who corrupt them but also to find the motive behind the election fraud and, when possible, to prosecute those involved in the underlying corruption.

There are several reasons why election crime prosecutions may present an easier means of obtaining convictions than do other forms of public corruption:

- Election crimes usually occur largely in public.
- Election crimes often involve many players. For example, successful voter bribery schemes require numerous voters; ballot box stuffing requires controlling all the election officials in a polling location; and illegal political contributions generally involve numerous conduits to disguise the transaction.
- Election crimes tend to leave paper trails, either in state voting documentation or in public reports filed by federal campaigns.

## B. TYPES OF ELECTION CRIMES

### 1. Election Fraud

Election fraud usually involves corruption of one of three processes: the obtaining and marking of ballots, the counting and certification of election results, or the registration of voters. Election fraud is generally not common when one party or one faction of a

party dominates the political landscape. Rather, the conditions most conducive to election fraud are close factional competition within an electoral jurisdiction for an elected position that matters. Thus, in a jurisdiction when one party is dominant, election fraud may nevertheless occur during the primary season, as various party factions vie for power.

Most election fraud aims at ensuring that important elected positions are occupied by "friendly" candidates. It occurs most often when the financial stakes involved in who controls public offices are great – as is often the case when patronage positions are a major source of employment, or when illicit activities are being conducted that require protection from official scrutiny. As noted, election crimes will typically coincide with other types of corruption.

### 2. Patronage Crimes

Patronage is a term used to describe the doctrine of "to the victor go the spoils." The Supreme Court has held that the firing, based on partisan considerations, of public employees who occupy non-confidential and non-policymaking positions violates the First Amendment. Moreover, an aggressive and pervasive patronage system can provide a fertile breeding ground for other forms of corruption. It is therefore important to root out aggravated patronage abuses wherever they occur.

Patronage crimes are most prevalent when one political faction or party dominates the political landscape but is also required to defend its position of power against a credible opposition. Patronage crimes are also common in jurisdictions where other forms of public corruption are prevalent and tolerated by the body politic.

### 3. Campaign Financing Crimes

The federal campaign financing laws are embodied within the Federal Election Campaign Act of 1971 (FECA), 52 U.S.C. §§ 30101–30146, as amended (most significantly in 1974, 1976, 1979, and 2002)

As amended, FECA applies to virtually all financial transactions that impact upon, directly or indirectly, the election of candidates for federal office, that is, candidates for President or Vice President or for the United States Senate or House of Representatives. FECA reaches a wide range of communications aimed at influencing the public with respect to issues that are closely identified with federal candidates, referred to in the law as "electioneering communications."

FECA contains its own criminal sanctions, which provide that, to be a crime, a FECA violation must have been committed knowingly and willfully and, except for campaign misrepresentations and certain coerced contributions, must have involved at least $2,000 in a calendar year. 52 U.S.C. § 30109(d). FECA crimes aggregating $25,000 or more are five-year felonies, and those that involve illegal *conduit contributions* and aggregate over $10,000 are two-year felonies. 52 U.S.C. § 30109(d)(1)(A), (D). Moreover, all criminal violations of FECA are subject to U.S. Sentencing Guideline § 2C1.8, that the United States Sentencing Commission promulgated in response to a specific Congressional directive.

FECA violations that either: (1) do not present knowing and willful violations, or (2) involve sums below the statutory minimums for criminal prosecution, are handled non-criminally by the Federal Election Commission (FEC) under the statute's civil enforcement provisions. 52 U.S.C. § 30109(a).

Finally, FECA violations that result in false information being provided to the FEC may present violations of 18 U.S.C. § 371 (conspiracy to disrupt and impede a federal agency), 18 U.S.C. § 1001 (false statements within the jurisdiction of a federal agency), 18 U.S.C. § 1505 (obstruction of agency proceedings), or 18 U.S.C. § 1519 (creation of false records in relation to or contemplation of federal matters).

#### 4. Civil Rights Crimes

Schemes to deprive minorities of the right to vote are federal crimes under the Voting Rights Act of 1965, as amended. 52 U.S.C. § 10308. Discrimination based on a potential voter's race, or on ethnic factors or minority language, may also be redressed under such criminal statutes as 18 U.S.C. §§ 241 and 242. These prosecutions are handled by Criminal Section of the Civil Rights Division.

In addition to civil rights crimes, federal law provides non-criminal remedies for any conduct that diminishes an individual's voting rights based on racial, ethnic, or language minority factors. These civil remedies are incorporated within the Voting Rights Act of 1965, as amended, and other civil rights laws, and they are enforced by the Voting Section of the Civil Rights Division.

## C. FEDERAL JURISDICTION

The federal government asserts jurisdiction over an election offense to ensure that basic rights of United States citizenship, and a fundamental process of representative democracy, remain uncorrupted.

Election crime cases tend to be long-term projects focusing on individuals with different degrees of culpability. The ultimate

goal is to move up the ladder of culpability to candidates, political operatives, public officials, and others who attempted to corrupt, or did corrupt, the public office involved.

Federal jurisdiction over election fraud is easily established in elections when a federal candidate is on the ballot. The mere listing of a federal candidate's name on a ballot is sufficient, under most of the federal statutes used to prosecute voter fraud, to establish federal jurisdiction. This generally occurs in what are called "mixed" elections, when federal and non-federal candidates are running simultaneously. In such cases, the federal interest is based on the presence of a federal candidate, whose election may be tainted, or appear tainted, by the fraud, a potential effect that Congress has the constitutional authority to regulate under Article I, Section 2, clause 1; Article I, Section 4, clause 1; Article II, Section 1, clause 2; and the Seventeenth Amendment.

The absence of a federal candidate from the ballot can present federal law enforcement with special challenges in attaining federal jurisdiction over election crime. Those challenges can sometimes be met, provided the investigation focuses on identifying additional facts that are needed to invoke application of the federal criminal laws that potentially apply to both federal and non-federal elections. These generally include election frauds that involve the necessary participation of public officers, notably election officials acting "under color of law," voting by non-citizens, fraudulently registering voters, or paying voters in violation of state law.

Federal jurisdiction over campaign financing offenses under FECA also derives from Congress's authority to regulate the federal election process. While a number of the provisions added to FECA by the Bipartisan Campaign Reform Act (BCRA) address financial activities by state and local parties that are generic in the sense that they simultaneously benefit both federal

and non-federal candidates, federal campaign financing law does not apply to violations of state campaign laws. Most states have enacted laws regulating and requiring transparency of campaign financing of candidates seeking state or local office. While violations of these state statutes are not, by themselves, federal crimes, they may be evidence of other federal crimes, including Hobbs Act, Travel Act, mail or wire fraud, or other offenses.

## D. ADVANTAGES OF FEDERAL PROSECUTION

The Constitution confers upon the states primary authority over the election process. Accordingly, federal law does not directly address how elections should be conducted. State law historically has regulated such important activities as the registration of voters, the qualifications for absentee voting, the type of voting equipment used to tabulate votes, the selection of election officials, and the procedures and safeguards for counting ballots.

These factors might suggest that the prosecution of election crime should be left primarily to local law enforcement. However, local law enforcement often is not equipped to prosecute election offenses. Federal law enforcement might be the only enforcement option available.

Four characteristics of the federal criminal justice system support the federal prosecution of election crimes despite the primary role of the states in most facets of election administration:

- Federal grand juries, the secrecy requirements of which help protect the testimony of witnesses who tend to be vulnerable to manipulation and intimidation.

- Federal trial juries, which are drawn from a broader geographic area than are most state juries, and thus lessen the possibility of local bias.

- Resources to handle the labor-intensive investigations generally required for successful prosecution of election crime.

- Detachment from local political forces and interests.

## E. FEDERAL ROLE: PROSECUTION, NOT INTERVENTION

The principal responsibility for overseeing the election process rests with the states. With the significant exception of violations of the Voting Rights Act involving denigration of the right to vote based on race, ethnicity, or language minority status, the federal government plays a role secondary to that of the states in election matters.[1] It is the states that have primary authority to ensure that only qualified individuals register and vote, that the polling process is conducted fairly, and that the candidate who received the most valid votes is certified as the winner.[2]

The federal prosecutor's role in matters involving corruption of the process by which elections are conducted, on the other hand, focuses on prosecuting individuals who commit federal crimes in connection with an election. Deterrence of future similar crimes is an important objective of such federal prosecutions. However, this deterrence is achieved by public

---

[1] When election offenses are driven by animus based on race, ethnicity, or language-minority status, the broad protections of the 1965 Voting Rights Act and other civil rights statutes apply. 52 U.S.C. §§ 10101, 10301, 10303(f), & 10503. Such matters are supervised by the Civil Rights Division.

[2] Of course, the U.S. electoral college presents an exception.

awareness of the Department's prosecutive interest in, and prosecution of, election fraud – not through interference with the process itself.

Because the federal prosecutor's function in the area of election fraud is not primarily preventative, any criminal investigation by the Department must be conducted in a way that minimizes the likelihood that the investigation itself may become a factor in the election. The mere fact that a criminal investigation is being conducted may impact upon the adjudication of election litigation and contests in state courts. Moreover, the seizure by federal authorities of documentation generated by the election process may deprive state election and judicial authorities of critical materials needed to resolve election disputes, conduct recounts, and certify the ultimate winners. Accordingly, it is the general policy of the Department not to conduct overt investigations, including interviews with individual voters, until after the outcome of the election allegedly affected by the fraud is certified.

In addition, the federal prosecutor has no authority to send FBI Special Agents or Deputy U.S. Marshals to polling places. In fact, a federal statute makes it a felony for any federal official to send "armed men" to the vicinity of open polling places. 18 U.S.C. § 592. In light of these considerations, Department and FBI policy requires that any investigative action that involves an intrusion by federal investigators into the area immediately surrounding an open polling place be approved by the Criminal Division's Public Integrity Section.

## F. EVALUATING AN ELECTION FRAUD ALLEGATION

Not all irregularities in the election process are appropriate for criminal prosecution. It is, for example, not a federal crime for election officials to make negligent mistakes in the administration of an election. Many of these non-criminal lapses are redressed through election contests, recounts, education programs, or disciplinary action against election officials whose mistakes are the result of negligence rather than corruption.

Determining whether an election fraud allegation warrants federal criminal investigation and possible prosecution requires that federal prosecutors and investigators answer two basic questions:

(1) Is criminal prosecution the appropriate remedy for the allegations and facts presented? Criminal prosecution is most appropriate when the facts demonstrate that the defendant's objective was to corrupt the process by which voters were registered, or by which ballots were obtained, cast, or counted.

(2) Is there potential federal jurisdiction over the conduct? Answering this question requires determining whether the conduct is cognizable under the federal criminal statutes that apply to election crimes. These generally allow for the prosecution of corrupt acts that occur in elections when the name of a federal candidate appears on the ballot, that are committed "under color of law," that involve voting by non-citizens, that focus on registering to vote, and when the election fraud is part of a larger public corruption problem reachable using general anti-corruption statutes, such as 18 U.S.C. §§ 201, 666, 1346, 1951, and 1952.

## G. INVESTIGATIVE CONSIDERATIONS IN ELECTION FRAUD CASES

When investigating election fraud, three considerations that are absent from most criminal investigations must be kept in mind: (1) respect for the primary role of the states in administering the voting process, (2) an awareness of the role of the election in the governmental process, and (3) sensitivity to the exercise of First Amendment rights in the election context. As a result, there are limitations on various investigative steps in an election fraud case.

In most cases, election-related documents should not be taken from the custody of local election administrators until the election to which they pertain has been certified and the time for contesting the election results has expired.[3] This avoids interfering with the governmental processes affected by the election.[4]

Another limitation affects voter interviews. Election fraud cases often depend on the testimony of individual voters whose votes were co-opted in one way or another. But in most cases voters should not be interviewed, or other voter-related investigation done, until after the election is over. Such overt investigative steps may chill legitimate voting activities. They

---

3 This non-interference policy assumes there is no evidence that local election administrators seek to retain or destroy the election records for a corrupt purpose or to further an ongoing election fraud scheme.

4 In cases in which physical custody may interfere unnecessarily with local election procedures, law enforcement may still take reasonable steps to ensure that such records retain their integrity and are effectively made available to federal law enforcement. Such steps may include the issuance of a grand jury subpoena, and formal and informal agreements concerning the custody, control, and integrity of such records.

are also likely to be perceived by voters and candidates as an intrusion into the election. Indeed, the fact of a federal criminal investigation may itself become an issue in the election.[5]

Some election frauds implicate a voter who participates in a voting act attributed to him or her; such cases include vote-buying schemes, absentee ballot fraud, and the like. Successful prosecution of those who organize such schemes often requires the cooperation of either the voter or the person who attempted to corrupt or take advantage of the voter. Accordingly, federal prosecutors should apply standard Department policies regarding charging decisions when contemplating charges against voters who cooperate and testify truthfully in cases involving organizational voter fraud.

## H. EVALUATING A CAMPAIGN FINANCING ALLEGATION

In general, violations of FECA become crimes when they satisfy a monetary threshold and are committed with specific criminal intent. Non-criminal FECA violations are subject to the exclusive jurisdiction of the FEC. To determine whether a FECA violation warrants criminal investigation, the following questions should be answered:

(1) Does the conduct involve a situation in which the application of the law to the facts is clear? That is, does it violate one of the principal prohibitions of FECA, namely, the prohibitions against:

- Excessive contributions (52 U.S.C. § 30116);

---

[5] Accordingly, the Public Integrity Section must be consulted prior to any voter interviews in the pre-election or balloting period. U.S. DEP'T OF JUSTICE, U.S. ATTORNEYS' MANUAL (USAM) § 9-85.210.

- Corporate and union contributions and coordinated expenditures (52 U.S.C. § 30118);

- Contributions from government contractors (52 U.S.C. § 30119);

- Donations from foreign nationals (52 U.S.C. § 30121);

- Disguised contributions through conduits (52 U.S.C. § 30122);

- Cash contributions (52 U.S.C. § 30123);

- Contributions raised through fraud (52 U.S.C. § 30124(b));

- The solicitation or receipt of "soft money" (funds not raised in compliance with FECA) by national political parties (52 U.S.C. § 30125);

- The conversion of campaign funds (52 U.S.C. § 30114); or

- The concealment of true recipients of expenditures (52 U.S.C. § 3104(b)(5)(A)).

And, if so:

(2) Was the total monetary amount involved in the violation at least $2,000? Most FECA violations become crimes when they aggregate $2,000 or more in a calendar year. Offenses that aggregate at least $25,000 (or *more* than $10,000 in the case of conduit violations) are felonies; offenses under these amounts are misdemeanors. 52 U.S.C. § 30109(d)(1). The Department interprets the significant enhancements to FECA's criminal

penalties enacted in 2002 as reflecting a clear congressional intent that all knowing and willful violations involving sums that aggregate above the statutory minimums for FECA crimes be considered for prosecution.

(3) Was the violation committed under circumstances suggesting that the conduct was "knowing and willful?" FECA violations become potential crimes when they are committed knowingly and willfully, that is, by offenders who acted with knowledge that their conduct was against the law. While this is at times a difficult element to satisfy, examples of evidence supporting the element include: (a) an attempt to disguise or conceal financial activity regulated by FECA; (b) status or prior experience as a campaign official, candidate, professional fundraiser, or lawyer; and (c) efforts by campaigns to notify contributors of applicable campaign finance law (e.g., donor card warnings).

## I. INVESTIGATIVE CONSIDERATIONS IN CAMPAIGN FINANCING CASES

Campaign financing cases have come to occupy an increasingly significant portion of the investigative and prosecutive resources that the Justice Department devotes to election crimes. Because criminal FECA violations require proof that defendants acted with the knowledge that their conduct was unlawful, matters investigated as possible criminal FECA violations generally must fall clearly within FECA's prohibitions.

If a campaign financing offense violates one of FECA's prohibitions and was committed in a manner calculated to conceal it from the public, the Justice Department also may pursue the matter as a conspiracy to defraud the United States under 18 U.S.C. § 371, or as a false statement or record under 18 U.S.C. § 1001 or §1519.

When investigating a criminal violation of FECA, care must be taken not to compromise the FEC's civil and administrative jurisdiction under 52 U.S.C. § 30109(a). All plea agreements involving activities that concern FECA violations should therefore contain an express disclaimer regarding the FEC's civil enforcement authority.

Finally, the public disclosure features of FECA provide investigators a source of information concerning suspicious contributions. The FEC maintains public data in a manner that permits it to be sorted by contributor, date of contribution, amount of contribution, occupation and employer of contributor, and identity of donee. Data is also similarly maintained with respect to expenditures. Therefore, the FEC's public database of financial transactions can be particularly useful in the preliminary stage of campaign financing investigations to evaluate or confirm the likelihood of a FECA violation. This data can be accessed and sorted at www.fec.gov.

## J. CONSULTATION REQUIREMENTS AND RECOMMENDATIONS

Justice Department supervision over the enforcement of all criminal statutes and prosecutive theories involving corruption of the election process, criminal patronage violations, and campaign financing crimes is delegated to the Criminal Division's Public Integrity Section. This Headquarters' consultation policy is set forth in the U.S. DEP'T OF JUSTICE, U.S. ATTORNEYS' MANUAL (USAM), Section 9-85.210. In 1980, the Election Crimes Branch was created within the Public Integrity Section to manage this supervisory responsibility. The Branch is headed by a Director and staffed on a case-by-case basis with Section prosecutors experienced in handling the investigation and prosecution of election crimes.

The Department's consultation requirements for election crime matters are designed to ensure that national standards are maintained for the federal prosecution of election crimes, that investigative resources focus on matters that have prosecutive potential, and that appropriate deference is given to the FEC's civil enforcement responsibilities over campaign financing violations so that the missions of both the Department and the FEC may be fulfilled in each case. The requirements are also intended to help ensure that investigations are pursued in a way that respects both individual voting rights and the states' primary responsibility for administering the electoral process. These requirements are as follows:

### 1. Consultation Requirements for Election Fraud and Patronage Crimes

United States Attorneys' Offices and FBI field offices may conduct a preliminary investigation of an alleged election fraud or patronage crime without consulting the Public Integrity Section. A preliminary investigation is limited to those investigative steps necessary to flesh out the complaint in order to determine whether a federal crime might have occurred and, if so, whether it might warrant federal prosecution. However, a preliminary investigation does not include interviewing voters during the pre-election or balloting periods concerning the circumstances under which they voted, as such interviews have the potential to interfere with the election process or inadvertently chill the exercise of an individual's voting rights.

Consultation with the Public Integrity Section is required to:

- expand an election fraud or patronage investigation beyond a preliminary stage;

- conduct interviews with individual voters during the pre-election period, on election day, or immediately after the election, concerning the circumstances under which they voted;

- issue a subpoena or search warrant in connection with an election fraud or patronage matter;

- present evidence involving an election fraud or patronage matter to a grand jury;

- file a criminal charge involving an election fraud or patronage offense; or

- present an indictment to a grand jury that charges an election fraud or patronage offense.

It is also recommended, although not required, that the Public Integrity Section be consulted with respect to sentencing issues during any plea negotiations in order to ensure consistency with similar cases.

### 2. Consultation Requirements for Campaign Financing Crimes

Additional considerations come into play in cases involving possible campaign financing violations under FECA, notably including the concurrent jurisdiction of the FEC to conduct parallel civil proceedings in this area and the resulting need to coordinate criminal law enforcement with the Commission. Therefore, consultation with the Public Integrity Section is required to:

- conduct *any* inquiry or preliminary investigation in a matter involving a possible campaign financing offense (including Title 18 offenses);

- issue a subpoena or search warrant in connection with a campaign financing matter;

- present evidence involving a campaign financing matter to a grand jury;

- file a criminal charge involving a campaign financing crime; or

- present an indictment to a grand jury that charges a campaign financing crime.

As is the case with election frauds, it also recommended that the Section be consulted with respect to sentencing matters during any plea negotiations in order to ensure consistency with similar cases.

The Public Integrity Section and its Election Crimes Branch are available to assist United States Attorneys' Offices and FBI field offices in handling election crime matters. This assistance includes evaluating election crime allegations, structuring investigations, and drafting indictments and other pleadings. The Election Crimes Branch also serves as the point of contact between the Department of Justice and the FEC, which share enforcement jurisdiction over federal campaign financing violations. Finally, Section attorneys may be available to provide operational assistance in election crime investigations and trials.

# CHAPTER TWO

# CORRUPTION OF THE ELECTION PROCESS

## A. HISTORICAL BACKGROUND

Federal concern over the integrity of the franchise has historically had two distinct areas of focus. The first, to ensure elections that are free from corruption for the general public, is the subject of this chapter. The second, to ensure there is no discrimination against minorities at the ballot box, involves entirely different constitutional and federal interests, and is supervised by the Justice Department's Civil Rights Division.

Federal interest in the integrity of the franchise was first manifested immediately after the Civil War. Between 1868 and 1870, Congress passed the Enforcement Acts, which served as the basis for federal activism in prosecuting corruption of the franchise until most of them were repealed in the 1890s. *See In re Coy*, 127 U.S. 731 (1888 *Ex parte Yarborough*, 110 U.S. 651 (1884); *Ex parte Siebold*, 100 U.S. 371 (1880

Many of the Enforcement Acts had broad jurisdictional predicates that allowed them to be applied to a wide variety of corrupt election practices as long as a federal candidate was on the ballot. In *Coy*, the Supreme Court held that Congress had authority under the Constitution's Necessary and Proper Clause to regulate any activity during a mixed federal/state election that exposed the federal election to potential harm, whether that harm materialized or not. *Coy* is still good law. *United States v. Slone*, 411 F.3d 643, 647 (6th Cir. 2005); *United States v. Mason*, 673 F.2d 737, 739 (4th Cir. 1982); *United States v. Malmay*, 671 F.2d 869, 874–75 (5th Cir. 1982).

After Reconstruction, federal activism in election matters subsided. The repeal of most of the Enforcement Acts in 1894

eliminated the statutory tools that had encouraged federal activism in election fraud matters. Two surviving provisions of these Acts, now embodied in 18 U.S.C. §§ 241 and 242, covered only intentional deprivations of rights guaranteed directly by the Constitution or federal law. The courts during this period incorrectly held that the Constitution directly conferred a right to vote only for federal officers, and that conduct aimed at corrupting non-federal contests was not prosecutable in federal courts. *See United States v. Gradwell*, 243 U.S. 476 (1917); *Guinn v. United States*, 238 U.S. 347 (1915). Federal attention to election fraud was further incorrectly limited by case law holding that primary elections were not part of the official election process, *Newberry* v. *United States*, 256 U.S. 232 (1918), and by cases like *United States v. Bathgate*, 246 U.S. 220 (1918), which read the entire subject of vote-buying out of federal criminal law, even when it was directed at federal contests.

In 1941, the Supreme Court reversed direction, overturning *Newberry*. The Court recognized that primary elections are an integral part of the process by which candidates are elected to office. *United States v. Classic*, 313 U.S. 299 (1941). *Classic* changed the judicial attitude toward federal intervention in election matters and ushered in a new period of federal activism. Federal courts now regard the right to vote in a fairly conducted election as a constitutionally protected feature of United States citizenship. *Reynolds v. Sims*, 377 U.S. 533 (1964).

In 1973, the use of Section 241 to address election fraud began to expand. *See, e.g.*, *United States v. Anderson*, 481 F.2d 685 (4th Cir. 1973), *aff'd on other grounds*, 417 U.S. 211 (1974). Since then, this statute has been successfully applied to prosecute certain types of local and tribal election fraud. *United States v. Wadena*, 152 F.3d 831, 843–47 (8th Cir. 1998) (applying Section 241 to the fabrication and false notarization of absentee ballots in tribal election); *United States v. Olinger*, 759 F.2d 1293, 1296–98 (7th Cir. 1985) (fabrication of absentee votes in mixed federal state election); *United States v. Stollings*, 501 F.2d 954, 955 (4th Cir. 1974) (rejecting defendant's argument that a federal grand jury lacked authority to

investigate a Section 241 violation involving the contested primary election of a state official).[6]

The mail and wire fraud statutes, 18 U.S.C. §§ 1341 & 1343, have sometimes been proposed as an alternative means to reach local election fraud, under the theory that such schemes defrauded citizens of their right to fair and honest elections. However, such a mail or wire fraud theory is not viable in light of *Skilling v. United States*, 561 U.S. 358 (2010) (honest services mail or wire fraud under 18 U.S.C. § 1346 limited to offenses in the nature of bribery or kickbacks).

Finally, over the past forty years, Congress has enacted new criminal laws with broad jurisdictional bases to combat false voter registrations, vote-buying, multiple-voting, and fraudulent voting in elections in which a federal candidate is on the ballot. 52 U.S.C. §§ 10307(c), 10307(e), 20511. These statutes rest on Congress's power to regulate federal elections (U.S. CONST. art. I, § 4) and on its power under the Necessary and Proper Clause (U.S. CONST. art. I, § 8, cl. 18) to enact laws to protect the federal election process from potential corruption. The federal jurisdictional predicate underlying these statutes is satisfied as long as either the name of a federal candidate is on the ballot, or the fraud involves corruption of the voter registration process in a state where one registers to vote simultaneously for federal as well as other offices. *Slone*, 411 F.3d at 647–48; *United States v. McCranie*, 169 F.3d 723, 727 (11th Cir. 1999).

---

[6] As indicated in the cited cases, Section 241 has been used to prosecute election fraud that affects the vote for federal officials, as well as vote fraud directed at non-federal candidates that involves the corruption of public officials – most often election officers – acting under color of law, i.e., ballot-box stuffing schemes. This latter type of scheme will be referred to in this book as a "public scheme." A scheme that does not involve the necessary participation of corrupt officials acting under color of law, but that affects the tabulation of votes for federal candidates, will be referred to as a "private scheme."

## B. WHAT IS ELECTION FRAUD?

### 1. In General

Election fraud involves a substantive irregularity relating to the voting act – such as bribery, intimidation, or forgery – which has the potential to taint the election itself. During the past century and a half, Congress and the federal courts have articulated the following constitutional principles concerning the right to vote in the United States. Any activity intended to interfere corruptly with any of the principles indicated below may be actionable as a federal crime:

- All qualified citizens are eligible to vote.
- All qualified voters have the right to have their votes counted fairly and honestly.
- Invalid ballots dilute the worth of valid ballots, and therefore will not be counted.
- Every qualified voter has the right to make a personal and independent election decision.
- Qualified voters may opt not to participate in an election.
- Voting shall not be influenced by bribery or intimidation.

Simply put, then, election fraud is conduct intended to corrupt:

- The process by which ballots are obtained, marked, or tabulated,
- The process by which election results are canvassed and certified, or
- The process by which voters are registered.

On the other hand, schemes that involve corruption of other political processes (i.e., political campaigning, circulation of nominating petitions, etc.) do not normally serve as the basis for a federal election crime.

### 2. Conduct that Constitutes Federal Election Fraud[7]

The following activities provide a basis for federal prosecution under the statutes referenced in each category:

- Paying voters for registering to vote, or for voting, in elections in which a federal candidate is on the ballot (52 U.S.C. § 10307(c), 18 U.S.C. § 597), or through the use of interstate facilities (such as the mails or of telephones) in those states in which vote-buying is a "bribery" offense (18 U.S.C. § 1952), as well as in federal elections[8] in those states in which purchased registrations or votes are voidable under applicable state law (52 U.S.C. § 20511(2)).

- Conspiring to prevent voters from participating in elections in which a federal candidate is on the ballot, or when done "under color of law" in *any* election, federal or non-federal (18 U.S.C. §§ 241, 242).

- Voting in federal elections for individuals who do not personally participate in, and assent to, the voting act

[7] As used throughout this book, the terms "federal election fraud" and "election fraud" mean fraud relating to an election in which a federal criminal statute applies. As will be discussed below, these terms are not limited to frauds aimed at corrupting federal elections.

[8] For purposes of this book, the term "federal election" means an election in which the name of a federal candidate is on the ballot, regardless of whether there is proof that the fraud caused a vote to be cast for the federal candidate. A "non-federal election" is one in which no federal candidate is on the ballot.

attributed to them, or impersonating voters, or casting ballots in the names of voters who do not vote in federal elections (52 U.S.C. §§ 10307(c), 10307(e), 20511(2)).

- Intimidating voters through physical duress in any type of election (18 U.S.C. § 245(b)(1)(A)), or through physical or economic threats in connection with their registering to vote or voting in federal elections (52 U.S.C. § 20511(1)), or their vote for a federal candidate (18 U.S.C. § 594). If the victim is a federal employee, intimidation in connection with *any* election, federal or non-federal, is prohibited (18 U.S.C. § 610).

- Malfeasance by election officials acting "under color of law" by performing such acts as diluting valid ballots with invalid ones (ballot-box stuffing), rendering false tabulations of votes, or preventing valid voter registrations or votes from being given effect in *any* election, federal or non-federal (18 U.S.C. §§ 241, 242), as well as in elections in which federal candidates are on the ballot (52 U.S.C. §§ 10307(c), 10307(e), 20511(2)).

- Submitting fictitious names to election officers for inclusion on voter registration rolls, thereby qualifying the ostensible voters to vote in federal elections (52 U.S.C. §§ 10307(c), 20511(2)).[9]

- Knowingly procuring eligibility to vote for federal office by persons who are not entitled to vote under applicable state law, notably persons who have committed serious crimes (approximately 40 states) (52 U.S.C. §§ 10307(c),

[9] With respect to fraudulent voter registrations, election registration is "unitary" in all 50 states in the sense that a person registers only once to become eligible to cast ballots for both federal and non-federal candidates. Therefore, false information given to establish eligibility to register to vote is actionable federally regardless of the type of election that motivated the subjects to act. *See, e.*, *United States v. Cianciulli*, 482 F. Supp. 585, 617 (E.D. Pa. 1979).

20511(2)), and persons who are not United States citizens (currently all states) (52 U.S.C. §§ 10307(c), 20511(2); 18 U.S.C. §§ 1015(f), 611).

- Knowingly making a false claim of United States citizenship to register to vote or to vote in any election (18 U.S.C. § 1015(f)), or falsely and willfully claiming U.S. citizenship for, *inter alia,* registering or voting in any election (18 U.S.C. § 911).

- Providing false information concerning a person's name, address, or period of residence in a voting district to establish that person's eligibility to register or to vote in a federal election (52 U.S.C. §§ 10307(c), 20511(2)).

- Causing the production of voter registrations that qualify alleged voters to vote for federal candidates, or the production of ballots in federal elections, that the actor knows are materially defective under applicable state law (5 U.S.C. § 20511(2)).

- Using the mails or interstate wire facilities to obtain the salary and emoluments of an elected official through any of the activities mentioned above (18 U.S.C. §§ 1341, 1343). Depending on the Circuit, this "salary theory" of mail and wire fraud has potential as a prosecutive theory that would extend federal criminal jurisdiction to election fraud schemes, including those that occurred in non-federal elections.[10]

---

[10] *Compare United States v. Ratcliff*, 488 F.3d 639, 647 (5th Cir. 2007) (candidate lied to election ethics board about illegal campaign loans), *United States v. Turner*, 459 F.3d 775, 784–90 (6th Cir. 2006) (defendant fraudulently concealed illegal contributions and bribed voters to vote for candidate), *Westchester Cnty. Indep. Party v. Astorino*, No. 13–CV–7737 KMK), 2015 WL 5883718, at *11–12 (S.D.N.Y. Oct. 8, 2015) (holding that "a person who has committed election fraud in order to obtain the normal salary given to the person holding that elected office has not committed money or property fraud, because the victim the government – has not

- Ordering, keeping, or having under one's authority or control any troops or armed persons at any polling place in *any* election, federal or non-federal. The actor must be an active civilian or military officer or employee of the United States Government (18 U.S.C. § 592).

### 3. Conduct that Does Not Constitute Federal Election Fraud

Various types of conduct that may adversely affect the election of a federal candidate may not constitute a federal election crime, despite what in many instances might be their reprehensible character. For example, a federal election crime does not normally involve irregularities relating to: (1) distributing inaccurate campaign literature, (2) campaigning too close to the polls, (3) engaging in activities to influence an opponent's withdrawal from an election, or (4) failing to comply with state-mandated voting procedures through the negligence of election officials. Also, "facilitation benefits," e.g., things of value given to voters to make it easier for them to cast a ballot that are not intended to stimulate or reward the voting act itself, such as a ride to the polls or a stamp to mail an absentee ballot, do not ordinarily involve federal crimes.

---

been deprived either of any money or property or the choice in how to spend the money"), *and United States v. George*, No. 86–CR–123, 1987 WL 48848, at *2 (W.D. Ky. Oct. 20, 1987) (similar), *with United States v. Schermerhorn*, 713 F. Supp. 88, 92 (S.D.N.Y. 1989) (scheme to conceal that state senate candidate was being financed by organized crime in violation of state campaign financing laws held actionable under the salary theory), *United States v. Webb*, 689 F. Supp. 703 (W.D. Ky. 1988) (scheme to fraudulently elect sheriff by procuring false absentee ballots held actionable under the salary theory), *and United States v. Ingber*, Cr. No. 86-1402 (2d Cir. Feb. 4, 1987) (unpublished), *quoted in Ingber v. Enzor*, 664 F. Supp. 814, 815–16 (S.D.N.Y. 1987) (*habeas* opinion).

### 4. Conditions Conducive to Election Fraud

Most election fraud is aimed at corrupting elections for local offices, which control or influence patronage positions and contracting for materials and services. Election fraud schemes are thus often linked to such other crimes as protection of illegal activities, corruption of local governmental processes, and patronage abuses.

Election fraud does not normally occur in jurisdictions where one political faction enjoys widespread support among the electorate, because in such a situation it is usually unnecessary or impractical to resort to election fraud in order to control local public offices.[11] Instead, election fraud occurs most frequently when there are fairly equal political factions, and when the stakes involved in who controls public offices are weighty – as is often the case when patronage jobs are a major source of employment, or when illicit activities are being protected from law enforcement scrutiny. In sum, election fraud is most likely to occur in electoral jurisdictions where there is close factional competition for an elected position that matters.

### 5. Voter Participation Versus Non-voter Participation Cases

As a practical matter, election frauds fall into two basic categories: those in which individual voters do not participate in the fraud, and those in which they do. The investigative approach and prosecutive potential are different for each type of case.

[11] Election fraud might occur at the local level in districts controlled by one political faction in order to affect a contested election in a larger jurisdiction. For example, a corrupt mayor assured of his own reelection might nevertheless engage in election fraud for the purpose of affecting a state-wide election that is perceived to be close.

### (a) Election frauds not involving the participation of voters

The first category involves cases when voters do not participate, in any way, in the voting act attributed to them. These cases include ballot-box stuffing cases, ghost voting cases, and "nursing home" frauds.[12] All such matters are potential federal crimes. Proof of these crimes depends largely on evidence generated by the voting process, or on handwriting exemplars taken from persons who had access to voting materials, and thus the opportunity to misuse them. Some of the more common ways these crimes are committed include:

- Placing fictitious names on the voter rolls. This "deadwood" allows for fraudulent ballots, which can be used to stuff the ballot box.

- Casting bogus ballots in the names of persons who did not vote.

- Obtaining and marking absentee ballots without the active input of the voters involved. Absentee ballots are particularly susceptible to fraudulent abuse because, by definition, they are marked and cast outside the presence of election officials and the structured environment of a polling place.

- Falsifying vote tallies.

---

[12] An example of a successfully prosecuted nursing home fraud is *United States v. Odom*, 736 F.2d 104, 106–08 (4th Cir. 1984), which involved a scheme by local law enforcement officials and others to vote the absentee ballots of mentally incompetent residents.

### (b) Election frauds involving the participation of voters

The second category of election frauds includes cases in which the voters do participate, at least to some extent, in the voting acts attributed to them. Common examples include:

- Vote-buying schemes;
- Absentee ballot frauds;
- Voter intimidation schemes;
- Migratory-voting (or floating-voter) schemes;
- Voter "assistance" frauds, in which the wishes of the voters are ignored or not sought.

Successful prosecution of these cases usually requires the cooperation and testimony of the voters whose ballots were corrupted. This requirement presents several difficulties. An initial problem is that the voters themselves might be technically guilty of participating in the scheme. However, because the voters can often be considered victims, in appropriate cases federal prosecutors should consider declining to prosecute them in exchange for truthful cooperation against organizers of such schemes.

The second difficulty encountered in cases when voters participate is that the voter's presence alone may suggest that he or she "consented" to the defendant's conduct (marking the ballot, taking the ballot, choosing the candidates, etc.). *Compare United States v. Salisbury*, 983 F.2d 1369, 1379 (6th Cir. 1993) (leaving unanswered the question whether a voter who signs a ballot envelope at the defendant's instruction but is not allowed to choose the candidates has consented to having the defendant mark the ballot), *with United States v. Cole*, 41 F.3d 303, 308 (7th Cir. 1994) (finding

that voters who merely signed ballots subsequently marked by the defendant were not expressing their own electoral preferences).

While the presence of the ostensible voter when another marks his or her ballot does not negate whatever crime might be occurring, it thus may increase the difficulty of proving the crime. This difficulty is compounded because those who commit this type of crime generally target vulnerable members of society, such as persons who are uneducated, socially disadvantaged, or impoverished and dependent upon government services – precisely the types of people who are likely targets for manipulation or intimidation. Therefore, in cases when the voter is present when another person marks his or her ballot, the evidence should show that the defendant either procured the voter's ballot through means that were themselves corrupt (such as bribery or threats), or that the defendant marked the voter's ballot without the voter's consent or input. *United States v. Boards*, 10 F.3d 587, 589 (8th Cir. 1993); *Cole,* 41 F.3d at 308.

## C. JURISDICTIONAL SUMMARY

Under the Constitution, the states retain broad jurisdiction over the elective process. When the federal government enters the field of elections, it does so to address specific federal interests, such as: (1) the protection of the voting rights of racial, ethnic, or language-minorities, a specific constitutional right; (2) the registration of voters to vote in federal elections; (3) the standardization and procurement of voting equipment purchased with federal funds; (4) the protection of the federal election process against corruption; (5) the protection of the voting process from corruption accomplished under color of law; and (6) the oversight of non-citizen and other voting by persons ineligible to vote under applicable state law.

Most federal election crime statutes do not apply to all elections. Several apply only to elections in which federal candidates are on the ballot, and a few require proof either that the fraud was intended to influence a federal contest or that a federal contest was affected by the fraud.

For federal jurisdictional purposes, there are two fundamental types of elections in which federal election crimes may occur: federal elections, in which the ballot includes the name of one or more candidates running for federal office; and non-federal elections, in which only the names of local or state candidates are on the ballot. Elections in which the ballot includes the names of both federal and non-federal candidates, often referred to as "mixed" elections, are "federal elections" for the purpose of the federal election crime statutes.

### 1. Statutes Applicable to Non-Federal Elections

Several federal criminal statutes can apply to purely non-federal elections, in addition to federal or mixed elections:

- 52 U.S.C. § 10307(c) and § 20511(2)(A), and 18 U.S.C. § 1015(f) – any fraud that is aimed at the process by which voters are registered, notably schemes to furnish materially false information to election registrars;

- 18 U.S.C. § 241 – any conspiracy to interfere with federal voting rights, and certain conspiracies involving state voting rights;

- 18 U.S.C. § 242 – any scheme that involves the necessary participation of public officials, usually election officers or notaries, acting "under color of law," which is actionable as a derogation of the "one person, one vote" principle of the 14th Amendment, i.e., "public schemes;"[13]

- 18 U.S.C. § 245(b)(1)(A) – physical threats or reprisals against candidates, voters, poll watchers, or election officials;

---

[13] If a public scheme involves bribery or kickbacks, federal prosecutors should also evaluate whether a public scheme may be charged as a deprivation of honest services. 18 U.S.C. §§ 1341, 1343, 1346.

- 18 U.S.C. § 592 – "armed" persons stationed at the polls;
- 18 U.S.C. § 609 – coercion of voting among the military;
- 18 U.S.C. § 610 – coercion of federal employees for political activity;
- 18 U.S.C. § 911 – fraudulent assertion of United States citizenship;
- 18 U.S.C. §§ 1341, 1343 – schemes involving the mails or interstate wires to corrupt elections that are predicated on the "salary" or "pecuniary loss" theories; and
- 18 U.S.C. § 1952 – schemes to use the mails or an interstate facility (such as a telephone) in furtherance of vote-buying activities in states that treat vote-buying as bribery.

### 2. Statutes Applicable to Federal Elections Only

The following additional statutes apply to federal (including "mixed") elections, but not to purely non-federal elections:[14]

- 18 U.S.C. § 594 – intimidation of voters;
- 18 U.S.C. § 597 – payments to vote, or to refrain from voting, for a federal candidate;
- 18 U.S.C. § 608(b) – vote-buying and false registration under the Uniformed and Overseas Citizens Absentee Voting Act;

---

[14] The name of a federal candidate on the ballot is sufficient to obtain federal jurisdiction.

- 18 U.S.C. § 611 – voting by aliens;
- 52 U.S.C. § 10307(c) – payments for voting and conspiracies to encourage illegal voting;
- 52 U.S.C. § 10307(e) – multiple-voting;
- 52 U.S.C. § 20511(1) – voter intimidation; and
- 52 U.S.C. § 20511(2) – fraudulent voting.

## D. STATUTES[15]

### 1. Conspiracy Against Rights: 18 U.S.C. § 241

Section 241 makes it unlawful for two or more persons to "conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States." Violations are punishable by imprisonment for up to ten years or, if death results, by imprisonment for any term of years or for life, or by a sentence of death.

The Supreme Court long ago recognized that the right to vote for federal offices is among the rights secured by Article I, Sections 2 and 4, of the Constitution, and hence is protected by Section 241. *United States v. Classic*, 313 U.S. 299 (1941); *Ex parte Yarborough*, 110 U.S. 651 (1884). Although the statute was enacted just after the Civil War to address efforts to deprive the newly emancipated slaves of the basic rights of citizenship, such as the right to vote, it has been interpreted to

[15] The text of the statutes discussed below is printed in Appendix C. Each statute carries, in addition to the prison term noted, fines applicable under 18 U.S.C. § 3571.

include any effort to derogate any right that flows from the Constitution or from federal law.

Section 241 has been an important statutory tool in election crime prosecutions. Originally held to apply only to schemes to corrupt elections for federal office, it has been successfully applied to non-federal elections as well, provided that state action was a necessary feature of the fraud. This state action requirement can be met not only by the participation of poll officials and notaries public, but by activities of persons who clothe themselves with the appearance of state authority, e.g., with uniforms, credentials, and badges. *Williams v. United States*, 341 U.S. 97 (1951).

Section 241 embraces conspiracies to:

- stuff a ballot box with forged ballots, *United States v. Saylor*, 322 U.S. 385 (1944); *United States v. Mosley*, 238 U.S. 383 (1915);

- prevent the official count of ballots in primary elections, *United States v. Classic,* 313 U.S. 299 (1941);

- destroy voter registration applications, *United States v. Haynes*, Nos. 91-5979, 91-6076, 1992 WL 296782, at *1 (6th Cir. Oct. 15, 1992);

- destroy ballots, *United States v. Townsley*, 843 F.2d 1070, 1073–75 (8th Cir. 1988)

- exploit the infirmities of elderly or handicapped people by casting absentee ballots in their names, *United States v. Morado*, 454 F.2d 167, 171 (5th Cir. 1972);

- illegally register voters and cast absentee ballots in their names, *United States v. Weston*, 417 F.2d 181, 182–8 (4th Cir. 1969);

- injure, threaten, or intimidate a voter in the exercise of his right to vote, *Fields v. United States*, 228 F.2d 544 (4th Cir. 1955);

- impersonate qualified voters, *Crolich v. United States*, 196 F.2d 879, 879 (5th Cir. 1952);

- fail to count votes and to alter votes counted, *Ryan v. United States*, 99 F.2d 864, 866 (8th Cir. 1938); *Walker v. United States*, 93 F.2d 383, 386 (8th Cir. 1937); and

- steal votes by changing the votes cast by voters at voting machines, *United States v. Thompson*, No. 6:09–16–KKC, 2013 WL 5528827, at *1 (E.D. Ky. Oct. 4, 2013)

Section 241 should be considered when addressing schemes to thwart voting in federal elections. In 2005, Section 241 was charged, along with telephone harassment charges under 47 U.S.C. § 223, in a scheme to jam the telephone lines of two get-out-the-vote services that were perpetrated to prevent voters from obtaining rides to the polls in the 2002 general elections. While the defendant was convicted only on the telephone harassment charges, the district court held that Section 241 applied to the facts (*United States v. Tobin*, No. 04-216-01 (SM), 2005 WL 3199672, at *1–3 (D.N.H. Nov. 30, 2005))

Section 241 does not require that the conspiracy be successful, *United States v. Bradberry*, 517 F.2d 498, 499 n.6 (7th Cir. 1975 nor need there be proof of an overt act. *United States v. Colvin*, 353 F.3d 569, 576 (7th Cir. 2003); *United States v. Whitney*, 229 F.3d 1296, 1301 (10th Cir. 2000). *But see United States v. Brown*, 49

F.3d 1162, 1165 (6th Cir. 1995) (stating in dicta that Section 241 requires an overt act). Section 241 reaches conduct affecting the integrity of the federal election process as a whole, and does not require fraudulent action with respect to any particular voter. *United States v. Nathan*, 238 F.2d 401, 407 (7th Cir. 1956)

On the other hand, Section 241 does not reach schemes to corrupt the balloting process through voter bribery, *United States v. Bathgate*, 246 U.S. 220 (1918), even schemes that involve poll officers to ensure that the bribed voters mark their ballots as they were paid to do, *United States v. McLean*, 808 F.2d 1044, 1048–49 (4th Cir. 1987) (noting, however, that Section 241 may apply when vote-buying occurs in conjunction with other corrupt practices, such as ballot-box stuffing).

Section 241 prohibits only conspiracies to interfere with rights flowing directly from the Constitution or federal statutes. This element has led to considerable judicial speculation over the extent to which the Constitution protects the right to vote for candidates running for non-federal offices. *Oregon v. Mitchell*, 400 U.S. 112 (1970); *Reynolds v. Sims*, 377 U.S. 533 (1964); *Blitz v. United States*, 153 U.S. 308 (1894); *In re Coy*, 127 U.S. 731 (1888); *Ex parte Siebold*, 100 U.S. 371 (1880)*; see also Duncan v. Poythress*, 657 F.2d 691, 699–706 (5th Cir. 1981). While *dicta* in *Reynolds* casts the parameters of the federally protected right to vote in extremely broad terms, in a ballot fraud case ten years later, the Supreme Court specifically refused to decide whether the federally secured franchise extended to non-federal contests. *Anderson v. United States*, 417 U.S. 211 (1974).

The use of Section 241 in election fraud cases generally falls into two types: "public schemes" and "private schemes." A public scheme is one that involves the necessary participation of a public official acting under the color of law. In election fraud cases, this public official is usually an election officer using his office to dilute valid ballots with invalid ballots, or to otherwise corrupt an honest vote tally in derogation of the Equal Protection and Due Process

Clauses of the Fourteenth Amendment. *See, e.g.*, *Haynes*, 1992 WL 296782, at *1; *Townsley*, 843 F.2d at 1073–75; *United States v. Howard*, 774 F.2d 838 (7th Cir. 1985 *United States v. Olinger*, 759 F.2d 1293 (7th Cir. 1985); *Anderson*, 481 F.2d at 689. Another case involving a public scheme turned on the necessary participation of a notary public who falsely notarized forged voter signatures on absentee ballot materials in an Indian tribal election. *United States v. Wadena*, 152 F.3d 831, 855 (8th Cir. 1998).

A private scheme is a pattern of conduct that does not involve the necessary participation of a public official acting under color of law, but that can be shown to have adversely affected the ability of qualified voters to vote in elections in which federal candidates were on the ballot. Examples of private schemes include: (1) voting fraudulent ballots in mixed elections, and (2) thwarting get-out-the-vote or ride-to-the-polls activities of political factions or parties through such methods as jamming telephone lines or vandalizing motor vehicles.

Public schemes may be prosecuted under Section 241 regardless of the nature of the election, i.e., elections with or without a federal candidate. On the other hand, private schemes can be prosecuted under Section 241 only when the objective of the conspiracy was to corrupt a specific federal contest, or when the scheme can be shown to have affected, directly or indirectly, the vote count for a federal candidate, e.g., when fraudulent ballots were cast for an entire party ticket that included a federal office.

### 2. Deprivation of Rights under Color of Law: 18 U.S.C. § 242

Section 242, also enacted as a post-Civil War statute, makes it unlawful for anyone acting under color of law, statute, ordinance, regulation, or custom to willfully deprive a person of any right, privilege, or immunity secured or protected by the Constitution or laws of the United States. Violations are one-year misdemeanors unless bodily injury occurs, in which case the penalty is ten years,

unless death results, in which case the penalty is imprisonment for any term of years or for life, or a sentence of death.

Prosecutions under Section 242 need not show the existence of a conspiracy. However, the defendants must have acted illegally "under color of law," i.e., the case must involve a public scheme, as discussed above. This element does not require that the defendant be a *de jure* officer or a government official; it is sufficient if he or she jointly acted with state agents in committing the offense, *United States v. Price*, 383 U.S. 787 (1966), or if his or her actions were made possible by the fact that they were clothed with the authority of state law, *Williams v. United States*, 341 U.S. 97 (1951); *United States v. Classic*, 313 U.S. 299 (1941).

Because a Section 242 violation can be a substantive offense for election fraud conspiracies prosecutable under Section 241, the cases cited in the discussion of Section 241 that involve public schemes (i.e., those involving misconduct under color of law) apply to Section 242.

### 3. False Information in, and Payments for, Registering and Voting: 52 U.S.C. § 10307(c)

Section 1030 c) makes it unlawful, in an election in which a federal candidate is on the ballot, to knowingly and willfully: (1) give false information as to name, address, or period of residence for the purpose of establishing one's eligibility to register or vote; (2) pay, offer to pay, or accept payment for registering to vote or for voting; or (3) conspire with another person to vote illegally. Violations are punishable by imprisonment for up to five years.

### (a) The basis for federal jurisdiction[16]

Congress added Section 10307(c) (originally codified as 42 U.S.C. § 1973i(c)) to the 1965 Voting Rights Act to ensure the integrity of the balloting process in the context of an expanded franchise. In so doing, Congress intended that Section 10307 c) have a broad reach. In fact, the original version of Section 10307(c) would have applied to all elections. However, constitutional concerns were raised during congressional debate on the bill, and the provision's scope was narrowed to elections that included a federal contest. Section 10307(c) rests on Congress's power to regulate federal elections and on the Necessary and Proper Clause. U.S. CONST. art. I, § 4; art. I, § 8, cl. 18; *United States v. Slone*, 411 F.3d 643, 648–49 (6th Cir. 2005)

Section 10307 c) has been held to protect two distinct aspects of a federal election: the actual results of the election, and the integrity of the process of electing federal officials. *United States v. Cole*, 41 F.3d 303, 307 (7th Cir. 199 In *Cole*, the Seventh Circuit held that federal jurisdiction is satisfied so long as a single federal candidate is on the ballot – even if the federal candidate is unopposed – because fraud in a mixed election automatically has an impact on the integrity of the federal election process. *See also Slone*, 411 F.3d at 648– *McCranie*, 169 F.3d at 727 (jurisdiction under Section 10307(c) satisfied by the name of unopposed federal candidate on ballot); *United States v. Douglas*, No. 309-014, 2010 WL 737330, at *4 (S.D. Ga. Mar. 2, 2010).

Section 10307 c) is particularly useful for two reasons: (1) it eliminates the unresolved issue of the scope of the constitutional right to vote in matters not involving racial discrimination, and (2) it eliminates the need to prove that a given pattern of corrupt conduct had an actual impact on a federal election. It is sufficient under

[16] The discussion here concerning federal jurisdiction under Section 10307(c) applies equally to its companion statute, 52 U.S.C. § 10307(e), which addresses multiple-voting with a federal jurisdictional predicate phrased precisely the same way.

Section 10307(c) that a pattern of corrupt conduct took place during a mixed election; in that situation it is presumed that the fraud will expose the federal race to potential harm. *Slone*, 411 F.3d at 647 (collecting cases).

Cases arising under this statute that involve corruption of the process by which individuals register, as distinguished from the circumstances under which they vote, present a different federal jurisdictional issue that is easily satisfied. This is because voter registration in every state is "unitary" in the sense that one registers to vote only once in order to become eligible to vote for all candidates on the ballot – local, state, and federal. Although a state could choose to maintain separate registration lists for federal and non-federal elections, at the time this book was written, no state had chosen to do so. Consequently, any corrupt act that affects the voter registration process and that can be reached under Section 10307 c) satisfies this federal jurisdictional requirement. An excellent discussion of this issue is contained in *United States v. Cianciulli*, 482 F. Supp. 585, 617–18 (E.D. Pa. 1979)

### (b) False information to an election official

The "false information" provision of Section 1030 c) prohibits any person from furnishing certain false data to an election official to establish eligibility to register or to vote in a federal election. The statute applies to three types of information: name, address, and period of residence in the voting district. *See, e.g.*, *United States v. Collins*, 685 F.3d 651, 653, 657 (7th Cir. 2012) (candidate established residency using false address in order to vote and run for public office). False information concerning other factors (such as citizenship, felon status, and mental competence) are not covered by this provision.[17]

[17] Such matters may, however, be charged as conspiracies to encourage illegal voting under the conspiracy clause of Section 10307(c); as citizenship offenses under, *inter alia*, 18 U.S.C. §§ 911 and 1015(f); or under the broad "false information" provision of 52 U.S.C. § 20511. These statutes will be discussed below.

As just discussed, registration to vote is "unitary," i.e., a single registration qualifies the applicant to cast ballots for all elections. Thus, the jurisdictional requirement that the false information be used to establish eligibility to vote in a federal election is satisfied automatically whenever a false statement is made to get one's name on the registration rolls. *See United States v. Bowman*, 636 F.2d 1003, 1008 (5th Cir. 1981).

On the other hand, when the false data is furnished to poll officials for the purpose of enabling a voter to cast a ballot in a particular election (as when one voter attempts to impersonate another), it must be shown that a federal candidate was being voted upon at the time. In such situations, the evidence should show that the course of fraudulent conduct could have jeopardized the integrity of the federal race, or, at a minimum, that the name of a federal candidate was on the ballot. *United States v. Carmichael*, 685 F.2d 903, 908–09 (4th Cir. 1982).

In *United States v. Boards*, 10 F.3d 587 (8th Cir. 1993), the Eighth Circuit confirmed the broad reach of the "false information" provision of Section 1030 c). The defendants in this case, and their unindicted co-conspirators, had obtained and marked the absentee ballots of other registered voters by forging the voters' names on ballot applications and directing that the ballots be sent to a post office box without the voters' knowledge. *Id.* at 588. The district court incorrectly granted post-verdict judgments of acquittal as to those counts in which the defendants' roles were limited to fraudulently completing an application for an absentee ballot, based on its conclusions that: (1) the statute did not extend to ballot applications, (2) the statute did not cover giving false information as to the names of real voters (as opposed to fictitious names), and (3) the defendants could not be convicted when the ballots were actually voted by an unidentified co-conspirator. *Id.* at 589.

The court of appeals rejected each of these narrow interpretations of Section 10307 c). It first held that an application for a ballot falls within the broad definition of "vote" in the statute,

"because an absentee voter must first apply for an absentee ballot as a 'prerequisite to voting.'" *Id.* at 589 (quoting the definition of "vote" in 52 U.S.C. § 10310(c)(1) The court also held that by using the names of real registered voters on the applications, the defendants "[gave] false information as to [their] name[s]" within the meaning of Section 10307(c).[18] *Id.* Finally, the court held that one of the defendants, whose role was limited to completing absentee ballot applications for ballots that others used to fraudulently vote, was liable under 18 U.S.C. § 2 as an aider and abettor. *Id.* at 589–90.

Subsequently, in *United States v. Smith*, the Eleventh Circuit held that each forgery of a voter's name on a ballot document or on an application for a ballot constituted a separate offense under the "false information as to name" clause of Section 10307(c). 231 F.3d 800, 815 (11th Cir. 2000)

Section 10307(c)'s false information clause is particularly useful when the evidence shows that a voter's signature (name) was forged on an election-related document, for example: (1) when signatures on poll lists are forged by election officials who are stuffing a ballot box, (2) when a voter's signature on an application for an absentee ballot is forged, or (3) when bogus voter registration documents are fabricated in order to get names on voter registries.

Some, but not all, states permit a practice commonly known as "bounty-hunting," that is, paying people to collect voter registrations on a per-registration basis. Where it is allowed, it is not unusual to find that this method of remuneration provides a motive for the unscrupulous to forge voter registrations and to enhance the piecework payments they can receive. While this situation usually does not result in fraudulent votes actually being cast, it does cause voter registration offices to become overloaded with the task of processing large numbers of bogus registrations immediately prior to an

---

[18] The Eighth Circuit observed that "[b]ecause only registered voters are eligible to apply for and vote absentee ballots, the use of real registered voters' names was essential to the scheme to obtain and fraudulently vote absentee ballots . . . ." *Id.*

election, when the resources of those offices should be directed at preparing ballots and staffing polling sites. It also risks overloading voter rolls with "deadwood" names, which in turn undermines public confidence in the election process. Thus, even when no fraudulent votes result from bounty-hunting, the fraudulent registrations that arise from this conduct are not victimless offenses. Federal prosecutors should be cognizant of these circumstances and, when evidence of fraudulent registrations inspired by bounty-hunting is discovered, should consider prosecuting the individuals submitting the false registrations, as well as, in appropriate circumstances, the organizations that employ and pay them, under Section 10307(c).

### (c) Vote-Buying

The clause of Section 1030 c) that prohibits vote-buying does so in broad terms, covering any payment made or offered to a would-be voter "for registering to vote or for voting" in an election when the name of a federal candidate appears on the ballot.[19] Section 103 c) applies as long as a pattern of vote-buying exposes a federal election to potential corruption, even though it cannot be shown that the threat materialized.

This aspect of Section 1030 c), is directed at eliminating commercial considerations from the voting process. *See United States v. Thomas*, 510 F.3d 714, 717 (7th Cir. 2007); *United States v. Garcia*, 719 F.2d 99, 102 (5th Cir. 1983); *United States v. Mason*, 673 F.2d 737, 739 (4th Cir. 1982); *United States v. Bowman*, 636 F2d. 1003, 1012 (5th Cir. 1981). The statute rests on the premises that potential

---

[19] The federal criminal code contains another vote-buying statute, 18 U.S.C. § 597, which has a narrower scope and provides for lesser penalties than Section 10307(c). Section 597 prohibits making or offering to make an expenditure to any person to vote or withhold his or her vote for a federal candidate. Non-willful violations of Section 597 are one-year misdemeanors; willful violations are two-year felonies. Section 597 and 52 U.S.C. § 10307(c) are distinct offenses, since each requires proof of an element that the other does not. *Whalen v. United States*, 445 U.S. 684 (1980); *Blockburger v. United States*, 284 U.S. 299 (1932). Whereas Section 597 requires that the payment be made to influence a federal election, Section 10307(c) requires that the defendant acted "knowingly and willfully."

voters can choose not to vote; that those who choose to vote have a right not to have the voting process diluted with ballots that have been procured through bribery; and that the selection of the nation's leaders should not degenerate into a spending contest, with the victor being the candidate who can pay the most voters. *See United States v. Blanton*, 77 F. Supp. 812, 816 (E.D. Mo. 194

The bribe may be anything having monetary value, including cash, liquor, lottery chances, and welfare benefits such as food stamps. *Garcia*, 719 F.2d at 102. However, offering free rides to the polls or providing employees paid leave while they vote are not prohibited. *United States v. Lewin*, 467 F.2d 1132, 1136 (7th Cir. 1972). Such things are given to make it easier for people to vote, not to induce them to do so. This distinction is important. For an offer or a payment to violate Section 10307(c), it must have been intended to induce or reward the voter for engaging in one or more acts necessary to cast a ballot. Section 1030 c) does *not* prohibit offering or giving things having pecuniary value, such as a ride to the polls or time off from work, to help individuals who have already made up their minds to vote to do so.

Moreover, payments made for some purpose other than to induce or reward voting activity, such as remuneration for campaign work, do not violate this statute. *See United States v. Canales* 744 F.2d 413, 423 (5th Cir. 1984) (upholding conviction because jury justified in inferring that payments were for voting, not campaign work). Similarly, Section 10307 c) does not apply to payments made to signature-gatherers for voter registrations such individuals may obtain. However, such payments become actionable under Section 10307(c) if they are shared with the person being registered.

Finally, Section 103 c) does not require that the offer or payment be made with a specific intent to influence a federal contest. It is sufficient that the name of a federal candidate appeared on the ballot in the election when the payment or offer of payment occurred. *Slone*, 411 F.3d at 647–48; *McCranie*, 169 F.3d at 725 (payments to vote for county commissioner); *Cole*, 41 F.3d at 306–07 (unopposed

House and Senate candidates on ballot); *United States v. Daugherty*, 952 F.2d 969, 970 (8th Cir. 1991) (payments to vote for several local candidates); *United States v. Odom*, 858 F.2d 664, 665–66 (11th Cir. 1988) (payments to vote for state representative); *United States v. Campbell*, 845 F.2d 782, 784 (8th Cir. 1988) (payments to benefit a candidate for county judge); *Garcia*, 719 F.2d at 100 (food stamps to vote for candidate for county judge); *Malmay*, 671 F.2d at 870 (payments to vote for school board member); *Carmichael*, 685 F.2d at 905 (payments for sheriff).

**(d) Conspiracy to cause illegal voting**

The second clause of Section 10307 c) criminalizes conspiracies to encourage "illegal voting."[20] The phrase "illegal voting" is not defined in the statute. On its face it encompasses unlawful conduct in connection with voting. It has potential application to those who undertake to cause others to register or vote in conscious derogation of state or federal laws. *Cianciulli*, 482 F.Supp. at 616 (noting that this clause would prohibit "vot[ing] illegally in an improper election district"). For example, all states require voters to be United States citizens, and most states disenfranchise people who have been convicted of certain crimes, who are mentally incompetent, or who possess other disabilities that may warrant restriction of the right to vote. This provision requires that the voters participate in the conspiracy.[21]

The conspiracy provision of Section 1030 c) applies only to the statute's "illegal voting" clause. *Olinger*, 759 F.2d at 1298–1300. Conspiracies arising under the other clauses of Section 10307(c) (i.e., those involving vote-buying or fraudulent registration) should be charged under the general federal conspiracy statute, 18 U.S.C. § 371.

---

[20] Violations of this provision are felonies.

[21] False statements involving any fact that is material to registering or voting under state law may also be prosecuted under 52 U.S.C. § 20511, as will be discussed in Part D.7 of this chapter.

### 4. Voting More than Once: 52 U.S.C. § 10307(e)

Section 10307(e), enacted as part of the 1975 amendments to the Voting Rights Act of 1965, makes it a crime to vote "more than once" in any election in which a federal candidate is on the ballot. Violations are punishable by imprisonment for up to five years.

The federal jurisdictional basis for this statute is identical to that for 52 U.S.C. § 10307(c), which is discussed in detail above.

Section 1030 e) is most useful as a statutory weapon against frauds that do not involve the participation of voters in the balloting acts attributed to them. Examples of such frauds are schemes to cast ballots in the names of voters who were deceased or absent, *Olinger*, 759 F.2d at 1297; schemes to exploit the infirmities of the mentally handicapped by casting ballots in their names, *United States v. Odom*, 736 F.2d 104, 106 (4th Cir. 1984); and schemes to cast absentee ballots in the names of voters who did not participate in and consent to the marking of their ballots, *Smith*, 231 F.3d at 804–05.

Most cases prosecuted under the multiple-voting statute have involved defendants who physically marked ballots outside the presence of the voters in whose names they were cast – in other words, without the voters' participation or knowledge.

The statute may also be applied successfully to schemes when the voters are present but do not participate in any way, or otherwise consent to the defendant's assistance, in the voting process. However, when the scheme involves "assisting" voters who are present and who also marginally participate in the process, such as by signing a ballot document, prosecuting the case under Section 10307 e) might present difficulties. For instance, in *United States v. Salisbury*, 983 F.2d 1369, 1372 (6th Cir. 1993) the defendant got voters to sign their absentee ballot forms, and then instructed them how to mark their ballots, generally without allowing them to choose the candidates – and even in some cases without disclosing the identity of

the candidates on the ballot. In a few cases the defendant also personally marked others' ballots. *Id.* The Sixth Circuit held that the concept "votes more than once" in Section 10307 e) was unconstitutionally vague as applied to these facts. *Id.* at 1379. Because the phrase "votes more than once" was not defined in the statute, the court found the phrase did not clearly apply when the defendant did not physically mark another's ballot. *Id.* The court further held that, even if the defendant did mark another's ballot, it wasn't clear this was an act of "voting" by the defendant if the defendant got the ostensible voters to demonstrate "consent" by signing their names to the accompanying ballot forms. *Id.*[22]

In a similar multiple-voting opinion published one year after the Sixth Circuit's *Salisbury* decision, however, the Seventh Circuit, with the benefit of more detailed jury instructions, took a different approach. *United States v. Cole*, 41 F.3d 303 (7th Cir. 1994) In both cases, the defendants had marked absentee ballots of other persons after getting the voters to sign their ballot documents. The Seventh Circuit rejected the Sixth Circuit's contention that the term "vote" was unconstitutionally vague, finding that the term was broadly and adequately defined in the Voting Rights Act itself, 52 U.S.C. § 10310(c)(1), and that this statutory definition was supported by both the dictionary and the commonly understood meaning of the word. *Id.* at 308–09 The Seventh Circuit thus held that the facts established a clear violation by the defendant of the multiple-voting prohibition in Section 10307(e).[23]

In addition to their conflicting holdings, the *Salisbury* and *Cole* opinions differ in their approach to so-called voter "assistance"

---

22 The *Salisbury* court noted that in *United States v. Hogue*, 812 F.2d 1568 (11th Cir. 1987), the jury was instructed that illegal voting under Section 10307(e) included marking another person's ballot without his or her "express or implied consent," but found that, based on the facts of *Salisbury*, the jury should also have been given definitions of "vote" and "consent." *Salisbury*, 983 F.2d at 1377.

23 "Ordinary people can conclude that the absentee voters were not expressing their wills or preferences, i.e., that Cole was using the absentee voters' ballots to vote his will and preferences." *Cole*, 41 F.3d at 308.

cases. *Salisbury* focused on the issue of voter consent – that is, whether the voters had, by their conduct, in some way "consented" to having the defendant mark, or help them mark, their own ballots. *Cole*, on the other hand, focused on whether it was the voter or the defendant who actually expressed candidate preferences.

In a more recent case, the Eleventh Circuit followed the rationale in *Cole* with respect to a scheme to obtain and cast ballots for indigent voters without their knowledge or consent. *United States v. Smith*, 231 F.3d 800 (11th Cir. 2000). The court even went so far as to note that, in its view, a Section 1030 e) offense could exist regardless of whether the voter had consented to another's marking his ballot. *Id.* at 819 n.20.

While the approach taken in *Cole* and *Smith* is, from a prosecutor's perspective, preferable to the approach taken in *Salisbury*, the latter's discussion of the issue of possible voter "consent" remains important, since facts suggesting the possibility of consent may weaken the evidence of fraud. Taken together, these three cases suggest the following approach to voter "assistance" frauds:

- Section 10307(e) most clearly applies to cases of "ballot theft." Examples of such situations are when the defendant marked the ballots of others without their input; when voters did not knowingly consent to the defendant's participation in their voting transactions; when the voters' electoral preferences were disregarded; or when the defendant marked the ballots of voters who lacked the mental capacity to vote or to consent to the defendant's activities.

- Jury instructions for a Section 103 e) charge should amplify the key term "votes more than once" in the context of the particular case, and specifically define the terms "vote," and, when appropriate, "consent" and "implied consent." *E.g.*, 52 U.S.C. § 10310(c)(l) (containing an extremely broad definition of "vote");

*Boards*, 10 F.3d at 589 (holding that this definition encompasses applying for an absentee ballot).

Thus, while the clearest use of Section 10307 e) is to prosecute pure ballot forgery schemes, the statute can also apply to other types of schemes when voters are manipulated, misled, or otherwise deprived of their votes. *See, e.g.*, *Cole*, 41 F.3d at 310–1 (witness believed the defendant was merely registering her to vote, not helping her vote). Schemes to steal the votes of the elderly, infirm, or economically disadvantaged may constitute multiple-voting, especially if there is a clear absence of meaningful voter participation. Because of their vulnerability, these persons are frequent targets of ballot schemes, and often do not even know that their ballots have been stolen or their voting choices ignored. Further, if they have been intimidated, they are generally reluctant to say so.

There is a significant evidentiary difference between voter intimidation and multiple-voting that suggests that the multiple-voting statute may become the preferred charging statute for voter "assistance" frauds. Voter intimidation requires proof of a difficult element: the existence of physical or economic intimidation that is intended by the defendant. In contrast, the key element in a multiple-voting offense is whether the defendant voted the ballot of another person without consulting with that person or taking into account his or her electoral preferences.

In conclusion, if the facts show manipulation of "vulnerable victims" as referenced in the sentencing guidelines for the purpose of obtaining control over the victims' ballot choices, the use of Section 10307(e) as a prosecutive theory should be considered.

### 5. Voter Intimidation

Voter intimidation schemes are the functional opposite of voter bribery schemes. In the case of voter bribery, voting activity is stimulated by offering or giving something of value to individuals to induce them to vote or reward them for having voted. The goal of

voter intimidation, on the other hand, is to deter or influence voting activity through threats to deprive voters of something they already have, such as jobs, government benefits, or, in extreme cases, their personal safety. Another distinction between vote-buying and intimidation is that bribery generates concrete evidence: the payment itself (generally money). Intimidation, on the other hand, is amorphous and largely subjective in nature, and lacks such concrete evidence.

Voter intimidation warrants prompt and effective redress by the criminal justice system. Yet a number of factors make it difficult to prosecute. The intimidation is likely to be both subtle and without witnesses. Furthermore, voters who have been intimidated are not merely victims; it is their testimony that proves the crime. These voters must testify, publicly and in an adversarial proceeding, against the very person who intimidated them. Obtaining this crucial testimony must be done carefully and respectfully. Because such offenses often occur in remote and insular communities, investigators should increase their efforts to maintain contact with voters, especially after charges are brought. Prosecutors should consider "locking in" testimony in grand jury sessions even at the risk of creating some negative *Jencks* material.[24]

The crime of voter "intimidation" normally requires evidence of threats, duress, economic coercion, or some other aggravating factor that tends to improperly induce conduct on the part of the victim. If such evidence is lacking, an alternative prosecutive theory may apply to the facts, such as multiple-voting in violation of 52 U.S.C. § 10307(e). Indeed, in certain cases the concepts of "intimidation" and "voting more than once" might overlap and even merge. For example, a scheme that targets the votes of persons who are mentally handicapped, economically depressed, or socially vulnerable may involve elements of both crimes. Because of their vulnerability, these

---

[24] Federal prosecutors should be mindful of Department resources and policies regarding the rights of victims and the concerns regarding their use as witnesses, and should consult with the victim-witness coordinator in their Office or Division.

persons are often easily manipulated – without the need for inducements, threats, or duress. In such cases, the use of Section 10307(e) as a prosecutive theory should be considered. *See generally United States v. Odom*, 736 F.2d 104 (4th Cir. 1984).

The main federal criminal statutes that can apply to voter intimidation are: 52 U.S.C. § 20511(1); 18 U.S.C. §§ 241, 242, 245(b)(1)(A), 594, and 610. Each of these statutes is discussed below.

### (a) Intimidation in voting and registering to vote: 52 U.S.C. § 20511(1)

In 1993, Congress enacted the National Voter Registration Act (NVRA), 52 U.S.C. §§ 20501 through 20511. The principal purpose of this legislation was to require that the states provide prospective voters with uniform and convenient means by which to register for the federal franchise. In response to concerns that relaxing registration requirements may lead to an increase in election fraud, the NVRA also included a series of election crimes, one of which prohibits knowingly and willfully intimidating or coercing[25] prospective voters in registering to vote, or for voting, in any election for federal office.[26] 52 U.S.C. § 20511(1). Violators are subject to imprisonment for up to five years.

---

25 For guidance in determining what constitutes "intimidation" or "coercion" under this statute, see the discussion of 18 U.S.C. § 594 below. Voter "intimidation" accomplished through conduct not covered by this statute or Section 594 may present violations of the Voting Rights Act, 52 U.S.C. § 10307(b), which is enforced by the Civil Rights Division through non-criminal remedies.

26 The jurisdictional element for Section 20511(1) is "in any election for Federal office." This is slightly different phraseology than used in Sections 10307(c) and (e), as discussed above. In matters involving intimidation in connection with voter *registration*, this jurisdictional element is currently satisfied in every case because voter registration is unitary in all 50 states: i.e., one registers to vote only once to become eligible to vote for federal as well as non-federal candidates. However, when the intimidation occurs in connection with *voting*, the jurisdictional situation might not be as clear. Absent case law to the contrary, federal prosecutors should advocate the position that "an election for Federal office" means any election in which a federal candidate is on the ballot.

**(b) Intimidation of voters: 18 U.S.C. § 594**

Section 594 prohibits intimidating, threatening, or coercing anyone, or attempting to do so, for the purpose of interfering with an individual's right to vote or not vote in any election held solely or in part to elect a federal candidate. The statute does not apply to primaries. Violations are one-year misdemeanors.

The operative words in Section 594 are "intimidates," "threatens," and "coerces." The *scienter* element requires proof that the actor intended to force voters to act against their will by placing them in fear of losing something of value. The feared loss might be something tangible, such as money or economic benefits, or intangible, such as liberty or safety.

Section 594 was enacted as part of the original 1939 Hatch Act, which aimed at prohibiting the blatant economic coercion used during the 1930s to force federal employees and recipients of federal relief benefits to perform political work and to vote for and contribute to the candidates supported by their supervisors. The congressional debates on the Hatch Act show that Congress intended Section 594 to apply when persons were placed in fear of losing something of value for the purpose of extracting involuntary political activities. 84 CONG. REC. 9596-611 (1939 Although the impetus for the passage of Section 594 was Congress's concern over the use of threats of economic loss to induce political activity, the statute also applies to conduct which interferes, or attempts to interfere, with an individual's right to vote by placing him or her in fear of suffering other kinds of tangible and intangible losses. It thus criminalizes conduct intended to force prospective voters to vote against their preferences, or refrain from voting, through activity reasonably calculated to instill some form of fear.[27]

---

[27] The civil counterparts to Section 594, 52 U.S.C. §§ 10101(b) and 10307(b), may also be used to combat non-violent voter intimidation. *See, e.g.*, *United States v. North Carolina Republican Party*, No. 91-16 Civ-5F (E.D.N.C., consent decree

### (c) Coercion of political activity: 18 U.S.C. § 610

Section 610 was enacted as part of the 1993 Hatch Act reform amendments to provide increased protection against political manipulation of federal employees in the executive branch.[28] It prohibits intimidating or coercing a federal employee to induce or discourage "any political activity" by the employee. Violators are subject to imprisonment for up to three years. This statute is discussed in detail in Chapter Three, which addresses patronage crimes.

Although the class of persons covered by Section 610 is limited to federal employees, the conduct covered by this statute is broad: it reaches political activity that relates to any public office or election, whether federal, state, or local. The phrase "political activity" in Section 610 expressly includes, but is not limited to, "voting or refusing to vote for any candidate or measure," "making or refusing to make any political contribution," and "working or refusing to work on behalf of any candidate."

### (d) Conspiracy against rights and deprivation of constitutional rights: 18 U.S.C. §§ 241 and 242

Section 241 makes it a ten-year felony to "conspire to injure, oppress, threaten, or intimidate" any person in the free exercise of any right or privilege secured by the Constitution or laws of the United

---

entered Feb. 27, 1992) (consent order entered against political organization for mailing postcards to thousands of minority voters that contained false voting information and a threat of prosecution).

[28] A similar statute addresses political intimidation within the military. 18 U.S.C. § 609. It prohibits officers of the United States Armed Forces from misusing military authority to coerce members of the military to vote for a federal, state, or local candidate. Violations are five-year felonies. In addition, 18 U.S.C. § 593 makes it a five-year felony for a member of the military to interfere with a voter in any general or special election, and 18 U.S.C. § 596 makes it a misdemeanor to poll members of the armed forces regarding candidate preferences.

States" – including the right to vote. The statute, which is discussed in detail above, has potential application in two forms of voter intimidation: a conspiracy to prevent persons whom the subjects knew were qualified voters from entering or getting to the polls to vote in an election when a federal candidate is on the ballot, and a conspiracy to misuse state authority to prevent qualified voters from voting for any candidate in any election.

Section 241 has been successfully used to prosecute intimidation in connection with political activities. *Wilkins v. United States*, 376 F.2d 552 (5th Cir. 1967) (*en banc*). *Wilkins* involved both violence and clear racial animus, and arose out of the shooting of a participant in the 1965 Selma-to-Montgomery voting rights march. *Id.* at 557–59. The marchers had intended to present the Governor of Alabama with a petition for redress of grievances, including denial of their right to vote. *Id.* at 555. The Fifth Circuit held that those marching to protest denial of their voting rights were exercising "an attribute of national citizenship, guaranteed by the United States," and that shooting one of the marchers therefore violated Section 241. *Id.* at 561.

Section 242 makes it a misdemeanor for any person to act "under color of any law, statute, ordinance, regulation, or custom," to willfully deprive any person in a state, territory, or district of a right guaranteed by the Constitution or federal law. For all practical purposes, this statute embodies the substantive offense for a Section 241 conspiracy, and it therefore can apply to voter intimidation.

It is the Criminal Division's position that Sections 241 and 242 may be used to prosecute schemes to intimidate voters in federal elections through threats of physical or economic duress, or to prevent otherwise lawfully qualified voters from getting to the polls in elections when a federal candidate is on the ballot. Examples of the latter include intentionally jamming telephone lines to disrupt a political party's get-out-the-vote or ride-to-the-polls efforts, and schemes to vandalize motor vehicles that a political faction or party intended to use to get voters to the polls.

### (e) Federally protected activities: 18 U.S.C. § 245(b)(1)(A)

The Civil Rights Act of 1968 contained a broad provision that addresses violence intended to intimidate voting in any election in this country. 18 U.S.C. § 245(b)(1)(A). This provision applies without regard to the presence of racial or ethnic factors.

Section 245(b)(1)(A) makes it illegal to use or threaten to use physical force to intimidate individuals from, among other things, "voting or qualifying to vote." It reaches threats to use physical force against a victim because the victim has exercised his or her franchise, or to prevent the victim from doing so. Violations are misdemeanors if no bodily injury results, ten-year felonies if there is bodily injury, and any term of years, life imprisonment, or death if death results.

Prosecutions under Section 245 require written authorization by the Attorney General, the Deputy Attorney General, the Associate Attorney General, or a specially designated Assistant Attorney General, who must certify that federal prosecution of the matter is "in the public interest and necessary to secure substantial justice." 18 U.S.C. § 245(a)(1). This approval requirement was imposed in response to federalism issues that many Members of Congress believed were inherent in a statute giving the federal government prosecutive jurisdiction over what otherwise would be mere assault and battery cases. S. REP. NO. 90-721 (1967), *reprinted in* 1968 U.S.C.C.A.N. 1837-67. In making the required certification, the standard to be applied is whether the facts of the particular matter are such that the appropriate state law enforcement authorities should, but either cannot or will not, effectively enforce the applicable state law, thereby creating an overriding need for federal intervention. *Id.* at 1845-48.

### 6. Voter Suppression: 18 U.S.C. §§ 241 and 242

Voter suppression schemes are designed to ensure the election of a favored candidate by blocking or impeding voters believed to oppose that candidate from getting to the polls to cast their ballots. Examples include providing false information to the public – or a particular segment of the public – regarding the qualifications to vote, the consequences of voting in connection with citizenship status, the dates or qualifications for absentee voting, the date of an election, the hours for voting, or the correct voting precinct. Another voter suppression scheme, attempted with partial success, involved impeding access to voting by jamming the telephone lines of entities offering rides to the polls in order to prevent voters from requesting needed transportation. This case was successfully prosecuted and is discussed below.

Currently there is no federal criminal statute that directly prohibits voter suppression activity. Nevertheless, the conspiracy against rights statute, 18 U.S.C. § 241, has been successfully used to prosecute conspiracies to destroy valid voter registrations, *United States v. Haynes*, Nos. 91-5979, 91-6076, 1992 WL 296782, at *1 (6th Cir. Oct. 15, 1992), and to destroy ballots, *In re Coy,* 127 U.S. 731 (1888), *United States v. Townsley*, 843 F.2d 1070 (8th Cir. 1988). The Criminal Division believes that voter suppression conspiracies, such as those described above, are the functional equivalent of the acts involved in these prosecutions, and that voter suppression conspiracies can – and should – be pursued under Section 241 where their objective is to deter voting in a federal election (thus depriving the victim voters of their federally guaranteed right to vote for federal candidates), or in any election when they involve "state action" in their execution (thus depriving the victim voters of their rights to due process and equal protection as guaranteed by the Fourteenth Amendment). As noted above, the substantive crime for Section 241 conspiracies can be prosecuted under 18 U.S.C. § 242, deprivation of constitutional rights, where the voter suppression is carried out "under color of law."

This prosecutive theory was used in a case in New Hampshire. In *United States v. Tobin,* No. 04-216-01 (SM), 2005 WL 3199672, at *1 (D.N.H. Nov. 30, 2005), a senior political party official was charged with violating Section 241 and with telephone harassment offenses under 47 U.S.C. § 223 in connection with a scheme to jam telephone lines for ride-to-the-polls services offered by the opposing political party and the local fire department during the 2002 general elections. The object of the conspiracy was to impede certain voters from getting to the polls in order to influence what was perceived to have been a very close United States Senate contest. *Id.* The defendant challenged the Section 241 charge, claiming that the statute had never been applied to a voter suppression scheme such as the one involved in that case, and that application of Section 241 to the scheme would therefore deprive him of constitutionally required notice that his activities were proscribed. *Id.* The district court disagreed and upheld the charge, stating:

> [T]he "fair warning" issue turns generally on whether a person of ordinary intelligence would know that the acts charged would violate specific constitutional rights. Or, with reference to the allegations in the superseding indictment, whether a person of ordinary intelligence would understand that participating in an agreement, or conspiracy, whose purpose is to prevent qualified persons from freely exercising their right to vote, would violate Section 241. Plainly, a reasonable person would understand that the right to vote is a right protected by the Constitution. He or she would also understand that knowingly joining a conspiracy with the specific intent to impede or prevent qualified persons from exercising the right to vote is conduct punishable under Section 241.

*Id*. at *3 [29]

---

[29] The defendant's convictions on the telephone harassment charges were reversed on appeal due to error in the jury instructions under § 223. *United States v. Tobin*, 480 F.3d 53, 56–58 (1st Cir. 2007).

The prosecution of voter suppression schemes represents an important law enforcement priority, and such schemes should be aggressively investigated. Unless Congress enacts a statute specifically criminalizing this type of conduct, 18 U.S.C. §§ 241 and 242 are the appropriate prosecutive tool by which to charge provable offenses.

### 7. Fraudulent Registration or Voting: 52 U.S.C. § 20511(2)

This provision was enacted as part of the National Voter Registration Act of 1993 (NVRA). As discussed above, Congress enacted the NVRA to ease voter registration requirements throughout the country. The major purpose of this legislation was to promote the exercise of the franchise by replacing diverse state voter registration requirements with uniform and more convenient registration options, such as registration by mail, when applying for a driver's license, and at various government agencies.

In addition, the NVRA sought to protect the integrity of the electoral process and the accuracy of the country's voter registration rolls. To further these goals, a criminal statute was enacted that specifically addressed two common forms of electoral corruption: intimidation of voters (52 U.S.C. § 20511(1), (discussed above), and fraudulent registration and voting (52 U.S.C. § 20511(2)). Violations are subject to imprisonment for up to five years.

With respect to fraudulent registration and voting, Section 20511(2) criminalizes submitting voter registrations or ballots that contain materially false information with knowledge of the falsity. *E.g.*, *United States v. Prude*, 489 F.3d 873, 874–75 (7th Cir. 2007) (affirming conviction of disenfranchised felon who voted after notice of her ineligibility).

The use of the word "willfully" in Section 20511(2) indicates that federal prosecutors must be prepared to prove that the offender was aware that he or she was doing something unlawful.

Section 20511(2) is also limited to conduct that occurs "in any election for Federal office." While the phrasing of this jurisdictional element differs somewhat from the jurisdictional language used by Congress in earlier election fraud statutes, the Department believes that it was intended to achieve the same result.[30]

### (a) Fraudulent registration: § 20511(2)(A)

Subsection 20511(2)(A) prohibits any person, in an election for federal office, from defrauding or attempting to defraud state residents of a fair and an impartially conducted election by procuring or submitting voter registration applications that the offender knows are materially false or defective under state law. The scope of the statute is broader than that of the "false information" provision of Section 10307(c), discussed above, which is limited to false information involving only name, address, or period of residence. The statute applies to any false information that is material to a registration decision by an election official. For this reason, the provision is likely to be the statute of preference for most false registration matters.

As already discussed, because registration to vote is unitary in all states, in the sense that in registering to vote an individual becomes eligible to vote in all elections, federal as well as non-federal, the jurisdictional element is automatically satisfied in schemes to submit fraudulent registration applications.

---

[30] The earlier statutes, 52 U.S.C. §§ 10307(c) and (e), contain express references to each federal office (Member of the House, Member of the Senate, President, Vice President, presidential elector) and type of election (primary, general, special) providing federal jurisdiction. The revised language seems to have been intended as a less cumbersome rephrasing of the required federal nexus.

**(b) Fraudulent voting: § 20511(2)(B)**

Subsection 20511(2)(B) prohibits any person, in an election for federal office, from defrauding or attempting to defraud the residents of a state of a fair election through casting or tabulating ballots that the offender knows are materially false or fraudulent under state law. Unlike other ballot fraud laws discussed in this chapter, the focus of this provision is not on any single type of fraud, but rather on the result of the false information: that is, whether the ballot generated through the false information was defective and void under state law. Because of the conceptual breadth of this provision, it is a useful alternative to other fraud statutes in reaching certain forms of election corruption, particularly alien and felon voting.

However, the statute's jurisdictional element, "in any election for Federal office," substantially restricts its usefulness for fraudulent voting (as opposed to fraudulent registration) schemes, as it applies only to elections that include a federal candidate. Thus, its scope is similar to that of 52 U.S.C. §§ 10307(c) and (e), and arises from the fact that fraudulent activity aimed at any race in a mixed election has the potential to taint the integrity of the federal race.

**8. Voting by Non-citizens**

Federal law does not expressly require that persons be United States citizens to vote. Moreover, eligibility to vote is a matter that the Constitution leaves primarily to the states.[31] At the time this book was written, however, all states required that prospective voters be United States citizens.

Historically, the states have regulated both the administrative and substantive facets of the election process, including how one

---

31 U.S. CONST. art. I, § 2; *id.* amend. XVII (electors for Members of the United States House of Representatives and the United States Senate have the qualifications for electors of the most numerous branch of the state legislatures); *id.* art. II, § 1, cl. 2 (presidential electors chosen as directed by state legislatures).

registers to vote and who is eligible to do so. Federal requirements, on the other hand, generally have focused on specific federal interests, such as protecting the integrity of the federal elective process and the exercise of fundamental rights to which constitutional protection has been expressly granted.[32]

Federal laws do, however, have quite a bit to say about citizenship and voting. Specifically, in 1993 the federal role in the election process expanded significantly with the enactment of the NVRA. This legislation required, among other things, that forms used to register persons to vote in federal elections clearly state "each eligibility requirement (including citizenship)" and that persons registering to vote in federal elections affirm that they meet "each eligibility requirement (including citizenship)." 52 U.S.C. §§ 20504(c)(2)(C), 20506(a)(6)(A)(i), 20508(b)(2). Nine years later, Congress passed the Help America Vote Act of 2002, which reemphasized these requirements in the case of voters who register to vote via mail by requiring the states to place a citizenship question on mailed registration forms. 52 U.S.C. § 21083(b)(4)(A)(i).

In addition to these federal requirements relating to voter registration, registering to vote and voting by non-citizens may be prosecuted under four separate federal criminal laws:

**(a) Fraudulent registration and voting: 52 U.S.C. § 20511(2)**

As already discussed, the NVRA enacted a criminal statute that reaches the knowing and willful submission to election authorities of false information that is material under state law. 52 U.S.C. § 20511(2). Because all states currently make citizenship a prerequisite for voting, statements by prospective voters concerning

32 For example, the states are prohibited from depriving "citizens of the United States" of the franchise on account of any of the following factors: race (amend. XV), gender (amend. XIX), non-payment of poll tax (amend. XXIV), age of 18 or older (amend. XXVI; 52 U.S.C. § 10701), residency after 30 days (52 U.S.C. § 10502), or overseas residence (52 U.S.C. § 20302).

citizenship status are automatically "material" within the meaning of this statute. Therefore, any false statement concerning an applicant's citizenship status that is made on a registration form submitted to election authorities, or made so that the individual may vote, can involve a violation of this statute.

As discussed above, the jurisdictional requirement – that the fraud be "in any election for Federal office" – is satisfied in voter registration cases whenever a false statement concerning citizenship status is made on a voter registration form because registration is unitary in every state. The jurisdictional requirement for voting cases is likely only satisfied where the ballot included a federal candidate.

Proof of the willfulness element is relatively easy in cases involving false claims of citizenship because, since 1993 when the NVRA was enacted, the citizenship requirement must be stated on the voter registration form, and the form requires that the voter check a box indicating that he or she is a citizen.

**(b) False claims to register or vote: 18 U.S.C. § 1015(f)**

Section 1015(f) was enacted in 1996 to provide an additional criminal prohibition addressing the participation of non-citizens in the voting process. This statute makes it an offense for an individual to make a false statement or claim that he or she is a citizen of the United States in order to register or to vote. Unlike all other statutes addressing alien voting, Section 1015(f) expressly applies to all elections – federal, state, and local – as well as to initiatives, recalls, and referenda.

Jurisdictionally, Section 1015(f) rests on Congress's power over nationality (U.S. CONST. art. I, § 8, cl. 4) rather than on the Election Clause (U.S. CONST. art. I, § 4, cl. 1), which provides the basis for its broad reach.

Violations of Section 1015(f) are felonies, punishable by imprisonment for up to five years.

### (c) False claims of citizenship: 18 U.S.C. § 911

Section 911 prohibits the knowing and willful false assertion of United States citizenship by a non-citizen. *See, e.g.*, *United States v. Franklin*, 188 F.2d 182 (7th Cir. 1951); *Fotie v. United States*,137 F.2d 831 (8th Cir. 194 Section 911 requires proof that the offender was aware he was not a United States citizen, and that he was falsely claiming to be a citizen. Violations of Section 911 are punishable by up to three years of imprisonment.

As noted, all states (but not all local jurisdictions) require United States citizenship as a prerequisite for voting; and, under the NVRA, all states must make this citizenship requirement clear, and prospective registrants must sign applications under penalty of perjury attesting that they meet this requirement. Therefore, falsely attesting to citizenship in any state is now more likely to be demonstrably willful, and therefore cognizable under Section 911.

### 9. Voting by Aliens: 18 U.S.C. § 611

Section 611 creates an additional crime for voting by persons who are not United States citizens. It applies to voting by non-citizens in an election when a federal candidate is on the ballot, except when non-citizens are authorized to vote by state or local law for non-federal candidates or issues, and the ballot is formatted in a way that the non-citizen has the opportunity to vote solely for these non-federal candidates or issues. Unlike Section 1015(f), Section 611 is directed at the act of voting, rather than the act of lying.

Also unlike Section 1015(f), Section 611 states a general intent offense, i.e., the offender must have known that he or she was not a citizen, and that the act he or she performed was an act of voting. However, it is not necessary to prove that the offender knew that voting by non-citizens was illegal. As thus interpreted, Section 611

has been held to conform to constitutional standards. *See United States v. Knight*, 490 F.3d 1268, 1270 (11th Cir. 2007

Violations of Section 611 are misdemeanors, punishable by up to one year of imprisonment.

**10. Travel Act: 18 U.S.C. § 1952**

The Travel Act, 18 U.S.C. § 1952, prohibits interstate travel, the use of any other facility (such as a telephone or the internet) capable of use interstate, and any use of the mails, to further specified "unlawful activity," including bribery in violation of state or federal law. Violations are punishable by imprisonment for up to five years. This statute may be useful in election crime matters because it applies to vote-buying offenses that occur in states where vote-buying is a "bribery" offense, regardless of the type of election involved.

The predicate bribery under state law need not be common law bribery. The Travel Act applies as long as the conduct is classified as a "bribery" offense under applicable state law. *Perrin v. United States*, 444 U.S. 37 (1979); *United States v. Dansker*, 537 F.2d 40, 47 (3d Cir. 1976). In addition, the Travel Act has been held to incorporate state crimes regardless of whether they are classified as felonies or misdemeanors. *United States v. Polizzi*, 500 F.2d 856, 873 n.17 (9th Cir. 1974) *United States v. Karigiannis*, 430 F.2d 148, 150 (7th Cir. 1970); *Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 678 (S.D. Cal. 1999)

The first task in determining whether the Travel Act has potential application to a vote-buying scheme, therefore, is to examine the law of the state where the vote-buying occurred to determine if it either: (1) is classified as a bribery offense, or (2) describes the offense of paying voters for voting in a way that requires proof of a *quid pro quo*, i.e., that a voter be paid in consideration for his or her vote for one or more candidates. If the state offense meets either of these criteria, the Travel Act potentially applies.

The analysis of whether an offense qualifies under these criteria can involve complex questions of state law. In *United States v. Manzo*, 851 F. Supp. 2d 797, 800 (D.N.J. 2012), the government charged an unsuccessful mayoral candidate with a Travel Act violation for accepting a campaign contribution in exchange for a promise to assist the development of real estate interests held by the bribe payor if the candidate prevailed in the election. The court, after extensively reviewing New Jersey's bribery and solicitation statutes, as well as the common law of bribery, determined that neither specifically proscribed the acceptance of a benefit by an unsuccessful candidate in exchange for a promise to perform an official act once elected. *Id.* at 811–29. Therefore, the government had not properly alleged a Travel Act violation, and the court granted the defendant's motion to dismiss the indictment. *Id.* at 829. The court did, however, note that "it is a crime in New Jersey to engage in bribery as a candidate in order to purchase or induce certain behaviors of voters specifically," *id.* at 812, indicating that a vote-buying allegation would constitute a valid charge under the Travel Act.

Travel Act jurisdiction rests on predicate acts of interstate travel, the use of interstate facilities, or the use of the mails (intra or interstate). *E.g., United States v. Nader*, 542 F.3d 713, 722 (9th Cir. 2008) ("We hold that intrastate telephone calls made with intent to further unlawful activity can violate the Travel Act because the telephone is a facility in interstate commerce."); *United States v. Halloran*, 821 F.3d 321, 342 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 1118 (2017) (citing *Nader*, 542 F.32 at 722) (holding purely intrastate use of an interstate facility, "e.g., the telephone or the internet" is sufficient to violate the Travel Act). Since election fraud is a local crime, interstate predicate acts are rarely present. The Travel Act may be considered as a vehicle to prosecute vote-buying schemes, however, in which the mails, a telephone, or the internet were used in those states where vote-buying is statutorily defined as bribery. This theory is one of the few available that do not require a federal candidate on the ballot.

As with the mail and wire fraud statutes, each use of the interstate facility or mail in furtherance of the bribery scheme is a separate offense. *United States v. Jabara*, 644 F.2d 574, 577–78 (6th Cir. 198 The defendant need not actually have used the facility or mail, so long as it was a reasonably foreseeable consequence of his or her activities. *United States v. Kelley*, 395 F.2d 727, 729 (2d Cir. 1968). Nor need the jurisdictional act have in itself constituted the illegal activity, as long as it promoted it in some way. *United States v. Welch*, 327 F.3d 1081, 1092 (10th Cir. 2003); *United States v. Bagnariol*, 665 F.2d 877, 898–99 (9th Cir. 1981); *United States v. Peskin*, 527 F.2d 71, 79 n.3 (7th Cir. 1975); *McIntosh v. United States*, 385 F.2d 274, 276 (8th Cir. 196

An unusual feature of the Travel Act is that it requires an overt act subsequent to the jurisdictional event charged in the indictment. Thus, if a Travel Act charge is predicated on a use of the mails, the government must allege and prove that the defendant subsequently acted to further the underlying unlawful activity. The subsequent overt act need not be unlawful in itself; this element has been generally held to be satisfied by the commission of a legal act as long as the act facilitated the unlawful activity. *See, e.g.*, *United States v. Davis*, 780 F.2d 838, 842 (10th Cir. 1985).

The Travel Act may be particularly useful in voter bribery cases in non-federal elections that involve the mailing of absentee ballot materials. Such matters usually involve a defendant who offers voters compensation for voting, followed by the voter applying for, obtaining, and ultimately casting an absentee ballot. Each voting transaction can involve as many as four separate mailings: (1) when the absentee ballot application is sent to the voter, (2) when the completed application is sent to the local election board, (3) when the absentee ballot is sent to the voter, and (4) when the voter sends the completed ballot back to the election authority for tabulation.

Because the mailing must be in furtherance of the scheme, however, care should be taken to ensure that the voting transaction in question was corrupted by a bribe before the mailing that is

charged. If, for example, the voter was not led to believe that he or she would be paid for voting until after applying for, and receiving, an absentee ballot package, then the only mailing affected by bribery would be the transmission of the ballot package to the election authority; the Travel Act charge is best predicated on this final mailing, with some other subsequent overt act charged.

### 11. Mail and Wire Fraud: 18 U.S.C. §§ 1341 and 1343

The federal mail and wire fraud statutes prohibit use of the United States mails, or a private or commercial interstate carrier, or the use of interstate wire communications to further a "scheme or artifice to defraud." 18 U.S.C. §§ 1341 and 1343.[33] Violations are punishable by imprisonment for up to twenty years.

Despite their prior broad application to election fraud at the state and local level, post-*McNally*, 483 U.S. 350 (1987), and *Skilling*, 561 U.S. 358 (2010 the mail and wire fraud statutes reach only those schemes to defraud others of property rights, and schemes to deprive others of the intangible right to honest services through bribery or kickbacks under 18. U.S.C. § 1346. Section 1346, therefore, likely will not provide a basis for prosecuting most types of election fraud. Federal prosecutors should consult with the Public Integrity Section before using Section 1346 in the context of election fraud.

#### (a) "Salary Theory" of mail and wire fraud

The Court's narrowing of the mail and wire fraud statutes does not entirely foreclose their use in prosecuting election fraud. Schemes to obtain salaried positions by falsely representing the applicant's credentials to a hiring authority remain prosecutable under the mail and wire fraud statutes after *McNally*. The objective of such "salary schemes" is to obtain pecuniary items – i.e., "money or property" – by fraud; such schemes are therefore clearly within the

[33] The mail and wire fraud statutes are essentially identical, except for their jurisdictional requirements.

scope of the common law concepts of fraud to which *McNally* sought to restrict the mail fraud statute. *See United States v. Sorich*, 523 F.3d 702, 712–13 (7th Cir. 2008) (scheme creating fraudulent hiring bureaucracy for city employees led to "salaries fraudulently obtained" and "job opportunities fraudulently denied," both of which "represent[ed] property for purposes of mail fraud"); *United States v. Granberry*, 908 F.2d 278, 280 (8th Cir. 1990) (scheme to obtain "wages paid" by falsifying application "is within the narrowest reading of the [mail fraud] statute"); *United States v. Doherty*, 867 F.2d 47, 54–57 (1st Cir. 1989) (Breyer, J.) (indictment alleging scheme to rig police promotion exam and make fraudulent appointments deemed "sufficient to charge a valid conspiracy to defraud the Commonwealth of 'money or property,' namely, a scheme 'for obtaining' the money used to pay the salaries of those improperly promoted 'by means of false or fraudulent pretenses'") (quoting 18 U.S.C. § 1341); *United States v. O'Brien*, 994 F. Supp. 2d 167, 182–8 (D. Mass. 2014) (scheme to hire and promote unqualified probation department employees); *United States v. Ferrara*, 701 F. Supp. 39, 41–4 (E.D.N.Y. 1988) (scheme to obtain hospital salaries by falsifying medical training), *aff'd*, 868 F.2d 1268 (2d Cir. 1988); *United States v. Thomas*, 686 F. Supp. 1078, 1083–85 (M.D. Pa. 1988) (scheme to rig police entrance exam), *aff'd*, 866 F.2d 1414 (3d Cir. 1988) (table); *cf. United States v. Cooper*, 677 F. Supp. 778, 781 (D. Del. 1988) (wire fraud scheme to obtain pay for person not performing work).

This salary theory of post-*McNally* mail or wire fraud has potential application to some election fraud schemes, since most elected offices in the United States carry with them a salary and various emoluments that have monetary value. For example, schemes to obtain salaried elected positions through procuring and tabulating invalid ballots, or by concealing from a supervising authority the receipt of illegal campaign funds during an election, result in the payment of a salary to an official who would not have been elected absent the fraud.

In addition, election fraud schemes can present related issues concerning the quality and value of the public officer hired thereby.

The Supreme Court observed in *McNally* that deceit concerning the quality and value of a commodity or service remains within the scope of Section 1341:

> We note that as the action comes to us, there was no charge and that the jury was not required to find that the Commonwealth itself was defrauded of any money or property. It was not charged that in the absence of the alleged scheme the Commonwealth would have paid a *lower* premium or secured *better* insurance.

*McNally*, 483 U.S. at 360 (emphasis added). Election fraud schemes involve an aspect of material concealment insofar as the "value" of the services the public is paying for are concerned: the public "hired" the candidate because it was falsely led to believe this candidate received the most valid votes, or (at least in part) because it believed the candidate did not engage in illegal fundraising activities, and consequently received services from an individual that were thus of lower value.

This "salary theory" of post-*McNally* mail or wire fraud has been applied to election frauds in only a few cases to date, with mixed results. The Fifth and Sixth Circuits have outright rejected the theory in the election fraud context. *United States v. Ratcliff*, 488 F.3d 639, 647 (5th Cir. 2007) (candidate lied to election ethics board about illegal campaign loans); *United States v. Turner*, 459 F.3d 775, 784–90 (6th Cir. 2006) (defendant fraudulently concealed illegal contributions and bribed voters to vote for candidate). District courts have split on whether the theory is viable in prosecuting election fraud. *Compare United States v. Schermerhorn*, 713 F. Supp. 88, 92 (S.D.N.Y. 1989) (scheme to conceal that state senate candidate was being financed by organized crime in violation of state campaign financing laws held actionable under the salary theory); *United States v. Webb*, 689 F. Supp. 703, 707 (W.D. Ky. 1988) (scheme to fraudulently elect sheriff by procuring false absentee ballots held actionable under the salary theory), *with Westchester Cnty. Indep. Party v. Astorino*, No. 13–CV–7737 (KMK), 2015 WL 5883718, at

*11–1 (S.D.N.Y. Oct. 8, 2015) (holding that "a person who has committed election fraud in order to obtain the normal salary given to the person holding that elected office has not committed money or property fraud, because the victim – the government – has not been deprived either of any money or property or the choice in how to spend the money"); *United States v. George*, No. 86–CR–123 1987 WL 48848, at *2 (W.D. Ky. Oct. 20, 1987) (similar).

Thus, the salary theory may still be viable in the election fraud context. Schemes designed to fraudulently elect a public official are materially indistinguishable from schemes to fraudulently obtain other government employment for purposes of Sections 1341 and 1343. The holdings of the Fifth and Sixth Circuits in *Ratcliff* and *Turner*, respectively, rely on three basic rationales that appear to conflict with case law discussing the salary theory in other contexts.

Both holdings rely on the courts' observation that the elected officials' fraudulently-obtained salaries did not cause the paying localities to incur a net monetary loss, because *someone* would be paid the salaries regardless of who ultimately obtained the positions. *Ratcliff*, 488 F.3d at 645; *Turner*, 465 F.3d at 680.[34] But, as the First Circuit has explained, "[Section] 1341 forbids schemes to defraud *or* to obtain money by false pretenses; this statutory language suggests no requirement that the scheme must be aimed at money which would not otherwise have gone to someone who honestly obtained the victim's business." *Doherty*, 867 F.2d at 60. Other circuit and district courts, applying the mail fraud statute to crimes outside of the election context, have confronted and rejected the rationale relied upon in *Ratcliff* and *Turner* as well. *See, e.g.*, *id*; *Sorich*, 523 F.3d at 712–13;

[34] In *United States v. Goodrich*, the Eleventh Circuit rejected the government's attempt to apply the salary theory to a scheme whereby the defendant bribed county officials. 871 F.2d 1011, 1013–14 (11th Cir. 1989). The district court had reasoned that the defendant defrauded the county of salaries paid to officials by bribing them to take certain official actions and conduct "sham meetings." *Id.* at 1013. Foreshadowing *Turner* and *Ratcliff*, the Eleventh Circuit reasoned that "the indictment does not allege that the purported mail fraud caused the County to incur any expenses over and above the cost of conducting regularly-scheduled commission business." *Id.* at 1013. The Second Circuit expressly declined to opine on the theory's application to a scheme to bribe previously-elected union officials. *United States v. Coppola*, 671 F.3d 220, 237 (2d Cir. 2012).

*Granberry*, 908 F.2d at 280; *United States v. Thomas*, 686 F. Supp. 1078, 1085 (M.D. Pa. 1988); *Webb*, 689 F. Supp. at 707 (characterizing "[a] net loss in the salary expended" as "superfluous" to a mail fraud charge). Moreover, the net expense rationale ignores the Supreme Court's observation in *McNally*, quoted above, that fraud causing a lower-quality service to be provided can give rise to a viable mail fraud claim. *See Schermerhorn*, 713 F. Supp. at 92 (explaining that the defendant's emphasis on overall cost "is at the expense of the remainder of that disjunctive clause – 'or secured better insurance'") (quoting *McNally*, 483 U.S. at 360)); *Granberry*, 908 F.2d at 280 ("What the school district wanted was a competent school-bus driver who was truthful and had not been convicted of a felony, and this is not what it got."). Neither the statutory language nor common law concepts of fraud require courts to "abide [or] judicially sanction the conclusion that corrupt and non-corrupt elected officials are of equal value." *Schermerhorn*, 713 F. Supp. at 92.

The Fifth Circuit's holding in *Ratcliff* also rested on its observation that the defendant's fraudulent misrepresentations were aimed directly at a local ethics board, rather than the locality paying the official's salary. *Ratcliff*, 488 F.3d at 644–4 However, just three years later, in *United States v. McMillan*, the circuit disavowed that line of reasoning, acknowledging that "[n]othing in the mail and wire fraud statutes requires that the party deprived of money or property be the same party who is actually deceived." 600 F.3d 434, 449 (5th Cir. 2010) (internal quotation marks omitted). The *McMillan* court instead read *Ratcliff*'s holding to rely principally upon the first basis explained above, i.e., the fact that the elected official's "salary and benefits . . . would have been paid regardless of the defendant's misrepresentations." *Id.* at 448.

Finally, in *Turner*, the Sixth Circuit based its holding in part on its view that the locality paying the official's salary lacked "control over the appropriation of the salary beyond ensuring payment to the duly elected official." *Turner*, 465 F.3d at 682. But there is no support in the statutory language for such a limitation. *See* 18 U.S.C. §§ 1341, 1343 (making unlawful "*any* scheme or artifice to defraud, or for

obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . .") (emphasis added). Nothing in the language of Sections 1341 or 1343, or *McNally*, for that matter, indicates that the *process* of selecting the official or employee – be it by popular election or a more traditional hiring procedure – is material for purposes of determining liability. It would be an odd result indeed if a bad actor who secures elected office by fraud could evade prosecution under Sections 1341 or 1343 simply because the hiring procedure involved delegation or otherwise involved multiple actors, not all of whom were directly targeted by the fraudulent conduct.

**(b) "Cost-of-election" theory: 18 U.S.C. § 1341**

One court, the D.C. Circuit, has held that a scheme to cast fraudulent ballots in a labor union election, which had the effect of tainting the entire election, was a scheme to defraud the election authority charged with running the election of the costs involved. *United States v. DeFries*, 43 F.3d 707, 710–11 (D.C. Cir. 1995)

*DeFries* was not a traditional election fraud prosecution. Rather, it involved corruption of a union election when supporters of one candidate for union office cast fraudulent ballots for that candidate. *Id.* at 708. When the scheme was uncovered, the United States Department of Labor ordered that a new election be held, thereby causing the union to incur an actual pecuniary loss. The D.C. Circuit held that the relationship between that pecuniary loss and the voter fraud scheme was sufficient to satisfy the requirements of *McNally*. *Id.* at 710–1

This theory of prosecution has potential usefulness primarily when the mail and wire fraud statutes are needed to federalize voter frauds involving the counting of illegal ballots in non-federal elections, particularly when the fraud has led to a successful election contest and the election authority has been ordered to hold a new election, thereby incurring additional costs.

### 12. Troops at Polls: 18 U.S.C. § 592

This statute makes it unlawful for anyone in the military or federal civil service to station troops or "armed men" at the polls in a general or special election (but not a primary), except when necessary "to repel armed enemies of the United States." Violations are punishable by imprisonment for up to five years and disqualification from any federal office.

Section 592 prohibits the use of official authority to order armed personnel to the polls; it does not reach the personnel who respond to those orders. The effect of this statute is to prohibit FBI Special Agents from conducting investigations within the polls on election day, and Deputy U.S. Marshals from being stationed at open polls, as both are required to carry their weapons while on duty.

This statute applies only to agents of the United States government. It does not prohibit state or local law enforcement agencies from sending police officers to quell disturbances at polling places, nor does it preempt state laws that require police officers to be stationed in polling places. And finally, it does not prohibit armed federal response when a polling place has ceased to function because of, for example, a bomb threat or active shooter.

### 13. Campaign Dirty Tricks

Two federal statutes, both of which are part of the Federal Election Campaign Act (FECA), specifically address campaign tactics and practices: 52 U.S.C. §§ 30120 and 30124 As is the case with all other FECA provisions, violations of these two statutes are subject to both civil and criminal penalties, 52 U.S.C. §§ 30109(a) and 30109(d) respectively. These penalties will be further discussed in Chapter Five.

### (a) Election communications and solicitations: 52 U.S.C. § 30120

Section 30120 provides that whenever a person or political committee makes certain types of election-related disbursements, an expenditure for the purpose of financing a public communication advocating the election or defeat of a clearly identified federal candidate, or a solicitation for the purpose of influencing the election of a federal candidate, the communication must contain an attribution clause identifying the candidate, committee, or person who authorized and/or paid for the communication. The content of the attribution, as well as its size and location in the advertisement, are described in the statute.

This statute has potential application to unattributed false, inflammatory, or scurrilous campaign literature that calls for the election or defeat of a federal candidate.

### (b) Fraudulent misrepresentation: 52 U.S.C. § 30124

Section 30124 prohibits fraudulently representing one's authority to speak for a federal candidate or political party. The provision contains two specific prohibitions:

- Section 30124(a) forbids a federal candidate or an agent of a federal candidate from misrepresenting his or her authority to speak, write, or otherwise act for any other federal candidate or political party in a matter which is damaging to that other candidate or political party. For example, Section 30124(a) would prohibit an agent of federal candidate A from issuing a statement that was purportedly written by federal candidate B, and which concerned a matter which was damaging to candidate B.

- Section 30124(b) forbids any person from fraudulently representing his or her authority to solicit contributions

on behalf of a federal candidate or political party. For example, this provision would prohibit any person from raising money by claiming that he or she represented federal candidate A, when, in fact, the person had no such authority.

### 14. Retention of Federal Election Records: 52 U.S.C. § 20701

The detection, investigation, and proof of election crimes – and in many instances Voting Rights Act violations – often depend on documentation generated during the voter registration, voting, tabulation, and election certification processes. In recognition of this fact, and the length of time it can take for credible evidence suggesting election fraud or voting rights violations to develop, Congress enacted Section 20701 to require that documentation generated in connection with the voting and registration process be retained for twenty-two months if it pertained to an election that included a federal candidate. Absent this statute, the disposition of election documentation would be subject solely to state law, which in virtually all states permits its destruction within a few months after the election is certified.

Section 20701 provides for criminal misdemeanor penalties for any election officer who willfully fails to retain records covered by the statute. Section 20702 provides similar criminal penalties for election officers or other persons who willfully steal, destroy, or alter covered records.[35] In addition to these criminal penalties, the reach of this statute to specific categories of election documentation is critical to both prosecutors and election administrators, who must often

[35] Election administrators, document custodians, or other persons who willfully violate Section 20701 or Section 20702 are subject to imprisonment for up to one year.

resolve election disputes and answer challenges to the fairness of elections.[36]

For this reason, a detailed discussion of Section 20701 and its application to particular types of election documentation generated in the current age of electronic voting follows.

### (a) Legislative purpose and background

The voting process generates voluminous documents and records, ranging from voter registration forms and absentee ballot applications to ballots and tally reports. If election fraud occurs, these records often play an important role in the detection and prosecution of the crime. Documentation generated by the election process also plays an equally important role in the detection, investigation, and prosecution of federal civil rights violations.

State laws generally require that voting documents be retained for sixty to ninety days. Those relatively brief periods are usually insufficient to make certain that voting records will be preserved until more subtle forms of federal civil rights abuses and election crimes have been detected.

In 1960, Congress enacted a federal requirement that extended the document retention period for elections when federal candidates were on the ballot to *twenty-two months* after the election. Pub. L. 86-44 Title III, § 301, 74 Stat. 88; 52 U.S.C. §§ 20701–20706 As noted above, this documentation retention requirement is backed-up with criminal misdemeanor penalties that apply to election officers or other persons who willfully destroy covered election records before the expiration of the federal retention period.

[36] Indeed, the federal courts have recognized that the purpose of this federal document retention requirement is to protect the right to vote by facilitating the investigation of illegal election practices. *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962).

The retention requirements of Section 20701 are aimed specifically at election administrators. In a parochial sense, these laws place criminally sanctionable duties on election officials. However, in a broader sense, this federal retention law assists election administrators in performing the tasks of managing elections and determining winners of elective contests. It does this by requiring election managers to focus appropriate attention on the types of election records under their supervision and control that may be needed to resolve challenges to the election process, and by requiring that they take appropriate steps to ensure that those records will be preserved intact until such time as they may become needed to resolve legitimate questions that frequently arise involving the election process.

**(b) The basic requirements of Section 20701**

Section 20701 requires that election administrators preserve for twenty-two months "all records and papers" that come into their possession relating to any "application, registration, payment of poll tax, or other act requisite to voting." This retention requirement applies to all elections in which a candidate for federal office was on the ballot, that is, a candidate for the United States Senate, the United States House of Representatives, President or Vice President of the United States, or presidential elector. Retention and disposition of records in elections with no federal candidate on the ballot (including elections for state and local bond issues, initiatives, referenda and the like) are governed by state law. Section 20701 does not apply to records generated in connection with purely local or state elections.

However, Section 20701 does apply to all records generated in connection with the process of registering voters and maintaining current electoral rolls. This is because voter registration in virtually all United States jurisdictions is "unitary" in the sense that a potential voter registers only once to become eligible to vote for both local and federal candidates. *See United States v. Cianciulli*, 482 F. Supp. 585, 617 (E.D. Pa. 1979). Thus, registration records must be preserved as long as the voter registration to which they pertain is considered an

"active" one under local law and practice, and those records cannot be disposed of until the expiration of twenty-two months following the date on which the registration ceased to be "active."

This statute must be interpreted in keeping with its congressional objective: under Section 20701, all documents and records that may be relevant to the detection or prosecution of federal civil rights or election crimes must be maintained if the documents or records were generated in connection with an election that included one or more federal candidates.

### (c) Section 20701 requires document preservation, not document generation

Section 20701 does *not* require that states or localities produce records in the course of their election processes. However, if a state or locality chooses to create a record that pertains to voting, this statute requires that record be retained if it relates to voting in an election covered by the statute.

### (d) Originals must be retained

Section 20701 further requires that the original documents be retained, even in those jurisdictions that have the capability to reduce original records to digitized replicas. This is because handwriting analysis may be difficult to perform on digitized reproductions of signatures, and because the legislative purpose advanced by this statute is to preserve election records for their evidentiary value in criminal and civil rights lawsuits. Therefore, in states and localities that employ new digitization technology to archive election forms that were originally manually subscribed by voters, Section 20701 requires that the originals be maintained for the requisite twenty-two month period.

### (e) Election officials must supervise storage

Section 20701 requires that covered election documentation be retained either physically by election officials themselves, or under their direct administrative supervision. This is because the document retention requirements of this federal law place the retention and safekeeping duties squarely on the shoulders of election officers.

An electoral jurisdiction, however, may validly determine that election records subject to Section 20701 would most efficiently be kept under the physical supervision of government officers other than election officers (e.g., motor vehicle departments and social service administrators). If an electoral jurisdiction makes such a determination, Section 20701 requires that administrative procedures be in place giving election officers ultimate management authority over the retention and security of those election records, including the right to physically access and dispose of them. The terms and conditions of storage also must conform to the retention requirements of the statute.

### 15. Section 20701 versus National Voter Registration Act

The retention requirements of Section 20701 interface significantly with somewhat similar retention requirements of the NVRA, 52 U.S.C. § 20507(i). However, there are four major differences between these two provisions:

- Section 20701 applies to all records generated by the election process, while Section 20507(i) applies only to registration records generated under the NVRA.

- Section 20701's retention period is twenty-two months while Section 20507(i)'s retention period is two years.

- Section 20507(i) requires that, with certain exceptions, covered records also must be made available to the public for inspection for two years.

- Violations of Section 20701 are subject to criminal sanctions, while violations of Section 20507(i) are subject only to non-criminal remedies.

## E. POLICY AND PROCEDURAL CONSIDERATIONS

Election-related allegations range from minor infractions, such as campaigning too close to the polls, to sophisticated criminal enterprises aimed at ensuring the election of corrupt public officials. Such matters present obvious and wide disparities in their adverse social consequences. As the Department has long strived to achieve a nationally consistent response to electoral fraud, it is important that federal investigators and prosecutors avail themselves of the expertise and institutional knowledge that the Public Integrity Section possesses in this sensitive area of law enforcement.

### 1. Consultation Requirements

The Department of Justice has a long-standing consultation policy for election crime investigations involving violations of the statutes discussed in this chapter. The policy is set forth in Section 9-85.210 of the U.S. DEP'T OF JUSTICE, UNITED STATES ATTORNEYS' MANUAL (USAM). The purposes of the consultation policy are to assist federal prosecutors and investigators in determining whether there is a sufficient factual legal basis to commence a federal criminal investigation, and, if so, to ensure that the investigation is timed in a manner that does not interfere with the adjudication of the election itself.

Upon receipt of an election fraud allegation, a United States Attorney's Office may, if the Office considers it warranted, request the FBI to conduct a preliminary inquiry in the form of an "assessment."[37]

---

[37] An "assessment" is defined in the FBI's Domestic Operations and Field Guide (2015) (DIOG) Section 5 to include those investigative steps necessary to flesh out the

Consultation with the Public Integrity Section is not required at this initial stage, although it is always welcome.

If the results of the preliminary inquiry suggest that further investigation is warranted, the United States Attorney's Office should contact the Public Integrity Section. Specifically, consultation with the Public Integrity Section, and with higher-level Department officials in the event agreement is not reached, is required for all grand jury and "full" investigations[38] of election fraud. Consultation with the Public Integrity Section is also required prior to filing any complaint or information, or prior to requesting a grand jury to act upon a proposed indictment that charges any of the election fraud offenses discussed in this chapter.

In practice, consultation typically proceeds as follows:

- The results of the preliminary investigation are submitted to FBI Headquarters and the Public Integrity Section, together with the recommendation of the United States Attorney's Office as to whether further investigation is warranted. At this point, if the matter has merit, it is discussed informally between the Section and the Assistant United States Attorney responsible for the matter, and, on occasion, between the Section and the FBI.

- The Public Integrity Section may suggest that additional investigation be conducted before determining whether a full-field or grand jury investigation is warranted. The Section may also request a preliminary investigation of a

complaint in order to determine whether a federal crime may have occurred, and, if so, whether federal prosecution of that offense is appropriate. It generally involves an FBI interview of the complainant and follow-up on certain investigative leads arising from the interview.

[38] In connection with election crime matters, a "full" FBI investigation is, essentially, anything beyond an assessment, and includes the FBI terms "preliminary investigation" and "full investigation." DIOG §§ 6 & 7. It is typically a broad-based investigation that often accompanies a grand jury investigation. Its purpose is to develop sufficient evidence of federal crimes to support federal charges.

matter that has been declined by a United States Attorney's Office.

- If the Public Integrity Section agrees that a full-field investigation and/or grand jury investigation of an election fraud allegation is warranted, a communication, in the form of an e-mail confirming this determination, is generally sent by the Section to the Assistant United States Attorney. At this stage, the Public Integrity Section also notifies FBI Headquarters that it has approved the initiation of a full-field or grand jury investigation of the matter. There is usually a discussion at this point of whether the United States Attorney's Office is able to make a commitment to prosecute any case that the investigation may generate, and, if not, whether the Public Integrity Section will handle the matter either jointly with the United States Attorney's Office or by itself.

- The initiation of any grand jury process in the matter, including the issuance of subpoenas for election documentation, requires prior consultation with the Public Integrity Section. This consultation is often done by phone, especially if speed is considered necessary to preserve voting documentation. As a rule, the Public Integrity Section will approve use of a grand jury at the time it approves a full-field investigation.

- Once this consultation has occurred, the United States Attorney's Office investigates the matter as it deems appropriate. While further consultation is not required until the charging stage, the Section welcomes questions and consultations regarding ongoing investigations.

- All indictments charging election fraud must be discussed with the Public Integrity Section before submission to the grand jury, as well as all information and criminal complaints.

- While acceptance of a plea agreement does not require consultation, this is encouraged in order to ensure that the plea agreement is consistent with those negotiated in similar cases elsewhere and with other department policies applicable with plea agreements. In addition, it is recommended that the Section be consulted in the case of pre-indictment pleas, although not required.

### 2. Urgent Reports and Press Releases

A United States Attorney's Office that is conducting an election fraud investigation should also submit urgent reports through the Executive Office for United States Attorneys at each critical stage of the investigation and ensuing prosecution. In addition, the filing of criminal charges should be accompanied by a press release that has been approved, when appropriate, by the Department's Office of Public Affairs.

### 3. Federal Seizure of State Election Materials

Federal custody of election materials is normally obtained by grand jury subpoena. In taking custody of election documents, election officials should not be deprived of documents necessary to tally and recount the ballots and to certify the election results.[39] Accordingly, copies in lieu of originals should be accepted until the state's need for the documentation expires. Originals may eventually be necessary for handwriting and other forensic analysis and for evidentiary purposes.

[39] An exception to this rule might be warranted if the facts indicate that the election officials are involved in an ongoing election fraud or obstruction scheme.

### 4. Non-interference with Elections

The Justice Department's goals in the area of election crime are to prosecute those who violate federal criminal law and, through such prosecutions, to deter corruption of future elections. The Department does not have a role in determining which candidate won a particular election, or whether another election should be held because of the impact of the alleged fraud on the election. In most instances, these issues are for the candidates to litigate in the courts or to advocate before their legislative bodies or election boards. Although civil rights actions under 42 U.S.C. § 1983 may be brought by private citizens to redress election irregularities, the federal prosecutor has no role in such suits.

In investigating an election fraud matter, federal law enforcement personnel should carefully evaluate whether an investigative step under consideration has the potential to affect the election itself. Starting a public criminal investigation of alleged election fraud before the election to which the allegations pertain has been concluded runs the obvious risk of chilling legitimate voting and campaign activities. It also runs the significant risk of interjecting the investigation itself as an issue, both in the campaign and in the adjudication of any ensuing election contest.

Accordingly, overt criminal investigative measures should not ordinarily be taken in matters involving alleged fraud in the manner in which votes were cast or counted until the election in question has been concluded, its results certified, and all recounts and election contests concluded. Not only does such investigative restraint avoid interjecting the federal government into election campaigns, the voting process, and the adjudication of ensuing recounts and election contest litigation, but it also ensures that evidence developed during any election litigation is available to investigators, thereby minimizing the need to duplicate investigative efforts. Many election fraud issues are developed to the standards of factual predication for a federal criminal investigation during post-election litigation.

The Department views any voter interviews in the pre-election and balloting periods, other than interviews of a complainant and any witnesses he or she may identify, as beyond a preliminary investigation. A United States Attorney's Office considering such interviews must therefore first consult with the Public Integrity Section. USAM 9-85.210. This consultation is also necessary before any investigation is undertaken near the polls while voting is in progress.

The policy discussed above does not apply to covert investigative techniques, nor does it apply to investigations or prosecutions of federal crimes other than those that focus on the manner in which votes were cast or counted. However, if there is any doubt about whether the policy may apply, we recommend that the Public Integrity Section be consulted.

Exceptions to this general rule of course exist. For example, one exception may be appropriate when undercover techniques are justified and the Department's guidelines for undercover operations have been met. Another exception may apply when it is possible to both complete an investigation and file criminal charges against an offender prior to the period immediately before an election. All such exceptions require consultation with the Public Integrity Section, as they involve action beyond a preliminary investigation.

### 5. Limitations on Federal Poll Watching

Federal agents may not be stationed at open polling places, except in cases of discrimination covered by the Voting Rights Act, or as part of the Civil Rights Division's oversight obligations with respect to the election system mandates enacted by the Help America Vote Act.[40]

---

[40] In such cases, the Civil Rights Division's Voting Section determines if there is a risk that voting by minorities will be impeded in a location specially covered by the Voting Rights Act. If so, the Voting Section will ask that the location be certified for "federal observers." Such observers are sent to view conduct at the polls and report

Control of polling places is governed by state laws that regulate who is authorized to be inside a polling place. Many of these laws have criminal penalties. Most states provide that no one except voters, election administrators, and perhaps party representatives may serve as poll watchers, or even approach closer than fifty to one hundred feet from an open poll. Except in Illinois, state poll access statutes do not contemplate that federal personnel serve as poll watchers or otherwise enter areas when polling is taking place. Therefore, other than as specifically provided by the Voting Rights Act and other civil rights laws, there is no statutory basis for federal personnel to serve as poll watchers.

In fact, federal law provides criminal penalties for any federal official who sends "armed men" to open polling locations. 18 U.S.C. § 592. Accordingly, the FBI's *Manual of Investigative Operations and Guidelines*, at § 56-8(6), provides that investigations in the vicinity of open polls must first be approved by the Justice Department.

### 6. Selective Prosecution Issues

The prosecution of certain types of electoral corruption can occasionally present sensitive issues of selective prosecution. A useful analysis of the law in this area, in the context of a voter fraud case, is contained in *United States v. Smith*, 231 F.3d 800, 807–13 (11th Cir. 2000).

## F. SUGGESTIONS FOR SUCCESSFUL ELECTION FRAUD INVESTIGATIONS

Most of the general principles and procedures that govern federal criminal investigations apply to the investigation of election crimes. This section will discuss those investigative issues and tactics that are unique to election fraud cases.

---

back through the Voting Section; they have no role in the detection of election crimes not involving racial animus.

Election fraud prosecutions are usually fairly easy to present, and the Department's conviction rate has been quite good. These prosecutions have proven to be a fast and effective method of combating election corruption. Moreover, because the motive for most election fraud is to corrupt the public office sought by those committing the fraud, these cases also provide an avenue to address other serious forms of public corruption.

If properly managed, election fraud cases are generally well received by the public. Favorable public reaction is likely to generate additional investigative leads in this sensitive area of criminal law enforcement.

### 1. Getting Started

Several basic steps underlie most successful election fraud investigations.

#### (a) Publicize your intent to prosecute election fraud

Most complaints that lead to prosecutable election fraud cases come from participants in the political process, such as voters, candidates, campaign workers, and poll officials. However, in places where election fraud has been entrenched, there is often widespread tolerance of election abuses among local law enforcement authorities. This frequently leads to public cynicism, which must be overcome if productive complaints are to be generated. The following steps can help:

- Hold press conferences before important elections and announce that prosecution of election fraud is a federal law enforcement priority.

- Ensure that Assistant United States Attorneys and FBI Special Agents are accessible to the public during and immediately after important elections by publicizing the

telephone numbers through which the public can reach them.

- Contact local election administrators (registrars, county and town clerks, boards of election, etc.) and high-level state officials (the State Attorney General's Office, Secretary of State) to enlist their support in detecting and reporting election abuses. These people are generally dedicated public servants who want to eliminate criminal election abuses. They are also the custodians of important records generated during the voting process.

### (b) Be aware of the importance of voting documentation

The voting process generates voluminous documentary evidence. Federal law requires that all voting documentation relating to an election that includes a federal contest be retained for at least twenty-two months after the election. 52 U.S.C. § 20701. The 1993 NVRA extended this period to two years for voter registration records generated under the Act. 52 U.S.C § 20507(i). Because the federal retention periods are significantly longer than normally required by state law, it is important to contact all election administrators in the district at the beginning of a ballot fraud investigation to be certain that they are aware of these federal requirements.

Voting documentation includes voter registration cards, absentee ballot applications, absentee ballot envelopes, tally sheets, poll lists, and ballots. These materials are particularly important to successful election crime investigations, since they contain information that helps identify fraudulent voting transactions and potential defendants. For example:

- Most states require persons seeking to vote to provide personal information to election registrars, and to furnish a handwriting specimen for comparison with the voter's signature on the registration form. These data can be

used to determine the authenticity of specific voting transactions.

- In many states, voters must sign a poll list before casting their ballots on election day. The validity of a particular voting transaction can be determined by comparing a voter's signature at the polls to the signature on his or her registration card. Persons responsible for casting fraudulent votes may be identified by comparing the poll list signatures of known fraudulent voting transactions to exemplars taken from suspects.

- States generally require voters to apply for absentee ballots in writing. They also customarily require an absentee voter to sign an oath (generally on the ballot envelope) attesting to the authenticity of the vote. These signatures can be used to identify fraudulent voting transactions and might also help identify potential defendants.

- Election officials are generally required to maintain logs of absentee applications received and approved, and of ballots issued, returned, and challenged. Once a few fraudulent voting transactions have been identified, this information can be used to identify the subjects with whom the voters involved dealt, and to locate other voters who also dealt with the same subjects.

- Election day tally sheets normally contain the handwritten certification of the poll officials who prepared them, and in many states these officials are required to execute an oath attesting to the authenticity and accuracy of the returns. These documents may corroborate the identities of those persons with official access to the tally sheets.

- Many states require voters who ask for help in voting at the polls to execute affidavits identifying the person they wish to accompany them into the voting booth. This information can be used to identify patterns of voter intimidation and voter bribery.

### (c) Consider the advantages of federal prosecution

Although the states have principal responsibility for administering the election process, many state law enforcement authorities are not well equipped to act effectively against ballot fraud. State and local prosecutors should be advised of the federal interest in prosecuting election fraud, and of the following factors that favor federal prosecution of this type of case:

- Resources: Election fraud investigations usually require a fairly large manpower commitment, which the federal government is normally better able to marshal than are local law enforcement authorities.

- Grand jury: The development of election crime cases requires an effective grand jury process through which testimony can be secured from the vulnerable witnesses who are frequently encountered in these cases, and through which necessary documentation can be secured.

- Broadly drawn venires: Election fraud is usually best tried by juries that are not drawn from the immediate location where the alleged fraud occurred. Federal venires are normally drawn from wider geographic areas than are state or local venires.

- Political detachment: State and local prosecutors are usually more closely linked to local politics than are federal prosecutors. Federal prosecution of election crime may therefore be viewed by the public and the media as more impartial.

### (d) Focus on areas vulnerable to election fraud

Election crime is most apt to occur in jurisdictions where there is substantial conflict among political factions, where voters are fairly equally distributed among factions, where local officials wield substantial power, and where there is a high degree of voter apathy. Jurisdictions meeting these criteria should be identified, and complaints coming from them given special attention in allocating investigative resources.

### (e) Develop your investigative strategy early

The typical election fraud scheme involves many levels of participants performing a variety of tasks on behalf of political operatives. For example, vote-buying schemes usually have “haulers” who take voters to the polls and pay them; “lieutenants,” “bankers,” or “politiqueras,” who obtain and distribute the money to the haulers; “captains” who coordinate the activities of the haulers; and “checkers” who accompany the voters into the voting booth to assure that they vote “correctly.” *See United States v. Adams*, 722 F.3d 788, 798–99 (6th Cir. 2013)

It is important to attempt at an early stage to identify as many of the participants in the scheme as possible and to assess their relative culpability. It is also helpful to identify the likely motive behind the scheme. An investigative strategy can then be developed which targets low-level participants for the purpose of encouraging them to be witnesses against more highly placed participants in the election scheme. These less culpable participants might also provide evidence and leads regarding the illegal activity or scheme motivating the election fraud.

## 2. The Investigation

Election fraud investigations fall into two stages: a preliminary investigation, followed by a grand jury investigation along with an FBI full-field investigation. Preliminary investigations are usually initiated by the United States Attorney's Office or FBI office that received the complaint. Consultation with the Public Integrity Section is required before grand jury and FBI full-field investigations are initiated. FBI participation must also be approved by FBI Headquarters.

### (a) Preliminary investigation

A preliminary investigation typically involves interviewing the complainant, then conducting a sufficient investigation to:

- identify the crime allegedly committed;
- determine whether that crime is prosecutable under federal law;
- evaluate the need for federal intervention as a function of –
  - the extent to which the crime may have impacted adversely on a federal election,
  - the extent to which the crime corrupted the registration or voting process, and
  - the desire and capability of local law enforcement officials to handle the case;
- identify persons who may have participated in the scheme; and

- identify, if possible, a few specific fraudulent voting transactions.

After the results of the preliminary investigation are reviewed by the United States Attorney's Office, they are forwarded to the Public Integrity Section and FBI Headquarters, along with the United States Attorney's recommendation as to whether further investigation is warranted. At this point, the matter will usually be discussed between attorneys in the Public Integrity Section and the United States Attorney's Office handling the matter. After this consultation, a grand jury and/or full-field investigation will be initiated in appropriate cases.

#### (b) Grand jury and FBI full-field investigations

The purposes of grand jury and FBI full-field investigations are to develop sufficient evidence against specific subjects to support criminal charges. These investigations are often time-consuming and labor-intensive, and generally involve obtaining and examining many election documents. Investigative approaches for two common types of election fraud are discussed below.

### 3. Investigating Two Types of Election Fraud

The most frequently encountered election frauds are absentee ballot fraud and ballot-box stuffing. Strategies for investigating these frauds are similar, but not identical.

#### (a) Absentee ballot frauds

Absentee ballot frauds involve the corruption of absentee voting transactions through such means as bribery, forgery, intimidation, and voter impersonation. Investigating these frauds involves identifying specific fraudulent voting transactions, interviewing voters who were corrupted or defrauded, using these persons as witnesses to prosecute those who corrupted or defrauded

them, and flipping those defendants to make cases against higher-level targets. The typical investigative approach is to:

- *Subpoena relevant absentee ballot documentation.*

  This documentation includes applications for absentee ballots; absentee ballots; envelopes in which ballots are placed (usually called a "privacy" or an "oath" envelope); outer envelopes forwarding ballots for tabulation (usually called a "mailer"); logs kept by election officials of applications issued, applications received, ballots issued, ballots returned, and ballots challenged; and the permanent voter registration cards for the voters ostensibly involved.

- *Analyze election documents.*

  Ballot applications and oath envelopes generally contain three key items that often reveal questionable voting transactions: the voter's purported signature, signatures of witnesses or notaries, and the address where the ballot package was sent. Examples of significant data are common notaries and witnesses; mismatches of voters' signatures on absentee ballot applications, ballot envelopes, or registration cards; and applications directed to be sent to addresses other than the addresses of the voters.

- *Identify similar transactions.*

  If the preliminary investigation identifies specific questionable voting transactions, the document analysis should be directed at identifying voting transactions having similar characteristics, such as the same handwriting, witnesses, or addresses to which absentee ballot packages were sent.

- *Interview voters allegedly involved.*

  After identifying questionable voting transactions, the voters whose names appear on the documents should be interviewed to determine whether they voted, and if so,

under what circumstances (for example, whether they were paid, intimidated, or not consulted).

- *Compare handwriting exemplars of subjects.*
  Handwriting exemplars of persons suspected of forging absentee ballot documents should be obtained and compared with the handwriting on those questioned documents.

- *Develop multiple witnesses.*
  Voters involved in fraudulent voting transactions are usually poorly educated, often intimidated by defendants and courtrooms, and generally may not make strong witnesses.[41] Successful prosecution of this type of case normally requires the testimony of several voter-witnesses against each defendant.

### (b) Ballot-box stuffing cases

These cases involve the insertion into ballot boxes of invalid, fraudulent, or otherwise illegal ballots. All ballot-box stuffing schemes necessarily involve poll officials, since access to voting documents is essential to this type of fraud and is controlled by state law. Ballot-box stuffing investigations seek to identify fraudulent voting transactions and to link specific poll officials to them. The general investigative methodology is to:

- *Subpoena election documents.*
  Obtain and examine the poll lists or other documentation that voters sign when entering the polls; the registration cards for voters residing in the target precinct, any paper or punch card ballots, and any tally sheets prepared by the poll officials reporting the election results.

---

[41] These very factors, on the other hand, demonstrate to the jury the susceptibility of these persons to manipulation, which is often important evidence in the case.

- *Examine election documents.*
  Examine poll lists for similar handwriting, giving special attention to names entered at times when voting activity was slow (such as mid-morning and early afternoon) and shortly before the polls closed.

- *Compare voters' signatures.*
  Compare signatures on the poll list with corresponding permanent registration cards to identify voters who may not have cast the ballots attributed to them.

- *Take handwriting exemplars.*
  Take exemplars from each poll official having access to the ballot box, and then compare them with questionable signatures of alleged voters.

- *Interview voters.*
  Interview the voters whose ballots were used in the scheme to determine whether they voted at the polls, and, if so, under what circumstances.[42]

### 4. A Few Cautions

Election fraud investigations raise a number of issues not normally encountered in other criminal investigations. Federal prosecutors and investigators should keep the following principles in mind:

*i.* *Respect the integrity of the polls.*
All states define by statute those persons entitled to be inside the polls during an election. Most state poll access laws do not permit federal law enforcement officials access to open polling places. Asking federal investigators to enter open polls risks violating the sovereignty that the states

---

[42] Successful prosecution of those schemes may require the cooperation of a poll official or other "insider."

have in this area, and might lead to confrontations among poll officials, local police, and federal agents. It also risks violating a federal statute that prohibits sending armed federal agents to the polls. 18 U.S.C. § 592.

ii. *Non-interference with the voting process.*

States use many types of documentation in conducting elections (such as registration cards, voter lists, poll books, and voting machines), and in tabulating and certifying the results (such as ballots, tally sheets, and absentee voting materials). Subpoenas for such documentation should be timed, and compliance procedures developed, so as not to deprive election officials of records they need to tabulate votes and certify election returns.

iii. *Need for probable cause before opening sealed ballots.*

Absentee ballots might come into the possession of federal officials while still sealed in the envelopes bearing the names of the voters who ostensibly marked them. Also, a few states provide for some types of paper ballots to be numbered in a way that corresponds with the order of signatures on a poll list. In either situation, marked ballots can be attributed to individual voters. This is particularly useful in cases involving suspected fraud in the marking or alteration of the ballot document itself. However, since voted ballots are documents in which individuals have an expectation of privacy, sealed ballots should not be opened without satisfying the Fourth Amendment's probable cause standard. Accordingly, a search warrant should be obtained before taking investigative steps that would result in linking individual ballots to the voters who allegedly cast them. Alternatively, if the individuals whose names appear on the sealed ballot envelopes deny that they voted, these individuals may be asked if they are willing to open the ballot envelopes ostensibly "voted" by them.

### 5. Conclusion

Election fraud cases can be successful and uncomplicated. However, prosecutors and investigators should use great care to avoid the pitfalls peculiar to these types of cases. Close consultation with the Public Integrity Section and its Election Crimes Branch, although not required after grand jury and FBI full-field investigations have been approved, can help avoid those pitfalls, develop effective investigative and legal strategies, and increase the likelihood of prosecutive success.

# CHAPTER THREE

# PATRONAGE CRIMES

## A. HISTORICAL BACKGROUND

Federal jurisdiction over patronage crimes is usually attained by virtue of the federal funds involved in a government job or benefit that is used to induce or reward partisan activity by government employees. Over the past century, Congress has enacted, at roughly fifty-year intervals, three landmark pieces of legislation in this area.

Until the Hatch Act reform amendments of 1993, most federal laws dealing with patronage abuses of government personnel and programs derived from either the 1883 Pendleton Civil Service Act or the 1939 Hatch Act. The Pendleton Act aimed at dismantling the partisan "spoils system" that existed in the executive branch of the federal government at the time; it created a merit civil service, and enacted the Civil Service Commission to ensure non-partisan federal employment. The Act also contained four criminal provisions designed to protect federal employees against political manipulation. These provisions, now codified at 18 U.S.C. §§ 602, 603, 606, and 607, prohibit political shakedowns of federal employees, political activity in federal workspace, and politically motivated threats and reprisals against federal employees.

In 1907, President Theodore Roosevelt promulgated an executive order, known as Civil Service Rule No. 1, that prohibited most active campaigning and electioneering by merit civil servants. Over the next thirty years, the Civil Service Commission decided approximately 2,000 administrative cases involving alleged violations of this executive order, and in the process defined the scope of permissible political activities.

In 1939, the Hatch Act codified this ban on active partisan campaigning by executive branch employees, and incorporated those

Civil Service Commission rules that defined permissible and impermissible activities. 5 U.S.C. § 7324 (repealed 1993). The Hatch Act also provided criminal penalties for various forms of political abuses in the administration of federal law, policies, and programs; these criminal provisions are now codified at 18 U.S.C. §§ 595, 598, 600, 601, 604, and 605.

In 1993, Congress enacted its third major piece of civil service legislation, which significantly reduced the scope of the 1939 Hatch Act ban on political activities. 5 U.S.C. §§ 7321–7326. The 1993 Hatch Act amendments permit all federal employees in the executive branch (other than those working in specified law enforcement or national security agencies) to engage in overt partisan activity, including the solicitation of political contributions from colleagues under certain circumstances. Although the amendments included a new anti-patronage provision, the overall goal was to remove the statutory shield, deemed no longer necessary, that had separated partisan politics and federal employment for over half a century.

Current federal law limits patronage practices and partisan political considerations in the federal civil service and in the administration of federal laws and programs. In extreme cases, patronage abuses may constitute a conspiracy to defraud the United States in the operation of a federally funded program. *See, e.g.*, *United States v. Pintar*, 630 F.2d 1270, 1273 (8th Cir. 1980); *Langer v. United States*, 76 F.2d 817, 818 (8th Cir. 1935). The Supreme Court, through a line of cases dating back to the 1970s, has held that personnel decisions involving the award, termination, or modification of employment conditions of ministerial positions in the public sector cannot be made solely on the basis of partisan association or partisan loyalty. To do so violates the First Amendment rights of public employees or those seeking such positions. *Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990); *Branti v. Finkel*, 445 U.S. 507 (1980); *Elrod v. Burns*, 427 U.S. 347 (1976). On the other hand, the Court recognized that partisan considerations may constitutionally play a part in personnel decisions involving public employees who occupy policymaking positions or positions involving

confidential relationships to senior public officers, when partisan loyalty is a reasonably necessary element of the job. *Id.* The distinction between ministerial public positions and those that involve policy formulation is difficult, and has, in the past, been left by the courts largely to a case-by-case analysis. Nevertheless, the distinction is important in assessing the scope and purpose of federal criminal laws addressing illegal patronage.

## B. STATUTES

The text of the criminal statutes discussed in this section is printed in Appendix B. Each of these statutes carries, in addition to the prison term noted, fines under 18 U.S.C. § 3571.

### 1. Limitations Based on Federal Employment or Workspace

#### (a) Solicitation of political contributions: 18 U.S.C. § 602

Section 602 prohibits a United States Senator or Representative, a candidate for Congress, officer or employee of the United States, or person receiving compensation for services from the United States Treasury, from knowingly soliciting any contribution from any other such officer, employee, or person, except as permitted under the 1993 Hatch Act amendments. The statute applies only to contributions made to influence a federal election. Violations are punishable by imprisonment for up to three years.

Section 602 has been interpreted by the courts as criminalizing aggravated forms of political "shakedowns." *United States v. Wurzbach*, 280 U.S. 396, 398 (1930) (statute prohibits exerting "pressure for money for political purpose"); *Ex parte Curtis*, 106 U.S. 371, 374 (1882) (statute protects federal employees against political "extractions through fear of personal loss"); *see also Brehm v. United States*, 196 F.2d 769, 770 (D.C. Cir. 1952); *United States v. Burleson*, 127 F. Supp. 400, 402 (E.D. Tenn. 1954).

The Criminal Division has interpreted Section 602 as not prohibiting a federal employee's solicitation of voluntary political contributions from other non-subordinate federal employees. However, because of the potential for coercion, express or implied, that inheres in the supervisor-subordinate relationship, contributions solicited from a *subordinate* are not considered "voluntary." The 1993 Hatch Act amendments reflect this interpretation; both the criminal and civil codes, as amended, expressly prohibit the solicitation of subordinates, while allowing certain solicitations of colleagues. The 1993 law further amended Sections 602 to exempt the soliciting activities authorized by the civil Hatch Act provisions, 5 U.S.C. §§ 7323 and 7324.

All officers and employees of the executive, judicial, or legislative branches of the federal government are within the class reached by Section 602. The statute does not reach persons who are paid with federal funds that have lost their "federal" character, such as state or local government employees or persons paid under federal grants. However, 18 U.S.C. §§ 600 and 601 may cover such persons.

The Federal Election Campaign Act Amendments of 1979 limited Section 602 in two respects. First, the word "knowingly" was added to clarify that the solicitor must have been aware of the federal status of the person solicited. Second, the critical term "contribution" in Section 602 was linked to the definition of this term in FECA, at 52 U.S.C. § 30101(8), which restricts "contributions" to financial activities intended to influence a federal election.

### (b) Making political contributions: 18 U.S.C. § 603

Section 603, like Section 602, reaches only contributions made to influence federal elections. The statute prohibits any officer or employee of the United States, or a person receiving compensation for services from money derived from the United States Treasury, from giving a contribution to any other such officer, employee, or person, or to any United States Senator or Representative, if the person receiving the contribution is the donor's "employer or employing authority." Although modified by the 1993 Hatch Act amendments, Section 603's basic prohibition against political donations between subordinates and supervisors was retained.[43] Section 603 applies to all congressional staff and White House employees, as well as to civil service personnel. Violations are punishable by imprisonment for up to three years.

The Department of Justice Office of Legal Counsel has interpreted Section 603 as *not* reaching voluntary contributions made by rank-and-file employees of the executive branch of the government to campaign committees authorized by an incumbent President or Vice President, provided that such donations are given in compliance with the provisions of the 1993 Hatch Act reform amendments (i.e., voluntarily and while the donor is off duty, not in a federal office space, and not in uniform or in a government-owned vehicle).

### (c) Intimidation to secure political contributions: 18 U.S.C. § 606

Section 606 makes it unlawful for a United States Senator, United States Representative, or federal officer or employee to discharge, demote, or promote another federal officer or employee, or to threaten or promise to do so, for making or failing to make "any contribution of money or other valuable thing for any political

[43] This prohibition was also added by the 1993 law to the civil Hatch Act provision. 5 U.S.C. § 7323(a).

purpose." Violations are punishable by imprisonment for up to three years.

Section 606 encompasses coerced donations of anything of value (including services) from federal employees to a candidate for any elective office – federal, state, or local. This statute should be used in lieu of Section 602 whenever a federal employee is actively threatened with an adverse change to his or her conditions of employment to induce a political contribution. This is also addressed in the discussion of 18 U.S.C. § 610 below.

In the Criminal Division's view, Section 606 was not intended to prohibit the consideration of political factors (such as ideology) in the hiring, firing, or assignment of the small category of federal employees who perform policymaking or confidential duties for the President or Members of Congress. In the executive branch, these senior officials either hold jobs on Schedule C of the excepted service, which by law may be offered or terminated on the basis of such factors, or hold direct presidential appointments and by statute serve at the President's pleasure. Section 606 does, however, protect all federal officials, including senior policymakers, from being forced by job-related threats or reprisals to donate to political candidates or causes.

### (d) Coercion of political activity: 18 U.S.C. § 610

Section 610 is an anti-intimidation statute enacted as part of the 1993 Hatch Act amendments to provide additional protections against political manipulation of the federal workforce.

The statute makes it a crime to intimidate, threaten, command, or coerce any employee of the executive branch to induce the victim to engage or not engage in any political activity.

The statute also prohibits attempts. It applies to all elections – federal, state, and local. Violations of Section 610 are punishable by imprisonment for up to three years.

Section 610 expressly includes within the broad phrase "any political activity" any conduct that relates to voting, to contributing, or to campaigning. Specifically, Section 610 provides that "any political activity" includes, but is not limited to: (1) voting or not voting for any candidate in any election; (2) making or refusing to make any political contribution; and (3) working or refusing to work on behalf of any candidate. The statute thus encompasses intimidation directed at inducing any form of political action.

The statute complements 18 U.S.C. § 606, which addresses coerced political donations from employees in any of the three branches of the federal government. Section 610 covers a broader range of conduct, while Section 606 protects a larger class of employees.

The inclusion of Section 610 in the 1993 Hatch Act amendments was in recognition of widely held concerns, both in Congress and in federal law enforcement agencies, that any lessening of the Hatch Act's prohibition on political activities may have the unintended effect of increasing the risk of political coercion and manipulation of federal employees. *See* 139 Cong. Rec. H6817 (daily ed. Sept. 21, 1993)

**2. Place of solicitation: 18 U.S.C. § 607**

Section 607 makes it unlawful for anyone to solicit or receive a political donation in any room, area, or building where federal employees are engaged in official duties. The prohibition covers political solicitations that are delivered by mail, as well as those made in person. *See United States v. Thayer*, 209 U.S. 39 (1908). Violations are punishable by imprisonment for up to three years.

The Bipartisan Campaign Reform Act of 2002 clarified an ambiguity concerning the reach of this statute to solicitations and receipts of political donations that were not intended to influence federal elections, i.e., donations to benefit non-federal candidates and the non-federal activities of political parties and other organizations. Under the revised text, Section 607 reaches the solicitation and receipt of *all* political funds within areas where federal personnel are engaged in official duties.

Section 607 covers all three branches of the federal government. However, it specifically exempts any contribution for a Member of Congress received by the Member's congressional staff in his or her federal office, provided that there had been no request for the contribution to be delivered to the office, and provided further that the contribution is quickly forwarded to the Member's campaign committee.

Violations of Section 607 require proof that the defendant was actively aware of the federal character of the place where the solicitation took place or was directed. The employment status of the parties to the solicitation is immaterial; it is the employment status of the persons who routinely occupy the area where the solicitation occurs that determines whether Section 607 applies.

Prosecutable violations of Section 607 may arise from solicitations that can be characterized as "shakedowns" of federal personnel. Thus, Section 607 reaches solicitations by non-federal employees, filling a void not covered by Section 602, and also reaches shakedowns of congressional employees, who are not covered by the anti-intimidation prohibition contained in Section 610, that was enacted as part of the 1993 Hatch Act reforms.

When federal premises are leased or rented to candidates in accordance with General Services Administration regulations, the premises are not considered "federal" for the purposes of this statute. The same holds true for United States Postal Service post office boxes. Thus, under appropriate circumstances, political events may be

held in leased or rented portions of federal premises, and political contributions may be sent to and accepted in United States post office boxes.

Most matters that have arisen under Section 607 have involved computer-generated direct mail campaigns in which solicitation letters are inadvertently sent to prohibited areas. Such matters are unlikely to warrant prosecution. Instead, the Criminal Division usually advises the person or entity involved of the existence of the prohibition in Section 607, and requests that the mailing lists be purged of addresses that appear to belong to the federal government. A systematic refusal or failure to comply with formal warnings of this kind can serve as a basis for prosecution.

### 3. Limitations Based on Federal Programs and Benefits

#### (a) Promise or deprivation of federal employment or other benefit for political activity: 18 U.S.C. §§ 600 and 601

Section 600 makes it unlawful for anyone to promise any employment, position, contract, or other benefit derived in whole or in part from an Act of Congress, as consideration, favor, or reward for past or future political activity, including support for or opposition to any candidate or political party in any election. The statute applies to all candidates – federal, state, and local. Section 601 makes it unlawful for any person knowingly to cause or attempt to cause any other person to make a contribution on behalf of any candidate or political party by depriving or threatening to deprive the other person of employment or benefits made possible in whole or in part by an Act of Congress. The statute defines "contribution" as encompassing anything of value, including services. Like Section 600, it applies to contributions at federal, state, and local levels.

Violations of these statutes are one-year misdemeanors. Although in 1976 Congress increased the fines under Sections 600 and 601 from $1,000 to $10,000, fines under these statutes are

actually governed by the general criminal fine structure in 18 U.S.C. § 3571.

Sections 600 and 601 are the two principal statutes providing federal jurisdiction over situations when corrupt public officials use government-funded jobs or programs to advance a partisan political agenda rather than to serve the public interest. Both statutes reach employment and benefits that are funded by Congress in whole or in part. The statutes are not restricted to federal jobs, although Section 601 specifically covers threats to terminate federal employment.[44] Sections 600 and 601 thus protect a broader class of employees than Section 610, which is restricted to federal employees in the executive branch. In addition, there is no minimum amount of federal funds that must be involved in the employment or benefit on which the corrupt demand focuses to trigger a violation.

The principal distinction between Sections 600 and 601 is whether the coerced political activity is demanded as a condition precedent to obtaining a publicly funded job or benefit (Section 600), or occurs in the form of a threat to terminate a federal benefit or job the victim already possesses (Section 601). Section 601 requires proof that the motive for the adverse job action was political and not inadequate performance or some other job-related factor; it is a lesser included offense of Section 606 when the threatened employee is a federal civil servant.

As with Section 606, the Criminal Division believes that Sections 600 and 601 were not intended to reach the consideration of political factors in the hiring or termination of the small category of senior public employees who perform policymaking or confidential duties for elected officials of federal, state, or local governments. With respect to such employees, a degree of political loyalty may be considered a necessary aspect of competent performance. *Compare Connick v. Myers*, 461 U.S. 138, 148–49 (1983) (upholding dismissal of an allegedly disruptive assistant district attorney), *with Rutan v.*

---

[44] Section 601 has a parallel provision in 18 U.S.C. § 665(b), which covers programs under the Comprehensive Employment and Training Act.

*Republican Party of Illinois*, 497 U.S. 62 (1990) (patronage promotions and hirings of rank-and-file public employees violate rights of speech and association); *Branti v. Finkel*, 445 U.S. 507, 517–1 (1980) (public employees may not be discharged based solely on their political beliefs unless party affiliation is an appropriate requirement for effective performance); *Elrod v. Burns*, 427 U.S. 347, 367 (1976) (patronage dismissals of non-policymaking public employees violate the First and Fourteenth Amendments).

Although Sections 600 and 601 are misdemeanors, there are alternative felony theories of prosecution that may be applicable to conduct implicating these statutes. Such theories include:

- The Travel Act, 18 U.S.C. § 1952, in states having statutes that broadly define bribery and extortion.

- Conspiracy to defraud the United States, 18 U.S.C. § 371, to the extent that the evidence shows a conspiracy to defraud the public of the fair and impartial administration of a federal grant or program.

- Bribery concerning federally funded programs, 18 U.S.C. § 666. However, the Third Circuit has held Section 666 inapplicable to a scheme to demand non-pecuniary political services from public employees. *See United States v. Cicco*, 938 F.2d 441, 444–46 (3d Cir. 1991).

The *Cicco* case illustrates the use of alternative theories to prosecute local public officials for corrupt patronage abuses. Unfortunately, the case also illustrates the difficulties involved in prosecuting patronage crimes under current law. Although the jury convicted the defendants under both Section 601 and Section 666, the two convictions were ultimately reversed on appeal.

In *Cicco*, local public officials demanded political services from part-time public employees, and when the employees refused to perform the services, the employees were denied permanent

employment. *Id.* at 443. The patronage scheme was charged under Section 601, and also under Sections 666, 1341, 1346, and 1952. All four prosecutive theories went to the jury, which convicted the defendants on the Sections 601 and 666 counts. In the defendants' first appeal, the Third Circuit reversed the Section 666 convictions, holding that Congress did not intend this statute to apply to the extortion of political activity rather than money. *Id.* at 445. In a subsequent appeal, the Third Circuit held that Section 601 does not apply if there are no express threats or specific promises made to induce political services from public employees. *United States v. Cicco*, 10 F.3d 980, 985 (3d Cir. 1993).

### (b) Promise of appointment by candidate: 18 U.S.C. § 599

This statute prohibits a candidate for federal office from promising appointments "to any public or private position or employment" in return for "support in his candidacy." It is one of the few federal criminal laws specifically addressing campaign-related activity by candidates. It is a class statute that applies only to misconduct by federal candidates. Willful violations are two-year felonies; non-willful violations are misdemeanors.

Section 599 has potential application when one candidate attempts to secure an opponent's withdrawal, or to elicit the opponent's endorsement, by offering the opponent a public or private job. *See also* 18 U.S.C. § 600, discussed above. It also applies to offers of jobs by federal candidates to *others* to secure endorsements. While Section 599 does not reach offers or payments of *money* to secure withdrawal or endorsements, if the payment was not reported accurately, such matters may be prosecutable as a reporting violation of FECA under 52 U.S.C. §§ 30104(b) and 30109(d).

### (c) Interference in election by employees of federal, state, or territorial governments: 18 U.S.C. § 595

Section 595 was enacted as part of the original 1939 Hatch Act. The statute prohibits any public officer or employee, in connection with an activity financed wholly or in part by the United States, from using his or her official authority to interfere with or affect the nomination or election of a candidate for federal office. This statute is aimed at the misuse of official authority. It does not prohibit normal campaign activities by federal, state, or local employees.[45] Violations are one-year misdemeanors.

Section 595 applies to all public officials, whether elected or appointed, federal or non-federal. For example, an appointed policymaking government official who bases a specific governmental decision on an intent to influence the vote for or against an identified federal candidate violates Section 595. The nexus between the official action and an intent to influence must be clear to establish a violation of this statute.

### (d) Coercion by means of relief appropriations: 18 U.S.C. § 598

Section 598 prohibits the use of funds appropriated by Congress for relief or public works projects to interfere with, restrain, or coerce any person in the exercise of his or her right to vote in any election. Violations are one-year misdemeanors.

### (e) Solicitation from persons on relief: 18 U.S.C. § 604

Section 604 makes it unlawful for any person to solicit or receive contributions for any political purpose from any person known to be entitled to, or receiving compensation, employment, or

---

[45] However, such political activities must be consistent with the Hatch Act restrictions on political activity, as amended in 1993, which will be discussed later in this chapter.

other benefit provided for or made possible by an Act of Congress appropriating funds for relief purposes. Violations are one-year misdemeanors.

**(f) Disclosure of names of persons on relief: 18 U.S.C. § 605**

Section 605 prohibits the furnishing or disclosure, for any political purpose, to a candidate, committee, or campaign manager, of any list of persons receiving compensation, employment, or benefits made possible by any Act of Congress appropriating funds for relief purposes. It also makes unlawful the receipt of any such list for political purposes. Violations are one-year misdemeanors.

**4. Permissible Political Activity under the Hatch Act, as Amended: 5 U.S.C. § 7323 and § 7324**

Although the 1939 Hatch Act consisted mostly of criminal provisions, it became widely known as a result of its one civil provision, which limited active partisan politicking by executive branch employees. 5 U.S.C. § 7324(a)(2) (repealed). This restriction on overt politicking lasted over fifty years, during which it was challenged on both constitutional and public policy grounds. The constitutional challenges were unsuccessful. *Civil Serv. Comm'n v. Letter Carriers*, 413 U.S. 548 (1973); *United Pub. Workers v. Mitchell*, 330 U.S. 75 (1947). The public policy challenges were successful in part, and ultimately led to the 1993 Hatch Act reforms, which substantively changed the Hatch Act politicking restrictions.

The 1993 legislation lifted the original ban on taking "an active part in political management or in political campaigns" for most employees of the executive branch. However, it continued the ban for employees of the following law enforcement and intelligence agencies:

Federal Election Commission
Federal Bureau of Investigation
Secret Service
Central Intelligence Agency
National Security Council
National Security Agency
Defense Intelligence Agency
Merit Systems Protection Board
Office of Special Counsel
Office of Criminal Investigation of the Internal Revenue Service
Office of Investigative Programs of the United States Customs Service
Office of Law Enforcement of the Bureau of Alcohol, Tobacco, and Firearms
National Geospatial-Intelligence Agency
Office of the Director of National Intelligence.

5 U.S.C. § 7323(b)(2)(B)(i). The ban is also retained for career members of the Senior Executive Service, 5 U.S.C. § 7323(b)(2)(B)(ii), and for employees of the Criminal or National Security Divisions of the Department of Justice, 5 U.S.C. § 7323(b)(3).

With the foregoing exceptions, federal employees are now permitted to hold positions in political party organizations; however, they are still precluded from becoming partisan candidates in elections to public office. 5 U.S.C. § 7323(a)(3). In addition, although solicitations of the general public are still barred, the law permits, under certain circumstances, employees who are members of a union or employee organization to solicit fellow members for

contributions to the organization's political committee. 5 U.S.C. § 7323(a)(2); 5 C.F.R. § 734.

A violation of the Hatch Act's politicking ban is not a federal crime; it is a personnel infraction. The statute is enforced by the Merit Systems Protection Board and by the United States Office of Special Counsel. 5 U.S.C. §§ 1204, 1212.

Active partisan campaigning in violation of the Hatch Act can lead to termination from federal employment, or thirty days' suspension if the Merit Systems Protection Board recommends a lesser penalty. 5 U.S.C. § 7326.

The partisan activity currently prohibited for employees of the specifically designated law enforcement agencies listed above is taking "an active part in political management or in political campaigns." Both the amended and original statutes expressly define this phrase to include those acts of "political campaigning" that were prohibited by the Civil Service Commission prior to July 19, 1940, the date the original Hatch Act went into effect. 5 U.S.C. § 7323(b)(4); 5 U.S.C. § 7324(a)(2) (repealed 1993); 5 C.F.R. §§ 733.121-733.

Although a subject of some confusion, the Hatch Act ban was never intended to apply to an employee's expression of personal opinion, whether given privately or publicly, on political candidates and issues. This basic right of expression was recognized in the original 1939 Hatch Act, former 5 U.S.C. § 7324(a)(2). It was reaffirmed by two appellate decisions, which reversed Hatch Act enforcement actions based on an employee's public expression of political opinion. *See Biller v. Merit Sys. Prot. Bd.*, 863 F.2d 1079, 1090–91 (2d Cir. 1988); *Blaylock v. Merit Sys. Prot. Bd.*, 851 F.2d 1348, 1354 (11th Cir. 1988). Finally, the principle was restated in the 1993 Hatch Act amendments. 5 U.S.C. § 7323(c) (employees retain the right to express their opinions on political candidates and issues). Thus, employees in designated law enforcement agencies who

remain covered by the Hatch Act politicking ban retain the right to express their personal political views.

All inquiries concerning possible violations of the Hatch Act politicking ban should be directed to the Office of Special Counsel.

## C. POLICY AND PROCEDURAL CONSIDERATIONS

United States Attorneys' Offices must consult the Public Integrity Section before instituting grand jury proceedings, filing an information, or seeking an indictment that charges patronage crimes. USAM § 9-85.210. As with election fraud matters, these consultation requirements are intended to assist federal prosecutors in this area and to ensure nationwide uniformity in the enforcement of these criminal patronage statutes.

# CHAPTER FOUR

# ELECTION DAY PROCEDURES

This chapter summarizes the Election Day Program that the Department of Justice implements for the federal general elections. This program has been in effect since 1970. The Election Day Program is also implemented on a narrower geographic basis in connection with other significant elections when the Department determines that the need exists.

There is a substantial federal interest in ensuring that complaints of election abuses that are made during elections are reviewed carefully and that appropriate action is taken promptly. This review allows the Department to determine whether the alleged facts warrant a criminal investigation, and, if so, of what nature and scope. Accordingly, for decades the Department has implemented an Election Day Program for those elections in which the federal interest is greatest, namely, the federal general elections that occur in November of even-numbered years. During these elections, the entire United States House of Representatives and one-third of the United States Senate are elected, along with, every four years, the President and Vice President. In addition, some federal anti-corruption statutes reach conduct occurring in state and local elections. On a case-by-case basis, the Election Day Program may be expanded to include non-federal elections when adequate predication exists to suggest a possible violation of federal criminal law.

The Election Day Program calls upon the Department's 93 United States Attorneys to designate one or more senior Assistant United States Attorneys (AUSAs) to serve a two-year term as District Election Officer (DEO) for his or her district. These AUSAs are

provided training and guidance by the Department in the areas of election crimes and voting rights violations. Since 2002, the Department's Criminal Division and Civil Rights Division have conducted training conferences for the DEOs prior to the November general elections.

The Election Day Program is designed to coordinate Department responses to election-related allegations among the United States Attorneys' Offices, FBI field offices, and Justice Department prosecutors in Washington, D.C. The Program also alerts the public to the Department's commitment to prosecuting election fraud.

Three important principles apply to the Election Day Program:

- First, as with all election crime matters, the Election Day Program emphasizes the detection, evaluation, and prosecution of crimes. As a general rule, except for the activities covered by the federal voting rights laws, the Department does not have authority to directly intercede in the election process itself.

- Second, except in matters involving alleged discrimination in the franchise that are covered by the civil rights statutes, the Justice Department generally has not heretofore placed observers inside open polling stations, even though there might be a reasonable basis for believing that criminal activity will occur there. This arises in part from respect for state laws governing who may be inside open polls, and in part from 18 U.S.C. § 592, which prohibits federal officials from stationing armed men at places where elections are in progress. However, there is no federal statutory bar against sending *unarmed* federal personnel, such as Assistant United States Attorneys, into open polling places as long as their presence is either

allowed by state law, or permitted by local election administrators. Federal prosecutors and investigators are encouraged to consider this option in appropriate circumstances, in consultation with the Public Integrity Section.

- Third, the Department does not intercede on behalf of private litigants in civil election contests. Such matters are private in nature, and are customarily redressed through election contests under state law or civil rights suits under 42 U.S.C. § 1983.

The following is a general summary of the Election Day Program implemented by the Department and its District Election Officers on election day:

Before significant elections –

- The Justice Department issues a press release emphasizing the federal interests in prosecuting election crime and protecting voting rights.

- Similar press releases are then issued throughout the country by each United States Attorney. The telephone number of each AUSA serving as a District Election Officer is publicized locally, as well as the telephone numbers of the local offices of the FBI. Citizens are encouraged to bring complaints of possible election fraud to the attention of these law enforcement officials.

- Each United States Attorney and District Election Officer is encouraged to meet with the state and, if possible, local officials responsible for the administration of the election process and the prosecution of crimes against that process. The purpose of these meetings is to

convey federal interest in assuming an appropriate law enforcement role with respect to electoral corruption, and to make federal assets and personnel available to assist the states in such matters.

On election day –

- In each district, the District Election Officer receives and handles election fraud allegations.

- FBI Special Agents are made available in each district to receive election-related complaints from all sources.

- If warranted, the District Election Officer or United States Attorney may request the FBI to interview a person who alleges that an election crime has occurred. However, care must be taken to ensure that the interview does not affect the election itself. To avoid this potential danger, overt investigation of election-related allegations, other than taking statements from complaining witnesses, ordinarily occurs after the election is over.

- In Washington, prosecutors in the Criminal Division's Public Integrity Section are available as long as polls remain open, to provide advice to United States Attorneys, District Election Officers, and FBI personnel. Special attention is given to preserving evidence that may lose its integrity with the passage of time.

- Under certain circumstances, FBI Headquarters may authorize its agents to conduct covert operations before, during, or after the election upon request of the Public Integrity Section. However, such operations must be predicated on preexisting evidence that observable or otherwise detectable illegal activities (such as vote-

buying) are likely to occur in that election. Such requests require particularly close review because of the risk of chilling legitimate voting activity, especially covert operations near or around polling places. Therefore, requests for authorization to use such techniques should be addressed to the Public Integrity Section as far before the election as is possible.

After the election –

- A United States Attorney's Office may request the FBI to conduct a preliminary investigation into election fraud allegations that the Office believes warrant further inquiry.

- The Public Integrity Section may also request a preliminary investigation into any election-related allegations.

- The results of each preliminary investigation are reviewed by attorneys in the United States Attorney's Office and in the Public Integrity Section. These offices then consult to determine which matters may warrant a grand jury and full-field investigation.

- The United States Attorney's Office, with the assistance of the FBI, conducts whatever additional investigation that Office deems appropriate.

- At the conclusion of the investigation, the United States Attorney's Office discusses any proposed federal charges with the Public Integrity Section. After this consultation, the United States Attorney's Office prosecutes those charges.

- On its own, or in collaboration with the United States Attorneys' Offices, the Public Integrity Section also investigates and prosecutes election crimes.

# CHAPTER FIVE

# CAMPAIGN FINANCING CRIMES

## A. INTRODUCTION

The nation's campaign financing laws are designed to regulate the influence of money on politics, to combat actual or apparent *quid pro quo* corruption.[46] The campaign finance laws do this by limiting the size of contributions that individuals may contribute; by prohibiting contributions from entities such as corporations, unions, and banks, whose potential corrupting influence on democratic government has been historically demonstrated, to candidates for public office and political parties; and by imposing strict disclosure requirements on those who participate in the federal campaign financing process. Transparency in campaign financing has also become a pillar of international standards for democratic elections.

In addition to the federal government, all the states have campaign financing laws. These vary from state to state, and in many instances they vary significantly from those at the federal level. Because this book is written for federal prosecutors and investigators, its focus is on the federal laws that govern this subject. In addition, because the power of the federal government in the area of campaign financing is limited primarily to regulating the financing of federal candidates, *Burroughs v. United States*, 290 U.S. 534 (1934), the focus of this chapter is further limited to federal laws that address the

---

[46] As to actual *quid pro quo* corruption, the Supreme Court has held that campaign contributions may constitute a violation of the Hobbs Act, 18 U.S.C. § 1951, only when they are provided in exchange for a specific requested exercise of official authority. *Evans v. United States,* 504 U.S. 255 (1992); *McCormick v. United States*, 500 U.S. 257 (1991). This is in recognition of the important and necessary role that campaign contributions play in our political system.

flow of money intended to influence election of candidates for federal office, that is, the Office of President, Vice President, or Member of Congress.[47]

Criminal violations of federal campaign financing laws require proof that the conduct was committed "knowingly and willfully."[48] *See United States v. Danielczyk*, 917 F. Supp. 2d 573, 578 80 (E.D. Va. 2013). As discussed below, this means that the defendant must know that his or her conduct is unlawful.

This standard creates an elevated *scienter* element requiring, at the very least, that application of the law to the facts in question be fairly clear. When there is substantial doubt concerning whether the law applies to the facts of a particular matter, the offender is more likely to have an intent defense. Consequently, this chapter will not attempt to cover the entire scope of the federal campaign financing laws. Rather, it will focus on the features of these laws that are well-defined and commonly understood by persons who participate in the modern federal campaign financing process.

---

[47] Violations of state campaign financing laws may, however, suggest the presence of federal corruption offenses. Consideration should be given to whether the alleged conduct may constitute, for example, possible mail, wire, or honest services fraud (18 U.S.C. §§ 1341, 1343, 1346); extortion under the Hobbs Act (18 U.S.C. § 1951); or federal program bribery (18 U.S.C. § 666). It is also important to note that those who violate state campaign financing laws might also engage in similar schemes at the federal level.

[48] Violations of these laws that are committed with lesser intent – including all violations committed negligently or because the offender did not understand his or her conduct to be unlawful – are not federal crimes. They are subject to civil and administrative enforcement by the Federal Election Commission.

## B. STATUTORY SCOPE

### 1. Types of Statutes

There are four main types of federal campaign financing laws:

- Laws that limit the amount of contributions;
- Laws that prohibit contributions by persons and entities whose participation in the federal election process has been deemed by Congress to present a sufficient potential for corruption as to warrant outright prohibition;
- Transparency laws that place before the voting public pertinent facts concerning the raising and spending of campaign funds; and
- Public funding laws, which, at the time of this edition, apply federally only to the campaigns of candidates seeking election to the Presidency.

The federal statute that regulates the financing of federal campaigns and ensures campaign transparency is the Federal Election Campaign Act of 1971, as amended (FECA or the Act). 52 U.S.C. §§ 30101, et seq.[49] The Act was amended significantly in 1974, 1976, 1979, and most recently in 2002. The 2002 amendments were contained in the Bipartisan Campaign Reform Act (BCRA). More recently, decisions by the U.S. Supreme Court and some U.S. Courts of Appeals have significantly limited what is prohibited under the statute.

[49] FECA's provisions were housed in Title 2 of the United States Code until September 1, 2014, when it was transferred to Title 52.

With two exceptions described below, FECA applies only to financial activity intended to influence the campaigns of candidates running for federal office (the Senate, House of Representatives, Presidency, or Vice Presidency). It contains two basic types of regulation: (1) campaign financing statutes, which regulate the sources and amounts of funds given or spent to influence a federal election; and (2) campaign reporting statutes, which require disclosure by federal candidates and political committees of the sources and recipients of their campaign funds.

Two federal statutes address public funding for presidential campaigns: the Presidential Primary Matching Payment Account Act, 26 U.S.C. §§ 9031-9042, which provides for federal matching payments for presidential primary campaigns; and the Presidential Election Campaign Fund Act, 26 U.S.C. §§ 9001-9012, which provides for full federal funding for presidential general election campaigns.[50]

### 2. Basic Statutory Definitions

FECA defines the basic terms that apply to the Act's substantive provisions. Because these terms are critical to a general understanding of the Act, it is important to identify them at the outset. These basic definitions are codified at 52 U.S.C. § 30101. The most important of these definitions are:

- "election" – a general, special, primary, or runoff election, or a convention or caucus held to nominate a candidate. § 30101(1).
- "candidate" – an individual who seeks nomination or election to federal office and has received contributions aggregating over $5,000 or has made expenditures

[50] In recent elections, presidential candidates have increasingly foregone federal matching funds.

aggregating over $5,00 or authorized such contributions or expenditures by another. § 30101(2).

- "federal office" – the office of President or Vice President of the United States, United States Senator, United States Representative, or Delegate or Resident Commissioner to the United States House of Representatives. § 30101(3).

- "political committee" – any committee or other group of persons that receives contributions or makes expenditures aggregating over $1,000 in a calendar year. § 30101(4).

- "contribution" – in general, any gift, loan, or anything else having pecuniary value that is made for the purpose of influencing the nomination or election of a federal candidate. § 30101(8).

- "expenditure" – in general, any purchase, payment, or anything else having pecuniary value that is made for the purpose of influencing the nomination or election of a federal candidate. § 30101(9). In the context of public communications, the definition has been judicially limited to disbursements for communications that contain "magic words of express advocacy," such as "elect," "defeat," or "vote for," or that otherwise clearly call for elective action for or against a clearly identified federal candidate. *Fed. Election Comm'n v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 247–249 (1986 *Buckley v. Valeo*, 424 U.S. 1, 44 n.5 (1976).

- "Electioneering communication" – a public communication made through the media within certain periods before a federal election that "refers to" a clearly

identified federal candidate and, in the case of a candidate for the United States House or Senate, is targeted to the relevant electorate. 52 U.S.C § 30104(f)(3). This term refers mostly to "issue ads," communications that suggest support for a federal candidate but do not contain words of express advocacy, such as "vote for" or "elect." Because these communications do not contain words of "express advocacy," they are generally not "expenditures," unless, as discussed below, a provision of the Act expressly deems them such. However, if they exceed $10,000 in a calendar year, they must be reported. § 30104(f)(4).

- "federal election activity" – activity by state or local political party committees that simultaneously benefits federal and non-federal candidates, such as get-out-the-vote and voter registration drives. § 30101(20). As discussed below, these activities can no longer be paid for with "soft money," but must be paid for with funds raised in compliance with the Act. 52 U.S.C. § 30125

With two exceptions relating to electioneering communications, the nouns describing the payment for "electioneering communications" and "federal election activity" is generally "disbursement" – not "expenditure" or "contribution." This distinction is critical, as "disbursements" are not covered by FECA's criminal penalty, which is confined to violations that involve a "contribution, donation, or expenditure." § 30109(d)(1). Therefore most violations of provisions involving "electioneering communications" and "federal election activity" fall exclusively within the civil enforcement jurisdiction of the Federal Election Commission.

### 3. Statutory Presumptions

Under certain circumstances, an unregulated activity will become subject to the Act because of its connection with a federal candidate or political committee. The following definitions reflect the statutory presumptions that result in coverage – or additional coverage – under the Act:

- "coordinated expenditure" – an expenditure that is made "in cooperation, consultation, or concert with, or at the request or suggestion of" a federal candidate or an agent of a federal candidate. Such an expenditure is deemed to be a "contribution" to the candidate – and, as such, subject to the Act's limits and prohibitions. 52 U.S.C. § 30116(a)(7)(B)(i).

- "electioneering communication"– as set forth above, this term includes broadcast communications within certain periods before primary and general elections that refer to a clearly identified federal candidate. In general, payments for these communications are not "expenditures" because they do not expressly advocate a candidate's election or defeat. However, if the electioneering communication is coordinated with a federal candidate or an agent of the candidate, the costs of the communication are deemed to be a "contribution" to the candidate – and thus subject to the Act's limits – as well as an "expenditure" by the candidate. 52 U.S.C. § 30116(a)(7)(C).

## C. STATUTES

### 1. Introduction

This section will present a discussion of those substantive provisions of FECA that are of most interest to federal prosecutors and investigators. We do not attempt to present a thorough discussion of the entire Act, or of all issues that might arise under it. The Justice Department's criminal jurisdiction is, for the most part, limited to violations that are committed "knowingly and willfully," that is, by subjects who knew their conduct was unlawful, even if they are unaware of which statute they were violating and what that statute required. *See* 52 U.S.C. § 30109(d)(1).

In view of the above considerations, the discussion that follows is confined to those substantive provisions of FECA that are fairly clear, generally well-known, and enforceable through the Act's criminal penalties.

### 2. Substantive Statutes

#### (a) 52 U.S.C. § 30116 Limitations on contributions and expenditures

Section 30116 sets quantitative limits on the amounts individuals, political committees, and other entities may contribute to federal candidates and political committees. 52 U.S.C. § 30116(a). It also limits expenditures by party committees and presidential candidates who accept federal funding. 52 U.S.C. § 30116(b) & (d). Generally, cases prosecuted under Section 30116 involve excessive contributions that are effected either surreptitiously (such as through conduits), or in the furtherance of some other felonious objective (such as a bribe that is disguised as a contribution to a candidate).

As noted above, "contribution" is generally defined as anything of value for the purpose of influencing a federal election. § 30101(8). In addition, the term includes expenditures that are made in "cooperation, consultation, or concert with, or at the request or suggestion of" a candidate, a person authorized to act on behalf of a candidate, or a national, state, or local party committee. 52 U.S.C. § 30116(a)(7)(B). "Disbursements," which do not fall within the reach of FECA's criminal penalties, therefore, can become "contributions" which do fall within its reach, if they are coordinated. For example, electioneering communications, if coordinated, will be deemed a "contribution" to the candidate or committee with whom or which they are coordinated, as well as an "expenditure" by that candidate or committee. 52 U.S.C. § 30116(a)(7)(C). An "expenditure" is a disbursement made for the purpose of influencing a federal election. 52 U.S.C. § 30101(9).

The distinction between a contribution and an expenditure has constitutional significance. Contributions are made by one person or entity to another to enable the recipient of the funds to engage in political speech of the recipient's choosing, while expenditures are made directly by the owner of the funds for political speech chosen by the owner of the funds. Thus, contributions are indirect political speech, and as such may constitutionally be subject to more stringent regulation than expenditures, which are direct political speech. *Buckley v. Valeo*, 424 U.S. 1, 13-59 (1976).

Section 30116(a) sets contribution limits for two sets of entities: those made by "persons" (individuals, partnerships, committees, and associations) and those made by "multi-candidate political committees" (political committees registered for six months with the FEC that have received contributions from over fifty persons and that support at least five federal candidates).[51] The

[51] A third category of limits on total contributions a person could make in a two-year period, 52 U.S.C. § 30116(a)(3), was invalidated by the Supreme Court in 2014. *See McCutcheon v. Fed. Election Comm'n*, 134 S. Ct. 1434 (2014).

contribution limits currently in place and discussed below have repeatedly been upheld against First Amendment challenges, and there is no question today that they are constitutionally valid. *McConnell v. Fed. Election Comm'n*, 540 U.S. 93 (2003); *Buckley v. Valeo*, 424 U.S. 1 (1976); *see also Nixon v. Shrink Missouri PAC*, 528 U.S. 377 (2000) (upholding similar state contribution limits).

Under Subsection 30116(a)(1), contributions from "persons" (individuals, associations, and committees) may not exceed:

- $2,000 to a federal candidate with respect to any election (primary and general elections are treated as separate elections for the purpose of Section 30116);
- $25,000 in a calendar year to a national party committee[52];
- $10,000 in a calendar year to a state party committee; or
- $5,000 in a calendar year to any other political committee.

Under Subsection 30116(a)(2), contributions from "multi-candidate political committees" may not exceed:

- $5,000 to a federal candidate per election;
- $15,000 in a calendar year to a national party committee; or

[52] At the time this book was written, there were six national party committees: the Republican National Committee, the Democratic National Committee, the National Republican Senatorial Committee, the Democratic Senatorial Campaign Committee, the National Republican Congressional Committee, and the Democratic Congressional Campaign Committee. 11 C.F.R. § 110.1(c)(2).

- $5,000 in a calendar year to any other political committee.

The limits on contributions by "persons" to federal candidates and national party committees are adjusted for inflation every two years, with the increases announced in odd-numbered years and effective for the two-year election cycle beginning with the day after the last general election. 52 U.S.C. § 30116(c). For the current limits, visit the FEC's website.

The above limits do not apply to transfers between the national, state, district, and local committees of the same political party. 52 U.S.C. § 30116(a)(4). However, contributions to a candidate from political committees that are subject to common control (e.g., committees affiliated with several locals of the same union, or committees affiliated with subsidiaries of the same corporation) are treated as though they were from a single political committee. 52 U.S.C. § 30116(a)(5).

The above limits also do not apply to contributions to political committees that engage in independent expenditures only (commonly known as "Super PACs"), meaning the committee does not coordinate any of its expenditures with a candidate or committee that makes contributions to a candidate or party. *See SpeechNow.org v. Fed. Election Comm'n*, 599 F.3d 686, 696 (D.C. Cir. 2010) (finding Section 30116's limits on contributions to independent expenditure-only political committees did not further the government's interest in preventing corruption or the appearance of corruption and thus were invalid under the First Amendment).

Limitations on expenditures are far fewer than those on contributions. A candidate's expenditures can constitutionally be limited only if the candidate elects to participate in a public funding program. *Buckley v. Valeo*, 424 U.S. 1, 54-59 (1976 At present, only presidential candidates have the option of receiving federal funds for

their campaigns; hence, these are the only candidates who may be subject to expenditure limits. *See* 52 U.S.C. § 30116(b). FECA also places limitations on expenditures by national and state party committees. The limits on expenditures by presidential candidates accepting public funding and party committees are increased to reflect inflation as discussed above. 52 U.S.C. § 30116(c)(1)(B).

There are no limits on expenditures by a person that are made independently of the candidate being benefitted thereby. However, if such "independent expenditures" exceed certain monetary thresholds, they must be reported to the FEC. 52 U.S.C. § 30104(g). This reporting requirement applies even if the entity making the independent expenditure is not required to register as a political committee with the FEC.

There are also no limits on the amount of personal funds that a federal candidate may use in his or her campaign. Under *Buckley v. Valeo*, 424 U.S. at 52–53, this use of personal funds represents an "expenditure" that cannot be constitutionally limited.

**(b) 52 U.S.C. § 30118: Prohibition on contributions and expenditures by national banks, corporations, or labor organizations**

Although Section 30118, when enacted, barred both corporate and union contributions and expenditures entirely – with the exception of those made by separate segregated funds – the Supreme Court has since invalidated as unconstitutional any limits on independent expenditures by corporations or labor organizations made directly from those entities' general treasury funds. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010) (overturning part of its earlier decision in *McConnell v. Fed. Election Comm'n*, 540 U.S. 93 (2003) and all of its decision in *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990)). In doing so, however, the Court continued to recognize the important governmental interest in preventing corruption and the

appearance of corruption, it upheld FECA's disclosure requirements, and it did nothing to disturb the Court's prior findings that limits on corporate and union contributions, as opposed to expenditures, appropriately further that interest. *See id.* at 356–5 *see also Cort v. Ash*, 422 U.S. 66 (1975 *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 787– n.26 (1978) (finding limits on contributions address problem of corruption of elected representatives through creation of political debts) (dictum).

Section 30118 prohibits the following:

- Contributions (which include coordinated expenditures) by corporations and labor organizations in connection with any federal election, unless made to a Super PAC (a political committee engaging only in independent expenditures).[53]

- Contributions and expenditures by a national bank or a federally chartered corporation in connection with any election – federal, state, or local.[54]

- Consent to a prohibited contribution or expenditure by any officer of a corporation, labor organization, or national bank; and

- Knowing acceptance of a prohibited contribution by any candidate, political committee, or other person.

---

[53] The ban on corporate and union contributions to independent expenditure-only political committees was invalidated by the D.C. Circuit in *SpeechNow.org v. Fed. Election Comm'n*, 599 F.3d 686 (D.C. Cir. 2010).

[54] This statute is one of two FECA prohibitions that extend to non-federal elections. The other is 52 U.S.C. § 30121, which prohibits foreign nationals from making contributions to non-federal as well as federal elections.

There are a number of corporate and union political activities that are not prohibited under FECA. After *Citizens United*, corporations and labor organizations are no longer prohibited from spending treasury funds to expressly advocate the election or defeat of a clearly identified federal candidate or to engage in electioneering communications,[55] as long as they do so independently of any candidates or organizations that contribute to candidates. *See also Fed. Election Comm'n v. Wis. Right to Life*, 551 U.S. 449 (2007) (invalidating limits on corporate and union electioneering communications).

Even before *Citizens United*, corporations and unions were not barred from using treasury funds to establish and operate "separate segregated funds" – commonly known as "affiliated political action committees," or PACs – provided the PACs confined their solicitation activities to raising voluntary contributions from corporate employees or union members, respectively. *Pipefitters Local Union No. 562 v. United States*, 407 U.S. 385, 409 (1972). They also always have been allowed to use corporate or union funds to finance communications, on any subject, between labor unions and their membership or between corporations and their stockholders, *see United States v. Auto. Workers,* 352 U.S. 567 (1957), as well as to support non-partisan expenditures, or to cover the costs of publishing statements of editorial opinion in newspapers of general public distribution that are owned by corporations or unions, *see United States v. C.I.O.*, 335 U.S. 106 (1948).

The statute also does not restrict contributions or expenditures

---

[55] "Electioneering communication" includes any broadcast or satellite communication which "refers to" a clearly identified federal candidate; is made 30 days before a primary or 60 days before a general or runoff election; and, in the case of a candidate for the United States Senate or United States House of Representatives, is targeted to the relevant electorate. 52 U.S.C. § 30104(f)(3)(A)(i).

from the personal resources of corporate or union officials, provided, of course, that the value of the funds given or spent are not reimbursed or otherwise passed back to a corporate or a union fisc such that the corporation or union would be engaging in conduct prohibited by the statute.

As with all other FECA violations, to reach the level of a Section 30118 criminal violation, the act had to have been committed "willfully." Absent direct evidence of such criminal intent (as through a confession), a prosecution under Section 30118 will most likely be successful when funds were diverted from a corporate or union treasury and laundered in some fashion to a candidate or when an entity using corporate or union funds to engage in election activity coordinates its expenditures with a candidate.

**(c) 52 U.S.C. § 30119: Prohibition on contributions by government contractors**

Section 30119 prohibits any person who is a signatory to, or who is negotiating for, a contract to furnish material, equipment, services, or supplies to the United States government, from making or promising to make a contribution "for any political purpose." It has been construed by the FEC to reach only contributions for the purpose of influencing the nomination or election of candidates for federal office. *See* 11 C.F.R. § 115.2(a). The statute applies to all types of businesses, including sole proprietorships, partnerships, and corporations, and reaches gifts made from such entities' business or partnership assets.[56] With respect to partnerships, however, the FEC has determined that Section 30119 does not prohibit contributions made from the personal assets of the partners, provided of course, that

[56] The D.C. Circuit reaffirmed that the ban on individual contractor contributions furthers the government's compelling interest in preventing *quid pro quo* corruption and the appearance of corruption in an 11-0 *en banc* decision. *See Wagner v. Fed. Election Comm'n*, 793 F.3d 1 (D.C. Cir. 2015)

the value of such contributions is not reimbursed from, or otherwise passed back to, partnership assets. 11 C.F.R. § 115.4.

The statute applies only to business entities that have negotiated or are negotiating for a contract with a department or agency of the United States. Thus, the statute does not reach those who have contracts with non-federal agencies to perform work under a federal program or grant. Nor does it reach persons who provide services to third-party beneficiaries under federal programs that require the signing of agreements with the federal government, such as physicians performing services for patients under Medicare. Finally, officers and stockholders of incorporated government contractors are not usually covered by Section 30119, because the government contract is usually with the corporate entity, not its officers. However, individual corporate officers may be covered by Section 30119 if they are individually liable on the government contract. Government contractors may make non-partisan expenditures, may establish and administer affiliated PACs, and may communicate with their officers and stockholders on political matters.

### (d) 52 U.S.C. § 30120 Attribution of sponsors of political communications and solicitations

Section 30120 requires that certain political communications include the identity of the person or entity responsible for the communication. Prior to enactment of BCRA in 2002, the statute was limited to two types of political communications:

(1) communications "expressly advocating the election or defeat" of a clearly identified federal candidate, and

(2) communications soliciting contributions to a federal candidate or political committee.

BCRA added two more types of communications requiring this attribution:

(1) general advertisements by political committees, and

(2) "electioneering communications" by any person, that is, communications to a targeted electorate within certain periods before primary and general elections that refer to a federal candidate.

Section 30120 does not cover anonymous communications that leave to inference the identity of a particular candidate. The FEC, acting pursuant to its advisory opinion authority under 52 U.S.C. § 301 has excluded several categories of campaign advocacy (such as bumper stickers and skywriting) from the reach of this law. 11 C.F.R. § 110.11(a)(2).

Although BCRA expanded the scope of Section 30120, only violations involving, generally, the two communications originally covered by the statute – communications that expressly advocate a federal candidate's election or defeat and communications that solicit contributions – are subject to prosecution. Funds expended for such communications are "expenditures" under the Act, and are therefore subject to its criminal provision, section 30109(d)(1). Electioneering communications and general political advertising by political committees, on the other hand, generally involve "disbursements," which are not reachable by the Act's criminal provision.

### (e) 52 U.S.C. § 30121: Prohibition on contributions, donations, and expenditures by foreign nationals

Section 30121 prohibits contributions and "donations" by foreign nationals to all United States elections, whether federal, state, or

local. It is one of the few federal campaign financing statutes that reach activities directed at both federal and non-federal elections.[57]

Specifically, the statute prohibits foreign nationals from engaging in the following types of political activity:

- Making, directly or through any other person, a contribution or donation in connection with any federal, state, or local election, or knowingly soliciting or accepting a contribution or donation from a foreign national.

- Making, directly or indirectly, an expenditure, as defined by Section 30101.

- Making, directly or indirectly, an independent expenditure.

- Making, directly or indirectly, a disbursement for an electioneering communication, within the meaning of 52 U.S.C. § 30104(f)(3).

BCRA added the term "donation" to Section 30121's prohibition (as well as to the Act's criminal provision), to leave no doubt that political donations to state and local candidates are covered.[58]

All types of Section 30121 violations are subject to prosecution except those involving electioneering communications, which are

---

[57] 52 U.S.C. § 30118, discussed above, which bars national banks and federal corporations from making a contribution in connection with an election to any political office. 52 U.S.C. § 30124 bars any fraudulent solicitation of funds on behalf of any candidate.

[58] Although not defined in the Act, a "donation" is a political gift that is not a "contribution" – a term that is confined to federal campaigns. Hence a "donation" is a political gift that is given to a candidate for state or local office or to a political committee in connection with a state or local election.

defined for purposes of Section 30121 as "disbursements" and therefore are not covered by the Act's criminal penalty.

The term "foreign national" means: (1) a "foreign principal" within the meaning of the Foreign Agents Registration Act, 22 U.S.C. § 611, and (2) any person who is not a citizen of the United States, or a national of the United States who is not lawfully admitted for permanent residence. 52 U.S.C. § 30121(b). A "foreign principal" includes a foreign government, a foreign political party, and a corporation organized under the laws of a foreign country. None of these entities may make contributions or donations to any candidate or political party in the United States.

Through its regulations, advisory opinions, and civil enforcement actions, the FEC has addressed the application of Section 30121 to contributions by domestic subsidiaries of foreign corporations.[59] The Commission has determined that a domestic subsidiary that is chartered under the laws of any state or United States territory, and has its principal place of business in the United States, is not a foreign principal – even though all of its capital stock may be owned by foreign individuals or entities. The FEC has, however, concluded that Section 30121 prohibits contributions by a domestic subsidiary if the parent foreign corporation provides funding for the contribution, or if individual foreign nationals are involved in any way in making the contribution. In 1991, the FEC rejected proposed rulemaking that would have expanded the scope of Section 30121 to include domestic subsidiaries of foreign-owned entities.

There are significant enhancements for FECA violations involving a foreign national or foreign government. U.S.S.G. § 2C1.8(b)(2). The Guideline is discussed in Chapter Six.

---

59 Persons who rely in good faith on an FEC advisory opinion may be immune from sanctions under FECA, including criminal prosecution. 52 U.S.C. § 30108(c)(2).

### (f) 52 U.S.C. § 30122 Prohibition on contributions through conduits

Section 30122 makes it unlawful for any person to make a contribution in the name of another, or for any person to permit his or her name to be used to make such a contribution. The statute also prohibits any person from knowingly accepting a contribution made by one person in the name of another.

The conduit statute is one of FECA's most frequently violated prohibitions. It was challenged and upheld in *United States v. O'Donnell*, 608 F.3d 546 (9th Cir. 2010). This is because it prohibits conduct that is often used by perpetrators to disguise other campaign financing violations, such as contributions over the Act's limits in violation of Section 3011 or from prohibited sources in violation of Section 30118 or Section 30121.

Section 30122 violations occur when a person gives money to straw donors, or conduits, for the purpose of having the conduits pass the funds on to a specific federal candidate as their own contributions. The motive is typically to preserve the true donor's anonymity and aggregate contribution amount, as the ostensible contributions will be reported publicly as having been made by the straw donors. A common type of conduit scheme involves a corporate official who instructs the corporation's employees to make contributions to a federal candidate, and then reimburses the employees from corporate funds generally through fictitious bonuses or pay raises. In so doing, illegal corporate funds are laundered to the candidate in violation of both Sections 30122 and 30118.

As discussed previously, to be subject to prosecution as a FECA crime, the act must be knowing and willful. Laundering campaign contributions through straw donors is persuasive evidence of the Act's willful intent element.

Conduit crimes are subject to a separate felony penalty with a lower monetary floor than the general felony provision for FECA offenses. Specifically, conduit crimes aggregating over $10,000 in a calendar year are now punishable as felonies, and subject to two years of imprisonment or fines. 52 U.S.C. § 30109(d)(1)(D). Conduit crimes aggregating $25,000 or more are subject to FECA's five-year felony provision. 52 U.S.C. § 30122(d)(1)(A)(ii). Finally, conduit crimes aggregating between $2,000 and $10,000 are one-year misdemeanors. 52 U.S.C. § 30122(d)(1)(A)(i).

Conduit violations also may be prosecuted under the federal conspiracy and false statement statutes, 18 U.S.C. §§ 371 and 1001. Courts have held that the use of conduits to disguise illegal contributions to federal candidates is evidence of an intent to interfere with the accurate reporting of campaign contributions, an intent to defraud the FEC, and an intent to cause false information to be conveyed to the FEC. *See United States v. Hsia*, 176 F.3d 517 (D.C. Cir. 1999); *see also United States v. Hopkins*, 916 F.2d 207, 213–1 (5th Cir. 1990) (upholding Section 1001 conviction for filing false statements on disclosure reports required by the Ethics in Government Act).

Conduit schemes often involve multi-district activity, and therefore the question of where a contribution is "made" or "received" within the meaning of Section 30122 can present venue questions. For a discussion of such venue issues, see *United States v. Passodelis*, 615 F.2d 975 (3d Cir. 1980) (reversing a conviction under Section 30122's predecessor, 18 U.S.C. § 614, on venue grounds). For a discussion of statute of limitations issues that also can arise in such cases, see *United States v. Hankin*, 607 F.2d 611 (3d Cir. 1979) (reversing a conviction under 18 U.S.C. § 614 on statute of limitations grounds).

### (g) 52 U.S.C. § 3012 Limitation on contribution of currency

Section 30123 makes it unlawful for any person to contribute more than $100 in United States or foreign currency to the campaign of a federal candidate. The limitation is cumulative, and applies to the candidate's entire campaign, including the primary and general election. The limitation differs from, and is in addition to, the contribution limitations in Section 30116.

The statute does not expressly address receiving cash for political purposes, but campaign agents who knowingly solicit or receive cash in violation of Section 30123 may be liable as aiders and abettors under 18 U.S.C. § 2.

### (h) 52 U.S.C. § 30124: Fraudulent misrepresentation of campaign authority

Section 30124 prohibits two discrete types of fraudulent misrepresentations in connection with federal campaigns: certain campaign "dirty tricks," and fraudulent fundraising. Specifically:

- Section 30124(a) prohibits federal candidates and their agents from fraudulently misrepresenting that they have authority to speak or act for another federal candidate or political party on a matter that is damaging to the other candidate or political party. The statute also prohibits conspiracies to misrepresent campaign authority to damage an opponent.

- Section 30124(b) prohibits any person from fraudulently misrepresenting, or conspiring with another to fraudulently misrepresent, that he or she is acting for any

> candidate or political party for the purpose of soliciting contributions or donations.[60]

Unlike all other FECA violations, violations of Section 30124 may be prosecuted without regard to the sum of money involved. 52 U.S.C. § 30109(d)(1)(C). Violations that involve amounts under $25,000 are one-year misdemeanors and violations involving $25,000 or more are five-year felonies. 52 U.S.C. § 30109(d)(1)(A).

### (i) 52 U.S.C. § 30125: Soft money of political parties

Section 30125, the so-called "soft money ban" enacted by BCRA in 2002, was designed to eliminate unregulated "soft money" from the federal election campaign process. It has several clear features that are enforceable through FECA's criminal penalty.

#### i. Section 30125(a)

Section 30125(a) provides that a "national committee of a political party (including a national congressional campaign committee of a political party)," an agent of such a national committee, and any entity that is established, financed, or controlled by such a national committee, may not "solicit, receive, or direct to another person" any "contribution, donation, or transfer of funds," or spend any funds, that are not subject to the limits and prohibitions of FECA.[61] Such funds would include contributions that exceed the

---

[60] Violations of Section 30124(b) involving fraudulent fundraising that are accomplished through the use of the mails or interstate wires may also be prosecuted as fraud offenses under 18 U.S.C. §§ 1341 or 1343.

[61] At the time this book was written, the following six committees were subject to this prohibition: the Republican National Committee, the Democratic National Committee, the National Republican Senatorial Committee, the Democratic Senatorial Campaign Committee, the National Republican Congressional Committee,

Act's quantitative limitations in violation of Section 30116; contributions from prohibited sources, such as corporations, labor organizations, banks, or government contractors in violation of Section 30118, Section 30119, or Section 30121; and contributions laundered through conduits or in cash in violation of Section 30122 or Section 30123

Stated differently, national committees of political parties and their agents may only solicit, receive, or direct funds that comply with the limitations and prohibitions of FECA, that is, "hard money." Any act of solicitation, receipt, or direction of "soft money" funds by a national party committee, its agents, or an entity it controls violates Section 30125(a).

Of particular significance is the statute's inclusion of the verb "direct." *See* 11 C.F.R. 300.2(n) (defining "direct" within the meaning of the statute). It would be, for example, a violation of Section 30125(a) if an agent of a national party committee suggested to a wealthy contributor that instead of giving soft money to the national party (which is no longer permissible), the contributor give the funds to a state or local component of the national party committee. It would also be a violation of Section 30125(a) if the agent suggested that a prohibited funding source such as a corporation or a labor organization give to a recipient not covered by FECA, such as a candidate for non-federal office.

**ii. Section 30125(b)**

Section 30125(b) prohibits state and local committees, as well as their officers and agents, from expending or disbursing funds that have not been raised in accord with the limitations and prohibitions of FECA on "federal election activity." This term was enacted by

---

and the Democratic Congressional Campaign Committee. *See* 11 C.F.R. § 110.1(c)(2).

BCRA and is defined broadly to include any activity that benefits both federal and non-federal candidates. 52 U.S.C. § 30101(20). Examples of "federal election activity" include get-out-the-vote efforts, voter registration drives, and generic public communications that simultaneously benefit a political party's federal and non-federal candidates, such as, "vote for the Democratic [or Republican] Party."

Prior to BCRA, the FEC permitted "generic" expenses such as those noted above to be allocated between federal and non-federal candidates, requiring that only the portion of their cost that was attributed to the promotion of federal candidates be paid from "hard money." This allocation process proved to be both weak and unenforceable. By enacting Section 30125, Congress rejected the FEC's allocation rules, and plugged this loophole by statutorily deeming all such "generic" activities around federal elections by state and local party committees to be entirely "federal" in nature, thus requiring that they be financed entirely from "hard money," i.e., money raised in compliance with FECA. The following year, the Supreme Court upheld this extension of FECA's coverage as a constitutional legislative effort to avoid circumvention of the Act. *McConnell v. Fed. Election Comm'n*, 540 U.S. 93 (2003). Thus, if an agent of a state political party committee knowingly and willfully uses "soft money" to pay for "generic" party advertisements, the agent would be in violation of 30125(b).

Section 30125(b) does not cover state and local political party communications that refer entirely to non-federal candidates. The statute also does not apply to expenditures or disbursements for generic get-out-the-vote or voter registration drives that are paid from a special fund that the Act permits state and local party committees to maintain. These special accounts – called "Levin" accounts after the Senator who sponsored this provision – may raise up to $10,000 from individual contributors, provided that national party committees, state party committees acting jointly, and, with narrow exceptions, federal

candidates and officeholders are not involved in the solicitation of such funds. 52 U.S.C. § 30125(b)(2)(C) & (e)(3).

### iii. Section 30125(d)

Section 30125(d) prohibits any national, state, or local committee of a political party, as well as agents thereof, from soliciting, making, or directing any contribution or donation to any organization that is exempt from federal taxation under the provisions of 26 U.S.C. §§ 501 or 527, if said tax-exempt organizations have made expenditures or disbursements to fund "federal election activities." Again, these include primarily "generic" expenses such as paying for get-out-the-vote or voter registration drives, or public communications that benefit simultaneously both federal and non-federal candidates. This far-reaching prohibition was also upheld in *McConnell* as a necessary measure to prevent evasion of the ban on the use of soft money in federal campaigns

### iv. Section 30125(e)

Finally, Section 30125(e) addresses what are commonly known as "leadership PACs." Prior to BCRA, these PACs were established and controlled by a federal candidate or officeholder to raise funds for candidates at the federal, state, and local levels in the expectation that such activities would also enhance the candidate's or officeholder's own political power. Specifically, Section 30125(e) provides that a federal candidate or officeholder, or an entity controlled by such a person, may not "solicit, receive, direct, transfer, or spend" funds raised in violation of FECA's limitations and prohibitions in connection with the election of any candidate for federal, state, or local elective office. § 30125(e)(1). The statute contains an exception for a federal candidate or officeholder who is also running simultaneously for a state or local office, which permits the candidate to solicit, receive, or spend "soft money" on behalf of his or her non-federal election campaign, provided that the transactions are

permitted under state law. 52 U.S.C. § 30125(e)(2). As noted above, in *McConnell* the Supreme Court upheld this broad limitation against various constitutional challenges, finding it necessary to prevent circumvention of the statute's prohibition on the use of soft money by federal candidates and officials to influence federal elections.

### 3. 52 U.S.C. § 301 Prohibition on Conversion of Campaign Funds

Section 30114 regulates the use of funds contributed to federal candidates and officeholders and reflects Congress's clear intent to bar completely the conversion of campaign funds for personal purposes. The statute is composed of two provisions and applies to *all* contributions to a federal candidate:

- Section 30114(a) sets forth the permissible uses of contributed funds, including use for "otherwise authorized expenditures in connection with a campaign for Federal office" and for "ordinary and necessary expenses incurred in connection with duties of the individual as a holder of Federal office."

- Section 30114(b) contains the statutory prohibition: A contribution to a federal candidate may not be "converted by any person to personal use." 52 U.S.C. § 30114(b)(1). The provision further provides that a contribution shall be considered to be converted to personal use if it is used to fulfill any "commitment, obligation, or expense of a person that would exist irrespective of the candidate's election campaign." 52 U.S.C. § 30114(b)(2).

- Finally, Section 30114(b)(2) lists nine specific examples of prohibited personal uses of campaign funds, such as mortgage payments, clothing expenses, vacations, and non-campaign-related car expenses.

Even temporary diversion can give rise to criminal prosecution. *See, e.g.*, *United States v. Taff*, 400 F. Supp. 2d 1270 (D. Kan. 2005) (rejecting motion to dismiss indictment charging Section 30114 (then 2 U.S.C. § 439a) based on candidate's temporary use of campaign funds for house closing).

Further, although the statute is limited to funds contributed to federal candidates and their authorized committees, conversion of contributions to other political committees can be addressed under Title 18 fraud statutes. Conduct in violation of Section 30114 can also be prosecuted under the false statements statute, 18 U.S.C. § 1001, for willfully causing another to submit false information to the FEC regarding the existence or use of the funds, and the false records statute, 18 U.S.C. § 1519.

#### 4. 52 U.S.C. §§ 30102, 30103, and 30104: Organization, Recordkeeping, and Reporting Requirements

In brief, FECA requires federal candidates and political committees to file with the FEC a statement of organization and periodic reports of receipts and disbursements. 52 U.S.C. §§ 30103, 30104. The reports are made available to the public, and must identify, among other things, persons contributing over $200 in a calendar year. 52 U.S.C. § 30104(b)(3)(A). The Act also requires that persons making independent expenditures (as distinct from contributions) in excess of $250 to elect or to defeat a federal candidate must file reports with the FEC. 52 U.S.C. § 30104(c). This requirement applies even to those persons or entities that are not required to register as political committees under the statute.

Most campaign records must be maintained for three years, including records reflecting the identity of all contributors giving in excess of $50. 52 U.S.C. § 30102(c) & (d). In addition, persons who collect, receive, or otherwise handle contributions to a political

committee from other persons are required to forward those contributions to the committee's treasurer within ten days, along with the name and address of any person who contributed over $50 to the candidate. 52 U.S.C. § 30102(b).

## D. ENFORCEMENT

### 1. Three Types of Enforcement

Federal campaign financing violations are subject to three types of enforcement:

i) Criminal prosecution by the Justice Department as felonies, either under FECA; under other federal criminal statutes addressing frauds and false statements, such as 18 U.S.C. §§ 371, 1001, 1341, 1343, and 1519; or under Title 26 statutes if the matter involves a publicly funded presidential campaign;

ii) Criminal prosecution by the Justice Department as FECA misdemeanors if the amount of the violation does not reach the felony threshold; and

iii) Civil enforcement proceedings by the FEC.

FECA creates a statutory dichotomy between non-willful violations involving any amount, and willful violations involving $2,000 or more within a calendar year. The former are expressly subject to the exclusive civil jurisdiction of the FEC. 52 U.S.C. §§ 30109(a), 30107(e). The latter are subject to both civil enforcement proceedings by the FEC and criminal prosecution by the Justice Department. 52 U.S.C. § 30109(a)(5)(B) & (C) & (d). In addition, the Commission has statutory authority to interpret the statute through regulations and advisory opinions, and its opinion should be given

deference. 52 U.S.C. §§ 30106(b)(1), 30107(a)(7)-(8), & (e); *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37 (1981).

The FEC pursues FECA violations under the statutory scheme set forth in Section 30109(a). In brief, civil penalties can be imposed through a "conciliation" process, which is roughly equivalent to an administrative guilty plea with a stipulated penalty agreed upon by the FEC and the respondent; civil penalties can also be imposed through a civil suit brought by the FEC in federal district court. Civil sanctions range from "cease and desist" agreements (in which the respondent agrees not to commit a similar violation in the future) to relatively substantial fines. The size of the civil fine depends both on the amount involved in the violation and the degree of knowledge and intent of the respondent. 52 U.S.C. § 30109(a)(5) & (a)(6). The FEC possesses subpoena power and the power to administer oaths, § 30107(a)(3) & (a)(2), as well.

Criminal prosecution under FECA can be pursued before civil and administrative remedies are exhausted. § 30109(a) & (d); *see United States v. Int'l Union of Operating Eng'rs, Local 701*, 638 F.2d 1161, 1162–68 (9th Cir. 1979); *see also Marcus v. Holder*, 574 F.3d 1182, 1184– (9th Cir. 2009); *Fieger v. U.S. Attorney Gen.*, 542 F.3d 1111, 1119 (6th Cir. 2008); *Bialek v. Mukaskey*, 529 F.3d 1267, 1271 (10th Cir. 2008).

The BCRA amendments to FECA in 2002 significantly enhanced the criminal penalties for willful violations of FECA. BCRA did so in response to identified anti-social consequences, namely, corruption and the appearance of corruption arising from FECA violations, and the consequent adverse effect on the proper functioning of American democracy.

These issues are addressed comprehensively in the Supreme Court's decision in *McConnell v. Fed. Election Comm'n*, 540 U.S. 93 (2003). Accordingly, all willful FECA violations that exceed the applicable jurisdictional floor specified in the Act's criminal provision

should be considered for federal prosecution under one or more of the prosecutive theories presented above.

### 2. FECA's Criminal Penalty Provision

As noted above, FECA has an internal criminal penalty provision, Section 30109(d). In order for a FECA violation to be a federal crime, Section 30109(d) generally requires that two elements be satisfied: the violation must have been committed "knowingly and willfully," and, with certain exceptions, the amount involved in the violation must aggregate $2,000 or more in a calendar year. Moreover, a single pattern of illegal conduct can often involve several FECA offenses, which may have different monetary thresholds for criminal penalties. An example would be corporate contributions in violation of Section 30118 that are laundered through conduits in violation of Section 30122. Prosecutions under the Act thus present three factual issues: intent, aggregate value, and applicable penalties. These topics are discussed below.

#### (a) Intent

Most FECA violations must have been done "knowingly and willfully" to provide a basis for criminal liability. § 30109(d). The willfulness required is defined by the *Bryan* standard, articulated by the Supreme Court in *Bryan v. United States*, 524 U.S. 184 (1998). In that case, the Supreme Court considered the willfulness requirement for trading in or transporting firearms in interstate commerce without a license. Finding that the statute at issue was not highly technical such that it would "ensnar[e] individuals engaged in apparently innocent conduct," as the tax laws might, the Court found willfulness, as used in the statute, did not require the defendant to have known of a specific statutory duty. *Bryan*, 524 U.S. at 193–9 Instead, the defendant need only know, generally, that his conduct was unlawful. *Id.* at 195–9

Courts directly addressing the criminal intent requirement under FECA have applied the *Bryan* standard. *United States v. Whittemore*, 944 F. Supp. 2d 1003, 1006–10 (D. Nev. 2013) (" [T]he government must prove that Whittemore knew his conduct violated *some* law, but it need not prove which one."), *aff'd,* 776 F.3d 1074 (9th Cir. 2015), *cert. denied,* 136 S. Ct. 89 (2015); *United States v. Danielczyk*, 788 F. Supp. 2d 472, 489–9 (E.D. Va. 2011) ("[T]he Government must prove that Defendants intended to violate the law (whatever the law was)."), *rev'd on other grounds,* 683 F.3d 611 (4th Cir. 2012), *cert. denied,* 133 S. Ct. 1459 (2013).

Offenders may argue that a higher standard applies: the standard articulated for willful violations of the tax code and currency structuring by the Supreme Court in *Cheek v. United States*, 498 U.S. 192, 201 (1991), and *Ratzlaf v. United States*, 510 U.S. 135, 144–4 149 (1994), respectively. Finding the tax code and currency structuring laws particularly complex and likely to ensnare innocent conduct, the Supreme Court found "willful" as used in those cases to require knowledge of the particular statutory requirement violated. Most courts interpreting these cases have understood the intent standard articulated to thus be limited to the criminal violations related to those specific schemes. One exception is a 1994 case, *United States v. Curran*, 20 F.3d 560 (3d Cir. 1994), in which the Third Circuit applied the *Cheek*/*Ratzlaf* standard to the willfulness requirement for causing false statements in violation of 18 U.S.C. §§ 1001 & 2(b), where the defendant had caused a campaign treasurer to file false reports with the FEC. Since *Bryan*, however, most circuits have rejected such an expansion of the *Cheek* standard for willfulness. *E.g.*, *United States v. Hsia*, 176 F.3d 517, 522 (D.C. Cir. 1999). Even the Third Circuit has appeared to retreat from this interpretation. *See United States v. Starnes*, 583 F.3d 196, 211–1 (3d Cir. 2009) (noting that the *Cheek/Ratzlaf* standard is used in only rare instances involving "highly technical statutes . . ., such as the federal criminal tax and antistructuring provisions" and that the court applied the heightened standard in *Curran* because of the "tandem violations of §§ 1001 & 2(b) in the 'federal election law context'").

As of the time of this publication no court has held that the *Cheek/Ratzlaf* standard applies to FECA offenses. In pre-*Bryan* and pre-*Cheek/Ratzlaf* cases, the D.C. Circuit required a "knowing, conscious, and deliberate flaunting" of the statute, *see Nat'l Right to Work Comm. v. FEC*, 716 F.2d 1401, 1403 (D.C. Cir. 1983) *AFL-CIO v. FEC*, 628 F.2d 97, 101 (D.C. Cir. 1980); but, these cases do not reflect the evolved understanding of "willful" as articulated by the Supreme Court in *Bryan*, *Cheek*, and *Ratzlaf*. As the courts found in *Whittemore* and *Danielczyk*, the core prohibitions of FECA are not complex in the same manner as those regulatory schemes at issue in *Cheek* and *Ratzlaf,* and thus FECA does not merit the even higher intent standard.

With the *Bryan* standard in mind, examples of evidence that has been used to prove that FECA violations were committed knowingly and willfully include:

- The use of surreptitious means, such as cash, conduits, or false documentation, to conceal the violation;

- Making a prohibited "in-kind" contribution by paying directly for goods or services provided to a recipient political committee;

- Proof that the offender is active in political fundraising and is personally well-versed in the federal campaign financing laws (such as offenders who can be shown to be professional lobbyists or fundraisers);

- Proof that the substantive FECA violation took place as part of another felonious end (such as the use of corporate funds to pay a bribe to a public official in violation of 18 U.S.C. § 201, with the bribe disguised as an ostensible campaign contribution to the official's campaign committee); and

- Proof that the donor received information about FECA prohibitions and requirements directly from a candidate, political committee, or campaign, e.g., through the use and execution of what are called "contributor cards."

Certain provisions of FECA address acts that are *malum in se*, that is, inherently wrongful conduct from which willful intent to violate the law can be inferred from mere proof that the prohibited act was committed. These exceptional provisions are the Act's prohibitions against: conversion of campaign funds (§ 30114); misrepresentation of campaign authority to damage an opponent's campaign (§ 30124(a)); fraudulent solicitations (§ 30124(b)); certain coerced contributions by corporations and unions (§ 30118(b)(3)(A)); and false expenditure reports to the FEC (§ 30104(b)(5)(A)). In such cases, the instructions must not take the intent issue from the jury. However, evidence and argument before the jury on the element of willfulness in these cases may not require as much proof of concealment as in other FECA offenses.

### (b) Aggregate value

For most FECA offenses to be eligible for criminal penalties, the contributions or expenditures at issue must "aggregate" to $2,000 or more in a calendar year. 52 U.S.C. § 30109(d)(1)(A). The exceptions to this $2,000 requirement are violations of the prohibition in Section 30118(b)(3) against the use by corporate or union PACs of coerced contributions, which sets a threshold of $250, and knowing and willful violations of the prohibition in Section 30124 against fraudulent misrepresentation of campaign authority to damage another candidate or political party or to solicit contributions for a candidate or political party, which sets no threshold.

In determining the aggregate value of a FECA violation, the customary practice has been to include the overall "value" of a series of

violations that are committed by, and attributed to, a given offender. For example, a $50,000 illegal corporate contribution within a given calendar year that was illegally passed through 50 individuals serving as conduits would have an aggregate value of $50,000.

### 3. Penalties

FECA offenses carry different penalties depending on the aggregate amount of the contributions and expenditures involved:

- All FECA violations that aggregate $25,000 or more in a calendar year are felonies subject to imprisonment for five years and, except for conduit violations, fines imposed pursuant to 18 U.S.C. § 3571 (up to $250,000 for each offense by an individual and up to $500,000 for each offense by an organization). 52 U.S.C. § 30109(d)(1)(A)(i).

- Conduit violations (52 U.S.C. § 30122) that aggregate *more than* $10,000 in a calendar year are felonies: those aggregating under $25,000 are two-year felonies, and those aggregating $25,000 or more are five-year felonies. 52 U.S.C. § 30109(d)(1)(D)(i). In addition, these offenses can be subject to a fine of 300% of the amount involved in the violation, and a maximum fine that is the greater of either $50,000, or 1,000% of the aggregate value involved in the offense, or the amount provided for in 18 U.S.C. § 3571. 52 U.S.C. § 30109(d)(1)(D)(ii).

- Fraudulent misrepresentations of campaign authority to damage an opponent or to solicit funds (2 U.S.C. § 30124) involving less than $25,000 in a calendar year are misdemeanors subject to one year of imprisonment and fines imposed pursuant to 18 U.S.C. § 3571 (up to $100,000 for each offense by an individual and up to

$200,000 for each offense by an organization). 52 U.S.C. § 30109(d)(1)(C).

- Violations of the prohibition against the use of coerced contributions by corporations and unions (52 U.S.C. § 30118(b)(3)(A)) that aggregate $250 or more in a calendar year are subject to one year of imprisonment and fines imposed pursuant to 18 U.S.C. § 3571. 52 U.S.C. § 30109(d)(1)(B).

- Violations of all other FECA provisions that aggregate $2,000 or more in a calendar year are misdemeanors subject to one year of imprisonment and fines imposed pursuant to 18 U.S.C. § 3571. 52 U.S.C. § 30109(d)(1)(A)(ii).

Of course, the actual penalties imposed for these offenses are subject to the guidance provided in FECA sentencing guideline, U.S.S.G. § 2C1.8.

### 4. Statute of Limitations for Campaign Financing Offenses

FECA violations are subject to a five-year statute of limitations period, 52 U.S.C. § 30145, the same as the general statute of limitations for most federal crimes, *see* 18 U.S.C. § 3282. The five-year limitations period also governs the prosecution of conduct based on FECA violations that is prosecuted under 18 U.S.C. §§ 371, 1001, or 1519. *Id.* This five-year period also applies to FECA-based crimes charged as frauds under the public financing provisions governing presidential campaigns. 26 U.S.C. §§ 9012(c), 9042(b).

### 5. Venue for FECA Offenses

The campaign financing statutes focus on the "making" and "receiving" of contributions and expenditures, and venue generally lies where a prohibited transaction was made or received. While this presents no problems in cases involving intradistrict transactions, one court of appeals has interpreted "making a contribution" so narrowly that serious difficulties may be encountered in establishing a centralized venue over multi-district FECA violations. *United States v. Passodelis*, 615 F.2d 975 (3d Cir. 1980).

In *Passodelis*, a campaign fundraiser had been convicted under 52 U.S.C. §§ 30116 and 30122 predecessor statutes for making excessive contributions to a presidential candidate through conduits in four states. Venue was laid in the district where the political committee to which these donations were given had its offices and bank accounts. The court of appeals held that cases against the donors had to be brought in the district where the donors "made" the prohibited donations, and that this concept did not encompass the district where the donee deposited the funds. Prosecutors facing similar fact situations should contact the Public Integrity Section to discuss potential solutions regarding venue.

In *United States v. Chestnut*, 533 F.2d 40 (2d Cir. 1976), the Second Circuit held that the act of "receiving" a prohibited contribution or expenditure encompassed the donee's acceptance of it. Therefore, multi-district acceptance, or "donee," cases may be brought in the district where the donee accepted the donation.

Venue for reporting offenses lies generally where the inaccurate report was prepared, dispatched, or received by the FEC. The FEC's offices are in the District of Columbia.

### 6. Other Applicable Federal Criminal Statutes

Conduct giving rise to a FECA violation may also give rise to violations of other federal statutes as well. The following statutes

provide viable charging theories for conduct in violation of FECA and should be pursued where applicable.

**(a) Willfully causing submission of false information to the Federal Election Commission: 18 U.S.C. §§ 1001 and 2.**

Each political committee that seeks to influence a federal election is required to have a treasurer who is required to file periodic reports with the FEC of contributions to and expenditures by the committee, including the identity of all persons contributing over $200 in a calendar year. 52 U.S.C. §§ 30102(a), 30104(a) & (b)(3)(A). In addition, persons receiving a contribution to a political committee must forward it to the treasurer, along with the identity of all donors contributing over $50. 52 U.S.C. § 30102(b). The treasurer's reports thus include information from individuals who have forwarded contributions to the committee.

A treasurer who submits information concerning contributions or expenditures to the FEC, knowing the information to be false, violates 18 U.S.C. § 1001. A person involved in a transaction reportable under FECA who attempts to disguise it, or misrepresents its source, purpose, or amount, "willfully causes" the treasurer of the recipient committee to furnish false information concerning the transaction to the FEC in violation of 18 U.S.C. §§ 2(b) and 1001 under the *Bryan* intent standard (which Department policy recognizes as applicable to § 1001). This information is "material" to the "jurisdiction" of the FEC in that it impacts adversely upon the Commission's statutory duties to make public an accurate account of financial transactions done for the purpose of influencing a federal election, *see* 52 U.S.C. § 30111(a)(4), and, in situations when the concealed fact itself constitutes a violation of FECA, to enforce the law, *see* §§ 30107(a)(6) & (9), 30109(a)(5).

The application of Section 1001 to campaign financing violations follows from *United States v. Hansen*, 772 F.2d 940 (D.C. Cir. 1985). In that case, Congressman Hansen was indicted and convicted under Section 1001 for filing false reports with the House Committee on Standards of Official Conduct under the 1978 Ethics in Government Act (EIGA). Like a portion of FECA, EIGA is essentially a disclosure statute; it applies to federal officeholders and candidates, while FECA applies to persons seeking federal office. Also like FECA, EIGA has an internal penalty that provides for non-felony sanctions. The D.C. Circuit rejected the contention that, by enacting EIGA, Congress had repealed by implication existing felony sanctions for false reports by public officials; the court held that the civil penalty in EIGA and the felony penalty under Section 1001 "produce a natural progression in penalties," and that "those who lie on their [EIGA] forms" violate Section 1001. *Hansen*, 772 F.2d at 945.

The use of Section 1001, in conjunction with Section 2(b), to prosecute those who willfully cause the treasurer of a political committee to submit materially false data to the FEC has been upheld by every court that has decided the issue.[62] *United States v. Hsia*, 176 F.3d 517 (D.C. Cir. 1999) *United States v. Kanchanalak*, 192 F.3d 1037 (D.C. Cir. 1999); *United States v. Curran*, 20 F.3d 560 (3d Cir. 1994); *United States v. Hopkins*, 916 F.2d 207 (5th Cir. 1990); *United States v. Braddock*, Crim. No. 12-cr-157, 2013 WL 4441531, at *10 (D. Conn. Aug. 14, 2013); *United States v. O'Donnell*, Crim. No. 08-87 2009 WL 9041223, at *6 (C.D. Cal.), *aff'd*, 608 F.3d 546 (9th Cir. 2010); *see also United States v. Whittemore*, 776 F.3d 1074, 1080 (9th Cir. 2015) (finding a jury's conclusion that the defendant caused a false report to the FEC in violation of 18 U.S.C. §§ 1001(a)(2)

---

[62] Several significant false reporting cases were prosecuted during the early days of FECA, before the FEC was created. *E.g.*, *United States v. Fin. Comm. to Re-elect the President*, 507 F.2d 1194, 1197–98 (D.C. Cir. 1974) (upholding convictions for willful failure to report a $200,000 cash contribution).

and 2 "follow[ed] accordingly" from findings that the defendant was the "true source" of the money used for contributions made by conduits); *United States v. Gabriel,* 125 F.3d 89 (2d Cir. 1997 (*dicta*) (analyzing the interrelationship between Section 1001 and FECA).

In most circuits, for a defendant to have "knowingly and willfully" made a false statement or have caused false statements to be made to the FEC, he or she must have known that the statement was false and he or she must have intended to act unlawfully, even if he or she was unaware of the specific reporting requirement. Most circuits have adopted this interpretation of the willful requirement in Section 1001; *see also Bryan*, 524 U.S. 184 (1998). Some have adopted a lesser standard. *See United States v. Hsia*, 176 F.3d 517, 521–22 (D.C. Cir. 1999 *United States v. Hopkins*, 916 F.2d 207, 214–15 (5th Cir. 1990). The Third Circuit, alone, has required the heightened showing that the defendant have also been aware of the specific statutory duty to disclose. *See Curran*, 20 F.3d at 570; *see also Starnes*, 583 F.3d at 211 (limiting *Curran* to "tandem violations of §§ 1001 and 2(b) in the 'federal election law context.'"). Department policy is to apply the *Bryan* standard.

The elements of a Section 1001 offense, in the context of false statements made to the FEC, are:

- the defendant caused another to make a statement that was false;

- the false statement concerned a matter that was within the jurisdiction of the Federal Election Commission; that is, the false statement related to a fact that the Federal Election Campaign Act required to be accurately reported;

- the false statement was material to the FEC, that is, it had the natural tendency to influence the FEC in the performance of its official duties; and

- the defendant acted knowingly and willfully; that is, the defendant intended to cause the recipient to record false statements and knew, generally, that making such a false statement as unlawful. However, the government does *not* have to prove that the defendant was aware of the specific statutory requirements and prohibitions of FECA or that he or she was aware of the federal agency's interest in the matter falsified.

**(b) Conspiracy to defraud the United States: 18 U.S.C. § 371**

The "conspiracy to defraud" approach to FECA crimes is based on *Hammerschmidt v. United States*, 265 U.S. 182 (1924), which held that a conspiracy to defraud the United States under Section 371 includes a conspiracy "to interfere with or obstruct one of [the federal government's] lawful governmental functions by deceit, craft, or trickery, or at least by means that are dishonest." *Id.* at 188. *See also, Dennis v. United States*, 384 U.S. 855, 861 (1966); *Haas v. Henkel*, 216 U.S. 462, 469 (1910).

This conspiracy theory, as applied to the functioning of the FEC, is as follows: the FEC, an agency of the United States, has the principal statutory duties of enforcing FECA's campaign financing prohibitions and disclosure requirements and providing the public with accurate information regarding the source and use of contributions to federal candidates and expenditures supporting federal candidates. 52 U.S.C. §§ 30106 and 30107. To perform these duties, the FEC must receive accurate information from the candidates and political committees that are required to file reports under the Act. A scheme to infuse patently illegal funds into a federal campaign, such as by using conduits or other means calculated to conceal the illegal source of the contribution, thus disrupts and impedes the FEC in the performance of its statutory duties.

As previously stated, prosecution under FECA's criminal provision requires proof that the defendant was aware that his or her conduct was generally unlawful. When the conduct is charged under Section 371, however, the proof must also show that the defendant intended to disrupt and impede the lawful functioning of the FEC. Indeed, the crux of a Section 371 FECA case is an intent on the part of the defendant to thwart the FEC. That is a higher factual burden than is required under 18 U.S.C. § 1001, and is arguably a greater factual burden than is required by Section 30109(d).

The use of Section 371 in this manner has been approved by the Third, Fifth, and D.C. Circuits. *United States v. Hsia*, 176 F.3d 517, 521 (D.C. Cir. 1999) *United States v. Curran*, 20 F.3d 560, 562 (3d Cir. 1994); *United States v. Hopkins*, 916 F.2d 207, 212 (5th Cir. 1990)

### (c) Public financing crimes relating to presidential campaigns

The anti-fraud provisions of the Presidential Primary Matching Payment Account Act, 26 U.S.C. §§ 9031-9042 and the Presidential Election Campaign Fund Act, 26 U.S.C. §§ 9001-9012 are five-year felonies and can be used to prosecute aggravated campaign financing schemes involving presidential campaigns. 26 U.S.C. §§ 9012 and 9042.

These statutes were enacted after the Supreme Court struck down the 1974 FECA's limits on campaign expenditures by federal candidates as violative of free speech. *Buckley v. Valeo*, 424 U.S. 1 (1976). The statutes tie eligibility for federal funds to voluntary adherence to campaign expenditure limits by participating candidates. Thus, presidential candidates are given a choice between making unlimited campaign expenditures or accepting public funds for their

campaigns in return for agreeing to abide by campaign expenditure limits.

The "matching payment" statute applies to the presidential primary campaign. It provides that, once certain statutory qualifications are met, a presidential candidate is entitled to receive matching payments (for contributions up to $250 from individual donors) from the United States Treasury for his or her campaign, up to half of the applicable total campaign spending limit. 26 U.S.C. § 9034(b). Presidential candidates who choose to accept primary campaign matching funds are subject to FECA's campaign expenditure limits. 52 U.S.C. § 30116(b).

The general election funding statute allows a candidate who has been nominated by a major party (i.e., the Republican Party or the Democratic Party) or by a qualifying minor or new party for the Presidency to receive all of his or her campaign funds from the United States Treasury. 26 U.S.C. § 9004(a)(1). Presidential candidates who choose to accept this federal grant are subject to the campaign expenditure limits in 2 U.S.C. § 441a(b), and are also for the most part prohibited from accepting any private contributions in connection with the general election phase of their campaigns. 26 U.S.C. §§ 9003 and 9012.

Both public financing statutes contain bookkeeping and reporting requirements, and also require that each campaign receiving federal funds submit to a post-election audit by the FEC. 26 U.S.C. §§ 9033 and 9003. Participating candidates must also agree to pay back all funds which the FEC determines were not used for campaign purposes, or which were spent in excess of the expenditure limit, were not matchable, or were otherwise illegal. 26 U.S.C. §§ 9038 and 9007.

Each of these statutes contains its own criminal provision for, among other things, providing false information to the FEC to obtain

public funds, which is punishable by imprisonment for up to five years and a fine under 18 U.S.C. § 3571. 26 U.S.C. §§ 9042(c) and 9012(d). Prosecutors considering false statement charges in connection with conduct violating one of these public funding laws thus have the choice of using either the public funding statute that specifically addresses the conduct or the general false statements statute, 18 U.S.C. § 1001. *See also United States v. Hopkins*, 916 F.2d 207 (5th Cir.1990) (same); *United States v. Woodward*, 469 U.S. 105 (1985) (affirming Section 1001 charge for currency reporting offense).

The administration and civil enforcement of these grant programs are within the FEC's sole jurisdiction. However, since these are federal funding programs, with federal candidates as the beneficiaries, if there is evidence of an intent to defraud the United States in the implementation of these programs, criminal prosecution is warranted and should be pursued.

**(d) Mail and wire fraud: 18 U.S.C. §§ 1341 and 1343**

The federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, which criminalize the use of the mails or interstate wires to further a scheme or artifice to defraud,[63] can provide an additional basis for prosecuting conduct that also violates FECA. Further, conduct in violation of state campaign finance laws, although not subject to FECA's provisions, may violate other federal laws, like the mail and wire fraud statutes. Federal prosecutors should consider these statutes when evaluating possible charges for unlawful campaign finance conduct.

The salary theory of mail and wire fraud, discussed at length in Chapter 2, may also provide a basis to prosecute state and federal campaign financial law violations by candidates and their agents. As discussed, however, courts are split as to whether the salary theory is

[63] Except for the jurisdictional element, the mail and wire fraud statutes are identical and courts have interpreted their elements in the same manner.

viable and federal prosecutors should be familiar with the law in their circuit and district before pursuing charges on this basis and consult with the Public Integrity Section.

In addition to the penalties imposed for diverting campaign funds in violation of Section 30114, the mail and wire fraud statutes may be used to prosecute embezzlement or theft of campaign funds. These cases generally fall into three factual scenarios, only the first two of which are also covered by Section 3011

i) Diversion by a candidate or campaign agent of incoming contributions to the candidate or committee before the contributions are deposited; and

ii) Embezzlement by a campaign agent or other person of contributions to a candidate or committee that have been deposited into the campaign's account; and

iii) Establishment of a fictitious political organization for the purpose of raising funds to be converted to personal use.

Examples of campaign embezzlement cases are *United States v. Thomas*, Cr. No. 05-0423 (D.D.C., information filed Nov. 30, 2005); *United States v. Bracewell*, Cr. No. 91-57-N (M.D. Ala., superseding indictment filed May 9, 1991); and *United States v. Karlsen*, Cr. No. 89-353 (D. Az., indictment filed Oct. 18 1989) [64]

---

[64] Copies of these charges, to which the defendants pled guilty, can be obtained from the Public Integrity Section.

#### (e) False records in the administration of a federal matter: 18 U.S.C. § 1519

Title 18 also affords an alternative for charging false statements that a defendant makes or causes in *records* of either a federal political entity (such as a federal candidate's authorized campaign committee) or in reports to the FEC. Specifically, under 18 U.S.C. § 1519, "[w]hoever knowingly … conceals, covers up, falsifies, or makes a false entry in any record [or] document … with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States … or in relation to or contemplation of any such matter or case" commits a twenty-year felony. The Department has applied this statute, in conjunction with 18 U.S.C. § 2, in charging defendants with causing false internal records of campaign expenditures and false external records in the follow-on campaign filings with the FEC by unwitting campaign personnel. The FEC's proper administration of the reporting and publication of expenditure reports serve as the predicate federal matter.

### 7. Policy and Procedural Considerations

#### (a) Consultation requirements and recommendations

For decades, the Public Integrity Section has coordinated the Department's law enforcement efforts against campaign financing crimes with United States Attorneys' Offices. The Section has two main goals in this area: to provide prompt and accurate guidance regarding the prosecutive potential of campaign financing allegations, and to assist the United States Attorneys' Offices and the FBI in bringing effective criminal penalties to bear when warranted.

Not all FECA violations are federal crimes, either because they lack the requisite criminal intent or because they do not meet the applicable monetary floor for FECA crimes. Early consultation with

the Public Integrity Section assists the Department, the United States Attorneys' Offices, and the FBI by ensuring that investigative and prosecutorial resources are focused on FECA violations only when appropriate.

Accordingly, the Department requires that the Public Integrity Section be consulted before beginning any criminal investigation, including a preliminary investigation, of a matter involving possible violations of FECA. USAM § 9-85.210. This consultation is also required before any investigation of campaign financing activities under one of the Title 18 felony theories discussed above. *Id.* The Public Integrity Section also recommends that the Section be consulted before commencing an investigation of possible violations of the public funding programs in Title 26.

Facts reflecting possible non-criminal FECA violations, should be brought to the attention of the Public Integrity Section, which will forward them to the FEC.

**(b) Investigative jurisdiction**

Criminal investigations of possible FECA violations, as well as violations of 26 U.S.C. §§ 9012 and 9042, are conducted by the FBI and other federal law enforcement agencies. Civil investigations are conducted by the FEC. The FEC is authorized by statute to conduct a civil inquiry parallel to an active criminal investigation involving the same matter. 52 U.S.C. §§ 30107(a)(9) and (e). Parallel proceedings present unique challenges to federal prosecutors and investigators. In these cases the Public Integrity Section should be consulted to ensure that any procedures or agreements regarding parallel proceedings are followed.

### (c) Non-waiver of the Federal Election Commission's civil enforcement authority

The FEC's enforcement jurisdiction over non-criminal FECA violations cannot be compromised or waived by the Department of Justice. 52 U.S.C. § 30107(a)(6) and (e). Accordingly, plea agreements with defendants who have possible non-criminal exposure for FECA violations must contain a specific disclaimer to the effect that the Department of Justice is not waiving the civil enforcement jurisdiction of the FEC, such as the following:

> Nothing in this agreement waives or limits in any way the authority of the Federal Election Commission to seek civil penalties or other administrative remedies for violations of the Federal Election Campaign Act pursuant to Section 30109(a) of Title 52, United States Code.

### (d) Dealings with the Federal Election Commission

As discussed above, the FEC and the Justice Department have overlapping enforcement responsibilities over willful and aggravated violations of FECA. At the same time, the FEC is an independent executive agency responsible for the oversight and civil enforcement of the federal campaign financing laws. The Commission's independent authority requires that the Department respect the FEC's enforcement efforts. Over time, the Public Integrity Section has developed good relationships with the FEC and its staff, and can help prosecutors and agents quickly obtain the information they need from the FEC. The FEC's Public Records Division has long been a helpful resource in developing campaign financing cases.

The United States Attorneys' Offices and the FBI should, whenever possible, route inquires to the FEC through the Public Integrity Section. Doing this avoids confusion and increases the

likelihood of a positive response from the Commission. It also helps to ensure that the good working relationship between the two agencies is maintained. The Section has also had success in recent years in working with the FEC to ensure that the Commission's civil enforcement responsibilities do not interfere with the Department's overlapping criminal jurisdiction. On occasion the FEC has voluntarily delayed moving forward with its own proceedings in order to avoid potential adverse effects on a pending criminal investigation.

In 1977, the FEC and the Department of Justice entered into a Memorandum of Understanding relating to their respective law enforcement jurisdiction and responsibilities. 43 FED. REG. 5441 (1978). However, in light of the significant statutory enhancements to the Department's ability to prosecute FECA crimes that were contained in the 2002 Bipartisan Campaign Reform Act, the 1977 Memorandum no longer reflects current congressional intent or Department policy.

### (e) Federal Election Commission officials as prosecution witnesses

The prosecution of criminal cases involving FECA violations generally requires testimony from expert witnesses and document custodians from the FEC. In order to utilize 18 U.S.C. §§ 371, 1001, or 1519 for FECA violations, the prosecutor must prove that the filings on which the case is based were false to a point that they had the potential to mislead or disrupt the FEC's ability to discharge its statutory responsibilities. Federal prosecutors seeking FEC witnesses should contact the Public Integrity Section, which will arrange for an FEC official who possesses the requisite expertise to testify to these issues. The FEC has at times advised that requests for FEC staff to appear as prosecution trial witnesses should be made by subpoena.[65]

[65] This is a departure from the usual practice of relying on oral or written requests for trial testimony from federal government personnel.

In 1991, the Justice Department's Justice Management Division (JMD) concluded that the travel and subsistence expenses of FEC staff who testify for the prosecution at FECA-based criminal trials are to be borne by the Department. Therefore, before a subpoena is served on an FEC employee to testify as a trial witness, the federal prosecutor handling the case should prepare a JMD expert witness form (OBD 47) providing information about the case and the FEC employee's role in it. This form is then to be submitted to JMD, which will generate a financial commitment form to accompany the trial subpoena when it is served on the prospective FEC witness.

# CHAPTER SIX

# SENTENCING OF ELECTION CRIMES

## A. OVERVIEW

This chapter discusses the sentencing of election crimes pursuant to the United States Sentencing Guidelines promulgated by the United States Sentencing Commission. U.S. SENTENCING GUIDELINES MANUAL (U.S.S.G. or sentencing guidelines).

For sentencing purposes, election crimes are divided into four categories:

(1) *Offenses involving corruption of the electoral process.* This type of offense is governed by U.S.S.G. § 2H2.1.

(2) *Offenses that violate FECA.* Campaign financing offenses that occur after January 25, 2003, are governed by U.S.S.G. § 2C1.8, a guideline that was promulgated by the United States Sentencing Commission in response to a congressional mandate in the BCRA. *See United States v. Rowland*, Cr. No. 3:14cr79 (JBA), 2015 WL 1275655, at *3 (D. Conn. Mar. 19, 2015) (applying Section 2C1.8 to a FECA violation). Prior to January 25, 2003, there was no guideline, or analogous guideline, that applied to FECA offenses and therefore FECA crimes were sentenced pursuant to U.S.S.G. § 2X5.1.

(3) *Campaign financing offenses addressed by alternative theories of prosecution.* Certain campaign financing crimes also may be prosecuted under Title 18 statutes, such as 18 U.S.C. § 371 (conspiracy), § 1001 (false statements), § 1341 (mail fraud), § 1343 (wire fraud), and § 1519 (creation of false

internal or external records). Conspiracy and fraud offenses are governed by U.S.S.G. § 2C1.1. Courts have held that Section 2C1.1 applies only to conspiracies to defraud that harm the government "in a manner similar to bribery offenses," although such a limitation is not apparent on the face of the guideline language. *See United States v. Huizar-Velazquez*, 720 F.3d 1189, 1191 (9th Cir. 2013); *see also United States v. Orsburn*, 525 F.3d 543, 544 (7th Cir. 2008) (Section §2C1.1 does not apply to "simple theft by public officials"); *Rowland*, 2015 WL 1275655, at *2 (holding that Section 2C1.8, rather than Section 2C1.1, applied to defendant's conviction for obstructing an FEC investigation).

False statement offenses that occur after January 25, 2003, are governed by FECA guideline pursuant to the cross-reference for fraudulent statements in U.S.S.G. § 2B1.1(c)(3).

(4) *Patronage offenses*. To date, there has been no jurisprudence addressing the application of the sentencing guidelines to patronage offenses. Some of these crimes (*e.g.,* 18 U.S.C. §§ 600, 601) may be governed by the fraud guideline, U.S.S.G. § 2B1.1. Others (*e.g.*, 18 U.S.C. §§ 602, 606, 610) may be governed by the robbery and extortion guideline, U.S.S.G. § 2B3.1. A few do not appear to be governed by any guideline, and thus would be handled for sentencing purposes under U.S.S.G. §§ 2X5.1 or 2X5.2.

## B. CONVICTIONS INVOLVING CORRUPTION OF THE ELECTORAL PROCESS

The guideline that governs sentencing for convictions that involve corruption of the electoral process is U.S.S.G. § 2H2.1. By its terms, this guideline applies to corruption of the electoral process regardless of the type of scheme involved or federal statute it violates. The guideline provides for three

alternative base offense levels (18, 12, or 6) depending upon the nature of the conduct involved in the offense. Specifically, Section 2H2.1 reads as follows:

1. **§ 2H2. Obstructing an Election or Registration**

(a) Base Offense Level (Apply the greatest):

(1) **18,** if the obstruction occurred by use of force or threat of force against person(s) or property; or

(2) **12**, if the obstruction occurred by forgery, fraud, theft, bribery, deceit, or other means, except as provided in (3) below; or

(3) **6,** if the defendant (A) solicited, demanded, accepted, or agreed to accept anything of value to vote, refrain from voting, vote for or against a particular candidate, or register to vote, (B) gave false information to establish eligibility to vote, or (C) voted more than once in a federal election.

Most election frauds involve offenders who have schemed, either by themselves or with others, to cause numerous illegal ballots to be cast through such methods as forgery, fraud, bribery, voter impersonation, multiple-voting, or ballot-box stuffing. Such conduct falls within U.S.S.G. § 2H2.1(a)(2) and calls for a base offense level of twelve. Relevant conduct, as defined in U.S.S.G. § 1B1.3(a), should be considered in selecting the appropriate base offense level.

Three circuits have approved sentencing calculations under this guideline:

In *United States v. Smith*, 231 F.3d 800, 818-21 (11th Cir. 2000), the Eleventh Circuit discussed the application of Section 2H2.1(a)(2) to a voter fraud scheme involving a deputy voter registrar and a political activist. The defendants were charged and convicted of multiple-voting (i.e., marking ballots in the names of voters without the voters' knowledge) in violation of 52 U.S.C. § 10307(e), and forging voters' names on applications for absentee ballots and on ballots in violation of 52 U.S.C. § 10307(c). *Id.* at 805-06. The Eleventh Circuit approved the following guideline calculations made by the district court: (1) a base offense level of twelve for both defendants; (2) a two-level enhancement for the deputy registrar for abuse of a position of public trust under U.S.S.G. § 3B1.3; (3) a four-level enhancement for both defendants based on the court's finding that each was an "organizer or leader of criminal activity that involved five or more participants" under U.S.S.G. § 3B1.1(a); and (4) a two-level enhancement for the political activist for obstructing justice based on evidence that the defendant influenced a witness to give a false affidavit concerning material facts. *Id.* at 819-2

*United States v. Cole*, 41 F.3d 303 (7th Cir. 1994), also involved a deputy voter registrar who was convicted of multiple-voting in violation of 52 U.S.C. § 10307(e). Proof at trial established that the defendant applied for and marked absentee ballots for several voters without their knowledge and consent, and that he threatened one of these voters to dissuade him from cooperating in the ensuing criminal investigation. *Id.* at 308, 311. The district judge assigned a base offense level of twelve to the offense under Section 2H2.1(a)(2), and applied enhancements for the leadership role in a conspiracy involving five or more participants under Section 3B1.1(a) (four levels), abuse of a position of public trust under Section 3B1.3 (two levels), and

obstruction of justice under Section 3C1.1 (two levels), for a total offense level of twenty. *Id.* at 311. The defendant was sentenced to forty-six months of imprisonment. *Id.* at 305. The Seventh Circuit held that the district judge's sentencing analysis was accurate. *Id.* at 311.

In *United States v. Haynes*, Nos. 91-5979, 91-6076, 1992 WL 296782, at *1 (6th Cir. Oct. 15, 1992), the defendants, party officials authorized to register voters, were convicted of conspiracy against rights and deprivation of constitutional rights in violation of 18 U.S.C. §§ 241 and 242 by destroying over 150 voter registration applications. Starting with a base level of twelve, they received upward adjustments of two levels for abuse of a position of trust, and five levels for multiple counts, resulting in a total offense level of nineteen. *Id.* at *3-4. The trial court imposed sentences of thirty months of imprisonment. *Id.* at *2. The Sixth Circuit upheld these sentences with the exception of a two-level reduction for the less culpable defendant. *Id.*at *3.

Other election fraud convictions have resulted in similar calculations under the sentencing guidelines. *E.g., United States v. Slone,* 411 F.3d 643, 650-51 (6th Cir. 2005) (affirming defendant's conviction for vote-buying in violation of 52 U.S.C. § 10307(c) and sentence of fifteen months' imprisonment calculated on a base offense level of twelve under § 2H2.1(a)(2), plus a two-level enhancement for obstructing justice under § 3C1.1(b) for lying to the FBI); *United States v. Sparkman*, Cr. No. 99-30, 2008 WL 2787415, at *1 (E.D. Ky. July 12, 2000) (following conviction for vote-buying in violation of 52 U.S.C. § 10307(c) and lying to the FBI in violation of 18 U.S.C. § 1001, sentence of twenty-four months' imprisonment calculated on a base offense level of twelve under § 2H2.1(a)(2), a three-level enhancement for leadership role under § 3B1.1(b), and two-level enhancement for obstruction of justice under § 3C1.1(b), for a total offense level of seventeen); *United States v. Boards*, Cr. No.

LR-92-1 (E.D. Ark. Sept. 12, 1994) (sentencing proceeding) (following convictions for conspiracy and providing false information under § 10307(c); total offense level of eight; prison term of thirteen months imposed), 10 F.3d 587 (8th Cir. 1993) (reversing trial court's judgments of acquittal on several counts and affirming other convictions); *United States v. Salisbury*, Cr. No. 2-90-197 (S.D. Ohio Oct. 8, 1991) (sentencing proceeding) (conviction for multiple-voting in violation of 52 U.S.C. § 10307(e); total offense level of fourteen; prison term of eighteen months imposed), *rev'd on other grounds*, 983 F.2d 1369 (6th Cir. 1993) (statute unconstitutionally vague as applied to defendant's conduct).

The *Smith* and *Cole* cases illustrate several issues prosecutors are likely to face in this area. First, all the defendants received four-level enhancements for their role in the offenses. In *Cole*, the defendant had contended that the fifteen voters involved were victims of the conspiracy, not "participants" within the meaning of Section 3B1.1. The court agreed with the government that, regardless of whether the voters were participants or outsiders, the criminal activity was "otherwise extensive" within the meaning of Section 3B1.1(a). In addition, both district courts found that a deputy voter registrar occupied a position of trust, requiring a two-level increase under Section 3B1.3. The Sixth Circuit also approved this upward adjustment in *Haynes*.

The *Smith* case presented another important sentencing issue. The defendants argued that the offense was essentially a "multiple-voting" crime, and the appropriate base level for "multiple-voting" was six under Section 2H2.1(a)(3) rather than twelve under Section 2H2.1(a)(2). Their argument was based on the fact that the words "multiple- voting" appear in Section 2H2.1(a)(3). The Eleventh Circuit held that despite this specific reference, Section 2H2.1(a)(3) was intended to apply only to isolated instances of electoral fraud (e.g., one person voting

twice), and that Subsection (a)(2), not (a)(3), governed all vote fraud schemes that entailed the casting of several corrupt ballots:

> We agree with the district court that the appropriate base offense level was 12, as provided in Section 2H2.1(a)(2). The language of (a)(2) applies in any case in which a forgery, fraud, theft, bribery, deceit or other means are used to effect the vote of another person, or the vote another person was entitled to cast. By contrast, the language of (a)(3) addresses an individual who acts unlawfully only with respect to his own vote, or votes more than once in his own name. The offenses for which Smith and Tyree were convicted involved the votes of other individuals, in particular, the forging of other voters' names on applications for absentee ballot and affidavits of absentee voters. The district court did not err in applying a base offense level of 12.

*Smith*, 231 F.3d at 817–1

In summary, certain factors that are often involved in election frauds will increase recommended sentences under the sentencing guidelines:

- A defendant who occupies a leadership or supervisory role in an election fraud scheme may receive an additional two to four levels under Section 3B1.1.

- A defendant who abuses a position of public or private trust (such as a public official who uses his or her office to facilitate election fraud, or a private individual who fraudulently marks and submits ballots entrusted to him or her by voters) will receive two additional

offense levels under Section 3B1.3. U.S.S.G. § 2H2.1, cmt. background (1998).

- If individual voters are viewed as vulnerable victims, separate substantive counts under Section 2H2.1 generally cannot be grouped under Section 3D1.2, so that counts involving multiple voters may result in increases of up to an additional five levels.

- Obstruction may add increased levels under Section 3C1.1. *See Slone*, 411 F.3d 643 (lying to the FBI); *Cole*, 41 F.3d 303 (threatening a witness).

- If the election fraud involved "corrupting a public official," an upward departure may be warranted under Chapter Five, Part K (Departures). U.S.S.G. § 2H2.1, cmt. n.1 (1998).

Thus, even for defendants without a criminal history, the guidelines' upward adjustments generally raise the base offense level for election fraud to a point where the imposition of significant prison terms is recommended.

For the purpose of sentencing criminal violations of FECA, offenses are handled under FECA guidelines. The guideline, U.S.S.G. § 2C1.8, reads as follows:

**2. § 2C1.8: Making, Receiving, or Failing to Report a Contribution, Donation, or Expenditure in Violation of the Federal Election Campaign Act; Fraudulently Misrepresenting Campaign Authority; Soliciting or Receiving a Donation in Connection with an Election While on Certain Federal Property**

(a) Base Offense Level: **8**

(b) Specific Offense Characteristics

(1) If the value of the illegal transactions exceeded $6,500, increase by the number of levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount.

(2) (Apply the greater) If the offense involved, directly or indirectly, an illegal transaction made by or received from –

(A) a foreign national, increase by **2** levels; or

(B) a government of a foreign country, increase by **4** levels.

(3) If (A) the offense involved the contribution, donation, solicitation, expenditure, disbursement, or receipt of governmental funds; or (B) the

defendant committed the offense for the purpose of obtaining a specific, identifiable non-monetary Federal benefit, increase by **2** levels.

(4) If the defendant engaged in 30 or more illegal transactions, increase by **2** levels.

(5) If the offense involved a contribution, donation, solicitation, or expenditure made or obtained through intimidation, threat of pecuniary or other harm, or coercion, increase by **4** levels.

(c) Cross Reference

(1) If the offense involved a bribe or gratuity, apply § 2C1.1 (Offering, Giving, Soliciting, or Receiving a Bribe; Extortion Under Color of Official Right; Fraud Involving the Deprivation of the Intangible Right to Honest Services of Public Officials; Conspiracy to Defraud by Interference with Governmental Functions) or § 2C1.2 (Offering, Giving, Soliciting, or Receiving a Gratuity), as appropriate, if the resulting offense level is greater than the offense level determined above.

*Commentary*

*Statutory Provisions: 18 U.S.C. § 607; 52 U.S.C. §§ 30109(d), 30114, 30116, 30117, 30118, 30119, 30120, 30121, 30122, 30123, 30124(a), 30125, 30126. For additional provision(s), see Statutory Index (Appendix A).*

*Application Notes:*

1. *Definitions.— For purposes of this guideline:*

   *"Foreign national" has the meaning given that term in section 319(b) of the Federal Election Campaign Act of 1971, 52 U.S.C. § 30121(b).*

   *"Government of a foreign country" has the meaning given that term in section 1(e) of the Foreign Agents Registration Act of 1938 (22 U.S.C. § 611(e)).*

   *"Governmental funds" means money, assets, or property, of the United States Government, of a State government, or of a local government, including any branch, subdivision, department, agency, or other component of any such government. "State" means any of the fifty States, the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, Guam, the Northern Mariana Islands, or American Samoa. "Local government" means the government of a political subdivision of a State.*

   *"Illegal transaction" means (A) any contribution, donation, solicitation, or expenditure of money or anything of value, or any other conduct, prohibited by the Federal Election Campaign Act of 1971, 52 U.S.C. § 30101 et seq; (B) any contribution, donation, solicitation, or expenditure of money or anything of value made in excess of the amount of such*

*contribution, donation, solicitation, or expenditure that may be made under such Act; and (C) in the case of a violation of 18 U.S.C. § 607, any solicitation or receipt of money or anything of value under that section. The terms "contribution" and "expenditure" have the meaning given those terms in section 301(8) and (9) of the Federal Election Campaign Act of 1971 (52 U.S.C. § 30101(8) and (9)), respectively.*

2. *Application of Subsection (b)(3)(B).— Subsection (b)(3)(B) provides an enhancement for a defendant who commits the offense for the purpose of achieving a specific, identifiable non- monetary Federal benefit that does not rise to the level of a bribe or a gratuity. Subsection (b)(3)(B) is not intended to apply to offenses under this guideline in which the defendant's only motivation for commission of the offense is generally to achieve increased visibility with, or heightened access to, public officials. Rather, subsection (b)(3)(B) is intended to apply to defendants who commit the offense to obtain a specific, identifiable non-monetary Federal benefit, such as a Presidential pardon or information proprietary to the government.*

3. *Application of Subsection (b)(4).— Subsection (b)(4) shall apply if the defendant engaged in any combination of 30 or more illegal transactions during the course of the offense, whether or not the illegal transactions resulted in a conviction for such conduct.*

4. *Departure Provision.— In a case in which the defendant's conduct was part of a systematic or pervasive corruption of a governmental function, process, or office that may cause loss of public confidence in government, an upward departure may be warranted.*

* * *

In addition, when creating the guideline in 2003, the Sentencing Commission amended Section 3D1.2(d) regarding closely related counts to include Section 2C1.8, and amended Section 5E1.2 to incorporate FECA's mandatory minimum fining provisions and maximum fining range under 52 U.S.C. § 30109(d)(1)(D) for conduit crimes that violate 52 U.S.C. § 30122

Finally, in commenting on the guideline, the Sentencing Commission recognized that there might be cases in which the defendant has entered into a conciliation agreement with the FEC. The Commission stated that the existence of such a conciliation agreement, and the extent of compliance with it, are appropriate factors for a sentencing court to consider in determining at what point within the applicable fine guideline range to sentence the defendant. However, the Commission also stated that these factors are not appropriate when the defendant began negotiations toward a conciliation agreement after becoming aware of a criminal investigation.

In addition to sentencing issues, a criminal disposition for a FECA offense might present an opportunity for the defendant to obtain a concurrent settlement from the FEC of his or her civil liability for FECA violations through what is known as a "global" plea agreement. If during plea negotiations the defendant indicates a desire to settle his or her civil FECA liability as well, the Department can assist in forwarding this request to the FEC. The normal procedure is for the federal prosecutor to contact the Public Integrity Section, which will forward the defendant's request and proposed civil settlement to the FEC for its consideration.

### 3. Examples of Application of FECA Sentencing Guidelines

The following six examples illustrate how the Department believes the guideline for campaign financing crimes would work for various FECA financing crimes. Each scenario assumes conviction after trial.[66] We have also assumed that the defendant falls under Criminal History Category I.

#### (a) Example 1: The conduit

Factual Scenario: The defendant permitted his name to be used by another person to make a contribution of $4,000 to a federal candidate ($2,000 for the primary and $2,000 for the general election) in violation of 52 U.S.C. § 30122. The funds used to make the contribution came from the other person. The aggregate value of the conduit violations is $4,000. Because the aggregate violation is at least $2,000 but does not exceed $25,000, it is a misdemeanor under 52 U.S.C. § 30109(d)(1)(A)(ii).[67]

[66] As readers know, the majority of federal prosecutions result in pleas of guilty, which generally result in a reduction of two or three levels in the defendant's total offense level under § 3E1.1 for acceptance of responsibility. We have not included calculations based on guilty pleas. A two- or three-level reduction in total offense level, especially at higher total levels, may result in a significant reduction in the recommended term of imprisonment.

[67] The offense is a Class A misdemeanor, 18 U.S.C. § 3559(a)(6), to which the guidelines apply. U.S.S.G. § 1B1.2(a).

Total Offense Level: **8**

Base Offense Level under § 2C1.8(a): **8**

Enhancement under § 2B1.1 for value not exceeding $6,50 **0**

Enhancement for number of illegal transactions under § 2C1.8(b)(4) (two conduit contributions of $2,000 each): **0**

Recommended Sentence:

(1) *Incarceration*: 0 to 6 months in Zone A.

(2) *Fine*: A minimum fine of $1,000 and a statutory maximum fine of $100,000, calculated as follows:

(a) Guideline fine: The maximum fine for a Class A misdemeanor under 18 U.S.C. § 3571(b)(5) is $100,000. However, the applicable guideline fine under U.S.S.G. § 5E1.2(c)(3) for an offense level of 8 would be a minimum of $2,000 and a maximum of $20,000. A fine above $20,0 for this offense would require an upward departure under § 5K2.0.

(b) FECA mandatory fine: Not applicable. The offense of conviction involves two violations of 52 U.S.C. § 30122, totaling $4,000. Since the violations do not exceed $25,000, this is a misdemeanor that is subject to the penalty provisions of 52 U.S.C. § 30109(d)(1)(A)(ii) and 18 U.S.C. § 3571(b)(5). Because this is a misdemeanor, the mandatory minimum and the discretionary maximum fining provisions applicable to felony conduit violations under 52 U.S.C. § 30109(d)(1)(D)(i) do not apply.

### (b) Example 2: A typical FECA crime: laundered corporate contributions

Factual Scenario: A corporate CEO contributes $50,000 in corporate funds to a federal candidate in violation of 52 U.S.C. § 30118 by laundering the money through thirteen conduits in violation of § 30122, twelve of whom gave $4,000, and one of whom gave $2,000. The defendant's motive was to fulfill a pledge. The conduct results in one § 30118 felony violation under § 30109(d)(1)(A)(i) with an aggregate value of $50,000, and one § 30122 felony violation under § 30109(d)(1)(D)(i) involving the thirteen conduit transactions. The combined aggregate value of the defendant's illegal conduct is $50,000. The conduct would be charged in two counts: one violation of § 30118 charged under § 30109(d)(1)(A)(i), and thirteen violations of § 30122 aggregated together as one offense charged under § 30109(d)(1)(D)(i).

Total Offense Level: **14**

Base Offense Level under § 2C1.8(a): **8**

Enhancement for value between $40,000 and $95,000 under § 2B1.1(b)(1)(D): **6**

Enhancement for number of illegal transactions under § 2C1.8(b)(4) (fourteen violations – one § 30118 corporate contribution crime and thirteen § 30122 conduit crimes): **0**

Recommended Sentence:

(1) *Incarceration*: 15 to 21 months in Zone D

(2) *Fine*: Between $154,000 and $540,000. Since there are two counts of conviction, the total fine would be the fine on each count added together, calculated as follows:

**(a)** § 30118 count (corporate contribution). Based on an offense level of 14, the guideline range for a fine under this count is $7,5 to $75,000. U.S.S.G. § 5E1.2(c)(3).

**(b)** § 30122 count (conduit contributions). By statute, the fine imposed under this count would be a minimum fine of $150,000 (300% of aggregate violative amount) and a maximum fine of $500,000

(1,000% of aggregate violative amount). 52 U.S.C.
§ 30109(d)(1)(D). Since these are higher fines than those permitted under U.S.S.G. § 5E1.2(c)(3), they prevail. *Id.* § 5E1.2(c)(4).

(c) Total combined fine:

(i) minimum: $7,500 + $150,000 = $162,500

(ii) maximum: $75,000 + $500,000 = $575,000

### (c) Example 3: Corporate contributor to multiple candidates through threats and coercion

Factual Scenario: The defendant is an individual who controls two corporations. The defendant gives $50,000 in corporate funds to fifty federal candidates in $1,000 amounts by laundering them through fifty corporate senior management personnel, and passes the cost of these

contributions back to the two corporations. The defendant makes clear to senior management that their success in his companies depends on their participation in the scheme. The defendant's motive is ideological – all the recipients represent causes in which he believes. The aggregate value involved in the defendant's conduct is $50,000. The conduct would be charged in two counts: one felony violation of Section 30118 charged under § 30109(d)(1)(A)(i), and fifty violations of Section 30122 aggregated together as one felony offense charged under § 30109(d)(1)(D)(i).

Total offense level: **20**

Base Offense Level under § 2C1.8(a): **8**
Enhancements for aggregate value of offense between $40,000 and $95,0 under § 2B1.1(b)(1)(D): **6**

Enhancements for number of illegal transactions under § 2C1.8(b)(4) (Fifty-two offenses – two § 30118 corporate contribution offenses and fifty § 30122 conduit offenses): **2**
Enhancement for intimidation and threats under § 2C1.8(b)(5): **4**

Recommended Sentence:

(1) *Incarceration*: 33 to 41 months in Zone D
(2) *Fine*: Because the nature of the conduct would result in convictions under both the criminal penalty applicable to conduit violations of FECA (§ 30109(d)(1)(D)), and the criminal penalty applicable to non-conduit violations of FECA (§ 30109(d)(1)(A)), the statutory

minimum and maximum penalties for conduit convictions will apply and result in enhanced fines. See Example 2 for an illustration of such a computation.

### (d) Example 4: Fundraiser possessing special skill

Factual Scenario: The defendant is a professional federal fundraiser who has attended several training courses sponsored by the Federal Election Commission and is therefore intimately familiar with the requirements and prohibitions of the Federal Election Campaign Act. The fundraiser has been retained by a federal candidate. He approaches a wealthy donor who he knows has given the candidate the maximum amount permitted by FECA, and suggests that the donor make a further contribution by permitting the candidate and his staffers to use the donor's personal jet for campaign purposes and without billing the campaign for its use. The ensuing illegal "in-kind" contribution is valued at $225,000, for which the fundraiser is liable as an aider and abettor. The aggregate value of the offense is $225,000, consisting of one felony violation of 52 U.S.C. § 30116(a)(1)(A), charged under Section 30109(d)(1)(A)(i) and 18 U.S.C. § 2.

Total Offense Level: **20**

Base Offense Level under § 2C1.8(a): **8**

Enhancement for value between $150,000 and $250,000 under § 2B1.1(b)(1)(F): **10**

Enhancement for number of transactions under § 2C1.8(b)(4) (one § 30116 violation): **0**

Enhancement for use of special skill under § 3B1.3: **2**

Recommended Sentence:

(1) *Incarceration*: 33 to 41 months in Zone D.

(2) *Fine*: between $15,0 and $150,000, calculated under § 5E1.2(c)(3).[68]

### (e) Example 5: Major political party donor seeking a benefit from the government

Factual Scenario: A wealthy individual wishes to contribute to a national political party committee in order to win political influence to obtain a pardon for his best friend. Under FECA, as amended by the Bipartisan Campaign Reform Act, individuals may give only $25,000 per year to national political party committees, and national political party committees cannot accept soft money. The individual therefore donates the remaining $225,000 to the national party committee by giving the committee the benefit of his personal jet to fly committee staffers around the country, at a value of $225,000, in violation of 2 U.S.C. § 441a(a)(1)(B). The aggregate value of the offense is $225,000 charged under Section 437g(d)(1)(A)(i).

Total Offense Level: **22**

Base Offense Level under § 2C1.8(a): **8**

Enhancement for value between $200,000 and $400,000 under § 2B1.1(b)(1)(G): **12**

Enhancement for number of illegal transactions under § 2C1.8(b)(4) (one $225,000 excessive contribution to a national party committee): **0**

---

[68] There were no conduit offenses involved in this example. Therefore the mandatory minimum fine and maximum fining range under Section 30109(d)(1)(D) do not apply.

Enhancement for intent to obtain a specific non-monetary federal benefit from the government under
§ 2C1.8(b)(3): **2**

Recommended Sentence:
(1) *Incarceration*: 41 to 51 months in Zone D.
(2) *Fine*: Between $10,000 and $100,000, pursuant to § 5E1.2(c)(3).

**(f) Example 6: Foreign agent who gives funds from foreign government to non-federal candidates to obtain a specific benefit from the government**

Factual Scenario: The defendant is an agent of a foreign government that is currently seeking United States diplomatic recognition of its annexation of neighboring territory it occupied during a recent military action. In the hopes of garnering political support for this cause, the defendant is given $250,000 by his foreign government principal, which he then gives in $50,000 increments to five candidates seeking governorships of five large states within the United States that impose no limits on political contributions. To conceal his identity, the defendant launders the funds through five individuals who have names that are ethnically identifiable with his foreign government principal, but who have resident alien status under U.S. law. The defendant's conduct results in five violations of 52 U.S.C. § 30121 having an aggregate value of $250,000,

charged together as one felony violation of Section 30109(d)(1)(A)(i).[69]

Total Offense Level: **24**

Base Offense Level: **8**

Enhancements for aggregate value of offense between $150,000 and $250,000 under § 2B1.1(b)(1)(G): **10**

Enhancements for foreign government source: **4**

Enhancements for number of illegal transactions (five § 30121 offenses): **0**

Enhancement for intent to achieve a non-monetary benefit from the Government: **2**

Recommended Sentence:

(1) *Incarceration*: 51 to 63 months in Zone D. (This sentence would be capped at 60 months, the maximum term permitted under Section 30109(d)(1)(A)).

(2) *Fine*: $20,000 to $200,000, calculated under Section 5E1.2(c)(3).

[69] Although in BCRA Congress made clear that the prohibition in Section 30121 on contributions from foreign nationals also reached donations to candidates for non-federal office, BCRA did not extend Section 30122 to encompass conduit donations to non-federal candidates.

## C. CONVICTIONS OF CAMPAIGN FINANCING VIOLATIONS ADDRESSED UNDER ALTERNATIVE THEORIES OF PROSECUTION

### 1. Conspiracy to Disrupt and Impede the Federal Election Commission

A scheme involving two or more participants designed in part to thwart the statutory duties of the Federal Election Commission to enforce FECA's reporting requirements and prohibitions and to provide the public with accurate data regarding the financial activities by federal candidates and entities supporting them can be prosecuted as a conspiracy under 18 U.S.C. § 371. The object of such a conspiracy would be to disrupt and to impede the FEC's ability to enforce FECA's requirements and prohibitions, and its statutory duty to make available to the public accurate information regarding contributions and expenditures made to influence the election of federal candidates.

Such offenses are governed by U.S.S.G. § 2C1.1. This guideline carries a base offense level of twelve or fourteen and an enhancement if the conduct involved an elected official or a person in a high-level decision making or sensitive position. In addition, if the defendant's conduct involved "pervasive corruption of a governmental function, process, or office that may cause loss of public confidence in government," an upward departure may be warranted. 52 U.S.C. § 2C1.1, cmt. n.7.

### 2. False Statements to the Federal Election Commission and False Internal Records

Many types of campaign financing crimes may also be charged as willfully causing false statements to be made to a federal agency under 18 U.S.C. § 1001(a)(2). Such false statement

offenses occurring after January 25, 2003, are governed by FECA guideline, U.S.S.G. § 2C1.8, pursuant to the cross-reference in U.S.S.G. § 2B1.1(c)(3) for false statements. Additionally, both false internal campaign records and false FEC filings may be charged as an obstruction under 18 U.S.C. § 1519, which is governed by U.S.S.G. §2J1.2, which, with a base offense level of 14, likely provides the highest guideline range available in campaign finance cases.

### 3. Embezzlement of Campaign Funds

On occasion, treasurers and other agents of candidates or political committees, and at times even candidates, convert campaign contributions to their personal use. If the conversion involves funds from a candidate's committee, it is prohibited by FECA. 52 U.S.C. § 30114. However, if the embezzlement is from a political committee that is not a candidate's committee, FECA prohibition in Section 30114 does not apply. In any event, campaign embezzlements may be prosecuted under the mail or wire fraud statutes, as a scheme to obtain money or property by deceit (18 U.S.C. §§ 1341, 1343) Section 30114 crimes aggregating $25,000 or more are felonies and for sentencing purposes fall under FECA guideline § 2C1.8. This is the preferred approach if the victim is a candidate's committee and the amount embezzled is at least $25,000.

For embezzlements from political committees that are not candidate committees, and for embezzlements from candidate committees involving amounts under $25,000, the mail and wire fraud statutes continue to be useful alternatives. Violations of Sections 1341 and 1343 are governed by the fraud guideline, U.S.S.G. § 2B1.1, which carries a base offense level of 6 with possible enhancements under the fraud loss table, § 2B1.1(b)(1).

Finally, a campaign embezzlement can be addressed under the false statements statute, 18 U.S.C. §§ 1001 and 1519, and 18 U.S.C. § 2 (willfully causing an offense). This is because the embezzlement is concealed from the committee's treasurer, who is required to file detailed reports with the FEC regarding the committee's receipts and disbursements. 52 U.S.C. § 30104(b). Thus, a person who embezzles contributions from a committee willfully causes the committee's treasurer to create false internal records and to submit false information to the FEC regarding the actual use of the funds, in violation of both the reporting requirements of FECA and 18 U.S.C. §§ 1001 and 1519. False statements involving FECA violations fall under FECA guideline, U.S.S.G. § 2C1.8.

## D. OBLIGATION TO REPORT FELONY CONVICTIONS TO STATE ELECTION OFFICIALS

The National Voter Registration Act of 1993 requires United States Attorneys' Offices to send a written notice whenever a defendant is convicted of a felony to the chief state election official in the state where the defendant resides. 52 U.S.C. § 20507(g). The notice must include basic information regarding the defendant, the court, the offense, and the sentence. 52 U.S.C. § 20507(g)(2). In addition, if the conviction is overturned, the election official must be sent written notice of the vacation of conviction. 52 U.S.C. § 20507(g)(4).

This information is important to election authorities who determine a person's eligibility to vote. You may identify the appropriate state election official using the website www.nased.org.

# CHAPTER SEVEN

# CONCLUSION

## WHY PROSECUTING ELECTION CRIMES IS IMPORTANT

We conclude this book with an editorial printed in the March 19, 2004, edition of Big Sandy News, Eastern Kentucky, concerning a series of election fraud prosecutions in a rural jurisdiction in the Appalachian Mountains of Eastern Kentucky. The editorial comments on the sentencing of the County Judge-Executive of Knott County and a campaign worker for vote-buying. It appears here with the permission of The Big Sandy News, whose late Publisher and Editor, Scott Perry, led a strong charge against public corruption and took a proactive role in this difficult and ongoing fight.[70]

In Kentucky, county judge-executives are the chief operating officers of county government, and, as such, occupy a position of substantial power. The jury's conviction of Knott County Judge-Executive Donnie Newsome was the culmination of a series of vote-buying cases that were jointly prosecuted by the United States Attorney's Office for the Eastern District of Kentucky and the Public Integrity Section during 2003 and early 2004. The charges arose from a scheme to pay individuals for voting in the 1998 Kentucky federal primary in violation of 52 U.S.C. § 10307(c). The investigation ultimately resulted in the indictment of 17 defendants. Thirteen of the defendants were convicted, three were acquitted, and one defendant's case was dismissed on a motion to dismiss made by the government.

---

[70] The Big Sandy News, Eastern Kentucky's oldest newspaper and the most widely circulated non-daily in Kentucky, was established in 1885 in Louisa, Kentucky.

Subsequent to his conviction, Judge-Executive Newsome cooperated with the government and received a sentence reduction recommendation under U.S.S.G. § 5K1.1. On March 16, 2004, he was sentenced to serve 26 months in prison.[71]

The following editorial, reprinted here in its entirety, presents a concise and eloquent statement of why the investigation and prosecution of electoral corruption are important law enforcement priorities of the Justice Department.

*Vote fraud sentencing sad, encouraging*
*– by Susan Allen*

*Tuesday's sentencing in federal court of Knott County Judge-Executive Donnie Newsome and campaign worker Willard Smith on vote buying charges was both a sad and encouraging day for Eastern Kentucky.*

*Sad the people of Knott County were effectively robbed of their voting rights by Newsome and others dolling out cash to buy a public office.*

*Sad that, as Federal Judge Danny C. Reeves pointed out, some people in Knott and other counties think that elections are supposed to be bought and the only reason to go to the polls is to get their pay off.*

*Sad those seeking public office in Knott County, and most assuredly in other counties, target poor, handicapped,*

[71] The sentencing judge stated that had it not been for the prosecution's recommendation for a downward departure, he was prepared to sentence Newsome to five years of imprisonment.

*addicted and uneducated voters to carry out their scheme to secure public office and a hefty paycheck.*

*Sad that voters in Knott and other counties have been reduced by years and years of political corruption to truly believing that selling their vote is not wrong, it's the norm.*

*Sad that Eastern Kentuckians have pretty much been left to the mercy of the political machines which serve as dictators of their lives, from their home towns all the way to Frankfort.*

*Sad that generations sacrificed their lives and their children's lives to the political bosses for mere bones from their local leaders while now their kids are dying from drug overdoses which, we strongly suspect, are directly tied to the years of iniquity and demoralization.*

*Sad that even today some elected officials continue the abuse and either refuse or can't comprehend the impact of their past and current atrocities against their own people.*

*Sad that Judge Reeves could see and completely understand during just a one week trial the utter hopelessness and apathy in the area people feel regarding the so-called democratic process.*

*Sad that our state lawmakers have piddled away their time during this legislative session on petty political issues without even proposing laws that would bar convicted felons, especially vote buyers from retaining their offices while appealing their verdicts.*

*Sad that Donnie Newsome continues to rule Knott County from a jail cell.*

*Tuesday's events were encouraging in that prosecutors [AUSA E.D. Ky.] Tom Self and [Public Integrity Section Trial Attorney] Richard Pilger were willing to fight the hard battle for the people of Knott County, which hopefully will lead to at least a grassroots effort for people to take back their towns.*

*Encouraging that some light has been shed on the workings of the dark political underworld which might shock the good people of Eastern Kentucky into action, at least for their children's future.*

*Encouraging that what might be perceived as a baby step with Newsome's conviction could finally lead to that giant step Eastern Kentuckians must surely be ready to take to recapture control of their own destinies.*

*Encouraging that federal authorities have pledged to continue the fight they have started to restore to the people the right to govern themselves without dealing with a stacked deck.*

*Encouraging that Judge Reeves and prosecutors did see that the Knott Countians who sold their votes, in some cases for food, were victims of Newsome's plot and didn't need to be punished further.*

*Encouraging that there's some branch of government, in this case on the federal level, not shy about taking on political power houses, knowing the obstacles in their way will be many.*

*Encouraging that Newsome's lips have loosened regarding others involved in similar schemes to buy public office, even though we suspect it has nothing to do with righting the wrongs, only a self-serving move to spend less days behind bars.*

*Encouraging that maybe, for once, we are not in this fight alone and have a place to turn to for help when we are willing to stand up to the machine.*

*The feds have helped us take that first step toward getting back what is rightfully ours which has been traded away by others in the past in back room deals. Not only do they need our help, WE need our help.*

*This time, let's not let ourselves down.*

# APPENDIX A

## EXCERPT FROM *McCONNELL v. F ELECTION COMMISSION*

In 2003, the Supreme Court presented a concise history of the federal campaign financing laws contained in the Federal Election Campaign Act of 1971, as amended, 2 U.S.C. §§ 431-455 (FECA). It did so in the context of upholding the constitutionality of the vast majority of restrictions that were added to these laws in 2002 by the Bipartisan Campaign Reform Act (BCRA) to close large gaps in statutory coverage that had emerged over the past three decades since FECA's original enactment. *McConnell v. Fed. Election Comm'n*, 540 U.S. 93 (2003). Set forth below are pertinent excerpts from the Supreme Court's discussion of our country's regulation of campaign financing and the events that led up to enactment of BCRA in 2002. *Id.* at 115-132.[72]

* * *

> More than a century ago the "sober-minded Elihu Root" advocated legislation that would prohibit political contri- butions by corporations in order to prevent "'the great aggregations of wealth, from using their corporate funds, directly or indirectly,'" to elect legislators who would "'vote for their protection and the advancement of their interests as against those of the public.'" *United States v. Automobile Workers*, 352 U.S. 567, 571 (1957) (quoting E. Root, Addresses on Government and Citizenship 143 (R. Bacon & J. Scott eds.1916))....

[72] The text presented here has been edited for conciseness. For example, all footnotes have been omitted, as have other court citations, extended recitations of legislative citations, and quotations from lower court decisions that have little direct bearing on the Court's ultimate rulings on the legal and constitutional issues involved. Interested readers may wish to consult the full decision for the entire content of the Court's discussion.

[T]he first [campaign financing] enactment responded to President Theodore Roosevelt's call for legislation forbidding all contributions by corporations "'to any political committee or for any political purpose.'" *Ibid.* The resulting 1907 statute completely banned corporate contributions of "money . . . in connection with" any federal election. Tillman Act, ch. 420, 34 Stat. 864. Congress soon amended the statute to require the public disclosure of certain contributions and expenditures and to place "maximum limits on the amounts that congressional candidates could spend in seeking nomination and election." *Automobile Workers*, *supra*, at 575-76.

In 1925 Congress [enacted the Federal Corrupt Practices Act, which] extended the prohibition of "contributions" "to include 'anything of value,' and made acceptance of a corporate contribution as well as the giving of such a contribution a crime." *Fed. Election Comm'n v. Nat'l Right to Work Comm.,* 459 U.S. 197, 209 (1982 During the debates preceding that amendment, a leading Senator characterized "'the apparent hold on political parties which business interests and certain organizations seek and sometimes obtain by reason of liberal campaign contributions'" as "'one of the great political evils of the time.'" *Automobile Workers*, *supra*, at 576 (quoting 65 Cong. Rec. 9507-9508 (1924)). We upheld the amended statute against a constitutional challenge, observing that "[t]he power of Congress to protect the election of President and Vice President from corruption being clear, the choice of means to that end presents a question primarily addressed to the judgment of Congress." *Burroughs v. United States*, 290 U.S. 534, 547 (1934).

Congress' historical concern with the "political potentialities of wealth" and their "untoward consequences for

the democratic process," *Automobile Workers*, *supra*, at 577-78, has long reached beyond corporate money. During and shortly after World War II, Congress reacted to the "enormous financial outlays" made by some unions in connection with national elections. 352 U.S., at 579. Congress first restricted union contributions in the Hatch Act, 18 U.S.C. § 610, and it later prohibited "union contributions in connection with federal elections . . . altogether." *Nat'l Right to Work*, *supra*, at 209 (citing War Labor Disputes Act, Smith-Connally Anti-Strike Act, ch. 144, § 9, 57 Stat. 167). Congress subsequently extended that prohibition to cover unions' election-related expenditures as well as contributions, and it broadened the coverage of federal campaigns to include both primary and general elections. Labor Management Relations Act, 1947 (Taft-Hartley Act), 61 Stat. 136. See *Automobile Workers*, *supra*, at 578-84. During the consideration of those measures, legislators repeatedly voiced their concerns regarding the pernicious influence of large campaign contributions. As we noted in a unanimous opinion recalling this history, Congress' "careful legislative adjustment of the federal electoral laws, in a 'cautious advance, step by step,' to account for the particular legal and economic attributes of corporations and labor organizations warrants considerable deference." *Nat'l Right to Work*, *supra*, at 209.

In early 1972 Congress continued its steady improvement of the national election laws by enacting FECA. As first enacted, that statute required disclosure of all contributions exceeding $100 and of expenditures by candidates and political committees that spent more than $1,000 per year. *Id.*, at 11-19 It also prohibited contributions made in the name of another person, *id.*, at 19, and by Government contractors, *id.*, at 10. The law ratified the earlier prohibition on the use of corporate and union

general treasury funds for political contributions and expenditures, but it expressly permitted corporations and unions to establish and administer separate segregated funds (commonly known as political action committees, or PACs) for election-related contributions and expenditures. *Id.*, at 12-13. *See Pipefitters v. United States*, 407 U.S. 385, 409-(1972).

As the 1972 presidential elections made clear, however, FECA's passage did not deter unseemly fundraising and campaign practices. Evidence of those practices persuaded Congress to enact the Federal Election Campaign Act Amendments of 1974. Reviewing a constitutional challenge to the amendments, the Court of Appeals for the District of Columbia Circuit described them as "by far the most comprehensive ... reform legislation [ever] passed by Congress concerning the election of the President, Vice- President and Members of Congress." *Buckley v. Valeo*, 519 F.2d 821, 831 (D.C. Cir. 1975) (en banc) (*per curiam*).

The 1974 amendments closed the loophole that had allowed candidates to use an unlimited number of political committees for fundraising purposes and thereby to circumvent the limits on individual committees' receipts and disbursements. They also limited individual political contributions to any single candidate to $1,000 per election, with an overall annual limitation of $25,000 by any contributor; imposed ceilings on spending by candidates and political parties for national conventions; required reporting and public disclosure of contributions and expenditures exceeding certain limits; and established the Federal Election Commission (FEC) to administer and enforce the legislation. *Id.*, at 831-3

The Court of Appeals upheld the 1974 amendments almost in their entirety. It concluded that the clear and compelling interest in preserving the integrity of the electoral process provided a sufficient basis for sustaining the substantive provisions of the Act. The court's opinion relied heavily on findings that large contributions facilitated access to public officials and described methods of evading the contribution limits that had enabled contributors of massive sums to avoid disclosure . . .. *Id., at* 837-4

The Court of Appeals upheld the provisions establishing contribution and expenditure limitations on the theory that they should be viewed as regulations of conduct rather than speech. *Id.*, at 840-41. This Court, however, concluded that each set of limitations raised serious--though different--concerns under the First Amendment. *Buckley v. Valeo*, 424 U.S. 1, 14-23 (1976) (*per curiam*). We treated the limitations on candidate and individual expenditures as direct restraints on speech, but we observed that the contribution limitations, in contrast, imposed only "a marginal restriction upon the contributor's ability to engage in free communication." *Id.*, at 20-22. Considering the "deeply disturbing examples" of corruption related to candidate contributions discussed in the Court of Appeals' opinion, we determined that limiting contributions served an interest in protecting "the integrity of our system of representative democracy." *Id.*, at 26-27 In the end, the Act's primary purpose –"to limit the actuality and appearance of corruption resulting from large individual financial contributions"– provided a constitutionally sufficient justification for the $1,000 contribution limitation." *Id.*, at 26.

We prefaced our analysis of the $1,000 limitation on expenditures by observing that it broadly encompassed

every expenditure "'relative to a clearly identified candidate.'" *Id.*, at 39 (quoting 18 U.S.C. § 608(e)(1) (1970 ed., Supp. IV)). To avoid vagueness concerns we construed that phrase to apply only to "communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office." 424 U.S., at 42-44 We concluded, however, that as so narrowed, the provision would not provide effective protection against the dangers of *quid pro quo* arrangements, because persons and groups could eschew expenditures that expressly advocated the election or defeat of a clearly identified candidate while remaining "free to spend as much as they want to promote the candidate and his views." *Id.*, at 45 We also rejected the argument that the expenditure limits were necessary to prevent attempts to circumvent the Act's contribution limits, because FECA already treated expenditures controlled by or coordinated with the candidate as contributions, and we were not persuaded that independent expenditures posed the same risk of real or apparent corruption as coordinated expenditures. *Id.*, at 46-47. We therefore held that Congress' interest in preventing real or apparent corruption was inadequate to justify the heavy burdens on the freedoms of expression and association that the expenditure limits imposed. We upheld all of the disclosure and reporting requirements in the Act that were challenged on appeal to this Court after finding that they vindicated three important interests: providing the electorate with relevant information about the candidates and their supporters; deterring actual corruption and discouraging the use of money for improper purposes; and facilitating enforcement of the prohibitions in the Act. *Id.*, at 66-68. In order to avoid an overbreadth problem, however, we placed the same narrowing construction on the term "expenditure" in the disclosure context that we had adopted in the context of the expenditure limitations. Thus, we construed the reporting requirement for persons making expenditures of more than $100 in a year "to reach only funds used for

communications that expressly advocate the election or defeat of a clearly identified candidate." *Id.*, at 80.

Our opinion in *Buckley* addressed issues that primarily related to contributions and expenditures by individuals, since none of the parties challenged the prohibition on contributions by corporations and labor unions. We noted, however, that the statute authorized the use of corporate and union resources to form and administer segregated funds that could be used for political purposes. *Id.*, at 28-29, n.31; *see also* n.3, *supra*.

Three important developments in the years after our decision in Buckley persuaded Congress that further legislation was necessary to regulate the role that corporations, unions, and wealthy contributors play in the electoral process. As a preface to our discussion of the specific provisions of BCRA, we comment briefly on the increased importance of "soft money," the proliferation of "issue ads," and the disturbing findings of a Senate investigation into campaign practices related to the 1996 federal elections.

*Soft Money*

Under FECA, "contributions" must be made with funds that are subject to the Act's disclosure requirements and source and amount limitations. Such funds are known as "federal" or "hard" money. FECA defines the term "contribution," however, to include only the gift or advance of anything of value "made by any person for the purpose of influencing any election for *Federal* office." 2 U.S.C. § 431(8)(A)(i) (emphasis added). Donations made solely for the purpose of influencing state or local elections are therefore unaffected by FECA's requirements and prohibitions. As

a result, prior to the enactment of BCRA, federal law permitted corporations and unions, as well as individuals who had already made the maximum permissible contributions to federal candidates, to contribute "non-federal money"– also known as "soft money" to political parties for activities intended to influence state or local elections.

Shortly after *Buckley* was decided, questions arose concerning the treatment of contributions intended to influence both federal and state elections. Although a literal reading of FECA's definition of "contribution" would have required such activities to be funded with hard money, the FEC ruled that political parties could fund mixed-purpose activities – including get-out-the-vote drives and generic party advertising – in part with soft money. In 1995 the FEC concluded that the parties could also use soft money to defray the costs of "legislative advocacy media advertisements," even if the ads mentioned the name of a federal candidate, so long as they did not expressly advocate the candidate's election or defeat. FEC Advisory Op. 1995-25.

> [Footnote 7:] ... In 1990 the FEC . . . promulgat[ed] fixed allocation rates. 11 CFR § 106.5 (1991). The regulations required the Republican National Committee (RNC) and Democratic National Committee (DNC) to pay for at least 60% of mixed-purpose activities (65% in presidential election years) with funds from their federal accounts. § 106.5(b)(2). By contrast, the regulations required state and local committees to allocate similar expenditures based on the ratio of federal to non-federal offices on the State's ballot, § 106.5(d)(1), which in practice meant that they could expend a substantially greater proportion of soft money than

national parties to fund mixed-purpose activities affecting both federal and state elections.

As the permissible uses of soft money expanded, the amount of soft money raised and spent by the national political parties increased exponentially. Of the two major parties' total spending, soft money accounted for 5% ($21.6 million) in 1984, 11% ($45 million) in 1988, 16% ($80 million) in 1992, 30% ($272 million) in 1996, and 42% ($498 million) in 2000. The national parties transferred large amounts of their soft money to the state parties, which were allowed to use a larger percentage of soft money to finance mixed-purpose activities under FEC rules. In the year 2000, for example, the national parties diverted $280 million – more than half of their soft money – to state parties.

Not only were such soft-money contributions often designed to gain access to federal candidates, but they were in many cases solicited by the candidates themselves. Candidates often directed potential donors to party committees and tax-exempt organizations that could legally accept soft money. For example, a federal legislator running for reelection solicited soft money from a supporter by advising him that even though he had already "'contributed the legal maximum'" to the campaign committee, he could still make an additional contribution to a joint program supporting federal, state, and local candidates of his party. Such solicitations were not uncommon.

The solicitation, transfer, and use of soft money thus enabled parties and candidates to circumvent FECA's limitations on the source and amount of contributions in connection with federal elections.

*Issue Advertising*

In *Buckley* we construed FECA's disclosure and reporting requirements, as well as its expenditure limitations, "to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." 424 U.S., at 80. As a result of that strict reading of the statute, the use or omission of "magic words" such as "Elect John Smith" or "Vote Against Jane Doe" marked a bright statutory line separating "express advocacy" from "issue advocacy." *See id.*, at 44, n.52. Express advocacy was subject to FECA's limitations and could be financed only using hard money. The political parties, in other words, could not use soft money to sponsor ads that used any magic words, and corporations and unions could not fund such ads out of their general treasuries. So-called issue ads, on the other hand, not only could be financed with soft money, but could be aired without disclosing the identity of, or any other information about, their sponsors.

While the distinction between "issue" and express advocacy seemed neat in theory, the two categories of advertisements proved functionally identical in important respects. Both were used to advocate the election or defeat of clearly identified federal candidates, even though the so-called issue ads eschewed the use of magic words. Little difference existed, for example, between an ad that urged viewers to "Vote Against Jane Doe" and one that condemned Jane Doe's record on a particular issue before exhorting viewers to "call Jane Doe and tell her what you think." Indeed, campaign professionals testified that the most effective campaign ads, like the most effective commercials for products such as Coca-Cola, should, and did, avoid the use of the magic words. Moreover, the conclusion that such ads were specifically intended to affect election

results was confirmed by the fact that almost all of them aired in the 60 days immediately preceding a federal election. Corporations and unions spent hundreds of millions of dollars of their general funds to pay for these ads, and those expenditures, like soft-money donations to the political parties, were unregulated under FECA. Indeed, the ads were attractive to organizations and candidates precisely because they were beyond FECA's reach, enabling candidates and their parties to work closely with friendly interest groups to sponsor so-called issue ads when the candidates themselves were running out of money…

Because FECA's disclosure requirements did not apply to so-called issue ads, sponsors of such ads often used misleading names to conceal their identity. "Citizens for Better Medicare," for instance, was not a grassroots organization of citizens, as its name might suggest, but was instead a platform for an association of drug manufacturers. And "Republicans for Clean Air," which ran ads in the 2000 Republican Presidential primary, was actually an organization consisting of just two individuals – brothers who together spent $25 million on ads supporting their favored candidate.

While the public may not have been fully informed about the sponsorship of so-called issue ads, the record indicates that candidates and officeholders often were. A former Senator confirmed that candidates and officials knew who their friends were and "sometimes suggest[ed] that corporations or individuals make donations to interest groups that run 'issue ads.'" As with soft-money contributions, political parties and candidates used the availability of so-called issue ads to circumvent FECA's limitations, asking donors who contributed their permitted quota of hard money

to give money to non-profit corporations to spend on "issue" advocacy.

*Senate Committee Investigation*

In 1998 the Senate Committee on Governmental Affairs issued a six-volume report summarizing the results of an extensive investigation into the campaign practices in the 1996 federal elections. The report gave particular attention to the effect of soft money on the American political system, including elected officials' practice of granting special access in return for political contributions.

The committee's principal findings relating to Democratic Party fundraising were set forth in the majority's report, while the minority report primarily described Republican practices. The two reports reached consensus, however, on certain central propositions. They agreed that the "soft money loophole" had led to a "meltdown" of the campaign finance system that had been intended "to keep corporate, union and large individual contributions from influencing the electoral process." One Senator stated that "the hearings provided overwhelming evidence that the twin loopholes of soft money and bogus issue advertising have virtually destroyed our campaign finance laws, leaving us with little more than a pile of legal rubble."

The report was critical of both parties' methods of raising soft money, as well as their use of those funds. It concluded that both parties promised and provided special access to candidates and senior Government officials in exchange for large soft-money contributions. The committee majority described the White House coffees that rewarded major donors with access to President Clinton, and the courtesies extended to an international businessman

named Roger Tamraz, who candidly acknowledged that his donations of about $300,000 to the DNC and to state parties were motivated by his interest in gaining the Federal Government's support for an oil-line project in the Caucasus. The minority described the promotional materials used by the RNC's two principal donor programs, "Team 100" and the "Republican Eagles," which promised "special access to high-ranking Republican elected officials, including governors, senators, and representatives." One fundraising letter recited that the chairman of the RNC had personally escorted a donor on appointments that "'turned out to be very significant in legislation affecting public utility holding companies'" and made the donor "'a hero in his industry.'"

In 1996 both parties began to use large amounts of soft money to pay for issue advertising designed to influence federal elections. The committee found such ads highly problematic for two reasons. Since they accomplished the same purposes as express advocacy (which could lawfully be funded only with hard money), the ads enabled unions, corporations, and wealthy contributors to circumvent protections that FECA was intended to provide. Moreover, though ostensibly independent of the candidates, the ads were often actually coordinated with, and controlled by, the campaigns. The ads thus provided a means for evading FECA's candidate contribution limits.

The report also emphasized the role of state and local parties. While the FEC's allocation regime permitted national parties to use soft money to pay for up to 40% of the costs of both generic voter activities and issue advertising, they allowed state and local parties to use larger percentages of soft money for those purposes. For that reason, national parties often made substantial transfers of soft money to "state and local political parties for 'generic

voter activities' that in fact ultimately benefit[ed] federal candidates because the funds for all practical purposes remain[ed] under the control of the national committees." The report concluded that "[t]he use of such soft money thus allow[ed] more corporate, union treasury, and large contributions from wealthy individuals into the system."

The report discussed potential reforms, including a ban on soft money at the national and state party levels and restrictions on sham issue advocacy by non-party groups. The majority expressed the view that a ban on the raising of soft money by national party committees would effectively address the use of union and corporate general treasury funds in the federal political process only if it required that candidate-specific ads be funded with hard money. The minority similarly recommended the elimination of soft-money contributions to political parties from individuals, corporations, and unions, as well as "reforms addressing candidate advertisements masquerading as issue ads."

* * *

The findings contained in the 1998 report by the Senate Committee on Governmental Affairs were the basis for the Bipartisan Campaign Reform Act passed four years later.

# APPENDIX B

## STATUTES

## EXCERPTS FROM TITLE 18 OF THE UNITED STATES CODE

### § 241 Conspiracy against rights

If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or

If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured–

They shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, they shall be fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death.

* * * * *

### § 242. Deprivation of rights under color of law

Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall

be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death.

* * * * *

**§ 245. Federally protected activities**

**(b)** Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with–

**(1)** any person because he is or has been, or in order to intimidate such person or any other person or any class of persons from–

**(A)** voting or qualifying to vote, qualifying or campaigning as a candidate for elective office, or qualifying or acting as a poll watcher, or any legally authorized election official, in any primary, special, or general election;

shall be fined under this title, or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire shall be fined under this title, or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death.

* * * * *

### § 371. Conspiracy to commit offense or to defraud United States

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

* * * * *

### § 592. Troops at polls

Whoever, being an officer of the Army or Navy, or other person in the civil, military, or naval service of the United States, orders, brings, keeps, or has under his authority or control any troops or armed men at any place where a general or special election is held, unless such force be necessary to repel armed enemies of the United States, shall be fined under this title or imprisoned not more than five years, or both; and be disqualified from holding any office of honor, profit, or trust under the United States.

This section shall not prevent any officer or member of the armed forces of the United States from exercising the right of suffrage in any election district to which he may belong, if otherwise qualified according to the laws of the State in which he offers to vote.

* * * * *

### § 593. Interference by armed forces

Whoever, being an officer or member of the Armed Forces of the United States, prescribes or fixes or attempts to prescribe or fix, whether by proclamation, order or otherwise, the qualifications of voters at any election in any State; or

Whoever, being such officer or member, prevents or attempts to prevent by force, threat, intimidation, advice or otherwise any qualified voter of any State from fully exercising the right of suffrage at any general or special election; or

Whoever, being such officer or member, orders or compels or attempts to compel any election officer in any State to receive a vote from a person not legally qualified to vote; or

Whoever, being such officer or member, imposes or attempts to impose any regulations for conducting any general or special election in a State, different from those prescribed by law; or

Whoever, being such officer or member, interferes in any manner with an election officer's discharge of his duties–

Shall be fined under this title or imprisoned not more than five years, or both; and disqualified from holding any office of honor, profit or trust under the United States.

This section shall not prevent any officer or member of the Armed Forces from exercising the right of suffrage in any district to which he may belong, if otherwise qualified according to the laws of the State of such district.

* * * * *

### § 594. Intimidation of voters

Whoever intimidates, threatens, coerces, or attempts to intimidate, threaten, or coerce, any other person for the purpose of interfering with the right of such other person to vote or to vote as he may choose, or of causing such other person to vote for, or not to vote for, any candidate for the office of President, Vice President, Presidential elector, Member of the Senate, Member of the House of Representatives, Delegate from the District of Columbia, or Resident Commissioner, at any election held solely or in part for the purpose of electing such candidate, shall be fined under this title or imprisoned not more than one year, or both.

* * * * *

### § 595. Interference by administrative employees of Federal, State, or Territorial Governments

Whoever, being a person employed in any administrative position by the United States, or by any department or agency thereof, or by the District of Columbia or any agency or instrumentality thereof, or by any State, Territory, or Possession of the United States, or any political subdivision, municipality, or agency thereof, or agency of such political subdivision or municipality (including any corporation owned or controlled by any State, Territory, or Possession of the United States or by any such political subdivision, municipality, or agency), in connection with any activity which is financed in whole or in part by loans or grants made by the United States, or any department or agency thereof, uses his official authority for the purpose of interfering with, or affecting, the nomination or the election of any candidate for the office of President, Vice President, Presidential elector, Member of the Senate, Member of the House of Representatives, Delegate from the District of Columbia, or Resident Commissioner, shall be fined under this title or imprisoned not more than one year, or both.

This section shall not prohibit or make unlawful any act by any officer or employee of any educational or research institution, establishment, agency, or system which is supported in whole or in part by any state or political subdivision thereof, or by the District of Columbia or by any Territory or Possession of the United States; or by any recognized religious, philanthropic or cultural organization.

* * * * *

### § 596. Polling armed forces

Whoever, within or without the Armed Forces of the United States, polls any member of such forces, either within or without the United States, either before or after he executes any ballot under any Federal or State law, with reference to his choice of or his vote for any candidate, or states, publishes, or releases any result of any purported poll taken from or among the members of the Armed Forces of the United States or including within it the statement of choice for such

candidate or of such votes cast by any member of the Armed Forces of the United States, shall be fined under this title or imprisoned for not more than one year, or both.

The word "poll" means any request for information, verbal or written, which by its language or form of expression requires or implies the necessity of an answer, where the request is made with the intent of compiling the result of the answers obtained, either for the personal use of the person making the request, or for the purpose of reporting the same to any other person, persons, political party, unincorporated association or corporation, or for the purpose of publishing the same orally, by radio, or in written or printed form.

* * * * *

### § 597. Expenditures to influence voting

Whoever makes or offers to make an expenditure to any person, either to vote or withhold his vote, or to vote for or against any candidate; and

Whoever solicits, accepts, or receives any such expenditure in consideration of his vote or the withholding of his vote–

Shall be fined under this title or imprisoned not more than one year, or both; and if the violation was willful, shall be fined under this title or imprisoned not more than two years, or both.

* * * * *

### § 598. Coercion by means of relief appropriations

Whoever uses any part of any appropriation made by Congress for work relief, relief, or for increasing employment by providing loans and grants for public-works projects, or exercises or administers any authority conferred by any Appropriation Act for the purpose of interfering with, restraining, or coercing any individual in the exercise of his right to vote at any election, shall be fined under this title or imprisoned not more than one year, or both.

* * * * *

## § 599. Promise of appointment by candidate

Whoever, being a candidate, directly or indirectly promises or pledges the appointment, or the use of his influence or support for the appointment of any person to any public or private position or employment, for the purpose of procuring support in his candidacy shall be fined under this title or imprisoned not more than one year, or both; and if the violation was willful, shall be fined under this title or imprisoned not more than two years, or both.

* * * * *

## § 600. Promise of employment or other benefit for political activity

Whoever, directly or indirectly, promises any employment, position, compensation, contract, appointment, or other benefit, provided for or made possible in whole or in part by any Act of Congress, or any special consideration in obtaining any such benefit, to any person as consideration, favor, or reward for any political activity or for the support of or opposition to any candidate or any political party in connection with any general or special election to any political office, or in connection with any primary election or political convention or caucus held to select candidates for any political office, shall be fined under this title or imprisoned not more than one year, or both.

* * * * *

## § 601. Deprivation of employment or other benefit for political contribution

**(a)** Whoever, directly or indirectly, knowingly causes or attempts to cause any person to make a contribution of a thing of value (including services) for the benefit of any candidate or any political party, by

means of the denial or deprivation, or the threat of the denial or deprivation, of–

**(1)** any employment, position, or work in or for any agency or other entity of the Government of the United States, a State, or a political subdivision of a State, or any compensation or benefit of such employment, position, or work; or

**(2)** any payment or benefit of a program of the United States, a State, or a political subdivision of a State; if such employment, position, work, compensation, payment, or benefit is provided for or made possible in whole or in part by an Act of Congress, shall be fined under this title, or imprisoned not more than one year, or both.

**(b)** As used in this section–

**(1)** the term "candidate" means an individual who seeks nomination for election, or election, to Federal, State, or local office, whether or not such individual is elected, and, for purposes of this paragraph, an individual shall be deemed to seek nomination for election, or election, to Federal, State, or local office, if he has (A) taken the action necessary under the law of a State to qualify himself for nomination for election, or election, or (B) received contributions or made expenditures, or has given his consent for any other person to receive contributions or make expenditures, with a view to bringing about his nomination for election, or election, to such office;

**(2)** the term "election" means (A) a general, special primary, or runoff election, (B) a convention or caucus of a political party held to nominate a candidate, (C) a primary election held for the selection of delegates to a nominating convention of a political party, (D) a primary election held for the expression of a preference for the nomination of persons for election to the office of President, and (E) the election of delegates to a constitutional convention for proposing amendments to the Constitution of the United States or of any State; and

**(3)** the term "State" means a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States.

* * * * *

## § 602. Solicitation of political contributions

**(a)** It shall be unlawful for–

**(1)** a candidate for the Congress;

**(2)** an individual elected to or serving in the office of Senator or Representative in, or Delegate or Resident Commissioner to, the Congress;

**(3)** an officer or employee of the United States or any department or agency thereof; or

**(4)** a person receiving any salary or compensation for services from money derived from the Treasury of the United States; to knowingly solicit any contribution within the meaning of section 301(8) of the Federal Election Campaign Act of 1971 [52 U.S.C.A. § 431(8)] from any other such officer, employee, or person. Any person who violates this section shall be fined under this title or imprisoned not more than 3 years, or both.

**(b)** The prohibition in subsection (a) shall not apply to any activity of an employee (as defined in section 7322(1) of title 5) or any individual employed in or under the United States Postal Service or the Postal Rate Commission, unless that activity is prohibited by section 7323 or 7324 of such title.

* * * * *

## § 603. Making political contributions

**(a)** It shall be unlawful for an officer or employee of the United States or any department or agency thereof, or a person receiving any salary or compensation for services from money derived from the Treasury of the United States, to make any contribution within the meaning of section 301(8) of the Federal Election Campaign Act of

1971 to any other such officer, employee or person or to any Senator or Representative in, or Delegate or Resident Commissioner to, the Congress, if the person receiving such contribution is the employer or employing authority of the person making the contribution. Any person who violates this section shall be fined under this title or imprisoned not more than three years, or both.

**(b)** For purposes of this section, a contribution to an authorized committee as defined in section 302(e) (1) of the Federal Election Campaign Act of 1971 shall be considered a contribution to the individual who has authorized such committee.

**(c)** The prohibition in subsection (a) shall not apply to any activity of an employee (as defined in section 7322(1) of title 5) or any individual employed in or under the United States Postal Service or the Postal Rate Commission, unless that activity is prohibited by section 7323 or 7324 of such title.

* * * * *

## § 604. Solicitation from persons on relief

Whoever solicits or receives or is in any manner concerned in soliciting or receiving any assessment, subscription, or contribution for any political purpose from any person known by him to be entitled to, or receiving compensation, employment, or other benefit provided for or made possible by any Act of Congress appropriating funds for work relief or relief purposes, shall be fined under this title or imprisoned not more than one year, or both.

* * * * *

## § 605. Disclosure of names of persons on relief

Whoever, for political purposes, furnishes or discloses any list or names of persons receiving compensation, employment or benefits provided for or made possible by any Act of Congress appropriating, or authorizing the appropriation of funds for work relief or relief purposes, to a political candidate, committee, campaign manager, or to any person

for delivery to a political candidate, committee, or campaign manager; and

Whoever receives any such list or names for political purposes–

Shall be fined under this title or imprisoned not more than one year, or both.

* * * * *

### § 606. Intimidation to secure political contributions

Whoever, being one of the officers or employees of the United States mentioned in section 602 of this title, discharges, or promotes, or degrades, or in any manner changes the official rank or compensation of any other officer or employee, or promises or threatens so to do, for giving or withholding or neglecting to make any contribution of money or other valuable thing for any political purpose, shall be fined under this title or imprisoned not more than three years, or both.

* * * * *

### § 607. Place of solicitation

**(a) Prohibition.–**

**(1) In general.**–It shall be unlawful for any person to solicit or receive a donation of money or other thing of value in connection with a Federal, State, or local election from a person who is located in a room or building occupied in the discharge of official duties by an officer or employee of the United States. It shall be unlawful for an individual who is an officer or employee of the Federal Government, including the President, Vice President, and Members of Congress, to solicit or receive a donation of money or other thing of value in connection with a Federal, State, or local election, while in any room or building occupied in the discharge of official duties by an officer or employee of the United States, from any person.

**(2) Penalty.**–A person who violates this section shall be fined not more than $5,00 imprisoned not more than 3 years, or both.

**(b)** The prohibition in subsection (a) shall not apply to the receipt of contributions by persons on the staff of a Senator or Representative in, or Delegate or Resident Commissioner to, the Congress or Executive Office of the President, provided, that such contributions have not been solicited in any manner which directs the contributor to mail or deliver a contribution to any room, building, or other facility referred to in subsection (a), and provided that such contributions are transferred within seven days of receipt to a political committee within the meaning of section 302(e) of the Federal Election Campaign Act of 1971.

* * * * *

## § 608. Absent uniformed services voters and overseas voters

**(a)** Whoever knowingly deprives or attempts to deprive any person of a right under the Uniformed and Overseas Citizens Absentee Voting Act shall be fined in accordance with this title or imprisoned not more than five years, or both.

**(b)** Whoever knowingly gives false information for the purpose of establishing the eligibility of any person to register or vote under the Uniformed and Overseas Citizens Absentee Voting Act, or pays or offers to pay, or accepts payment for registering or voting under such Act shall be fined in accordance with this title or imprisoned not more than five years, or both.

* * * * *

## § 609. Use of military authority to influence vote of member of Armed Forces

Whoever, being a commissioned, noncommissioned, warrant, or petty officer of an Armed Force, uses military authority to influence the vote of a member of the Armed Forces or to require a member of the Armed Forces to march to a polling place, or attempts to do so, shall be

fined in accordance with this title or imprisoned not more than five years, or both. Nothing in this section shall prohibit free discussion of political issues or candidates for public office.

* * * * *

### § 610. Coercion of political activity

It shall be unlawful for any person to intimidate, threaten, command, or coerce, or attempt to intimidate, threaten, command, or coerce, any employee of the Federal Government as defined in section 7322(1) of title 5, United States Code, to engage in, or not to engage in, any political activity, including, but not limited to, voting or refusing to vote for any candidate or measure in any election, making or refusing to make any political contribution, or working or refusing to work on behalf of any candidate. Any person who violates this section shall be fined under this title or imprisoned not more than three years, or both.

* * * * *

### § 611. Voting by aliens

**(a)** It shall be unlawful for any alien to vote in any election held solely or in part for the purpose of electing a candidate for the office of President, Vice President, Presidential elector, Member of the Senate, Member of the House of Representatives, Delegate from the District of Columbia, or Resident Commissioner, unless–

**(1)** the election is held partly for some other purpose;

**(2)** aliens are authorized to vote for such other purpose under a State constitution or statute or a local ordinance; and

**(3)** voting for such other purpose is conducted independently of voting for a candidate for such Federal offices, in such a manner that an alien has the opportunity to vote for such other purpose, but not an opportunity to vote for a candidate for any one or more of such Federal offices.

**(b)** Any person who violates this section shall be fined under this title, imprisoned not more than one year, or both.

**(c)** Subsection (a) does not apply to an alien if–

**(1)** each natural parent of the alien (or, in the case of an adopted alien, each adoptive parent of the alien) is or was a citizen (whether by birth or naturalization);

**(2)** the alien permanently resided in the United States prior to attaining the age of 16; and

**(3)** the alien reasonably believed at the time of voting in violation of such subsection that he or she was a citizen of the United States.

* * * * *

## § 911. Citizen of the United States

Whoever falsely and willfully represents himself to be a citizen of the United States shall be fined under this title or imprisoned not more than three years, or both.

* * * * *

## § 1001. Statements or entries generally

**(a)** Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully–

**(1)** falsifies, conceals, or covers up by any trick, scheme, or device a material fact;

**(2)** makes any materially false, fictitious, or fraudulent statement or representation; or

**(3)** makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry; shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both.

**(b)** Subsection (a) does not apply to a party to a judicial proceeding, or that party's counsel, for statements, representations, writings or documents submitted by such party or counsel to a judge or magistrate in that proceeding.

**(c)** With respect to any matter within the jurisdiction of the legislative branch, subsection (a) shall apply only to–

**(1)** administrative matters, including a claim for payment, a matter related to the procurement of property or services, personnel or employment practices, or support services, or a document required by law, rule, or regulation to be submitted to the Congress or any office or officer within the legislative branch; or

**(2)** any investigation or review, conducted pursuant to the authority of any committee, subcommittee, commission or office of the Congress, consistent with applicable rules of the House or Senate.

* * * * *

## § 1015 Naturalization, citizenship or alien registry

**(f)** Whoever knowingly makes any false statement or claim that he is a citizen of the United States in order to register to vote or to vote in any Federal, State, or local election (including an initiative, recall, or referendum)–

Shall be fined under this title or imprisoned not more than five years, or both. Subsection (f) does not apply to an alien if each natural parent of the alien (or, in the case of an adopted alien, each adoptive parent of the alien) is or was a citizen (whether by birth or naturalization), the alien permanently resided in the United States prior to attaining the age of 16, and the alien reasonably believed at the time of making the false statement or claim that he or she was a citizen of the United States.

* * * * *

### § 1341. Frauds and swindles

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

* * * * *

### § 1343. Fraud by wire, radio, or television

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

* * * * *

**§ 1346. Definition of "scheme or artifice to defraud"**

For the purposes of this chapter, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

* * * * *

**§ 1519. Destruction, alteration, or falsification of records in Federal investigations and bankruptcy**

Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

* * * * *

**§ 1952. Interstate and foreign travel or transportation in aid of racketeering enterprises**

**(a)** Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to–

**(1)** distribute the proceeds of any unlawful activity; or

**(2)** commit any crime of violence to further any unlawful activity; or

**(3)** otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform–

**(A)** an act described in paragraph (1) or (3) shall be fined under this title, imprisoned not more than 5 years, or both; or

**(B)** an act described in paragraph (2) shall be fined under this title, imprisoned for not more than 20 years, or both, and if death results shall be imprisoned for any term of years or for life.

**(b)** As used in this section (i) "unlawful activity" means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics or controlled substances (as defined in section 102(6) of the Controlled Substances Act), or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States, or (3) any act which is indictable under sub- chapter II of chapter 53 of title 31, United States Code, or under section 1956 or 1957 of this title and (ii) the term "State" includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States.

**(c)** Investigations of violations under this section involving liquor shall be conducted under the supervision of the Attorney General.

# EXCERPTS FROM TITLE 26, UNITED STATES CODE

## § 9012 Criminal penalties

**(c) Unlawful use of payments.–**

**(1)** It shall be unlawful for any person who receives any payment under section 9006, or to whom any portion of any payment received under such section is transferred, knowingly and willfully to use, or authorize the use of, such payment or such portion for any purpose other than–

**(A)** to defray the qualified campaign expenses with respect to which such payment was made, or

**(B)** to repay loans the proceeds of which were used, or otherwise to restore funds (other than contributions to defray qualified campaign expenses which were received and expended) which were used, to defray such qualified campaign expenses.

**(2)** It shall be unlawful for the national committee of a major party or minor party which receives any payment under section 9008(b)(3) to use, or authorize the use of, such payment for any purpose other than a purpose authorized by section 9008(c).

**(3)** Any person who violates paragraph (1) shall be fined not more than $10,000, or imprisoned not more than five years, or both.

**(d) False statements, etc.–**

**(1)** It shall be unlawful for any person knowingly and willfully–

**(A)** to furnish any false, fictitious, or fraudulent evidence, books, or information to the Commission under this subtitle, or to include in any evidence, books, or information so furnished any misrepresentation of a material fact, or to falsify or conceal any evidence, books, or information relevant to a certification by the

Commission or an examination and audit by the Commission under this chapter; or

**(B)** to fail to furnish to the Commission any records, books, or information requested by it for purposes of this chapter.

**(2)** Any person who violates paragraph (1) shall be fined not more than $10,000, or imprisoned not more than five years, or both.

* * * * *

### § 9042. Criminal penalties

**(b) Unlawful use of payments.–**

**(1)** It is unlawful for any person who receives any payment under section 9037, or to whom any portion of any such payment is transferred, knowingly and willfully to use, or authorize the use of, such payment or such portion for any purpose other than—

**(A)** to defray qualified campaign expenses, or

**(B)** to repay loans the proceeds of which were used, or otherwise to restore funds (other than contributions to defray qualified campaign expenses which were received and expended) which were used, to defray qualified campaign expenses.

**(c) False statements, etc.–**

**(1)** It is unlawful for any person knowingly and willfully–

**(A)** to furnish any false, fictitious, or fraudulent evidence, books, or information to the Commission under this chapter, or to include in any evidence, books, or information so furnished any misrepresentation of a material fact, or to falsify or conceal any evidence, books, or information relevant to a certification by the Commission or an examination and audit by the Commission under this chapter, or

**(B)** to fail to furnish to the Commission any records, books, or information requested by it for purposes of this chapter.

**(2)** Any person who violates the provisions of paragraph (1) shall be fined not more than $10,000, or imprisoned not more than 5 years, or both.

# EXCERPTS FROM TITLE 52, UNITED STATES CODE

## § 103 Prohibited acts

### (c) False information in registering or voting; penalties

Whoever knowingly or willfully gives false information as to his name, address or period of residence in the voting district for the purpose of establishing his eligibility to register or vote, or conspires with another individual for the purpose of encouraging his false registration to vote or illegal voting, or pays or offers to pay or accepts payment either for registration to vote or for voting shall be fined not more than $10,000 or imprisoned not more than five years, or both: *Provided, however*, that this provision shall be applicable only to general, special, or primary elections held solely or in part for the purpose of selecting or electing any candidate for the office of President, Vice President, presidential elector, Member of the United States Senate, Member of the United States House of Representatives, Delegate from the District of Columbia, Guam, or the Virgin Islands, or Resident Commissioner of the Commonwealth of Puerto Rico.

### (e) Voting more than once

**(1)** Whoever votes more than once in an election referred to in paragraph (2) shall be fined not more than $10,000 or imprisoned not more than five years, or both.

**(2)** The prohibition of this subsection applies with respect to any general, special, or primary election held solely or in part for the purpose of selecting or electing any candidate for the office of President, Vice President, presidential elector, Member of the United States Senate, Member of the United States House of Representatives, Delegate from the District of Columbia, Guam, or the Virgin Islands, or Resident Commissioner of the Commonwealth of Puerto Rico.

**(3)** As used in this subsection, the term “votes more than once” does not include the casting of an additional ballot if all prior ballots of that voter were invalidated, nor does it include the

voting in two jurisdictions under section 1973aa-1 of this title, to the extent two ballots are not cast for an election to the same candidacy or office.

* * * * *

### § 20511. Criminal penalties

A person, including an election official, who in any election for Federal office–

**(1)** knowingly and willfully intimidates, threatens, or coerces, or attempts to intimidate, threaten, or coerce, any person for–

**(A)** registering to vote, or voting, or attempting to register or vote;

**(B)** urging or aiding any person to register to vote, to vote, or to attempt to register or vote; or

**(C)** exercising any right under this subchapter; or

**(2)** knowingly and willfully deprives, defrauds, or attempts to deprive or defraud the residents of a State of a fair and impartially conducted election process, by–

**(A)** the procurement or submission of voter registration applications that are known by the person to be materially false, fictitious, or fraudulent under the laws of the State in which the election is held; or

the procurement, casting, or tabulation of ballots that are known by the person to be materially false, fictitious, or fraudulent under the laws of the State in which the election is held, shall be fined in accordance with Title 18 (which fines shall be paid into the general fund of the Treasury, miscellaneous receipts (pursuant to section 3302 of Title 31), notwithstanding any other law), or imprisoned not more than 5 years, or both.

* * * * *

**§ 30101. Definitions**

When used in this Act:

**(1) Election**. The term "election" means–

**(A)** a general, special, primary, or runoff election;

**(B)** a convention or caucus of a political party which has authority to nominate a candidate;

**(C)** a primary election held for the selection of delegates to a national nominating convention of a political party; and

**(D)** a primary election held for the expression of a preference for the nomination of individuals for election to the office of President.

**(2) Candidate**. The term "candidate" means an individual who seeks nomination for election, or election, to Federal office, and for purposes of this paragraph, an individual shall be deemed to seek nomination for election, or election–

**(A)** if such individual has received contributions aggregating in excess of $5,000 or has made expenditures aggregating in excess of $5,000; or

**(B)** if such individual has given his or her consent to another person to receive contributions or make expenditures on behalf of such individual and if such person has received such contributions aggregating in excess of $5,000 or has made such expenditures aggregating in excess of $5,000.

**(3) Federal office**. The term "Federal office" means the office of President or Vice President, or of Senator or Representative in, or Delegate or Resident Commissioner to, the Congress.

**(4) Political committee**. The term "political committee" means–

**(A)** any committee, club, association, or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year; or

**(B)** any separate segregated fund established under the provisions of section 441b(b) of this title; or

**(C)** any local committee of a political party which receives contributions aggregating in excess of $5,000 during a

calendar year, or makes payments exempted from the definition of contribution or expenditure as defined in paragraphs (8) and (9) aggregating in excess of $5,000 during a calendar year, or makes contributions aggregating in excess of $1,000 during a calendar year or makes expenditures aggregating in excess of $1,000 during a calendar year.

* * * * *

**(8)(A) Contribution**. The term “contribution” includes–

**(i)** any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office; or

**(ii)** the payment by any person of compensation for the personal services of another person which are rendered to a political committee without charge for any purpose.

* * * * *

**(9)(A) Expenditure**. The term “expenditure” includes–

**(i)** any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office; and

**(ii)** a written contract, promise, or agreement to make an expenditure.

* * * * *

**(11) Person**. The term “person” includes an individual, partnership, committee, association, corporation, labor organization, or any other organization or group of persons, but such term does not include the Federal Government or any authority of the Federal Government.

* * * * *

**(14) National committee**. The term “national committee” means the organization which, by virtue of the bylaws of a political party, is responsible for the day-to-day operation of such political party at the national level, as determined by the Commission.

**(15) State committee**. The term “State committee” means the organization which, by virtue of the bylaws of a political party, is responsible for the day-to-day operation of such political party at the State level, as determined by the Commission.

**(16) Political party**. The term “political party” means an association, committee, or organization which nominates a candidate for election to any Federal office whose name appears on the election ballot as the candidate of such association, committee, or organization.

**(17) Independent expenditure**. The term “independent expenditure” means an expenditure by a person–

**(A)** expressly advocating the election or defeat of a clearly identified candidate; and

**(B)** that is not made in concert or cooperation with or at the request or suggestion of such candidate, the candidate's authorized political committee, or their agents, or a political party committee or its agents.

* * * * *

**(20) Federal election activity**

**(A) In general**. The term “Federal election activity” means–

**(i)** voter registration activity during the period that begins on the date that is 120 days before the date a regularly scheduled Federal election is held and ends on the date of the election;

**(ii)** voter identification, get-out-the-vote activity, or generic campaign activity conducted in connection with an election in which a candidate for Federal office appears on the ballot (regardless of whether a candidate for State or local office also appears on the ballot).

**(iii)** a public communication that refers to a clearly identified candidate for Federal office (regardless of whether a candidate for State or local office is also mentioned or identified) and that promotes or supports a candidate for that office, or attacks or opposes a candidate for that office (regardless of whether the communication expressly advocates a vote for or against a candidate); or

**(iv)** services provided during any month by an employee of a State, district, or local committee of a political party who spends more than 25 percent of that individual's compensated time during that month on activities in connection with a Federal election.

* * * * *

**(21) Generic campaign activity**. The term "generic campaign activity" means a campaign activity that promotes a political party and does not promote a candidate or non-Federal candidate.

**(22) Public communication**. The term "public communication" means a communication by means of any broadcast, cable, or satellite communication, newspaper, magazine, outdoor advertising facility, mass mailing, or telephone bank to the general public, or any other form of general public political advertising.

* * * * *

## § 30102. Organization of political committees

### (a) Treasurer; vacancy; official authorizations

Every political committee shall have a treasurer. No contribution or expenditure shall be accepted or made by or on behalf of a political committee during any period in which the office of treasurer is vacant. No expenditure shall be made for or on behalf of a political committee without the authorization of the treasurer or his or her designated agent.

**(b) Account of contributions; segregated funds**

**(1)** Every person who receives a contribution for an authorized political committee shall, no later than 10 days after receiving such contribution, forward to the treasurer such contribution, and if the amount of the contribution is in excess of $50 the name and address of the person making the contribution and the date of receipt.

**(2)** Every person who receives a contribution for a political committee which is not an authorized committee shall–

**(A)** if the amount of the contribution is $50 or less, forward to the treasurer such contribution no later than 30 days after receiving the contribution; and

**(B)** if the amount of the contribution is in excess of $50, forward to the treasurer such contribution, the name and address of the person making the contribution, and the date of receipt of the contribution, no later than 10 days after receiving the contribution.

**(3)** All funds of a political committee shall be segregated from, and may not be commingled with, the personal funds of any individual.

**(c) Recordkeeping**

The treasurer of a political committee shall keep an account of–

**(1)** all contributions received by or on behalf of such political committee;

**(2)** the name and address of any person who makes any contribution in excess of $50, together with the date and amount of such contribution by any person;

**(3)** the identification of any person who makes a contribution or contributions aggregating more than $200 during a calendar year, together with the date and amount of any such contribution;

**(4)** the identification of any political committee which makes a contribution, together with the date and amount of any such contribution; and

**(5)** the name and address of every person to whom any disbursement is made, the date, amount, and purpose of the disbursement, and the name of the candidate and the office sought by the candidate, if any, for whom the disbursement was made, including a receipt, invoice, or canceled check for each disbursement in excess of $200.

* * * * *

(e) **Principal and additional campaign committees; designations, status of candidate, authorized committees, etc.**

**(1)** Each candidate for Federal office (other than the nominee for the office of Vice President) shall designate in writing a political committee in accordance with paragraph (3) to serve as the principal campaign committee of such candidate. Such designation shall be made no later than 15 days after becoming a candidate. A candidate may designate additional political committees in accordance with paragraph (3) to serve as authorized committees of such candidate. Such designation shall be in writing and filed with the principal campaign committee of such candidate in accordance with subsection (f)(1) of this section.

**(2)** Any candidate described in paragraph (1) who receives a contribution, or any loan for use in connection with the campaign of such candidate for election, or makes a disbursement in connection with such campaign, shall be considered, for purposes of this Act, as having received the contribution or loan, or as having made the disbursement, as the case may be, as an agent of the authorized committee or committees of such candidate.

**(3)**

**(A)** No political committee which supports or has supported more than one candidate may be designated as an authorized committee, except that–

**(i)** the candidate for the office of President nominated by a political party may designate the national committee of such political party as a principal campaign committee, but only if that national committee maintains separate books of account with respect to its function as a principal campaign committee; and

**(ii)** candidates may designate a political committee established solely for the purpose of joint fundraising by such candidates as an authorized committee.

**(B)** As used in this section, the term "support" does not include a contribution by any authorized committee in amounts of $2,000 or less to an authorized committee of any other candidate.

**(4)** The name of each authorized committee shall include the name of the candidate who authorized such committee under paragraph (1). In the case of any political committee which is not an authorized committee, such political committee shall not include the name of any candidate in its name.

**(5)** The name of any separate segregated fund established pursuant to section 441b(b) of this title shall include the name of its connected organization.

**(f) Filing with and receipt of designations, statements, and reports by principal campaign committee**

**(1)** Notwithstanding any other provision of this Act, each designation, statement, or report of receipts or disbursements made by an authorized committee of a candidate shall be filed with the candidate's principal campaign committee.

**(2)** Each principal campaign committee shall receive all designations, statements, and reports required to be filed with it under paragraph (1) and shall compile and file such designations, statements, and reports in accordance with this Act.

* * * * *

**§ 30104. Reporting requirements**

**(a) Receipts and disbursements by treasurers of political committees; filing requirements**

**(1)** Each treasurer of a political committee shall file reports of receipts and disbursements in accordance with the provisions of this subsection. The treasurer shall sign each such report.

* * * * *

**(b) Contents of reports**

Each report under this section shall disclose–

**(1)** the amount of cash on hand at the beginning of the reporting period;

**(2)** for the reporting period and the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), the total amount of all receipts, and the total amount of all receipts in the following categories:

**(A)** contributions from persons other than political committees;

**(B)** for an authorized committee, contributions from the candidate....

* * * * *

**(3)** the identification of each–

**(A)** person (other than a political committee) who makes a contribution to the reporting committee during the reporting period, whose contribution or contributions have an aggregate amount or value in excess of $200 within the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), or in any lesser amount if the reporting committee should so elect, together with the date and amount of any such contribution;

* * * * *

**(4)** for the reporting period and the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), the total amount of all disbursements, and all disbursements in the following categories:

**(A)** expenditures made to meet candidate or committee operating expenses;

* * * * *

**(6)(A)** for an authorized committee, the name and address of each person who has received any disbursement not disclosed under paragraph (5) in an aggregate amount or value in excess of $200 within the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), together with the date and amount of any such disbursement;

**(B)** for any other political committee, the name and address of each–

* * * * *

**(v)** person who has received any disbursement not otherwise disclosed in this paragraph or paragraph (5) in an aggregate amount or value in excess of $200 within the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), from the reporting committee within the reporting period, together with the date, amount, and purpose of any such disbursement;

* * * * *

**(f) Disclosure of electioneering communications**

**(1) Statement required**

Every person who makes a disbursement for the direct costs of producing and airing electioneering communications in an aggregate amount in excess of $10,000 during any calendar year shall, within 24 hours of each disclosure date, file with the Commission a statement containing the information described in paragraph (2).

**(2) Contents of Statement**

Each statement required to be filed under this subsection shall be made under penalty of perjury and shall contain the following information:

**(A)** The identification of the person making the disbursement, of any person sharing or exercising direction or control over the activities of such person, and of the custodian of the books and accounts of the person making the disbursement.

**(B)** The principal place of business of the person making the disbursement, if an individual.

**(C)** The amount of each disbursement of more than $200 during the period covered by the statement and the identification of the person to whom the disbursement was made.

**(D)** The elections to which the electioneering communications pertain and the names (if known) of the candidates identified or to be identified.

**(E)** If the disbursements were paid out of a segregated bank account which consists of funds contributed solely by individuals who are United States citizens or nationals or lawfully admitted for permanent residence (as defined in section 1101(a)(20) of Title 8) directly to this account for electioneering communications, the names and addresses of all contributors who contributed an aggregate amount of $1,000 or more to that account during the period beginning on the first day of the preceding calendar year

and ending on the disclosure date. Nothing in this subparagraph is to be construed as a prohibition on the use of funds in such a segregated account for a purpose other than electioneering communications.

**(F)** If the disbursements were paid out of funds not described in subparagraph (E), the names and addresses of all contributors who contributed an aggregate amount of $1,000 or more to the person making the disbursement during the period beginning on the first day of the preceding calendar year and ending on the disclosure date.

**(3) Electioneering communication**

For purposes of this subsection–

**(A) In general**

**(i)** The term "electioneering communication" means any broadcast, cable, or satellite communication which–

**(I)** refers to a clearly identified candidate for Federal office;

**(II)** is made within–

**(aa)** 60 days before a general, special, or runoff election for the office sought by the candidate; or

**(bb)** 30 days before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate, for the office sought by the candidate; and

**(III)** in the case of a communication which refers to a candidate for an office other than President or Vice President, is targeted to the relevant electorate.

* * * * *

## § 30109. Enforcement

**(d) Penalties; defenses; mitigation of offenses**

**(1)(A)** Any person who knowingly and willfully commits a violation of any provision of this act which involves the making, receiving, or reporting of any contribution, donation, or expenditure

**(i)** Aggregating $25,000 or more during a calendar year shall be fined under Title 18, or imprisoned for not more than 5 years, or both; or

**(ii)** aggregating $2,000 or more (but less than $25,000) during a calendar year shall be fined under such title, or imprisoned for not more than 1 year, or both.

**(B)** In the case of a knowing and willful violation of section 441b(b)(3) of this title, the penalties set forth in this subsection shall apply to a violation involving an amount aggregating $250 or more during a calendar year. Such violation of section 441b(b)(3) of this title may incorporate a violation of section 441c(b), 30122, or 441g of this title.

**(C)** In the case of a knowing and willful violation of section 441h of this title, the penalties set forth in this subsection shall apply without regard to whether the making, receiving, or reporting of a contribution or expenditure of $1,000 or more is involved.

**(D)** Any person who knowingly and willfully commits a violation of section 30122 of this title involving an amount aggregating more than $10,000 during a calendar year shall be

**(i)** imprisoned for not more than 2 years if the amount is less than $25,000 (and subject to imprisonment under subparagraph (A) if the amount is $25,000 or more);

**(ii)** fined not less than 300 percent of the amount involved in the violation and not more than the greater of–

**(i)** $50,000; or

**(ii)** 1,000 percent of the amount involved in the violation; or

**(iii)** both imprisoned under clause (i) and fined under clause (ii).

**(2)** In any criminal action brought for a violation of any provision of this Act or of chapter 95 or chapter 96 of Title 26, any defendant may evidence their lack of knowledge or intent to commit the alleged violation by introducing as evidence a conciliation agreement entered into between the defendant and the Commission under subsection (a)(4)(A) of this section which specifically deals with the act or failure to act constituting such violation and which is still in effect.

**(3)** In any criminal action brought for a violation of any provision of this Act or of chapter 95 or chapter 96 of Title 26, 0the court before which such action is brought shall take into account, in weighing the seriousness of the violation and in considering the appropriateness of the penalty to be imposed if the defendant is found guilty, whether–

**(A)** the specific act or failure to act which constitutes the violation for which the action was brought is the subject of a conciliation agreement entered into between the defendant and the Commission under subparagraph (a)(4)(A);

**(B)** the conciliation agreement is in effect; and

**(C)** the defendant is, with respect to the violation involved, in compliance with the conciliation agreement.

* * * * *

## § 30114. Use of contributed amounts for certain purposes

**(a) Permitted uses**

A contribution accepted by a candidate, and any other donation received by an individual as support for activities of the individual as a holder of Federal office, may be used by the candidate or individual–

**(1)** for otherwise authorized expenditures in connection with the campaign for Federal office of the candidate or individual;

**(2)** for ordinary and necessary expenses incurred in connection with duties of the individual as a holder of Federal office;

**(3)** for contributions to an organization described in section 170(c) of Title 26;

**(4)** for transfers, without limitation, to a national, State, or local committee of a political party;

**(5)** for donations to State and local candidates subject to the provisions of State law; or

**(6)** for any other lawful purpose unless prohibited by subsection (b) of this section.

**(b) Prohibited use**

**(1) In general**

A contribution or donation described in subsection (a) of this section shall not be converted by any person to personal use.

**(2) Conversion**

For the purposes of paragraph (1), a contribution or donation shall be considered to be converted to personal use if the contribution or amount is used to fulfill any commitment, obligation, or expense of a person that would exist irrespective of the candidate's election campaign or individual's duties as a holder of Federal office, including–

**(A)** a home mortgage, rent, or utility payment;

**(B)** a clothing purchase;

**(C)** a noncampaign-related automobile expense;

**(D)** a country club membership;
**(E)** a vacation or other noncampaign-related trip;
**(F)** a household food item;
**(G)** a tuition payment;
**(H)** admission to a sporting event, concert, theater, or other form of entertainment not associated with an election campaign; and
**(I)** dues, fees, and other payments to a health club or recreational facility.

* * * * *

## § 30116. Limitations on contributions and expenditures

**(a) Dollar limits on contributions**

**(1)** Except as provided in subsection (i) of this section and section 441a-1 of this title, no person shall make contributions–

**(A)** to any candidate and his authorized political committees with respect to any election for Federal office which, in the aggregate, exceed $2,000;

**(B)** to the political committees established and maintained by a national political party, which are not the authorized political committees of any candidate, in any calendar year which, in the aggregate, exceed $25,000;

**(C)** to any other political committee (other than a committee described in subparagraph (D)) in any calendar year which, in the aggregate, exceed $5,000; or

**(D)** to a political committee established and maintained by a State committee of a political party in any calendar year which, in the aggregate, exceed $10,000.

**(2)** No multicandidate political committee shall make contributions–

**(A)** to any candidate and his authorized political committees with respect to any election for Federal office which, in the aggregate, exceed $5,000;

**(B)** to the political committees established and maintained by a national political party, which are not the authorized political committees of any candidate, in any calendar year, which, in the aggregate, exceed $15,000; or

**(C)** to any other political committee in any calendar year which, in the aggregate, exceed $5,000.

**(3)** During the period which begins on January 1 of an odd-numbered year and ends on December 31 of the next even-numbered year, no individual may make contributions aggregating more than–

**(A)** $37,500, in the case of contributions to candidates and the authorized committees of candidates;

**(B)** $57,500, in the case of any other contributions, of which not more than $37,500 may be attributable to contributions to political committees which are not political committees of national political parties.

**(4)** The limitations on contributions contained in paragraphs and (2) do not apply to transfers between and among political committees which are national, State, district, or local committees (including any subordinate committee thereof) of the same political party for purposes of paragraph (2), the term "multicandidate political committee" means a political committee which has been registered under section 433 of this title for a period of not less than 6 months, which has received contributions from more than 50 persons, and, candidates for Federal office.

**(5)** For purposes of the limitations provided by paragraph (1) and paragraph (2), all contributions made by political committees established or financed or maintained or controlled by any corporation, labor

organization, or any other person, including any parent, subsidiary, branch, division, department, or local unit of such corporation, labor organization, or any other person, or by any group of such persons, shall be considered to have been made by a single political committee, except that (A) nothing in this sentence shall limit transfers between political committees of funds raised through joint fund raising efforts; (B) for purposes of the limitations provided by paragraph (1) and paragraph (2) all contributions made by a single political committee established or financed or maintained or controlled by a national committee of a political party and by a single political committee established or financed or maintained or controlled by the State committee of a political party shall not be considered to have been made by a single political committee; and (C) nothing in this section shall limit the transfer of funds between the principal campaign committee of a candidate seeking nomination or election to a Federal office and the principal campaign committee of that candidate for nomination or election to another Federal office if (i) such transfer is not made when the candidate is actively seeking nomination or election to both such offices; (ii) the limitations contained in this Act on contributions by persons are not exceeded by such transfer; and (iii) the candidate has not elected to receive any funds under chapter 95 or chapter 96 of Title 26. In any case in which a corporation and any of its subsidiaries, branches, divisions, departments, or local units, or a labor organization and any of its subsidiaries, branches, divisions, departments, or local units establish or finance or maintain or control more than one separate segregated fund, all such separate segregated funds shall be treated as a single separate segregated fund for

purposes of the limitations provided by paragraph (1) and paragraph (2).

**(6)** The limitations on contributions to a candidate imposed by paragraphs (1) and (2) of this subsection shall apply separately with respect to each election, except that all elections held in any calendar year for the office of President of the United States (except a general election for such office) shall be considered to be one election.

**(7)** For purposes of this subsection–

**(A)** contributions to a named candidate made to any political committee authorized by such candidate to accept contributions on his behalf shall be considered to be contributions made to such candidate;

**(B)(i)** expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such candidate;

**(ii)** expenditures made by any person (other than a candidate or candidate's authorized committee) in cooperation, consultation, or concert with, or at the request or suggestion of, a national, State, or local committee of a political party, shall be considered to be contributions made to such party committee; and

**(iii)** the financing by any person of the dissemination, distribution, or republication, in whole or in part, of any broadcast or any written, graphic, or other form of campaign materials prepared by the candidate, his campaign committees, or their authorized agents shall be considered to be an

expenditure for purposes of this paragraph; and

**(C)** if–

**(i)** any person makes, or contracts to make, any disbursement for any electioneering communication (within the meaning of section 434(f)(3) of this title); and

**(ii)** such disbursement is coordinated with a candidate or an authorized committee of such candidate, a Federal, State, or local political party or committee thereof, or an agent or official of any such candidate, party, or committee; such disbursement or contracting shall be treated as a contribution to the candidate supported by the electioneering communication or that candidate's party and as an expenditure by that candidate or that candidate's party; and

**(D)** contributions made to or for the benefit of any candidate nominated by a political party for election to the office of Vice President of the United States shall be considered to be contributions made to or for the benefit of the candidate of such party for election to the office of President of the United States (except a general election for such office) shall be considered to be one election.

**(8)** For purposes of the limitations imposed by this section, all contributions made by a person, either directly or indirectly, on behalf of a particular candidate, including contributions which are in any way earmarked or otherwise directed through an intermediary or conduit to such candidate, shall be treated as contributions from such person to such candidate. The intermediary or conduit shall report the original source and the intended

recipient of such contribution to the Commission and to the intended recipient.

* * * * *

**(f) Prohibited contributions and expenditures**

No candidate or political committee shall knowingly accept any contribution or make any expenditure in violation of the provisions of this section. No officer or employee of a political committee shall knowingly accept a contribution made for the benefit or use of a candidate, or knowingly make any expenditure on behalf of a candidate, in violation of any limitation imposed on contributions and expenditures under this section.

* * * * *

**§ 30118. Contributions or expenditures by national banks, corporations, or labor organizations**

**(a) In General**

It is unlawful for any national bank, or any corporation organized by authority of any law of Congress, to make a contribution or expenditure in connection with any election to any political office, or in connection with any primary election or political convention or caucus held to select candidates for any political office, or for any corporation whatever, or any labor organization, to make a contribution or expenditure in connection with any election at which presidential and vice presidential electors or a Senator or Representative in, or a Delegate or Resident Commissioner to, Congress are to be voted for, or in connection with any primary election or political convention or caucus held to select candidates for any of the foregoing offices, or for any candidate, political committee, or other person knowingly to accept or receive any contribution prohibited by this section, or any officer or any director of any corporation or any national bank or any officer of any labor organization to consent

to any contribution or expenditure by the corporation, national bank, or labor organization, as the case may be, prohibited by this section.

**(b) Definitions; Particular Activities Prohibited or Allowed**

**(1)** For the purposes of this section the term "labor organization" means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

**(2)** For purposes of this section and section 79l(h) of Title 15, the term "contribution or expenditure" includes a contribution or expenditure, as those terms are defined in section 431 of this title, and also includes any direct or indirect payment, distribution, loan, advance, deposit, or gift of money, or any services, or anything of value (except a loan of money by a national or State bank made in accordance with the applicable banking laws and regulations and in the ordinary course of business) to any candidate, campaign committee, or political party or organization, in connection with any election to any of the offices referred to in this section or for any applicable electioneering communication, but shall not include (A) communications by a corporation to its stockholders and executive or administrative personnel and their families or by a labor organization to its members and their families on any subject; (B) nonpartisan registration and get-out-the-vote campaigns by a corporation aimed at its stockholders and executive or administrative personnel and their families, or by a labor

organization aimed at its members and their families; and (C) the establishment, administration, and solicitation of contributions to a separate segregated fund to be utilized for political purposes by a corporation, labor organization, membership organization, cooperative, or corporation without capital stock.

**(3)** It shall be unlawful–

**(A)** for such a fund to make a contribution or expenditure by utilizing money or anything of value secured by physical force, job discrimination, financial reprisals, or the threat of force, job discrimination, or financial reprisal; or by dues, fees, or other moneys required as a condition of membership in a labor organization or as a condition of employment, or by moneys obtained in any commercial transaction;

**(B)** for any person soliciting an employee for a contribution to such a fund to fail to inform such employee of the political purposes of such fund at the time of such solicitation; and

**(C)** for any person soliciting an employee for a contribution to such a fund to fail to inform such employee, at the time of such solicitation, of his right to refuse to so contribute without any reprisal.

**(4)**

**(A)** Except as provided in subparagraphs (B), (C), and (D), it shall be unlawful–

**(i)** for a corporation, or a separate segregated fund established by a corporation, to solicit contributions to such a fund from any person other than its stockholders and their families and its executive or administrative personnel and their families, and

**(ii)** for a labor organization, or a separate segregated fund established by a labor organization, to solicit contributions to such a fund from any person other than its members and their families.

**(B)** It shall not be unlawful under this section for a corporation, a labor organization, or a separate segregated fund established by such corporation or such labor organization, to make 2 written solicitations for contributions during the calendar year from any stockholder, executive or administrative personnel, or employee of a corporation or the families of such persons. A solicitation under this subparagraph may be made only by mail addressed to stockholders, executive or administrative personnel, or employees at their residence and shall be so designed that the corporation, labor organization, or separate segregated fund conducting such solicitation cannot determine who makes a contribution of $50 or less as a result of such solicitation and who does not make such a contribution.

**(C)** This paragraph shall not prevent a membership organization, cooperative, or corporation without capital stock, or a separate segregated fund established by a membership organization, cooperative, or corporation without capital stock, from soliciting contributions to such a fund from members of such organization, cooperative, or corporation without capital stock.

**(D)** This paragraph shall not prevent a trade association or a separate segregated fund established by a trade association from soliciting contributions from the stockholders and executive or administrative personnel of the

member corporations of such trade association and the families of such stockholders or personnel to the extent that such solicitation of such stockholders and personnel, and their families, has been separately and specifically approved by the member corporation involved, and such member corporation does not approve any such solicitation by more than one such trade association in any calendar year.

**(c)** Rules relating to electioneering communications

**(1) Applicable electioneering communication**

For purposes of this section, the term "applicable electioneering communication" means an electioneering communication (within the meaning of section 434(f)(3) of this title) which is made by any entity described in subsection (a) of this section or by any other person using funds donated by an entity described in subsection (a) of this section.

**(2) Exception**

Notwithstanding paragraph (1), the term "applicable electioneering communication" does not include a communication by a section 501(c)(4) organization or a political organization (as defined in section 527(e)(1) of Title 26) made under section 434(f)(2)(E) or (F) of this title if the communication is paid for exclusively by funds provided directly by individuals who are United States citizens or nationals or lawfully admitted for permanent residence (as defined in section 1101(a)(20) of Title 8). For purposes of the preceding sentence, the term "provided directly by individuals" does not include funds the source of which is an entity described in subsection (a) of this section.

* * * * *

## § 30119. Contributions by government contractors

### (a) Prohibition

It shall be unlawful for any person–

**(1)** who enters into any contract with the United States or any department or agency thereof either for the rendition of personal services or furnishing any material, supplies, or equipment to the United States or any department or agency thereof or for selling any land or building to the United States or any department or agency thereof, if payment for the performance of such contract or payment for such material, supplies, equipment, land, or building is to be made in whole or in part from funds appropriated by the Congress, at any time between the commencement of negotiations for and the later of (A) the completion of performance under; or (B) the termination of negotiations for, such contract or furnishing of material, supplies, equipment, land, or buildings, directly or indirectly to make any contribution of money or other things of value, or to promise expressly or impliedly to make any such contribution to any political party, committee, or candidate for public office or to any person for any political purpose or use; or

**(2)** knowingly to solicit any such contribution from any such person for any such purpose during any such period.

### (b) Separate segregated funds

This section does not prohibit or make unlawful the establishment or administration of, or the solicitation of contributions to, any separate segregated fund by any corporation, labor organization, membership organization, cooperative, or corporation without capital stock for the purpose of influencing the nomination for election, or election, of any person to Federal office, unless the provisions of section 441b of this title prohibit or make unlawful the establishment

or administration of, or the solicitation of contributions to, such fund. Each specific prohibition, allowance, and duty applicable to a corporation, labor organization, or separate segregated fund under section 441b of this title applies to a corporation, labor organization, or separate segregated fund to which this subsection applies.

**(c) "Labor organization" defined**

For purposes of this section, the term "labor organization" has the meaning given it by section 441b(b)(1) of this title.

* * * * *

**§ 30120. Publication and distribution of statements and solicitations; charge for newspaper or magazine space**

**(a)** Whenever a political committee makes a disbursement for the purpose of financing any communication through any broadcasting station, newspaper, magazine, outdoor advertising facility, mailing, or any other type of general public political advertising, or whenever any person makes a disbursement for the purpose of financing communications expressly advocating the election or defeat of a clearly identified candidate, or solicits any contribution through any broadcasting station, newspaper, magazine, outdoor advertising facility, mailing, or any other type of general public political advertising or makes a disbursement for an electioneering communication (as defined in section 434(f)(3) of this title), such communication–

**(1)** if paid for and authorized by a candidate, an authorized political committee of a candidate, or its agents, shall clearly state that the communication has been paid for by such authorized political committee, or[73]

**(2)** if paid for by other persons but authorized by a candidate, an authorized political committee of a candidate, or its agents, shall clearly state that the

[73] So in original. The word "or" probably should appear at the end of par. (2).

communication is paid for by such other persons and authorized by such authorized political committee;

**(3)** if not authorized by a candidate, an authorized political committee of a candidate, or its agents, shall clearly state the name and permanent street address, telephone number, or World Wide Web address of the person who paid for the communication and state that the communication is not authorized by any candidate or candidate's committee.

**(b)** No person who sells space in a newspaper or magazine to a candidate or to the agent of a candidate, for use in connection with such candidate's campaign, may charge any amount for such space which exceeds the amount charged for comparable use of such space for other purposes.

**(c)** Specification

Any printed communication described in subsection (a) of this section shall–

**(1)** be of sufficient type size to be clearly readable by the recipient of the communication;

**(2)** be contained in a printed box set apart from the other contents of the communication; and

**(3)** be printed with a reasonable degree of color contrast between the background and the printed statement.

**(d)** Additional requirements

**(1)** Communications by candidates or authorized persons

**(A) By radio**

Any communication described in paragraph (1) or (2) of subsection (a) of this section which is transmitted through radio shall include, in addition to the requirements of that paragraph, an audio statement by the candidate that identifies the candidate and states that the candidate has approved the communication.

**(B) By television**

Any communication described in paragraph (1) or (2) of subsection (a) of this section which is transmitted

through television shall include, in addition to the requirements of that paragraph, a statement that identifies the candidate and states that the candidate has approved the communication.

Such statement–

**(i)** shall be conveyed by–

**(I)** an unobscured, full-screen view of the candidate making the statement, or

**(II)** the candidate in voice-over, accompanied by a clearly identifiable photographic or similar image of the candidate; and

**(i)** shall also appear in writing at the end of the communication in a clearly readable manner with a reasonable degree of color contrast between the background and the printed statement, for a period of at least 4 seconds.

**(2) Communications by others**

Any communication described in paragraph (3) of subsection (a) of this section which is transmitted through radio or television shall include, in addition to the requirements of that paragraph, in a clearly spoken manner, the following audio statement: "_is responsible for the content of this advertising." (with the blank to be filled in with the name of the political committee or other person paying for the communication and the name of any connected organization of the payor). If transmitted through television, the statement shall be conveyed by an unobscured, full-screen view of a representative of the political committee or other person making the statement, or by a representative of such political committee or other person in voice-over, and shall also appear in a clearly readable manner with a reasonable degree of color contrast between the background and the printed statement, for a period of at least 4 seconds.

* * * * *

### § 30121. Contributions and donations by foreign nationals

**(a) Prohibition**

It shall be unlawful for–

**(1)** a foreign national, directly or indirectly, to make–

**(A)** a contribution or donation of money or other thing of value, or to make an express or implied promise to make a contribution or donation, in connection with a Federal, State, or local election;

**(B)** a contribution or donation to a committee of a political party; or

**(C)** an expenditure, independent expenditure, or disbursement for an electioneering communication (within the meaning of section 434(f)(3) of this title); or

**(2)** a person to solicit, accept, or receive a contribution or donation described in subparagraph (A) or (B) of paragraph (1) from a foreign national.

**(b) "Foreign National" Defined**

As used in this section, the term "foreign national" means–

**(3)** a foreign principal, as such term is defined by section 611(b) of Title 22, except that the term "foreign national" shall not include any individual who is a citizen of the United States; or

**(4)** an individual who is not a citizen of the United States or a national of the United States (as defined in section 1101(a)(22) of Title 8) and who is not lawfully admitted for permanent residence, as defined by section 1101(a)(2) of Title 8.

* * * * *

## § 30122. Contributions in name of another prohibited

No person shall make a contribution in the name of another person or knowingly permit his name to be used to effect such a contribution, and no person shall knowingly accept a contribution made by one person in the name of another person.

* * * * *

## § 30123. Limitation on contribution of currency

No person shall make contributions of currency of the United States or currency of any foreign country to or for the benefit of any candidate which, in the aggregate, exceed $100, with respect to any campaign of such candidate for nomination for election, or for election, to Federal office.

* * * * *

## § 30124. Fraudulent misrepresentation of campaign authority

**(a)** In general

No person who is a candidate for Federal office or an employee or agent of such a candidate shall–

- **(1)** fraudulently misrepresent himself or any committee or organization under his control as speaking or writing or otherwise acting for or on behalf of any other candidate or political party or employee or agent thereof on a matter which is damaging to such other candidate or political party or employee or agent thereof; or
- **(2)** willfully and knowingly participate in or conspire to participate in any plan, scheme, or design to violate paragraph (1).

**(b)** Fraudulent solicitation of funds No person shall–

- **(1)** fraudulently misrepresent the person as speaking, writing, or otherwise acting for or on behalf of any candidate or political party or employee or agent

thereof for the purpose of soliciting contributions or donations; or

**(2)** willfully and knowingly participate in or conspire to participate in any plan, scheme, or design to violate paragraph (1).

* * * * *

## § 30125. Soft money of political parties

### (a) National committees

#### (1) In general

A national committee of a political party (including a national congressional campaign committee of a political party) may not solicit, receive, or direct to another person a contribution, donation, or transfer of funds or any other thing of value, or spend any funds, that are not subject to the limitations, prohibitions, and reporting requirements of this Act.

#### (2) Applicability

The prohibition established by paragraph (1) applies to any such national committee, any officer or agent acting on behalf of such a national committee, and any entity that is directly or indirectly established, financed, maintained, or controlled by such a national committee.

### (b) State, district, and local committees

#### (1) In general

Except as provided in paragraph (2), an amount that is expended or disbursed for Federal election activity by a State, district, or local committee of a political party (including an entity that is directly or indirectly established, financed, maintained, or controlled by a State, district, or local committee of a political party and an officer or agent acting on behalf of such committee or entity), or by an association or similar group of candidates for State or local office or of individuals holding State or local office, shall

be made from funds subject to the limitations, prohibitions, and reporting requirements of this Act.

**(2) Applicability**

**(A) In general**

Notwithstanding clause (i) or (ii) of section 431(20)(A) of this title, and subject to subparagraph (B), paragraph (1) shall not apply to any amount expended or disbursed by a State, district, or local committee of a political party for an activity described in either such clause to the extent the amounts expended or disbursed for such activity are allocated (under regulations prescribed by the Commission) among amounts–

**(i)** which consist solely of contributions subject to the limitations, prohibitions, and reporting requirements of this Act (other than amounts described in subparagraph (B)(iii)); and

**(ii)** other amounts which are not subject to the limitations, prohibitions, and reporting requirements of this Act (other than any requirements of this subsection).

**(B) Conditions**

Subparagraph (A) shall only apply if–

**(i)** the activity does not refer to a clearly identified candidate for Federal office;

**(ii)** the amounts expended or disbursed are not for the costs of any broadcasting, cable, or satellite communication, other than a communication which refers solely to a clearly identified candidate for State or local office;

**(iii)** the amounts expended or disbursed which are described in subparagraph (A)(ii) are paid from amounts which are donated in accordance with State law and which meet the requirements of subparagraph (C), except that no person (including any person established, financed,

maintained, or controlled by such person) may donate more than $10,000 to a State, district, or local committee of a political party in a calendar year for such expenditures or disbursements; and

**(iv)** the amounts expended or disbursed are made solely from funds raised by the State, local, or district committee which makes such expenditure or disbursement, and do not include any funds provided to such committee from–

**(I)** any other State, local, or district committee of any State party,

**(II)** the national committee of a political party (including a national congressional campaign committee of a political party),

**(III)** any officer or agent acting on behalf of any committee described in subclause (i) or (II), or

**(IV)** any entity directly or indirectly established, financed, maintained, or controlled by any committee described in subclause (i) or (II).

**(C) Prohibiting involvement of National parties, Federal candidates and officeholders, and State parties acting jointly**

Notwithstanding subsection (e) of this section (other than subsection (e)(3) of this section), amounts specifically authorized to be spent under subparagraph (B)(iii) meet the requirements of this subparagraph only if the amounts–

**(i)** are not solicited, received, directed, transferred, or spent by or in the name of any person described in subsection (a) or (e) of this section; and

**(ii)** are not solicited, received, or directed through fundraising activities conducted jointly by 2 or

more State, local, or district committees of any political party or their agents, or by a State, local, or district committee of a political party on behalf of the State, local, or district committee of a political party or its agent in one or more other States.

**(c) Fundraising costs**

An amount spent by a person described in subsection (a) or (b) of this section to raise funds that are used, in whole or in part, for expenditures and disbursements for a Federal election activity shall be made from funds subject to the limitations, prohibitions, and reporting requirements of this Act.

* * * * *

**(e) Federal candidates**

**(1) In general**

A candidate, individual holding Federal office, agent of a candidate or an individual holding Federal office, or an entity directly or indirectly established, financed, maintained or controlled by or acting on behalf of 1 or more candidates or individuals holding Federal office, shall not–

**(A)** solicit, receive, direct, transfer, or spend funds in connection with an election for Federal office, including funds for any Federal election activity, unless the funds are subject to the limitations, prohibitions, and reporting requirements of this Act; or

**(B)** solicit, receive, direct, transfer, or spend funds in connection with any election other than an election for Federal office or disburse funds in connection with such an election unless the funds—

**(i)** are not in excess of the amounts permitted with respect to contributions to candidates and

political committees under paragraphs (1), (2), and (3) of section 441a(a) of this title; and

**(ii)** are not from sources prohibited by this Act from making contributions in connection with an election for Federal office.

* * * * *

**§ 30145. Period of limitations**

**(a)** No person shall be prosecuted, tried, or punished for any violation of subchapter I of this chapter, unless the indictment is found or the information is instituted within 5 years after the date of the violation.

**(b)** Notwithstanding any other provision of law–

**(1)** the period of limitations referred to in subsection (a) of this section shall apply with respect to violations referred to in such subsection committed before, on, or after the effective date of this section; and

**(2)** no criminal proceeding shall be instituted against any person for any act or omission which was a violation of any provision of subchapter I of this chapter, as in effect on December 31, 1974, if such act or omission does not constitute a violation of any such provision, as amended by the Federal Election Campaign Act Amendments of 1974.

# APPENDIX C

# EDITORIAL RECLASSIFICATION TABLE FOR TITLE 52

| Title | Former Designation | Current Designation |
|---|---|---|
| Definitions | 2 U.S.C. § 431 | 52 U.S.C. § 30101 |
| Organization of political committees | 2 U.S.C. § 432 | 52 U.S.C. § 30102 |
| Reporting requirements | 2 U.S.C. § 434 | 52 U.S.C. § 30104 |
| Enforcement | 2 U.S.C. § 437g | 52 U.S.C. § 30109 |
| Use of contributed amounts for certain purposes | 2 U.S.C. § 439a | 52 U.S.C. § 30114 |
| Limitations on contributions and expenditures | 2 U.S.C. § 441a | 52 U.S.C. § 30116 |
| Contributions or expenditures by national banks, corporations, or labor organizations | 2 U.S.C. § 441b | 52 U.S.C. § 30118 |
| Contributions by government contractors | 2 U.S.C. § 441c | 52 U.S.C. § 30119 |
| Publication and distribution of statements and solicitations; charge for newspaper or magazine space | 2 U.S.C. § 441d | 52 U.S.C. § 30120 |
| Contributions and donations by foreign nationals | 2 U.S.C. § 441e | 52 U.S.C. § 30121 |
| Contributions in name of another prohibited | 2 U.S.C. § 441f | 52 U.S.C. § 30122 |
| Limitation on contribution of currency | 2 U.S.C. § 441g | 52 U.S.C. § 30123 |
| Fraudulent misrepresentation of campaign authority | 2 U.S.C. § 441h | 52 U.S.C. § 30124 |
| Soft money of political parties | 2 U.S.C. § 441i | 52 U.S.C. § 30125 |
| Period of limitations | 2 U.S.C. § 455 | 52 U.S.C. § 30145 |
| Prohibited Acts | 42 U.S.C. § 1973i | 52 U.S.C. § 10307 |
| Criminal Penalties | 42 U.S.C. § 1973gg-1 | 52 U.S.C. § 20511 |

# APPENDIX D

## TABLE OF CASES

### CASES

*AFL-CIO v. Fed. Election Comm'n*,
628 F.2d 97 (D.C. Cir. 1980)....................................................15
*Anderson v. United States*, 417 U.S. 211 (1974)....................1, 36
*Austin v. Michigan Chamber of Commerce*,
494 U.S. 652 (1990)................................................................133
*Bialek v. Mukaskey*, 529 F.3d 1267 (10th Cir. 2008)....................151
*Biller v. Merit Sys. Prot. Bd.*, 863 F.2d 1079 (2d Cir. 1988)......114
*Blaylock v. Merit Sys. Prot. Bd.*,
851 F.2d 1348 (11th Cir. 1988) ..............................................114
*Blitz v. United States*, 153 U.S. 308 (1894) ....................................36
*Blockburger v. United States*, 284 U.S. 299 (1932) .................43
*Branti v. Finkel*, 445 U.S. 507 (1980) .................................100, 109
*Brehm v. United States*, 196 F.2d 769 (D.C. Cir. 1952)................101
*Buckley v. Valeo*, 424 U.S. 1 (1976) ......................................passim
*Buckley v. Valeo*,
519 F.2d 821 (D.C. Cir. 1975) (en banc) ...........................205, 206
*Burroughs v. United States*, 290 U.S. 534 (1934).............122, 203
*Cheek v. United States*, 498 U.S. 192 (1991) ..........................153, 154
*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010)........................................................ 133–135
*Civil Serv. Comm. v. Letter Carriers*,
413 U.S. 548 (1973)...................................................................112
*Connick v. Myers*, 461 U.S. 138 (1983) .......................................108
*Cort v. Ash*, 422 U.S. 66 (1975) ..............................................134
*Crolich v. United States*, 196 F.2d 879 (5th Cir. 1952)..................35
*Dennis v. United States*, 384 U.S. 855 (1966) ..............................162
*Duncan v. Poythress*, 657 F.2d 691 (5th Cir. 1981) ......................36
*Elrod v. Burns*, 427 U.S. 347 (1976) ...........................100, 101, 109
*Evans v. United States,* 504 U.S. 255 (1992) ..............................122
*Ex parte Curtis*, 106 U.S. 371 (1882) .........................................101
*Ex parte Siebold*, 100 U.S. 371 (1880).......................................19, 36
*Ex parte Yarborough*, 110 U.S. 651 (1884)...............................19, 33

*Fed. Election Comm'n v. Wis. Right to Life*,
551 U.S. 449 (2007) ..... 135
*Fed. Election Comm'n v. Nat'l Right to Work Comm.*,
459 U.S. 197 (1982). ..... 203, 204
*Fed. Election Comm'n v. Mass. Citizens for Life, Inc.*, 479 U.S.
238 (1986) ..... 126
*Fieger v. U.S. Attorney General*, 542 F.3d 1111 (6th Cir. 2008) .. 151
*Fields v. United States*, 228 F.2d 544 (4th Cir. 1955) ..... 35
*First Nat'l Bank of Boston v. Bellotti*,
435 U.S. 765 (1978) ..... 134
*Fotie v. United States,* 137 F.2d 831 (8th Cir. 1943) ..... 63
*Guinn v. United States*, 238 U.S. 347 (1915) ..... 20
*Haas v. Henkel*, 216 U.S. 462 (1910) ..... 162
*Hammerschmidt v. United States*, 265 U.S. 182 (1924) ..... 162
*In re Coy*, 127 U.S. 731 (1888) ..... 19, 36, 56
*Ingber v. Enzor*, 664 F. Supp. 814 (S.D.N.Y. 1987) ..... 26
*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962) ..... 76
*Langer v. United States*, 76 F.2d 817 (8th Cir. 1935) ..... 100
*Marcus v. Holder*, 574 F.3d 1182 (9th Cir. 2009) ..... 151
*McConnell v. Fed. Election Comm'n*,
540 U.S. 93 (2003) ..... passim
*McCormick v. United States*, 500 U.S. 257 (1991) ..... 122
*McCutcheon v. Fed. Election Comm'n*,
134 S. Ct. 1434 (2014) ..... 130
*McIntosh v. United States*, 385 F.2d 274 (8th Cir. 1967) ..... 66
*McNally v. United States*, 483 U.S. 350 (1987) ..... passim
*Nat'l Right to Work Comm. v. Fed. Election Comm'n*, 716 F.2d
1401 (D.C. Cir. 1983) ..... 154
*Newberry* v. *United States*, 256 U.S. 232 (1918) ..... 20
*Nixon v. Shrink Missouri PAC*, 528 U.S. 377 (2000) ..... 131
*Oregon v. Mitchell*, 400 U.S. 112 (1970) ..... 36
*Perrin v. United States*, 444 U.S. 37 (1979) ..... 64
*Pipefitters v. United States*, 407 U.S. 385 (1972) ..... 135, 205
*Ratzlaf v. United States*, 510 U.S. 135 (1994) ..... 153, 154
*Reynolds v. Sims*, 377 U.S. 533 (1964) ..... 20, 36
*Rutan v. Republican Party of Illinois*,
497 U.S. 62 (1990) ..... 100, 101, 108
*Ryan v. United States*, 99 F.2d 864 (8th Cir. 1938) ..... 35

*Schwartz v. Upper Deck Co.*, 183 F.R.D. 672 (S.D. Cal. 1999)..... 64
*Skilling v. United States*, 561 U.S. 358 (2010).......................... 21, 67
*SpeechNow.org v. Fed. Election Comm'n*,
599 F.3d 686 (D.C. Cir. 2010) ......................................... 132, 134
*United Public Workers v. Mitchell*, 330 U.S. 75 (1947)............ 112
*United States v. Anderson*, 481 F.2d 685 (4th Cir. 1973)........ 20, 37
*United States v. Auto. Workers*,
352 U.S. 567 (1957) ........................................... 135, 202, 203, 204
*United States v. Canales*, 744 F.2d 413 (5th Cir. 1984) ........... 44
*United States v. Fin. Comm. to Re-elect the President*,
507 F.2d 1194 (D.C. Cir. 1974) ....................................... 160
*United States v. Gradwell*, 243 U.S. 476 (1917)........................ 20
*United States v. Hopkins*, 916 F.2d 207 (5th Cir. 1990) ....... passim
*United States v. Howard*, 774 F.2d 838 (7th Cir. 1985)................. 37
*United States v. Ingber*,
Cr. No. 86-1402 (2d Cir. Feb. 4, 1987) ................................ 26
*United States v. Kelley*, 395 F.2d 727 (2d Cir. 1968).................... 66
*United States v. Malmay*, 671 F.2d 869 (5th Cir. 1982).......... 19, 45
*United States v. Mason*, 673 F.2d 737 (4th Cir. 1982)........... 19, 43
*United States v. Olinger*,
759 F.2d 1293 (7th Cir. 1985).............................. 20, 37, 45, 46
*United States v. Pintar*, 630 F.2d 1270 (8th Cir. 1980) ............ 100
*United States v. Prude*, 489 F.3d 873 (7th Cir. 2007) ............. 58
*United States v. Webb*,
689 F. Supp. 703 (W.D. Ky. 1988)........................ 26, 69, 71
*United States v. Weston*, 417 F.2d 181 (4th Cir. 1969) ................. 35
*United States v. Woodward*, 469 U.S. 105 (1985)....................... 165
*United States v. Adams*, 722 F.3d 788 (6th Cir. 2013)..................... 91
*United States v. Bagnariol*, 665 F.2d 877 (9th Cir. 1981);............. 66
*United States v. Bathgate*, 246 U.S. 220 (1918)........................ 20, 36
*United States v. Blanton*, 77 F. Supp. 812 (E.D. Mo. 1948)........... 44
*United States v. Boards*,
10 F.3d 587 (8th Cir. 1993) ..................................... 30, 41, 42, 49
*United States v. Boards*,
Cr. No. LR-92-18 (E.D. Ark. Sept. 12, 1994) ....................... 177
*United States v. Bowman*, 636 F.2d 1003 (5th Cir. 1981)........ 41, 43
*United States v. Bracewell*,
Cr. No. 91-57-N (M.D. Ala., May 9, 1991) .......................... 166

*United States v. Bradberry*, 517 F.2d 498 (7th Cir. 1975)............35
*United States v. Braddock*, Crim. No. 12-cr-157,
2013 WL 4441531 (D. Conn. Aug. 14, 2013)..........................160
*United States v. Brown*, 49 F.3d 1162 (6th Cir. 1995) ............ 35–36
*United States v. Bryan*, 524 U.S. 184 (1998)...........................passim
*United States v. Burleson*, 127 F. Supp. 400 (E.D. Tenn. 1954) ..101
*United States v. C.I.O.*, 335 U.S. 106 (1948) ...............................135
*United States v. Campbell*, 845 F.2d 782 (8th Cir. 1988).............45
*United States v. Carmichael*, 685 F.2d 903 (4th Cir. 1982)......41, 45
*United States v. Chestnut*, 533 F.2d 40 (2d Cir. 1976) ................158
*United States v. Cianciulli*,
482 F. Supp. 585 (E.D. Pa. 1979) ...........................24, 40, 45, 77
*United States v. Cicco*, 10 F.3d 980 (3d Cir. 1993)......................110
*United States v. Cicco*, 938 F.2d 441 (3d Cir. 1991)...........109, 110
*United States v. Classic*, 313 U.S. 299 (1941).............20, 33, 34, 38
*United States v. Cole*, 41 F.3d 303 (7th Cir. 1994) .................passim
*United States v. Collins*, 685 F.3d 651 (7th Cir. 2012) ..................40
*United States v. Colvin*, 353 F.3d 569 (7th Cir. 2003)....................35
*United States v. Cooper*, 677 F. Supp. 778 (D. Del. 1988)............68
*United States v. Coppola*, 671 F.3d 220 (2d Cir. 2012) .................70
*United States v. Danielczyk*,
788 F. Supp. 2d 472 (E.D. Va. 2011)................................153, 154
*United States v. Danielczyk*,
917 F. Supp. 2d 573, 578-80 (E.D. Va. 2013) ..........................123
*United States v. Dansker*, 537 F.2d 40 (3d Cir. 1976) ...................64
*United States v. Daugherty*, 952 F.2d 969 (8th Cir. 1991)..........45
*United States v. Davis*, 780 F.2d 838 (10th Cir. 1985) ..................66
*United States v. DeFries*, 43 F.3d 707 (D.C. Cir. 1995) ..............72
*United States v. Doherty*, 867 F.2d 47 (1st Cir. 1989)............68, 70
*United States v. Douglas*, No. 309-014,
2010 WL 737330 (S.D. Ga. Mar. 2, 2010)................................39
*United States v. Ferrara*, 701 F. Supp. 39 (E.D.N.Y. 1988)...........68
*United States v. Franklin,* 188 F.2d 182 (7th Cir. 1951)................63
*United States v. Gabriel,* 125 F.3d 89 (2d Cir. 1997 .....................161
*United States v. Garcia*, 719 F.2d 99 (5th Cir. 1983)........43, 44, 45
*United States v. George*, No. 86–CR–123,
1987 WL 48848 (W.D. Ky. Oct. 20, 1987) .....................26, 70
*United States v. Goodrich*, 871 F.2d 1011 (11th Cir. 1989)...........70

*United States v. Granberry*,
908 F.2d 278 (8th Cir. 1990) ............................................68, 71
*United States v. Hankin*, 607 F.2d 611 (3d Cir. 1979) ...............142
*United States v. Hansen*, 772 F.2d 940 (D.C. Cir. 1985)..............160
*United States v. Haynes*, Nos. 91-5979, 91-6076,
1992 WL 296782 (6th Cir. Oct. 15, 1992) ..........................passim
*United States v. Hogue*, 812 F.2d 1568 (11th Cir. 1987) .......47
*United States v. Hsia*, 176 F.3d 517 (D.C. Cir. 1999) ...........passim
*United States v. Huizar-Velazquez*,
720 F.3d 1189 (9th Cir. 2013) ..................................................173
*United States v. Int'l Union of Operating Eng.*,
638 F.2d 1161 (9th Cir. 1979)....................................................151
*United States v. Jabara*, 644 F.2d 574 (6th Cir. 1981) ..................66
*United States v. Kanchanalak*,
192 F.3d 1037 (D.C. Cir. 1999) ................................................160
*United States v. Karigiannis*, 430 F.2d 148 (7th Cir. 1970) ..........64
*United States v. Karlsen*, Cr. No. 89-35
(D. Az., indictment filed Oct. 18, 1989)................................166
*United States v. Knight*, 490 F.3d 1268 (11th Cir. 2007) ................64
*United States v. Lewin*, 467 F.2d 1132 (7th Cir. 1972) .................44
*United States v. Manzo*, 851 F. Supp. 2d 797 (D.N.J. 2012)..........65
*United States v. McCranie*,
169 F.3d 723 (11th Cir. 1999)........................................21, 39, 44
*United States v. McLean*, 808 F.2d 1044 (4th Cir. 1987)..............36
*United States v. McMillan,* 600 F.3d 434 (5th Cir. 2010) ..............71
*United States v. Morado*, 454 F.2d 167 (5th Cir. 1972) .................34
*United States v. Mosley*, 238 U.S. 383 (1915)...............................34
*United States v. Nader,* 542 F.3d 713 (9th Cir. 2008).....................65
*United States v. Nathan*, 238 F.2d 401 (7th Cir. 1956)..................36
*United States v. North Carolina Republican Party*,
No. 91-161-Civ-5F (E.D.N.C. Feb. 27, 1992) ................. 52–53
*United States v. O'Brien*, 994 F. Supp. 2d 167 (D. Mass 2014) .....68
*United States v. O'Donnell*, Crim. No. 08-872
2009 WL 9041223 (C.D. Cal.) ........................................141, 160
*United States v. Odom*,
736 F.2d 104 (4th Cir. 1984)...............................28, 45, 46, 51
*United States v. Orsburn*, 525 F.3d 543 (7th Cir. 2008) ..............173

*United States v. Passodelis*,
615 F.2d 975 (3d Cir. 1980) ............................................142, 158
*United States v. Peskin*, 527 F.2d 71 (7th Cir. 1975)...............66
*United States v. Polizzi*, 500 F.2d 856 (9th Cir. 1974)................64
*United States v. Price*, 383 U.S. 787 (1966) ................................38
*United States v. Ratcliff*,
488 F.3d 639 (5th Cir. 2007) ...........................................passim
United States v. Rowland, Cr. No. 3:14cr79 (JBA),
2015 WL 1275655 (D. Conn. Mar. 19, 2015) ..................172, 173
*United States v. Salisbury*,
983 F.2d 1369 (6th Cir. 1993)...........................................passim
*United States v. Salisbury*,
Cr. No. 2-90-197 (S.D. Ohio Oct. 8, 1991) ...............................177
*United States v. Saylor*, 322 U.S. 385 (1944).................................34
*United States v. Schermerhorn*,
713 F. Supp. 88 (S.D.N.Y. 1989) ..............................26, 69, 71
*United States v. Slone*, 411 F.3d 643 (6th Cir. 2005)..............passim
*United States v. Smith*, 231 F.3d 800 (11th Cir. 2000).............passim
*United States v. Sorich*, 523 F.3d 702 (7th Cir. 2008) .............68, 70
*United States v. Sparkman*, Cr. No. 99-30,
2008 WL 2787415, (E.D. Ky. July 12, 2000)...........................176
*United States v. Starnes*, 583 F.3d 196 (3d Cir. 2009).............153, 161
*United States v. Stollings*, 501 F.2d 954 (4th Cir. 1974)................20
*United States v. Taff*, 400 F. Supp. 2d 1270 (D. Kan. 2005)........149
*United States v. Thayer*, 209 U.S. 39 (1908)...............................105
*United States v. Thomas*, 510 F.3d 714 (7th Cir. 2007)..................43
*United States v. Thomas*, 686 F. Supp. 1078 (M.D. Pa. 1988)..68, 71
*United States v. Thomas*, Cr. No. 05-0423
(D.D.C., information filed November 30, 2005)......................166
*United States v. Thompson*, No. 6:09–16–KKC,
2013 WL 5528827 (E.D. Ky. Oct. 4, 2013) ...............................35
*United States v. Tobin*, No. 04-216-01 (SM), 2005 WL 3199672
(D.N.H. Nov. 30, 2005) .......................................................35, 57
*United States v. Townsley*,
843 F.2d 1070 (8th Cir. 1988) .......................................34, 37, 56
*United States v. Turner*,
459 F.3d 775 (6th Cir. 2006) ................................25, 69, 70, 71
*United States v. Wadena*, 152 F.3d 831 (8th Cir. 1998) ...........20, 37

*United States v. Welch*, 327 F.3d 1081, 1092 (10th Cir. 2003)......66
*United States v. Whitney*,
229 F.3d 1296 (10th Cir. 2000) .......................................35
*United States v. Whittemore*,
776 F.3d 1074, 1080 (9th Cir. 2015).........................................160
*United States v. Whittemore*,
944 F. Supp. 2d 1003 (D. Nev. 2013) ........................... 152–54, 160
*United States v. Wurzbach*, 280 U.S. 396 (1930)......................101
*Wagner v. FEC*, 793 F.3d 1 (D.C. Cir. 2015)...............................136
*Walker v. United States*, 93 F.2d 383 (8th Cir. 1937) ...................35
*Westchester Cnty. Indep. Party v. Astorino*,
No. 13–CV–773 KMK), 2015 WL 5883718
(S.D.N.Y. Oct. 8, 2015) .............................................. 25, 69–70
*Whalen v. United States*, 445 U.S. 684 (1980).......................43
*Wilkins v. United States*, 376 F.2d 552 (5th Cir. 1967) (*en banc*)...54
*Williams v. United States*, 341 U.S. 97 (1951) .........................34, 38

# EXHIBIT B

# Office of the Attorney General
Washington, D.C. 20530

June 24, 2024

MEMORANDUM FOR ALL DEPARTMENT EMPLOYEES

FROM: THE ATTORNEY GENERAL

SUBJECT: ELECTION YEAR SENSITIVITIES

Department of Justice employees are entrusted with the authority to enforce the laws of the United States and with the responsibility to do so in a neutral and impartial manner. This is particularly important in an election year. Now that the 2024 election season is upon us, and as in prior election cycles, I am issuing this memorandum to remind you of the Department's existing policies with respect to political activities.

## I. STATEMENTS, INVESTIGATIONS, AND CHARGING NEAR AN ELECTION

The Department of Justice has a strong interest in the prosecution of election-related crimes, such as those involving federal and state campaign finance laws, federal patronage laws, and corruption of the election process. As Department employees, however, we must be particularly sensitive to safeguarding the Department's reputation for fairness, neutrality, and non-partisanship.

Simply put, partisan politics must play no role in the decisions of federal investigators or prosecutors regarding any investigations or criminal charges. Law enforcement officers and prosecutors may never select the timing of public statements (attributed or not), investigative steps, criminal charges, or any other action in any matter or case for the purpose of affecting any election, or for the purpose of giving an advantage or disadvantage to any candidate or political party. Such a purpose, or the appearance of such a purpose, is inconsistent with the Department's mission and with the Principles of Federal Prosecution. *See* JM § 9-27.260 – Initiating and Declining Charges – Impermissible Considerations; JM § 9-85.500 – Actions that May Have an Impact on an Election.

If you face an issue, or the appearance of an issue, regarding the timing of statements, investigative steps, charges, or other actions near the time of a primary or general election, contact the Public Integrity Section of the Criminal Division ("PIN") for further guidance. Such consultation is also required at various stages of all criminal matters that focus on violations of federal and state campaign-finance laws, federal patronage crimes, and corruption of the election process. More detailed guidance is available in Sections 1-4 and 9-85 of the Justice Manual at https://www.justice.gov/jm/justice-manual.

Finally, Department employees must also adhere to the additional requirements issued by the Attorney General on February 5, 2020, governing the opening of criminal and counterintelligence investigations by the Department, including its law enforcement agencies, related to politically sensitive individuals and entities. *See* Memorandum of Attorney General William Barr, Additional Requirements for the Opening of Certain Sensitive Investigations, February 5, 2020 ("February 2020 AG Memorandum"). Any questions regarding the scope or requirements of the February 2020 AG Memorandum should be directed to PIN.

## II. HATCH ACT

As you are aware, the Hatch Act generally prohibits Department employees from engaging in partisan political activity while on duty, in a federal facility, or using federal property. Please note that this prohibition includes using the Internet at work for any political activities. The Act also prohibits us from using our authority for the purpose of affecting election results; soliciting (or discouraging) political participation; soliciting, accepting, or receiving political contributions; and generally from running as a candidate in a partisan election.

In addition to restrictions on what Department employees may and may not do while on duty, while using government property, and in off-duty activities, certain employees are further restricted from engaging in certain political activity even while not on duty. The degree to which an employee is restricted in his/her off duty activities depends on his/her position, with further restrictions applying to members of the career SES, administrative law judges, Criminal Investigators and Explosives Enforcement Officers of the Bureau of Alcohol, Tobacco and Firearms, non-career appointees in the Department, and employees of the Criminal Division, National Security Division, and the Federal Bureau of Investigation. If you are unclear on these restrictions or the classification of your position, please consult with your component's designated ethics official about the limits of permissible activity prior to engaging in any political activity. You can also visit the Justice Management Division's Ethics page at www.justice.gov/jmd/political-activities for more detailed information, which includes the most recent guidance issued by the Assistant Attorney General for Administration and links to memoranda issued to both career employees and non-career appointees dated August 30, 2022.

It is critical that each of us complies with the Hatch Act and the principles set out in this memorandum to ensure that the public retains its confidence that we are adhering to our responsibility to administer justice in a neutral manner. The Department's reputation for fairness and impartiality depends upon it.

# EXHIBIT C

JUSTICE MANUAL

## Title 9: Criminal

# 9-85.000 - Protection of Government Integrity


| | |
|---|---|
| 9-85.100 | Supervisory Jurisdiction |
| 9-85.101 | Bribery of Public Officials |
| 9-85.110 | Investigations Involving Members of Congress |
| 9-85.200 | Federally Protected Activities (18 U.S.C. § 245) |
| 9-85.210 | Violations of Campaign Financing Laws, Federal Patronage Laws, and Corruption of Elections — Consultation Requirement |
| 9-85.220 | Purchase and Sale of Public Office (18 U.S.C. §§ 210, 211) |
| 9-85.300 | Non-Interference in Elections When Conducting Federal Criminal Investigations Involving Ballot Fraud |
| 9-85.400 | Armed Officials Where Elections are Held |
| 9-85.500 | Actions that May Have an Impact on an Election |

## 9-85.100 Supervisory Jurisdiction

This chapter addresses crimes which affect government integrity, including bribery of public officials and accepting a gratuity, election crimes, and other related offenses. The Public Integrity Section of the Criminal Division has supervisory jurisdiction over these offenses.

[Updated April 2018]

## 9-85.101 Bribery of Public Officials

Section 201 of Title 18 is entitled "Bribery of public officials and witnesses." The statute comprises two distinct offenses, however, in common parlance only the first, codified in section 201(b) of the statute, is true "bribery." The second offense, codified in section 201(c), concerns what are commonly known as "gratuities," although that word does not appear anywhere in the statute. Due to this distinction, government attorneys should take particular care and should not hesitate to consult with the Public Integrity Section of the Criminal Division.

[updated January 2020]

## 9-85.110 Investigations Involving Members of Congress

Consultation with the Public Integrity Section ("PIN") is required in all investigations involving a Member of Congress or congressional staff member ("Congressional Staffer").[1] As set forth in the table below, such consultation shall occur, and where required, approval shall be obtained, prior to opening any investigation or taking particular investigative steps involving a Member of Congress or Congressional Staffer, including, but not limited to:

- interviewing or subpoenaing a Member of Congress or Congressional Staffer (unless the Member of Congress or Congressional Staffer is being interviewed as a victim);
- obtaining a subpoena, 2703(d) order, search warrant, or other legal process for records, information, or property belonging to a Member of Congress, Congressional Office, or Congressional Staffer; or
- engaging in consensual monitoring of oral communications of a Member of Congress or Congressional Staffer. Consensual monitoring in an investigation involving allegations of misconduct by a Member of Congress also requires approval by a Deputy Assistant Attorney General. *See* JM 9-7.302.

PIN may also recommend partnership with United States Attorney's Offices or other prosecuting components on particular matters that implicate PIN's areas of expertise.

As set forth in the table below, certain charging decisions and resolutions of criminal charges in such investigations require PIN approval. For example, any criminal charge, resolution of a criminal charge, or declination in a matter in which a Member of Congress is an investigative subject or target requires prior approval by PIN. (Note that plea agreements involving defendants who are candidates for Congress also require prior approval by PIN. *See* JM 9-16.110.) Where consultation or approval is required, no investigative action shall be taken until such consultation has been completed or such approval has been obtained.

U.S. Attorney's Offices should also apply elevated internal review and approval requirements for all investigative steps identified below, with U.S. Attorney approval required where PIN approval is required.

The requirements in this section are in addition, and not an alternative, to other consultation and approval requirements in the Justice Manual. Further, prior to taking an investigative step governed by one of the requirements set forth in this section, the United States Attorney's Office or other prosecuting component must file an Urgent Report. *See* JM 1-13.130. The Urgent Report should indicate whether PIN concurred with, or approved of, the planned investigative step.

| **Investigative Step/Prosecutorial Decision** | **Consultation or Approval Requirement**[2] |
|---|---|
| Case Opening, Where a Subject or Target is a Member of Congress, or Congressional Staffer When Related to the Staffer's Duties | Consultation with PIN |
| Issuance of Subpoena to a Congressional Office, Member of Congress, or Congressional Staffer | Consultation with PIN |
| Issuance of Subpoena to Third Party for Records Belonging to a Congressional Office, Member of Congress, or Congressional Staffer When Related to the Staffer's Duties | Approval by PIN |
| Issuance of Subpoena to Third Party for Records Belonging to Congressional Staffer When Unrelated to the Staffer's Duties | Consultation with PIN |
| Applications, Pursuant to 18 U.S.C. §§ 2703(d) or 2705(b), [3] for Records Belonging to a Congressional Office Member of Congress, or Congressional Staffer When Related to the Staffer's Duties | Approval by PIN |

| | |
|---|---|
| Applications, Pursuant to 18 U.S.C. §§ 2703(d) or 2705(b), for Records Belonging to Congressional Staffer When Unrelated to the Staffer's Duties | Consultation with PIN |
| Application for Pen Register or Trap & Trace Surveillance of Devices or Accounts Belonging to a Congressional Office Member of Congress, or Congressional Staffer When Related to the Staffer's Duties | Approval by PIN |
| Application for Pen Register or Trap & Trace Surveillance of Devices or Accounts Belonging to a Congressional Staffer When Unrelated to the Staffer's Duties | Consultation with PIN |
| Interview of Member of Congress or Congressional Staffer, Except When Member of Congress or Congressional Staffer Is a Victim | Consultation with PIN |
| Government-Directed Contact, by a Source or Government Cooperator, with Member of Congress or Congressional Staffer | Approval by PIN |
| Application for Warrant for Records, Information, or Property Belonging to a Congressional Office, Member of Congress, or Congressional Staffer, or for a Location or Device in Which Legislative Materials Are Likely To Be Found[4] | Approval by PIN |
| Application for Title III Electronic Surveillance if Member of Congress's or Congressional Staffer's Communications May Be Intercepted | Approval by PIN[5] |
| Consensual Electronic Monitoring of Oral Communications of Member of Congress or Congressional Staffer | Approval by PIN |
| Charging (Whether by Criminal Complaint, Information, or Indictment) in Matter in Which a Member of Congress Is a Subject or Target for Conduct Related to Public Office or Campaign Activities | Approval by PIN |
| Charging (Whether by Criminal Complaint, Information, or Indictment) in Matter in Which a Member of Congress Is a Subject or Target for Conduct Unrelated to Public Office or Campaign Activities | Consultation with PIN |
| Resolution of Criminal Charges (Guilty Plea, DPA, NPA, or Declination) in Matter in Which a Member of Congress Is a Subject or Target | Approval by PIN |
| Resolution of Criminal Charges Against a Congressional Staffer (Guilty Plea, DPA, NPA, or Declination) in Matter in Which a Member of Congress Is Not a Subject or Target | Consultation with PIN |

[1] In investigations in which Members of Congress or their offices or staff are crime victims — such as in a threats case, or when money or property is stolen from a Congressional office — prosecutors are generally encouraged but not required to consult with PIN. However, if investigative or prosecutorial steps that are otherwise addressed in this section become necessary in such a case, then the PIN consultation and approval requirements set forth in the chart below would apply. For example, if the investigation into a crime committed against a Member of Congress were to require a subpoena for records belonging to a Congressional office, then PIN consultation would be required.

[2] PIN must notify the Criminal Division's Assistant Attorney General of consultations and approvals undertaken.

[3] If a § 2705(b) order would delay notice to a Member of Congress, Congressional Office, or a Congressional Staffer, as defined in JM 9-85.110 , the prosecutor must disclose such information in the application to the Court. JM 9-13.700(2) .

[4] This approval requirement also applies to warrants for GPS or other location data and tracking devices for vehicles or other property, devices, or accounts belonging to a Member of Congress, Congressional Staffer, Congressional Office, or in which legislative materials are likely to be found.

[5] Additional approvals from the Office of Enforcement Operations, a Criminal Division Deputy Assistant Attorney General, and/or an Assistant Attorney General are required for TIIIs, as well as consensual monitoring in certain circumstances. *See* JM 9-7.000 *et seq.*

[updated September 2024]

## 9-85.200 - Federally Protected Activities (18 U.S.C. § 245)

No prosecution of an offense described in 18 U.S.C. § 245 (Federally Protected Activities) may be undertaken by the United States except upon the certification of the Attorney General, Deputy Attorney General, Associate Attorney General, or Assistant Attorney General for the Civil Rights or Criminal Division that in his or her judgment a prosecution by the United States is in the public interest and necessary to secure substantial justice. The function of certification may not be delegated. *See* 18 U.S.C. § 245(a)(1). The anti-riot provision, 18 U.S.C. § 245(b)(3), and violations of 18 U.S.C. § 245(b)(1), insofar as that provision relates to matters not involving

discrimination or intimidation on grounds of race, color, religion, or national origin, are assigned to the Criminal Division and requests for certification relating to them should be sent to the Criminal Division.

When the offense involves voting, and race is not an issue, prosecutors should contact the Public Integrity Section of the Criminal Division. When the offense involves voting and race is an issue, prosecutors should contact the Criminal Section of the Civil Rights Division. For required authorizations in civil rights cases, including offenses under 18 U.S.C. §§ 247 and 249, *see* JM Sections 8-1.010 to 8-3.300.

[cited in JM 9-2.112; JM 9-85.210] [updated August 2022]

## 9-85.210 - Violations of Campaign Financing Laws, Federal Patronage Laws, and Corruption of Elections — Consultation Requirement

***Department leadership is currently revising this section. The Consultation Requirement is suspended while revisions are ongoing. [June 2025]***

Consultation with the Public Integrity Section of the Criminal Division is required in each federal criminal matter that involves alleged or suspected violations of federal or state campaign financing laws, federal patronage crimes, or corruption of the election process.

Federal prosecutors and agents must consult with the Public Integrity Section prior to opening any such matter or taking any potentially overt investigative step, including but not limited to interviewing witnesses, issuing grand jury subpoenas, executing search warrants, or conducting surveillance. This provision does not, however, apply to intaking a complaint, provided that the intaking component advises the complainant that receiving a complaint in no way implies that there is or will be any federal criminal investigation of the allegation.

Federal prosecutors shall also consult with the Public Integrity Section before instituting grand jury proceedings relating to, or filing an information or seeking an indictment charging, a campaign finance, ballot fraud, or patronage offense.

Matters for which consultation with the Public Integrity Section is required include, but are not limited to, investigations and prosecutions of the offenses codified in: 18 U.S.C. §§ 592 to 611; 52 U.S.C. §§ 10307, 20511, 20701, 30101-30145; and prosecutive theories that involve election fraud or campaign fund raising violations using 18 U.S.C. §§ 241, 242, and 245; 18 U.S.C. § 371; 18 U.S.C. §§ 1341, 1343, and 1346; 18 U.S.C. § 1952; and 18 U.S.C. §§ 1956 and 1957.

[cited in JM 9-43.100] [updated August 2022]

## 9-85.220 - Purchase and Sale of Public Office (18 U.S.C. §§ 210, 211)

United States Attorneys shall consult with the Public Integrity Section of the Criminal Division before instituting grand jury proceedings, filing an information, or seeking an indictment for violations of 18 U.S.C. §§ 210 and 211 (Purchase and Sale of Public Office).

[updated August 2022]

## 9-85.300 Non-Interference in Elections When Conducting Federal Criminal Investigations Involving Ballot Fraud

Ballot fraud is crime involving the process by which voters are registered, votes are cast, or votes are tabulated. The Department has long recognized that the States – not the federal government – are responsible for administering elections, determining the validity of votes, and tabulating the results, with challenges handled by the appropriate election administrators, officials, legislatures, and courts. The Department has a limited role in these processes and should generally avoid interfering or appearing to interfere with election administration, tabulation, validation, or certification. *See* § 9-85.500. The Department's role is limited to investigating and prosecuting violations of federal election laws and deterring criminal conduct. Accordingly, the Department should not engage in overt criminal investigative measures in matters involving alleged ballot fraud until the election in question has been concluded, its results certified, and all recounts and election contests concluded. Doing otherwise runs the risk of chilling legitimate voting and campaign activities and of interjecting the investigation itself into ongoing campaigns and the adjudication of any ensuing election contest. It may, however, often be appropriate, in consultation with the Public Integrity Section, to share information and allegations involving such matters with state or local authorities where an immediate need for overt measures exists. Exceptions to this policy may be recognized, but only with the approval of the Public Integrity Section.

[added August 2022]

## 9-85.400 Armed Officials Where Elections are Held

Issues involving the application of 18 U.S.C. § 592, which prohibits armed federal presence where elections are held, are supervised by the Public Integrity Section. When issues arise regarding the presence of armed officials at a location where an election is being held, federal prosecutors and agents must consult the Public Integrity Section.

[added August 2022]

## 9-85.500 Actions that May Have an Impact on an Election

Federal prosecutors and agents may never select the timing of any action, including investigative steps, criminal charges, or statements, for the purpose of affecting any election, or for the purpose of giving an advantage or disadvantage to any candidate or political party. Such a purpose is inconsistent with the Department's mission and with the Principles of Federal Prosecution. *See* § 9-27.260. Any action likely to raise an issue or the perception of an issue under this provision requires consultation with the Public Integrity Section, and such action shall not be taken if the Public Integrity Section advises that further consultation is required with the Deputy Attorney General or Attorney General.

[added August 2022]

9-79.000 - Other Criminal Division Statutes 9-90.000 - National Security

# EXHIBIT D

JUSTICE MANUAL

## Title 9: Criminal

# 9-27.000 - Principles of Federal Prosecution


| | |
|---|---|
| 9-27.001 | Preface |
| 9-27.110 | Purpose |
| 9-27.120 | Application |
| 9-27.130 | Implementation |
| 9-27.140 | Modifications or Departures |
| 9-27.150 | Non-Litigability |
| 9-27.200 | Initiating and Declining Prosecution — Probable Cause Requirement |
| 9-27.220 | Grounds for Commencing or Declining Prosecution |
| 9-27.230 | Initiating and Declining Charges — Substantial Federal Interest |
| 9-27.240 | Initiating and Declining Charges — Prosecution in Another Jurisdiction |
| 9-27.250 | Non-Criminal Alternatives to Prosecution |

| | |
|---|---|
| 9-27.260 | Initiating and Declining Charges — Impermissible Considerations |
| 9-27.270 | Records of Declined Prosecutions |
| 9-27.300 | Selecting Charges — Conducting an Individualized Assessment |
| 9-27.310 | Charges Triggering Mandatory Minimum Sentences and Statutory Enhancements |
| 9-27.311 | Charges Triggering Mandatory Minimum Sentences and Statutory Enhancements in Certain Drug Cases |
| 9-27.320 | Additional Charges |
| 9-27.330 | Pre-Charge Plea Agreements |
| 9-27.400 | Plea Agreements Generally |
| 9-27.410 | Plea Agreements — Cooperation |
| 9-27.420 | Plea Agreements — Considerations to be Weighed |
| 9-27.430 | Selecting Plea Agreement Charges |
| 9-27.440 | Plea Agreements When Defendant Denies Guilt |
| 9-27.450 | Records of Plea Agreements |
| 9-27.500 | Offers to Plead Nolo Contendere — Opposition Except in Unusual Circumstances |
| 9-27.520 | Offers to Plead Nolo Contendere — Offer of Proof |
| 9-27.530 | Argument in Opposition of Nolo Contendere Plea |
| 9-27.600 | Entering into Non-prosecution Agreements in Return for Cooperation — Generally |
| 9-27.620 | Entering into Non-prosecution Agreements in Return for Cooperation — Considerations to be Weighed |

| | |
|---|---|
| 9-27.630 | Entering into Non-prosecution Agreements in Return for Cooperation — Limiting the Scope of Commitment |
| 9-27.640 | Agreements Requiring Assistant Attorney General Approval |
| 9-27.641 | Multi-District (Global) Agreement Requests |
| 9-27.650 | Records of Non-Prosecution Agreements |
| 9-27.710 | Participation in Sentencing — Generally |
| 9-27.720 | Establishing Factual Basis for Sentence |
| 9-27.730 | Making Sentencing Recommendations |
| 9-27.731 | Making Sentencing Recommendations in Certain Drug Cases |
| 9-27.745 | Unreasonable or Illegal Sentences |
| 9-27.750 | Disclosing Factual Material to Defense |
| 9-27.760 | Limitation on Identifying Uncharged Parties Publicly |

# 9-27.001 - Preface

These principles of federal prosecution provide federal prosecutors a statement of prosecutorial policies and practices. As such, they should promote the reasoned exercise of prosecutorial authority and contribute to the fair, evenhanded administration of the federal criminal laws.

A determination to prosecute represents a policy judgment that the fundamental interests of society require the application of federal criminal law to a particular set of circumstances — recognizing both that serious violations of federal law must be prosecuted, and that prosecution entails profound consequences for the accused, crime victims, and their families whether or not a conviction ultimately results. Other prosecutorial decisions can be equally significant. Decisions, for example, regarding the specific charges to be brought, or

concerning plea dispositions, effectively determine the range of sanctions or other measures that may be imposed for criminal conduct. The rare decision to consent to pleas of nolo contendere may affect the success of related civil suits for recovery of damages. And the government's position during the sentencing process will help ensure that the court imposes a sentence consistent with 18 U.S.C. § 3553(a).

These principles of federal prosecution have been designed to assist in structuring the decision-making process of attorneys for the government. For the most part, they have been cast in general terms with a view to providing guidance rather than to mandating results. The intent is to assure regularity without regimentation, and to prevent unwarranted disparity without sacrificing necessary flexibility.

The availability of this statement of principles to federal law enforcement officials and to the public serves two important purposes: ensuring the fair and effective exercise of prosecutorial discretion and responsibility by attorneys for the government, and promoting confidence on the part of the public and individual defendants that important prosecutorial decisions will be made rationally and objectively based on an individualized assessment of the facts and circumstances of each case. The principles provide convenient reference points for the process of making prosecutorial decisions; they facilitate the task of training new attorneys in the proper discharge of their duties; they contribute to more effective management of the government's limited prosecutorial resources by promoting greater consistency among the prosecutorial activities of all United States Attorney's offices and between their activities and the Department's law enforcement priorities; they make possible better coordination of investigative and prosecutorial activity by enhancing the understanding of investigating departments and agencies of the considerations underlying prosecutorial decisions by the Department; and they inform the public of the careful process by which prosecutorial decisions are made.

Important though these principles are to the proper operation of our federal prosecutorial system, the success of that system must rely ultimately on the character, integrity, sensitivity, and competence of those men and women who are selected to represent the public interest in the federal criminal justice process. It is with their help that these principles have been prepared, and it is with their efforts that the purposes of these principles will be achieved.

[updated June 2023]

# 9-27.110 - Purpose

The principles of federal prosecution set forth herein are intended to promote the reasoned exercise of prosecutorial discretion by attorneys for the government with respect to:

1. Initiating and declining prosecution;
2. Selecting charges;
3. Taking a position on detention or release pending judicial proceedings;
4. Entering into plea agreements;
5. Opposing offers to plead nolo contendere;
6. Entering into non-prosecution agreements in return for cooperation; and
7. Participating in sentencing.

**Comment.** Under the federal criminal justice system, the prosecutor has wide latitude in determining when, whom, how, and even whether to prosecute for apparent violations of federal criminal law. The prosecutor's broad discretion in such areas as initiating or foregoing prosecutions, selecting or recommending specific charges, and terminating prosecutions by accepting guilty pleas has been recognized on numerous occasions by the courts. *See, e.g.*, *United States v. LaBonte,* 520 U.S. 751, 762 (1997)*; Oyler v. Boles*, 368 U.S. 448 (1962); *United States v. Fokker Services B.V.,* 818 F.3d 733, 741 (D.C. Cir. 2016); *Newman v. United States*, 382 F.2d 479 (D.C. Cir. 1967); *Powell v. Ratzenbach*, 359 F.2d 234 (D.C. Cir. 1965). This discretion exists by virtue of the prosecutor's status as a member of the Executive Branch, and the President's responsibility under the Constitution to ensure that the laws of the United States be "faithfully executed." U.S. Const. Art. II § 3. *See Nader v. Saxbe*, 497 F.2d 676, 679 n. 18 (D.C. Cir. 1974).

Since federal prosecutors have great latitude in making crucial decisions concerning enforcement of a nationwide system of criminal justice, it is desirable, in the interest of the fair and effective administration of justice, that all federal prosecutors be guided by a general statement of principles that summarizes appropriate considerations to be weighed, and desirable practices to be followed, in discharging their prosecutorial responsibilities.

Although these principles deal with the specific situations indicated, they should be read in the broader context of the basic responsibilities of federal attorneys: making certain that the general purposes of the criminal law — assurance of warranted punishment, deterrence of further criminal conduct, protection of the public from offenders, and rehabilitation of offenders — are adequately met, while making certain also that the rights of individuals are scrupulously protected.

[cited in JM 9-2.031, JM 9-6.100]

[updated January 2023]

# 9-27.120 - Application

In carrying out criminal law enforcement responsibilities, each Department of Justice attorney should be guided by these principles, and each United States Attorney and each Assistant Attorney General should ensure that such principles are communicated to the attorneys who exercise prosecutorial responsibility within his/her office or under his/her direction or supervision. Prosecutors should further refer to the Attorney General's memoranda — *General Department Policies Regarding Charging, Pleas, and Sentencing* and *Additional Department Policies Regarding Charging, Pleas, and Sentencing in Drug Cases* — for additional background and guidance.

**Comment.** It is expected that each federal prosecutor will be guided by these principles in carrying out his/her criminal law enforcement responsibilities unless a modification of, or departure from, these principles has been authorized pursuant to JM 9-27.140. However, it is not intended that reference to these principles will require a particular prosecutorial decision in any given case. Rather, these principles are set forth solely for the purpose of assisting attorneys for the government in determining how best to exercise their authority in the performance of their duties.

[updated June 2023]

# 9-27.130 - Implementation

Each United States Attorney and responsible Assistant Attorney General should establish internal office procedures to ensure:

1. That prosecutorial decisions are made at an appropriate level of responsibility, and are made consistent with these principles; and
2. That serious, unjustified departures from the principles set forth herein are followed by such remedial action, including the imposition of disciplinary sanctions or other measures, when warranted, as deemed appropriate.

**Comment.** One purpose of such procedures should be to ensure consistency in the decisions within each office by regularizing the decision-making process so that decisions are made at

the appropriate level of responsibility. A second purpose, equally important, is to provide appropriate remedies for serious, unjustified departures from sound prosecutorial principles. The United States Attorney or Assistant Attorney General may also wish to establish internal procedures for appropriate review and documentation of decisions.

[updated June 2023]

# 9-27.140 - Modifications or Departures

United States Attorneys may modify or depart from the principles set forth herein as necessary in the interests of fair and effective law enforcement within the district. Any modification or departure contemplated as a matter of policy or regular practice must be approved by the appropriate Assistant Attorney General where required, *see* JM 9-2.400 (prior approvals chart), and the Deputy Attorney General. Similarly, Assistant Attorneys General overseeing prosecuting components may modify or depart from the principles set forth herein in the interests of fair and effective law enforcement, and any modification or departure contemplated by an Assistant Attorney General as a matter of policy or regular practice must be approved by the Deputy Attorney General.

**Comment.** Although these materials are designed to promote consistency in the application of federal criminal laws, they are not intended to produce rigid uniformity among federal prosecutors in all areas of the country at the expense of the fair administration of justice. Different offices face different conditions and have different requirements. In recognition of these realities, and in order to maintain the flexibility necessary to respond fairly and effectively to local conditions, each United States Attorney and Assistant Attorney General overseeing prosecuting components is authorized to modify or depart from these principles, as necessary in the interests of fair and effective law enforcement within the district. In situations in which any modification or departure is contemplated as a matter of policy or regular practice, the appropriate U.S. Attorney and/or Assistant Attorney General and the Deputy Attorney General must approve the action before it is adopted.

[cited in JM 9-27.120]

[updated June 2023]

# 9-27.150 - Non-Litigability

These principles, and internal office procedures adopted pursuant to them, are intended solely for the guidance of attorneys for the government. They are not intended to create a substantive or procedural right or benefit, enforceable at law , and may not be relied upon by a party to litigation with the United States.

**Comment.** The Principles of Federal Prosecution have been developed purely as matter of internal Departmental policy and are being provided to federal prosecutors solely for their own guidance in performing their duties. Neither this statement of principles nor any internal procedures adopted by individual offices create any rights or benefits. By setting forth this fact explicitly, JM 9-27.150 is intended to foreclose efforts to litigate the validity of prosecutorial actions alleged to be at variance with these principles or not in compliance with internal office procedures. In the event that an attempt is made to litigate any aspect of these principles, to litigate any internal office procedures, or to litigate the applicability of such principles or procedures to a particular case, the attorney for the government should oppose the attempt. The attorney for the government should also notify the Department of the litigation if there is a reasonable possibility the government may face an adverse decision on the litigation or if a court renders an adverse decision.

[updated February 2018]

# 9-27.200 - Initiating and Declining Prosecution — Probable Cause Requirement

If the attorney for the government concludes that there is probable cause to believe that a person has committed a federal offense within his/her jurisdiction, he/she should consider whether to:

1. Request or conduct further investigation;
2. Commence or recommend prosecution;
3. Decline prosecution and refer the matter for prosecutorial consideration in another jurisdiction;
4. Decline prosecution and commence or recommend pretrial diversion or other non-criminal disposition; or
5. Decline prosecution without taking other action.

**Comment.** JM 9-27.200 sets forth the courses of action available to the attorney for the government once he/she concludes that there is probable cause to believe that a person has committed a federal offense within his/her jurisdiction. The probable cause standard is the same standard required for the issuance of an arrest warrant or a summons upon a complaint (*see* Fed. R. Crim. P. 4(a)), and for a magistrate's decision to hold a defendant to answer in the district court (*see* Fed. R. Crim. P. 5.1(a)), and is the minimal requirement for indictment by a grand jury. *See Branzburg v. Hayes*, 408 U.S. 665, 686 (1972). This is, of course, a threshold consideration only. Merely because this requirement can be met in a given case does not automatically warrant prosecution; further investigation may instead be warranted, and the prosecutor should still take into account all relevant considerations, including those described in the following provisions, in deciding upon his/her course of action. On the other hand, failure to meet the minimal requirement of probable cause is an absolute bar to initiating a federal prosecution, and in some circumstances may preclude reference to other prosecuting authorities or recourse to non-criminal sanctions or other measures as well.

[cited in JM 9-10.060; JM 9-2.031]

[updated February 2018]

# 9-27.220 - Grounds for Commencing or Declining Prosecution

The attorney for the government should commence or recommend federal prosecution if he/she believes that the person's conduct constitutes a federal offense, and that the admissible evidence will probably be sufficient to obtain and sustain a conviction, unless (1) the prosecution would serve no substantial federal interest; (2) the person is subject to effective prosecution in another jurisdiction; or (3) there exists an adequate non-criminal alternative to prosecution.

**Comment.** JM 9-27.220 sets forth the longstanding threshold requirement from the *Principles of Federal Prosecution* that a prosecutor may commence or recommend federal prosecution only if he/she believes that the person will more likely than not be found guilty beyond a reasonable doubt by an unbiased trier of fact and that the conviction will be upheld on appeal. Evidence sufficient to sustain a conviction is required under Rule 29(a) of the Federal Rules of Criminal Procedure, to avoid a judgment of acquittal. Moreover, both as a matter of fundamental fairness and in the interest of the efficient administration of justice, no prosecution should be initiated against any person unless the attorney for the government believes that the admissible evidence is sufficient to obtain and sustain a guilty verdict by an unbiased trier of fact. In this

connection, it should be noted that, when deciding whether to prosecute, the government attorney need not have in hand, at that time, all of the evidence upon which he/she intends to rely at trial, if he/she has a reasonable and good faith belief that such evidence will be available and admissible at the time of trial. Thus, for example, it would be proper to commence or recommend a prosecution even though a key witness may be out of the country, so long as there is a good faith basis to believe that the witness's presence at trial could reasonably be expected.

Where the law and the facts create a sound, prosecutable case, the likelihood of an acquittal due to unpopularity of some aspect of the prosecution or because of the overwhelming popularity of the defendant or his/her cause is not a factor prohibiting prosecution. For example, in a civil rights case or a case involving an extremely popular political figure, it might be clear that the evidence of guilt — viewed objectively by an unbiased factfinder — would be sufficient to obtain and sustain a conviction, yet the prosecutor might reasonably doubt, based on the circumstances, that the jury would convict. In such a case, despite his/her negative assessment of the likelihood of a guilty verdict (based on factors extraneous to an objective view of the law and the facts), the prosecutor may properly conclude that it is necessary and appropriate to commence or recommend prosecution and allow the criminal process to operate in accordance with the principles set forth here.

However, the attorney for the government's belief that a person's conduct constitutes a federal offense and that the admissible evidence will probably be sufficient to obtain and sustain a conviction is not sufficient standing by itself to commence or recommend prosecution. The prosecution must also serve a substantial federal interest, and the prosecutor must assess whether, in his/her judgment, the person is subject to effective prosecution in another jurisdiction; and whether there exists an adequate non-criminal alternative to prosecution. It is left to the judgment of the attorney for the government to determine whether these circumstances exist. In exercising that judgment, the attorney for the government should consult JM 9-27.230, 9-27.240, 9-27.250, and 9-27.260.

[cited in JM 6-4.210; JM 9-10.060; JM 9-27.200; JM 9-28.300]

[updated June 2023]

# 9-27.230 - Initiating and Declining Charges — Substantial Federal Interest

In determining whether a prosecution would serve a substantial federal interest, the attorney for the government should weigh all relevant considerations, including:

1. Federal law enforcement priorities, including any federal law enforcement initiatives or operations aimed at accomplishing those priorities;
2. The nature and seriousness of the offense;
3. The deterrent effect of prosecution;
4. The person's culpability in connection with the offense;
5. The person's history with respect to criminal activity;
6. The person's willingness to cooperate in the investigation or prosecution of others;
7. The person’s personal circumstances;
8. The interests of any victims; and
9. The probable sentence or other consequences if the person is convicted.

**Comment.** The list of relevant considerations is not intended to be all-inclusive. Moreover, not all of the factors will be applicable to every case, and in any particular case one factor may deserve more weight than it might in another case.

1. **Federal Law Enforcement Priorities.** Federal law enforcement resources are not sufficient to permit prosecution of every alleged offense over which federal jurisdiction exists. Accordingly, in the interest of allocating its limited resources so as to achieve an effective nationwide law enforcement program, from time to time the Attorney General may establish national investigative and prosecutorial priorities. These priorities are designed to focus federal law enforcement efforts on those matters within the federal jurisdiction that are most deserving of federal attention and are most likely to be handled effectively at the federal level, rather than state or local level. As just one example, prosecution of offenses within the exclusive territorial jurisdiction of the United States, where no other avenue of prosecution exists, serves a particular and important federal interest. In addition, individual United States Attorneys are required to establish their own priorities (in consultation with law enforcement authorities), within the national priorities, in order to concentrate their resources on problems of particular local or regional significance. The Attorney General and individual United States Attorneys may implement specific federal law enforcement initiatives and operations designed at accomplishing those priorities. In weighing the federal interest in a particular prosecution, the attorney for the government should give careful consideration to the extent to which prosecution would accord with these national and local priorities, as well as federal law enforcement initiatives or operations designed to accomplish them, whether on a national level or by important impact on local law enforcement needs. The fact that a particular prosecution is part of a larger federal law enforcement initiative that serves a substantial federal interest is an appropriate and relevant consideration in determining whether that individual prosecution also serves such a federal interest.

2. **Nature and Seriousness of Offense.** It is important that limited federal resources not be wasted in prosecuting inconsequential cases or cases in which the violation is only technical. Thus, in determining whether a substantial federal interest exists that requires prosecution, the attorney for the government should consider the nature and seriousness of the offense involved. A number of factors may be relevant to this consideration. One factor that is obviously of primary importance is the actual or potential impact of the offense on the community and on the victim(s). The nature and seriousness of the offense may also include a consideration of national security interests.

The impact of an offense on the community in which it is committed can be measured in several ways: in terms of economic harm done to community interests; in terms of physical danger to the citizens or damage to public property; and in terms of erosion of the inhabitants' peace of mind and sense of security. In assessing the seriousness of the offense in these terms, the prosecutor may properly weigh such questions as whether the violation is technical or relatively inconsequential in nature and what the public attitude may be toward prosecution under the circumstances of the case. The public may be indifferent, or even opposed, to enforcement of the controlling statute whether on substantive grounds, or because of a history of non-enforcement, or because the offense involves essentially a minor matter of private concern and the victim is not interested in having it pursued. On the other hand, the nature and circumstances of the offense, the identity of the offender or the victim, or the attendant publicity, may be such as to create strong public sentiment in favor of prosecution. While public interest, or lack thereof, deserves the prosecutor's careful attention, it should not be used to justify a decision to prosecute, or to take other action, that is not supported on other grounds. Public and professional responsibility sometimes will require the choosing of a particularly unpopular course.

3. **Deterrent Effect of Prosecution.** Deterrence of criminal conduct, whether it be criminal activity generally or a specific type of criminal conduct, is one of the primary goals of the criminal law. This purpose should be kept in mind, particularly when deciding whether a prosecution is warranted for an offense that appears to be relatively minor; some offenses, although seemingly not of great importance by themselves, if commonly committed would have a substantial cumulative impact on the community.
4. **The Person's Culpability.** Although a prosecutor may have sufficient evidence of guilt, it is nevertheless appropriate for him/her to give consideration to the degree of the person's culpability in connection with the offense, both in the abstract and in comparison with any others involved in the offense. If, for example, the person was a relatively minor participant in a criminal enterprise conducted by others, or his/her motive was non-criminal, and no other factors require prosecution, the prosecutor might reasonably conclude that some course other than prosecution would be appropriate.
5. **The Person's Criminal History.** If a person is known to have a prior conviction or is reasonably believed to have engaged in criminal activity at an earlier time, this should be

considered in determining whether to commence or recommend federal prosecution. In this connection, particular attention should be given to the nature of the person's prior criminal involvement, when it occurred, its relationship, if any, to the present offense, and whether he/she previously avoided prosecution as a result of an agreement not to prosecute in return for cooperation or as a result of an order compelling his/her testimony. By the same token, a person's lack of prior criminal involvement or his/her previous cooperation with the law enforcement officials should be given due consideration in appropriate cases.

6. **The Person's Willingness to Cooperate.** A person's willingness to cooperate in the investigation or prosecution of others is another appropriate consideration in the determination whether a federal prosecution should be undertaken. Generally speaking, a willingness to cooperate should not by itself relieve a person of criminal liability. There may be some cases, however, in which the value of a person's cooperation clearly outweighs the federal interest in prosecuting him/her. These matters are discussed more fully below, in connection with plea agreements and non-prosecution agreements in return for cooperation.

7. **The Person's Personal Circumstances.** In some cases, the personal circumstances of an accused may be relevant in determining whether to prosecute or to take other action. Some circumstances particular to the accused, such as extreme youth, advanced age, or mental or physical impairment, may suggest that prosecution is not the most appropriate response to his/her offense; other circumstances, such as the fact that the accused occupied a position of trust or responsibility which he/she violated in committing the offense, might weigh in favor of prosecution.

8. **The Interests of Any Victims.** It is important to consider the economic, physical, and psychological impact of the offense, and subsequent prosecution, on any victims. It is appropriate for the prosecutor to take into account such matters as the seriousness of the harm inflicted and the victim's desire for prosecution. Prosecutors may solicit the victim's views on the filing of charges through a general conversation without reference to any particular defendant or charges. For more information regarding the Department's obligations to victims, see the Crime Victims' Rights Act, 18 U.S.C. § 3771, the Victims' Rights and Restitution Act, 34 U.S.C. § 20141, and the Attorney General Guidelines for Victim and Witness Assistance. When considering whether to initiate a prosecution or pursue an alternative resolution, such as a deferred or non-prosecution agreement, prosecutors should be aware of the possible effect the decision may have on the Department's ability to compensate victims of the underlying crimes and on the Crime Victims Fund (CVF). The CVF is a statutorily created fund that is financed by fines and penalties paid by convicted federal offenders. *See* 34 U.S.C. § 20101. Money from the CVF is used to support federal, tribal, state, territorial, and local crime victim assistance programs and to help compensate crime victims across the country. Pursuant to statute, almost all criminal fines collected following conviction are deposited into the CVF, along with all Special Assessments. *See* 34 U.S.C. § 20101(b)(1).

9. **The Probable Sentence or Other Consequence**. In assessing the strength of the federal interest in prosecution, the attorney for the government should consider the sentence, or other consequence, that is likely to be imposed if prosecution is successful, and whether such a sentence or other consequence would justify the time and effort of prosecution. If the offender is already subject to a substantial sentence, or is already incarcerated, as a result

of a conviction for another offense, the prosecutor should weigh the likelihood that another conviction will result in a meaningful addition to his/her sentence, might otherwise have a deterrent effect, or is necessary to ensure that the offender's record accurately reflects the extent of his/her criminal conduct. For example, it might be desirable to commence a bail-jumping prosecution against a person who already has been convicted of another offense so that law enforcement personnel and judicial officers who encounter him/her in the future will be aware of the risk of releasing him/her on bail. On the other hand, if the person is on probation or parole as a result of an earlier conviction, the prosecutor should consider whether the public interest might better be served by instituting a proceeding for violation of probation or revocation of parole, than by commencing a new prosecution. The prosecutor should also be alert to the desirability of instituting prosecution to prevent the running of the statute of limitations and to preserve the availability of a basis for an adequate sentence if there appears to be a chance that an offender's prior conviction may be reversed on appeal or collateral attack. Finally, if a person previously has been prosecuted in another jurisdiction for the same offense or a closely related offense, the attorney for the government should consult existing departmental policy statements on the subject of "successive prosecution" or "dual prosecution," depending on whether the earlier prosecution was federal or nonfederal. *See* JM 9-2.031 (Petite Policy).

There are also considerations that deserve no weight and should not influence the decision, such as the time and resources already expended in federal investigation of the case. No amount of investigative effort warrants commencing a federal prosecution that is not fully justified on other grounds.

[cited in JM 9-2.031; JM 9-27.220; JM 9-27.250; JM 9-27.620]

[updated June 2023]

# 9-27.240 - Initiating and Declining Charges — Prosecution in Another Jurisdiction

In determining whether prosecution should be declined because the person is subject to effective prosecution in another jurisdiction, the attorney for the government should weigh all relevant considerations, including:

1. The strength of the other jurisdiction's interest in prosecution;
2. The other jurisdiction's ability and willingness to prosecute effectively; and
3. The probable sentence or other consequences if the person is convicted in the other jurisdiction.

When declining prosecution, or reviewing whether federal prosecution should be initiated, the attorney for the government should: (1) consider whether to discuss the matter under review with state, local, territorial, or tribal law enforcement authorities for further investigation or prosecution; and (2) coordinate with those authorities as appropriate. The attorney for the government should be especially aware of the need to coordinate with state, local, territorial, and tribal law enforcement authorities, and shall do so as permitted by law, when declining a matter that involves an ongoing threat or relates to acts of violence or abuse against vulnerable victims, including minors. The attorney for the government should document these coordination efforts, where undertaken, when federal prosecution is declined.

**Comment.** In many instances, it may be possible to prosecute criminal conduct in more than one jurisdiction. Although there may be instances in which a federal prosecutor may wish to consider deferring to prosecution in another federal district, or to another government, in most instances the choice will probably be between federal prosecution and prosecution by state or local authorities. The factors listed in JM 9-27.240 are illustrative only, and the attorney for the government should also consider any others that appear relevant to his/her particular case.

1. **The Strength of the Jurisdiction's Interest.** The attorney for the government should consider the relative international, federal, state, territorial, and tribal interests with regard to the alleged criminal conduct. Some offenses, even though in violation of federal law, are of particularly strong interest to the authorities of the jurisdiction in which they occur (*e.g.*, local, state, or foreign), either because of the nature of the offense, the identity of the offender or victim, the fact that the investigation was conducted primarily by foreign, state, or local investigators, or some other circumstance. Whatever the reason, when it appears that the federal interest in prosecution is less substantial than the interest of local, state, or foreign authorities, consideration should be given to referring the case to those authorities rather than commencing or recommending a federal prosecution.

2. **Ability and Willingness to Prosecute Effectively.**In assessing the likelihood of effective prosecution in another jurisdiction, the attorney for the government should also consider the intent of the authorities in that jurisdiction and whether that jurisdiction has the prosecutorial and judicial resources that are necessary to undertake prosecution promptly and effectively. Other relevant factors might be legal or evidentiary problems that might attend prosecution in the other jurisdiction. In addition, the federal prosecutor should be alert to any local conditions, attitudes, relationships, or other circumstances that might cast doubt on the likelihood of the other authorities conducting a thorough and successful prosecution.

3. **Probable Sentence Upon Conviction.** The ultimate measure of the potential for effective prosecution in another jurisdiction is the sentence, or other consequence, that is likely to be imposed if the person is convicted. In considering this factor, the attorney for the government should bear in mind not only the statutory penalties in the jurisdiction and sentencing patterns in similar cases, but also, the particular characteristics of the offense or of the offender that might be relevant to sentencing. He/she should also be alert to the possibility that a conviction under another jurisdiction's laws may, in some cases, result in collateral consequences for the defendant, such as disbarment, that might not follow upon a conviction under federal law.

[cited in JM 5-11.113; JM 9-27.220; JM 9-28.1100]

[updated June 2023]

# 9-27.250 - Non-Criminal Alternatives to Prosecution

In determining whether there exists an adequate, non-criminal alternative to prosecution, the attorney for the government should consider all relevant factors, including:

1. The sanctions or other measures available under the alternative means of disposition;
2. The likelihood that an effective sanction will be imposed;
3. The effect of non-criminal disposition on federal law enforcement interests; and
4. The interests of any victims.

**Comment.** When a person has committed a federal offense, it is important that the law respond promptly, fairly, and effectively. This does not mean, however, that a criminal prosecution must be commenced. In recognition of the fact that resort to the criminal process is not necessarily the only appropriate response to serious forms of antisocial activity, Congress and state legislatures have provided civil and administrative remedies for many types of conduct that may also be subject to criminal sanction. Examples of such non-criminal approaches include civil tax proceedings; civil actions under the False Claims Act or other statutory causes of action for false or fraudulent claims; civil actions under the securities, customs, antitrust, or other regulatory laws; administrative suspension and debarment or exclusion proceedings; civil judicial and administrative forfeiture; and reference of complaints to licensing authorities or to professional organizations such as bar associations. Another potentially useful alternative to prosecution in some cases is pretrial diversion. *See* JM 9-22.000 (1) requiring every United States Attorney's Office to develop and implement a pretrial diversion policy (2).

Attorneys for the government should familiarize themselves with these alternatives and should consider pursuing them if they are available in a particular case. Although on some occasions they should be pursued in addition to criminal prosecution, on other occasions these alternatives can be expected to provide an effective substitute for criminal prosecution. In weighing the adequacy of such an alternative in a particular case, the prosecutor should consider the nature and impact of the sanctions or other measures that could be imposed, the likelihood that an effective sanction or other measure would in fact be imposed, and the effect of such a non-criminal disposition on federal law enforcement and community interests.

When considering whether to pursue a non-criminal disposition, prosecutors should also consider the interests of any victims. In evaluating victim interests and determining whether to pursue a non-criminal disposition, the prosecutor should be available to confer with the victim in furtherance of the Crime Victims' Rights Act (CVRA) and in accordance with the Attorney General Guidelines for Victim and Witness Assistance. For more information regarding the Department's obligations to victims, see the Crime Victims' Rights Act, 18 U.S.C. § 3771, the Victims' Rights and Restitution Act, 34 U.S.C. § 20141, and the Attorney General Guidelines for Victim and Witness Assistance.

It should be noted that referrals for non-criminal disposition may not include the transfer of grand jury material unless an order under Rule 6(e) of the Federal Rules of Criminal Procedure, is obtained. See United States v. Sells Engineering, Inc., 463 U.S. 418 (1983).

[cited in JM 9-27.220; JM 9-28.1100]

[updated June 2023]

# 9-27.260 - Initiating and Declining Charges — Impermissible Considerations

In determining whether to commence or recommend prosecution or take other action against a person, the attorney for the government may not be influenced by:

1. The person's race, religion, gender, ethnicity, national origin, sexual orientation, or political association, activities, or beliefs;
2. The attorney's own personal feelings concerning the person, the person's associates, or the victim; or

3. The possible effect of the decision on the attorney's own professional or personal circumstances.

Charges or statutory sentencing enhancements may not be filed, nor the option of filing charges or enhancements raised, simply to exert leverage to induce a plea or because the defendant elected to exercise the right to trial.

In addition, federal prosecutors and agents may never make a decision regarding an investigation or prosecution, or select the timing of investigative steps or criminal charges, for the purpose of affecting any election, or for the purpose of giving an advantage or disadvantage to any candidate or political party. *See* § 9-85.500.

[updated June 2023]

# 9-27.270 - Records of Prosecutions Declined

Whenever an attorney for the government declines to commence or recommend federal prosecution, he/she should ensure that his/her decision and the reasons therefore are communicated to the investigating agency involved and to any other interested agency, and are also reflected in the office files to ensure an adequate record of disposition of matters that are brought to the attention of the government attorney for possible criminal prosecution, but that do not result in federal prosecution. When prosecution is declined in serious cases on the understanding that action will be taken by other authorities, appropriate steps should be taken to ensure that the matter receives their attention.

[updated February 2018]

# 9-27.300 - Selecting Charges — Conducting an Individualized Assessment

Once a determination has been made that prosecution would satisfy the requirements set forth in JM 9-27.220 – 9-27.250, the prosecutor must select the most appropriate charges. Ordinarily, those charges will include the most serious offense that is encompassed by the defendant's conduct and that is likely to result in a sustainable conviction. In selecting the appropriate charges, however, prosecutors should consider whether the consequences of those charges for

sentencing would yield a result that is proportional to the seriousness of the defendant's conduct, and whether the charge achieves such purposes of the criminal law as punishment, protection of the public, specific and general deterrence, and rehabilitation. Such decisions should be informed by an individualized assessment of all the facts and circumstances of each particular case. The goal in any prosecution is a sanction that is "sufficient, but not greater than necessary," 18 U.S.C. § 3553(a), to satisfy these considerations.

To ensure consistency and accountability, charging and plea agreement decisions must be reviewed by a supervisory attorney. All but the most routine indictments should be accompanied by a prosecution memorandum that identifies the charging options supported by the evidence and the law and explains the charging decision therein. Each United States Attorney's Office and litigating division of the Department is required to promulgate written guidance describing its internal indictment review process.

Prosecutors have an ongoing obligation to evaluate a case and the provable evidence, even after offenses have been charged. If a prosecutor determines that, as a result of a change in the evidence or for another reason, a charge is no longer readily provable or appropriate, the prosecutor should dismiss those charges, consistent with the written policies of the district or litigating division and the *Principles of Federal Prosecution*.

**Comment.** Once it has been determined to commence prosecution, either by filing a complaint or an information, or by seeking an indictment from the grand jury, the attorney for the government must determine what charges to file or recommend. When the conduct in question consists of a single criminal act, or when there is only one applicable statute, this is not a difficult task. Typically, however, a defendant will have committed more than one criminal act and his/her conduct may be prosecuted under more than one statute. Moreover, the selection of charges may be complicated further by the fact that different statutes have different proof requirements and provide substantially different penalties. In such cases, considerable care is required to ensure selection of the proper charge or charges. In addition to reviewing the concerns that prompted the decision to prosecute in the first instance, particular attention should be given to the need to ensure that the prosecution will be both fair and effective.

At the outset, the attorney for the government should bear in mind that he/she will have to introduce at trial admissible evidence sufficient to obtain and sustain a conviction, or else the government will suffer a dismissal, or a reversal on appeal. For this reason, he/she should not include in an information, or recommend in an indictment, charges that he/she cannot reasonably expect to prove beyond a reasonable doubt by legally sufficient and admissible evidence at trial.

In connection with the evidentiary basis for the charges selected, the prosecutor should also be particularly mindful of the different requirements of proof under different statutes covering similar conduct. For example, the bribe provisions of 18 U.S.C. § 201 require proof of "corrupt

intent," while the '"gratuity" provisions do not. Similarly, the "two witness" rule applies to perjury prosecutions under 18 U.S.C. § 1621 but not under 18 U.S.C. § 1623.

[cited in JM 9-27.400; JM 9-28.1200; JM 9-100.020]

[updated June 2023]

# 9-27.310 - Charges Triggering Mandatory Minimum Sentences and Statutory Enhancements

Charges that subject a defendant to a mandatory minimum sentence should ordinarily be reserved for instances in which the remaining charges (*i.e.*, those for which the elements are also satisfied by the defendant's conduct, and do not carry mandatory minimum terms of imprisonment) would not sufficiently reflect the seriousness of the defendant's criminal conduct, danger to the community, harm to victims, or such purposes of the criminal law as punishment, protection of the public, specific and general deterrence, and rehabilitation. Prosecutors, in the exercise of their discretion and through discussions with their supervisors, should determine whether the remaining charges would, in fact, capture the gravamen of the defendant's conduct and danger to the community and yield a sanction "sufficient" to satisfy the considerations outlined above. 18 U.S.C. § 3553(a) (mandating sentences that are "sufficient but not greater than necessary").

In some cases, the Department's duty to ensure that the laws are faithfully executed will require that prosecutors charge offenses that impose a mandatory minimum sentence, particularly where other charges do not sufficiently reflect the seriousness of the defendant's conduct, the danger the defendant poses to the community, or other important federal interests. This may well be the case, for example, for defendants who have committed or threatened violent crimes, or who have directed others to do so. For example, a defendant who commits a federal crime of violence, such as a Hobbs Act robbery or hate crime, or a federal drug-trafficking crime, and who also uses or carries a firearm in furtherance of that crime, may appropriately be charged under 18 U.S.C. § 924(c) even if the prosecutor could potentially proceed by charging the substantive offense alone and seek a firearm enhancement at sentencing, if the latter would not sufficiently account for the defendant's conduct or danger to the community.

As a general matter, the decision whether to seek a statutory sentencing enhancement should be guided by these same principles.

Department policy requires that prosecutors always be candid with the court, the probation office, and the public as to the full extent of the defendant's conduct and culpability, regardless of whether the charging document includes such specificity.

Any decision to include a mandatory minimum charge in a charging document or plea agreement must also obtain supervisory approval. Each United States Attorney and Assistant Attorney General for a litigating division must determine, and designate, the appropriate level of supervisory review of charging documents and plea agreements containing mandatory minimum charges, which must be no lower than section chief or equivalent.

Until such time that the Department has developed and implemented a software program that enables real-time, trackable reporting by districts and litigating divisions of all charges brought by the Department, each United States Attorney's Office and litigating division must report semi-annually to the Executive Office for United States Attorneys the number and percentage of charging documents and plea agreements in which it has included mandatory minimum charges.

[updated June 2023]

# 9-27.311 - Charges Triggering Mandatory Minimum Sentences and Statutory Enhancements in Certain Drug Cases

The principles set forth in JM 9-27.310 regarding careful use of mandatory minimum charges apply with particular force in drug cases brought under Title 21 of the United States Code, where mandatory minimum sentences based on drug type and quantity have resulted in disproportionately severe sentences for certain defendants and perceived and actual racial disparities in the criminal justice system.

Accordingly, in cases where Title 21 mandatory minimum sentences are applicable based on drug type and quantity, prosecutors should decline to charge the quantity necessary to trigger a mandatory minimum sentence if the defendant satisfies all of the following criteria:

1. The defendant's relevant conduct does not involve: the use of violence, the direction to another to use violence, the credible threat of violence, the possession of a weapon, the trafficking of drugs to or with minors, or the death or serious bodily injury of any person;
2. The defendant does not have a significant managerial role in the trafficking of significant quantities of drugs;

3. The defendant does not have significant ties to a large-scale criminal organization or cartel, or to a violent gang; and
4. The defendant does not have a significant history of criminal activity that involved the use or threat of violence, personal involvement on multiple occasions in the distribution of significant quantities of illegal drugs, or possession of illegal firearms.

In making the above assessment, prosecutors should consider whether the above criteria are satisfied without regard to whether the defendant would be eligible for a sentence below a mandatory minimum term based on application of the safety valve, 18 U.S.C. § 3553(f), or on substantial assistance under 18 U.S.C. § 3553(e).

In cases in which prosecutors determine that some but not all of the criteria are satisfied, prosecutors should not automatically charge the quantity necessary to trigger the mandatory minimum, but rather weigh the considerations set forth in this subsection and JM 9-27.310 to carefully determine, through the exercise of their discretion and in consultation with their supervisors, whether a Title 21 charge with a mandatory minimum sentence is appropriate. For example, in a case involving a defendant who serves only as a “drug mule,” but who arguably does not satisfy all of the criteria discussed above, the balance of considerations may still weigh against the filing of a Title 21 charge carrying a mandatory minimum sentence.

As set forth in JM 9-27.310, any decision to include a mandatory minimum charge in a charging document or plea agreement must be approved by a supervisory attorney as designated by the United States Attorney or Assistant Attorney General for the relevant litigating division.

In deciding whether to file an information under 21 U.S.C. § 851 requiring imposition of enhanced statutory penalties, prosecutors in drug cases should be guided by the same criteria discussed above for charging mandatory minimum offenses, as well as whether the filing would create a significant and unwarranted sentencing disparity with equally or more culpable codefendants. Prosecutors are encouraged to make the Section 851 determination, and to file any such notice, at the time the case is charged or as soon as possible thereafter. As with any filing, a Section 851 enhancement should not be filed simply to exert leverage to induce a plea or because the defendant elected to exercise the right to trial. JM 9-27.400.

If information sufficient to determine that all of the criteria listed above in this subsection are satisfied is available at the time initial charges are filed, prosecutors should decline to pursue Title 21 charges triggering a mandatory minimum sentence. If this information is not yet available, prosecutors may file charges involving these mandatory minimum statutes pending further information. If information that the criteria are satisfied is subsequently obtained, prosecutors should pursue a disposition that does not require a Title 21 mandatory minimum sentence. For example, a prosecutor could ask the grand jury to supersede the indictment with charges that do not carry mandatory minimum sentences; a defendant could plead guilty to a lesser included offense that does not carry the mandatory minimum; or a defendant could waive

indictment and plead guilty to an information that does not charge the quantity necessary to trigger the mandatory minimum.

If charging a mandatory minimum term of imprisonment under Title 21 for a drug offense involving crack cocaine is deemed warranted under JM 9-27.310 and this provision, prosecutors should charge the pertinent statutory quantities that apply to powder cocaine offenses. Prosecutors should consult guidance from the Criminal Division and the Executive Office for U.S. Attorneys as to how to structure such charges.

[added June 2023]

# 9-27.320 - Additional Charges

Except as hereafter provided, the attorney for the government should also charge, or recommend that the grand jury charge, other offenses only when, in his/her judgment, such additional charges:

1. Are necessary to ensure that the information or indictment adequately reflects the nature and extent of the criminal conduct involved, and provides the basis for an appropriate sentence under all of the facts and circumstances of the case;
2. Provide the basis for an appropriate sentence under all of the facts and circumstances of the case; or
3. Will significantly enhance the strength of the government's case against the defendant or a codefendant.

**Comment.** It is important to the fair and efficient administration of justice in the federal system that the government bring as few charges as are necessary to ensure that justice is done. JM 9-27.320 outlines three general situations in which additional charges may be brought: (1) when necessary adequately to reflect the nature and full extent of the criminal conduct involved; (2) when necessary to provide the basis for an appropriate sentence under all the circumstances of the case; or (3) when an additional charge or charges would significantly strengthen the case against the defendant or a codefendant.

1. **Nature and Full Extent of Criminal Conduct.** The prosecutor's initial concern should be to recommend charges that adequately reflect the nature and full extent of the criminal conduct involved. This means that the charges should fairly describe both the kind and scope of unlawful activity; should be legally sufficient; should provide notice to the public of the seriousness of the conduct involved; and should negate any impression that, after committing one offense, an offender can commit others with impunity.

2. **Basis for Sentencing.** Proper charging also requires consideration of the end result of successful prosecution — the imposition of an appropriate sentence under all of the facts and circumstances of the case. In order to achieve this result, it may not be necessary to charge a person with every offense for which he/she, may be liable. What is important is that the person be charged in such a manner that, if he/she is convicted, the court may impose an appropriate sentence, in light of all of the relevant facts and circumstances.

3. **Effect on the Government's Case.** When considering whether to include a particular charge in a proposed indictment or information, the attorney for the government should consider the possible effects of inclusion or exclusion of the charge on the government's case against the defendant or a codefendant. It is proper to consider the evidentiary consequences of failing to seek certain charges. For example, in a case in which a substantive offense was committed pursuant to an unlawful agreement, inclusion of a conspiracy count is permissible and may be desirable to ensure the introduction of all relevant evidence at trial. Similarly, it might be important to include a perjury or false statement count in an indictment charging other offenses, in order to give the jury a complete picture of the defendant's criminal conduct. Failure to include appropriate charges for which the proof is sufficient may not only result in the exclusion, of relevant evidence, but also may impair the prosecutor's ability to prove a coherent case, and lead to jury confusion. In this connection, it is important to remember that, in multi-defendant cases, the presence or absence of a particular charge against one defendant may affect the strength of the case against another defendant. In short, when the evidence exists, the charges should be structured so as to permit proof of the strongest case possible without undue burden on the administration of justice.

[cited in JM 6-4.210; JM 9-27.300]

[updated June 2023]

# 9-27.330 - Pre-Charge Plea Agreements

Before filing or recommending charges pursuant to a precharge plea agreement, the attorney for the government should consult the plea agreement provisions of JM 9-27.430, relating to the selection of charges to which a defendant should be required to plead guilty.

[cited in JM 9-27.300]

[updated February 2017]

# 9-27.400 - Plea Agreements Generally

The attorney for the government may, in an appropriate case, enter into an agreement with a defendant that, upon the defendant's plea of guilty or nolo contendere to a charged offense or to a lesser or related offense, he/she will not bring or will move for dismissal of other charges, take a certain position with respect to the sentence to be imposed, or take other action. *See* JM 9-27.300 (discussing the individualized assessment by prosecutors of the extent to which particular charges fit the specific circumstances of the case, are consistent with the purposes of the federal criminal code, and maximize the impact of federal resources on crime); *see also* JM 9-27.310 (Charges Triggering Mandatory Minimum Sentences and Statutory Enhancements); JM 9-27.311 (Charges Triggering Mandatory Minimum Sentences and Statutory Enhancements in Certain Drug Cases).

Each United States Attorney's Office and litigating division must promulgate written guidance regarding the standard elements required in its plea agreements, including any waiver of defendants' rights.

**Comment.** JM 9-27.400 permits the disposition of federal criminal charges pursuant to plea agreements between defendants and government attorneys. Such negotiated dispositions should be distinguished from situations in which a defendant pleads guilty or nolo contendere to fewer than all counts of an information or indictment in the absence of any agreement with the government. Only the former type of disposition is covered by the provisions of JM 9-27.400 *et seq*.

Negotiated plea dispositions are explicitly sanctioned by Rule 11(c)(1) of the Federal Rules of Criminal Procedure, which provides that:

> An attorney for the government and the defendant's attorney, or the defendant when acting *pro se*, may discuss and reach a plea agreement. The court must not participate in these discussions. If the defendant pleads guilty or nolo contendere to either a charged offense or a lesser or related offense, the plea agreement may specify that an attorney for the government will:

A. Not bring, or will move to dismiss, other charges;

B. Recommend, or agree not to oppose the defendant's request, that a particular sentence or sentencing range is appropriate or that a particular provision of the Sentencing Guidelines, or policy statement, or sentencing factor does or does not apply (such a recommendation or request does not bind the court); or

C. Agree that a specific sentence or sentencing range is the appropriate disposition of the case, or that a particular provision of the Sentencing Guidelines, or policy statement, or sentencing factor does or does not apply (such a recommendation or request binds the court once the court accepts the plea agreement).

Three types of plea agreements are encompassed by the language of JM 9-27.400: 1) agreements whereby in return for the defendant's plea to a charged offense or to a lesser or

related offense, other charges are not sought or are dismissed ("charge agreements"); 2) agreements pursuant to which the government takes a certain position regarding the sentence to be imposed ("sentence agreements"); and 3) agreements that combine a plea with a dismissal of charges and an undertaking by the prosecutor concerning the government's position at sentencing ("mixed agreements").

Plea agreements should reflect the totality of a defendant's conduct. These agreements are governed by the same fundamental principles as are charging decisions: prosecutors will generally seek a plea to the most serious offense that is consistent with the nature and full extent of the defendant's conduct and likely to result in a sustainable conviction and proportional sentence, informed by an individualized assessment of all of the facts and circumstances of each particular case. Charges should not be filed simply to exert leverage to induce a plea; nor should charges be abandoned to arrive at a plea bargain that does not reflect the seriousness of the defendant's conduct.

1. **Charge Agreements.** Charge agreements envision dismissal of counts in exchange for a plea. Should a prosecutor determine in good faith after indictment that, as a result of a change in the evidence or for another reason (*e.g.*, a need has arisen to protect sources and methods, including the identity of a particular witness until he or she testifies against a more significant defendant), a charge is not readily provable or that an indictment exaggerates the seriousness of an offense or offenses, a plea bargain may reflect the prosecutor's reassessment. There should be documentation, however, in any case in which the charges originally brought are dismissed. Moreover, a decision not to prosecute a violation of federal law pursuant to Section 12(a) of the Classified Information Procedures Act would trigger a reporting requirement to the Congress, and may not take place without the approval of the Assistant Attorney General for National Security.

2. **Sentencing Agreements.** There are only two types of sentence bargains. Both are permissible, but one is more complicated than the other. First, prosecutors may bargain for a sentence that is within the specified United States Sentencing Commission's guideline range. This means that when a guideline range is 18 to 24 months, the prosecutor has discretion to agree to recommend a sentence of, for example, 18 to 20 months rather than to argue for a sentence at the top of the range. Such a plea does not require that the actual sentence range be determined in advance. The plea agreement may have wording to the effect that once the range is determined by the court, the United States will recommend a certain point in that range. Similarly, the prosecutor may agree to recommend a downward adjustment for acceptance of responsibility if he or she concludes in good faith that the defendant is entitled to the adjustment. Second, the prosecutor may seek to depart or vary from the guidelines. This is more complicated than a bargain involving a sentence within a guideline range. Departures and variances are discussed more generally below.

Department policy requires transparency and honesty in sentencing; federal prosecutors are expected to identify for the court departures or variances when they agree to support them. For example, it would be improper for a prosecutor to agree that a departure or variance is in order, but to conceal the agreement in a charge bargain that is presented to a court as a *fait accompli* so that there is neither a record of nor judicial review of the departure or variance.

The language of JM 9-27.400 with respect to sentence agreements is intended to cover the entire range of positions that the government might wish to take at the time of sentencing. Among the options are: taking no position regarding the sentence; not opposing the defendant's request; requesting a specific type of sentence (*e.g.*, a fine or probation), a specific fine or term of imprisonment, or not more than a specific fine or term of imprisonment; and requesting concurrent rather than consecutive sentences. Agreement to any such option must be consistent with the sentencing guidelines.

3. **Mixed Agreements.** Plea bargaining, both charge bargaining and sentence bargaining, must reflect the totality and seriousness of the defendant's conduct and any departure or variance to which the prosecutor is agreeing, and must be accomplished through appropriate application of sentencing guidelines provisions.

The basic policy is that charges are not to be bargained away or dropped in ways that represent a significant departure from the principles set forth herein unless the prosecutor has a good faith doubt as to the government's ability readily to prove a charge for legal or evidentiary reasons. There are, however, two common circumstances in which charges may be dropped consistent with these principles.

First, if the applicable guideline range from which a sentence may be imposed would be unaffected, readily provable charges may be dismissed or dropped as part of a plea bargain. It is important to know whether dropping a charge may affect a sentence, including monetary penalties such as restitution or forfeiture. For example, the multiple offense rules in Part D of Chapter 3 of the guidelines and the relevant conduct standard set forth in Sentencing Guideline § 1B1.3(a)(2) will mean that certain dropped charges will be counted for purposes of determining the sentence, subject to the statutory maximum for the offense or offenses of conviction. It is vital that federal prosecutors understand when conduct that is not charged in an indictment or conduct that is alleged in counts that are to be dismissed pursuant to a bargain may be counted for sentencing purposes and when it may not be. For example, in the case of a defendant who could be charged with five bank robberies, a decision to charge only one or to dismiss four counts pursuant to a bargain precludes any consideration of the four uncharged or dismissed robberies in determining a guideline range, unless the plea agreement included a stipulation as to the other robberies. By contrast, in the case of a defendant who could be charged with five counts of fraud, the total amount of money involved in a fraudulent scheme will be considered

in determining a guideline range even if the defendant pleads guilty to a single count and there is no stipulation as to the other counts.

Second, federal prosecutors may drop readily provable charges with the specific approval of the United States Attorney, appropriate Assistant Attorney General, or designated supervisory level official for reasons set forth in the file of the case. This exception recognizes that the aims of the Sentencing Reform Act must be sought without ignoring other, critical aspects of the federal criminal justice system. For example, approvals to drop charges in a particular case might be given because the United States Attorney's office is particularly over-burdened, the case would be time-consuming to try, and proceeding to trial would significantly reduce the total number of cases disposed of by the office.

The Sentencing Guidelines, including Chapter 5, Part K, list departures that may be considered by a court in imposing a sentence. Moreover, Guideline § 5K2.0 recognizes that a sentencing court may consider a ground for departure that has not been adequately considered by the Commission. Likewise, district courts always retain discretion to vary from the Sentencing Guidelines. Prosecutors should consult JM 9-27.730 in determining whether agreement to a departure or variance may be appropriate.

A departure or variance requires approval by the court. To the extent a prosecutor enters into a plea bargain which is based upon an agreement that a departure or variance is warranted, prosecutors should inform the court of that agreement and thereby afford the court an opportunity to reject it.

The concession required by the government as part of a plea agreement, whether it be a "charge agreement," a "sentence agreement," or a "mixed agreement," should be weighed by the responsible government attorney in the light of the probable advantages and disadvantages of the plea disposition proposed in the particular case. Particular care should be exercised in considering whether to enter into a plea agreement pursuant to which the defendant will enter a nolo contendere plea. As discussed in JM 9-27.500 and JM 9-16.000, there are serious objections to such pleas, and they should be opposed unless the appropriate United States Attorney and/or Assistant Attorney General concludes that the circumstances are so unusual that acceptance of such a plea would be in the public interest.

[updated June 2023] [cited in JM 9-16.300; JM 9-16.320; JM 9-27.300; JM 9-28.1300]

# 9-27.410 - Plea Agreements - Cooperation

Section 5K1.1 of the Sentencing Guidelines allows the United States to file a pleading with the sentencing court, which permits the court to depart below the indicated guideline, on the basis that the defendant provided substantial assistance in the investigation or prosecution of another. Authority to approve such pleadings is limited to the United States Attorney, the Chief Assistant United States Attorney, and supervisory criminal Assistant United States Attorneys, or a committee including at least one of these individuals. Similarly, for Department of Justice attorneys, approval authority should be vested in a Section Chief or Office Director, or such official's deputy, or in a committee that includes at least one of these individuals.

Every United States Attorney or Department of Justice Section Chief (or Assistant Chief) or Office Director shall maintain documentation of the facts behind and justification for each substantial assistance pleading in the official file. Freedom of Information Act or other considerations may suggest that the final decision be memorialized on a separate form rather than on the recommendation itself.

The procedures described above shall also apply to Motions filed pursuant to Rule 35(b) of the Federal Rules of Criminal Procedure, where the sentence of a cooperating defendant is reduced after sentencing on motion of the United States. Such a filing is deemed for sentencing purposes to be the equivalent of a substantial assistance pleading.

[updated June 2023]

# 9-27.420 - Plea Agreements — Considerations to be Weighed

In determining whether it would be appropriate to enter into a plea agreement, the attorney for the government should weigh all relevant considerations, including:

1. The defendant's willingness to cooperate in the investigation or prosecution of others;
2. The defendant's history with respect to criminal activity;
3. The nature and seriousness of the offense or offenses charged;
4. The defendant's remorse or contrition and his/her willingness to assume responsibility for his/her conduct;

5. The desirability of prompt and certain disposition of the case;

6. The likelihood of obtaining a conviction at trial;

7. The probable effect on witnesses;

8. The probable sentence or other consequences if the defendant is convicted;

9. The public interest in having the case tried rather than disposed of by a guilty plea;

10. The expense of trial and appeal;

11. The need to avoid delay in the disposition of other pending cases; and

12. The interests of the victim, including any effect upon the victim's right to restitution.

**Comment.** JM 9-27.420 sets forth some of the appropriate considerations to be weighed by the attorney for the government in deciding whether to enter into a plea agreement with a defendant pursuant to the provisions of Rule 11 of the Federal Rules of Criminal Procedure. The provision is not intended to suggest the desirability or lack of desirability of a plea agreement in any particular case or to be construed as a reflection on the merits of any plea agreement that actually may be reached; its purpose is solely to assist attorneys for the government in exercising their prosecutorial discretion as to whether a plea agreement would be appropriate in a particular case. Government attorneys should consult with the investigating agency involved and the victim, if appropriate or required by law.

1. **Defendant's Cooperation.** The defendant's willingness to provide timely and useful cooperation as part of his/her plea agreement should be given serious consideration. The weight it deserves will vary, of course, depending on the nature and value of the cooperation offered and whether the same benefit can be obtained without having to make the charge or sentence concession that would be involved in a plea agreement. In many situations, for example, all necessary cooperation in the form of testimony can be obtained through a compulsion order under 18 U.S.C. §§ 6001-6003. In such cases, that approach should be attempted unless, under the circumstances, it would seriously interfere with securing the person's conviction. If the defendant's cooperation is sufficiently substantial to justify the filing of a 5K1.1 Motion for a downward departure, the procedures set out in JM 9-27.410 shall be followed.

2. **Defendant's Criminal History.** One of the principal arguments against the practice of plea bargaining is that it results in leniency that reduces the deterrent impact of the law and leads to recidivism on the part of some offenders. Although this concern is probably most relevant in non-federal jurisdictions that must dispose of large volumes of routine cases with inadequate resources, it should nevertheless be kept in mind by federal prosecutors, especially when dealing with repeat offenders or "career criminals." Particular care should be taken in the case of a defendant with a prior criminal record to ensure that society's need for protection is not sacrificed in the process of arriving at a plea disposition. In this connection, it is proper for the government attorney to consider not only the defendant's past, but also facts of other criminal involvement not resulting in conviction. By the same token, of course, it is also proper to consider a defendant's absence of past criminal involvement and his/her past cooperation with law enforcement officials. Note that 18 U.S.C. § 924(e), as well as Sentencing Guidelines §§ 4B1.1 and 4B1.4 address "career criminals" and "armed career criminals." 18 U.S.C. § 3559(c) — the so-called "three strikes" statute — addresses serious violent recidivist offenders. The application of these provisions to a particular case may affect the plea negotiation posture of the parties.

3. **Nature and Seriousness of Offense Charged.** Important considerations in determining whether to enter into a plea agreement include the nature and seriousness of the offense or offenses charged. In weighing those factors, the attorney for the government should bear in mind the interests sought to be protected by the statute defining the offense (e.g., national security, constitutional rights, the governmental process, personal safety, public welfare, or property), as well as nature and degree of harm caused or threatened to those interests and any attendant circumstances that aggravate or mitigate the seriousness of the offense in the particular case.

4. **Defendant's Attitude.** A defendant may demonstrate apparently genuine remorse or contrition, and a willingness to take responsibility for his/her criminal conduct by, for example, efforts to compensate the victim for injury or loss, or otherwise to ameliorate the consequences of his/her acts. These are factors that bear upon the likelihood of his/her repetition of the conduct involved and that may properly be considered in deciding whether a plea agreement would be appropriate. Sentencing Guideline § 3E1.1 allows for a downward adjustment upon acceptance of responsibility by the defendant. It is permissible for a prosecutor to enter a plea agreement which approves such an adjustment if the defendant otherwise meets the requirements of the section.

It is particularly important that the defendant not be permitted to enter a guilty plea under circumstances that will allow him/her later to proclaim lack of culpability or even complete innocence. Such consequences can be avoided only if the court and the public are adequately

informed of the nature and scope of the illegal activity and of the defendant's complicity and culpability. To this end, the attorney for the government is strongly encouraged to enter into a plea agreement only with the defendant's assurance that he/she will admit, the facts of the offense and of his/her culpable participation therein. A plea agreement may be entered into in the absence of such an assurance, but only if the defendant is willing to accept without contest a statement by the government in open court of the facts it could prove to demonstrate his/her guilt beyond a reasonable doubt. Except as provided in JM 9-27.440, the attorney for the government should not enter into a plea agreement with a defendant who admits his/her guilt but disputes an essential element of the government's case.

When negotiating a plea agreement, the attorney for the government should also not seek to have a defendant waive claims of ineffective assistance of counsel whether those claims are made on collateral attack or, when permitted by circuit law, made on direct appeal. As long as prosecutors exempt ineffective-assistance claims from their waiver provisions, they may request waivers of appeal and of post -conviction remedies to the full extent permitted by law as a component of plea discussions and agreements.

E. **Prompt Disposition.** In assessing the value of prompt disposition of a criminal case, the attorney for the government should consider the timing of a proffered plea. A plea offer by a defendant on the eve of trial after the case has been fully prepared is hardly as advantageous from the standpoint of reducing public expense as one offered months or weeks earlier. In addition, a last minute plea adds to the difficulty of scheduling cases efficiently and may even result in wasting the prosecutorial and judicial time reserved for the aborted trial. For these reasons, governmental attorneys should make clear to defense counsel at an early stage in the proceedings that, if there are to be any plea discussions, they must be concluded prior to a certain date, and well in advance of the trial date. *See* USSG § 3E1.1(b)(1). However, avoidance of unnecessary trial preparation and scheduling disruptions are not the only benefits to be gained from prompt disposition of a case by means of a guilty plea. Such a disposition also saves the government and the court the time and expense of trial and appeal. In addition, a plea agreement facilitates prompt imposition of sentence, thereby promoting the overall goals of the criminal justice system. Thus, occasionally it may be appropriate to enter into a plea agreement even after the usual time for making such agreements has passed.

F. **Likelihood of Conviction.** The trial of a criminal case inevitably involves risks and uncertainties, both for the prosecution and for the defense. Many factors, not all of which can be anticipated, can affect the outcome. To the extent that these factors can be identified, they should be considered in deciding whether to accept a plea or go to trial. In this connection, the prosecutor should weigh the strength of the government's

case relative to the anticipated defense case, bearing in mind legal and evidentiary problems that might be expected, as well as the importance of the credibility of witnesses. However, although it is proper to consider factors bearing upon the likelihood of conviction in deciding whether to enter into a plea agreement, it obviously is improper for the prosecutor to attempt to dispose of a case by means of a plea agreement if he/she is not satisfied that the legal standards for guilt are met.

G. **Effect on Witnesses.** Attorneys for the government should bear in mind that it is often burdensome for witnesses to appear at trial and that sometimes to do so may cause them serious embarrassment or even place them in jeopardy of physical or economic retaliation. The possibility of such adverse consequences to witnesses should not be overlooked in determining whether to go to trial or attempt to reach a plea agreement. Another possibility that may have to be considered is revealing sources and methods, such as the identity of informants. For example, when an informant testifies at trial, his/her identity and relationship to the government become matters of public record. As a result, in addition to possible adverse consequences to the informant, there is a strong likelihood that the informant's usefulness in other investigations will be seriously diminished or destroyed. These are considerations that should be discussed with the investigating agency involved, as well as with any other agencies known to have an interest in using the informant in their investigations.

H. **Probable Sentence.** In determining whether to enter into a plea agreement, the attorney for the government may properly consider the probable outcome of the prosecution in terms of the sentence or other consequences for the defendant in the event that a plea agreement is reached. If the proposed agreement is a "sentence agreement" or a "mixed agreement," the prosecutor should realize that the position he/she agrees to take with respect to sentencing may have a significant effect on the sentence that is actually imposed. If the proposed agreement is a "charge agreement," the prosecutor should bear in mind the extent to which a plea to fewer or lesser offenses may reduce the sentence that otherwise could be imposed. In either event, it is important that the attorney for the government be aware of the need to preserve the basis for an appropriate sentence under all the circumstances of the case. Thorough knowledge of the Sentencing Guidelines, any applicable statutory minimum sentences, and any applicable sentence enhancements is clearly necessary to allow the prosecutor to accurately and adequately evaluate the effect of any plea agreement.

I. **Trial Rather Than Plea.** There may be situations in which the public interest might better be served by having a case tried rather than by having it disposed of by means of a guilty plea. These include situations in which it is particularly important to permit a clear public understanding that "justice is done" through exposing the exact nature of the

defendant's wrongdoing at trial, or in which a plea agreement might be misconstrued to the detriment of public confidence in the criminal justice system. For this reason, the prosecutor should be careful not to place undue emphasis in certain cases on factors that favor disposition of a case pursuant to a plea agreement over a trial.

J. **Expense of Trial and Appeal.** In assessing the expense of trial and appeal that would be saved by a plea disposition, the attorney for the government should consider not only such monetary costs as juror and witness fees, but also the time spent by judges, prosecutors, and law enforcement personnel who may be needed to testify or provide other assistance at trial. In this connection, the prosecutor should bear in mind the complexity of the case, the number of trial days and witnesses required, and any extraordinary expenses that might be incurred such as the cost of sequestering the jury.

K. **Prompt Disposition of Other Cases.** A plea disposition in one case may facilitate the prompt disposition of other cases, including cases in which prosecution might otherwise be declined. This may occur simply because prosecutorial, judicial, or defense resources will become available for use in other cases, or because a plea by one of several defendants may have a "domino effect," leading to pleas by other defendants. In weighing the importance of these possible consequences, the attorney for the government should consider the state of the criminal docket and the speedy trial requirements in the district, the desirability of handling a larger volume of criminal cases, and the workloads of prosecutors, judges, and defense attorneys in the district.

L. **The Interests of the Victim.** Some victims may view a plea as denying them the opportunity to see the defendant answer for his crimes, while others may be grateful for a faster resolution of a difficult phase in their lives. In any event, it is useful for the prosecutor to understand the victim's desires with regard to a plea, and to explain to the victim the impact of any plea on the victim and on the defendant. For instance, in a plea, the defendant may agree to provide restitution to victims beyond those charged in the indictment, while those individuals would not receive restitution following a trial. In these discussions, prosecutors are advised to remember that victims are not subject to any rules governing nondisclosure of information, and so may wish to focus on soliciting the victim's views and to limit information provided to the victim to that which is publicly available.

M. **Other Considerations.** The Attorney General or the Deputy Attorney General may periodically issue guidance that includes other considerations that should be evaluated by a prosecutor.

[cited in JM 9-28.1300]

[updated February 2018]

# 9-27.430 - Selecting Plea Agreement Charges

If a prosecution is to be concluded pursuant to a plea agreement, the defendant should be required to plead to a charge or charges:

1. That ordinarily include the most serious readily provable offense consistent with the nature and extent of his/her criminal conduct;
2. That have an adequate factual basis;
3. That make likely the imposition of an appropriate sentence and order of restitution, if appropriate, under all the circumstances of the case; and
4. That do not adversely affect the investigation or prosecution of others.

**Comment.** JM 9-27.430 sets forth the considerations that should be taken into account in selecting the charge or charges to which a defendant should be required to plead guilty once it has been decided to dispose of the case pursuant to a plea agreement. The considerations are essentially the same as those governing the selection of charges to be included in the original indictment or information. *See* JM 9-27.300; JM 9-27.310 (Charges Triggering Mandatory Minimum Sentences and Statutory Enhancements); JM 9-27.311 (Charges Triggering Mandatory Minimum Sentences and Statutory Enhancements in Certain Drug Cases).

1. **Relationship to Criminal Conduct.** The charge or charges to which a defendant pleads guilty should be consistent with the defendant's criminal conduct, both in nature and in scope. This charge ordinarily will be the most serious one, as defined in JM 9-27.300; *but see* JM 9-27.310; JM 9-27.311. This principle governs the number of counts to which a plea should be required in cases involving different offenses, or in cases involving a series of familiar offenses. Therefore the prosecutor must be familiar with the Sentencing Guideline rules applicable to grouping offenses (*see* USSG § 3D) and to relevant conduct (*see* USSG § 1B1.3) among others. In regard to the seriousness of the offense, the guilty plea should assure that the public record of conviction provides an adequate indication of the defendant's conduct. With respect to the number of counts, the prosecutor should take care to assure that no impression is given that multiple offenses are likely to result in no greater a potential penalty than is a single offense. The requirement that a defendant plead to a charge, that is consistent with the nature and extent of his/her criminal conduct is not inflexible. Although cooperation is usually acknowledged through a Sentencing Guideline § 5K1.1 filing, there may be situations involving cooperating defendants in which considerations such as those discussed in JM 9-27.600, take precedence. Such situations should be approached cautiously, however. Unless the government has strong corroboration for the cooperating defendant's testimony, his/her credibility may be subject to successful impeachment if

he/she is permitted to plead to an offense that appears unrelated in seriousness or scope to the charges against the defendants on trial. It is also doubly important in such situations for the prosecutor to ensure that the public record of the plea demonstrates, the full extent of the defendant's involvement in the criminal activity, giving rise to the prosecution.

2. **Factual Basis.** The attorney for the government should also bear in mind the legal requirement that there be a factual basis for the charge or charges to which a guilty plea is entered. This requirement is intended to assure against conviction after a guilty plea of a person who is not in fact guilty. Moreover, under Rule 11(b)(3) of the Federal Rules of Criminal Procedure, a court may not enter a judgment upon a guilty plea without "determin[ing] that, there is a factual basis for the plea." For this reason, it is essential that the charge or charges selected as the subject of a plea agreement be such as could be prosecuted independently of the plea under these principles. However, as noted, in cases in which Alford or nolo contendere pleas are tendered, the attorney for the government may wish to make a stronger factual showing. In such cases there may remain some doubt as to the defendant's guilt even after the entry of his/her plea. Consequently, in order to avoid creating a misleading impression, the government should ask leave of the court to make a proffer of the facts available to it that show the defendant's guilt beyond a reasonable doubt.

   In addition, the Department's policy is only to stipulate to facts that accurately reflect the defendant's conduct. If a prosecutor wishes to support a departure from the guidelines, he or she should candidly do so and not stipulate to facts that are untrue. Stipulations to untrue facts are unethical. If a prosecutor has insufficient facts to contest a defendant's effort to seek a downward departure or to claim an adjustment, the prosecutor can say so. If the presentence report states facts that are inconsistent with a stipulation in which a prosecutor has joined, the prosecutor should object to the report or add a statement explaining the prosecutor's understanding of the facts or the reason for the stipulation.

   Recounting the true nature of the defendant's involvement in a case will not always lead to a higher sentence. Where a defendant agrees to cooperate with the government by providing information concerning unlawful activities of others and the government agrees that self-incriminating information so provided will not be used against the defendant, Sentencing Guideline § 1B1.8 provides that the information shall not be used in determining the applicable guideline range, except to the extent provided in the agreement. The existence of an agreement not to use information should be clearly reflected in the case file, the applicability of Sentencing Guideline § 1B1.8 should be documented, and the incriminating information must be disclosed to the court or the probation officer, even though it may not be used in determining a guideline sentence. Note that such information may still be used by the court in determining whether to depart from the guidelines and the extent of the departure. *See* USSG § 1B1.8.

3. **Basis for Sentencing.** In order to guard against inappropriate restriction of the court's sentencing options, the plea agreement should provide adequate scope for sentencing

under all the circumstances of the case. To the extent that the plea agreement requires the government to take a position with respect to the sentence to be imposed, there should be little danger since the court will not be bound by the government's position. When a "charge agreement" is involved, however, the court will be limited to imposing the maximum term authorized by the statute to which the guilty plea is entered, with attention to the Sentencing Guidelines range for the offense. Thus, as noted in JM 9-27.320 above, the prosecutor should take care to avoid a charge agreement that would unduly restrict the court's sentencing authority. In this connection, as in the initial selection of charges, the prosecutor should take into account the purposes of sentencing, the penalties provided in the applicable statutes (including mandatory minimum penalties), the gravity of the offense, any aggravating or mitigating factors, and any post-conviction consequences to which the defendant may be subject. In addition, if restitution is appropriate under the circumstances of the case, the plea agreement should specify the amount of restitution and require a defendant to agree that any restitution ordered by the Court shall be due and payable immediately. Plea agreements should also specify that any payment schedule set by the court represents a minimum payment obligation and does not preclude the government from pursuing any other means by which to satisfy the defendant's full and immediately enforceable financial obligation under applicable federal and/or state law. Additionally, defendants who have the ability to pay some or all of their restitution shall be required as part of the plea to pay what they reasonably can by the date of sentencing. *See* Attorney General Guidelines for Victim and Witness Assistance Art. V.H.1.d (2022); JM 9-16.320.

4. **Effect on Other Cases.** In a multiple-defendant case, care must be taken to ensure that the disposition of the charges against one defendant does not adversely affect the investigation or prosecution of co-defendants. Among the possible adverse consequences to be avoided are the negative jury appeal that may result when relatively less culpable defendants are tried in the absence of a more culpable defendant, or when a principal prosecution witness appears to be equally culpable as the defendants but has been permitted to plead to a significantly less serious offense; the possibility that one defendant's absence from the case will render useful evidence inadmissible at the trial of co-defendants; and the giving of false exculpatory testimony on behalf of the other defendants by the defendant who has pled guilty.

[updated June 2023]

# 9-27.440 - Plea Agreements When Defendant Denies Guilt

The attorney for the government should not, except with the approval of the United States Attorney and the appropriate Assistant Attorney General, enter into a plea agreement if the defendant maintains his/her innocence with respect to the charge or charges to which he/she offers to plead guilty. In a case in which the defendant tenders a plea of guilty but denies

committing the offense to which he/she offers to plead guilty, the attorney for the government should make an offer of proof of all facts known to the government to support the conclusion that the defendant is in fact guilty. See also JM 9-16.015, which discusses the approval requirement.

**Comment.** JM 9-27.440 concerns plea agreements involving "Alford" pleas — guilty pleas entered by defendants who nevertheless claim to be innocent. In *North Carolina v. Alford*, 400 U.S. 25 (1970), the Supreme Court held that the Constitution does not prohibit a court from accepting a guilty plea from a defendant who simultaneously maintains his/her innocence, so long as the plea is entered voluntarily and intelligently and there is a strong factual basis for it. The Court reasoned that there is no material difference between a plea of *nolo contendere*, where the defendant does not expressly admit his/her guilt, and a plea of guilty by a defendant who affirmatively denies his/her guilt.

Despite the constitutional validity of *Alford* pleas, such pleas should be avoided except in the most unusual circumstances, even if no plea agreement is involved and the plea would cover all pending charges. As one court put it, "the public might well not understand or accept the fact that a defendant who denied his guilt was nonetheless placed in a position of pleading guilty and going to jail." *See United States v. Bednarski*, 445 F.2d 364, 366 (1st Cir. 1971). Consequently, it is often preferable to have a jury resolve the factual and legal dispute between the government and the defendant, rather than have government attorneys encourage defendants to plead guilty under circumstances that the public might regard as questionable or unfair. For this reason, government attorneys should not enter into *Alford* plea agreements, without the approval of the United States Attorney and the appropriate Assistant Attorney General. Apart from refusing to enter into a plea agreement, however, the degree to which the Department can express its opposition to *Alford* pleas may be limited. Although a court may accept a proffered plea of *nolo contendere* after considering "the parties' views and the public interest in the effective administration of justice," Fed. R. Crim. P. Rule 11 (a)(3), at least one court has concluded that it is an abuse of discretion to refuse to accept a guilty plea "solely because the defendant does not admit the alleged facts of the crime." *United States v. Gaskins*, 485 F.2d 1046, 1048 (D.C. Cir. 1973); *see also United States v. Bednarski*, *supra*; *United States v. Boscoe*, 518 F.2d 95 (1st Cir. 1975). Nevertheless, government attorneys can and should discourage *Alford* pleas by refusing to agree to terminate prosecutions where an *Alford* plea is proffered to fewer than all of the charges pending. As is the case with guilty pleas generally, if such a plea to fewer than all the charges is tendered and accepted over the government's objection, the attorney for the government should proceed to trial on any remaining charges not barred on double jeopardy grounds unless the United States Attorney, or in cases handled by Departmental attorneys, the appropriate Assistant Attorney General, approves dismissal of those charges.

Government attorneys should also take full advantage of the opportunity afforded by Rule 11(b)(3) in an *Alford* case to thwart the defendant's efforts to project a public image of innocence.

Under Rule 11(b)(3), the court must be satisfied that there is "a factual basis" for a guilty plea. However, the Rule does not require that the factual basis for the plea be provided only by the defendant. *See United States v. Navedo*, 516 F.2d 29 (2d Cir. 1975); *Irizarry v. United States*, 508 F.2d 960 (2d Cir. 1974); *United States v. Davis*, 516 F.2d 574 (7th Cir. 1975). Accordingly, attorneys for the government in *Alford* cases should endeavor to establish as strong a factual basis for the plea as possible not only to satisfy the requirement of Rule 11(b)(3), but also to minimize the adverse effects of *Alford* pleas on public perceptions of the administration of justice.

[updated February 2018] [cited in JM 6-4.330; JM 9-28.1300]

# 9-27.450 - Records of Plea Agreements

All negotiated plea agreements to felonies or to misdemeanors negotiated from felonies shall be in writing and filed with the court.

**Comment.** JM 9-27.450 is intended to facilitate compliance with Rule 11 of the Federal Rules of Criminal Procedure and to provide a safeguard against misunderstandings that might arise concerning the terms of a plea agreement. Rule 11(c)(2) requires that a plea agreement be disclosed in open court (except upon a showing of good cause in which case disclosure may be made in camera), while Rule 11(c)(4) requires that the disposition provided for in the agreement be embodied in the judgment. Compliance with these requirements will be facilitated if the agreement has been reduced to writing in advance. Any time a defendant enters into a negotiated plea, that fact and the conditions of the agreement should also be maintained in the office case file. Written agreements will facilitate efforts by the Department to monitor compliance by prosecutors with Department policies and the guidelines. Documentation may include a copy of the court transcript at the time the plea is taken in open court.

There shall be within each office a formal system for approval of negotiated pleas. The approval authority shall be vested in at least a supervisory criminal Assistant United States Attorney, or a supervisory attorney of a litigating division in the Department of Justice, who will have the responsibility of assessing the appropriateness of the plea agreement under the policies of the Department of Justice pertaining to pleas. Where certain predictable fact situations arise with great frequency and are given identical treatment, the approval requirement may be met by a written instruction from the appropriate supervisor which describes with particularity the standard plea procedure to be followed, so long as that procedure is otherwise within Departmental guidelines. An example would be a border district that routinely deals with a high volume of illegal alien cases daily.

[updated February 2018]

# 9-27.500 -Offers to Plead Nolo Contendere — Opposition Except in Unusual Circumstances

The attorney for the government should oppose the acceptance of a plea of *nolo contendere* unless the United States Attorney and the appropriate Assistant Attorney General conclude that the circumstances of the case are so unusual that acceptance of such a plea would be in the public interest. *See* JM 9-16.010 (discussing the approval requirement).

**Comment.** Rule 11(a)(3) of the Federal Rules of Criminal Procedure, requires the court to consider "the parties' views and the public interest in the effective administration of justice" before it accepts a plea of *nolo contendere*. Thus, it is clear that a criminal defendant has no absolute right to enter a *nolo contendere* ("nolo") plea. The Department has long attempted to discourage the disposition of criminal cases by means of nolo pleas.

Government attorneys have been instructed for many years not to consent to nolo pleas except in the most unusual circumstances, and to do so then only with Departmental approval. Federal prosecutors should oppose the acceptance of a nolo plea, unless the United States Attorney and the appropriate Assistant Attorney General concludes that the circumstances are so unusual that acceptance of the plea would be in the public interest.

[updated February 2018] [cited in JM 6-2.000; JM 6-4.320; JM 9-28.1300]

# 9-27.520 - Offers to Plead Nolo Contendere — Offer of Proof

In any case in which a defendant seeks to enter a plea of *nolo contendere*, the attorney for the government should make an offer of proof in open court of facts known to the government that support the conclusion that the defendant has in fact committed the offense charged. *See also* JM 9-16.010.

**Comment.** If a defendant seeks to avoid admitting guilt by offering to plead *nolo contendere*, the attorney for the government should, in open court, make an offer of proof of facts known to the government that support the conclusion that the defendant has, in fact, committed the offense charged. This should be done in open court even in the rare case in which the government does not oppose the entry of a nolo plea. In addition, as is the case with respect to guilty pleas, the attorney for the government should urge the court to require the defendant to admit publicly the facts underlying the criminal charges. These precautions should minimize the effectiveness of any subsequent efforts by the defendant to portray himself/herself as technically liable, but not seriously culpable.

[updated February 2018]

# 9-27.530 - Argument in Opposition of Nolo Contendere Plea

If a plea of *nolo contendere* is offered over the government's objection, the attorney for the government should state for the record why acceptance of the plea would not be in the public interest; and he/she should also oppose the dismissal of any charges to which the defendant does not plead *nolo contendere*.

**Comment.** When a plea of *nolo contendere* is offered over the government's objection, the prosecutor should take full advantage of Rule 11(a)(3) of the Federal Rules of Criminal Procedure, to state for the record why acceptance of the plea would not be in the public interest. In addition to reciting facts that could be proved to show the defendant's guilt, the prosecutor should bring to the court's attention whatever arguments exist for rejecting the plea. At the very least, a forceful presentation should make it clear to the public that the government is unwilling to condone the entry of a special plea that may help the defendant avoid legitimate consequences of his/her guilt. If the nolo plea is offered to fewer than all charges, the prosecutor should also oppose the dismissal of the remaining charges.

[cited in JM 6-4.320]

[updated February 2018]

# 9-27.600 - Entering into Non-prosecution Agreements in Return for Cooperation — Generally

Except as hereafter provided, the attorney for the government may, with supervisory approval, enter into a non-prosecution agreement in exchange for a person's cooperation when, in his/her judgment, the person's timely cooperation appears to be necessary to the public interest and other means of obtaining the desired cooperation are unavailable or would not be effective.

**Comment.**

1. **Fifth Amendment Privileges.** In many cases, it may be important to the success of an investigation or prosecution to obtain the testimony or other cooperation of a person who is himself/herself implicated in the criminal conduct being investigated or prosecuted. However, because of his/her involvement, the person may refuse to cooperate because of a desire not to incriminate himself or herself, including, for example, by invoking his/her Fifth Amendment privilege against compulsory self-incrimination. In this situation, there are several possible approaches the prosecutor can take to render the privilege inapplicable, induce its waiver, or otherwise obtain the testimony or cooperation.
   a. First, if time permits, the person may be charged, tried, and convicted before his/her cooperation is sought in the investigation or prosecution of others.
   b. Second, the person may be willing to cooperate if the charges or potential charge against him/her are reduced in number or degree in return for his/her cooperation and his/her entry of a guilty plea to the remaining charges. An agreement to file a motion pursuant to Sentencing Guideline § 5K1.1 or Rule 35 of the Federal Rules of Criminal Procedure after the defendant gives full and complete cooperation is the preferred method for securing such cooperation. Usually such a concession by the government will be all that is necessary, or warranted, to secure the cooperation sought. Since it is certainly desirable as a matter of policy that an offender be required to incur at least some liability for his/her criminal conduct, government attorneys should attempt to secure this result in all appropriate cases, following the principles set forth in JM 9-27.430 to the extent practicable.
   c. The third method for securing the cooperation of a potential defendant is by means of a court order under 18 U.S.C. §§ 6001-6003. Those statutory provisions govern the conditions under which uncooperative witnesses may be compelled to testify or provide information notwithstanding their invocation of the privilege against compulsory self-incrimination. In brief, under the so-called "use immunity" provisions of those statutes, the court may order the person to testify or provide other information, but neither his/her testimony nor the information he/she provides may be used against him/her, directly or indirectly, in any criminal case except a prosecution for perjury or other failure to comply with the order. Ordinarily, these "use immunity" provisions should be relied on in cases in which attorneys for the government need to obtain sworn testimony or the production of

information before a grand jury or at trial, and in which there is reason to believe that the person will refuse to testify or provide the information on the basis of his/her privilege against compulsory self-incrimination. Consideration should be given to documenting the evidence available prior to the immunity offer. For more information on the process for obtaining a court order for immunity, see JM 9-23.000 *et seq*.

d. Finally, there may be cases in which it is impossible or impractical to employ the methods described above to secure the necessary information or other assistance, and in which the person is willing to cooperate only in return for an agreement that he/she will not be prosecuted at all for what he/she has done. The provisions set forth hereafter describe the conditions that should be met before such an agreement is made, as well as the procedures recommended for such cases

   It is important to note that these provisions apply only if the case involves an agreement with a person who might otherwise be prosecuted. If the person reasonably is viewed only as a potential witness rather than a potential defendant, and the person is willing to cooperate, there is no need to consult these provisions.

   JM 9-27.600 describes three circumstances that should exist before government attorneys enter into non-prosecution agreements in return for cooperation: (1)the unavailability or ineffectiveness of other means of obtaining the desired cooperation; (2)the apparent necessity of the cooperation to the public interest; and (3) the approval of such a course of action by an appropriate supervisory official.

2. **Unavailability or Ineffectiveness of Other Means.** As indicated above, non-prosecution agreements are only one of several methods by which the prosecutor can obtain the cooperation of a person whose criminal involvement makes him/her a potential subject of prosecution. Other methods - such as seeking cooperation after trial and conviction, bargaining for cooperation as part of a plea agreement, and compelling cooperation under a "use immunity" order - involve prosecuting the person or at least leaving open the possibility of prosecuting him/her on the basis of independently obtained evidence. Since these outcomes are clearly preferable to permitting an offender to avoid any liability for his/her conduct, the possible use of an alternative to a non-prosecution agreement should be given serious consideration in the first instance.

   Another reason for using an alternative to a non-prosecution agreement to obtain cooperation concerns the practical advantage in terms of the person's credibility if he/she testifies at trial. If the person already has been convicted, either after trial or upon a guilty plea, for participating in the events about which he/she testifies, his/her testimony is apt to be far more credible than if it appears to the trier of fact that he/she is getting off "scot free." Similarly, if his/her testimony is compelled by a court order, he/she cannot properly be portrayed by the defense as a person who has made a "deal" with the government and whose testimony is, therefore, suspect; his/her testimony will have been forced from him/her, not bargained for.

   In some cases, however, there may be no effective means of obtaining the person's timely cooperation short of entering into a non-prosecution agreement. The person may be unwilling to cooperate fully in return for a reduction of charges, the delay involved in

bringing him/her to trial might prejudice the investigation or prosecution in connection with which his/her cooperation is sought and it may be impossible or impractical to rely on the statutory provisions for compulsion of testimony or production of evidence. One example of the latter situation is a case in which the cooperation needed does not consist of testimony under oath or the production of information before a grand jury or at trial. Other examples are cases in which time is critical, or where use of the procedures of 18 U.S.C. § 6001-6003 would unreasonably disrupt the presentation of evidence to the grand jury or the expeditious development of an investigation, or where compliance with the statute of limitations or the Speedy Trial Act precludes timely application for a court order.

Only when it appears that the person's timely cooperation cannot be obtained by other means, or cannot be obtained effectively, should the attorney for the government consider entering into a non-prosecution agreement.

3. **Public Interest.** If he/she concludes that a non-prosecution agreement would be the only effective method for obtaining cooperation, the attorney for the government should consider whether, balancing the cost of foregoing prosecution against the potential benefit of the person's cooperation, the cooperation sought appears necessary to the public interest. This "public interest" determination is one of the conditions precedent to an application under 18 U.S.C. § 6003 for a court order compelling testimony. Like a compulsion order, a non-prosecution agreement limits the government's ability to undertake a subsequent prosecution of the witness. Accordingly, the same "public interest" test should be applied in this situation as well. Some of the considerations that may be relevant to the application of this test are set forth in JM 9-27.620.
4. **Supervisory Approval.** Finally, the prosecutor should secure supervisory approval before entering into a non-prosecution agreement. Prosecutors working under the direction of a United States Attorney must seek the approval of the United States Attorney or a supervisory Assistant United States Attorney. Departmental attorneys not supervised by a United States Attorney should obtain the approval of the appropriate Assistant Attorney General, and should notify the United States Attorney or Attorneys concerned. The requirement of approval by a superior is designed to provide review by an attorney experienced in such matters, and to ensure uniformity of policy and practice with respect to such agreements. This section should be read in conjunction with JM 9-27.640, concerning particular types of cases in which an appropriate Assistant Attorney General must concur in or approve an agreement not to prosecute in return for cooperation.

[updated June 2023]

# 9-27.620 - Entering into Non-prosecution Agreements in Return for Cooperation — Considerations to be Weighed

In determining whether a person's cooperation may be necessary to the public interest, the attorney for the government, and those whose approval is necessary, should weigh all relevant considerations, including:

1. The importance of the investigation or prosecution to an effective program of law enforcement, or consideration of other national security or governmental interests;
2. The value of the person's cooperation to the investigation or prosecution;
3. The person's relative culpability in connection with the offense or offenses being investigated or prosecuted and his/her history with respect to criminal activity; and
4. The interests of any victims.

**Comment.** This section is intended to assist federal prosecutors, and those whose approval they must secure, in deciding whether a person's cooperation appears to be necessary to the public interest. The considerations listed here are not intended to be an exhaustive list or to require a particular decision in a particular case. Rather they are meant to focus the decision-maker's attention on factors that probably will be controlling in the majority of cases.

1. **Importance of Case.** Since the primary function of a federal prosecution in ordinary criminal cases is to enforce the criminal law, a federal prosecutor should not routinely or indiscriminately enter into non-prosecution agreements, which are, in essence, agreements not to enforce the law under particular conditions. Rather, he/she should reserve the use of such agreements for cases in which the cooperation sought concerns the commission of a serious offense, or prosecution is important in achieving effective enforcement of the criminal laws, including national security-related enforcement and prevention efforts. The relative importance or unimportance of the contemplated case is therefore a significant threshold consideration.
2. **Value of Cooperation.** An agreement not to prosecute in return for a person's cooperation binds the government to the extent that the person carries out his/her part of the bargain. *See Santobello v. New York* 404 U.S. 257 (1971); *Wade v. United States*, 504 U.S. 181 (1992). Since such an agreement forecloses enforcement of the criminal law against a person who otherwise may be liable to prosecution, it should not be entered into without a clear understanding of the nature of the quid pro quo and a careful assessment of its probable value to the government. In order to be in a position adequately to assess the potential value of a person's cooperation, the prosecutor should insist on an "offer of proof" or its equivalent from the person or his/her attorney. The prosecutor can then weigh the offer in terms of the investigation or prosecution in connection with which cooperation is sought. In doing so, he/she should consider such questions as whether the cooperation will in fact be forthcoming, whether the testimony or other information provided will be credible, whether it can be corroborated by other evidence, whether it will materially assist the investigation or prosecution, and whether substantially the same benefit can be obtained from someone else without an agreement not to prosecute. After assessing all of these factors, together with any others that may be relevant, the prosecutor can judge the strength of his/her case with and without the person's cooperation, and determine whether it may be in the public interest to agree to forego prosecution under the circumstances.

3. **Relative Culpability and Criminal History.** In determining whether it may be necessary to the public interest to agree to forego prosecution of a person who may have violated the law in return for that person's cooperation, it is also important to consider the degree of his/her apparent culpability relative to others who are subjects of the investigation or prosecution as well as his/her history of criminal involvement. Of course, ordinarily it would not be in the public interest to forego prosecution of a high-ranking member of a criminal enterprise in exchange for his/her cooperation against one of his/her subordinates, nor would the public interest be served by bargaining away the opportunity to prosecute a person with a long history of serious criminal involvement in order to obtain the conviction of someone else on less serious charges. These are matters with regard to which the attorney for the government may find it helpful to consult with the investigating agency or with other prosecuting authorities who may have an interest in the person or his/her associates.

4. **The Interests of Any Victims.** When considering whether it is in the public interest to forego prosecution, it is also important to consider the economic, physical, and psychological impact of the offense on any victims. In this connection, it is appropriate for the prosecutor to take into account such matters as the victim's desire for prosecution, the victim's age or health, and whether full or partial restitution has been made. In evaluating victim interests and determining whether to pursue a non-prosecution agreement, the prosecutor should be available to confer with the victim in furtherance of the Crime Victims' Rights Act (CVRA) and in accordance with the Attorney General Guidelines for Victim and Witness Assistance. The prosecutor should also be aware of any effect on the Department's ability to directly compensate victims of the underlying crimes and on the Crime Victims Fund. *See* Comment to JM 9-27.230. For more information regarding the Department's obligations to victims, see the Crime Victims' Rights Act, 18 U.S.C. § 3771, the Victims' Rights and Restitution Act, 34 U.S.C. § 20141, and the Attorney General Guidelines for Victim and Witness Assistance.

It is also important to consider whether the person has a background of cooperation with law enforcement officials, either as a witness or an informant, and whether he/she has previously been the subject of a compulsion order under 18 U.S.C. §§ 6001-6003 or has escaped prosecution by virtue of an agreement not to prosecute. Such information regarding compulsion orders may be available by telephone from the Policy and Statutory Enforcement Unit in the Office of Enforcement Operations of the Criminal Division.

[updated November 2022]

# 9-27.630 - Entering into Non-prosecution Agreements in Return for Cooperation — Limiting the Scope of Commitment

In entering into a non-prosecution agreement, the attorney for the government should, if practicable, explicitly limit the scope of the government's commitment to:

1. Non-prosecution based directly or indirectly on the testimony or other information or cooperation that has been or will be provided; or
2. Non-prosecution within his/her district with respect to a pending charge, or to a specific offense then known to have been committed by the person.

**Comment.** The attorney for the government should exercise extreme caution to ensure that his/her non-prosecution agreement does not confer "blanket" immunity on the witness. Thus, for example, he/she should attempt to limit his/her agreement to non-prosecution based on the testimony or information provided. Such an "informal use immunity" agreement has two advantages over an agreement not to prosecute the person in connection with a particular transaction: first, it preserves the prosecutor's option to prosecute on the basis of independently obtained evidence if it later appears that the person's criminal involvement was more serious than it originally appeared to be; and second, it encourages the witness to be as forthright as possible since the more he/she reveals the more protection he/she will have against a future prosecution. To further encourage full disclosure by the witness, it should be made clear in the agreement that the government's forbearance from prosecution is conditioned upon the witness's testimony or production of information being complete and truthful, and that failure to testify truthfully may result in a perjury prosecution.

Even if it is not practicable to obtain the desired cooperation pursuant to an "informal use immunity" agreement, the attorney for the government should attempt to limit the scope of the agreement in terms of the testimony and transactions covered, bearing in mind the possible effect of his/her agreement on prosecutions in other districts.

It is important that non-prosecution agreements be drawn in terms that will not bind other federal prosecutors or agencies without their consent. Thus, if practicable, the attorney for the government should explicitly limit the scope of his/her agreement to non-prosecution within his/her district. If such a limitation is not practicable and it can reasonably be anticipated that the agreement may affect prosecution of the person in other districts, the attorney for the government contemplating such an agreement shall communicate the relevant facts to the appropriate United States Attorney and/or Assistant Attorney General. United States Attorneys may not make agreements that prejudice other litigating divisions, without the agreement of all affected divisions. *See also* JM 9-16.000 et seq. for more information regarding plea agreements.

Finally, the attorney for the government should make it clear that his/her agreement relates only to non-prosecution and that he/she has no independent authority to promise that the witness will be admitted into the Department's Witness Security program or that the Marshal's Service will provide any benefits to the witness in exchange for his/her cooperation. This does

not mean, of course, that the prosecutor should not cooperate in making arrangements with the Marshal's Service necessary for the protection of the witness in appropriate cases. The procedures to be followed in such cases are set forth in JM 9-21.000.

[updated February 2018]

# 9-27.640 - Agreements Requiring Assistant Attorney General Approval

The attorney for the government should not enter into a non-prosecution agreement in exchange for a person's cooperation without first obtaining the approval of the appropriate Assistant Attorney General when:

1. Prior consultation or approval would be required by a statute or by Departmental policy for a declination of prosecution or dismissal of a charge with regard to which the agreement is to be made; or
2. The person is:
   a. A high-level federal, state, or local official;
   b. An official or agent of a federal investigative or law enforcement agency; or
   c. A person who otherwise is, or is expected to become, of major public interest.

**Comment.** JM 9-27.640 sets forth special cases that require approval of non-prosecution agreements by the appropriate Assistant Attorney General. Subparagraph (1) covers cases in which existing statutory provisions and departmental policies require that, with respect to certain types of offenses, the Attorney General, the Deputy Attorney General, or an Assistant Attorney General be consulted or give his/her approval before prosecution is declined or charges are dismissed. *See e.g.*, JM 6-4.245 (tax offenses); JM 9-41.010 (bankruptcy frauds); JM 9-90.020 (national security-related offenses); JM 9-2.400 (for a complete listing of all prior approval and consultation requirements). An agreement not to prosecute resembles a declination of prosecution or the dismissal of a charge in that the end result in each case is similar: a person who has engaged in criminal activity is not prosecuted or is not prosecuted fully for his/her offense. Accordingly, attorneys for the government should obtain the approval of the appropriate Assistant Attorney General before agreeing not to prosecute in any case in which consultation or approval would be required for a declination of prosecution or dismissal of a charge.

Subparagraph (2) sets forth other situations in which the attorney for the government should obtain the approval of an Assistant Attorney General, of a proposed agreement not to prosecute in exchange for cooperation. Generally speaking, the situations described will be cases of an exceptional or extremely sensitive nature, or cases involving individuals or matters of major public interest. In a case covered by this provision that appears to be of an especially sensitive nature, the Assistant Attorney General should, in turn, consider whether it would be appropriate to notify the Attorney General or the Deputy Attorney General.

[updated February 2018]

# 9-27.641 - Multi-District (Global) Agreement Requests

No district or division shall make any agreement, including any agreement not to prosecute, which purports to bind any other district(s) or division without the approval of the United States Attorney(s) in each affected district and/or the appropriate Assistant Attorney General .

The requesting district/division shall make known to each affected district/division the following information:

1. The specific crimes allegedly committed in the affected district(s) as disclosed by the defendant. (No agreement should be made as to any crime(s) not disclosed by the defendant.)

2. Identification of victims of crimes committed by the defendant in any affected district, insofar as possible.

3. The proposed agreement to be made with the defendant and the applicable Sentencing Guideline range.

See JM 16.030 for a discussion of the requirement for consultation with investigative agencies and victims regarding pleas.

[cited in JM 9-28.1000]

[updated February 2018]

# 9-27.650 - Records of Non-Prosecution Agreements

In a case in which a non-prosecution agreement is reached in return for a person's cooperation, the attorney for the government should ensure that the case file contains a memorandum or other written record setting forth the terms of the agreement. The memorandum or record should be signed or initialed by the person with whom the agreement is made or his/her attorney.

**Comment.** The provisions of this section are intended to serve two purposes. First, it is important to have a written record in the event that questions arise concerning the nature or scope of the agreement. Such questions are certain to arise during cross-examination of the witness, particularly since the existence of the agreement should be disclosed to defense counsel pursuant to the requirements of *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972). The exact terms of the agreement may also become relevant if the government attempts to prosecute the witness for some offense in the future. Second, such a record will facilitate identification by government attorneys (in the course of weighing future agreements not to prosecute, plea agreements, pre-trial diversion, and other discretionary actions) of persons whom the government has agreed not to prosecute.

The principal requirements of the written record are that it be sufficiently detailed that it leaves no doubt as to the obligations of the parties to the agreement, and that it be signed or initialed by the person with whom the agreement is made and his/her attorney, or at least by one of them.

[updated February 2018]

# 9-27.710 - Participation in Sentencing — Generally

During the sentencing phase of a federal criminal case, the attorney for the government should assist the sentencing court by:

1. Attempting to ensure that the relevant facts and sentencing factors, as applied to the facts, are brought to the court's attention fully and accurately; and

2. Making sentencing recommendations in appropriate cases.

**Comment.** Sentencing is a critical stage in a case, and prosecutors play an indispensable role in advocating for just sentences. A prosecutor must be familiar with the guidelines generally and with the specific guideline provisions applicable to the case. A prosecutor should, as provided in JM 9-27.720 and 9-27.750, endeavor to ensure the accuracy and completeness of the information upon which the sentencing decisions will be based. Department policy requires that prosecutors always be candid with the court, the probation office, and the public as to the full extent of the defendant's conduct and culpability, regardless of whether the charging document includes such specificity. In addition, as provided in JM 9-27.730, a prosecutor should offer recommendations with respect to the sentence to be imposed.

[updated June 2023]

# 9-27.720 - Establishing Factual Basis for Sentence

In order to ensure that the relevant facts are brought to the attention of the sentencing court fully and accurately, the attorney for the government should:

1. Cooperate with the Probation Service in its preparation of the presentence investigation report;
2. Review the presentence investigation report;
3. Highlight critical facts and sentencing considerations in a way that accurately and compellingly supports the government's recommended sentence;
4. Make a factual presentation to the court when:
    a. Sentence is imposed without a presentence investigation and report;
    b. It is necessary to supplement or correct the presentence investigation report;
    c. It is necessary in light of the defense presentation to the court; or
    d. It is requested by the court;
5. Be prepared to substantiate significant factual allegations disputed by the defense; and
6. Provide an opportunity for victim allocution.

**Comment.**

1. **Cooperation with Probation Service.** The prosecutor should cooperate with the Probation Service in its preparation of the presentence report for the court. Under Rule 32 of the Federal Rules of Criminal Procedure, the report should contain information about the history and characteristics of the defendant, including any prior criminal record, financial condition, and any circumstances affecting the defendant's behavior that may be helpful in imposing sentence or in the correctional treatment of the defendant. While much of this information may be available to the Probation Service from sources other than the government, some of it may be obtainable only from prosecutorial or investigative files to which probation officers do not have access. For this reason, it is important that the attorney for the government respond promptly to Probation Service requests by providing the requested information whenever possible. The attorney for the government should also recognize the occasional desirability of volunteering information to the Probation Service especially in a district where the Probation Office is overburdened. Doing so may be the best way to ensure that important facts about the defendant come to its attention. In addition, the prosecutor should be particularly alert to the need to volunteer relevant information to the Probation Service in complex cases, since it cannot be expected that probation officers will obtain a full understanding of the facts of such cases simply by questioning the prosecutor or examining his/her files.

   The relevant information can be communicated orally, or by making portions of the case file available to the probation officer, or by submitting a sentencing memorandum or other written presentation for inclusion in the presentence report. Whatever method he/she uses, however, the attorney for the government should bear in mind that since the report will be shown to the defendant and defense counsel, care should be taken to prevent disclosures that might be harmful to law enforcement interests.

2. **Review of Presentence Report.** Before the sentencing hearing, the prosecutor should always review the presentence report, which is prepared pursuant to Rule 32 of the Federal Rules of Criminal Procedure. Not only must the prosecutor be satisfied that the report is factually accurate, he or she must also pay attention to the initial determination of the base offense level. Further, the prosecutor must also consider all adjustments reflected in the report, as well as any recommendations for departure made by the probation office. These adjustments and potential departures can have a profound effect on the defendant's sentence. As advocates for the United States, prosecutors should be prepared to argue concerning those adjustments (and, if necessary, departures allowed by the guidelines) in order to arrive at a final result which adequately and accurately describes the defendant's conduct of offense, criminal history, and other factors related to sentencing.

3. **Emphasize Critical Facts and Arguments.** The attorney for the government should apply relevant sentencing factors to the facts in a way that most accurately and convincingly supports the government’s recommended sentence. Judges are often presented with a substantial amount of information at sentencing. Justice is best served when prosecutors distill that information to its most salient points and provide judges with a persuasive framework through which to understand the significance of the case, the impact on the victims, the importance of general and specific deterrence, and the need for the requested punishment and rehabilitation plan to achieve a just result.

4. **Factual Presentation to Court.** In addition to assisting the Probation Service with its presentence investigation, the attorney for the government may find it necessary to make a factual presentation directly to the court. Such a presentation is authorized by Rule 32(i) of the Federal Rules of Criminal Procedure, which requires the court to "allow the parties' attorneys to comment on the probation officer's determinations and other matters relating to an appropriate sentence."

   Ordinarily, the need to address the court concerning the facts relevant to sentencing may arise in four situations: (a) when sentence is imposed without a presentence investigation and report; (b) when necessary to correct, supplement, or highlight portions of the presentence report; (c) when necessary in light of the defense presentation to the court; and (d) when requested by the court.

   a. **Furnishing Information in Absence of Presentence Report.** Rule 32(c) of the Federal Rules of Criminal Procedure authorizes the imposition of sentence without a presentence investigation and report, if the court finds that the record contains sufficient information to permit the meaningful exercise of sentencing authority under 18 U.S.C. § 3553. Imposition of sentence pursuant to this provision usually occurs when the defendant has been found guilty by the court after a non-jury trial, when the case is relatively simple and straightforward, when the defendant has taken the stand and has been cross-examined, and when it is the court's intention not to impose a prison sentence. In such cases, and any others in which sentence is to be imposed without benefit of a presentence investigation and report (such as when a report on the defendant has recently been prepared in connection with another case), it may be particularly important that the attorney for the government take advantage of the opportunity afforded by Rule 32(i) of the Federal Rules of Criminal Procedure, to address the court, since there will be no later opportunity to correct or supplement the record. Moreover, even if government counsel is satisfied that all facts relevant to the sentencing decision are already before the court, he/she may wish to make a factual presentation for the record that makes clear the government's view of the defendant, the offense, or both.

   b. **Correcting, Supplementing, or Highlighting Portions of the Presentence Report.** The attorney for the government should bring any significant inaccuracies or omissions to the Court's attention at the sentencing hearing, together with the correct or complete information. The attorney may also wish to highlight certain factual findings in making a sentencing recommendation to the court.

   c. **Responding to Defense Assertions.** Having read the presentence report before the sentencing hearing, the defendant or his/her attorney may dispute specific factual statements made therein. More likely, without directly challenging the accuracy of the report, the defense presentation at the hearing may omit reference to the derogatory information in the report while stressing any favorable information and drawing all inferences beneficial to the defendant. Some degree of selectivity in the defense presentation can reasonably be expected, and will be recognized by the court. There may be instances, however, in which the defense presentation, if not challenged, will leave the court with a mistaken view of the defendant or of the offense, because it is significantly different from that appearing in the presentence report. If this happens, the attorney for

the government may respond by correcting factual errors in the defense presentation, pointing out facts and inferences ignored by the defense, and generally reinforcing the objective view of the defendant and his/her offense as expressed in the presentence report.

d. **Responding to Court's Requests.** The court will request specific information from government counsel at the sentencing hearing. When this occurs, the attorney for the government should, of course, furnish the requested information if it is readily available and no prejudice to law enforcement interests will result from its disclosure.

5. **Substantiation of Disputed Facts.** In addition to providing the court with relevant factual material at the sentencing hearing, the attorney for the government should be prepared to substantiate significant factual allegations disputed by the defense. This can be done by making the source of the information available for cross examination or if there is good cause for nondisclosure of his/her identity, by presenting the information as hearsay and providing other guarantees of its reliability, such as corroborating testimony by others. *See United States v. Fatico*, 579 F.2d 707, 713 (2d Cir. 1978).

6. **Provide an Opportunity for Victim Allocution.** Pursuant to the Crime Victims' Rights Act of 2004, 18 U.S.C. § 3771(a)(4), a victim is entitled to address the court at sentencing regarding the impact of the crime on the victim. Prosecutors should notify victims of this opportunity in advance of sentencing with sufficient time for the victim to prepare a statement, and should notify the court of any victims wishing to make a statement.

[updated February 2018]

# 9-27.730 - Making Sentencing Recommendations

The attorney for the government should make sentencing recommendations based on an individualized assessment of the nature and circumstances of the offense and the history and characteristics of the defendant, without improper consideration of the defendant's race, religion, gender, ethnicity, national origin, sexual orientation, or political association, activities, or beliefs.

When making a sentencing recommendation, the attorney for the government should seek a sentence that is sufficient, but not greater than necessary, to:

1. Reflect the seriousness of the offense;

2. Promote respect for the law;

3. Provide just punishment;

4. Afford deterrence to future criminal conduct by the defendant and others;

5. Protect the public from further crimes of the defendant;

6. Avoid unwarranted sentencing disparities among offenders with similar records who have been found guilty of similar conduct;

7. Offer the defendant an opportunity for effective rehabilitation and provide the defendent with needed correctional treatment; and

8. Take into account the need for the defendant to provide restitution to any victims of the offense.

In many cases, the appropriate balance among these factors will lead to a recommendation for a sentence within the advisory range resulting from application of the Sentencing Guidelines, and prosecutors should generally continue to advocate for a sentence within that range. Prosecutors should consider whether the departure provisions under the guidelines are appropriate, and, if so, should advocate for their application accordingly. When advocating at sentencing, prosecutors must fully and accurately alert the court to all known relevant facts and criminal history and explain why the interests of justice warrant their sentencing recommendations. Before recommending a sentence that reflects an upward departure or variance from the advisory guideline range, the attorney for the government must obtain supervisory approval.

**Comment.** Congress has identified the factors courts must consider when imposing sentence. These factors are set forth in 18 U.S.C. § 3553, and are listed above. Absent a specific provision in a plea agreement, the attorney for the government is not legally obligated to make a recommendation at sentencing. However, the interests of justice and the public interest often will be best served if the prosecutor handling the matter makes a recommendation as to an appropriate sentence.

**1. Sentences Above or Below the Guidelines.** Although consistent application of the guidelines encourages uniformity throughout the federal system, it is appropriate for prosecutors to consider whether the penalty yielded by the advisory guideline range is proportional to the seriousness of the defendant's conduct and would achieve the purposes of criminal sentencing

articulated in § 3553(a). Based on an individualized assessment of the facts and circumstances of a particular case, a prosecutor may conclude that a sentence request for a departure or variance above or below the advisory guidelines is warranted. All prosecutorial recommendations for departures or variances — upward or downward — must be supported by specific and articulable factors and documented in the case file. Recommendations for upward departures and variances should also be approved by a supervisor.

**2. Balancing Sentencing Factors.** The attorney for the government should recognize that not all of the factors set forth in § 3553 may be relevant or of equal importance in every case and that, for a particular offense committed by a particular offender, one of the purposes, or a combination of purposes, may be of overriding importance.

**3. Conveying Sentencing Recommendations to the Court.** The attorney for the government should be guided by the practice of the court concerning the manner and form in which sentencing recommendations are made. If the government's position with respect to the sentence to be imposed is related to a plea agreement, that position must be made known to the court at the time the plea is entered. In other situations, the government's position might be conveyed to the probation officer during the presentence investigation; to the court in the form of a sentencing memorandum filed in advance of the sentencing hearing; or to the court orally at the time of the hearing. Courts often find it helpful when federal prosecutors, in addition to their oral advocacy at the sentencing hearing, file with the court in advance of sentencing a memorandum setting forth the recommended sentence with supporting reasons.

**4. Recommendations Required by Plea Agreements.** As set forth in JM 9-27.400, prosecutors may enter into plea agreements that require the government to make – or not make – particular recommendations at sentencing. If the prosecutor has entered into a plea agreement calling for the government to take a certain position with respect to the sentence to be imposed, and the defendant has entered a guilty plea in accordance with the terms of the agreement, the prosecutor must perform his/her part of the bargain or risk having the plea invalidated. *Machibroda v. United States*, 368 U.S. 487, 493 (1962); *Santobello v. United States*, 404 U.S. 257, 262 (1971).

**5. Substantial Assistance.** When making a sentencing recommendation, the attorney for the government may consider whether, and to what extent, the defendant has provided substantial assistance in the investigation or prosecution of others. The attorney for the government must obtain supervisory approval before filing any substantial assistance motion pursuant to section 5K.1.1 of the Sentencing Guidelines or Federal Rule of Criminal Procedure 35. This requirement is addressed in JM 9-27.400.

[updated June 2023]

# 9-27.731 - Making Sentencing Recommendations in Certain Drug Cases

As set forth in JM 9-27.730, although in many cases the appropriate balance among the 18 U.S.C. § 3553(a) factors will lead to a recommendation for a sentence within the advisory range resulting from the application of the Sentencing Guidelines, there are cases in which such a sentence may not be proportional to the seriousness of the defendant's conduct or achieve the purposes of criminal sentencing as articulated in 18 U.S.C. § 3553(a). In such cases, prosecutors may conclude that a request for a departure or variance above or below the guidelines range is warranted.

In the context of drug cases, requests for departures or variances may be particularly justified in the following circumstances:

- **Certain cases in which the guidelines range does not adequately reflect the defendant's crime and culpability:** At times, a low-level seller in a large-scale drug organization may be held responsible under the relevant conduct provisions of the Sentencing Guidelines for a large quantity of drugs that produces an advisory range near the top of the sentencing table. In such cases, prosecutors should consider supporting a downward departure or variance, particularly where all or most of the criteria listed in JM 9-27.311 are satisfied. Conversely, where the criteria are satisfied and yet the penalty yielded by the advisory guidelines range is not proportional to the seriousness of the defendant's conduct, prosecutors may consider seeking an upward departure or variance.
- **Certain cases in which the career offender guidelines range does not adequately reflect the defendant's crime and culpability:** Similar consideration should be given in a case in which the defendant is subject to sentencing under the career offender guideline, *see* U.S.S.G. § 4B1.1, which is designed to trigger guideline ranges at or near statutory maximum sentences. In a case in which all or most of the listed criteria are present, and the defendant's status as a career offender is predicated only on the current and previous commission of nonviolent controlled substance offenses, prosecutors should consider supporting a downward variance to the guidelines range that would apply in the absence of career offender status. (For purposes of this subsection, nonviolent offenses are those that do not involve the actual or threatened use of a weapon or other means of violence.) Conversely, if the defendant's prior convictions involved the actual or threatened use of violence, but the crimes do not qualify as career offender predicates under the "categorical approach," if appropriate prosecutors may consider advocating for an upward variance, including toward the career offender range.

In crack cocaine cases, prosecutors should advocate for a sentence consistent with the guidelines for powder cocaine rather than crack cocaine. Where a court concludes that the

crack cocaine guidelines apply, prosecutors should generally support a variance to the guidelines range that would apply to the comparable quantity of powder cocaine.

Whatever the ultimate sentencing recommendation, prosecutors must always be candid with the court, the probation office, and the public as to the full extent of the defendant's conduct and culpability, including the type and quantity of drugs involved in the offense and the quantity attributable to the defendant's role in the offense, even if the charging document lacks such specificity.

[added June 2023]

# 9-27.745 - Unreasonable or Illegal Sentences

The attorney for the government should oppose attempts by the court to impose any sentence that is: (1) not supported by the law or the evidence; (2) unreasonable in light of 18 U.S.C. § 3553(a); (3) below the statutory minimum; (4) above the statutory maximum; or (5) based on a prohibited factor, such as race, religion, gender, ethnicity, national origin, sexual orientation, or political association, activities, or beliefs.

**Comment.** The prosecutor, with Departmental approval, may appeal a sentence which is unreasonable, unlawful or based on a prohibited factor. The requirements for reporting and seeking approval to appeal adverse sentencing decisions are set forth in JM 9-2.170.

[updated February 2018]

# 9-27.750 - Disclosing Factual Material to Defense

A. The attorney for the government should disclose to defense counsel, reasonably in advance of the sentencing hearing, any factual material not reflected in the presentence investigation report that he/she intends to bring to the attention of the court.
B. Comment. Due process requires that the sentence in a criminal case be based on accurate information. *See, e.g.*, *Moore v. United States*, 571 F.2d 179, 182-84 (3d Cir. 1978). Accordingly, the defense should have access to all material relied upon by the sentencing judge, including memoranda from the prosecution (to the extent that considerations of informant

safety permit), as well as sufficient time to review such material and an opportunity to present any refutation that can be mustered. *See, e.g.*, *United States v. Perri*, 513 F.2d 572, 575 (9th Cir. 1975); *United States v. Rosner*, 485 F.2d 1213, 1229-30 (2d Cir. 1973), *cert. denied*, 417 U.S. 950 (1974); *United States v. Robin*, 545 F.2d 775 (2d Cir. 1976). JM 9-27.750 is intended to facilitate satisfaction of these requirements by providing the defendant with notice of information not contained in the presentence report that the government plans to bring to the attention of the sentencing court.

[updated February 2018]

# 9-27.760 - Limitation on Identifying Uncharged Parties Publicly

In all public filings and proceedings, federal prosecutors should remain sensitive to the privacy and reputation interests of uncharged parties. In the context of public plea and sentencing proceedings, this means that, in the absence of some significant justification, it is not appropriate to identify (either by name or unnecessarily specific description), or cause a defendant to identify, a party unless that party has been publicly charged with the misconduct at issue. In the unusual instance where identification of an uncharged party during a plea or sentencing hearing is justified, and absent exigent circumstances, prosecutors should obtain the approval of the appropriate United States Attorney or Assistant Attorney General prior to the hearing. *See* JM 9-16.500. In other less predictable contexts, prosecutors should strive to avoid unnecessary public references to wrongdoing by uncharged parties. With respect to bills of particulars that identify unindicted co-conspirators, prosecutors generally should seek leave to file such documents under seal. Prosecutors shall comply, however, with any court order directing the public filing of a bill of particulars.

As a series of cases makes clear, there is ordinarily "no legitimate governmental interest served" by the government's public allegation of wrongdoing by an uncharged party, and this is true "[r]egardless of what criminal charges may . . . b[e] contemplated by the Assistant United States Attorney against the [third party] for the future." *In re Smith*, 656 F.2d 1101, 1106-07 (5th Cir. 1981). Courts have applied this reasoning to preclude the public identification of unindicted parties in plea hearings, sentencing memoranda, and other government pleadings. *See Finn v. Schiller*, 72 F.3d 1182 (4th Cir. 1996); *United States v. Briggs*, 514 F.2d 794 (5th Cir. 1975); *United States. v Anderson*, 55 F. Supp. 2d 1163 (D. Kan 1999); *United States v. Smith*, 992 F. Supp. 743 (D.N.J. 1998); *see also* JM 9-11.130.

In most cases, any legitimate governmental interest in referring to uncharged parties can be advanced through means other than those condemned in this line of cases. For example, in those cases where the offense to which a defendant is pleading guilty requires as an element that a third party have a particular status (*e.g.*, 18 U.S.C. § 203(a)(2), Unlawful Compensation to Members of Congress), the third party can usually be referred to generically ("a Member of Congress"), rather than identified specifically ("Senator X"). Similarly, when the defendant engaged in joint criminal conduct with others, generic references ("another individual") to the uncharged parties are typically sufficient for purposes of a guilty plea.

For the same reasons, following the conclusion of a case (whether by closing of an investigation or conclusion of a prosecution), DOJ personnel should not publicly disclose the identity (either by name or unnecessarily specific description) of uncharged parties absent approval of the United States Attorney or Assistant Attorney General, or their designee. When evaluating whether to grant approval, the United States Attorney or Assistant Attorney General, or their designee, may consider factors such as:

- The privacy, safety, and reputational interests of uncharged parties;
- The potential effect of any statements on ongoing criminal investigations or prosecutions, *see* JM 1-7.600, 1-7.610;
- Whether public disclosure may advance significant law enforcement interests, such as where release of information is necessary to protect public safety or uphold the integrity of the law enforcement investigation; and
- Other legitimate and compelling governmental interests, including whether the public has a significant need to know the information.

Public statements concerning the identity of uncharged parties following the conclusion of a case are permissible only if the legitimate and compelling government interests served, including law enforcement interests, substantially outweigh the privacy and reputational interests of the uncharged parties. To the extent a public statement regarding uncharged parties meets this standard and is otherwise permitted by law, such disclosure must be limited to the extent necessary to advance the government interests served by the disclosure.

Significant justification for identifying uncharged parties commonly exists where it is ordered by the Court, is necessary to protect the integrity of the case, or assists the government in meeting its burden of proof. In these instances, the use of generalized terms or descriptions may be unfeasible or insufficient or may create confusion or false impressions for the judge or jury. For example, in conspiracy trials, the identity and conduct of uncharged parties are often highly relevant to the government's case, and it is not feasible to shield that individual's identity in proving the case. In such instances where significant justification exists relating to court proceedings and pleadings, prior approval by the appropriate United States Attorney or Assistant Attorney General is not necessary.

[updated February 2024]

[9-24.000 - Requests For Special Confinement Conditions]

[9-28.000 - Principles of Federal Prosecution Of Business Organizations]

**U.S. Department of Justice**

950 Pennsylvania Avenue NW
Washington DC 20530

Contact the Department

Phone: 202-514-2000

TTY: 711 | TRS Info

# EXHIBIT E

# Office of the Attorney General
## Washington, D.C. 20530

November 9, 2020

MEMORANDUM FOR UNITED STATES ATTORNEYS
THE ASSISTANT ATTORNEYS GENERAL FOR THE
CRIMINAL DIVISION
CIVIL RIGHTS DIVISION
NATIONAL SECURITY DIVISION
DIRECTOR, FEDERAL BUREAU OF INVESTIGATION

FROM: THE ATTORNEY GENERAL

SUBJECT: POST-VOTING ELECTION IRREGULARITY INQUIRIES

Last week, our nation once again demonstrated the strength of our democracy as more than 140 million Americans cast ballots to select their leaders. I want to thank each of you and your teams for your extraordinary efforts to ensure that all Americans could exercise this most fundamental of rights with confidence and in safety.

Now that the voting has concluded, it is imperative that the American people can trust that our elections were conducted in such a way that the outcomes accurately reflect the will of the voters. Although the States have the primary responsibility to conduct and supervise elections under our Constitution and the laws enacted by Congress, the United States Department of Justice has an obligation to ensure that federal elections are conducted in such a way that the American people can have full confidence in their electoral process and their government.

The Department's general policies with regard to election fraud investigations are contained in the Justice Manual. Those policies require, among other things, consultation with the Public Integrity Section's Election Crimes Branch ("ECB") in some instances. Those policies already allow preliminary inquiries, including witness interviews, to be conducted without ECB consultation. In instances in which they are consulted, the ECB's general practice has been to counsel that overt investigative steps ordinarily should not be taken until the election in question has been concluded, its results certified, and all recounts and election contests concluded. Such a passive and delayed enforcement approach can result in situations in which election misconduct cannot realistically be rectified. Moreover, this ECB practice has never been a hard and fast rule, and case-specific determinations and judgments must be made. While most allegations of purported election misconduct are of such a scale that they would not impact the outcome of an election and, thus, investigation can appropriately be deferred, that is not always the case. Furthermore, any concerns that overt actions taken by the Department could inadvertently impact an election are greatly minimized, if they exist at all, once voting has concluded, even if election certification has not yet been completed.

Given this, and given that voting in our current elections has now concluded, I authorize you to pursue substantial allegations of voting and vote tabulation irregularities prior to the certification of elections in your jurisdictions in certain cases, as I have already done in specific instances. Such inquiries and reviews may be conducted if there are clear and apparently-credible allegations of

irregularities that, if true, could potentially impact the outcome of a federal election in an individual State. Any investigation of claims of irregularities that, if true, would clearly not impact the outcome of a federal election in an individual State should normally be deferred until after the election certification process is completed. While U.S. Attorneys maintain their inherent authority to conduct inquiries and investigations as they deem appropriate, it will likely be prudent to commence any election-related matters as a preliminary inquiry, so as to assess whether available evidence warrants further investigative steps.

While it is imperative that credible allegations be addressed in a timely and effective manner, it is equally imperative that Department personnel exercise appropriate caution and maintain the Department's absolute commitment to fairness, neutrality and non-partisanship. You are the most senior leaders in the United States Department of Justice and I trust you to exercise great care and judgment in addressing allegations of voting and vote tabulation irregularities. While serious allegations should be handled with great care, specious, speculative, fanciful or far-fetched claims should not be a basis for initiating federal inquiries. Nothing here should be taken as any indication that the Department has concluded that voting irregularities have impacted the outcome of any election. Rather, I provide this authority and guidance to emphasize the need to timely and appropriately address allegations of voting irregularities so that all of the American people, regardless of their preferred candidate or party, can have full confidence in the results of our elections. The American people and the leaders they freely elect deserve nothing less.