CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney
KENNETH BRAKEBILL (CABN 196696)
Chief, Civil Division
KENNETH J. KAO (CABN 194912)
Assistant United States Attorney
KELSEY J. HELLAND (CABN 298888)
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7320
Fax: (415) 436-6748
kenneth.kao@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE, et al.,<br><br>Defendants. | ) | Case No. 3:26-cv-12800-TLT<br><br>**DEFENDANTS' *EX PARTE* MOTION TO STAY TEMPORARY RESTRAINING ORDER OR, IN THE ALTERNATIVE, REQUEST FOR AN INDICATIVE RULING PURSUANT TO FED. R. CIV. P. 65(b)(4)**<br><br>Immediate Relief Requested<br><br>The Honorable Trina L. Thompson<br>United States District Judge |

## TABLE OF CONTENTS


I. INTRODUCTION ....1

II. BACKGROUND ....3

A. Federal Law. ....3

B. The California Letters. ....3

C. Litigation. ....3

D. This Case. ....4

III. LEGAL STANDARD ....4

IV. ARGUMENT ....5

A. The Order Does Not Address Standing, and Plaintiffs' Declarations Fail To Establish It. ....5

1. The Union Plaintiffs. ....6

2. The Non-Profit Plaintiffs. ....7

B. Plaintiffs Are Unlikely To Succeed on the Merits. ....7

1. Plaintiffs' Voting Rights Act Claim Fails on the Merits and Is Unlikely To Survive on Appeal. ....8

2. Defendants' Challenged Actions Do Not Violate the Tenth Amendment or the Elections Clause. ....12

3. The Order's APA, Due Process, and Ultra Vires Conclusions Are Unexplained and Incorrect. ....13

4. Equity Does Not Restrain Criminal Investigations or Declare Non-Parties Innocent in Advance. ....14

C. The Order Is Impermissibly Vague and Improperly Intrudes on the Executive Branch's Enforcement of Federal Election Law. ....15

D. The Remaining Stay Factors Decisively Favor the Government. ....17

V. CONCLUSION ....18

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aetna Life Ins. Co. v. Haworth*,
300 U.S. 227 (1937) ........ 15

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ........ 8, 9

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
148 F.4th 648 (9th Cir. 2025) ........ 5

*Anderson v. United States*,
417 U.S. 211 (1974) ........ 1, 11, 12, 18

*Andrews v. D'Souza*,
696 F. Supp. 3d 1332 (N.D. Ga. 2023) ........ 9

*Arizona Alliance for Retired Americans v. Clean Elections USA*,
638 F. Supp. 3d 1033 (D. Ariz. 2022) ........ 11

*California v. Texas*,
593 U.S. 659 (2021) ........ 7

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........ 7

*Deaver v. Seymour*,
822 F.2d 66 (D.C. Cir. 1987) ........ 14

*Douglas Oil Co. of Cal. v. Petrol Stops Nw.*,
441 U.S. 211 (1979) ........ 17, 18

*E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*,
137 F.4th 932 (9th Cir. 2025) ........ 5

*Ex Parte Siebold*,
100 U.S. 371 (1880) ........ 1, 11, 12

*FDA v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024) ........ 7

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) ........ 16

*Gardner v. Jessup*,
2025 WL 4743403 (S.D. Ga. June 26, 2025) ........ 9

*Heckler v. Chaney*,
470 U.S. 821 (1985) ........ 14

*Int'l Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade Ass'n*,
389 U.S. 64 (1967) ........ 16

*Jett v. Castaneda*,
578 F.2d 842 (9th Cir. 1978) ........ 17

*Jolt Initiative, Inc. v. Paxton*,
821 F. Supp. 3d 706 (W.D. Tex. 2026) ........ 11

*Laird v. Tatum*,
408 U.S. 1 (1972) ........ 7, 13

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ........ 18

*Leiva-Perez v. Holder*,
640 F.3d 962 (9th Cir. 2011) .......... 5
*Lopez v. Candaele*,
630 F.3d 775 (9th Cir. 2010) .......... 6
*Maryland v. King*,
567 U.S. 1301 (2012).......... 17
*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007).......... 15
*Michigan Welfare Rights Organization v. Trump*,
642 F. Supp. 3d 98 (D.D.C. 2022).......... 12
*Morton v. Mancari*,
417 U.S. 535 (1974).......... 8
*Murphy v. NCAA*,
584 U.S. 453 (2018).......... 13
*Murthy v. Missouri*,
603 U.S. 43 (2024).......... 6, 15
*Nat'l Coal. on Black Civic Participation v. Wohl*,
512 F. Supp. 3d 500 (S.D.N.Y. 2021).......... 11
*Nat'l Council of La Raza v. Cegavske*,
800 F.3d 1032 (9th Cir. 2015) .......... 6
*Nken v. Holder*,
556 U.S. 418 (2009).......... 5
*NLRB v. Express Publ'g Co.*,
312 U.S. 426 (1941).......... 16
*Nurses Ass'n v. Mullin*,
2026 WL 3166149 (N.D. Cal. Oct. 21, 2026).......... 9
*Printz v. United States*,
521 U.S. 898 (1997).......... 13
*Purcell v. Gonzalez*,
549 U.S. 1 (2006).......... 18
*Return Mail, Inc. v. USPS*,
587 U.S. 618 (2019).......... 9
*Rosemond v. United States*,
572 U.S. 65 (2014).......... 7, 11, 15
*Roudebush v. Hartke*,
405 U.S. 15 (1972).......... 12, 14
*Sampson v. Murray*,
415 U.S. 61 (1974).......... 5
*Schmidt v. Lessard*,
414 U.S. 473 (1974).......... 16
*Serv. Emps. Int'l Union v. Nat'l Union of Healthcare Workers*,
598 F.3d 1061 (9th Cir. 2010) .......... 5
*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998).......... 5
*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009).......... 6
*Thomas v. Anchorage Equal Rts. Comm'n*,
220 F.3d 1134 (9th Cir. 2000) .......... 6

