Stacey Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
Connie K. Chan (SBN 284230)
Colin Clemente Jones (SBN 354301)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
(415) 421-7151
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com
cchan@altber.com
cjones@altber.com

*Attorneys for Plaintiffs*

Norman L. Eisen*
Tianna Mays*
Pooja Chaudhuri (SBN 314847)
Jacob Kovacs-Goodman*
Elizabeth Westfall*
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Ave. SE #15180
Washington, DC 20003 (202) 601-8678
(202) 601-8678
norman@democracydefenders.org
tianna@democracydefenders.org
pooja@democracydefenders.org
jacob@democracydefenders.org
elizabeth-contract@democracydefenders

*Attorneys for Plaintiffs*

* *Pro Hac Vice application forthcoming*

[Additional counsel and affiliations listed on signature page]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SERVICE EMPLOYEES INTERNATIONAL UNION, et al.,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF JUSTICE, et al.,

Defendants.

Case No. 3:26-cv-12800-TLT

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' EX PARTE MOTION TO STAY TEMPORARY RESTRAINING ORDER OR, IN THE ALTERNATIVE, REQUEST FOR AN INDICATIVE RULING PURSUANT TO FED. R. CIV. P. 65(b)(4)**

## INTRODUCTION

Defendants have simultaneously appealed and asked this Court to dissolve the TRO, which they cannot do. Rule 64(b)(4) is a rule designed for TROs issued without notice, and does not apply because Defendants had notice of the TRO, had appeared through counsel, and chose not to present their arguments to this Court rather than file their appeal. The present circumstances do not warrant circumventing the rules of this Court, or the Ninth Circuit, and this Court should flatly decline Defendants' invitation to consider any motion to "dissolve" the injunction.

With respect to the motion for a stay pending appeal, the stay should be denied for all the same reasons this Court granted the TRO. Defendants' new arguments do not change that balance. In short, Defendants are not engaged in lawful law enforcement activity. Their arguments rely on mischaracterizations of the record of their own actions and this Court's order, including defying the record evidence targeting elections workers (including employees represented by Union Plaintiffs) with threats of criminal prosecution. The evidence also establishes that Defendants' actions go far beyond just "an accurate statement of federal criminal law" (Dkt. 33 at 1), and threaten criminal prosecution on the ground that employees are "on notice" that ballots are being cast by noncitizens on the basis of Defendants' faulty analysis and unsupported claims. Defendants also mischaracterize the scope of this Court's TRO order, which does not sweep so far as to prevent Defendants from engaging in legitimate law enforcement activities at all. Finally, once the record evidence is properly understood, the remaining issues all fall in Plaintiffs favor: standing, merits and the scope of relief. Plaintiffs respond in turn to Defendants' arguments below.[1]

### 1. Legal Standard

A stay pending appeal is an "extraordinary request." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 661 (9th Cir. 2021). It "is not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 433 (2009). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Nken v. Holder*,

[1] Plaintiffs requested Defendants withdraw their pending appeal in light of this Court's hearing scheduled for Monday, November 2, 2026 on the motion for a stay and/or indicative ruling. Defendants declined to do so, forcing Plaintiffs to now proceed on parallel tracks.

556 U.S. 418, 433–34 (2009). "The factors governing stay requests are much like those that govern requests for preliminary injunctions: whether irreparable injury will result, whether the applicant has a strong likelihood of success on the merits, and whether the balance of interests favor a stay." *Am. Fed'n of Gov't Emps. v. Trump*, 139 F.4th 1020, 1029 (9th Cir. 2025). All factors weigh in favor of Plaintiffs and denial of Defendants' stay request, for the same reasons this Court granted the TRO. In addition, Plaintiffs are likely to prevail on Defendants' pending appeal, which attempts to appeal an unreviewable TRO order. *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 762 (9th Cir. 2018).

**2. Defendants' Stay Motion Relies on Factual Misrepresentations.**

Defendants' motion is permeated by two factual assertions that defy their own actions and the record: first, that USDOJ and DHS officials have not targeted their threats beyond government officials, and second, that they have simply reiterated the requirements of federal law regarding noncitizen voting. The record is clear these predicates to many of Defendants' arguments are not correct.

First, Defendants claim that the letters and other actions threatening those working on state and local elections with criminal prosecution target only *officials*, and not the employees represented by the Union Plaintiffs. Dkt. 33 at 3, 6-7. Defendants, however, have very clearly announced that they will prosecute *any* election worker who processes a ballot associated with Defendants' list of purported non-citizens, to coerce and force state and local governments into segregating and ultimately not counting those ballots. Those statements were directed not just at the officials in charge but all workers who may process ballots.

For example, on October 16, 2026, Defendants sent a threatening letter to Los Angeles County (where Plaintiff Union SEIU represents election workers, Dkt. 23 (Medina Decl. at 3 ¶¶12-13)), expressly threatening the county's workers with criminal prosecution for continuing to process the ballots the federal government wanted to remove. That letter states first that: 1. "If persons knowingly tabulate ballots cast by individuals identified by federal agencies as noncitizens, they risk becoming aiders and abettors to a federal crime."; and then 2. "Your assertion that ballots must be counted simply because California's registration system relies on self-attestation does not

relieve election officials of their obligations under federal law ***when they are on actual notice of noncitizen voting***. Nor can state procedures supersede federal criminal statutes." Dkt. 19-8 (Evers Decl., Ex. 23) (emphasis in the original); see also ECF 1 at 17-29. Election workers, not just election officials, are involved in the work of "tabulat[ing]" ballots. The threat of prosecution is thus expressly and directly aimed at election officials and workers alike.

Likewise, on October 23, 2026, Defendants sent counties across California letters threatening criminal prosecution on this theory that anyone processing a ballot is now, because of Defendants' faulty lists and Defendants' say-so, on *notice* that doing so is sufficient to trigger aiding and abetting liability. *E.g.,* Dkt 29-1 ("Notice of Suspected Likely Aliens on Santa Clara County Voter Roll); Dkt. 23 (Medina Decl. at 3 ¶13) (SEIU represents Santa Clara elections workers). The county letters stated: "I write to make unmistakably clear the legal implications of continuing to send vote-by-mail ballots to those people on the list or tabulating ballots cast by them…" The U.S. Attorney continued: "[u]nder 18 U.S.C. §2, anyone who aids, abets, counsels, induces, or procures the commission of a federal office is equally liable. If persons knowingly tabulate ballots cast by individuals identified by federal agencies as noncitizens, they risk becoming aiders and abettors of a federal crime." He then repeated the assertion that the letters and lists create "***actual notice of noncitizen voting***." Dkt. 29-1 (Morales, Ex. A) (emphasis in original); ECF 1 at 17-29.

The State of Washington (where Union Plaintiff AFSCME represents state and local elections workers, Dkt. 19-1 (Sforza Decl. at 3 ¶7)), received similar letter with demands to segregate ballots of purported noncitizens. Dkt. 19-4. The acting representatives of the U.S. Attorneys offices explained that, in addition to the requirements of federal criminal law, "county auditors and government agency employees" who work on "voter registration" may be violating state law, and "we do make criminal referrals to our state counterparts." These specific threats of prosecution for anyone working on ballots the federal government deems suspect came after months of public statements by officials regarding "prison time" and enforcing the law to the fullest extent in this context. ECF 17-1 at 17-29.

