Stacey Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
Connie K. Chan (SBN 284230)
Colin Clemente Jones (SBN 354301)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
(415) 421-7151
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com
cchan@altber.com
cjones@altber.com

*Attorneys for Plaintiffs*

Norman L. Eisen*
Tianna Mays*
Pooja Chaudhuri (SBN 314847)
Jacob Kovacs-Goodman*
Elizabeth Westfall*
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Ave. SE #15180
Washington, DC 20003 (202) 601-8678
(202) 601-8678
norman@democracydefenders.org
tianna@democracydefenders.org
pooja@democracydefenders.org
jacob@democracydefenders.org
elizabeth-contract@democracydefenders.org

*Attorneys for Plaintiffs*

* *Pro Hac Vice application forthcoming*

[Additional counsel and affiliations listed on signature page]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SERVICE EMPLOYEES INTERNATIONAL UNION, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE, et al.,<br><br>Defendants. | Case No. 3:26-cv-12800-TLT<br><br>**PLAINTIFFS' RESPONSES TO QUESTIONS FOR HEARING (DKT. 37)** |

Plaintiffs submit the following responses to the Court's Questions for Hearing (Dkt. 37):

**I. STANDING**

**QUESTION (I)(A):**

A. In *California Nurses Association v. Mullin*, No. 26-7139, 2026 WL 3268397, at *4 (9th Cir. Oct. 30, 2026) (citation omitted), the Ninth Circuit held that certain union plaintiffs had associational standing, as they had "clearly shown that the Federal Defendants' conduct chills citizens' election-related activities and presents 'a real and immediate threat of future injury' to their legally protected interest in participating in the election." In this action, Plaintiffs aver that election workers, including members of SEIU and AFSCME, express ongoing fear and concern about Defendants' conduct. *See, e.g.*, ECF 19-1 ¶¶13–14; ECF 23 ¶¶23, 29, 34, 38–41; ECF 29-2 ¶¶4, 6–7; ECF 29-4, ¶¶9–10.

i. …

ii. **To Both Parties: To the extent that associational standing exists under *California Nurses Association* in this action, does it apply to each Plaintiff independently?**

**Plaintiffs' Response:**

While the Court does not need to decide whether each Plaintiff has standing so long as it is satisfied that one Plaintiff does,[1] the answer is yes: each Plaintiff has standing under *California Nurses Association*. As far as the Union Plaintiffs, Defendants have put members of both SEIU and AFSCME to the choice between performing their duties under state and federal law, at the threat of being criminally investigated and prosecuted, and acceding to Defendants' demands. Being in that position, in and of itself, is cognizable harm for standing and flows to both Union Plaintiffs. *See Isaacson v. Mayes*, 84 F.4th 1089, 1099 (9th Cir. 2023) (a plaintiff who faces an imminent threat to their liberty because of the threat of prosecution has stated a sufficient harm to establish standing). SEIU and AFSCME have established their pervasive union membership presence in election

[1] *See Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009).

offices throughout California, as well as AFSCME's presence throughout Washington. Dkt. 19-1 ¶¶7a-b, 15 (Sforza Decl.), 23 ¶12-13 (Medina Decl.). Both Union Plaintiffs also represent election workers in more than eleven other states, where the Defendants have also amplified their threats. Dkt. 19-1 ¶7 (Sforza Decl.), 23 ¶11 (Medina Decl.). The "scope" of Defendants' conduct as well as the presence of SEIU and AFSCME members in election offices throughout the country "make it such that there is a sufficiently high likelihood of future injury." *CNA*, No. 26-7139, 2026 WL 3268397, at *5.

Both Union Plaintiffs have also established *additional* concrete harm to their membership in the form of "fear and unease experienced by those subjected to intimidatory conduct." *CNA*, No. 26-7139, 2026 WL 3268397, at *5. *See, e.g.*, Dkt. 23 ¶¶21-40 (Medina Decl.) (documenting SEIU has members in California elections offices who fear unfounded accusations, criminal charges, immigration consequences, and "psychological stress"); Dkt. 19-1 ¶15 (Sforza Decl.) (documenting AFSCME membership caught in cross-hairs and endangered by private harassment and threats). In addition, the Director of Elections of Washington State, whose staff is AFSCME-represented, *see* Dkt. No. 19-1 ¶15 (Sforza Decl.), has attested to the "extraordinary stress" on behalf of himself and his staff, "due to the relentless interference" of Defendants, including "escalating threats of criminal prosecution simply for doing our jobs," leading to the reasonable fear that "staff members of the Secretary of State's Office . . . could become targets of a [] criminal probe." Dkt. No. 19-4 ¶¶6, 28, 33 (Holmes Decl.).

The standing of Non-Profit Plaintiffs, and the need for nationwide relief, is addressed *infra*.

iii. **<u>To Both Parties</u>: Even if individual election workers did not personally receive a letter from Defendants, doesn't the threat of criminal prosecution chill SEIU and AFSCME members' election-related activities, such that SEIU and AFSCME have associational standing?**

**<u>Plaintiffs' Response:</u>**

Yes. As Plaintiffs' response brief explained, Defendants' insistence that their threats cannot affect union members because they are directed at election officials, not their staff, is belied by the

facts. *See* Dkt. 36 at 9 (citing Dkt. 19-8 (Evers Ex. 23) (threatening "*anyone*" who "tabulate[s]" ballot of identified voters with aiding and abetting liability) (emphasis added); Dkt. 29-1 (Moreles Ex. A at 2-3) (letter sent broadly to California counties making similar threat); Dkt. 19-8 (Evers Ex. 29) (similar public statement by U.S. Attorney); Dkt. 19-8 Ex. 26 (President posting threatening letter on Truth Social and warning "They will *all* go to jail for a long period of time!!!") (emphasis added).

