CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney
KENNETH BRAKEBILL (CABN 196696)
Chief, Civil Division
KENNETH J. KAO (CABN 194912)
Assistant United States Attorney
KELSEY J. HELLAND (CABN 298888)
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7320
Fax: (415) 436-6748
kenneth.kao@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE, et al.,<br><br>Defendants. | Case No. 3:26-cv-12800-TLT<br><br>**RESPONSES TO QUESTIONS FOR THE HEARING (ECF NO. 37)**<br><br>The Honorable Trina L. Thompson<br>United States District Judge |

Defendants respectfully submit the following answers to the Court's questions directed to them in advance of the hearing on Defendants' motion to stay the injunctive order pending appeal (ECF No. 37).

**I. STANDING**

A. In *California Nurses Association v. Mullin*, No. 26-7139, 2026 WL 3268397, at *4 (9th Cir. Oct. 30, 2026) (citation omitted), the Ninth Circuit held that certain union plaintiffs had associational standing, as they had "clearly shown that the Federal Defendants' conduct chills citizens' election-related activities and presents 'a real and immediate threat of future injury' to their legally protected interest in participating in the election." In this action, Plaintiffs aver that election workers, including members of SEIU and AFSCME, express ongoing fear and concern about Defendants' conduct. *See, e.g.*, ECF 19-1 ¶¶ 13–14; ECF 23 ¶¶ 23, 29, 34, 38–41; ECF 29-2 ¶¶ 4, 6–7; ECF 29-4, ¶¶ 9–10.

i. **To Defendants:** On what basis do Defendants distinguish the Ninth Circuit's associational-standing determination in *California Nurses Association* from the circumstances presented here?

**Defendants state:** In *California Nurses Association*, the members of the CNA/NNU had a stronger claim that their fears of being personally affected by law enforcement activities were justified than do any of the plaintiffs' members here. In that case, CNA/NNU submitted declarations from members whom the Ninth Circuit described as "precisely the types of people the Initiative has already targeted, and the scope of the Initiative and Plaintiffs' membership make it such that there is a sufficiently high likelihood of future injury." 2026 WL 3268397, at *4. Here, by contrast, neither the Union members nor the nonprofit members *nor any other individuals meaningfully like them* have been threatened with enforcement. Rather, Defendants' letters have been sent to the Secretary of State and county registrars—an entirely different class of individuals. Without demonstrating that even anyone else in their shoes has been the subject of the enforcement actions they challenge, Plaintiffs lack standing under *California Nurses* here.

ii. **To Both Parties**: To the extent that associational standing exists under *California Nurses Association* in this action, does it apply to each Plaintiff independently?

**Defendants state:** The Court must evaluate standing for each plaintiff individually. *See, e.g.*,

*Murthy v. Missouri*, 603 U.S. 43, 58, 61 (2024). Defendants submit that all plaintiffs lack standing, but if the Court were to find that any individual plaintiff has demonstrated associational standing, that would not excuse the need to evaluate standing for the other plaintiffs as well. Indeed, in *California Nurses*, the district court found that three of the organizational plaintiffs lacked standing for their requested injunction. *See* 2026 WL 3268397, at *3.

iii. **To Both Parties**: Even if individual election workers did not personally receive a letter from Defendants, doesn't the threat of criminal prosecution chill SEIU and AFSCME members' election-related activities, such that SEIU And AFSCME have associational standing?

**Defendants state:** No. In order for a potential future injury to support standing, the threat to the plaintiff personally must be "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). This is an objective standard, not a subjective one. In this case, SEIU and AFSCME members must show that they face a "certainly impending" risk of prosecution for their election-related activities. They cannot do so.

Plaintiffs also describe concerns among naturalized U.S. citizen members of NAACP and LULAC that "their names may wrongfully appear on the lists of noncitizens" or that "databases often fail to reflect that a person has been naturalized." *See* ECF 19-2 ¶ 13; ECF 19-3 ¶ 9. "[E]very NAACP member" faces the risk that election workers, "under the threat of federal prosecution, could set aside or decline to count that member's ballot," based on Defendants' assertion that the member's identifying information matches that of a current or former noncitizen. ECF 19-3, ¶ 14. LULAC members have expressed fear and anger about the federal government's conduct. See ECF 19-2, ¶¶ 17, 21. In *Mi Familia Vota v. Fontes*, 129 F.4th 691, 708-09 (9th Cir. 2025), the Ninth Circuit held that representational standing was present, where there was a danger that "properly registered voters, who in fact are citizens, may have their voter registrations cancelled upon mere and potentially arbitrary suspicion of a county recorder, losing their constitutional right to vote."

