Dana Paikowsky (SBN 329562)
Bruce V. Spiva (SBN 164032)
Rachel Appel*
Valencia Richardson*
Alice Huling*
CAMPAIGN LEGAL CENTER
1333 New Hampshire Ave. NW, Suite 300
Washington, DC 20036
(202) 736-2200
dpaikowsky@campaignlegalcenter.org
bspiva@campaignlegalcenter.org
rappel@campaignlegalcenter.org
vrichardson@campaignlegalcenter.org
ahuling@campaignlegalcenter.org

Shelby Wayment (SBN 350937)
Safeguarding Democracy Project
UCLA School of Law
385 Charles E. Young Dr.,
East Los Angeles, CA 90095
(310) 206-3103
wayment.shelbyk@gmail.com

*Counsel for* amicus curiae *Justice Connection*
**Pro Hac Vice application forthcoming*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO, et al.,<br>Plaintiffs,<br>v.<br>UNITED STATES DEPARTMENT OF JUSTICE, et al.,<br>Defendants. | Case No. 3:26-cv-12800-TLT<br><br>**BRIEF OF *AMICUS CURIAE* JUSTICE CONNECTION IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' EX PARTE MOTION TO STAY TEMPORARY RESTRAINING ORDER OR, IN THE ALTERNATIVE, REQUEST FOR AN INDICATIVE RULING PURSUANT TO FED. R. CIV. P. 65(b)(4)**<br><br>Judge: Trina L. Thompson<br>Ctrm: Courtroom 09, 19th Floor<br>Date: November 2, 2026<br>Time: 11:00 a.m. |

## INTEREST OF *AMICUS CURIAE*[1]

Justice Connection provides direct support to the Department of Justice's ("DOJ") current and former apolitical career workforce. As a network of DOJ alumni, it connects current and recent employees with pro bono legal representation, mental health counseling, whistleblower assistance, FBI support, employment help, coaching, and media support. It also advocates for the integrity of DOJ's mission-critical work and speaks out in defense of the rule of law. Justice Connection operates as an independent 501(c)(3) organization. Its team of staff and advisors include former prosecutors, civil litigators, judges, FBI agents and analysts, and national security experts, who served in components across DOJ, under both Republican and Democratic administrations. Its DOJ Alumni Network—comprising thousands of former DOJ and FBI employees—includes many who enforced election integrity and voting rights laws at the Department. Justice Connection submits this brief because it has a direct interest in ensuring that DOJ's law enforcement work remains apolitical and lawful, and that DOJ is held accountable when it is not.

## INTRODUCTION

In its role enforcing Section 11(b) of the Voting Rights Act, 52 U.S.C. § 10307(b) (hereinafter "Section 11(b)"), the United States has argued that the statute "is to be given an expansive meaning." *See, e.g.*, Statement of Interest of U.S. at 4, *United States v. Alabama*, No. 2:24-cv-01329 (N.D. Ala. Oct. 9, 2024), ECF No. 27 (quoting *Jackson v. Riddell*, 476 F. Supp. 849, 859 (N.D. Miss. 1979)). In that capacity, it recognized that Section 11(b) includes a private right of action. It also often called upon courts to determine whether typically authorized or lawful activities have been undertaken in an unlawful manner or to achieve unlawful ends and asserted that abuses of law enforcement authority fall within that scope. Consistent with this understanding of the law and the important concerns animating it, in the past, the United States voluntarily adopted policies and practices that carefully

[1] Proposed *Amicus Curiae* Justice Connection states that no counsel for a party authored this brief in whole or in part, and no person or entity, other than *Amicus* and its counsel, made a monetary contribution to the preparation or submission of the brief.

limited federal law enforcement activities around elections to minimize the risk of intimidation, avoid undue interference in ongoing elections, and respect state administration of elections.