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .......... 2, 15, 17
*Trump v. United States*,
603 U.S. 593 (2024) .......... 13, 14, 18
*United States v. Armstrong*,
517 U.S. 456 (1996) .......... 14
*United States v. Clark*,
249 F. Supp. 720 (S.D. Ala. 1965) .......... 11
*United States v. Classic*,
313 U.S. 299 (1941) .......... 1, 11, 12
*United States v. McLeod*,
385 F.2d 734 (5th Cir. 1967) .......... 11
*United States v. Oakland Cannabis Buyers' Coop.*,
532 U.S. 483 (2001) .......... 18
*United States v. R. Enters., Inc.*,
498 U.S. 292 (1991) .......... 14
*United States v. Williams*,
504 U.S. 36 (1992) .......... 14
*Vasquez Perdomo*,
148 F.4th .......... 15
*Washington v. Trump*,
847 F.3d 1151 (9th Cir. 2017) .......... 5
*Wayte v. United States*,
470 U.S. 598 (1985) .......... 14
*Younger v. Harris*,
401 U.S. 37 (1971) .......... 14, 18

**Statutes**

5 U.S.C. § 705 .......... 13
18 U.S.C. § 2 .......... passim
18 U.S.C. § 611 .......... 1, 3, 10
28 U.S.C. § 516 .......... 3
28 U.S.C. § 1292 .......... 5
52 U.S.C. § 10302 .......... 9
52 U.S.C. § 10307 .......... 1, 8, 9, 10
52 U.S.C. § 10308 .......... 9, 10
52 U.S.C. § 10310 .......... 8
U.S. Const. art. I, § 4, cl. 1 .......... 9

**Rules**

Fed. R. Civ. P. 62 .......... 4
Fed. R. Civ. P. 65 .......... 1, 2, 5, 15, 16
Fed. R. Crim. P. 6 .......... 16, 17
Fed. R. Crim. P. 17 .......... 14

**Other Authorities**

1965 U.S.C.C.A.N. 2437 .......... 9
Executive Order 14,399 .......... 3
H.R. Rep. 89-439 .......... 9

# I. INTRODUCTION

Plaintiffs have asked for and received an extraordinary order from this Honorable Court: a nationwide temporary restraining order that would bar the Department of Justice (DOJ) and the Department of Homeland Security (DHS) from telling state and local officials what federal criminal law prohibits, bar them from asking those officials to set aside ballots pending citizenship verification, and require them to report to this Court on pending search warrant applications and other requests for election materials. Compl., Prayer ¶¶ 175–77. Plaintiffs cite no court that has ever entered such an order, and this Court should not have been the first, especially without giving the Government a chance to brief the issues.

The TRO's many flaws show the importance of adversarial briefing. The TRO grants novel relief, but it never analyzes Plaintiffs' standing to request that relief. The TRO finds that Plaintiffs are likely to succeed on two claims, but it includes no merits analysis. Rather, its circular reasoning simply assumes the merits. *See* ECF No. 26 at 4 ("Defendants likely violated Section 11(b) of the Voting Rights Act, 52 U.S.C. §10307(b), because the record shows that Defendants intimidated, threatened, or coerced election workers."). In ordering relief, the TRO appears to copy and paste from the proposed order, going so far as to erroneously cite the Administrative Procedure Act as a basis for relief after expressly declining to analyze the merits of that claim. *Compare id.* at 5, 6.

Plaintiffs' theory is that the Government "intimidates" election workers when it reminds them that federal law makes it a crime for a noncitizen to vote in a federal election, 18 U.S.C. § 611(a), and a crime to knowingly aid and abet that offense, 18 U.S.C. § 2. But an accurate statement of federal criminal law is not intimidation. The Supreme Court has upheld federal prosecution of state election officers for misconduct in federal elections for nearly 150 years. *Ex parte Siebold*, 100 U.S. 371 (1880); *United States v. Classic*, 313 U.S. 299 (1941); *Anderson v. United States*, 417 U.S. 211 (1974). Nothing in the Voting Rights Act (VRA), the Constitution, or the Administrative Procedures Act (APA) licenses a civil court to declare, in advance, that unnamed state employees will never violate federal criminal law, or to enjoin the Executive's investigative and grand jury functions.

As a threshold issue, the Court's Order should be stayed on Plaintiffs' questionable standing, an issue the Order does not address. Plaintiffs lack standing: no Union member has been charged,

subpoenaed, or even addressed by the challenged letters, and no voter-member has had a ballot set aside—in fact, Plaintiffs' own exhibits show that the State and Counties refused the Government's request, and the Central District of California has already denied the Government's motion to compel segregation.

On the merits, Plaintiffs' statutory claims fail because courts of equity like this one do not, and indeed should not, restrain criminal investigations – to wit, Section 11(b) does not reach good-faith law enforcement communications about conduct Congress has criminalized. In the same vein, Plaintiffs' reliance on and the Court's adjudgment of the Elections Clause is misplaced. The Clause plainly concerns Congress's authority to legislate with respect to the time, place, and manner of congressional elections, not the Executive Branch's ability to investigate and prosecute potential federal crimes. Plaintiffs offer no reason as to why the Elections Clause, which has been historically understood as pertaining to Congress's authority to legislate with respect to elections, should be read as a bar on the Executive's longstanding authority to enforce federal law, including through potential investigation and prosecutions. The harms Plaintiffs allege are either speculative or, under settled law, not irreparable. And the relief they permanently seek is a universal, obey-the-law injunction that *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), and Rule 65(d) forbid.

Given the time-sensitive nature of this case, Defendants have filed a Preliminary Injunction Appeal notice pursuant to Ninth Circuit Rule 3-3 seeking immediate relief in equity from the Court of Appeals. Defendants file this motion to stay enforcement of the TRO on similar grounds, and as its papers responding to Plaintiffs' request for preliminary injunction as ordered by the Court prior to November 2, 2026 (ECF No. 26 at 8).