Second, Defendants also characterize the letters and other statements as simply reiterating the law, which requires "knowingly" processing the ballot of a noncitizen; but this characterization is not accurate either. Dkt. 33 at 1 ("an accurate statement of federal criminal law is not intimidation"). In the above-quoted language (bolded by Defendants), Defendants very clearly stated that anyone who processes a ballot associated with their lists is "on notice" that the ballots are in fact unlawful. That is false: Defendants' lists are not proof that the names on those lists belong to noncitizens, as Defendants themselves admit, Dkt. 17-1 at 14-17. Those lists and the data and analytics on which they rely are replete with problems that render them entirely unreliable predictors of actual citizenship (Dkt. 17-1 at 14-17). Moreover, Defendants are not engaged in mere saber-rattling; as Plaintiffs' declarations establish, they are threatening real people, who are working hard to make this election happen and our democracy function, with actual criminal prosecution. And, as has been widely reported, Defendants are carrying through on those threats, and fear in response is an entirely reasonable reaction. Dkt. 17-1 at 17-29. In making these threats of prosecution to election workers merely for processing ballots that match the names on these faulty lists, Defendants are not simply "reminding" people of the requirements of the law. They are using the full weight of federal authority to threaten, intimidate and coerce election workers for doing nothing other than their jobs in compliance with federal and state law.

And, the record establishes that recipients understood the letters precisely as Defendants intended. Santa Clara's Registrar read them to treat any "failure to comply with the demands of DOJ's letter as 'knowingly' processing the ballots of noncitizens." Dkt. 29-1 (Moreles Decl. ¶13). San Benito's Clerk-Recorder "understood this visit as an effort to intimidate me." Unsure whether he "might be arrested," he drew up an emergency plan for running his office without him. Dkt. 29-5 (Diaz Decl. ¶¶6–8). Election workers across the country now fear prosecution simply for doing their jobs. Dkt. 23, 19-1, 19-7, 19-8, 29-2, 29-3, 29-4 (Medina Decl. ¶¶23–24, 29, 34, 38–39; Sforza Decl. ¶¶13–14; Evers Decl. Ex. 33; Connelly Decl. ¶¶5–7; Darling Allen Decl. ¶¶ 3–4; Becker Decl. ¶¶ 9–10). These reactions confirm what any reasonable election worker would conclude.

**3. Defendants Mischaracterize the Scope of this Court's TRO.**

Defendants ignore the plain language of this Court's order, and dramatically overstate the effect to contend that this Court has enjoined them from engaging in bone fide law enforcement activities. Dkt 33 at 22-23, 27-28. Paragraphs (1)-(4) plainly enjoin *threats* that go beyond lawful law enforcement activity, for all the reasons Plaintiffs explained in their TRO memorandum. ECF 17-1 at 21. This Court did not go so far as to enjoin any criminal investigation or prosecution. Defendants swing at the wrong target.

Next, Defendants mischaracterize the Order as pre-adjudicating the facts of any particular criminal prosecution, when it does no such thing. ECF 33 at 14-15. In paragraph (5), this Court required Defendants to *correct* the threatening statements they have already made to state and local election officials, to reset the status quo for this election. That is an appropriate exercise of this Court's authority, as discussed further below.

Defendants also complain that in resolving Plaintiffs' motion for a TRO, the Court reached conclusions of law, which they equate with issuing a declaratory judgment. ECF 33 at 6. But the Court's conclusions with respect to Plaintiffs' likelihood of success are just that: legal conclusions, which are appropriate in resolving Plaintiffs' motion. The argument that a Court cannot issue a declaratory judgment in the context of a TRO is again misplaced because the Court did not purport to issue such a judgment; rather, it ruled on the likely success of Plaintiffs' claims. In resolving Defendants' motion, this Court can likewise make rulings of law, and can easily clarify what its order does, and does not do.[2]

**4. Plaintiffs Have Standing.**

**a. Unions Representing Election Workers Across the Country Have Associational Standing.**

Defendants argue that the Union Plaintiffs lack standing because it is speculative that any members have been or will be adversely affected and because the Union Plaintiffs' "members have no plan to *knowingly* facilitate a noncitizen's vote …" Dkt. 33 at 6 (emphasis in original). It is true

[2] Plaintiffs provide further responses to Defendants' arguments regarding scope of relief below. *Infra*.

the Union Plaintiffs' members have no such plans, but that is not the question, because Defendants both misrepresent the contents of their threats and misunderstand the Union Plaintiffs' showing of injury. *Supra*.

Initially, Plaintiffs showed that Defendants' threats go far beyond a mere informational advisory that non-citizens are not allowed to vote or that election workers should not knowingly facilitate such illegal voting. What Defendants have *actually* done is generate grossly inaccurate lists of registered voters whom Defendants identify as "likely" non-citizens and then issue public threats that any election officials or workers who process voters on this list will be criminally prosecuted for aiding and abetting violation of federal law—even if they are merely carrying out their responsibilities as mandated by state elections laws (which Defendants have not challenged) governing ballot processing and resolution of challenges. *Supra*.

Union Plaintiffs' members are not harmed *only if* prosecution ensues. Rather, they are presently being harmed by the pendency of the threats themselves. "Elections administration is an extremely challenging job under any circumstances." Dkt. 29-3 (Allen) ¶4. That difficulty has been dramatically exacerbated by the federal government's threats of prosecution. *Id.* (Allen) ¶¶4-5 (threats are causing "frustration" and "stress" and "disruption to normal election administration processes"). Election workers nationwide, including those represented by Union Plaintiffs, are being subjected to the looming threat of criminal investigation and prosecution simply for performing their responsibilities to process and count ballots cast by lawfully registered voters in accordance with federal and state law and have expressed grave concern regarding these threats. Dkt. 23 (Medina) ¶¶18, 23-24, 29, 34, 38-41; Dkt. 19-1 (Sforza) ¶¶13-14; Dkt. 19-4 (Holmes) ¶¶6, 10-12, 21, 28-32 & Exs. C-E; Dkt. 19-8 (Evers) Ex. 33.

"The federal government's conduct has had and continues to have a severe chilling effect" on county elections officials and workers. Dkt. 29-1 (Moreles) ¶16; Dkt. 19-4 (Holmes) ¶¶6, 28-40. Election workers are public employees bound by state law to carry out their nonpartisan responsibilities, but Defendants' intimidation, threats, and coercion subject election workers daily to a Hobson's choice between acceding to Defendants' unlawful demands or adhering to their duties and thereby subjecting themselves to a serious risk of criminal investigation and prosecution.