In addition to employing broad language, Defendants have "made extensive efforts to publicize" the threats, *CNA*, No. 26-7139, 2026 WL 3268397, at *5 (9th Cir. Oct. 30, 2026), on social media and in traditional media, ensuring that individual election workers are aware of them, even if they did not individually receive a letter. Given Defendants' extensive amplification of their broad language, it is reasonable for individual election workers to conclude that they must choose between carrying out their duties under state and federal law, on the one hand, and complying with Defendants' demands, on the other. *See* Dkt. 19-1 ¶¶13-14 (Sforza Decl.); Dkt. 23 ¶18 (Medina Decl.). And there is ample evidence in the record to show that is happening, and why. *See, e.g.*, Dkt. 23 ¶¶20-39 (Medina Decl. ) (describing SEIU members in California), Dkt. 19-4 ¶¶28-34 (Holmes Decl.) (describing fear that staff members of the Washington Secretary of State and election administrators statewide, who are represented by AFSCME, could become targets of criminal probe, and the negative effects of those threats on election administration).

Even if there were not such strong evidence of the broad reach of these threats, Defendants' fixation on the distinction between elections officials and individual election employees overstates the standard for standing in the context of a pre-enforcement threat of prosecution. Ninth Circuit case law is clear that "a plaintiff may reasonably fear prosecution even if enforcement authorities have not communicated an explicit warning to the plaintiff." *Isaacson*, 84 F.4th at 1100. Here, election workers, who carry out the processing of ballots alongside the heads of their offices, reasonably would perceive a threat from Defendants' conduct. Indeed, Defendants have not explained what legal distinction they perceive between union members who assist officials in carrying out their election-related duties and the officials themselves when it comes to the work of processing ballots. Whatever unexplained legal distinction Defendants think there is, it cannot

overcome the objectively reasonable perception of union members that the threats encompass their duties in carrying out election-related responsibilities.

**QUESTION (I)(B):**

B. Plaintiffs also describe concerns among naturalized U.S. citizen members of NAACP and LULAC that "their names may wrongfully appear on the lists of noncitizens" or that "databases often fail to reflect that a person has been naturalized." *See* ECF 19-2 ¶13; ECF 19-3 ¶9. "[E]very NAACP member" faces the risk that election workers, "under the threat of federal prosecution, could set aside or decline to count that member's ballot," based on Defendants' assertion that the member's identifying information matches that of a current or former noncitizen. ECF 19-3, ¶14. LULAC members have expressed fear and anger about the federal government's conduct. See ECF 19-2, ¶¶17, 21. In *Mi Familia Vota v. Fontes*, 129 F.4th 691, 708-09 (9th Cir. 2025), the Ninth Circuit held that representational standing was present, where there was a danger that "properly registered voters, who in fact are citizens, may have their voter registrations cancelled upon mere and potentially arbitrary suspicion of a county recorder, losing their constitutional right to vote."

iv. **<u>To Both Parties</u>: Is the danger that NAACP and LULAC's members will be placed on Defendants' lists of potential non-citizens in any way akin to the dangers that Promise Arizona's members faced in *Mi Familia Vota*?**

**<u>Plaintiffs' Response</u>:**

Yes. Like Promise Arizona in *Mi Familia Vota*, both NAACP and LULAC include many naturalized citizens among their members. Dkt. 19-3 (Sterling Decl.) ¶9; Dkt. 19-2 (Proaño Decl.) ¶19. Defendants have acknowledged that their methodology for identifying purported non-citizens has erroneously swept in eligible naturalized citizens, *see United States v. Amore*, No. 25-639 (D.R.I. March 26, 2026), Dkt. 47 (Hr'g Tr. at 51-53); *Common Cause v. U.S. Dep't of Just.*, 2026 WL 3033772, at *8 (D.D.C. Oct. 9, 2026) (finding APA violation where "DOJ entirely failed to consider the risk that its use of citizenship records known to be unreliable would lead the Civil Rights Division to demand that states remove U.S. citizens from their voter rolls"), and the

evidence shows that in some cases, every single one of the individuals on one of Defendants' lists were, in fact, citizens. *See* Dkt. 19-7 Exs. 13, 19.[2] In a case like this one, "[w]here it is relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by a defendant's action, … we see no purpose to be served by requiring an organization to identify by name the member or members injured." *National Council of La Raza v. Cegavske*, 800 F.3d 1032, 1042 (9th Cir. 2015); *accord Mi Familia Vota*, 129 F.4th at 709 (holding that injured members need not be identified by name where it is clear that one or more members of plaintiff associations "may be adversely affected by [the challenged conduct] and the [defendant] does not need to know the identity of a particular member to respond to [the plaintiff's] claim of injury").

Further, even aside from this risk, the likelihood that the burden Defendants are placing on election workers who must manage the already immense task of administering an election will impact the voter experience at the polls—for example, by creating staffing problems at polling places, leading to longer lines—is another injury-in-fact faced by Plaintiffs' members. *See* Dkt. 29-2 (Connelly Decl.) ¶8; Dkt. 19-4 (Holmes Decl.) ¶¶6, 21, 31-39 (federal government's threats have "created a[n election worker] recruiting crisis" and diverted resources from elections administration).; Dkt. 29-1 (Moreles Decl.) ¶¶16-17; Dkt. 29-5 (Diaz Decl.) ¶¶10-14.