**To Both Parties**: Is the danger that NAACP and LULAC's members will be placed on

Defendants' lists of potential non-citizens in any way akin to the dangers that Promise Arizona's members faced in *Mi Familia Vota*?

**Defendants state**: First, Defendants respectfully note that the Supreme Court has granted certiorari in *Mi Familia Vota*. *See Republican Nat'l Comm. v. Mi Familia Vota*, 146 S. Ct. 2799 (2026). Second, the chain of causation in *Mi Familia Vota* whereby a properly registered voter would lose the ability to vote was significantly more direct than what the nonprofits allege here. In that case, a state law required that voters' registrations would be cancelled if they were not "confirmed to be citizens" after various databases were checked. *See* 129 F.4th at 716. Here, by contrast, there is no law requiring removal from the voter rolls unless citizenship can be affirmatively proven, and the relevant state and local actors have indicated their intention to refuse the federal government's requests. *See, e.g.*, ECF No. 33 at 7.

C. Under *Arizona All. for Retired Americans v. Mayes*, 186 F.4th 622 (9th Cir. 2026), have NAACP and LULAC clearly shown that it is likely that Defendants' actions affect or interfere with their core activities, such that they have organizational standing?

D. **To Both Parties**: Does the Court's standing analysis with respect to Plaintiffs' claim under Section 11(b) apply equally to Plaintiffs' constitutional claims? If not, please discuss what additional showings are required to establish standing for Plaintiffs' Due Process claims.

**Defendants state:** It is black letter law that "'plaintiffs must demonstrate standing for each claim that they press' against each defendant, 'and for each form of relief that they seek.'" Murthy, 603 U.S. at 61 (citation omitted). Plaintiffs must therefore establish the elements of standing—an injury that is fairly traceable to the defendants' specific violation, and which can be redressed by the Court under their legal theory—for each claim. For the reasons set forth in Defendants' prior briefing, Plaintiffs have not stated a cognizable injury under the Tenth amendment. See ECF No. 33 at 12-13. Nor do Plaintiffs' Fifth Amendment claims map onto the challenged conduct here. Anderson-Burdick applies to election rules imposed by the government conducting the election. Burdick v. Takushi, 504 U.S. 428, 433–34 (1992). Defendants have imposed no rule, and no ballot has been set aside. The fundamental-fairness theory requires "patent and fundamental unfairness," not anticipated irregularities. Bennett v. Yoshina, 140 F.3d

1218, 1226–27 (9th Cir. 1998). California continues to apply its established procedures. And "[c]ourts of equity do not enjoin criminal investigations and prosecutions where the person affected may raise his defenses in the criminal proceeding." ECF No. 33 at 14 (citing cases). The elements of standing (a redressable injury that is fairly traceable to the alleged violation) are lacking here.

**II. SECTION 11(B)**

A. In *California Nurses Association v. Mullin,* No. 26-cv-10680, 2026 WL 3166149, at *7 (N.D. Cal. Oct. 21, 2026) this Court held that Section 11(b) of the Voting Rights Act creates an implied right of action for injunctive relief. Other decisions from district courts in this Circuit are consistent with *California Nurses Association*. *See Kennedy v. Meta Platforms, Inc*. No. 3:24-cv-02869, 2024 WL 4031486, at *6 (N.D. Cal. Sept. 3, 2024) ("It is well established that § 11(b) reaches beyond government actors, affording a private right of action . . . . (citation and internal quotation marks omitted)); *Krabach v. King Cnty.*, No. 2:22-cv-1252, 2023 WL 7018431, at *3 (W.D. Wash. Oct. 25, 2023) (holding that an implied right of action exists under Section 11(b) of theVoting Rights Act); *Arizona Democratic Party v. Arizona Republican Party*, No. 16-cv-03752, 2016 WL 8669978, at *4 (D. Ariz. Nov. 4, 2016) (recognizing that Section 11(b) of the Voting Rights Act "does not exclude a private right of action for injunctive relief, as Plaintiff has brought here").

i. Is there any binding Supreme Court or Ninth Circuit authority that would require this Court to reach a different conclusion than the persuasive authorities cited above?

B. **To Defendants**: What evidence supports Defendants' assertion that it provided "credible evidence that certain ballots may be unlawful to count," given the reported "missing and jumbled information" in the voter list and Secretary Weber's stated concerns about DHS's methodology and data reliability? Identify the verification undertaken before demanding that election officials confirm citizenship or withhold ballot processing within 24 or 48 hours, and explain how the evidence supports those demands rather than further investigation. *See* ECF 19-8, Exs. 23, 31–32; ECF 19-7, Exs. 11, 21.

**<u>Defendants state:</u>** The attached declarations of Nicolas Bartell and Eric McLoughlin, previously filed in *California I*, detail the methods used in compiling the list.