This Administration has set aside these well-supported interpretations of federal law and historically restrained law enforcement approaches by publicly threatening to criminally prosecute elections officials—in every county in California—for doing their jobs and asserting the authority to take other extraordinary (and unlawful) steps to interfere in the ongoing election. These unprecedented actions by the Department of Justice—and others—undermine any claim the United States has to the "presumption of regularity" it has historically been accorded. Defs.' *Ex Parte* Mot. to Stay TRO at 14 ("Defs.' Mot.").[2] The district court's temporary restraining order ("TRO") appropriately ensures that the United States complies with federal law; it is also consistent with Department policy and practice and thus does not improperly constrain the executive's ability to engage in legitimate law enforcement activities. At bottom, Defendants cannot avoid complying with Section 11(b) by cloaking themselves in law enforcement authority. If courts cannot narrowly enjoin unlawful abuses—as the district court rightly did—these federal protections would be hollow. This Court should deny Defendants' *Ex Parte* Motion to to Stay Temporary Restraining Order, or in the alternative, Request for an Indicative Ruling Pursuant to Fed. R. Civ. P. 65(b)(4).

## ARGUMENT

### I. The United States has consistently recognized that state power can be wielded in an unlawful manner or to achieve unlawful ends in violation of Section 11(b).

In its past enforcement actions, the United States has recognized Section 11(b) affected a "broad prohibition against intimidation, threats, and coercion." Statement of Interest of U.S. at 4, *League of Women Voters of N.H. v. Kramer*, No. 1:24-cv-00073 (D.N.H. July 25, 2024), ECF No. 86; *see also* Statement of Interest of U.S. at 1, *Colo. Mont. Wyo. State Area Conf. of the NAACP v. U.S. Election Integrity Plan*, No. 1:22-cv-00581 (D. Colo. Jan. 3, 2023), ECF No. 74 (arguing that "Section 11(b) comprehensively prohibits voter intimidation"). Consistent with that understanding—as well as

[2] Walter Olson, *Do the Feds Still Merit the Court's Presumption of Regularity?*, CATO Inst. (Jan. 8, 2026), https://perma.cc/EYL7-W5RL.

the statutory text, history, and precedent—the United States has historically fought to defend Section 11(b)'s private right of action and recognized that its reach extends to abuses of lawful authority or legal process—including state actors' abuses of investigatory, prosecutorial, and law enforcement authority. No changes in law or facts provide reason or justification for Defendants' radical reversal in federal position.

The United States has repeatedly exercised the authority granted to it under 28 U.S.C. § 517 to intervene in private litigation to submit Statements of Interest urging courts to uphold Section 11(b)'s private right of action and "ensur[e] the proper interpretation of Section 11(b)." U.S. SOI at 1, *Kramer*, ECF No. 86; *see, e.g.*, U.S. SOI at 1, *Alabama*, ECF No. 27; U.S. SOI at 1, *U.S. Election Integrity Plan*, ECF No. 74. In these cases, the United States grounded its arguments in the text of the statute—arguments that directly contradict those raised by the United States in this case, *compare* U.S. SOI at 7 n.2, *Kramer*, ECF No. 86, *with* Defs.' Mot. at 8–9—and highlighted that nearly every court to consider this question has found a private right of action. The United States also explained that declining to find a private right of action in Section 11(b) would undermine the statute's purpose, given the "limited federal resources available to enforce the Voting Rights Act." U.S. SOI at 13, *U.S. Election Integrity Plan*, ECF No. 74.

Moreover, the United States has long recognized that, in Section 11(b) cases, "courts are often called upon to determine when otherwise lawful activities are being used for unlawful ends." U.S. Br. at 18, *Fair Fight, Inc. v. True the Vote, Inc.*, No. 2:20-cv-0302 (N.D. Ga. Jan. 17, 2023), ECF No. 192. The fact that a defendant may have undertaken the challenged activities pursuant to some plausible statutory or executive authority, then, is far from dispositive in assessing whether those actions violate Section 11(b). As the Department explained:

> [C]ompliance with state law and procedure is not sufficient to inoculate otherwise unlawful voter challenges from liability under Section 11(b), contrary to Defendants' suggestion. Defs.' Br. at 12. Section 11(b) was designed to provide a remedy against government officials and others who weaponized state law to intimidate and coerce voters with conduct ranging from baseless arrests and prosecutions to abuse of voter registration laws, challenges, and purges.