**Defendants respectfully request an immediate ruling on this motion to stay the TRO pending appeal. Given the exigent circumstances with the November 3, 2026 election just two days away, Defendants will move in the Court of Appeals for an emergency stay motion.**

Should the Court deny Defendants' motion to stay, Defendants respectfully request in the alternative that the Court consider this motion as one made as a "motion to dissolve" under Fed. R. Civ. P. 65(b)(4) and issue only an **indicative ruling** thereunder so as to preserve Defendants' jurisdiction in the Court of Appeals.

## II. BACKGROUND

### A. Federal Law.

Congress has made it a crime for "any alien to vote in any election held solely or in part for the purpose of electing" a federal officer. 18 U.S.C. § 611(a). Anyone who "aids, abets, counsels, commands, induces or procures" a federal offense is punishable as a principal. 18 U.S.C. § 2. The Attorney General is charged with detecting and prosecuting federal crimes. 28 U.S.C. §§ 516, 533. In Executive Order 14,399, the President directed the Attorney General to prioritize the investigation and, "as appropriate," prosecution of those who issue federal ballots to ineligible individuals. Compl. ¶¶ 5, 59.

### B. The California Letters.

On July 16, 2026, the Secretary of Homeland Security informed California that a preliminary review indicated large numbers of noncitizens may be registered to vote, and asked the State to collaborate in verifying those findings. Compl. ¶¶ 67–69. California declined. *Id.* ¶ 70. On October 13, the Acting Deputy Attorney General asked the Secretary of State and Los Angeles County Registrar to review a list of approximately 20,000 registrants that federal agencies identified as likely noncitizens, and to set aside (not reject) those individuals' mail ballots until citizenship could be confirmed. *Id.* ¶¶ 79–82. On October 16 and 23, the Department explained the governing law: "If persons *knowingly* tabulate ballots cast by individuals identified by federal agencies as noncitizens, they risk becoming aiders and abettors to a federal crime." *Id.* ¶¶ 85, 95 (emphasis added). The letters were addressed to the Secretary of State and county elections officials. *Id.* ¶¶ 79–82, 93–94. Plaintiffs do not allege that any letter was addressed to a Union member.

### C. Litigation.

When California and Los Angeles County declined, the United States sued and sought a TRO. *United States v. California*, No. 2:26-cv-12025-DOC-ADS (C.D. Cal.). On October 28, the court denied that motion. Compl. ¶¶ 14, 91. Ballots are therefore being processed under state procedures; no ballot has been segregated at the Government's request. Separately, a federal grand jury investigation concerning election officials in four California counties is underway. *Id.* ¶ 98. Plaintiffs do not allege that any Union member is a subject of that investigation or has received a subpoena. On October 26, 2026, the DOJ made a similar request to the State of Washington. *Id.* ¶ 99.

**D. This Case.**

Plaintiffs—two unions and two voting-rights organizations—filed suit on October 29, 2026 (ECF No. 1.), and on October 30, moved for a TRO ("Mot.") (ECF No. 17).

The complaint asserts nine causes of action, alleging that the Government's actions violate Section 11(b) of the VRA by intimidating election workers, infringe constitutional federalism principles under the Elections Clause and Tenth Amendment, and violate the Due Process Clause by burdening the fundamental right to vote and undermining the fairness of elections. Plaintiffs also allege that the President and federal agencies acted *ultra vires* and that DOJ and the DHS engaged in final agency actions that are unlawful, arbitrary and capricious, and contrary to constitutional and statutory limits under the APA. Compl. ¶¶ 114–72.

On October 30, 2026, the Court granted Plaintiffs' ex parte motion and entered a temporary restraining order, ECF No. 26, the same day the motion was filed and without giving Defendants a chance to respond. The Order bars the DOJ and the DHS nationwide from communicating with state and local officials about the consequences of federal criminal law. It compels the Defendants to notify every recipient jurisdiction that its letters have been "enjoined." It requires the Defendants to report pending grand jury subpoenas and search warrant applications to this Court. And it declares that unnamed state and local employees "do not violate federal criminal law." Order at 6–7. The Order rests on two paragraphs of merits analysis. It does not address standing. It expressly declines to analyze the Fifth Amendment and APA claims, *id.* at 5.

Defendants are appealing the TRO. *See* ECF No. 31. Defendants respectfully move under Federal Rule of Civil Procedure 62 and Federal Rule of Appellate Procedure 8(a)(1) for a stay of the Order pending appeal. In the alternative, Defendants move for an indicative ruling on the dissolution or modification of the TRO under Rule 65(b)(4). At a minimum, Defendants request an immediate administrative stay of the Order's declaratory language, so that the Ninth Circuit may consider the matter.

## III. LEGAL STANDARD

Courts consider four factors to determine whether a stay pending appeal should be granted: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will

substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (citation modified); *accord Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 148 F.4th 648, 654–56 (9th Cir. 2025) (applying *Nken* factors to grant stay of preliminary injunction pending appeal). "The first two factors . . . are the most critical." *Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, 137 F.4th 932, 937 (9th Cir. 2025) (citation modified).

The Ninth Circuit uses a "sliding scale" approach that balances these factors, such "that a stronger showing of one element may offset a weaker showing of another." *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011). Moreover, it has explained that "[a]lthough a stay pending appeal certainly has some functional overlap with an injunction, stays are typically less coercive and less disruptive than are injunctions." *Id.* (citation modified). "Whereas 'the extraordinary remedy of injunction' is the means by which a court 'directs the conduct of a party . . . with the backing of its full coercive powers,' a stay operates only 'upon the judicial proceeding itself . . . either by halting or postponing some portion of the proceeding, or by temporarily divesting an order of enforceability.'" *Id.* (citation omitted). Thus, "a flexible approach is even more appropriate in the stay context." *Id.* Here, all four *Nken* factors weigh in favor of staying the Court's Order pending its appeal.