Dkt. 23 (Medina) ¶18; Dkt. 19-1 (Sforza) ¶13. Elections workers are concerned about criminal prosecution and harassment "for simply carrying out [their] jobs." Dkt. 29-1 (Moreles) ¶16. "These threats are taking a toll. Election officials report being scared and exhausted by the onslaught of threats." Dkt. 29-4 (Becker) ¶9. As the District Court found, "Defendants' intimidation, threats, and attempts at coercion force election workers daily to choose between acceding to Defendants' unlawful demands or adhering to their duties and thereby subjecting themselves to a serious risk of criminal investigation and prosecution." Dkt. 26 at 11-16 (citing Dkt. 19-1 (Sforza) ¶¶13-14); Dkt. 19-4 (Holmes) ¶¶6, 10-12, 21, 28-32; Dkt. 19-7 (Evers) Ex. 17; Dkt. 19-8 (Evers) Exs. 23-25).

When an individual is subject to the threat of prosecution, they need not wait for criminal charges to be filed before they have standing to sue. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–59 (2014): *Steffel v. Thompson*, 415 U.S. 452, 459 (1974); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007). So long as threatened enforcement is "sufficiently imminent," a litigant has standing. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014); *Culinary Workers Union, Local 226 v. Del Papa*, 200 F.3d 614, 618 (9th Cir. 1999).[3] This is true regardless of whether the threat of enforcement actually causes any change in the threatened person's behavior. *See Hemp Indus. Ass'n v. Drug Enf't Admin.*, 333 F.3d 1082, 1086 (9th Cir. 2003) (noting controversy is ripe if plaintiff must choose between compliance and risk of serious penalties for violation); *Isaacson v. Mayes*, 84 F.4th 1089, 1098–99 (9th Cir. 2023) (chilling effect is not required when threat of prosecution is credible). Nor does it matter whether any ultimate prosecution would be successful. *See Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 487 (9th Cir. 2024) ("[T]he substantial threat of enforcement, and not the likelihood that any such enforcement action would ultimately lead to sanctions, drives our analysis"; "For pre-enforcement plaintiffs, the injury is the anticipated enforcement of the challenged statute in the future.").[4]

---

[3] The question whether a threat is sufficiently imminent to allow a plaintiff to file suit does not depend on the merits of the plaintiff's challenge to the underlying government action. *See Holder v. Humanitarian L. Project*, 561 U.S. 1, 15 (2010).

[4] Even if the Union Plaintiffs' showing of harm had been based only on the injury from actual prosecution (as opposed to injury from the threats themselves), standing doctrine "does not require

Defendants further argue that "the challenged letters concern [only] California and Washington." Dkt. 33 at 7. In the very next sentence, however, Defendants acknowledge that the Trump administration took the unprecedented step of sending letters warning of potential criminal prosecution to elections officials in all 50 states. *Id.*; *see* Evers Decl. Ex. 42. They protest that these letters "are addressed to chief election officials, not to union members," *id.*, but Defendants' phrasing and amplification of these threats precludes any such argument. The threats are broadly directed not at specific individuals but at elections officials and workers generally. *See*, *e.g.*, Dkt. 19-8 (Evers Ex. 23) (threatening "*anyone*" who "tabulate[s]" ballot of identified voters with aiding and abetting liability) (emphasis added); Dkt. 29-1 (Moreles Ex. A at 2-3) (letter sent broadly to California counties making similar threat); Dkt. 19-8 (Evers Ex. 29) (similar public statement by U.S. Attorney).

Defendants are amplifying these prosecution threats through public statements and on social media. For example, the President posted on Truth Social the USDOJ letter warning that "[i]f persons knowingly tabulate ballots cast by individuals identified by federal agencies as noncitizens, they risk becoming aiders and abetters to a federal crime" and warns that "*they are on actual notice of noncitizen voting*." Dkt. 19-8 (Evers Ex. 26) (emphasis in original). That letter does not say that election workers are not included in the reference to "persons." And to the extent that letter left any ambiguity, the President warned in his post: "They will all go to jail for a long period of time!!!" *Id.* Again, the President did not clarify that he did not mean to include election workers in his reference to "They."

Finally, Defendants' threats are encouraging the public to believe that election workers are

---

plaintiffs … to demonstrate that it is literally certain that the harms they identify will come about. Rather, ... substantial risk that the harm will occur" is sufficient. *San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*, 65 F.4th 1012, 1023 (9th Cir. 2023)) (citation omitted); *see also Harris v. Bd. of Supervisors*, 366 F.3d 754, 762-53 (9th Cir. 2004) (it was "not speculative" that cuts to health system would harm chronically ill patients even if it was uncertain "*when*" they would be harmed). Defendants have sent direct threats to election officials and made clear their intent to investigate or prosecute election workers for not acceding to Defendants' demands and for simply administering the election in accordance with their obligations under federal and state law. Indeed, not only have Defendants threatened the Union Plaintiffs' members, but they have already initiated the process for prosecutions. *See, e.g.,* Dkt. 19-8 (Evers) Ex. 41. As such, the Union Plaintiffs' election worker members risk immediate, extreme harm that will result from prosecution. Dkt. 19-1 (Sforza) Decl. ¶14; Dkt. 23 (Medina) ¶¶23, 29, 39-40.

facilitating unlawful vote casting, threatening further harm to election workers from public harassment. Dkt. 29-4 (Becker) ¶10 (threats come "at a time of heightened tensions and documented threats, abuse, and harassment directed at elections officials and workers" and "are pouring gasoline on the fire"); Dkt. 19-4 (Holmes) ¶33 (describing death threats and doxxing); Dkt. 19-1 (Sforza) ¶15 (describing anthrax threat); Dkt. 23 (Medina) ¶23 (describing public mistrust). These impacts also harm the Union Plaintiffs' members and establish standing.[5]

**b. Non-Profit Organizations Associational and Organizational Standing.**

Defendants' attacks on the standing of LULAC and NAACP also fail. LULAC and NAACP are membership organizations and have standing to sue under an associational standing theory, *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977), and "on their own behalf for injuries they have sustained," *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, n.19 (1982). As to associational standing, the record evidence shows that many members of NAACP and LULAC are naturalized citizens and are thus in danger of being placed on Appellants' error-riddled lists of potentially ineligible voters. *See* Dkt. 19-3 (Sterling Decl.) ¶¶9, 11-16; Dkt. 19-2 (Proaño Decl.) ¶¶13-19, 21. These members' fundamental rights to vote are being threatened, including through the possibility of being subjected to Defendants' interference with election officials' proper processing of their ballots and the imposition of undefined verification or re-certification requirements. Dkt. 19-3 ¶14 (NAACP members "face[] the risk that county election workers, under the threat of federal prosecution, could set aside or decline to count [their] ballot[s], thereby disenfranchising them, based merely on Defendants' say-so that their details match a person who is—or was at one time—a non-citizen"); Dkt. 19-2 ¶¶13, 17 (many LULAC members are naturalized U.S. citizens and have files with U.S. Citizenship and Immigration Services, and face risk of disenfranchisement should their "name wrongfully appear or should they share the same name of someone on [Defendants'] list").