---

[2] *See also, e.g.*, *California Nurses Association v. Mullin,* No. 26-cv-10680, 2026 WL 3166149, at *8 (N.D. Cal. Oct. 21, 2026) (explaining that DHS derives their lists from "faulty data sources that sweep in U.S. citizens"); *United States v. California*, No. 26-7231, 2026 WL 3268272, at *6 (9th Cir. Oct. 30, 2026) (per curiam) ("The district court also found that the United States's process in creating the October List was not credible, and thus the United States's assertion that individuals on the October List are 'highly likely to be noncitizens' is also not credible."); *California Nurses Association v. Mullin*, No. 26-7139, 2026 WL 3268397, at *1-2 (9th Cir. Oct. 30, 2026) (9th Cir. Oct. 30, 2026) (describing the flawed process for list creation and noting that, "[a]s the district court found, '[e]ven under the best conditions, there is a high likelihood of error in review because there is no federal database containing citizenship status of U.S. residents,' and '[t]he time limitations implemented during the Surge further exacerbate the risk of error'"); Dkt. 19-6 (Oskooii Expert Report and Decl.); Dkt. 24 (Oskooii Supp. Expert Report and Decl.); Dkt. 19-8 Ex. 32.

United States District Court
Northern District of California

**QUESTION (I)(C):**

C. **Under *Arizona All. for Retired Americans v. Mayes*, 186 F.4th 622 (9th Cir. 2026), have NAACP and LULAC clearly shown that it is likely that Defendants' actions affect or interfere with their core activities, such that they have organizational standing?**

**<u>Plaintiffs' Response:</u>**

Yes. Plantiffs LULAC and NAACP include among their core activities voter education and voter engagement. Defendants' actions—including their own efforts to amplify their threats against election workers on social media and elsewhere—have forced LULAC and NAACP to divert attention and resources toward fielding calls and questions from members and voters concerned about whether their ballots will be counted, whether they or their families could be targeted, and what they should do to mitigate the risk that their ballot will be set aside. *See* Dkt. 19-2 (Proaño Decl.) ¶¶17, 18, 21, 24, 27; Dkt. 19-3 (Sterling Decl.) ¶¶10, 16-17, 19. Responding to these inquiries affects and interferes with Non-Profit Plaintiffs' core activities of voter education and engagement, and requires the organizations to dedicate resources to counteracting the effects of Defendants' actions. This is not the kind of voluntary spending on issue advocacy or litigation found insufficient in *Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), and the resulting impairment of the organizations' planned activities, is "far more than simply a setback to [their] abstract social interests" and is sufficient to confer standing. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

**QUESTION (I)(D):**

D. **<u>To Both Parties</u>: Does the Court's standing analysis with respect to Plaintiffs' claim under Section 11(b) apply equally to Plaintiffs' constitutional claims? If not, please discuss what additional showings are required to establish standing for Plaintiffs' Due Process claims.**

**Plaintiffs' Response:**

Yes. "A plaintiff must demonstrate standing for each claim he seeks to press [and] 'for each form of relief'" that is sought. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006) (citation omitted). As explained in Plaintiffs' briefing and *supra*, each Plaintiff has standing to assert a Section 11(b) claim because each is adversely affected by Defendants' violation of Section 11(b). Likewise, courts have recognized that affected parties have standing to challenge action that is ultra vires or that violates the separation of powers. *See*, *e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952); *id.* at 596 (Frankfurter, J., concurring) (recognizing the availability of an injunction to restrain executive actions taken without constitutional or statutory authority and executive violations of the separation of powers); *New York v. United States*, 505 U.S. 144, 181 (1992) (quotations omitted) (the "Constitution does not protect the sovereignty of States for the benefit of the States … as abstract political entities" but rather "for the protection of individuals); *accord Murphy v. Nat'l Collegiate Athletic Ass'n, 584 U.S. 453,* 473 (2018).

Additionally, Plaintiffs have "standing to press . . . due process claims" where the harm from those violations has been "caused by [defendant officials]" and "the harm may be redressed by a favorable court decision." *B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 967 (9th Cir. 2019).

Because the relief sought under Section 11(b) and the relief sought under the constitutional claims is the same, namely, enjoining Defendants from coercing or attempting to coerce election officials into segregating ballots cast by individuals they allege are "likely non-citizens," and because prevailing on either claim would redress the injury to Plaintiffs, the standing analysis is the same under both claims. Because the injury caused by the violations of Section 11(b) and the constitutional claims is the same, and because the relief sought under both claims is the same, and relief sought under namely, and because prevailing on any of the claims would redress the injury to Plaintiffs, the standing analysis is the same under all the claims.

**II. SECTION 11(B)**

**QUESTION II (A):**

A. In *California Nurses Association v. Mullin,* No. 26-cv-10680, 2026 WL 3166149, at *7 (N.D. Cal. Oct. 21, 2026) this Court held that Section 11(b) of the Voting Rights Act creates an implied right of action for injunctive relief. Other decisions from district courts in this Circuit are consistent with *California Nurses Association*. *See Kennedy v. Meta Platforms, Inc*. No. 3:24-cv-02869, 2024 WL 4031486, at *6 (N.D. Cal. Sept. 3, 2024) ("It is well established that § 11(b) reaches beyond government actors, affording a private right of action . . . . (citation and internal quotation marks omitted)); *Krabach v. King Cnty.*, No. 2:22-cv-1252, 2023 WL 7018431, at *3 (W.D. Wash. Oct. 25, 2023) (holding that an implied right of action exists under Section 11(b) of the Voting Rights Act); *Arizona Democratic Party v. Arizona Republican Party*, No. 16-cv-03752, 2016 WL 8669978, at *4 (D. Ariz. Nov. 4, 2016) (recognizing that Section 11(b) of the Voting Rights Act "does not exclude a private right of action for injunctive relief, as Plaintiff has brought here").

v. **Is there any binding Supreme Court or Ninth Circuit authority that would require this Court to reach a different conclusion than the persuasive authorities cited above?**

**<u>Plaintiffs' Response:</u>**

No, Plaintiffs are aware of no binding Supreme Court or Ninth Circuit authority that would require this Court to reach a different conclusion than the persuasive authorities it cites.