DHS compared voter-registration data with federal immigration records. DOJ's filings in *California I* describe the process, including use of a commercially available voter file. Evers Ex. 27, ECF 19-8 at 24. DHS reported using "multiple data sources… to further verify the identity of registrants and eliminate false positives." *Id.* at 25. Holmes says he "understand[s]" DOJ used LexisNexis for "some part" of its search. Holmes Decl. ¶ 19.

Washington and Butte County show that the requested check works. Washington compared the list with its rolls and with Department of Licensing records. It found that "multiple people" had presented U.S. birth certificates, passports, or naturalization certificates. Holmes Decl. ¶¶ 24–25. Butte County found that 32 of its 45 unique names were not on its active rolls, and 7 lacked enough information to match. Evers Ex. 32, ECF 19-8 at 43. Identifying citizens and non-registrants is what the letters asked for.

Lastly, in addition to the list itself which is credible evidence, Defendants refer the Court to the Press Release, Department of Justice *28 Foreign Nationals Arrested on Charges that they Illegally Registered and Voted* (October 19, 2026). These individuals are on the list.

C. What legal and factual basis distinguishes Defendants' repeated warnings of criminal prosecution from the intimidation prohibited by Section 11(b), given the Washington Director of Elections' account of the letters, the reported pursuit of criminal subpoenas, and the court's admonition in *United States v. California* that "these threats must stop"? *United States of America v. California*, ("*California I*"), Case No. 2:26-cv-12025 (C.D. Cal. Oct. 28, 2026), ECF 19 at 7.

**III. CONSTITUTIONAL CLAIMS**

A. If "Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute." *Gregory v. Ashcroft*, 501 U.S. 452, 460-61 (1991). The court in *California I* said any litigant who "believes requiring additional confirmation of citizenship is necessary for vote-by mail ballots … the appropriate audience for that suggestion, in full accord with the plain language of the Elections Clause, is Congress, not the Courts." United States v. California, No. 26-7070 at 13 (9th Cir. 2026) (Bennett, J., concurring)

(citing Watson, 609 U.S. at 695) ("[P]olicy arguments are properly directed to legislatures, not courts."). The *California I* court went on to note that "Congress knows how to displace state election procedures with federal law." *See* National Voting Registration Act of 1993 (52 U.S.C. § 20510(a)); Help America Vote Act of 2002 (HAVA) (52 U.S.C. § 2111); Voting Rights Act of 1965 (52 U.S.C. § 10307(a)); Voting Accessibility for the Elderly and Handicapped Act of 1984 (VAEHA) (42 U.S.C. §§ 1973ee–1973ee-6).

i. **To Defendants**: While *California I* addressed the authority 18 U.S.C. § 611 grants the executive branch with respect to segregating and counting ballots, the rationale applies here. What statutory authority do Defendants' claim authorizes them to send letters to officials and employees in California (and other states) warning of criminal prosecution under an aiding and abetting theory against any election worker who processes ballots the Department of Justice purports to belong to unlawful voters?

**Defendants state:** At the outset, Defendants respectfully note that *California I* rested on a statutory argument that differs from the claims Plaintiffs raise here. Instead, Plaintiffs here raise a general constitutional theory about states' rights based on the Elections Clause and the Tenth Amendment. But as Defendants have explained, the former does not concern executive enforcement or states' rights, but is rather a recognition of Congress's powers in a particular area. *See* ECF No. 33 at 12. And the latter is not an independent grant of power, nor does it bar Executive Branch investigations or the prosecutions of valid federal criminal laws. *See id.*

The letters rely on federal criminal statutes enacted by Congress that apply to election officials. Holmes Ex. C, ECF 19-4 at 27–33 (collecting them). Those include the following:

- 18 U.S.C. § 611: noncitizen voting in federal elections.
- 18 U.S.C. § 2: aiding and abetting.
- 52 U.S.C. § 20511(2)(B): knowing and willful "procurement, casting, or tabulation" of fraudulent ballots, expressly including by "an election official."
- 52 U.S.C. §§ 10307(c), 21144: false information in registering or voting.
- 18 U.S.C. §§ 1015(f), 911: false claims of citizenship.

- 52 U.S.C. §§ 20701–02: willful failure to preserve election records.

The Attorney General also has express civil enforcement authority. 52 U.S.C. §§ 20510(a). Moreover, the Executive Branch is charged by the Constitution to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. And as the Supreme Court has recognized, "the President's duty to 'take Care that the Laws be faithfully executed' plainly encompasses enforcement of federal election laws passed by Congress." *Trump v. United States*, 603 U.S. 593, 626-27 (2024).