*Id.* at 19 n.9; *see also Voting Rights Act of 1965: Hearing Before the H. Comm. on the Judiciary*, 89th Cong. (1965) (statement of Nicholas Katzenbach at 8–9, Att'y Gen. of the U.S.,

https://perma.cc/N9S4-KH2P ("Katzenbach Statement")) (highlighting the failure of predecessor statutes to address intimidation by government officials). These arguments have also come up in Section 11(b) enforcement actions related to activities like voter outreach, voter challenges, and private poll monitoring, practices ordinarily authorized or even protected by law. *See* Statement of Interest of U.S. at 4–10, *Nat'l Coal. on Black Civic Participation v. Wohl*, No. 20-cv-08668, (S.D.N.Y. Aug. 12, 2022), ECF No. 235; Statement of Interest of U.S. at 7–13, *Fair Fight, Inc. v. Catherine Engelbrecht*, No. 24-10372 (11th Cir. May 20, 2024), ECF No. 27; Statement of Interest of U.S. at 4–11, *League of Women Voters of Ariz. v. Lions of Liberty LLC*, No. 22-cv-08196 (D. Ariz. Oct. 31, 2022), ECF No. 17. But courts have found that the right to engage in these activities is not unlimited and must yield when the manner in which a person undertakes these activities becomes intimidating, threatening, or coercive. The same logic applies to misuse of law enforcement authority and investigatory tactics.

In determining whether such activities run afoul of 11(b), the United States and courts have emphasized that a holistic analysis is required. Relevant factors, according to the United States, include whether the challenged activities occur close in time or place to elections and whether they would subject individuals to public scrutiny or opprobrium. U.S. SOI at 7, *Lions of Liberty LLC*, ECF No. 17; U.S. SOI at 18, *Kramer*, ECF No. 86. The United States has also consistently explained that private parties' use of law enforcement tactics, such as interrogations, surveillance, or threats of legal consequences, can give rise to significant concern under Section 11(b). *E.g.*, U.S. SOI at 5–8, *Lions of Liberty*, ECF No. 17; U.S. SOI at 12, *Kramer*, ECF No. 86. And private parties' use of these kinds of tactics paired with "formal governmental processes" can exacerbate intimidating effects because these actions "carry the official imprimatur of the state" and "can raise the specter of administrative difficulties and . . . adverse legal consequences." U.S. Br. at 13, *Fair Fight, Inc. v. True the Vote, Inc.*, ECF No. 192. There is no question that threats of adverse legal action are even more colorable when such conduct is undertaken by someone with actual power.

Courts, too, have recognized that prosecutions or other adverse government actions taken in retaliation for the exercise of rights can violate the Constitution. "To punish a person because he has

done what the law plainly allows him to do is a due process violation of the most basic sort . . . and for an agent of the State to pursue a course of action whose objective is to penalize a person's reliance on his legal rights is patently unconstitutional." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978) (citation modified) (discussing what rises to the level of vindictive prosecution); *see also Nieves v. Bartlett*, 587 U.S. 391, 402 (2019) (describing the elements of a First Amendment retaliation claim). In holding that prosecutions can violate constitutional rights, the Supreme Court emphasized that even "the fear of . . . vindictiveness may unconstitutionally deter a defendant's exercise" of rights. *Blackledge v. Perry*, 417 U.S. 21, 28 (1974). Courts' recognition that government action taken under color of law, including baseless or vindictive prosecutions, can have the practical effect of discouraging the exercise of an array of political rights contextualizes how such actions can constitute voter intimidation under Section 11(b). And outside of this context, it is well established that courts can (and must) limit prosecutorial and law enforcement discretion to ensure compliance with the Constitution. *Barnes v. Felix*, 605 U.S. 73 (2025) (the Fourth Amendment protects against excessive force by law enforcement officers); *Haynes v. Washington*, 373 U.S. 503 (1963) (threats and coercion cannot be used to obtain confession); *Miranda v. Arizona*, 384 U.S. 436 (1966) (the Fifth Amendment protects people suspected of crimes from self-incrimination); *Gideon v. Wainwright*, 372 U.S. 335 (1963) (those accused of crimes have a constitutional right to legal counsel); *Brady v. Maryland*, 373 U.S. 83 (1963) (withholding exculpatory evidence violates due process). That is no less true in the context of Section 11(b).