The Order is appealable under 28 U.S.C. § 1292(a)(1). A TRO that has the practical effect of a preliminary injunction is treated as one on appeal. *Washington v. Trump*, 847 F.3d 1151, 1158 (9th Cir. 2017) (per curiam); *Serv. Emps. Int'l Union v. Nat'l Union of Healthcare Workers*, 598 F.3d 1061, 1067 (9th Cir. 2010); *see also Sampson v. Murray*, 415 U.S. 61, 86–88 (1974).

Independently, Rule 65(b)(4) entitles a party restrained without notice to move to dissolve or modify the order on two days' notice, and requires the Court to "hear and decide the motion as promptly as justice requires." Fed. R. Civ. P. 65(b)(4). The Order's defects warrant that relief whether or not the Court views it as appealable.

## IV. ARGUMENT

### A. The Order Does Not Address Standing, and Plaintiffs' Declarations Fail To Establish It.

A federal court must assure itself of jurisdiction before reaching the merits. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). On a request for preliminary relief, each plaintiff must

make a "clear showing" that it is likely to establish each element of standing, for each claim and each form of relief. *Murthy v. Missouri*, 603 U.S. 43, 58, 61 (2024). The Order contains no standing analysis at all. That omission alone warrants a stay because the record does not support standing.

**1. The Union Plaintiffs.**

An association suing on behalf of its members must show that at least one member would have standing in its own right. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498–99 (2009). Even where specific members need not be named, it must be "relatively clear, rather than merely speculative," that one or more members has been or will be adversely affected. *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015).

Plaintiffs' declarations do not meet that standard. The SEIU declarant describes three anonymous members. One, a naturalized citizen, fears job loss and deportation. Medina Decl. ¶¶ 22–24. Deportation of a U.S. citizen is not a consequence of anything the Order enjoins. A second fears hardship "if Defendants proceeded to criminally prosecute election workers." *Id.* ¶ 29. A third is "concerned about the impact of Defendants' threats on their election worker peers." *Id.* ¶¶ 37, 39. The AFSCME declarant states that members intend to follow state law "in accordance with their instructions from management." Mot. at 20 (citing Sforza Decl. ¶¶ 13–14). None of these members received a challenged letter. None has been subpoenaed. None is alleged to be a subject of the grand jury investigation. The officials who did receive letters—the Secretary of State and county registrars—are not parties, and Plaintiffs cannot borrow their injuries.

Pre-enforcement standing requires a "credible threat" of prosecution, assessed by whether the plaintiff has a concrete plan to violate the law, whether authorities have communicated a specific warning to the plaintiff, and whether there is a history of past prosecution under the statute. *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc); *Lopez v. Candaele*, 630 F.3d 775, 786 (9th Cir. 2010). The Union members have no plan to *knowingly* facilitate a noncitizen's vote—the only conduct the letters address. They received no warning. And Plaintiffs identify no prosecution of a rank-and-file election worker under 18 U.S.C. §§ 2 and 611. The arrest of an SEIU local president in connection with an immigration protest, Mot. at 20 n.14, is unrelated to the conduct challenged here.

Plaintiffs' own brief confirms the point. Plaintiffs argue that election workers "could [not] have the requisite mens rea to establish aiding and abetting liability" based on Defendants' letters and lists. Mot. at 33 n.20 (citing *Rosemond v. United States*, 572 U.S. 65, 76–77 (2014)). If that is true, the workers face no credible threat of prosecution, and their fear is the kind of "subjective chill" that does not confer standing. *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416–18 (2013). Plaintiffs cannot claim that their members face an imminent risk of prosecution while also claiming that no prosecution could succeed.

The Unions' nationwide theory is weaker still. They point to members in thirteen states, Mot. at 38, but the challenged letters concern California and Washington. The October 29 letters to all fifty states, Mot. at 1 (citing Evers Decl. Ex. 42), are addressed to chief election officials, not to Union members. A worker in Maine or Virginia faces no specific threat of any kind.

**2. The Non-Profit Plaintiffs.**

LULAC and NAACP rely on members' fear that they "may appear" on a list. Mot. at 21 (citing Proaño Decl. ¶¶ 17–18); Sterling Decl. ¶¶ 7, 17. Fear of a hypothetical future harm is not an injury in fact. *Clapper*, 568 U.S. at 416. No member has been identified on any list. And no member's ballot is at risk of being set aside: California and Los Angeles County have refused the Government's request, the Central District of California denied the Government's motion, and the Ninth Circuit denied a stay of that ruling. Mot. at 12, 15. A harm that depends on the independent choices of a State and two federal courts that have already chosen otherwise is not "certainly impending." *Clapper*, 568 U.S. at 409–14; *California v. Texas*, 593 U.S. 659, 675 (2021).

For the same reason, the Order does not redress the voters' claimed injury. Their ballots will be counted under state procedures whether or not the Order remains in effect. The organizations' own asserted injuries—loss of members' trust and diversion of resources, Proaño Decl. ¶¶ 24–25—are foreclosed by *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 394–96 (2024), which holds that an organization "cannot spend its way into standing" absent direct interference with its core activities.

**B. Plaintiffs Are Unlikely To Succeed on the Merits.**

**1. Plaintiffs' Voting Rights Act Claim Fails on the Merits and Is Unlikely To Survive on Appeal.**

Plaintiffs first argue that Defendants' conduct violates Section 11(b) of the VRA. ECF No. 17 at 24-28.

Section 11(b) bars intimidation of any person "for urging or aiding any person to vote or attempt to vote." 52 U.S.C. § 10307(b). Plaintiffs rely on the VRA's definition of "vote" as "all action necessary to make a vote effective." Mot. at 22 (quoting 52 U.S.C. § 10310(c)(1)). That definition presupposes a lawful vote. The adjacent subsection confirms the point: Section 11(a) protects persons "entitled to vote" or "otherwise qualified to vote." 52 U.S.C. § 10307(a). Provisions of the same section are read together. *Morton v. Mancari*, 417 U.S. 535, 551 (1974). Thus, Section 11(b) protects those who aid qualified voters. A noncitizen is not qualified to vote in a federal election, and knowingly helping one do so is a federal crime. 18 U.S.C. §§ 2, 611(a).