---

[5] Plaintiff SEIU represents millions of members, a substantial number of whom also have standing as voters who are likely to be on, or likely to be false matches for individuals on, Defendants' lists, and assert associational and organizational standing on that ground as well, for the same reasons as explained with respect to the other voter organization plaintiffs in the next section.

Defendants argue that, despite the evidence of Defendants' ongoing demands that election workers use the unreliable lists of purported noncitizens or face criminal prosecution, the nonprofit organizations' member injuries are speculative because (1) the organizations have not identified specific voter-members who are injured, and (2) California and Los Angeles have thus far refused Defendants' demand that ballots of voters on the federal government's "lists" be set aside. See Dkt. 33 at 7. However, in a case like this one, "[w]here it is relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by a defendant's action, … we see no purpose to be served by requiring an organization to identify by name the member or members injured." *National Council of La Raza v. Cegavske*, 800 F.3d 1032, 1042 (9th Cir. 2015); *accord Mi Familia Vota v. Fontes*, 129 F.4th 691, 708 (9th Cir. 2025). This rule applies where, as here, "the defendant need not know the identify of a particular member to understand and respond to an organization's claim of injury." *National Council of La Raza*, 800 F.3d at 1042; *see also Arcia v. Fla. Sec'y of State*, 772 F.3d 1135, 1340-41 (11th Cir. 2014) (plaintiffs stated cognizable prospective injury because, as naturalized U.S. citizens, "there was a realistic probability that they would be misidentified … in the secretary's data-matching process").

Second, while it is true that certain jurisdictions have resisted Defendants' demands to date, Defendants have not ceased threatening election workers with criminal sanctions should they not comply with Defendants' demands. It is neither unreasonable nor speculative for nonprofit organizations' members to fear that election workers, under threat of criminal prosecution by the federal government, will set aside members' ballots if they appear on Defendants' lists. The fact that voter-members cannot be certain their ballots will be correctly counted and tabulated is an imminent and ongoing harm. *See* Dkt. 19-3 ¶17 (describing risk that the count of NAACP voter-members' ballots will be impacted by threats to prosecute election workers for counting lawfully cast ballots, including that ballots will be "set aside, mishandled, or delayed past certification deadlines"); Dkt. 19-2 ¶20 (LULAC member voters face "uncertainty and delay about whether their votes will count"). Indeed, Defendants' demands have diverted election workers' attention from the already immense task of administering an election and, should election workers be forced to comply with the demands, Plaintiffs have demonstrated that Defendants' actions would disrupt

the election. *See* Dkt. 29-2 (Connelly Decl.) ¶8; Dkt. 19-4 (Holmes Decl.) ¶¶6, 21, 31-39 (federal government's threats have "created a[n election worker] recruiting crisis" and diverted resources from elections administration).; Dkt. 29-1 (Moreles Decl.) ¶¶16-17; Dkt. 29-5 (Diaz Decl.) ¶¶10-14. This disruption harms not only the election workers who receive the threats, but also voters who are participating in the election and rely on those workers for all kinds of assistance. Id.; Dkt. 19-2 (Proaño Decl.) ¶19.

Finally, Defendants offer no real response to the nonprofit organizations' showing of organizational standing. The organizations have had to expend time responding to Defendants' public attacks on election officials and the legitimacy of the election process, time that has been taken away from their planned voter engagement and educational activities. *See* Dkt. 19-2 (Proaño Decl.) ¶¶17, 18, 21, 24, 27; Dkt. 19-3 (Sterling Decl.) ¶¶10, 16-17, 19. While Defendants assert that organizations "cannot spend [their] way into standing," Dkt. 33 at 7, that argument takes aim at strawman. Nonprofit organizations' reallocation of resources to respond to voters concerned about threats against election workers, and the resulting impairment of the organizations' planned activities, is "far more than simply a setback to [their] abstract social interests" and is sufficient to confer standing. *Havens*, 455 U.S. at 379.

**5. Plaintiffs Are Likely to Succeed on their Claims.**

**a. VRA Section 11(b) Claims Will Succeed.**

As Plaintiffs previously established, the Voting Rights Act of 1965 prohibits the threats, intimidation and coercion by federal officials aimed at election workers—exactly the type of behavior that Defendants' officials have engaged in here. ECF 17-1 at 21-24. Defendants' arguments to avoid application of that law do not withstand scrutiny.

First, Congress intended VRA Section 11(b) to be enforceable by private actors. The vast majority of courts that have squarely addressed the question—including, repeatedly, courts within this Circuit—have held that Section 11(b) creates a private right of action. *See, e.g.*, *Cal. Nurses Ass'n v. Mullin*, No. 26-cv-10680-AMO, 2026 WL 3166149, at *7 (N.D. Cal. Oct. 21, 2026), *stay pending app. denied*, 2026 WL 3268397 (9th Cir. Oct. 30, 2026); *Kennedy v. Meta Platforms, Inc.*, No. 3:24-cv-02869-WHO, 2024 WL 4031486, at *6 (N.D. Cal. Sept. 3, 2024); *Krabach v. King*

*County*, No. 2:22-cv-1252-BJR, 2023 WL 7018431, at *3 (W.D. Wash. Oct. 25, 2023); *AARA v. Clean Elections USA*, 638 F.Supp.3d 1033, 1041 (D. Ariz. 2022) (collecting cases)[6]; *Ariz. Democratic Party v. Ariz. Republican Party*, No. CV-16-03752-PHX-JJT, 2016 WL 8669978, at *4 (D. Ariz. Nov. 4, 2016).[7]

Defendants offer no persuasive reason to depart from this vast body of authority. Nor could they. To determine whether Congress intended to create a private right of action, courts must (1) make the "critical" determination of whether the statute in question contains "rights-creating language," and, if so, (2) evaluate whether Congress has "manifest[ed] an intent to create a private remedy." *Alexander v. Sandoval*, 532 U.S. 275, 286, 288-89 (2001). By its plain terms, Section 11(b) contains precisely the kind of "rights-creating" language that evidences an implied right of action: no person "shall intimidate, threaten, or coerce . . . *any person* for voting or attempting to vote, or . . . for urging or aiding *any person* to vote." 52 U.S.C. § 10307(b) (emphasis added); *see Gonzaga University v. Doe*, 536 U.S. 273, 284–85 (2002). That language focuses on the persons protected—voters *and* those who aid them—not merely on "the person regulated." And the VRA also clearly manifests an intent to supply a remedy for private actors. Congress included language throughout the Act to indicate that its provisions are privately enforceable. *See* 52 U.S.C. § 10302(a), (c) (providing for certain remedies in actions brought by "the Attorney General *or an aggrieved person* . . . under any statute to enforce the voting guarantees of the fourteenth or

---

[6] The *AARA* court first denied preliminary relief, but later found liability after a hearing and entered a consent injunction to prevent armed voter-intimidation in the vicinity of dropboxes. 2022 WL 17088041, at *1 (D. Ariz. Nov. 1, 2022). After the election, the Ninth Circuit vacated for mootness. *See* 2023 WL 1097766 (9th Cir. 2023).