The Ninth Circuit, while not directly addressing the issue, recently denied the federal government's request for a stay pending appeal of the Northern District of California's preliminary injunction decision in *California Nurses Association v. Mullin*. *See California Nurses Ass'n v. Mullin*, No. 26-7139, 2026 WL 3268397, at *1 (9th Cir. Oct. 30, 2026). This Court, in concluding that plaintiffs were likely to succeed on the claim that the federal government "r[a]n afoul of the Voting Rights Act's prohibition of intimidating voter assistance and mobilization," concluded that there was a private right of action under Section 11(b). *California Nurses Ass'n v. Mullin*, No. 26-

CV-10680-AMO, 2026 WL 3166149, at *7 (N.D. Cal. Oct. 21, 2026). Rehearing en banc was denied. *See* Order, *California Nurses Ass'n v. Mullin*, No. 26-7139 (Oct. 30, 2026), ECF No. 58.1.

## III. CONSTITUTIONAL CLAIMS

**QUESTION III (B):**

**B. Is *Bennett v. Yoshina*, 140 F.3d 1218, 1226-1227 (9th Cir. 1998) the most recent authority from this Circuit to support Plaintiffs' Fifth Amendment Due Process claim?**

**<u>Plaintiffs' Response:</u>**

Yes. Plaintiffs are not aware of any more recent Ninth Circuit appellate case regarding an allegation that voters relied on an established procedure that was subsequently changed to invalidate their ballots in the context of a Fifth Amendment Due Process Claim.

That said, *Election Integrity Project California, Inc. v. Weber*, 113 F.4th 1072, 1096 (9th Cir. 2024), recognized that "[e]lection irregularities that are so 'pervasive [that they] undermine[ ] the organic processes of the ballot' violate the fundamental fairness principles inherent in the Due Process Clause of the Fourteenth Amendment." Further, the District of Montana applied the Bennett test in *Davis v. Stapleton*, 480 F. Supp. 3d 1099, 1107–08 (D. Mont. 2020), but it found that there was no unforeseeable departure from past election practices.

## IV. APA CLAIMS

**QUESTION IV (A):**

A. The Supreme Court has "long taken" a "pragmatic approach" to the question what constitutes final agency action. *San Francisco Herring Ass'n v. Dep't of Interior*, 946 F.3d 564, 577-78 (9th Cir. 2019) (quoting *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 599, (2016)). Procedurally, this case is similar to *San Francisco Herring Ass'n*. There, the Ninth Circuit found that allegations that, based on the defendant's conduct, a member of the San Francisco Herring Association "understood that if he disobeyed the [government's] orders, he would be subject to federal prosecution" were "enough to sustain [the] action" under the final agency action

requirement of an APA claim. *Id.* at 577. The Ninth Circuit distinguished ordering certain conduct "on pain of fines and imprisonment—backed by formal agency notices clearing up reported [jurisdictional disputes" from "mere restatements of the law," "guides containing answers to frequently asked questions," or agency letters that are "purely informational in nature." *Id.*

i. **Describe the features of Defendants' letters which make Defendants' conduct more similar to or distinguishable from that conduct found to constitute final agency action in *San Francisco Herring Ass'n v. Dep't of Interior*, 946 F.3d 564 (9th Cir. 2019).**

**<u>Plaintiffs' Response:</u>**

Defendants' policy of targeting state and local election workers with intimidation, coercion, and threats of criminal prosecution, as well as the issuance of specific threat letters and criminal subpoenas to election workers pursuant to that policy, constitute final agency action subject to APA review. Both the policy and implementing actions (including the letters) satisfy the requisite test under *Bennett v. Spear*, 520 U.S. 154, 178 (1997), as applied in *S.F. Herring Ass'n v. DOI*, 946 F.3d 564, 577-78 (9th Cir. 2019).

As in *San Francisco Herring Association*, 946 F.3d at 564, the letters at issue are not mere "restatements" of the law: they are specific threats, aimed at any election worker who processes a ballot associated with anyone on a specific list of voters, claiming that those workers are on "actual notice" of illegality and therefore subject to aiding and abetting liability.

In *San Francisco Herring Association*, the Ninth Circuit held that a series of threats by National Park Service employees and state park workers acting at their direction to enforce commercial fishing laws and impose penalties constituted final agency action. The court explained that when an agency asserts its authority, refuses to change its position, and threatens enforcement, "potentially subjecting [threatened individuals] to serious penalties," it would "raise[] questions of basic fairness" to require them to risk those penalties by denying that these threats are reviewable final agency action. *Id.* at 575 ("The APA's judicial review provisions prevent precisely this 'heads

I win, tails you lose' approach."). Despite the absence of a formal rule, the government was not "still in the middle of trying to figure out its position"— when it "went out … to implement the commercial fishing prohibition," its "position was a fait accompli." *Id.* at 578-79; *see also id.* at 582 ("The APA's final agency action requirement prevents this 'strong-arming of regulated parties into 'voluntary compliance' without the opportunity for judicial review—even judicial review of the question whether the regulated party is within the [agency's] jurisdiction.'") (quoting *Sackett v. EPA*, 566 U.S. 120, 131 (2012)); *AAUP v. Rubio*, 802 F.Supp.3d 120, 191 (D. Mass. 2025) (holding "discrete and novel" enforcement initiative to be final agency action).

That is exactly what DOJ has done here. The letters to state and local officials (and corresponding statements by high-ranking DOJ and DHS officials) do not express that DOJ is in the middle of sorting out its position: they are strong statements that according to this DOJ, election workers can be subject to criminal liability for processing ballots associated with their lists. Moreover, DOJ is conclusively asserting that, it its view, notice of its faulty lists can supply the requisite mes rea under federal law—there is nothing tentative or preliminary about these statements. *See, e.g.*, Dkt. 19-8, Ex. 21 & Dkt. 19-7, Ex. 20; Dkt. 19-8, Ex. 23; Dkt. 29-1, Ex. A; Dkt. 19-4, Ex. C; Dkt. 19-4, Ex. E. These letters were delivered by uniformed officers, ordered implementation on an incredibly tight timeframe, and threatened serious legal consequences. *See* Dkt. 29-2 (Connelly Decl.), App. 834; Dkt. 29-5 (Diaz Decl.), App. 843; Dkt. 29-1 (Moreles Decl.).