B. Is *Bennett v. Yoshina*, 140 F.3d 1218, 1226-1227 (9th Cir. 1998) the most recent authority from this Circuit to support Plaintiffs' Fifth Amendment Due Process claim?

**IV. APA CLAIMS**

A. The Supreme Court has "long taken" a "pragmatic approach" to the question what constitutes final agency action. *San Francisco Herring Ass'n v. Dep't of Interior*, 946 F.3d 564, 577-78 (9th Cir. 2019) (quoting *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 599, (2016)). Procedurally, this case is similar to *San Francisco Herring Ass'n*. There, the Ninth Circuit found that allegations that, based on the defendant's conduct, a member of the San Francisco Herring Association "understood that if he disobeyed the [government's] orders, he would be subject to federal prosecution" were "enough to sustain [the] action" under the final agency action requirement of an APA claim. *Id.* at 577. The Ninth Circuit distinguished orderingcertain conduct "on pain of fines and imprisonment—backed by formal agency notices clearing up reported [jurisdictional disputes" from "mere restatements of the law," "guides containing answers to frequently asked questions," or agency letters that are "purely informational in nature." *Id.*

i. Describe the features of Defendants' letters which make Defendants' conduct more similar to or distinguishable from that conduct found to constitute final agency action in *San Francisco Herring Ass'n v. Dep't of Interior*, 946 F.3d 564 (9th Cir. 2019).

B. Explain how Defendants' conduct accords with Justice Manual § 9-85.300's instruction to "generally avoid interfering or appearing to interfere with election administration, tabulation, validation,

or certification," and identify what evidence of an election official's knowledge or intent, beyond receipt of Defendants' voter list, supports the threatened aiding-and-abetting liability. *See* ECF 19-4, ¶¶ 11–12 & Ex. C; ECF 19-8, Exs. 31–32, 37, 42

**V. RELIEF**

A. Federal courts may grant relief only to the extent "necessary to provide complete relief to each plaintiff with standing to sue." *Trump v. CASA, Inc*., 606 U.S. 831, 861 (2025). However, an injunction that protects non-parties may be appropriate if necessary to afford complete relief to the parties in the case. In *CASA*, the Court gave the example of a nuisance case seeking to prevent someone from playing their music too loud. *Id*. at 851–52. Moreover, CASA declined to disrupt the general understanding that the APA authorizes federal courts to universally vacate federal agency action. *See id.* at 847 n.10.

i. **To Both Parties**: Please discuss whether either of these two exceptions to CASA's general rule prohibiting relief to non-parties applies in this case.

**<u>Defendants state:</u>** Neither exception applies. Complete relief for four associations and their identified members does not require an order protecting every election official, election worker, and voter in the country, or in any state. Each member's claimed injury is that member's own fear of prosecution or of a ballot being set aside. Relief limited to members redresses it fully. CASA's footnote on APA vacatur reserved the question and did not decide it. It cannot support universal relief here in any event. The letters are not final agency action. Interim APA relief is limited by 5 U.S.C. § 705 to what is "necessary to prevent irreparable injury' to the parties. And vacating letters addressed to non-party states and counties would be a universal injunction under another name.

ii. **To Both Parties**: Discuss the implication of the Court narrowing the scope of the TRO to the Northern District of California, to the state of California, or to the states of Washington and California.

**<u>Defendants state:</u>** Under CASA, the correct limit is by party, not by place. Relief should run to Plaintiffs and their identified members, wherever they are. A geographic limit narrows the overbreadth, but it still protects non-parties inside the chosen area. If the Court nonetheless chooses a geographic limit,

the Northern District of California is the least problematic choice. A California-wide order would overlap with *California I* and its pending appeal, and with grand jury proceedings in the Central District. Adding Washington would extend relief into Washington's federal districts on the basis of a non-party declarant, where DOJ has taken no enforcement step.

B. **To Plaintiffs**: Please identify the particularized need for the language asking the Department of Justice to inform this Court of any "pending search warrant applications, grand jury subpoenas, or other demands to access election materials," and of efforts to "compel testimony related thereto."

**C. To Both Parties**: Describe, procedurally, how the Court's issuance of an indicative ruling differs from this Court modifying its October 30, 2026, Temporary Restraining Order.

**Defendants state:** While the appeal on the injunctive order is pending, this Court no longer has jurisdiction to dissolve or even modify the injunctive order in a way that would "materially alter the status of the case on appeal." The proper route is for the Court to rule on the motion to stay and/or render an indicative ruling on the motion to dissolve.

Dated: November 2, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

*/s/ Kenneth J. Kao*
KENNETH J. KAO
Assistant United States Attorney

Attorneys for Defendants