## II. The TRO is consistent with longstanding government policy and practice and is not overly burdensome.

Consistent with its long understanding of Section 11(b), the federal government historically embraced a careful and restrained law enforcement approach around elections to minimize the risk that federal law enforcement activities will intimidate voters and individuals who aid voters, disrupt the federalism interests that delegate election administration largely to the states, or otherwise interfere in the democratic process. The actions and conduct challenged here run contrary to this well-founded approach. And in response to these unprecedented actions, the Court's Order does not impose

unreasonable or overly burdensome restrictions on law enforcement activities. Rather, it requires the Department to adhere to reasonable limitations on its exercise of law enforcement power and to operate consistently with its own policies mandating restraint around election-related law enforcement activities during ongoing elections, as provided in the Department of Justice's Federal Prosecution of Election Offenses Manual ("Election Offenses Manual"), the Justice Manual's instructions regarding the non-interference in elections, FBI Domestic Investigations and Operations Guide § 4.4 (2024) ("DIOG"), and the Civil Rights Division's election monitoring program.

As a threshold matter, the DIOG specifically requires that the "'least intrusive' means or method be considered and . . . used to obtain intelligence or evidence in lieu of a more intrusive method."[3] Consistent with the DIOG, the Election Offenses Manual explains that, for election fraud matters, "in most cases voters should not be interviewed, or other voter-related investigations done, until after the election is over" because "[s]uch overt investigative steps may chill legitimate voting activities."[4] Accordingly, the Election Offenses Manual specifically instructs that "the Department should not engage in overt criminal investigative measures in matters involving alleged ballot fraud until the election in question has been concluded, its results certified, and all recounts and election contests concluded."[5] Overt criminal investigations were directed to occur after the election and any preliminary fact gathering was to be done discreetly because of the perception of such investigations by voters and the public at large.[6] Anything beyond a preliminary investigation required approval from the prosecutors in the Department's Public Integrity Section ("PIN"). But the Administration has also crippled PIN, reducing it from 36 attorneys to around just two, leaving the workforce depleted and rendering few of the historical internal constraints or checks on investigative activity related to election crimes intact.[7]

Importantly, the Election Offenses Manual emphasizes that the federal government's role is

---

[3] DIOG § 4.4.
[4] Federal Prosecution of Election Offenses 12 (Richard C. Pilger ed., 8th ed. 2017).
[5] *Id.*
[6] *Id.* at 12–13.
[7] *See* Jose Pagliery, *The Justice Department Had 36 Lawyers Fighting Corruption Full-Time. Under Trump, It's Down to Two.*, The Wash. Sun (Sep. 22, 2025), https://perma.cc/459L-2FRD.

*not* prevention or intervention, but prosecution *after* crimes have occurred—again—in part to protect voters and safeguard the democratic process.[8] This position has been consistent for decades. The 1984 Election Offenses Manual described that "the fact that the Constitution expressly leaves the States primary responsibility for the conduct of elections raises federalism that make federal intervention in all but the most serious of these matter inappropriate."[9] In investigating and prosecuting election fraud crimes, prosecutors were directed to be deferential to state officials and act as a "last resort to redress longstanding patterns of egregious electoral abuse."[10] Likewise, the Justice Manual instructions regarding the non-interference in elections caution that "[t]he Department has a limited role in these processes and should generally avoid interfering or appearing to interfere with election administration, tabulation, validation, or certification."[11]

The necessity of federal restraint in its election-related law enforcement activities is also apparent in the Department's approach to civil election-related law enforcement activities. For example, the Civil Rights Division structured its election monitoring program—one of the primary investigatory and information-gathering apparatuses on the civil enforcement side—to minimize the risk it would intimidate voters, declining to allow criminal prosecutors, investigators, and others who supported criminal work to participate in these efforts.[12]

The challenged actions here run afoul of both the spirit and letter of these policies. Defendants nevertheless try to recast the exceptional as banal, arguing that "Plaintiffs' allegations show at most that Defendants have addressed and pursued suspected violations of federal law" and accordingly "asked that state and local election officials and workers to temporarily 'pause or segregate ballots' from individuals the federal government has credibly flagged in order to confirm that such individuals are citizens eligible to vote in accordance with federal law." U.S. Br. at 10. But this overlooks several critical facts, including that the lists the United States provided to officials were replete with errors

---

[8] Federal Prosecution of Election Offenses 9.