The Order's Section 11(b) analysis is a single sentence: Defendants "likely violated Section 11(b) . . . because the record shows that Defendants intimidated, threatened, or coerced election workers." Order at 4. The Order does not identify the governing standard, does not explain what conduct crossed the line, and does not address whether an accurate statement of federal criminal law can be "intimidation" at all. It cannot.

For at least two reasons, Defendants are likely to prevail on the merits of Plaintiffs' claim that Defendants have "intimidate[d], threaten[ed] or coerce[d]" them "for urging or aiding" others to vote. *See* 52 U.S.C. § 10307(b). First, there is no private cause of action to enforce Section 11(b). And second, even if that provision were privately enforceable, the record still would not support a finding of intimidation based on Defendants' mere statements of the law.

***(i) There is No Private Right of Action Under the VRA.***

"[P]rivate rights of action to enforce federal law must be created by Congress, and courts may not imply them absent clear evidence of congressional intent." *Alexander v. Sandoval*, 532 U.S. 275, 286-287 (2001). "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but *also* a private remedy." *Id* (emphasis added). "Statutory intent on th[e] latter point is determinative. Without it, a cause of action does not exist and

courts may not create one, no matter how desirable . . . as a policy matter, or how compatible with the statute. *Id.* (citations omitted).

Section 11(b) does not contain an express private right of action, and nothing in that provision, or the rest of the VRA, suggests that Congress intended to create one by implication. Indeed, the opposite is true. The Act provides expressly for enforcement of Section 11(b) by the Attorney General, 52 U.S.C. § 10308(d) (authorizing Attorney General to seek injunctions against "any act or practice prohibited by section . . . 10307"), and "the express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others," *Sandoval*, 532 U.S. at 290.

Moreover, where Congress elsewhere enacted language recognizing that *some* provisions of the VRA are privately enforceable by "an aggrieved person," it expressly cabined that recognition to "proceeding[s] instituted . . . under" statutes enacted "*to enforce the voting guarantees of the fourteenth or fifteenth amendment*." 52 U.S.C. § 10302. But Section 11(b)—which applies to private conduct as well as state action and requires no showing of discriminatory or race-based intent—is manifestly not based on those provisions. *Gardner v. Jessup*, 2025 WL 4743403, at *6 (S.D. Ga. June 26, 2025), *vacated on other grounds*, 2026 WL 3089236 (S.D. Ga. June 29, 2026); *Andrews v. D'Souza*, 696 F. Supp. 3d 1332, 1351 (N.D. Ga. 2023). Rather, it is based on Congress' authority to "make or alter . . . Regulations" governing federal elections. U.S. Const. art. I, § 4, cl. 1; H.R. Rep. 89-439 (1965), *as reprinted in* 1965 U.S.C.C.A.N. 2437, 2462.

#### ***(ii) Even if Section 11(b) Were Privately Enforceable, Plaintiffs Still Would Have No Likelihood of Success.***

While Section 11(b) bars a "person, whether acting under color of law or otherwise" from engaging in voter intimidation (52 U.S.C. § 10307(b)), it does not apply to the federal government. As Judge Tung aptly explained in his dissent from denial en banc in *California Nurses Ass'n v. Mullin*, 2026 WL 3166149 (N.D. Cal. Oct. 21, 2026), "'[i]n the absence of an express statutory definition,' we apply a 'longstanding interpretive presumption that 'person' does not include the sovereign,'" and thus would not include agencies and federal officials sued in their official capacity. Case: 26-7139, 10/30/2026, Dkt Entry: 58.1, Dissental 17-18, n.4 18, (alteration omitted) (quoting *Return Mail, Inc. v. USPS*, 587 U.S.

618, 626 (2019)). The conclusion that Section 11(b) does not apply to the federal government is confirmed by the statute's express enforcement mechanism, which is a civil action brought by the Attorney General "for the United States, or in the name of the United States." *See* 52 U.S.C. § 10308(d). It is nonsensical that the Attorney General would sue the United States on behalf of the United States, and given this context and background interpretive principles, it is clear that Congress did not intend for the "persons" governed by the statute to encompass the United States.

In any event, even if the United States is a "person" within the meaning of Section 11(b), the Plaintiffs' allegations do not make out any likely violation. By its plain terms, Section 11(b) does not reach every action that incidentally or inadvertently discourages someone from lawfully "urging or aiding" another person to vote, but only intimidating, threatening, or coercing a person for engaging in protected voter mobilization and assistance. 52 U.S.C. § 10307(b).

Plaintiffs' allegations show at most that Defendants have addressed and pursued suspected violations of federal law. It is beyond dispute that federal law prohibits noncitizens from voting in any election for federal office, *see* 18 U.S.C. § 611. DHS and DOJ have accordingly taken steps to further ensure that noncitizens are not permitted to vote and that their votes are not improperly counted by state and local officials. Defendants provided state and local officials with lists of individuals that the Defendants reasonably believe might be noncitizens who are ineligible to vote. Those lists were compiled based on "multilayered, multiagency investigative methodology that relied upon internal immigration records, data matching, supervisory verification procedures, and more." ECF No. 19-8, at 10 (Ex. 23). Defendants have accordingly asked that state and local election officials and workers to temporarily "pause or segregate ballots" from individuals the federal government has credibly flagged in order to confirm that such individuals are citizens eligible to vote in accordance with federal law.

#### *(iii) The Record Does Not Support a Finding of Intimidation Based on Defendants' Accurate Statement of Federal Law.*

While Plaintiffs have submitted over a dozen declarations and nearly 50 exhibits, the at-issue communications warn of liability only for those who "*knowingly* tabulate ballots cast by individuals

identified by federal agencies as noncitizens." Mot. at 11 (quoting Evers Decl. Ex. 23) (emphasis added). That tracks the elements of aiding-and-abetting liability, which require knowledge and intent to facilitate the offense. *Rosemond*, 572 U.S. at 76–77. Plaintiffs concede that liability turns on mens rea. Mot. at 33 n.20. A warning that applies only to those who knowingly help a noncitizen vote does not deter anyone from aiding a citizen to vote. If the voters on the lists are citizens, as Plaintiffs contend, no one who counts their ballots commits any crime, and the letters do not say otherwise.