[7] *See also, e.g.*, *Nat'l Coal. on Black Civic Participation v. Wohl*, 661 F.Supp.3d 78, 112 (S.D.N.Y. 2023); *Allen v. City of Graham*, No. 1:20-cv-997, 2021 WL 2223772, at *7 (M.D.N.C. June 2, 2021). In addition, every circuit court to have considered an 11(b) claim has not questioned the statute's private enforcement, *see, e.g., Colo. Mont. Wyo. State Area Conf. of the NAACP v. Smith*, 180 F.4th 1266 (10th Cir. 2026) (reversing judgment for defendants in 11(b) suit brought by private plaintiffs); *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 673 F.3d 192, 204 (3d Cir. 2012) (declining to vacate consent decree based on private enforcement of 11(b)); *Bershatsky v. Levin*, 99 F.3d 555 (2d Cir. 1996) (per curiam) (dismissing private voter-intimidation claim for failure to state a claim, not for want of a private right); *Whatley v. City of Vidalia*, 399 F.2d 521 (5th Cir. 1968) (private citizens' voter-intimidation claim properly in federal court), and no court of appeals has ever held otherwise.

fifteenth amendment") (emphasis added); 52 U.S.C. § 10308(f) (endowing district courts with jurisdiction over "*a person*" bringing claims pursuant to the VRA, including Section 10 and Section 11(b)) (emphasis added); 52 U.S.C. § 10310(e) (providing for attorneys' fees for "the prevailing party, *other than the United States*") (emphasis added).

The specific references to the Attorney General in Section 12(d) and (e) on which Defendants rely are "certainly no specific exclusion of private actions," but rather are necessary additions to grant "the Attorney General power to bring suit to enforce what might otherwise be viewed as 'private' rights." *Allen v. State Bd. of Elections*, 393 U.S. 554, 555 n. 18 (1969); *see also Morse v. Republican Party of Virginia*, 517 U.S. 186, 234-35 (1996) (squarely rejecting that Attorney General enforcement supplants private right of action). Defendants' reliance on two out-of-circuit district court decisions in *Andrews v. D'Souza*, 696 F. Supp. 3d 1332, 1351 (N.D. Ga. 2023) and *Gardner v. Jessup*, 2025 WL 4743403, at *6 (S.D. Ga. June 26, 2025), *vacated on other grounds*, 2026 WL 3089236 (S.D. Ga. June 29, 2026) (relying entirely on *Andrews*), is insufficient to overcome the Act's text, consensus across the Circuits and the majority of district courts, and Supreme Court precedents.[8]

Second, Defendants incorrectly contend that Section 11(b) does not apply to federal officials. The plain text of Section 11(b) is fatal to Defendants' argument that federal officials enjoy wholesale immunity from its prohibitions. "Because the plain text of the Voting Rights Act prohibits any person, 'whether acting under color of law or otherwise' from intimidating someone urging or aiding any person to vote or attempting to vote, 52 U.S.C. § 50307(b), . . . there is no readily apparent basis to limit the reach of the statute." *Cal. Nurses Ass'n*, 2026 WL 3166149, at *8 (N.D. Cal. Oct. 21, 2026) (applying VRA to federal law enforcement intimidation). That Judge Tung made his argument to the contrary in dissent, ECF 33 at 9, is telling; the en banc Ninth Circuit left undisturbed a stay of an 11(b) injunction against the federal government.

[8] Even if the VRA contained no private right of action, the APA supplies a private right of action for federal statutes. *California v. Trump*, 963 F.3d 926, 941 (9th Cir. 2020); *San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1099 (9th Cir. 2005)); *see also Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140-41 (1967) ("The APA embodies [a] basic presumption of judicial review to one suffering legal wrong because of agency action") (cleaned up).

Nor is there any basis to atextually carve out actions by federal prosecutors from the reach of the VRA, which is to be given "the broadest possible scope." *Colo. Mont. Wy. State Area Conf. of the NAACP v. Smith*, 180 F.4th 1266, 1281 (10th Cir. 2026). By its explicit terms, the law applies to those "acting under color of law," including federal government officials. *Accord* 42 U.S.C. § 1983. Section 11(b)'s use of "under color of law," without reference to "state" law as in 42 U.S.C. § 1983, also means it applies to federal prosecutors because "he who acts under 'color' of law may be a federal officer or a state officer. He may act under 'color' of federal law or of state law." *Screws v. United States*, 325 U.S. 91, 108 (1945); *see also United States v. Otherson*, 637 F.2d 1276, 1278 (9th Cir. 1980) (relying on *Screws* to apply 18 U.S.C. § 242 to U.S. Border Patrol).[9]

Finally, Defendants contend that Plaintiffs would not prevail on the merits of their VRA claims, but rest those arguments largely on the misrepresentations of record described above. *Supra*. Conduct violates Section 11(b) if "a reasonable recipient, familiar with the context of the message, would interpret [it] as a threat of injury"—including the "nonviolent" injury of legal repercussions—"intended to deter individuals from" aiding others in voting. *Nat'l Coal. on Black Civic Participation v. Wohl* ("*NCBCP II*"), 512 F. Supp. 3d 500, 509 (S.D.N.Y. 2021); *see also Cal. Nurses Ass'n*2026 WL 3166149, at *7 (N.D. Cal. Oct. 21, 2026) ("Unlawful intimidation includes '[a]ctions or communications that inspire fear of . . . legal repercussions[.]'") (citation omitted). The record previously addressed by Plaintiffs, Dkt. 17-1 at 21-24, more than satisfies this standard.

**b. Defendants' Actions Violate the Tenth Amendment and Elections Clause**

As explained in Plaintiffs' TRO memorandum, there have been flurry of decisions in recent weeks and days holding that the federal government cannot interfere with the administration of elections by states and local governments without running afoul of the U.S. Constitution. Dkt. 17-1 at 25-28. Defendants attempt here to reargue the conclusions of the Ninth Circuit in *United*

---

[9] That the Act provides the Attorney General with enforcement authority, says nothing about its applicability to the federal government, in light of the private right of action it provides.

*States v. California*, __ F.4th __, Case No. 26-7231, 2026 WL 3268272 (9th Cir. Oct. 30, 2026), which apply directly here. *Id.* In that decision, the Ninth Circuit concluded that the Constitution grants authority over the process for challenging ballots or removing ineligible voters to the States except insofar as Congress has prescribed otherwise, and that Congress has not done so with respect to Defendants' lists of suspected non-citizen voters. *Id.* at *4-5; *see also California I*, 2026 WL 3212945, at *10 ("A review of § 611 also reveals no hidden provision authorizing the Department of Justice ... to superintend or intervene in a state's election administration.") (Bennett, J. concurring).

Peculiarly, Defendants contend that because the Elections Clause does not mention the executive branch, it "in no way limits or applies to the executive branch." Dkt. 33 at 12. That helps, not hurts, Plaintiffs' argument: the Clause grants authority to the States except as limited by Congress, and Congress has not imposed relevant limitations. As such, by threatening state and local elections officials and workers that they will be subject to criminal prosecution unless they disregard their own processes for processing ballots and determining voter eligibility, Defendants have intruded on the constitutional authority of States, in violation of the Tenth Amendment and as exceeding Defendants' authority under the Elections Clause.