"In the face of that lockstep action, a court is 'not required to exhibit a naiveté from which ordinary citizens are free,' and may infer that [Defendants] likely adopted a categorical policy." *Thakur v. Trump*, 787 F.Supp.3d 955, 986 (N.D. Cal. 2025), *rev'd in part on other grounds*, 178 F.4th 1187 (9th Cir. 2026) (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019)). Defendants are implementing an "unprecedented" and "discrete enforcement initiative," and any "insistence" by Defendants that it is "a mere matter of shifting … priorities, not a final agency action, [would be] unavailing." *AAUP*, 802 F.Supp.3d at 191. The actions set forth in the factual record (described in detail at ECF 17-1 at 7-14) reflect escalating threats that have "crystaliz[ed] the agency position into final agency action within APA §704's meaning." Id. at 579.

**QUESTION (IV)(B):**

B. **Explain how Defendants' conduct accords with Justice Manual § 9-85.300's instruction to "generally avoid interfering or appearing to interfere with election administration, tabulation, validation, or certification," and identify what evidence of an election official's knowledge or intent, beyond receipt of Defendants' voter list, supports the threatened aiding-and-abetting liability. *See* ECF 19-4, ¶¶11–12 & Ex.C; ECF 19-8, Exs. 31–32, 37, 42**

**Plaintiffs' Response:**

Defendants' conduct does not accord with Justice Manual § 9-85.300's instruction to "generally avoid interfering or appearing to interfere with election administration, tabulation, validation, or certification." Section 9-85.300 directs prosecutors to "generally avoid interfering or appearing to interfere with election administration, tabulation, validation, or certification." It also bars "overt criminal investigative measures" until results are certified, unless the Public Integrity Section approves. *See also Georgia v. Clark*, 119 F.4th 1304, 1316 (11th Cir. 2024) (citing the Manual and explaining that the Criminal Division "enjoys no authority to interfere with state election procedures on its own initiative"). Here, Defendants are interfering or attempting to interfere with election administration, tabulation, validation, and certification during an ongoing election by threatening criminal investigation and prosecution of election officials for simply performing their responsibilities to process and count ballots cast by lawfully registered voters in accordance with existing federal and state law. Medina Decl. ¶¶18, 40-41; Sforza Decl. ¶¶13-14; Holmes Decl. ¶¶6, 10-12, 21.

Election officials are public employees who are bound by state law to carry out their nonpartisan election administration, tabulation, validation, and certification responsibilities. *See* Hulser Decl. ¶22 (quoting Justice Manual § 9-85.300) (recognizing "the States—not the federal government—are responsible for administering elections, determining the validity of votes, and tabulating the results"). But the federal government has, for example, sent some election officials

letters, telling them to segregate and not count ballots of individuals the federal government alleges are likely noncitizens within 48 hours or face "legal consequences," which would require election workers to disregard and violate their own state and fedearl elections law responsibilities. Dkt. 29-1, Ex. A. DHS employees personally delivered these letters to at least three California counties. *See* Dkt. 29-2 (Connelly Decl.), App. 834; Dkt. 29-5 (Diaz Decl.), App. 843; Dkt. 29-1 (Moreles Decl.), App. 820. Election officials have thus expressed grave concern that the federal government may target them with criminal prosecution for following state law regarding how voters who are on the federal government's lists are treated. Medina Decl. ¶¶23-24, 29, 34, 38-39; Sforza Del. ¶13, 14; Evers Decl. Ex. 33.

This is particularly egregious in light of the fact that Defendants have not identified any evidence that an election official's knowledge or intent of non-citizen voting, beyond receipt of the fundamentally flawed federal government's voter list as discussed in Plaintiffs' previous filings and *supra*. The lists could not possibly meet the mens rea requirement under 18 U.S.C. § 2. Aiding and abetting requires that the defendant act "with the intent of facilitating the offense's commission," and with "advance knowledge" of the crime. *Rosemond v. United States*, 572 U.S. 65, 71, 76–78 (2014). The defendant must "participate in it as in something that he wishes to bring about" and "seek[] by his action to make it succeed." *United States v. Batimana*, 623 F.2d 1366, 1369–70 (9th Cir. 1980) (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938) (L. Hand, J.)). It is "not enough" that the defendant "unknowingly or unintentionally did things that were helpful" to the principal. *Altamirano v. Gonzales*, 427 F.3d 586, 594 & n.8 (9th Cir. 2005) (quoting Ninth Cir. Model Crim. Jury Instr. 5.1); *see* Ninth Cir. Model Crim. Jury Instr. 4.1. Election workers do not violate the criminal law by following their mandatory state rules regarding processing of and challenges to ballots.

## V. RELIEF

**QUESTION (V)(A):**

A. Federal courts may grant relief only to the extent "necessary to provide complete relief to each plaintiff with standing to sue." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025). However, an injunction that protects non-parties may be appropriate if necessary to afford complete relief to the parties in the case. In *CASA*, the Court gave the example of a nuisance case seeking to prevent someone from playing their music too loud. *Id.* at 851–52. Moreover, CASA declined to disrupt the general understanding that the APA authorizes federal courts to universally vacate federal agency action. *See id.* at 847 n.10.

i. **<u>To Both Parties</u>: Please discuss whether either of these two exceptions to CASA's general rule prohibiting relief to non-parties applies in this case.**

**<u>Plaintiffs' Response:</u>**

Plaintiffs's November 1, 2026, Opposition addresses these issues at pages 16-17 (Section 6).