[9] Federal Prosecution of Election Offenses 49 (Craig C. Donsanto ed., 4th ed. 1984).

[10] *Id.*

[11] U.S. Dep't of Just., Just. Manual § 9-85.300 (2018).

[12] *See* Compl. at 4, *NAACP v. Blanche*, No. 1:26-cv-03626 (D.D.C. Oct. 16, 2026), ECF No. 1; Stephanie Berger & Regan Rush, *Inside DOJ's Election Monitoring Program, Past and Present*, Red Line for Civil Rights (Sep. 29, 2026), https://perma.cc/XFG3-DTKJ.

and included eligible voters; that officials have separate legal obligations under federal and state law to process ballots from eligible voters; and that the efforts the United States has thus far made to require California officials to comply with its efforts have been roundly halted by federal courts deeming them unsupported by law. Pls.' Opp'n Br. at 5; 14–15. In this case, the United States has not only failed to substantiate their claims that their requests were limited only to ineligible voters—a claim that has been disproven in other fora—but also failed to reckon with the fact that states have the power to maintain their voter rolls, not the federal government, a constitutional balance the Election Offenses Manual expressly recognizes.[13]

This Court's Order appropriately recognizes the extraordinary nature of the government's actions here and imposes remedial restrictions on the Department's activities that are consistent with its past practice and thus do not overly burden legitimate law enforcement activities. Importantly, the Order still allows the Department to investigate state and local election officials who are not otherwise complying with state and federal law. It simply restricts the Department from making threats to election officials based solely on the Department's unsubstantiated allegations of an individual's ineligibility and from threatening criminal prosecution if election officials permit lawfully registered voters to vote. Order at 7. For example, most ballot fraud cases hinge on records that election officials are required by law to preserve. The Department—pursuant to the Order—can still act if there is evidence that a jurisdiction is destroying records in violation of these laws. The Department can also still investigate and prosecute matters involving officials illegally facilitating voting for non-citizens, so long as those law enforcement actions are not predicated solely on an official's refusal to obey the unlawful federal directives at issue here.

As former federal law enforcement officials recently represented in a related matter, "the government's asserted harm should be measured against what the order actually does": "the order affects when certain steps may be taken, not whether the government may investigate."[14] The fact that

---

[13] *Supra* note 4, at 7.

[14] Br. of *Amicus Curiae* Former Law-Enforcement and Immigration-Enforcement Officials, and Former Federal Prosecutors at 10, *Cal. Nurses Ass'n v. Mullin*, No 26-7139 (9th Cir. 2026), ECF No. 32.1

DOJ policy long cautioned against or proscribed law enforcement operations of this nature evidences how the district court's injunction, which permits investigations into crimes without coercive threats, "costs an investigation nothing"[15] but safeguards the integrity of a federal election.

## CONCLUSION

For the above reasons, *Amicus* Justice Connection urges the Court to deny Defendants' *Ex Parte* Motion to Stay Temporary Restraining Order, or in the alternative, Request for an Indicative Ruling Pursuant to Fed. R. Civ. P. 65(b)(4).

Dated: November 2, 2026

Respectfully submitted,

/s/ *Dana Paikowsky*

Shelby Wayment (SBN 350937)
Safeguarding Democracy Project
UCLA School of Law
385 Charles E. Young Dr.,
East Los Angeles, CA 90095
(310) 206-3103
wayment.shelbyk@gmail.com

Dana Paikowsky (SBN 329562)
Bruce V. Spiva (SBN 164032)
Rachel Appel*
Valencia Richardson*
Alice Huling*
CAMPAIGN LEGAL CENTER
1333 New Hampshire Ave. NW, Suite 300
Washington, DC 20036
(202) 736-2200
dpaikowsky@campaignlegalcenter.org
bspiva@campaignlegalcenter.org
rappel@campaignlegalcenter.org
vrichardson@campaignlegalcenter.org
ahuling@campaignlegalcenter.org

*Counsel for Amicus Curiae Justice Connection*

**Pro Hac Vice application forthcoming*

---

[15] *Id.* at 9