Federal prosecution of state election officers for corrupting federal elections has been upheld for nearly 150 years. *Ex parte Siebold*, 100 U.S. 371, 382–83, 388 (1880); *United States v. Classic*, 313 U.S. 299, 315–21 (1941); *Anderson v. United States*, 417 U.S. 211, 226–27 (1974). Plaintiffs themselves invoke *Classic*. Mot. at 29. Those decisions would be inexplicable if warning election officials of that exposure were unlawful intimidation.

Further, Plaintiffs' authorities involve false or baseless threats, not accurate descriptions of law. For example, Plaintiffs rely on cases involving robocalls falsely telling mail voters that their information would be used to execute warrants and collect debts, *Nat'l Coal. on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500 (S.D.N.Y. 2021); a pattern of baseless arrests and prosecutions of Black voter-registration workers, *United States v. McLeod*, 385 F.2d 734, 740–41 (5th Cir. 1967); *United States v. Clark*, 249 F. Supp. 720, 728 (S.D. Ala. 1965); and an official's vow to "crush" a voter-registration group, *Jolt Initiative, Inc. v. Paxton*, 821 F. Supp. 3d 706, 725–26 (W.D. Tex. 2026). Mot. at 22–25 & n.17. The Order adds *Arizona Alliance for Retired Americans v. Clean Elections USA*, 638 F. Supp. 3d 1033 (D. Ariz. 2022) (vacated by 9th Cir., 2023 WL 1097766), which concerned private monitoring of ballot drop boxes. In each, the conduct had no legitimate basis or rested on falsehood. Plaintiffs quote *McLeod* for the proposition that acts "otherwise entirely within the law" may violate the statute, Mot. at 25 n.17, but *McLeod* addressed prosecutions found to be baseless and pretextual. Here, no election worker has been arrested or charged. Whether any future charge is supported by probable cause is a question for the grand jury and the criminal court, not for a civil injunction entered in advance.

*California Nurses Ass'n v. Mullin* is not to the contrary. As Plaintiffs describe it, that case concerned armed field operations at voters' homes. Mot. at 7. It did not hold that written communications to state officials describing the elements of a federal crime violate Section 11(b).

*Michigan Welfare Rights Organization v. Trump*, 642 F. Supp. 3d 98 (D.D.C. 2022), was decided on a motion to dismiss and did not involve statements of federal criminal law.

**2. Defendants' Challenged Actions Do Not Violate the Tenth Amendment or the Elections Clause.**

Plaintiffs next argue that Defendants' conduct violates the Tenth Amendment and exceeds their authority under the Elections Clause. ECF No. 17 at 28-31. The Order holds that Defendants "exceed[] their authority under the Elections Clause" because the States have "authority to provide a complete code for congressional elections." Order at 5 (quoting *Roudebush v. Hartke*, 405 U.S. 15, 24 (1972)). That reasoning misreads the Clause and ignores controlling precedent.

Firstly, the Elections Clause in no way limits or applies to the executive branch. Rather, it pertains to Congressional authority to enact statutes pertaining to elections and has nothing to do with executive enforcement of elections. The Clause "prescribe[s]" the "Times, Places and Manner of holding Elections." U.S. Const. art. I, § 4, cl. 1. Defendants have prescribed nothing. They have not purported to change any registration rule, ballot procedure, or canvass requirement. They have described the reach of federal criminal statutes that Congress enacted, asked state officials to cooperate, and, when California declined, asked a federal court for relief. Mot. at 12. *Roudebush* upheld a state recount procedure; it says nothing about whether federal criminal law applies to state election officers.

Moreover, the Supreme Court has upheld federal criminal liability for state election officers. In *Siebold*, the Court rejected the argument that federal punishment of state election officers for misconduct in congressional elections invaded state authority. 100 U.S. at 382–88. Congress may "impose additional penalties" for violations of election duties, and federal officers may enforce them against state officials. *Id.* at 383–88. *Classic* sustained the prosecution of Louisiana election commissioners for falsely counting ballots in a congressional primary. 313 U.S. at 315–21. *Anderson* sustained the convictions of local election officials for casting fraudulent votes in a federal election. 417 U.S. at 226–27. If the Elections Clause immunized state election workers from federal criminal law, none of those prosecutions could have occurred. Moreover, it in no way violates the Elections Clause for the Executive Branch to investigate and prosecute violations of federal law. As the Supreme Court has recognized, "the President's duty to 'take Care that the Laws be faithfully executed' plainly

encompasses enforcement of federal election laws passed by Congress." *Trump v. United States*, 603 U.S. 593, 627 (2024) (quoting U.S. Const. art. II, sec. 3). That well-established authority is no different in the context of investigating violations of federal law pertaining to elections. *See* Tung Dissental 19 (explaining that the "Executive Branch has authority to conduct such investigations, and the [DHS] has exercised that authority for some time"). It would be absurd to construe the Elections Clause as prohibiting such executive enforcement—especially where no one disputes that states and localities must abide by the federal law that the Executive Branch seeks to enforce.

Plaintiffs contend that Congress has not exercised its Elections Clause power to "displace state elections law." Mot. at 26–27. But Defendants do not challenge any Act of Congress. They challenge the Executive's enforcement of federal law, which the Elections Clause plainly does not apply to. This distinction also disposes of Plaintiffs' reliance on the *California* litigation. Mot. at 25–27, 33. Those rulings addressed whether Section 611 authorizes a federal court to order California to change its procedures for processing ballots. *See* Mot. at 33 (quoting Judge Bennett's concurrence that Section 611 does not "preempt[] California's comprehensive statutory scheme"). They did not hold that federal criminal law ceases to apply to anyone who participates in counting ballots, or that federal prosecutors may not say so.