In light of this clear violation, Defendants resort to attacking a strawman. Plaintiffs do not argue that state election officers who commit fraud, falsify returns, or stuff ballot boxes are immune from federal prosecution. Defendants cite inapposite cases involving officials who corrupted the vote by falsifying returns or casting fraudulent ballots and were later prosecuted under federal law. *See Ex parte Siebold*, 100 U.S. 371, 378 (1879); *U.S. v. Classic*, 313 U.S. 299, 315-21 (1941); *Anderson v. U.S.*, 417 U.S. 211, 226-27 (1974). That the Executive has the authority to prosecute crimes in no way supports the Executive taking over the mechanics of elections from the States.

Finally, Defendants' arguments that actions to interfere with state and local administration of elections through threats, intimidation, and coercion of local election workers somehow does not violate those principles fails for all the reasons explained in Plaintiffs' TRO application.

**c. Plaintiffs are Likely to Prevail on Other Claims as Well.**

Defendants have no statutory authority whatsoever to engage in threats aimed at intimidating and coercing state and local elections officials and workers. Dkt. 17-1 at 30-35. Because they have no authority, because these actions violate multiple provisions of the Constitution, and because Defendants violate the VRA, Defendants' actions are ultra vires and violate the APA. The actions of Defendants are also profoundly arbitrary and capricious. *Id*. at 34. This Court did not reach the remaining claims, but if it had, they would support this TRO as well, for all the reasons previously explained.

**6. The Court Has Authority to Issue this TRO.**

**a. The Court's Order Protects the Status Quo and Plaintiffs from Harm.**

In the context of immediate emergency relief preventing unlawful acts of threats, coercion, and intimidation by Defendants aimed at election workers across the country, the TRO appropriately maintains the status quo and halts those unlawful actions nationwide. Defendants' argument that this Court cannot issue a "universal" injunction and should have instead carved limited relief only to the members of Plaintiffs fail, for several reasons. ECF 33 at 15. This Court did not abuse its discretion in issuing this TRO. *Novedades Y Servicios, Inc. v. Fin. Crimes Enf't Network*, 181 F.4th 961, 981 (9th Cir. 2026) (scope of injunction will be reviewed for abuse of discretion); *accord California v. Azar*, 911 F.3d 558, 568 (9th Cir. 2018).

First, the law has long permitted a court to issue injunctive relief to maintain the status quo that has the incidental impact of protecting others. *See Trump v. CASA, Inc.,* 606 U.S. 831, 851 (2025) (cleaned up) ("The equitable tradition has long embraced the rule that courts generally may administer complete relief between the parties, even when such relief may sometimes advantage nonparties.") (quotations omitted). Contrary to the Defendants' assertion, *CASA* did not hold that a court's equitable authority can never extend to an injunction that reached the full extent of a Defendants' nationwide actions. Dkt. 33 at 15. In order to protect the Plaintiffs and their members from harm, this Court needed to act swiftly and decisively.

Second, a piecemeal order preventing only the coercion, intimidation, and threats of criminal prosecution against election officials and workers represented by Union Plaintiffs would be entirely unworkable. As a practical matter, permitting federal government officials to inquire

into whether individual election workers are union members for the purpose of determining whether to threaten them or not would itself be intimidating and coercive, and would do nothing to address the impact of these actions on *all* election workers. And, there is no feasible way to craft an order that protects *only* the voters represented by Plaintiff Nonprofit organizations and not other similarly-situated voters as well, as the election workers across the country targeted by these threats are processing these ballots whether they are represented by unions or not. Continued threats to any election workers are so intertwined with the impact on Plaintiffs and their members as to affect the employees that the Union Plaintiffs represent and the voters represented by the Non-Profit Plaintiffs across the country. "[A]n injunction is not necessarily made overbroad by extending benefit or protection to persons other than the prevailing parties in the lawsuit ... if such breadth is necessary to give prevailing parties the relief to which they are entitled." *See Nat'l TPS Alliance v. Noem*, 150 F.4th 1000, 1028-29 (9th Cir. 2025), *stayed on other grounds*, 145 S. Ct. 2728 (Mem.) (quoting *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018)).

Third, although this Court did not reach the likelihood of success on APA grounds, the Court's authority to issue the TRO can alternatively be found in that expansive grant of authority to courts by Congress as well. The Plaintiffs have brought claims directly under the Constitution and statutory provision protecting elections and voters from federal overreach, and under the APA, in which Congress has expressly authorized interim judicial relief that stays unlawful action, 5 U.S.C. §705, for the purpose of preserving a plaintiff's right to full APA remedy of vacating unlawful actions in their entirety, 5 U.S.C. §706. *CASA* left undisturbed the "ordinary result" under the APA—namely, "that the rules are vacated—not that their application to the individual petitioners is proscribed." *Regents of the Univ. of Cal. v. Dep't of Homeland Sec.*, 908 F.3d 476, 511 (9th Cir. 2018), *vacated in part on other grounds*, 591 U.S. 1 (2020) (cleaned up); *see CASA*, 606 U.S. at 847 n.10; *id.* at 869 (Kavanaugh, J., concurring); *see also Novedades Y Servicios, Inc. v. Fin. Crimes Enf't Network*, 181 F.4th 961, 982 (9th Cir. 2026) ("As the Ninth Circuit previously recognized, the U.S. Supreme Court's decision in *Trump v. CASA, Inc.* does not narrow the scope of the injunctive relief possible under the APA"). Where, as here, Plaintiffs have challenged the

policy and implementing actions as violative of the APA, interim relief staying and enjoining actions in furtherance of that policy is authorized section 705 relief to maintain the status quo and preserve the ability to issue vacatur later.

**b. The TRO Does Not Violate the Separation of Powers.**

Defendants are mistaken in arguing that the TRO unduly encroaches on the Executive's prosecutorial authority, in violation of the separation of powers. As explained above, the TRO simply temporarily enjoins Defendants from continuing to "threaten, intimidate, or coerce" state and local election officials and workers, including by "threat[ening them] with criminal prosecution for processing or counting ballots in the 2026 election in compliance with state and federal laws that govern election administration …." Dkt. 26 at 6-7. The order does not interfere with Defendants' lawful exercise of its prosecutorial authority and does not prevent Defendants from conducting bona fide, lawful investigations or prosecutions consistent with applicable law. *Jett v. Castaneda*, 578 F.2d 842, 845 (9th Cir. 1978) is therefore inapplicable. *See CNA*, 2026 WL 3268397, at *6; *Vasquez Perdomo*, 148 F.4th at 680.