First, the law has long permitted a court to issue injunctive relief to maintain the status quo that has the incidental impact of protecting others. *See Trump v. CASA, Inc.,* 606 U.S. 831, 851 (2025) (cleaned up) ("The equitable tradition has long embraced the rule that courts generally may administer complete relief between the parties, even when such relief may sometimes advantage nonparties.") (quotations omitted). Here, the TRO enjoining Defendants' threats to any election workers is necessary to protect Plaintiffs and their members from harm.

Defendants' conduct targeting election workers is not aimed only at particular individuals, but rather is aimed broadly at election offices and any "person[]" who "tabulate[s]" the targeted ballots. *See* Dkt 29-1 (Moreles Ex. A); Dkt 19-1 (Sforza Decl.) ¶¶13–14. Like the music referenced in *CASA*, threats amplified broadly in social media and traditional media (*see supra* response to Question I.A.iii) cannot be turned down for Plaintiffs and their members alone. 606 U.S. at 851–52. Moreover, a piecemeal order preventing only the coercion, intimidation, and threats of criminal prosecution against election officials and workers represented by Union Plaintiffs would be entirely

unworkable. As a practical matter, permitting federal government officials to inquire into whether individual election workers are union members for the purpose of determining whether to threaten them or not would itself be intimidating and coercive, and would do nothing to address the impact of these actions on *all* election workers. Ordering the cessation of threats to election officials and workers in particular offices would not protect the Union Plaintiffs' members if threats against election officials and workers in other jurisdictions for the same conduct (processing registered voters' ballots) are being publicized and amplified. And there is no feasible way to craft an order that protects *only* the voters represented by Plaintiff Non-Profit organizations and not other similarly-situated voters as well, as the election workers across the country targeted by these threats are processing these ballots whether they are represented by unions or not. Continued threats to any election workers are so intertwined with the impact on Plaintiffs and their members as to affect the employees that the Union Plaintiffs represent and the voters represented by the Non-Profit Plaintiffs across the country.

"[A]n injunction is not necessarily made overbroad by extending benefit or protection to persons other than the prevailing parties in the lawsuit ... if such breadth is necessary to give prevailing parties the relief to which they are entitled." *See Nat'l TPS Alliance v. Noem*, 150 F.4th 1000, 1028-29 (9th Cir. 2025), *stayed on other grounds*, 145 S. Ct. 2728 (Mem.) (quoting *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018)). Because Plaintiffs represent election workers and voters nationwide, the scope of the TRO is commersurate with their membership, and any collateral protection for nonparties is incidental to providing relief to Plaintiffs. *Accord LULAC v. Exec. Off. of the President*, 818 F. Supp. 3d 34, 92 (D.D.C. 2026) (enjoining federal government from enforcing mail ballot rule is a party-specific remedy consistent with *CASA* where the Democratic Party plaintiffs operate throughout the nation); *DSCC v. Trump*, 2026 WL 2681471, at *11 (D.D.C. Sept. 13, 2026) (enjoining federal government from enforcing mail ballot rule is a party-specific remedy consistent with *CASA* where the plaintiff organizations have voter members nationwide).

Second, the Court's authority to issue the TRO can alternatively be found in that expansive grant of authority to courts by Congress in Section 705 of the APA as well. Congress has expressly

authorized interim judicial relief that stays unlawful action, 5 U.S.C. §705, for the purpose of preserving a plaintiff's right to full APA remedy of vacating unlawful actions in their entirety, 5 U.S.C. §706. *CASA* left undisturbed the "ordinary result" under the APA—namely, "that the rules are vacated—not that their application to the individual petitioners is proscribed." *Regents of the Univ. of Cal. v. Dep't of Homeland Sec.*, 908 F.3d 476, 511 (9th Cir. 2018), *vacated in part on other grounds*, 591 U.S. 1 (2020) (cleaned up); *see CASA*, 606 U.S. at 847 n.10; *id.* at 869 (Kavanaugh, J., concurring). As the Ninth Circuit has held, the "scope of interim relief" under section 705 of the APA is "consistent with the scope of final relief under" section 706, which authorizes courts to "'set aside agency action[s]' on a nationwide basis when the challenged action is held unlawful." *Novedades y Servicios, Inc. v. Fin. Crimes Enf't Network*, 181 F.4th 961, 981–82 (9th Cir. 2026). Where, as here, Plaintiffs have challenged the policy and implementing actions as violative of the APA, interim relief staying and enjoining actions in furtherance of that policy is authorized section 705 relief to maintain the status quo and preserve the ability to issue vacatur later.

ii. **<u>To Both Parties</u>: Discuss the implication of the Court narrowing the scope of the TRO to the Northern District of California, to the state of California, or to the states of Washington and California.**

**<u>Plaintiffs' Response:</u>**

Narrowing the scope of the TRO to Northern District of California, the state of California, or the states of Washingtion and California would not provide complete relief to Plaintiffs and their election worker and voter members, and leave workers and voters subject to irreparable harm across the country.

While Defendants have targeted specific threats to election workers in California and Washington in recent days, the campaign and policy at issue is nationwide. Defendants' high-ranking officials have not limited their threats to these states.

Defendants spent months attempting to obtain voter rolls from almost every state in the

country and threatening officials in those states that refused to comply. Compl. ¶¶51-54. DHS's surge of agents in the field based on unreliable data—which has been enjoined in *California Nurses Association*—covered at least nine states. *Id.* ¶60. DHS has falsely claimed that tens or even hundreds of thousands of non-citizens are on the voter rolls in four states. *Id.* ¶¶67-72. Defendants have repeatedly threatened election officials nationwide with prosecution. *Id.* ¶¶63-66, 73-74. Significantly*, on October 30, DOJ sent letters to every state in the country* threatening prosecution. Dkt. 19-4 ¶30; Dkt. 19-8 Ex. 42.