Lastly, the anti-commandeering doctrine bars the federal government from compelling States to enact or administer a federal regulatory program. *Printz v. United States*, 521 U.S. 898, 935 (1997); *Murphy v. NCAA*, 584 U.S. 453, 470–71 (2018). It does not exempt state employees from federal criminal laws of general application. The Department's letters *requested* cooperation; California refused and has suffered no consequence other than a lawsuit that it won. Mot. at 12.

**3. The Order's APA, Due Process, and Ultra Vires Conclusions Are Unexplained and Incorrect.**

The Order states that, "[g]iven the urgency of the TRO, the Court does not find it necessary to analyze whether Defendants violate the Fifth Amendment and/or the APA at this time." Order at 5. Its conclusion nonetheless holds that Defendants' actions are "final agency actions," "contrary to law," "arbitrary and capricious," and "ultra vires," and that they violate the Fifth Amendment. *Id.* at 6. It also invokes 5 U.S.C. § 705. *Id.* Yet, earlier in its Order, the Court expressly declined to decide "whether

Defendants violate the Fifth Amendment and/or the APA." Order 5. The Court appears to have adopted verbatim the Plaintiffs' proposed temporary restraining order (ECF No. 17-3). Regardless of the intention to rule on these other claims or not, those conclusions have no analytical support in the Order and cannot sustain relief on appeal. They are also in error.

As these claims are not the basis for the Court's injunction that is being appealed, they cannot be the basis for an affirmance by the Court of Appeal.

**4. Equity Does Not Restrain Criminal Investigations or Declare Non-Parties Innocent in Advance.**

Plaintiffs asked the Court to enjoin Defendants "from criminally investigating or prosecuting state and local officials." Mot. at 3. Elsewhere, they assure the Court that they are "not seeking to constrain the federal government's lawful exercise of its prosecutorial authority." *Id.* at 40. The Order resolves that tension in favor of the broader request, and in doing so it departs from settled limits on equitable power.

Courts of equity do not enjoin criminal investigations and prosecutions where the person affected may raise his defenses in the criminal proceeding. *Younger v. Harris*, 401 U.S. 37, 43–46 (1971). That principle applies fully to federal prosecutions. *Deaver v. Seymour*, 822 F.2d 66, 69–71 (D.C. Cir. 1987). "[I]nvestigative and prosecutorial decisionmaking is 'the special province of the Executive Branch.'" *Trump v. United States*, 603 U.S. 593, 620 (2024) (quoting *Heckler v. Chaney*, 470 U.S. 821, 832 (1985)). The decision whether to prosecute is "particularly ill-suited to judicial review." *Wayte v. United States*, 470 U.S. 598, 607 (1985). It is entitled to a presumption of regularity. *United States v. Armstrong*, 517 U.S. 456, 464 (1996). A grand jury may investigate "merely on suspicion that the law is being violated," *United States v. R. Enters., Inc.*, 498 U.S. 292, 297 (1991), and operates independently of the court, *United States v. Williams*, 504 U.S. 36, 47–50 (1992). A subpoenaed witness's remedy is a motion to quash in the court supervising the grand jury. Fed. R. Crim. P. 17(c)(2).

The Order disregards each of these principles. It enjoins statements describing potential criminal liability, Order ¶¶ 3–4. It requires the Department to report grand jury subpoenas, search warrant applications, and efforts to "compel testimony" to this Court, *id.* ¶ 6. And it declares that state and local

employees who administer the election under state law "do not violate federal criminal law even if a particular ballot belongs to a registered voter alleged by Defendants to be ineligible to vote." *Id.* at 6.

That declaration is especially problematic. Whether any person has aided and abetted a noncitizen's vote depends on that person's knowledge and intent. *Rosemond*, 572 U.S. at 76–77. A civil court cannot adjudicate those facts in advance, for unnamed non-parties, in a TRO entered without hearing from the Government. Declaratory relief requires a dispute that is "definite and concrete," not a hypothetical state of facts. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41 (1937)). And a declaratory judgment is final relief that a TRO cannot provide. The declaration would not bind the grand jury or any criminal court. But it will be cited as though it did, and it purports to resolve the merits of criminal questions that are not before this Court.

### C. The Order Is Impermissibly Vague and Improperly Intrudes on the Executive Branch's Enforcement of Federal Election Law.

Defendants are also entitled to a stay because the TRO is unenforceably vague and improperly seeks to superintend the details of Defendants' investigative processes.

Federal Rule of Civil Procedure 65 requires injunctions to be "specific in terms" and to "describe in reasonable detail . . . the act or acts sought to be restrained. Fed. R. Civ. P. 65(d)(1). An injunction violates Rule 65's specificity provisions if it is "so vague that it has no reasonably specific meaning." *Vasquez Perdomo*, 148 F.4th at 679 (quotation marks omitted). The TRO does not satisfy this basic requirement.

*Firstly, the Order is universal.* Federal courts may grant relief only to the extent "necessary to provide complete relief to each plaintiff with standing to sue." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025). The Order runs in favor of every "state or local elections official[] or worker[]" in the country. Order ¶¶ 1–4. It requires notice to every jurisdiction that received any letter. *Id.* ¶ 5. Plaintiffs are two unions and two organizations; they are not the nation's election officials. Relief of this breadth is what *CASA* forbids. Standing "is not dispensed in gross," and relief must be tailored to plaintiffs who have shown injury. *Murthy*, 603 U.S. at 61.

*Paragraphs 1 through 3 are impermissibly vague.* Those who must obey an injunction are

entitled to know "what the court intends to require and what it means to forbid." *Int'l Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76 (1967). The Order forbids Defendants to "threaten, intimidate or coerce" officials and to "demand" that they set aside ballots "solely on the basis that the ballot belongs to an individual alleged by Defendants to be ineligible to vote." Order ¶¶ 1–3. That language leaves basic questions unanswered.