Moreover, while the order does not enjoin the federal government's law enforcement activities, it bears emphasis that "[w]hile the executive has discretion over prosecutorial decisions, it has no discretion to violate the constitutional rights of individuals," including the right to vote. *Smith v. Meese*, 821 F.2d 1484, 1491-92 (11th Cir. 1987) (holding separation of powers doctrine did not bar federal court review of investigatory and prosecutorial decisions of United States Attorney General and United States attorneys that allegedly deprived black voters of constitutional right to vote and associate freely); *see Olagues v. Russoniello*, 797 F.2d 1511, 1519 (9th Cir. 1986) (en banc), *vacated as moot*, 484 U.S. 806 (1987) (explaining that section 11(b) of the VRA "unquestionably" applied to "unwarranted interference by prosecutorial officials").The Constitution "imposes on all three branches a duty to uphold and support the Constitution, and when the other branches of government fail in that duty, the judicial branch has the power and the obligation to redress the violation." *Smith*, 821 F.2d at 1493 (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) at 165-66). Thus, "[i]n various contexts, the federal courts have been willing to intervene where prosecutorial decisions by the executive branch encroach on constitutional rights of

individuals." *Id.* at 1492 (citing cases). For the reasons explained *above,* even if this Court's order were construed to implicate in some way the Federal Executive's prosecutorial discretion, the extraordinary facts of this case involving the Federal Executive's unprecedented campaign to interfere with the States' administration of the 2026 election would justify "federal court intervention in the prosecutorial and investigative process." *Smith*, 821 F.2d at 1493.

**c. The TRO Satisfies Rule 65(c)'s Specificity Requirement.**

Defendants' argument that the TRO is impermissibly vague fails. The order is "properly drawn and narrowly defined." *CNA*, 2026 WL 3268397, at *8.

Federal Rule of Civil Procedure 65 requires that an order granting a preliminary injunction "state its terms specifically" and "describe in reasonable detail … the acts restrained or required." Fed. R. Civ. P. 65(d)(1)(B), (C). "A district court has considerable discretion in fashioning suitable relief and defining the terms of an injunction," and "[a]ppellate review of those terms is correspondingly narrow.'" *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) (quoting *Coca-Cola Co. v. Overland, Inc.*, 692 F.2d 1250, 1256 n.16 (9th Cir. 1982)). Accordingly, the Court "will not set aside an injunction under Rule 65 unless it is 'so vague' that it has 'no reasonably specific meaning.'" *CNA*, 2026 WL 3268397, at *7 (quoting *Vasquez Perdomo v. Noem*, 148 F.4th 656, 679 (9th Cir. 2025)).

The narrow and specific injunction entered by this Court is appropriately "tailored to remedy the specific harm alleged." *Lamb-Weston*, 941 F.2d at 974. Defendants' challenges to each of the paragraphs are meritless.

<u>Paragraphs 1-3.</u> Defendants claim that paragraphs 1 through 3 of the TRO are "impermissibly vague," but their terms are crystal clear and narrowly tailored to enjoin the specific conduct that Plaintiffs are engaged in and that Plaintiffs challenge as unlawful. Paragraphs 1 through 3 do not broadly prohibit all conceivable acts to "threaten, intimidate or coerce" election officials and workers, but rather specifically enjoin Defendants from "threaten[ing], intimidat[ing], or coerc[ing] state or local election officials or workers *to demand that they halt processing the ballots of any registered voters solely on the basis that the ballot belongs to an individual alleged by Defendants to be ineligible to vote*," Dkt .26 at 6 (¶1) (emphasis added), and from "threaten[ing]

state or local election officials and workers with criminal prosecution for failure to comply with" expressly enumerated demands, Dkt. 26 at 6 (¶¶2-3).[1] The specific "demands" that the order enjoins precisely track the specific demands that Defendants have been widely and aggressively directing at election officials and workers across all 50 states. *Supra*. The specific type of enjoined conduct that Defendants have been engaged in, and that the order now temporarily enjoins as an attempt to "threat[en], intimidate, or coerce" election officials and workers, is likewise clearly identified in Plaintiffs' motion and amply substantiated by the evidentiary record. These provisions are specific and precise about what kinds of conduct is prohibited. *See Vasquez Perdomo*, 148 F.4th at 680 (injunction satisfied Rule 65 where government could avoid contempt by not making decision based on factors forbidden by the order's plain terms, "even if a court later conclude[d]' that the bottom-line decision was wrong)[2]; *CNA*, 2026 WL 3268397, at *7 (rejecting similar challenge to injunction enjoining federal defendants "from [] conducting elections-related field operations and field interviews in [specified states] that involve or are likely to involve persons whom the Enjoined Parties know, suspect, or should reasonably know or suspect are U.S. citizens; and [c]onducting elections-related field operations in [specified states] based wholly on TECS records generated from the Voter Eligibility Matching Policy, as identified in this Order, against persons whom the Enjoined Parties know, suspect, or should reasonably know or suspect are U.S. citizens"). Defendants cannot pretend not to understand what type of conduct the order enjoins. *See United States v. Christie Indus., Inc.*, 465 F.2d 1000, 1007 (3d Cir. 1972) ("Rule 65(d)'s fair notice requirement must be applied "in the light of the circumstances surrounding (the injunction's) entry: the relief sought by the moving party, the evidence produced … on the injunction, and the mischief that the injunction seeks to prevent"); *Williams v. United States*, 402 F.2d 47, 48-49 (10th Cir. 1967) (sustaining injunction in light of defendant's subjective knowledge; content of litigation may provide sufficient notice of what conduct injunction enjoins).

Paragraph 4. Paragraph 4 is not a "circular" "obey-the-law injunction (Dkt. 33 at 16). Paragraph 4 does not "declare[] that compliance with state procedures can *never* violate federal criminal law" (Dkt. 33 at 16, emphasis added), nor does it simply "forbid[] Defendants from threatening to prosecute conduct that does not violate federal law" (Dkt. 33 at 16). Rather, it

provides that "Defendants shall not threaten state or local election officials and workers with criminal prosecution *for processing or counting ballots in the 2026 election in compliance with state and federal laws that govern election administration* on the basis that a ballot belongs to an individual alleged by Defendants to be ineligible to vote." Dkt. 26 at 6 (emphasis added). It very specifically prohibits Defendants from only one thing: threatening state or local election officials and workers with criminal prosecution only for processing or counting ballots in the 2026 election in compliance with state and federal laws that govern election administration. That is the specific conduct in which Defendants are engaged, and that Plaintiffs' lawsuit documents and challenges. Paragraph 4's specific and narrow prohibition against engaging in that same conduct bears no resemblance to the type of overbroad "obey-the-law" injunction at issue in the cases Defendants cite. *Cf., e.g. NLRB v. Express Publ'g Co.*, 312 U.S. 426, 435-36 (1941) (injunction impermissibly subjected defendant to contempt proceedings "if he shall at any time in the future commit some new violation unlike and unrelated to that with which he was originally charged").