As a result of this policy and these actions, election workers across the country now fear prosecution simply for doing their jobs. Dkt. 23, 19-1, 19-7, 19-8, 29-2, 29-3, 29-4 (Medina Decl. ¶¶23–24, 29, 34, 38–39; Sforza Decl. ¶¶13–14; Evers Decl. Exs. 16, 33; Connelly Decl. ¶¶5–7; Darling Allen Decl. ¶¶3–4; Becker Decl. ¶¶9–10); Gabe Cohen & Marshall Cohen, *How officials are preparing for Election Day Disruptions – including from Trump*, CNN, Nov. 2, 2026, https://edition.cnn.com/2026/11/02/politics/election-day-interference-disruption-trump (Matt Crane, Republican head of the Colorado Clerks Association explaining that local officials have subpoenas "in the back of their minds" and that there is "more pressure now because you know one little mistake can be amplified into a national disinformation campaign"). These reactions confirm what any reasonable election worker would conclude: that these are serious threats to prosecute based on election workers if they do not yield to Defendants' demands. *See Nat'l Coal. on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500, 509 (S.D.N.Y. 2021) (conduct violates Section 11(b) if "a reasonable recipient, familiar with the context of the message, would interpret [it] as a threat of injury"— including the "nonviolent" injury of legal repercussions—"intended to deter individuals from" aiding others in voting); *United States v. McLeod*, 385 F.2d 734, 740 (5th Cir. 1967) (reasonableness is judged "against the background of contemporaneous events" and "the general climate prevailing").

Plaintiffs have members across the country who are targets of Defendants' threats. *See* Medina Decl., Dkt. 23 ¶¶5, 11; Sforza Decl., Dkt. 19-1 ¶¶7, 11, 13-15; Proaño Decl., Dkt. 19-2 ¶¶3-4, 17; Sterling Decl., Dkt. 19-3 ¶¶3-5, 10. In particular, the Plaintiff Unions' election worker members are not limited to the Northern District of California or the states of Washington and

California. SEIU represents thousands of election workers across the country, in California, Colorado, Illinois, Massachusetts, Maine, Nevada, New York, Pennsylvania, and Virginia. Medina Decl., Dkt. 23 ¶11-13. AFSCME represents election workers in states across the country, including but not limited to Washington State (including state employees in the Washington Secretary of State's elections division, led by Stuart Holmes who filed a declaration outlining the grave threats to election workers throughout that state, as well as county employees in 20 counties), California, Texas, Michigan, Arizona, Pennsylvania, and New York. Sforza Decl., Dkt. 19-1 ¶¶6-7, 15. If the TRO is limited in scope, the election workers represented by Plaintiff Unions in those states will be left exposed to the same ongoing threats and intimidation as election workers in California and Washington. Consider just one example, Pennsylvania, where both Plaintiff Unions have election worker members, and where DHS sent letters in July claiming that a preliminary review of its records included likely non-citizens, and where HSI agents had been surged until the injunction in *California Nurses Association*. Dkt. 1 ¶¶ 60, 67.

The balance of factors at this emergency stage of this litigation, weighing the likelihood of success in challenging these unlawful nationwide policy and campaign against election workers, the irreparable harm they face, and the balance of the equities all weighs in favor of not limiting relief to California and Washington, but protecting election workers and voters more broadly.

**QUESTION (V)(B):**

B. **<u>To Plaintiffs</u>: Please identify the particularized need for the language asking the Department of Justice to inform this Court of any "pending search warrant applications, grand jury subpoenas, or other demands to access election materials," and of efforts to "compel testimony related thereto."**

**<u>Plaintiffs' Response:</u>**

In recent days, high-ranking DOJ officials carried through on their repeated threats to prosecute election officials for doing their job of running this ongoing election by directing prosecutors in California to seek criminal subpoenas. ECF 1 ¶¶14, 100 ("An initial batch of

subpoenas went out to California officials Thursday [October 29]"). Plaintiffs proposed this particular relief to provide a mechanism, in this emergency context, for this Court could monitor compliance with its order prohibiting the Defendants from threatening, intimidating, or coercing state and local elections officials utilizing baseless criminal process—but without enjoining or interfering with any legitimate governmental prosecutorial prerogative.

Reporting provisions are a routine compliance tool used by courts to facilitate oversight and enforcement of their own orders. *See, e.g.*, *L.A. Int'l Corp. v. Prestige Brands Hldgs., Inc.*, No. 18-6809-MWF, 2024 WL 2272384, at *15 ("C.D. Cal. May 20, 2024) ("[C]ourts regularly impose [reporting] provisions to ensure compliance with other provisions of the injunctions."). Courts also have broad authority to frame injunctions to prevent evasion and related violations. *See See N.L.R.B. v. Express Pub. Co.*, 312 U.S. 426, 435 (1941) ("A federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future unless enjoined, may fairly be anticipated from the defendant's conduct in the past.").