*Paragraph 4 is an obey-the-law injunction, and a circular one.* Paragraph 4 bars Defendants from threatening prosecution "for processing or counting ballots . . . in compliance with state and federal laws that govern election administration." Order ¶ 4. Federal law includes 18 U.S.C. §§ 2 and 611. Read literally, Paragraph 4 forbids Defendants from threatening to prosecute conduct that does not violate federal law, which Defendants have never done. Read as Plaintiffs presumably intend, it declares that compliance with state procedures can never violate federal criminal law, which is the merits question discussed above. Either way, it does not tell Defendants what they may and may not do. Rule 65(d) requires an injunction to "state its terms specifically" and "describe in reasonable detail" the acts restrained. Fed. R. Civ. P. 65(d)(1)(A)–(C); *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). An injunction to obey the law does not meet that standard. *See NLRB v. Express Publ'g Co.*, 312 U.S. 426, 435–36 (1941).

*Paragraph 5 is mandatory relief that alters the status quo.* Paragraph 5 compels the Department to inform every State, county, and local government that received a letter "that the demands and threats of prosecution . . . have been enjoined." Order ¶ 5. Mandatory injunctions are "particularly disfavored" and require that "the law and facts clearly favor" the movant. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). The paragraph also compels the Government to adopt Plaintiffs' characterization of its own letters as "threats." And once those notices are sent, they cannot be unsent if the Order is reversed.

*Paragraph 6 conflicts with grand jury secrecy.* Paragraph 6 requires the Department to inform this Court of any "pending search warrant applications, grand jury subpoenas, or other demands to access election materials," and of efforts to "compel testimony related thereto." Order ¶ 6. Government attorneys "must not disclose a matter occurring before the grand jury" except as Rule 6(e) permits. Fed. R. Crim. P. 6(e)(2)(B). Disclosure in connection with a judicial proceeding requires a showing of

particularized need, *Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 222 (1979), and a petition for it must be filed "in the district where the grand jury convened," Fed. R. Crim. P. 6(e)(3)(F). Search warrant applications, for their part, are typically sealed by the issuing judicial officers. Paragraph 6 bypasses these rules entirely, without any showing of need.

That vagueness is all the more impermissible under the circumstances of this case, where the gist of the injunction is that the Government may not take otherwise-lawful steps to investigate potential federal crimes if the Court thinks its initial suspicions are ill-founded. But "the investigation of crime is primarily an executive function" and "a Court has no general supervisory jurisdiction over the course of executive investigations." *Jett v. Castaneda*, 578 F.2d 842, 845 (9th Cir. 1978). The Court deviated from this principle by entering an injunction that purports to dictate the quantum of evidence the Executive Branch must possess before it can fulfill that core executive role of conducting a criminal investigation.

**D. The Remaining Stay Factors Decisively Favor the Government.**

The Court should stay the preliminary injunction because the Government and public interest will be irreparably injured absent a stay. The Court effectively seeks to oversee Defendants' efforts to determine whether preliminary evidence of noncitizen voting warrants further investigation. By itself, that violation of the separation of powers constitutes an irreparable harm to the Executive Branch. *See Trump v. CASA, Inc.*, 606 U.S. 831, 859 (2025).

Defendants will suffer irreparable harm absent a stay. The Order restrains the Executive's enforcement of federal law. When the Government is enjoined from enforcing statutes enacted by the people's representatives, "it suffers a form of irreparable injury." *CASA*, 606 U.S. at 861 (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). The Order constrains how federal prosecutors may communicate about 18 U.S.C. §§ 2 and 611 at the very time those statutes are most likely to be violated: during voting, tabulation, and certification. The Order's vague terms expose federal officials to contempt for ordinary, lawful conduct—answering press questions, responding to county inquiries, presenting evidence to a grand jury. The resulting chill on legitimate law enforcement is itself irreparable. Moreover, the Order intrudes on core Article II functions. Investigative and prosecutorial decisions are "the special province of the Executive Branch." *Trump v. United States*, 603

U.S. at 620. An order that places a civil court in supervision of grand jury subpoenas, search warrant applications, and prosecutors' public statements inflicts a structural injury that cannot be remedied after the fact. Elections offer "no do over." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). If the Order is wrong, the Government cannot recover the enforcement opportunities it loses during this election cycle.

Likewise, the public has a compelling interest in preventing noncitizen voting. "Every voter in a federal . . . election . . . has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson*, 417 U.S. at 227. "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam). Congress codified that interest in Section 611, and courts of equity may not "reject the balance that Congress has struck in a statute." *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001). The public also has a strong interest in the secrecy and independence of grand jury proceedings. *Douglas Oil*, 441 U.S. at 218–19. And it has an interest in the orderly resolution of the ballot-segregation dispute by the courts already considering it, rather than through a parallel ex parte order in a different district. The public-interest findings Plaintiffs cite from *California I*, Mot. at 40, concern the segregation of ballots, a question a stay here does not affect.

By contrast, Plaintiffs fail to establish even standing to sue, much less a valid claim under the Voting Rights Act. Nor will a stay injure the Union Plaintiffs' members. None has been charged, subpoenaed, or named as a subject of any investigation. If that changes, they may raise every argument presented here before the grand jury's supervising court or in the criminal case. "[T]he cost, anxiety, and inconvenience of having to defend against a single criminal prosecution" is not irreparable injury. *Younger*, 401 U.S. at 46. Accordingly, both the equities and the public interest decisively favor a stay pending appeal.

## V. CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court enter an immediate stay of the TRO pending the resolution of the Government's appeal. In the alternative, should the Court deny Defendants' motion to stay, Defendants request that the Court treat these papers as a motion to dissolve the TRO under Rule 65(b)(4) motion, yet issue only an indicative ruling so that jurisdiction before the

Court of Appeals is not disturbed.

Dated: November 1, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

*/s/ Kenneth J. Kao*
KENNETH J. KAO
Assistant United States Attorney

Attorneys for Defendants