Paragraph 5. The fifth paragraph orders "Defendants to inform any State, county, or any other local government to which any Defendant sent a letter regarding the processing and counting of ballots in the 2026 election and any list of individuals alleged by Defendants to be ineligible to vote that the demands and threats of prosecution to election officials and workers reflected in that letter have been enjoined." Dkt. 26 at 7, ¶5. Defendants contend that Paragraph 5 is mandatory relief that alters the status quo, and that mandatory injunctions are "particularly disfavored" unless "the law and facts clearly favor the movant." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).[3]

Even if this were a mandatory injunction (rather than restoring the pre-illegality status quo), mandatory injunctions should not issue in "doubtful cases." *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011). This is not a doubtful case. For the reasons previously explained, Plaintiffs have clearly satisfied the *Winter* factors and so are entitled to preliminary relief. *See United States v. California*, ___ F.4th ___, 2026 WL 3268272, at *3 (9th Cir. 2026) (observing that the likelihood of success of the merits is "the most important" of the *Winter* factors in assessing that the law and facts "clearly favor" the movant for purposes of

obtaining a mandatory injunction). And Defendants' argument that any notices that the TRO requires Defendants to distribute "cannot be unsent" is frivolous—Defendants can alert by letter the relevant officials as to any future changes in this litigation, just as they issued letters threatening criminal prosecution in the first instance.

Paragraph 6. The sixth paragraph orders "Defendant U.S. Department of Justice to inform the Court of any pending search warrant applications, grand jury subpoenas, or other demands to access election materials or ballots pertaining to any list of individuals alleged by Defendants to be ineligible to vote, or compel testimony related thereto." Dkt. 26 at 7, ¶6. Defendants challenge Paragraph 6's inclusion of grand jury subpoenas, insisting that government attorneys "'must not disclose a matter occurring before the grand jury' except as Rule 6(e) permits." Dkt. 33 at 16 (quoting Fed. R. Crim. P. 6(e)(2)(B)). However, this Court's order does not specify how Defendants must notify the Court—Defendants may file any such notification in camera. Federal Rule of Criminal Procedure 6, which governs grand jury proceedings, imposes an obligation of secrecy as to matters occurring before a grand jury on attorneys for the government. *See* Fed. R. Crim. P. 6(e)(2)(B)(vi). "Records, orders, and subpoenas relating to grand-jury proceedings must be kept under seal to the extent and as long as necessary to prevent the unauthorized disclosure of a matter occurring before a grand jury." Fed. R. Crim. P. 6(e)(6).

Courts have not held that grand jury matters are, in all instances, entitled to absolute secrecy.[4] "Grand juries are not licensed to engage in arbitrary fishing expeditions, nor may they select targets of investigation out of malice or an intent to harass." *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 297 (1991). So, for example, where a party has challenged the issuance of a subpoena with a motion to quash, courts are permitted to require that "the Government reveal the subject of the investigation to the trial court *in camera*, so that the court may determine whether the motion to quash has a reasonable prospect for success before it discloses the subject matter to the challenging party." *Id.* at 302. True, district courts may not generally superintend the issuance of grand jury subpoenas.[5] *See, e.g.*, *Baylson v. Disciplinary Bd. of Supreme Ct. of Pennsylvania*, 975 F.2d 102, 110 (3d Cir. 1992) (holding that "the district court may not under the guise of its supervisory power or its local-rule making power" impose substantive restraints on a grand jury).

But the TRO does not require such supervision. The TRO only requires disclosure to this Court.[6]

In sum, this Court's order falls well within "the broad boundaries of traditional equitable relief." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 322 (1999). The TRO narrowly enjoins Defendants from "threaten[ing] state or local election officials and workers with criminal prosecution for processing or counting ballots in the 2026 election in compliance with state and federal laws that govern election administration …," which as a matter of law is not and cannot be a federal crime under 18 U.S.C. §2.

**7. Rule 65(b)(4) Does Not Apply Where Defendants Had Notice**

Defendants invoked Rule 65(b)(4) to argue that this Court was required to respond to their motion, in the alternative, to "dissolve" the injunction. But Defendants *did* have notice. Dkt. 17-2. This Court should reject the request in the alternative to dissolve the TRO, to which Rule 64(b)(4) does not apply.

Moreover, Defendants have already appealed, divesting this Court of jurisdiction to modify the injunction (which Defendants implicitly acknowledge by asking for only an indicative ruling on their request to dissolve). If the Court does decide to issue a ruling embracing any modification to the now-appealed TRO order, that could be properly done through an indicative ruling.

DATED: November 1, 2026

Respectfully submitted,

Stacey Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
Connie K. Chan (SBN 284230)
Colin Clemente Jones (SBN 354301)
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com
cchan@altber.com
cjones@altber.com

By: *<u>/s/ Danielle Leonard</u>*

*Attorneys for Plaintiffs*

Norman L. Eisen*
Tianna Mays*
Pooja Chaudhuri (SBN 314847)
Jacob Kovacs-Goodman*
Elizabeth Westfall*
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Ave. SE #15180
Washington, DC 20003 (202) 601-8678
(202) 601-8678
norman@democracydefenders.org
tianna@democracydefenders.org
pooja@democracydefenders.org
jacob@democracydefenders.org
elizabeth-contract@democracydefenders.org

By: *<u>/s/ Norman L. Eisen</u>*

*Attorneys for Plaintiffs*

Jared Fletcher Davidson*
NY Bar No. 5202429
PROTECT DEMOCRACY PROJECT
82 Nassau Street, #601
New York, NY 10038
(202) 579-4582
jared.davidson@protectdemocracy.org

Naomi Gilens (Cal. Bar. 315813)
Anna Dorman*
Ori Lev *
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, Suite #163
Washington, DC 20006
(202) 579-4582
naomi.gilens@protectdemocracy.org
Anna.dorman@protectdemocracy.org
ori.lev@protectdemocracy.org

Benjamin L. Berwick*
15 Main Street, Suite 312
Watertown, MA 02472
Tel.: (202) 579-4582
ben.berwick@protectdemocracy.org

By: */s/ Jared Fletcher Davidson*

*Attorneys for Plaintiffs*

Steven K. Ury (SBN 199499)
SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO
1800 Massachusetts Ave., N.W.
Washington, D.C. 20036
Tel: (202) 730-7428
steven.ury@seiu.org

By: */s/ Steven K. Ury*

*Attorney for Plaintiff Service Employees International Union AFL-CIO (SEIU)*

Teague Paterson (SBN 226659)
Matthew Blumin*
Georgina Yeomans*
AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, AFL-CIO
1625 L Street, N.W.
Washington, D.C. 20036
Tel: (202) 775-5900
TPaterson@afscme.org
MBlumin@afscme.org
GYeomans@afscme.org

By: /s/ Teague Paterson

*Attorneys for Plaintiff American Federation of State County and Municipal Employees, AFL-CIO (AFSCME)*

Stuart Naifeh (SBN 233295)
John S. Cusick*
Brittany Carter*
NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006

I. Sara Rohani (SBN 337842)
Hayley Hahn*
Victor Olofin*
NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
700 14th Street N.W., Ste. 600
Washington, DC 20005
snaifeh@naacpldf.org

By: /s/ Stuart Naifeh

*Attorneys for Plaintiff NAACP*