Any confidentiality concerns expressed by Defendants can be resolved by limiting all disclosures pursuant to Paragraph 6 to solely *in camera* review by the Court. Reporting provisions are a routine compliance tool used by courts to enforce compliance with their own orders. *See, e.g.*, *L.A. Int'l Corp. v. Prestige Brands Hldgs., Inc.*, No. 18-6809-MWF, 2024 WL 2272384, at *15 ("C.D. Cal. May 20, 2024) ("[C]ourts regularly impose [reporting] provisions to ensure compliance with other provisions of the injunctions

**QUESTION (V)(C):**

C. **<u>To Both Parties</u>: Describe, procedurally, how the Court's issuance of an indicative ruling differs from this Court modifying its October 30, 2026, Temporary Restraining Order.**

**<u>Plaintiffs' Response:</u>**

Defendants have chosen to proceed simultaneously in this Court and the Court of Appeals,

and ask that if this Court denies their motion for a stay pending appeal, the Court treat their motion as a motion to dissolve the TRO under Rule 65(d)(4) but issue "only an indicative ruling so that jurisdiction before the Court of Appeals is not disturbed." ECF 33 at 18. The Court need not abide Defendants' gamesmanship. Here is why:

Appellate courts generally have jurisdiction of appeals from "[i]nterlocutory orders of the district courts of the United States . . . granting, continuing, modifying, refusing or dissolving injunctions." 28 U.S.C. §1292(a)(1). They generally lack jurisdiction, however, to hear an appeal of a district court's decision to grant or deny a TRO. *See Office of Pers. Mgmt. v. Am. Fed'n of Gov't Employees, AFL-CIO*, 473 U.S. 1301, 1303-04 (1985). "The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982). But Defendants' notice of appeal did not divest this court of jurisdiction, as it was premature.[3] "Filing an appeal from an unappealable decision does not divest the district court of jurisdiction." *United States v. Hickey*, 580 F.3d 922, 928 (9th Cir. 2009) (citing *Estate of Conners by Meredith v. O'Connor*, 6 F.3d 656, 658 (9th Cir.1993)); *see also Griggs*, 459 U.S. at 58 (citing *Ruby v. Secretary of United States Navy*, 365 F.2d 385, 389 (9th Cir. 1966) (en banc)).

Even if Defendants' appeal were not premature, this Court has jurisdiction under Rule 62(d) to modify the TRO so long as such modification does not "materially alter the status of the case on appeal," meaning that it would "le[ave] unchanged the core questions before the appellate panel." *NRDC v. Southwest Marine, Inc.*, 242 F.3d 1163, 1166-67 (9th Cir. 2001) (cleaned up); *see also Meinhold v. U.S. Dep't of Defense*, 34 F.3d 1469, 1480 n.14 (9th Cir. 1994). Any such modifications would take effect immediately and constitute the order considered on appeal. *NRDC*, 242 F.3d at 1165-66 (original appeal affirmed modified injunction).

An indicative ruling under Rule 62.1, by contrast, has no operative effect and would simply signal to the Court of Appeals how this Court would rule upon remand. Fed. R. Civ. P. 62.1; Fed.

[3] With more time, Plaintiffs' position on this point has developed from the reasoning supplied in Section 7 of Plaintiffs' November 1, 2026, Opposition. *See* Dkt. 36 at 23.

R. App. P. 12.1. An indicative ruling is appropriate where this Court "lacks authority to grant" the requested relief because of an appeal. Fed. R. Civ. P. 62.1(a). That is not the case with respect to either an order modifying the TRO or an order denying a motion to dissolve it. *Cf. id.* Committee Notes on Rule (district court retains jurisdiction to deny Rule (60)(b) motion without a remand).

DATED: November 2, 2026

Respectfully submitted,

Stacey Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
Connie K. Chan (SBN 284230)
Colin Clemente Jones (SBN 354301)
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com
cchan@altber.com
cjones@altber.com

By: */s/ Danielle Leonard*

*Attorneys for Plaintiffs*

Norman L. Eisen*
Tianna Mays*
Pooja Chaudhuri (SBN 314847)
Jacob Kovacs-Goodman*
Elizabeth Westfall*
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Ave. SE #15180
Washington, DC 20003 (202) 601-8678
(202) 601-8678
norman@democracydefenders.org
tianna@democracydefenders.org
pooja@democracydefenders.org
jacob@democracydefenders.org
elizabeth-contract@democracydefenders.org

By: */s/ Norman L. Eisen*

*Attorneys for Plaintiffs*

Jared Fletcher Davidson*
NY Bar No. 5202429
PROTECT DEMOCRACY PROJECT
82 Nassau Street, #601
New York, NY 10038
(202) 579-4582
jared.davidson@protectdemocracy.org

Naomi Gilens (Cal. Bar. 315813)
Anna Dorman*
Ori Lev *
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, Suite #163
Washington, DC 20006
(202) 579-4582
naomi.gilens@protectdemocracy.org
Anna.dorman@protectdemocracy.org
ori.lev@protectdemocracy.org

Benjamin L. Berwick*
15 Main Street, Suite 312
Watertown, MA 02472
Tel.: (202) 579-4582
ben.berwick@protectdemocracy.org

By: */s/ Jared Fletcher Davidson*

*Attorneys for Plaintiffs*

Steven K. Ury (SBN 199499)
SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO
1800 Massachusetts Ave., N.W.
Washington, D.C. 20036
Tel: (202) 730-7428
steven.ury@seiu.org

By: */s/ Steven K. Ury*

*Attorney for Plaintiff Service Employees International Union AFL-CIO (SEIU)*

Teague Paterson (SBN 226659)
Matthew Blumin*
Georgina Yeomans*

AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, AFL-CIO
1625 L Street, N.W.
Washington, D.C. 20036
Tel: (202) 775-5900
TPaterson@afscme.org
MBlumin@afscme.org
GYeomans@afscme.org

By: */s/ Teague Paterson*

*Attorneys for Plaintiff American Federation of State County and Municipal Employees, AFL-CIO (AFSCME)*

Stuart Naifeh (SBN 233295)
John S. Cusick*
Brittany Carter*
NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006

I. Sara Rohani (SBN 337842)
Hayley Hahn*
Victor Olofin*
NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
700 14th Street N.W., Ste. 600
Washington, DC 20005
snaifeh@naacpldf.org

By: */s/ Stuart Naifeh*

*Attorneys for Plaintiff NAACP*